IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

TRACY LANE BEATTY,                          §
                            Petitioner,     §
                                            §
v.                                          §        NO.4:09-cv-00225
                                            §        Hon. Richard A. Schell
RICK THALER, Director                       §        (Death Penalty Case)
Texas Department of Criminal Justice,       §
Correctional Institutions Division,         §
                            Respondent.     §


# RESPONDENT'S MOTION FOR SUMMARY JUDGMENT
# WITH BRIEF IN SUPPORT


GREG ABBOTT                                     EDWARD L. MARSHALL
Attorney General of Texas          Chief, Postconviction Litigation Division

DANIEL T. HODGE
First Assistant Attorney General               *GEORGETTE P. ODEN
                                             Assistant Attorney General
DON CLEMMER                              Postconviction Litigation Division
Deputy Attorney General
For Criminal Justice                    P.O. Box 12548, Capitol Station
                                          Austin, Texas 78711-2548
*Counsel of Record                              (512) 936-1400

_____

ATTORNEYS FOR RESPONDENT

## RESPONDENT'S MOTION FOR SUMMARY JUDGMENT
## WITH BRIEF IN SUPPORT

Petitioner Tracy Lane Beatty (Beatty) was properly convicted of the capital murder of his mother Carolyn Click during the course of a robbery and was sentenced to death. He now challenges his presumptively valid death sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254.  For the reasons discussed below, Beatty fails to demonstrate he is entitled to federal habeas relief.

## PETITIONER'S ALLEGATIONS

In this federal habeas proceeding, Beatty raises the following allegations:

1.    His attorneys were ineffective during the punishment stage for failing to investigate, discover, and present evidence in mitigation, and

2.    His attorneys were ineffective during the guilt-innocence stage for failing to investigate facts which would have shown this crime was mere murder rather than capital murder

both in violation of his Sixth Amendment rights.  Pet., ECF No. 13, at 15.  These requests for relief must fail.  Beatty cannot show that the state courts unreasonably applied clearly established federal law or that they unreasonably determined the facts.  Also, he fails to present clear and convincing evidence to overcome the presumption of correctness due to the state court's factual findings. Therefore, the requested relief should be denied.

## STATEMENT OF THE CASE

Beatty was indicted in 2004 in the 241st Judicial District Court of Smith

County, Texas, for the capital offense of murdering Carolyn Click in the course of committing or attempting to commit the offense of robbery which occurred on or about November 25, 2003.  1 CR 8[1]; *see* Tex. Penal Code Ann. §19.03(a)(2) (Vernon 2003).  In 2004, Beatty was tried before a jury upon a plea of not guilty and was found guilty of capital murder.  2 CR 237-238.  Following a separate punishment hearing, the jury answered the two special sentencing issues submitted pursuant to Article 37.071(b) of the Texas Code of Criminal Procedure.  2 CR 234-236.  In accordance with their verdict and state law, on August 11, 2004, the trial court assessed Beatty's punishment at death.  2 CR 241.

Beatty appealed his conviction and sentence to the Texas Court of Criminal Appeals, which affirmed.  *Beatty v. State*, 2009 WL 619191 (Tex. Crim. App. 2009)(not designated for publication).  No petition for writ of certiorari was filed.

The state petition for habeas corpus was filed on January 4, 2007, while direct appeal was pending.  *Ex Parte Beatty*, No. 59,939-02 (hereinafter *Ex parte Beatty*) at 1.[2]  In 2007, the trial court held an evidentiary hearing on the

---

[1] "CR" refers to the Clerk's Record of trial papers filed with the district court during Beatty's trial, preceded by volume number and followed by page number(s).

[2] The first writ of habeas corpus filed in state court was related to the trial court's finding of contempt against Beatty for failing to comply with the court's order to give a handwriting exemplar.

ineffective-assistance-of-counsel claims.  The Court of Criminal Appeals adopted the trial court's findings of fact and conclusions of law, with some exceptions, in their denial of Beatty's application for writ of habeas corpus on May 6, 2009.  *Ex parte Beatty* (not designated for publication).  It is important to note that Beatty errs in his recitation of the state court's ruling on the findings of fact and conclusions of law.  Pet., ECF No. 13, at 23-26.  The Court of Criminal Appeals did not adopt findings 60 and 61.

Beatty filed this federal petition for writ of habeas corpus on June 9, 2010. Pet., ECF No. 13.  This response is timely filed.

## STATEMENT OF FACTS

### I.    Facts of the Crime

[Beatty] and [his mother Carolyn Click] had a volatile and combative relationship. [Beatty] moved into Click's house in early October 2003. Although Click told her next-door neighbor and close friend, Betty McCarty, that [Beatty] had assaulted her several times in the past, Click said that she was excited about [Beatty]'s arrival. Click's excitement, however, vanished shortly after [Beatty] moved in. McCarty testified that Click told her that she asked [Beatty] to leave sometime in October and a second time on November 25, 2003--two days before Thanksgiving and the last day Click was seen alive. Around 4:00 p.m. on November 25th, Click went to McCarty's house. Click was "stressed out and crying."  Click told McCarty that she was unhappy about the way things were going with [Beatty] and that she had asked [Beatty] to leave:

[Prosecutor:] What did [Click] tell you?
[McCarty:] That she had asked him to leave that day, and that—she said, "I put up with all I'm going to put up with, and I had asked

him to leave," and she was upset about it. And that's the last time I saw her.

[Prosecutor:] Did she tell you what time that day she had told [[Beatty]] to leave?
[McCarty:] No, sir.

Although McCarty initially testified that Click said that she "asked" [Beatty] to leave, she later clarified that Click said, "I told [[Beatty]] to leave today." McCarty did not know exactly when the conversation with [Beatty] had occurred that day or when [Beatty] was supposed to leave:

[Defense counsel:] Did [Click] say specifically when . . . she had that conversation with [[Beatty]] or when he was supposed to leave by?
[McCarty:] No, sir. I saw her at 4:00, and I didn't know anything about it until that time. So I don't know what time she told him.

[Beatty]'s cousin, Stacey Killough, testified that [Beatty] arrived at her house later that day between 5:00 and 5:30 p.m. driving Click's car. Killough testified that the drive from Click's house to her house takes approximately forty-five minutes. [Beatty] smelled of alcohol but was not intoxicated. Noting Click's absence, Killough became suspicious because Click was "very protective" of her car and never let anyone else drive it. In fact, Killough had previously seen Click refuse to let [Beatty] drive the car. When Killough asked [Beatty] where Click was, [Beatty] told her that Click was out of town with a friend and would not be back for a few weeks. Because Killough was busy, [Beatty] stayed at Killough's house for only five to ten minutes.

Lieanna [sic] Wilkerson testified that she lived across the road from Click and that they had become close friends. Click told Wilkerson that [Beatty] had assaulted her on several occasions in the past. Once [Beatty] had "beaten her so severely that he had left her for dead." Click was nevertheless excited that [Beatty] was coming to live with her and hoped that she and [Beatty] could mend their relationship. After [Beatty] moved in with Click, Wilkerson hired him to do odd jobs around her house because he was unemployed. The two became friends, and Wilkerson referred to [Beatty] as

"Trey." [Beatty] went to her house when he and Click would argue, which was daily. Toward the end of October and the first part of November, [Beatty] house-sat for Wilkerson while she was out of town for several days. Wilkerson extended the offer to [Beatty] because she was concerned about [Beatty] and Click fighting, and she thought it would give them an opportunity to separate from each other. When Wilkerson returned home, [Beatty]'s suitcase was sitting in the living room. [Beatty] told Wilkerson that Click had packed his things and brought them over. Wilkerson understood this to mean that Click had packed [Beatty]'s suitcase in an effort to kick him out. [Beatty], however, returned to Click's house and continued to live with her. According to Wilkerson, [Beatty] and Click fought daily in November.

Wilkerson described a conversation that she had with [Beatty] in the middle of November in which he expressed his anger with Click. [Beatty] told Wilkerson about missing a job interview with an electric company that he had been very excited about. Click refused to drive him to the interview, saying that "she just didn't feel like it." Wilkerson knew that [Beatty] could not drive himself because Click refused to let [Beatty], who did not have a driver's license, borrow her car. Around the same time, [Beatty] told Wilkerson that he thought about harming Click:

[Wilkerson:] I know [[Beatty]] had said they were underpinning her house, and he had gotten upset . . . . And they had gotten into a huge fight, and she was yelling at him, and he just made an offhand comment, "I can't believe she handed me that hammer." He said, "Because all I could think about was hitting her in the head with it." And I said, "Trey," and he goes, "Well, I couldn't do it." He said, "If I shoved her under there, she would have just started stinking."

[Prosecutor:] She handed it - she being Carolyn Click, handed him a hammer. He thought about hitting her with it, rolling her underneath the house, but she would start to stink?
[Wilkerson:] Right. And I just thought he was joking.
[Prosecutor:] Did he ever make any references to hurting her, to choking her, to hitting her?

5

[Wilkerson:] Several times he had said he just wanted to shut her up, that he just wanted to choke her and shut her up, that—they got into horrible fights.

Wilkerson testified that, on November 25th, [Beatty] ate spaghetti at her house around 6:00 or 6:30 p.m. and stayed at her house until 10:00 p.m., when he went home. The next day, [Beatty] gave Wilkerson a turkey. He told Wilkerson that he had bought it for Thanksgiving, but that Click had decided to go out of town with a man named "Junior," so they would not need it.

[Beatty] told various people multiple stories about how his mother died. [Beatty] first claimed to law enforcement officials that he came home one day and discovered that Junior had killed his mother. In response to this discovery, he stabbed Junior, disposed of his body in a lake, and buried his mother in the backyard. [Beatty] even took officers to a couple of different locations where he claimed to have submerged Junior's body. [Beatty] told them that he sliced Junior's body open so that it would fill with lake water and sink. In a statement three days later, [Beatty] reiterated the story involving Junior. But four days after that, [Beatty] told detectives that he "really didn't mean to" kill his mother: he "came in drunk," she "started bitching" at him, he choked her, she fell to the floor, and he did not realize that she was dead until the next day.

[Beatty] also told his cousin, John Clary, that he had "killed the bitch." He told Clary that he "had gone into the house, and there had been an argument, and [Click] had pulled a gun on him, so he went to choke her." When Clary told [Beatty] that he needed to turn himself in or go back home, [Beatty] inexplicably told Clary that he could not go back there because his mother "would have the cops looking for him."

[Beatty] also told differing stories about his mother's death to acquaintances with whom he spent time doing drugs, using Click's credit and debit cards, and disposing of Click's belongings in the weeks after her death. He initially told these acquaintances that his "aunt" had died and left him her property. He later told them "a friend" killed his mother and that he killed the friend to cover it up. He also said that he had killed "his mother's boyfriend" after

discovering that he had killed Click and that he buried both bodies in the woods.

[Beatty] gave differing stories to Wilkerson as well. First, he told her that he came home to find Click dead. Junior killed Click and attacked [Beatty], so [Beatty] killed him. He then described in great detail how he disposed of Junior's body by submerging it in the lake. He said that he buried his mother. Later, [Beatty] told Wilkerson that he hired a friend to kill Click and that he then killed the friend. Finally, [Beatty] said that he killed Click on the night of November 25th, when he returned home from having dinner at Wilkerson's house. Wilkerson testified:

The very last thing that—incident that [[Beatty]] told me what happened is he said when he left my house, he went directly across the street to her house and that she was waiting for him, and that when he came through the door, they had a horrible fight . . . .

[Beatty] told Wilkerson that he ended up choking Click until she fell to the floor. He said that he did not realize that she was dead until he woke up the next morning and saw her lying in the same place on the floor.

*Beatty v. State,* 2009 WL 619191 at *1-4.

## II.   Punishment Evidence

In the punishment phase, the State presented evidence regarding Beatty's extensive criminal history, including drug possession, theft, weapons possession, a brutal assault against a child under two years of age, and prior assaults against his mother, a correctional officer, and others. 46 RR 49-59; SX 64, 150, 151, 152, 153, 156, 157. When Beatty was booked into jail on the instant offense, a handcuff key was amongst his personal property and was introduced into evidence during the penalty phase. 42 RR 77-78; SX 155. A correctional officer

testified about the prevalence of violence in prison and specifically discussed Beatty's membership in a prison gang, a physical altercation he had with Beatty, and a shank that was found on Beatty.  46 RR 127-130, 134-135; SX 158, 161-169.  Royce Smithey, an investigator, testified about the potential for inmate violence in prison.  47 RR 25-35.  Dr. Tynus McNeel and Dr. Edward Gripon testified that Beatty would likely pose a future danger to society.  47 RR 160-179, 190-201.

After the State rested, an ex parte hearing took place on the record between the defense counsel, Beatty and the trial court.  48 RR 3-22.  In this proceeding, Beatty's trial counsel enumerated the steps they had taken to prepare for the penalty phase.  A psychiatrist and a psychologist had been appointed to assist the defense, but neither found any mitigating factors and indeed, indicated their opinion was that Beatty would pose a future danger.  *Id.* at 4-7.  Trial counsel pointed out that they, their investigator, and their mitigation expert all attempted to locate any possible mitigation witnesses without success.  *Id.* at 7-10.  Beatty himself indicated that he understood the position his defense team was in, and concurred that he did not want to testify nor did he want two possible witnesses called.  *Id.* at 17-21.

Before the jury, the defense rested without presenting any punishment evidence.  49 RR 18.

## STANDARD OF REVIEW

## I.    Anti-terrorism And Effective Death Penalty Act ("AEDPA")

Beatty filed his federal writ petition in 2010, thus review is governed by the federal habeas statutes as amended by the AEDPA.  *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997).  As an initial matter, habeas relief is inappropriate if a claim is not cognizable on federal review.  Beatty, confined pursuant to a state court judgment, is entitled to relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991).

Under 28 U.S.C. § 2254(d), a federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the relevant constitutional claim by the state court, (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court; or (2) "'involved an unreasonable application of'" clearly established Supreme Court precedent; or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (quoting *(Terry) Williams v. Taylor,* 529 U.S. 362, 412 (2000)); 28 U.S.C. § 2254(d).  The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or

9

confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. *Williams*, 529 U.S. at 405–06.

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Williams*, 529 U.S. at 406. To this end, a state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id*. at 407–09. And as the Supreme Court recently described this deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree that those arguments* or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 131 S. Ct. at 786 (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id*.

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Richter,* 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Woodford v. Visciotti,* 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state-

court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado,* 541 U.S. at 664. This is particularly true when reviewing a state court's application of *Strickland v. Washington*, 466 U.S. 668 (1984), which when analyzed in conjunction with § 2254(d), creates a difficult to surmount, "doubly" deferential assumption in favor of the state court denial. *Richter*, 131 S. Ct. at 786.

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter,* 131 S. Ct. at 786.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is *no possibility fairminded jurists could disagree* that the state court's decision conflicts with this Court's precedents. It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a "guard against *extreme malfunctions* in the state criminal justice systems," *not a substitute for ordinary error correction through appeal.*

*Id.* (emphasis added) (internal citations omitted).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th

Cir. 2001); *see also Catalan v. Cockrell*, 315 F.3d 491, 493  (5th  Cir.  2002) (". . . we review only the state court's decision, not its reasoning or written opinion . . . ."). Indeed, state courts are presumed to "know and follow the law." *Visciotti*, 537 U.S. at 24. And, even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, AEDPA's deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002); *Richter*, 131 S. Ct. at 786.

If the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the contrary to or unreasonable application standard. *Williams*, 529 U.S. at 381. Stated differently:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there *was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*Richter*, 131 S. Ct. at 786–87 (emphasis added). And a federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply to the facts at hand . . ." because such a process suggests the proposed rule is not clearly established. *Alvarado,* 541 U.S. at 666.

AEDPA also provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001).

And except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which a petitioner would challenge a state court fact finding must have been presented to the state court.  Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.  28 U.S.C. § 2254(d)(2).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) he establishes by clear and convincing evidence

that, but for constitutional error, no reasonable factfinder would have found him guilty.  28 U.S.C. § 2254(e)(2).  A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence.  *(Michael) Williams v. Taylor,* 529 U.S. 420, 436 (2000).  For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2).  *Id.* at 433.  But even if the petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits.  *Clark v. Johnson,* 227 F.3d 273, 284-85 (5th Cir. 2000).

## II.    Summary Judgment Standard In Habeas Corpus Cases

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000) (citing Rule 11, Rules Governing § 2254 Cases; Fed. R. Civ. P. 81(a)(2)).  Summary judgment is proper if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Martinez v. Johnson*, 255 F.3d 229, 237 (5th Cir. 2001) (citing *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 482 (5th Cir. 2000)); Fed. R.

Civ. P. 56 (c).

In ruling on a motion for summary judgment, a court views the evidence through "the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby*, 477 U.S. 242, 254 (1986). Thus, the application of the summary judgment standard to a habeas corpus case differs from its application in other civil cases to the extent that habeas' substantive evidentiary rules or burdens differ. In the ordinary civil context, courts must construe the facts of the case in favor of the non-moving party. *Id*. at 255. In the habeas context, however, where factual allegations have been adversely resolved by express or implied findings of the state courts and the petitioner fails to demonstrate, by clear and convincing evidence, that § 2254(e)(1)'s presumption of correctness should not apply, it is inappropriate for the court to resolve the facts of the case in petitioner's favor. *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983).

## ANSWER

**I.      Counsel Investigated As Thoroughly As Possible Given Resource and Time Constraints.  The Defense Presented No Mitigating Evidence Because All Was  Double-Edged And Because Beatty Himself Instructed Counsel Not to Present Two Witnesses. Beatty Proves Neither Deficiency Nor Prejudice, and the State Court Properly Found Beatty Failed to Show That Counsel Was Ineffective.**

Beatty contends his Sixth Amendment rights were violated because some witnesses were not contacted by the trial team and others who did testify were

15

not asked the right questions.  Pet., ECF No. 13, at 38.  Beatty explicitly limits his claim to ineffective assistance of counsel during punishment, not guilt-innocence.  *Id.* at 27, 35, 38-39.  He contends that the state court both unreasonably applied federal law and unreasonably determined the facts before it.  Pet., ECF No. 13, at 22.  Beatty failed to demonstrate either deficiency or prejudice to the state court, which properly denied relief after a full hearing including the testimony of the defense team and other witnesses. SHCR at 102-103.  Because his attorneys conducted a thorough investigation into Beatty's possible mitigation case, and because Beatty himself instructed his attorneys not to present any evidence during the penalty phase, the state court's decision was sound.

## A.    Legal standards applying to ineffective assistance claims

To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Harrington,* 131 S.Ct. at 171; *Strickland,* 466 U.S. at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by

16

the Sixth Amendment." *Strickland,* 466 U.S. at 687.

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010). "An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington,* 131 S.Ct. at 788, citing *Strickland*, 466 U.S. at 689-690. "Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'" *Harrington,* 131 S.Ct.

17

at 788( citing *Strickland*, 466 U.S. at 689); *see also Bell v. Cone*, 535 U.S. 685, 702 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington,* 131 S.Ct. at 788 (citing *Strickland*, 466 U.S. at 690).

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and when the two apply in tandem, review is "doubly" so.  *Harrington,* 131 S.Ct. at 788 (citing *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1420 (2009)). The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  *Knowles*, 129 S.Ct. at 1420.  "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington,* 131 S.Ct. at 788.

Although the state court did not specifically refer to Supreme Court

precedent by name, it examined the evidence and evaluated the case under the appropriate rubric of deficiency and prejudice.    In order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree that those arguments* or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 131 S. Ct. at 786 (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id.* Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, and not every jot of its reasoning. *Neal*, 286 F.3d at 246; *Santellan,* 271 F.3d at 193; *see also Catalan*, 315 F.3d at 493 (". . . we review only the state court's decision, not its reasoning or written opinion . . . ."). Even where the state court fails to cite to applicable Supreme Court precedent, AEDPA's deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002); *Richter*, 131 S. Ct. at 786.

With respect to defense counsel's performance, the Court of Criminal Appeals held that trial counsel was not deficient and had conducted an adequate investigation, and that the additional information was not prejudicially omitted

from the jury's consideration.  Supp. CR at 82.[3]

### B.   Beatty's arguments on deficiency fail to overcome the presumption of correctness of the state court's findings of fact and credibility determinations.

Beatty loosely complains:

> Although purportedly several witness [sic] were contacted by the trial team, other witnesses were not.  Witnesses that could describe the tumultuous relationship between Petitioner and his mother, and witnesses who could describe the eccentricity and bizarreness of Ms. Click's personality were never contacted.  There [sic] were available. . . had [defense counsel] known of the testimony of the Day children, he would have introduced said testimony.  However, upon being questioned by the State of Texas, "he crawfished" [sic] on this contention and stated he would not have offered this testimony [because] the testimony [would] be more aggravating than mitigating. . . . [T]he mitigation investigator explained she just didn't have enough time to do what she felt needed to be done and consequently decisions had to be made where they could 'get the biggest bang for their buck.' . . . There were no witnesses presented by the defense. . .

Pet., ECF No. 13, at 38-39.

In order to establish that counsel were ineffective due to a failure to investigate the case, Beatty must do more than merely allege a failure to investigate—he must state with specificity what the investigation would have revealed, what specific evidence would have been disclosed, and how the evidence would have altered the outcome of the trial. *Anderson v. Collins*, 18

---

[3]     "Supp. CR" refers to the Supplemental Clerk's Record which comprises Beatty's second state writ, No. 59,939-02, followed by page number(s).

F.3d 1208, 1221 (5th Cir 1994); *Rose v. Johnson*, 141 F.Supp.2d 661, 691 (S.D. Tex. 2001).  Beatty fails to do so.  Although he contends the state court both unreasonably applied federal law and unreasonably determined the facts, he focuses on his factual attack and never explains his unreasonable application argument.  Pet., ECF No. 13, at 27 et seq.

The witnesses that trial counsel did not contact, according to Beatty, were his step-siblings Chad and Kamie Day[4], stepfather Tim Day, and acquaintances Leanne Wilkerson and Twyla Johnson.  Pet., ECF No. 13, at 38.  He also mentions in passing "medical records regarding Ms. Click's visits to the hospital." *Id.* at 18.  Beatty says these witnesses and documents would have described "the tumultuous relationship between [Beatty] and his mother, and . . . the eccentricity and bizarreness of Ms. Click's personality." *Id.*  Finally, Beatty contends that any aggravating evidence from these witnesses was already before the jury, so counsel had nothing to lose by presenting these individuals. *Id.* at 39.  But according to *Strickland*, counsel is entitled to make reasonable decisions that make particular investigations unnecessary.  466 U.S. at 691.  Here, counsel struggled to find witnesses who could sponsor the things

---

[4]      Beatty mentions counsel not calling "the Day kids" but he presented no testimony from stepsister Kim Day Patterson at the state writ hearing.  Supp. CR at 75.  As he only presented evidence about what Kamie and Chad might have offered, he can only complain of deficiency related to their omitted testimony.

Beatty said about his background and relationship with his mother, but were unable to find them in part because of time limitations and in part because Beatty was not forthcoming with information.  Supp. CR at 71-72.  Counsel also reasonably hesitated to attack the victim for her "eccentricity and bizarreness" because it would have offended the jury and increased the risk of a death sentence.  *Id.* at 69, 72.

### 1.   Proposed testimony from the Day step-family was more aggravating than mitigating.

The trial court judge made findings of fact based on testimony from these witnesses during the state court evidentiary hearing.  Beatty's attorneys made calculated choices about what kind of mitigating evidence they would consider using.  Supp. CR at 71.  Defense counsel would not have presented any of these three former family members because they were more aggravating than mitigating.  *Id.* at 72, 76.

The court found Beatty's step-sibling Chad to be credible and found that his testimony would have presented significantly more aggravating than mitigating evidence to the jury.  Supp. CR at 74. Although Chad would have painted a dire picture of Ms. Click's treatment of Chad and his sister Kamie, the state court believed it would not assist Beatty's case because Beatty seemed not to care about his siblings being beaten and had done nothing to intercede on Chad's behalf.  *Id.*  Further, Chad observed Ms. Click to show favoritism towards

22

Beatty and never observed her abuse him. *Id.* Even worse, he would have told a jury that Beatty had thrown Ms. Click against a refrigerator and knocked her unconscious. *Id.*

The court further found that step-sibling Kamie Day Bentley was abused by Ms. Click in Beatty's presence, but that he only intervened once. *Id.* at 72, 74. Kamie said Ms. Click never beat Beatty. *Id.* Kamie additionally contradicted the current defense investigator's sworn account of Kamie's story, and the court found that Beatty did not protect her and her siblings from Ms. Click. *Id.* As a result of Kamie's testimony, the court found that Kamie was a credible witness who would have presented significantly more aggravating than mitigating evidence. *Id.*

Based on the testimony of Tim Day, Ms. Click's ex-husband, the state court found that counsel was not deficient because Day, too, would have presented significantly more credible aggravating than mitigating evidence. Supp CR at 73. Tim Day explained that he could not think of one good thing to say about his stepson Beatty, that Beatty had been kicked out of the home by Ms. Click, that Beatty stole her car and crashed it, and that Beatty was apparently unaffected by his mother's behavior; indeed, that she favored him over his stepsiblings and catered to him. *Id.* Mr. Day believed Ms. Click to be a lenient, understanding, and helpful mother. *Id.* He also disputes the

statement attributed to him by the current defense investigator, Ms. Stillwell, who indicated that he witnessed Ms. Click abusing Beatty. *Id*. Mr. Day believed there was no connection between Ms. Click's treatment of the children and Beatty's decision to murder her almost thirty years later. *Id*.

Because the two Day step-siblings would be unable to testify that Beatty was himself beaten, that Beatty seemed at all affected by Ms. Click's abuse of the other children, or that he'd intervened more than once, the court reasonably held that their testimony was not so mitigating that it merited being presented to the jury or that its absence prejudiced Beatty. Supp. CR at 72-74. The stepfather was unable to think of anything good to say about Beatty. The former stepfamily would have been double-edged witnesses that counsel would not have chosen to call to the stand. Furthermore, counsel tried to find them but were unable to, in part because of Beatty's recalcitrance. The state court properly found that Beatty failed to demonstrate deficiency on counsel's part for failing to push harder to find these witnesses, and failed to show prejudice from their absence. Supp. CR at 82. Beatty fails to show that fairminded jurists would agree that the state court erroneously determined that his claim lacks merit. *Richter,* 131 S. Ct. at 786*; Yarborough*, 541 U.S. at 664.

In addition, Beatty's current theory of mitigation is internally contradictory—Beatty contends he murdered his mother in a fit of rage,

implicitly in reaction to her abuse in the past, yet Beatty was the favored child who cold-heartedly  observed repeated beatings of his siblings but only interceded one time. Supp. CR at 72-76. The state court found that counsel was concerned about prejudicing any chance Beatty might have for a life sentence, resulting from a juror's residual doubt, by presenting evidence that was both aggravating and mitigating. *Id*. at 72.

Beatty also argues that Holly Randall, the trial mitigation specialist, proves his ineffectiveness complaint, because she knew he had stepsiblings but did not explore that avenue.  It is highly relevant that Beatty never told his attorneys to specifically talk with his stepfamily, though his attorneys had followed up on every potential witness to whom Beatty referred.  Supp. CR at 72.  Ms. Randall interviewed Beatty more than once and spent hours in preparation for trial.  *Id*. at 81.  Beatty never told Ms. Randall to speak to his Day or Wyatt stepsiblings.  *Id*. at 82.  Ms. Randall was only appointed two months prior to trial, but in that two months the defense team accomplished five months' worth of work. Supp. CR at 82. The time limitations were not the fault of Beatty's counsel, and every defense team has to deal with limitations on resources and time.[5]  Beatty's defense team was aware of the existence of his

---

[5]      Beatty never claims that his attorneys were ineffective for moving for her appointment too late and indeed, such a claim would be barred as unexhausted because it was never presented in state court.

stepfamily.  However, counsel reasonably would have chosen not to call these individuals to testify, because their testimony was more harmful than beneficial. Supp. CR at 76.

Beatty's postconviction investigator, Sherry Stillwell, did not testify at the state hearing.  *Id*. at 83.  Nonetheless, based on her affidavit and the sworn testimony of other witnesses, the state court found that she was "overly biased" because her statements contained "intentionally one-sided [and] exaggerated accounts of the witness interviews she conducted."  *Id*.  She stated legal and medical conclusions that "she simply is not qualified to make."  *Id*.  The state court concluded "her entire affidavit should be discounted as unreliable and misleading, perhaps intentionally so."  *Id*.

Beatty fails to show that all reasonable jurists would disagree with the state court's conclusion that counsel was not deficient and that Beatty was not prejudiced. *Id*. at 82.  A reasonable jurist could find the state court correctly viewed counsel's choices to be logical and strategic.  Likewise, reasonable jurists could agree that Beatty was not prejudiced by the absence of these witnesses.

### 2.    Proposed testimony from Twyla Johnson and Leanna Wilkerson would also have been detrimental to Beatty's case.

Beatty says his attorneys should have been aware, but were not, of helpful testimony available from two other women: his acquaintance Twyla Johnson, who once witnessed Ms. Click calling Beatty names, Pet., ECF No. 13, at 20, and

26

Leanna Wilkerson, the neighbor, who could have testified about the relationship between Beatty and Ms. Click. *Id.* Specifically, Wilkerson could have testified that Ms. Click frequently argued with Beatty, that she was not a "poor, little weak disabled lady," and that she could be "a mean cold-hearted bitch." *Id.* Also, Wilkerson could have testified about Ms. Click not driving Beatty to his job interview, leaving him disappointed and upset. *Id.*

The state court found that Twyla Johnson could have told the jury that on one occasion, Ms. Click called Beatty names in a hateful tone of voice. Supp. CR at 76. However, the state court also found that Ms. Johnson never witnessed any other confrontation between Ms. Click and Beatty, that she'd never heard Ms. Click talk to anyone like that before, and that the argument she heard did not justify Beatty killing his mother. *Id.* Further, Ms. Johnson would have told a jury that Beatty enjoyed Thanksgiving with Ms. Johnson's family and friends, shortly after murdering his mother, and that she did not know he had buried his mother in the backyard just one day prior to the turkey dinner. *Id.* Given the time constraints and Beatty's lack of emphasis on Ms. Johnson's potential as a witness, a reasonable jurist could agree with the state court that defense counsel were not deficient for failing to contact her. Likewise, the state court properly balanced the slim potential mitigation impact that at one time, unconnected to the murder, Beatty's mother had called him names against the aggravating

27

circumstances that Ms. Click did not speak that way to others or Beatty outside of that instance, and that Beatty had callously dined with Ms. Johnson's family at Thanksgiving only a day after burying his mother, and concluded that Beatty failed to prove he was prejudiced.  *Id.* at 82.

Ms. Wilkerson, a neighbor, testified at trial.  She described the argument between Beatty and his mother, and told the jury how Ms. Click's refusal to drive Beatty to the interview had hurt and angered him. *Beatty v. State* at *1-4. The state court found that she was a "biased witness who may let her relationship with [Beatty] taint her testimony to paint him in a better light." *Id.* at 77.  Ms. Wilkerson testified that Ms. Click was "eccentric," and she had heard Beatty arguing with his mother on occasion; that Beatty had stolen a gun from Ms. Wilkerson; and that Beatty told Ms. Wilkerson three different versions of a story to account for his mother's death. *Id.* at 77.  However, Ms. Wilkerson never saw anything that made Ms. Click deserve her fate at Beatty's hands.  *Id.*

Reasonable jurists would agree with the state court that defense counsel were not deficient for failing to question Ms. Wilkerson regarding Beatty's relationship with his mother.  The state court found Ms. Wilkerson's testimony to be lacking in credibility because of her personal bias in favor of Beatty. Likewise, the state court properly balanced the mitigation testimony from Ms. Wilkerson that Beatty's mother did not drive him to a job interview, against the

28

aggravating testimony from her that Wilkerson believed the victim was a cold-hearted bitch, both of which could easily have cut against the credibility of the defense and any possible sympathy or residual doubt emanating from the jury. *Id.* at 82.  Beatty fails to address this even in passing.  The Supreme Court has held many times that a federal court is not free to substitute its own judgment as to the credibility of witnesses for that of the state court fact finder.  *Maggio v. Fulford,* 462 U.S. 111, 113 (1983).  Further, in *Marshall v. Lonberger,* the Supreme Court held that the credibility choices made by the state trial courts may not be redetermined by the reviewing federal court when that court has not viewed the witnesses' testimony.  459 U.S. at 435.

If counsel had presented these witnesses, Beatty would now be arguing that *that* decision was ineffective because it added new elements of aggravation. Beatty claims counsel he should have investigated and introduced these witnesses because he had nothing to lose—all the negative things these people could say were already before the jury.  Pet., ECF No. 13, at 39.  Not only is this patently untrue, it is not clearly established federal law.  "With no Supreme Court precedent establishing a 'nothing to lose' standard for ineffective-assistance-of-counsel claims, habeas relief cannot be granted pursuant to § 2254(d)(1) based on such a standard." *Knowles*, 129 S.Ct. at 1419.

In addition, his assertion is unbriefed and unsupported by any record

citation.  See Fed.R.App.P. 28(a)(4) (appellant must identify "the facts relevant to the issues presented for review, with appropriate references to the record," or to record excerpts filed in an appendix); see also Shell Offshore, Inc. v. Director, Office of Workers' Compensation, 122 F.3d 312, 317 (5th Cir. 1997) (recognizing that a party who inadequately briefs an issue waives the claim.)  Similarly, Fifth Circuit rules provide that "[e]very assertion in briefs regarding matter in the record shall be supported by a reference to the page number of the original record where the matter relied upon is to be found." 5th Cir. R. 28.2.3.  In fact, had these witnesses testified at trial, the jury would also have learned (to Beatty's detriment) that:

- Beatty did not care his stepsiblings were beaten by his mother (if this was in fact true);

- Beatty did not intercede when Chad was abused and only once intervened on Kamie's behalf, allowing all other incidents to proceed unchecked;

- Beatty was favored by his mother, in fact was "doted on" and "catered to," and was not abused by her, according to both Tim, Chad and Kamie;

- Beatty threw his mother against the refrigerator and knocked her unconscious;

- His mother had to throw Beatty out of the house at one point;

- Beatty stole his mother's car and crashed it, was "very high strung [and] hot-headed" and "exhibited the classic signs of drug abuse";

- Beatty tried to shoot a neighbor's dog and instead hit their house;

- Beatty was unaffected by his mother's odd behavior and didn't seem to care very much about her problems;

- His stepfather was unable to say anything nice about Beatty;

- His stepfather believed there was no connection between the relationship Beatty had with his mother, who did not want to punish him and was

lenient, understanding, and helpful, and Beatty's murder of her years later.

Supp. CR at 70-82.  By way of comparison, had counsel done as Beatty now wishes, at best the jury could have learned that Ms. Click called him names, did not drive him to a job interview, was not a weak little old lady, and had abused his stepsiblings.  *Id.*  This is insufficient to demonstrate deficiency or prejudice.

### 3. Counsel strategically declined not to offer Ms. Click's medical records.

Beatty acknowledges that his defense team discussed Ms. Click's medical records and made a strategic decision not to attempt to offer them.  Pet., ECF No. 13, at 18.  Beatty never explains what was in these records, never provides them to this Court, and does not articulate a reason why these medical records have any relevance.  Beatty failed to adequately brief his claim and has, accordingly, waived it on appeal.  See Green v. Johnson, 160 F.3d 1029, 1036 n.2 ("It is not the job of an appellate court to go on a fishing expedition through the record to find facts favoring or disfavoring an appellant's arguments.  Rather, it is the job of a party before this court to supply in its brief relevant record cites in order that this court may properly review his arguments."); see also, e.g., Cavallini v. State Farm Mut. Auto Ins. Co., 44 F.3d 256, 260 n. 9 (5th Cir.1995) (holding that "failure to provide any legal or factual analysis of an issue results in waiver"); United States v. Maldonado, 42 F.3d 906, 910 n. 7 (5th Cir.1995) (reasoning that failure to do more than vaguely refer to an issue constitutes

31

waiver).

In the state court, Beatty referred to Ms. Click's alleged mental condition and drug/alcohol problems as uninvestigated mitigation evidence. Supp. CR at 70. If this is what he now hints at, the state court properly discounted his position, finding that a fully-considered strategical decision was made by the defense not to present this evidence. *Id*. at 83. Dr. Gripon, who was found to be a very credible witness, reviewed the entire record and did not see any medical documentation to substantiate Ms. Click attempted suicide while pregnant or that she abused her medications. *Id*. at 80. The state court found that Beatty had failed to present any medical evidence to substantiate claims that his mother suffered from various medical or mental health issues. *Id*. at 83. Ms. Randall, the mitigation specialist, prepared a medical outline for Ms. Click. *Id*. The defense team had "very serious" discussions about Ms. Click's "many abdominal surgeries [and . . . ] extensive medical problems unrelated to substance abuse" and decided not to present evidence of this as a strategic matter. *Id*. at 80-82. Beatty fails to show deficiency or prejudice, and fails to show why this Court should not accord the required deference to the state court's dismissal of this subclaim.

### 4. The state court's findings on deficiency are entitled to deference.

The state court found that both defense attorneys were experienced and

competent in the defense of capital murder cases, and that both were very credible witnesses. *Id.* at 65, 69. The defense team also included court-appointed mental health experts, an investigator, and a mitigation specialist. *Id.* at 65. The state court found that throughout preparation for trial, the defense attorneys were unable to find a witness who could recount the details of the relationship between Beatty and Ms. Click. Supp. CR at 71. Counsel followed up on all names provided them by Beatty, but none of the witnesses proved to be more mitigating than aggravating. *Id.* at 72. Counsel used an "extensively experienced criminal investigator" who was a credible witness. *Id.* at 77. Beatty was "not very helpful" and "was very hard to communicate with" and the defense team generally "had a difficult time getting [Beatty] to provide any information." *Id.* at 78. The investigator stated that after eight weeks of travel through two states he was unable to find a single person to testify positively about Beatty. *Id.*

The investigator focused a "large part" of his investigation on Ms. Click's alleged abuse with the punishment phase in mind, as "the guilt or innocence part wasn't looking too good" for Beatty. *Id.* The investigator spoke with witnesses who indicated that Ms. Click was not abusive towards Beatty. *Id.* Further, the investigator reported back the results of his investigation, both the good and the bad, and had either located or attempted to locate every character

witness Beatty had mentioned.  *Id.*  Beatty did not give his defense team any information regarding his stepsiblings.  *Id.* at 70.  Nor did Beatty tell his attorneys that he'd intervened in a beating by Ms. Click.  *Id.* at 72.  His team investigated everyone Beatty mentioned, but nothing Beatty told them led to a witness who would be more mitigating than aggravating.  *Id.*

The state court found that counsel had legal and strategic reasons for their choices, which insulate them from the accusation of deficiency, and that Beatty failed to overcome the strong presumption that counsel's conduct was reasonable and professional.  Supp CR at 82.  First, Beatty did not advise his team that his former stepfamily would be able to confirm his tale of abuse at his mother's hands.  *Id.*  This alone makes it reasonable that counsel did not prioritize finding and communicating with them.  *Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.")  Presumably if a client killed their mother because of childhood abuse, the client would tell their attorney if anyone was able to substantiate such a claim.  And if they did not, a reasonable attorney or investigator could conclude that there were no witnesses able to sponsor such a tale.  Especially because the defense team labored diligently to find someone, anyone, who could say anything helpful at all, and failed.  Supp. CR at 73-82.

Second, Beatty himself indicated to the trial judge, in a hearing outside the presence of the jury, that he understood the position his defense team was in, and concurred that he did not want to testify nor did he want two possible witnesses called.  48 RR 17-21.  It is unclear from the record the identity of these witnesses, but Beatty cannot block his attorney's efforts and later claim that the resulting performance was constitutionally deficient.  See Sonnier v. Quarterman, 476 F.3d 349, 362 (5th Cir.2007); Autry v. McKaskle, 727 F.2d 358, 361 (5th Cir. 1984); see also Roberts v. Dretke, 381 F.3d 491, 499-500 (5th Cir. 2004) (counsel cannot be ineffective for acquiescing to a defendant's self-destructive instructions regarding trial strategy after first challenging those decisions and determining that defendant was competent to make them) (opinion after grant of appeal).  Indeed, in Schriro v. Landrigan, the Supreme Court rejected the very claim Beatty is raising. 550 U.S. 465 (2007). Specifically, the Court held that counsel was not ineffective for failing to present mitigating evidence because the defendant informed the trial court that he instructed his lawyer not to present mitigating evidence, namely evidence from the defendant's birth mother that she used drugs during her pregnancy.  Id. at 476-78. Landrigan forecloses Beatty's allegation.

Third, counsel had strategic and logistical reasons for conducting the investigation as they did.  The defense team pursued family members,

acquaintances, and every individual on the State's discovery list, and reviewed medical and incarceration records and relied on the input of psychological and medical professionals as well as a criminal investigator and a mitigation specialist regarding the case, despite Beatty's consistent recalcitrance to discuss possible witnesses.  Beatty was a loner without many friends and not a single person could be found to testify on his behalf.  Supp. CR at 78.  The investigation counsel did undertake was sufficient to ascertain what *could* be presented to the jury.  Unfortunately, none of it was any help, and what Beatty presented to the state court on postconviction review is more hurtful than helpful.  *Id*. at 82.

Fourth, the Fifth Circuit has repeatedly held a strategic decision not to pursue and introduce evidence which possesses both mitigating and aggravating qualities is objectively reasonable. *See Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir. 2003) (holding a tactical decision not to pursue and present potentially mitigating evidence on the ground that it is double-edged in nature is objectively reasonable); *Ladd v. Cockrell,* 311 F.3d at 360 (recognizing where evidence is double-edged in nature it is uncertain whether reasonable counsel would have used same had it been available); *Foster v. Johnson,* 293 F.3d 766, 778-79 (5th Cir. 2002) (holding a tactical decision not to pursue and present potential mitigating evidence on the grounds it is double-edged in nature is objectively reasonable and does not amount to deficient performance); *Kitchens v. Johnson,*

36

190 F.3d 698, 701-03 (5th Cir.1999) (holding "objectively reasonable" trial counsel's decisions not to pursue or present double-edged evidence showing petitioner: (1) was physically abused by his father, (2) had abused alcohol from an early age, and (3) had been hospitalized several times for attempted suicide, depression, blackouts, and hallucinations because such evidence would also have revealed instances of extreme violence during petitioner's childhood, petitioner's history of violence even when sober, petitioner's extensive history of drug abuse, and voluntary termination of needed treatment); *Lamb v. Johnson,* 179 F.3d 352, 357-59 (5th Cir. 1999) (holding "objectively reasonable" a trial counsel's decision not to present mitigating evidence in the form of testimony regarding the petitioner's non-violent character in the past because such testimony would have come from persons who had little contact with the petitioner for many years and who could have been asked about their personal knowledge of the petitioner's extensive juvenile criminal record); *Rector v. Johnson,* 120 F.3d 551, 564 (5th Cir.1997) (holding "objectively reasonable" a trial counsel's decision not to present potentially mitigating evidence showing the petitioner suffered from child abuse, family instability, a poor educational background, low IQ, gunshot injuries, and petitioner's mother was severely and chronically mentally ill because trial counsel believed the jury might consider that evidence aggravating, rather than mitigating).

37

Fifth, when a federal court reviews a state prisoner's habeas petition, a "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence." § 2254(e)(1); *Jackson v. Johnson,* 150 F.3d 520, 524 (5th Cir. 1998). This presumption of correctness is especially strong where, as here, the state habeas court and the trial court are one and the same. *See Schriro*, 550 U.S. at 476-477; *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). Supreme Court interpretations of 28 U.S.C. § 2254(d) teach that the factual determinations made by state trial and appellate courts after a hearing are to be accorded a presumption of correctness and are entitled to a high measure of deference by reviewing federal courts. Credibility choices, like express findings of historical fact, are entitled to a presumption of correctness on federal habeas corpus review. In *Self v. Collins*, the Fifth Circuit Court of Appeals accorded credibility choices made by a state court a presumption of correctness under 28 U.S.C. § 2254(d), and came to the same conclusion with regard to implicit credibility choices:

> Implicit in the state's findings (as well as the jury's verdict) is a determination that Self was not credible. "When . . . a trial court fails to render express findings on credibility but makes a ruling that depends upon an implicit determination that credits one witness's testimony as being truthful, or implicitly discredits another's, such determinations are entitled to the same presumption of correctness that they would have been accorded had they been made explicitly." *Lavernia v. Lynaugh*, 845 F.2d at 500.

38

973 F.2d 1198, 1214 (5th Cir. 1992).

In sum, there were valid, strategic reasons for the decision by Beatty's trial counsel not to present, or continue pursuing, potentially mitigating evidence of the type Beatty now complains his trial counsel should have investigated and presented at the punishment phase of trial. The state court made implicit and explicit credibility rulings and its fact findings are entitled to a presumption of correctness.

### C.   Beatty fails to show prejudice.

Beatty presented no evidence before the state court below, nor in his federal petition, which would establish that not hearing from his former stepfamily or acquaintances, Twyla Johnson and Leanna Wilkerson, affected the outcome of his penalty phase. Supp. CR at 82. His only argument seems to contend that there was a breakdown on the adversarial process:

> Prejudice; [sic] the totality of the mitigating evidence might have a [sic] influenced the juries [sic] appraisal of the defendant moral culpable [sic] for successful claim of ineffective assistance of counsel [sic], a reasonable probability must exists [sic] that the result of the proceeding would have been different but for trial counsels [sic] error.  Strickland v. Washington 466 U.S. 687 [sic] a reasonable probability is a probability sufficient to undermine this courts [sic] confidence in the outcome of the proceeding. . . In this Writ of Habeas Corpus Mr. Beatty presents evidence that had not ever was [sic] presented to the trial jury. . . Petitioner contends that there is a reasonable probability that the available mitigating evidence would have forced at least one juror to have struck a different cord. [sic] . . . The fact that there was no evidence presented. . . when. . . evidence could have been presented and should have been presented. . . By failing to present this evidence calls [sic] into question the reliability and fundamental fairness of this proceeding.

Pet., ECF No. 13, at 39.  To the contrary, his attorneys challenged the State's punishment case with cross examination and argument, and argued that Beatty was a "child of God" deserving of a life sentence.  That they presented no witnesses is truly Beatty's fault, both for making certain choices throughout his own life and for indicating he did not wish them to call witnesses in his defense. 48 RR at 17-21.

Beatty was "not very helpful" and "was very hard to communicate with" about potential witnesses.  Supp. CR at 78.  His attorneys understood that there was possibly evidence that Ms. Click was abusive to the stepsiblings, but they could not find witnesses who would testify that she abused Beatty.  Further, the defense team would not have presented the witnesses that Beatty now urges because they would have been on balance more aggravating than mitigating.  *Id*. at 76.  Counsel Hawk indicated reasonably that "if the bad outweighs the good he will not risk opening the door to overwhelming aggravating evidence in order to establish a single mitigating factor."  *Id*.  Beatty presented nothing new and mitigating in state court, and what there was could not have overcome the State's punishment case.  *Id*. at 84.  The Supreme Court dismissed a stronger claim of prejudice in *Banks v. Dretke*, where  Justices Thomas and Scalia concurred,

> The conclusory and uncorroborated claims of some level of physical abuse, the allegations that a bad skin condition negatively affected his childhood development, the evidence that he was a slow learner and possessed a willingness to please others, and the claim that Banks' brother-in-law was responsible for his own pistol-whipping and receipt of a death threat are so unpersuasive that there is no reasonable probability that the jury would have come to the opposite

conclusion with respect to the future dangerousness special issue, even if presented with this evidence.

540 U.S. 668, 710 (2004)(Thomas, J. and Scalia, J., concurring in part and dissenting in part).

Likewise, given the overwhelming evidence of guilt and blameworthiness—including the sympathetic qualities of the victim, the circumstances of the offense itself, Beatty's numerous and contradictory accounts of his mother's demise, his lack of remorse, and, at punishment, his lengthy criminal history and violent behavior while incarcerated—there is no reasonable probability that the jury would answer future dangerousness with a "no" or mitigation with a "yes," even if counsel had presented the double-edged punishment case as Beatty vaguely suggests. If these witnesses had been called, the jury would have additionally learned that his own stepfather could not think of anything good to say about him; that Beatty had thrown his mother into a refrigerator and knocked her unconscious, and numerous other aggravating facts discussed previously.

Significantly, the evidence of Beatty's future dangerousness was overwhelming. When that is the case, it is virtually impossible to establish prejudice. *E.g., Strickland*, 466 U.S. at 698 (no prejudice due to State's overwhelming evidence on aggravating factors supporting death penalty); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002); *Santellan v. Cockrell*, 271 F.3d 190, 198 (5th Cir. 2001); *Jones v. Johnson*, 171 F.3d 270, 277 (5th Cir. 1999)(no prejudice due to brutal facts of murder); *Russell v. Lynaugh*, 892 F.2d 1205, 1213

41

(5th Cir.1989) (no ineffective assistance "[g]iven the weakness of such testimony when juxtaposed with the overwhelming evidence of guilt, the horrifying nature of the crime, and the abundant impeachment material available to the state"). Counsel did not give up the only defense available. Counsel put on a strategic defense during the guilt and sentencing phases. Counsel also defended his client at the sentencing phase. The law does not require counsel to raise every available nonfrivolous defense. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983); *cf. Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (explaining, in case involving similar issue of counsel's responsibility to present mitigating evidence at sentencing, that "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant ... [or even to] present mitigating evidence at sentencing in every case").

Finally, Beatty appears to contend that the state court did not adjudicate the issue of prejudice, saying "The state courts made the determination only on whether or not [Beatty] received effective representation. If this Honorable Court determines that the state court adjudication of the determination of the deficient performance [sic] was adjudicated [sic] and unreasonably [sic] then it knows [sic] no deference to a hypothetical state "finding [sic] on the prejudice prong of *Strickland*. . ." Pet., ECF No. 13, at 41-42. While the state court's findings of fact and conclusions of law do not categorize findings under headings of deficiency and prejudice, it is apparent that the analysis conducted was focused on both prongs. Many of the factual findings address the potential prejudicial effect this testimony would have had on a jury. The court repeatedly

42

characterized the testimony as "significantly more aggravating than potentially mitigating" or "more beneficial than offensive" and detailed concerns by the defense team that they might "prejudice [Beatty's chances] . . . for a life sentence" or whether evidence would have "changed the outcome had it been presented." Supp. CR at 72-84. The labels given the findings are irrelevant. The findings are presumed to be correct whatever verbage is used to describe them, and the focus of the state court was properly on whether counsel had strategic reasons to make their choices; whether those reasons were sound; and whether it would have made any difference to the outcome had they done otherwise.

Thus, the state court properly found that Beatty showed neither deficiency or prejudice, and this Court should decline to grant relief, and instead grant the Director's motion for summary judgment.

## II.   Beatty's Claim of Ineffective Assistance at Guilt-Innocence is Unexhausted and Procedurally Barred. Trial Counsel Effectively Represented Beatty During Guilt-Innocence.

Beatty argues his attorneys were also ineffective during the guilt-innocence stage because they did not investigate and present facts which would show Beatty was merely guilty of murdering his mother because he did it in a fit of rage and had only formed the intent to steal from her after her death. Pet., ECF No. 13, at 20, 42-45. These undiscovered, unpresented "facts" are as follows:

> Although, [sic] there was some evidence admitted at the trial of this case that showed the relationship between the parties; [sic] it was

43

> the unrequited [sic] contention of the State of Texas that the
> decedent was a kind, weak, disabled, loving woman and
> consequently, [Beatty] must have killed her for the purpose of
> obtaining property or burglarizing her home. . . [Ms. Click] had
> another side.  The other side as described by Ms. Wilkerson was
> "mean cold hearted bitch," who aggravated fights with her son. . .
> and knew how to push buttons.

*Id.* at 44.  In short, he recycles his ineffective-assistance-at-punishment claim,

again illogically contending that with more evidence of Beatty's "tumultuous

relationship" with his mother, the jury could have concluded he was only guilty

of murder.  *Id.* at 44.

### A.    Beatty's ineffective-assistance-at-guilt-innocence claim is unexhausted and procedurally barred.

This claim is unexhausted and distinct from that which Beatty presented

in state court, to wit: that counsel was ineffective for failing to investigate facts

indicating the killing was done in self-defense, and for conceding that the killing

was a murder in the opening statement.  Petition*, Ex parte Beatty* at 14, 26, 29.

Beatty did not claim that counsel was ineffective for failing to investigate

facts showing he formed the intent to steal only after his mother's death either

on direct appeal or in state collateral review.  It is clear then that Beatty has

failed to exhaust state court remedies with regard to this claim.  It is equally

clear, however, that Beatty would be barred from raising the claim in a

successive state habeas application under Article 11.071 § 5(a) of the Texas Code

of Criminal Procedure.[6]  *Balentine v. Thaler*, 626 F.3d 842, 857 (5th Cir. 2010).

Pursuant to 28 U.S.C. § 2254(b)(1)(A), habeas corpus relief may not be granted "unless it appears that the applicant has exhausted the remedies available in the courts of the State."   However, "[b]ecause [the exhaustion] requirement refers only to remedies still available at the time of the federal petition, it is satisfied if it is clear that the habeas petitioner's claims are now procedurally barred under state law."  *Gray v. Netherland*, 518 U.S. 152, 161 (1996) (internal citations omitted); *see also Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); *Castille v. Peoples*, 489 U.S. 346, 351(1989); *Graham v. Johnson*, 94 F.3d 958, 969 (5th Cir. 1996) ("exhaustion is not required if it would plainly be futile"). Nonetheless, such an unexhausted claim is subject to denial in federal court as procedurally defaulted.   Although under *Harris v. Reed*, 489 U.S. 255, 265 (1989), federal review of a habeas claim is procedurally barred only if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default,

> [t]his rule does not apply if the petitioner failed to exhaust state
> remedies and the court to which petitioner would be required to

---

[6]Article 11.071 §5(a), which became effective September 1, 1995, provides that a state court may not consider the merits of or grant relief on claims presented in a successive state habeas application absent facts giving rise to a statutory exception. Tex. Code Crim. Proc. Ann. art. 11.071, § 5(a).  Beatty has made no showing that one of the article 11.071 exceptions would apply to allow review of this claim in state court.

> present his claims in order to meet the exhaustion requirement
> would now find the claims procedurally barred.  In such a case there
> is a procedural default for purposes of federal habeas regardless of
> the decision of the last state court to which the petitioner actually
> presented his claims.

*Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).  In the instant case, just as in *Gray v. Netherland*, "the procedural bar which gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default."  518 U.S. at 162 (barring claim on basis that claim would be barred in state court if it were presented there); *Nichols v. Scott*, 69 F.3d 1255, 1280 (5th Cir. 1995).

The Fifth Circuit has held that where a petitioner raises claims in federal court that have not previously been presented to the state courts, and Article 11.071 § 5(a) would apply to foreclose review of the claims if presented in a successive state habeas application, such is an adequate state procedural bar foreclosing federal habeas review of the claims.  *Balentine v. Thaler*, 626 F.3d at 857; *Nobles v. Johnson*, 127 F.3d 409, 422 (5th Cir. 1997); *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998).  Beatty does not attempt to distinguish his case from *Nobles* and *Muniz*; nor does he attempt to demonstrate cause and prejudice for his failure to raise the claims in his initial state habeas application.  Thus, circuit precedent compels the denial of this claim as procedurally defaulted.

46

## B.   Counsel effectively represented Beatty during guilt-innocence.

Beatty fails to proffer much additional evidence that counsel could have introduced at trial which would explain Beatty's motive for murdering his mother, beyond the testimony the jury already heard.  Neither his step-family, nor Ms. Johnson, nor Ms. Wilkerson, nor anyone else was present during Ms. Click's last horrific hours and minutes.  The only person who could have explained to a jury that Beatty killed her in a fit of rage independent of his drug-addicted desire for methamphetamines (and the money to purchase more) was Beatty.  However, the jury was able to hear Beatty's self-serving accounts from several sources who did testify at trial.

The state court found that Beatty's many versions of the night's events were presented to the jury.  Following his arrest Beatty confessed that he snapped during an argument with his mother and "killed the bitch."  Supp. CR at 67.  In another version, he told trial witness Mr. Clary that he choked his mother in self-defense.  *Id.*  Ms. Wilkerson testified that Beatty said he killed his mother during an argument.  *Id.* at 66.  Beatty told a police investigator that his mother started the altercation by slapping him for coming home drunk.  *Id.* at 68.  Therefore, counsel cannot be said to be deficient for failing to present to the jury the minimal additional statements that his mother was a mean cold-hearted bitch and could "push your buttons."

47

Nor does Beatty prove prejudice.  The state court found that the defense team considered the possibility of a self-defense or sudden passion defense "more times than I can count" but made the strategic decision not to do so because "it would not only harm their ability to help [Beatty] in guilt-innocence, it would destroy their ability to provide effective assistance at the punishment phase where they would be asking for a life sentence." *Id*. at 69.  Beatty and the defense team agreed to try to get him convicted of the lesser-included offense of murder. *Id*. at 70.  The state court found this to be a well-considered strategy based on the evidence, the law, and the specifics of Smith County juries. *Id*.

Beatty fails to overcome the deference owed the state court's decision.  The Supreme Court recently reaffirmed this deferential standard, holding that in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree that those arguments* or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 131 S. Ct. at 786 (emphasis added); *see also Visciotti,* 537 U.S. at 27 (federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion").  This is particularly true when reviewing a state court's application

48

of *Strickland*, which when analyzed in conjunction with § 2254(d), creates a difficult to surmount, "doubly" deferential assumption in favor of the state court denial. *Richter*, 131 S. Ct. at 786.

Additional evidence that Beatty had a contentious relationship with his mother would not disprove the State's circumstantial evidence case indicating that Ms. Click kicked Beatty out of the house earlier that day, and that shortly after the murder, Beatty was spending his mother's money, attempting to sell her car, and doing drugs with the proceeds of his crime. *Beatty v. State,* 2009 WL 619191 at * 2-4. Therefore, Beatty shows neither deficiency nor prejudice during guilt-innocence, and his unexhausted, procedurally barred claim should be dismissed.

## CONCLUSION

Given the deference due the state court's factual findings and Beatty's failure to show that the state court misapplied clearly established federal law or wrongly determined the facts, his claims for relief must fail.  For the foregoing reasons, Beatty's petition for writ of habeas corpus should be denied.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

49

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

\*        /s/ Georgette P. Oden
GEORGETTE P. ODEN
Assistant Attorney General
\*Attorney-in-charge
State Bar No. 24029752

P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1400
facsimile (512) 320-8132
Georgette.Oden@oag.state.tx.us

## CERTIFICATE OF SERVICE

I do hereby certify that on March 15, 2011, I mailed a copy of this pleading

to Counsel for Beatty at the following address:

Jeff L. Haas
908 First Place
Tyler, Texas 75702

/s/ Georgette P. Oden

GEORGETTE P. ODEN

Assistant Attorney General