IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

_____

| | | |
|---|---|---|
| **TRACY LANE BEATTY,** | § | |
| | § | |
| **PETITIONER** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 4:09CV225** |
| | § | |
| **RICK THALER,** | § | |
| **Director, Texas Department** | § | |
| **of Criminal Justice,** | § | **\*DEATH PENALTY CASE\*** |
| **Institutional Division,** | § | |
| | § | |
| **RESPONDENT** | § | |

_____

**PETITIONER'S RESPONSE TO RESPONDENT'S MOTION FOR SUMMARY
JUDGMENT WITH BRIEF IN SUPPORT**

_____

**THIS IS A DEATH PENALTY CASE**

Jeff L. Haas
ATTORNEY AT LAW
908 First Place
Tyler, Texas 75702
903-593-8338
903-593-8330 (fax)

## STATEMENT OF THE CASE

Tracy Beatty was indicted in 2004 in the 241st Judiical District Court of Smith County, Texas, in Cause No. 241-0978-04 for the Capital Offense of the murder of Carolyn Click, his mother, in the coarse of committing or attempting to commit the offense of robbery.  On August 10, 2004, the Defendant was convicted by a jury upon his plea of not guilty of the offense of capital murder.  The following evidence presented a the punishment stage pursuant to Article 37.071 (b) Texas Code of Criminal Procedure special issues were answered in such a way that a death sentence was imposed. On August 11, 2004, the Trial Court sentenced Petitioner to death. A State Petition pursuant to Texas Code of Criminal Procedure 11.071 a Writ of Habeas Corpus was filed on January 4, 2007.   After an Evidentiary Hearing, the Trial Court entered findings of fact and conclusions of law which recommended that relief be denied.  The Texas Court of Criminal Appeals adopted this recommendation on May 6,2009.

 The Petitioner filed his Federal Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. 2241 & 2254 on June 9, 2010.   On or about March 15, 2011, Respondent filed his Motion for Summary Judgment with Brief in Support.  This Honorable Court allowed Petitioner to file his reply to Respondent's Answer on July 28, 2011.  This response is timely filed.

## STANDARD OF REVIEW

Petitioner filed his Federal Writ Petition in 2010 and  Petitioner agrees review is governed by the Federal Habeas Statute as amended by the Anti-Effective Death Penalty Act (AEDPA).  See **Lynd v. Murphy** 521 U.S. 320 (1997).  Put in the text of 28 U.S.C. 2254 D states: " an application for Writ of Habeas Corpus on behalf of a person in custody pursuant to

2

the judgment of the State Court shall not be granted with respect to any claim that was adjudicated on the merits of state court proceedings unless the adjudication of the claim" (1)

    1.  Resulted in a decision that was contrary to or involved an unreasonable application clearly established federal law as determined by the Supreme Court of the United States or,

    2.   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

A State Court decision is "an unreasonable application of clearly established" Supreme Court precedent under 2254 if the State Court correctly identifies the governing legal rule but applies that unreasonably to the facts of a particular prisoners case. **Williams v. Taylor** 529 U.S. 420. To prevail under 2254 D(2) a Petitioner must rebutt by clear and convincing evidence the presumption that a State Court's factual findings are correct under 28 U.S. 2254 D(1).  However, **Pinholster** and **Richter** appear to hold that a determination of a claim against a habeas proceeding determines all parts of the claim that are integral to that claim.  If this is the case then Petitioner would have to surmount the second level of deference pursuant to the AEDPA regarding the prejudice prong of **Strickland** and the progeny of **Williams, Wiggins, Rompella**, etc.

By its terms 28U.S.C. 2254 (D) bars relitigation of any claim adjudicated on the merits in State Court subject only to the exceptions of 28 U.S.C. 2254 D(1) and D(2) see **Herrington v. Richter** 131 S Ct. 770 (2011). Petitioner agrees that his claims that were presented to the State Court were adjudicated on the merits and thus 28 U.S.C. 2254 D(1) and D(2) apply.[1]  Thus

---

[1] See **Cullen v. Pinholster** 563 U.S. ____ 2011, 2011 WL 12257805 (2011) also see **Harrington v. Richter** 131 Sct. 770(2011) holding that a summary denial by a State Court is an adjudication without merits.

review in Federal Court is only permitted when the earlier State Court decision resulted from an

unreasonable application of clearly established Federal Law or the State Court decision was

based on a unreasonable determination of the facts in light of the record before the State Court.

     Petitioner agrees that the question of whether  an unreasonable application of Federal

Law is different from an incorrect application of federal law.  **Williams v. Taylor** 529 U.S. 361

(2000).  In Ineffective Assistance of Counsel claims where the controlling Supreme Court

precedent is **Strickland.** The Application of the AEDPA grants a further layer of deference in

addition to the deference implicitly contained in the holding of **Strickland.**   The State Courts

determination that a claim lacks merit precludes Federal Habeas relief so long as fair minded

jurors could disagree on the correctness of the State Court decision see **Yarborough v.**

**Alvarado** 541 U.S. 652 (2004).

     A Federal Habeas Court reviewing a claim of a State prisoner that was adjudicated on the

merits on the State Court Proceedings must determine what arguments or theories could have

supported the State Court's decision and it must ask whether it is possible fair minded jurors

could disagree that those arguments or theories are inconsistent with a holding in a prior decision

of the Supreme Court of the United States see **Cullen v. Pinholster** 563 U.S. (April, 2011), 2011

WL 12257805 (2011).

    It's clear that in regard to 2254 (D)(1) claims and  **Strickland v. Washington** provides the

clearly established federal law in regard to the 6th Amendment Ineffective Assistance of Counsel

claims.   Pursuant to **Strickland** Petitioner must show both the deficient performance and

prejudice prongs  **Strickland** at 690.   Defendant must show that Counsel failed to act

reasonably considering all the circumstance an in order to satisfy the deficient performance

4

prong.  In order to satisfy the prejudice prong of **Strickland** the Defendant must show there is

reasonable probability that but for Counsel's unprofessional errors  results of the proceeding

would have been different. In a death penalty case,  in satisfying the prejudice prong of

**Strickland** the Defendant must show that there was a reasonable probability that absent the

errors the sentence would have concluded that death was not warranted.  **Strickland** supra at

695.  Further Petitioner must show that the requirements of 28 USC 2254 (D)(1) and (D) (2) have

been satisfied.

## FACTUAL BASIS

**Tim Day**  married  Carolyn Click in 1978.(V2 P116 L15) [2]During their marriage Mr. Day

determined that Ms. Click had mental issues.(V2 P119L2)  She overdosed on prescription

medication numerous times. (V2 P119 L9) On one occasion he saw Ms. Click and her son Tracy

Beatty in a fight where Ms. Click was on Mr. Beatty's back.(V2 P119 L22)  Later on CPS

contacted Mr. Day and as a result of this contact he and Ms. Click divorced. (V2 P121 L6) Mr.

Day had children by a prior marriage by the names of Tim, Chad and Kammie. While he worked

Ms. Click took care of the kids. Ms. Click had some paranoia where she actually thought that

people were living in the attic.(V2 P128 L12) Mr. Day had never been contacted by Holly

Randall or anyone from the defense team.(V2 P138 L17-25) Although that there were some

problems with Mr. Beatty while he resided in the house he thought that Tracy Beatty was a pretty

good kid around him. (V2 P146 L13)  Chad Day also testified that Carolyn Click was physically

and emotionally abused the kids.(V2 P152 L8)  He was beat with a frying pan on one occasion

---

[2] These references are to the Statement of Facts from the 11.071 Evidentiary Hearing
conducted on March 4-9, 2007.

with a knife on another occasion. (V2 P152 L16) On one occasion the school noticed bruises on

him that had been caused by Carolyn Click and when he got home (V2 P153 L6) Carolyn Click

gave him one of the worst whippings he ever had. (V2 P153 L12) According to Mr. Day he sure

didn't deserve it.(V2 P153 L14) He was present when he saw Ms. Click pull his sister Kammie's

hair out. (V2 P154) Ms. Click would engage in bizarre behavior;   where she would make the

kids walk around in circles in the heat in the back yard in and if they stopped that they would be

beaten.(V2 P155 L10-16) Most if not all of these beatings occurred while Ms. Click was in the

nude and the kids were in the nude. (V2 P156 L1)  He wasn't allowed to have any friends over (

V2 P 157 L1) and he couldn't tell his father about the abuse because fear of what Ms. Click

would do. (V2 P158 L7)

 **Kamie Bently** also testified at the Writ Hearing about the mental and physical abuse by

Ms. Click.(V2 P172 L3)  She was sadistically beat with a belt. (V2 P172 L20)She bolstered her

brother's testimony where the children were made to walk in circles outside in the back yard and

they weren't given anything to drink.(V2 P173 L2)  She likewise talked about the nude

beatings,(V2 P173 L23) the hair pulling and in addition the kids weren't given enough food to

eat.   She also was told not to tell their father, (V2 P175 L15) which she didn't do because of

fear.  Ms. Click also told the kids that they were fat, ugly and stupid.  She was picked on because

she was the smallest, weakest one.(V2 P176 L21)On at least one occasion Tracy Beatty stopped

his mother from beating her. (V2 P177 L24)Likewise no one ever spoke to her from the defense

team when this case initially went to trial.

 Mr. Perkins lead trial counsel also testified at the Writ Hearing. He testified about the

defense team that was assembled which included a fact investigator, a mitigation investigator,

6

and forensic investigator, and psychological and psychiatric experts.  (V2) Roy Linn was the fact

investigator. Dr. Allen and Dr. Self were psychological psychiatric experts. Dr. Frost was a

forensic expert, Holly Randall was the mitigation investigator and Ken Hawk second chair trial

counsel.  Mr. Perkins was primarily in charge of the guilt or innocence stage of the trial while

Mr. Hawk was more in charge of the experts and the punishment phase of the trial.(V2 P19 L7)

Mr. Perkins through Mr. Linn and Ms. Randall's efforts became aware of some suicide attempts

by the deceased.  During the trial of this case, the defense attempted to admit into evidence,

evidence of these suicide attempts however, such attempts were unsuccessful based on a ruling

by the Trial Court.  Mr. Perkins articulated reasons of attempting to get these suicide attempts

into evidence was "just to dirty up the deceased when we get to the special issues. (V2 P31 L13)

Mr. Perkins also testified at the Writ Hearing that had he known of the bizarre behavior of Ms.

Click i.e. the beatings, and abuse of the Day kids, i.e. the walking around in the nude, the

paranoia, and  the mental illness of the deceased he would have proffered that evidence. (V2 P47

L7-16) Holly Randall  also testified at the Writ Hearing.  Ms. Randall was the mitigation

investigator and she was aware of the existence of Tim Day.   His name appeared on a life line

she prepared in regard to Mr. Beatty's case.  She received the information of Tim Day from

Tracy Beatty. She was aware that Mr. Beatty had step-siblings however, (V5 P15 L24) no one

ever contacted Mr. Beatty's extended family   and no decision was ever made not to contact

them. (V5 P23L4)  In articulating a reason why this information was not explored she stated that

she had only two months to do what she had to do and they didn't have time.(V5 P 23 L12) She

also testified that these medical records regarding Ms. Click's visits to the hospital were

mitigating however, based on a meeting by the defense team there was a legal strategy not to

attempt to offer these medical records. (V5 P34 L14)  She elaborated on the time situation by

saying that she didn't have enough time to do what she had to do that she felt frustrated by the

lack of time. (V5 P47L24) The two month window between the time she was appointed until the

trial time was very unusual (V5 P48 L7)and she would never take a case when she had that little

time again. (V5 P48L13) She did feel as if there was nothing really that the defense team could

have done however, she did agree that what is mitigating is left up to the jury and if evidence

isn't proffered by the defense then a jury never has the opportunity to determine if something is

mitigating or not. (V5 P53 L7)   When advised of the previously testimony from Mr. Day, and

the Day kids she thought that this bizarre behavior by Ms.Click was extremely important and

should have been presented. (V5 P54L17) She actually stated that if this evidence existed " I

would have driven there and picked it up myself, that's how important it would have been.

(V5P56L9)

    Dr. Gripon a Psychiatrist  who testified at punishment stage of petitioners trial in regard

to 37.071 i.e. the future dangerousness issue; Dr. Gripon  also testified at the writ hearing.  Dr.

Gripon is a forensic psychiatrist who has testified numerous times in capital murder cases. He is

familiar with capital murder legal procedure.   He is aware of the importance of mitigation

evidence in conjunction with Article T.C.C.P. Art. 37.071.   He is also aware that a jury has

unbridled discretion to determine whether something is mitigating or not. Dr. Gripon testified

that Tim Day's testimony regarding Carolyn Click's mental illness, hospital visits, and overdose

could be considered to be mitigating.  Dr. Gripon as psychiatrist also stated that Carolyn Click's

eccentric behavior as testified to by Chad and Kamie Day regarding the beatings, being made to

walk around in circles outside, an administration of beatings in the nude was absolutely abnormal

behavior. (V4 P247L17) He also could conceded that the testimony from Leanne Wilkerson and Twyla Johnson regarding Carolyn Click's nature as being controlling, eccentric, and knowing how to push buttons also could be considered to be mitigating evidence (V4P251L19). He also theorized that since beatings often time are administered behind closed doors, that its conceivable that Carolyn Click treated her own son Tracy Beatty the same way she had treated the Day children. (V4 P262L18)

This evidence along with evidence presented at the Writ Hearing from Twyla Johnson and Lana Wilkerson regarding the circumstances between Mr. Beatty and his mother's relationship and the actual character of Ms. Click as cold, arrogant, demanding was never presented to the jury for their consideration in regard for their consideration pursuant to T.C.C.P. Art. 37.071 i.e. the mitigation issue.

At the guilt/innocence stage of the trial, during opening statements, Trial Counsel conceded that the Defendant/Petitioner was guilt of the offense of murder.  The strategy of Trial Counsel was due to the relationship between Petitioner and his mother, Ms. Click. That Petitioner just snapped and killed his mother, Ms. Click. It was only after Ms. Click death that Petitioner formed the intent to take and use her property. It is well settled under Texas Law that the intent to commit the underlying felony which elevates murder to capital murder must be prior to or simultaneously with the formation of the intent to commit the murder.  The State was allowed to offer un-rebutted evidence as to the loving nature of the decedent.   Nothing was offered by the Defendant to rebutt this damaging testimony.  Consequently, the only belief the jury could have had is that this ex-con killed his mother to obtain her property, what else could the jury think giving the state of the record in this matter?  Evidence presented at T.C.C.P.

11.071 Writ, included testimony from witnesses who Trial Counsel were aware of and should have been named in discovery or included in the State witnesses list.  Twyla Johnson, an acquaintance of the Decedent had previously given a statement whereby she had witnessed an altercation between Carolyn Click, the decedent,(V4P9L8) and Petitioner.  According to Ms. Johnson Ms. Click was being very abusive and hateful to Petitioner calling him "stupid", "retarded" and "dumb".(V4P11L9-19)  Ms. Johnson had never been contacted by anyone from the defense team. (V4P12L3)This evidence as well as evidence that followed from Leanne Wilkerson would  have been admissible pursuant to T.C.C.P. Art. 38.36 which states as follows:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

 On cross examination, Mr. Bingham, the District Attorney for Smith County, Texas, asked the following question:

> "And in your mind....can you think of .... I don't know everything you know... can you think of anything about these statements that would justify Tracy Beatty's killing his mother?"

> "After an objection, the court allowed the witness to answer the question, the Court allowed the witness to answer the question."

Its obvious from the question itself that Mr. Bingham misses the import of Petitioners contention,  its not that these words justify Mr. Beatty's actions, they do not. But what it does show is that the murder was committed not in pursuit of financial gain, but rather in a moment of anger.  Additionally the defense also called Leanne Wilkerson, a neighbor of Ms. Click, who also testified at the Writ Hearing in State Court. (V4 P23 L7)Ms. Wilkerson also testified at the Trial

of this case and had been contacted by investigator for the defense team. (V4 P30L17) However, the investigator never questioned Ms. Wilkerson prior to Trial as to prior incidents that she had observed between Petitioner and his mother.   According to Ms. Wilkerson she had known the decedent for approximately 10 years. She met Tracy Beatty after he moved in with his mother. Mr. Beatty did a lot of work for Ms. Wilkerson.  Ms. Wilkerson previously suffered a heart attack and was unable to do any physical labor.  As a result Mr. Beatty helped her by mowing grass, moving dirt, picking up rocks things that he didn't need to do but did just to help her out for very small in financial gain.(V4)  Ms. Wilkerson was never afraid of Mr. Beatty and considered Mr. Beatty to be a friend.(V4 P26L8)  While Mr. Beatty was living with his mother, Ms. Wilkerson heard numerous arguments almost on a daily basis between Petitioner and his mother.  During these arguments she heard Ms. Click's voice raised in anger. Ms. Wilkerson was bothered by the way Ms. Click was depicted at trial as a poor, little weak disabled lady.  She was the farthest thing from that that would possibly be (V4P46 L3-7) And indeed Ms. Click became angry with Ms. Wilkerson for no obvious reason. According to Ms. Wilkerson at times Ms. Click could be a very nice lady but at other times she could be a "mean cold hearted bitch." Ms. Click was eccentric, controlling, strange.  On one occasion Mr. Beatty was excited about having a job interview he had been looking forward to it for days. At the time of the job interview he got ready, dressed, and Ms. Click advised him that she just didn't feel like taking him to the job interview today. Mr. Beatty was very disappointed and upset.(V4 P52L3-5)  None of this evidence was ever discovered, and proffered to the jury at the trial of this case.

## PETITIONER'S ALLEGATIONS

The following allegations were raised by Petitioner at this Federal Habeas Proceeding.

(1)Petitioner received Ineffective Assistance of Counsel in violation of the 6th Amendment of the United States Constitution by Trial Counsel's failure to properly investigate, discover and present "mitigating evidence" in violation of **Strickland v. Washington** and **Wiggins v. Smith**

(2) Petitioner received Ineffective Assistance of Counsel in violation of the Sixth Amendment of the United States Constitution by Trial Counsel's failure to properly investigate facts which would have shown that this " killing" was a murder rather than capital murder.

## CLAIM #1 RESTATED

Petitioner received Ineffective Assistance of Counsel in violation of the 6th Amendment of the United States Constitution by Trial Counsel's failure to properly investigate, discover and present "mitigating evidence" in violation of **Strickland v. Washington** and **Wiggins v. Smith**.

In answering Petitioner's claim, Respondent states:

(1) That Counsel investigated this thoroughly as possible given resource and time constraints.(2) The defense presented no mitigating evidence because all was double edged and because Beatty himself instructed Counsel not to present two witnesses. (3)Tracy Beatty proves neither deficiency nor prejudice and the State Court properly found Beatty failed to show that Counsel was Ineffective.

Taking Respondent's answer into separate components, results in the following:

(1) Counsel investigated as throughly as possible given resources and time constraints

12

State Court's Findings of Fact

## PETITIONER'S RESPONSE

Petitioner actually agrees with this.  Given the limited amount of time that Ms. Randall had to conduct an investigation the investigation was as thorough as possible.  This, however, does not excuse any failure to discover and present any mitigating testimony that should have been discovered  if a more thorough investigation would have been conducted.

## RESPONDENT'S ANSWER

(2) The Defense presented no mitigating evidence because all was double edged and because Beatty had instructed Counsel not to present his witnesses.

## PETITIONER'S RESPONSE

As stated in Respondent's answer, Petitioner contends that both 28 USC 2254(D)(1) and 2254 (D)(2) apply.

(D) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim.

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

## THE STATE COURT ADOPTED THE FOLLOWING FINDINGS OF FACT :

57.  Mr. Perkins and Mr. Hawk both testified that they would have to initially find the names of any potential mitigation witnesses based upon what Applicant told them about his life.

13

Later, the discovery provided by the State and their own investigative efforts could supplement the initial interview with Applicant.

58.  Mr. Perkins testified that he was not aware of the names, Tim Day, Chad Day, Kammie Bently, Kim Patterson, Melanie Carmichael or David and Danny Wyatt.

75.  Mr. Perkins was not aware that Applicant had not one time stepped in and stopped his mother from a beating she was inflicted on a step-sibling.  Mr. Perkins was of the opinion that he would not have presented that evidence because it also shows that all the other times he stood by and watched his mother beat the step-siblings and did nothing.

76.  At the Evidentiary hearing, Applicant also presented Mr. Tim Day who testified that he was married to the victim from 1978 until 1984.  He brought three children into that marriage, Kimberly Patterson, Chad Day and Kamie Bently.  He was not contacted by Applicant's defense team.

77.  According to Mr. Day, the victim was in counseling for mental problems the entire time they were married and she did overdose on her medications from time to time during that period.

78.  Mr. Day saw Applicant and the victim being violent towards each other one time in six years.  He heard her hollering and saw her hanging on Applicant's back.

80. If called by the defense to testify in Applicant's behalf at the punishment phase, Mr. Day could not think of one good thing to say about Applicant.  At one point during the marriage, Applicant was kicked out of the house by the victim and Mr. Day because he stole the victim's vehicle and crashed it.  Applicant was described by Mr. Day as "very high strung, hot-headed person." Furthermore, Mr. Day believes that Applicant was abusing drugs and exhibited the

14

"classic signs" of drug abuse.

85. Applicant called Mr. Chad Day who testified that when his father, Tim, was married to the victim she would be physically abusive to him and beat him and his sisters quite frequently.  She would make them stay outside all day and they had to keep within her eyesight and never stop moving in a circle.  During the beatings the victim was often nude and the children were told to take their clothes off as well.

88. Instead, Mr. Chad Day would tell the jury that Applicant "stayed in trouble a lot," he stole a car and wrecked it, he tried to shoot the neighbor's dog and hit their house by mistake. This witness further saw Applicant smoke marijuana in his presence when he was only 10 or 11 and Applicant was seventeen.  In addition, this witness would tell a jury that he saw Applicant throw the victim against a refrigerator and knock her unconscious.

89. Mr. Tim Day did not testify concerning whether anyone from Applicant's original defense team had contacted him. He did, however, testify that when Sheri Stillwell spoke with him she did not ask him about flipside of his testimony- that is she did not ask him about the "bad things" he could say about the Applicant if called as a punishment witness.

91. Applicant presented Ms. Kamie Bently who testified that she was 6 or 7 years old when her father, Mr. Tim Day, got married to Applicant's mother. She claims that she too was physically and mentally abused by the victim.  According to Ms. Bently, the victim would beat her and pull her hair.  She did not tell her father because the victim warned her not to.

92. Ms. Bently remembers only one time that Applicant interceded while she was being beat by the victim, although he was present for other beatings.  She never saw the victim beat Applicant.

93.  Ms. Bently, if called to testify as a punishment witness could not remember one good thing to say about Applicant other than the single act of intercession.  She didn't recall Sheri Stillwell ever asking her what bad things she might be able to say about Applicant.  Further, contrary to Ms. Stillwell's affidavit, Applicant did not play a role in protecting her and her siblings from the victim.

94.  Applicant presented no direct testimony from this witness regarding whether she had been contacted by Applicant's original defense team.

99.  Mr. Perkins would not attach much mitigating value to testimony that the victim was abusive to her step-children when weighed against the evidence that she was not similarly abusive to Applicant, and in fact doted on him.

100.  Mr. Perkins would not have presented the testimony of Mr. Tim Day, Mr. Chad Day, or Kamie Bently, because each had more aggravating evidence to present regarding Applicant than mitigating.  Although Mr. Perkins could not recall talking to these witnesses, he would have contacted them if Applicant had given him their names.

103.  Mr. Ken Hawk testified that he had heard the names of Mr. Tim Day, Mr. Chad Day, and Ms. Kamie Bently before, but could not recall if it was in connection to the trial or the writ hearing.

106.  Mr. Hawk would not attach much mitigating value to testimony that the victim was abusive to her former step-children when weighed against the evidence that she was not similarly abusive to Applicant, or in fact doted on him.

109.  Ms. Twyla Johnson was presented by Applicant and testified that she lived near the victim at the time of the offense and saw Applicant and the victim arguing one time in the front

yard.  She heard the victim calling Applicant names in a very hateful tone of voice.  She never observed any other confrontations between them.  She had never heard the victim talk to anybody like that before.  In her opinion, the argument she saw did not justify Applicant's killing his mother.

111.  Applicant called Ms. Lee Ann Wilkerson who testified at the evidentiary hearing and at Applicant's trial.  She knew the victim and lived across the street from her for approximately nine years.  When she learned that Applicant was coming to stay with the victim, she invited them both over for dinner.  However, that dinner never occurred because the victim and Applicant had an argument about the victim driving her vehicle the short distance to Ms. Wilkerson's residence.  Over time the witness came to know Applicant and he did odd jobs for her and had dinner at her house.

115.  According to Ms. Wilkerson, the victim was eccentric, but she never saw anything that made her deserving of being murdered by Applicant.

152.  The State presented Ms. Holly Randall who testified that she is an experienced mitigation specialist who was assigned to assist Applicant's defense team.  She interviewed Applicant more than once in an attempt to get names of witnesses she could contact regarding mitigating evidence.  All told, Ms. Randall spent 91 hours in preparation for trial.

155.  Applicant did not tell this witness the names of the Day siblings, or any person not listed in her report.  Applicant did not tell her that she should talk to them because the victim was abusive to them.  Nor did Applicant mention that she should talk to the Wyatt's.

158.  She did not feel that evidence that was available regarding Applicant's childhood and relationship with his mother would have "changed the outcome" had it been presented.

17

159.  Ms. Randall testified that she felt like the defense team worked very hard and did a thorough job within the time constraints placed upon them by the scheduling of the trial.  She also felt that the defense team's efforts were so concentrated that they had accomplished in two months what would normally take them five months.  She felt she did a "very good job."

The findings of fact entered by the Court basically summarized testimony of witnesses after they have been cross examined by the State.  A careful reading of the record indicates that the testimony upon which the findings of fact are based is a mere "ad hoc" rationalization of prior performance as warned about in **Wiggins**.

In addition, the findings of fact which were drafted by the State in this case, if not ingenious, are at least misleading.  For instance Mr. Day testified at the State writ hearing that the Tracy Beatty was " a pretty good kid". (V2P142) Chad Day did testify that, at one time, Tracy Beatty shot at a neighbor's dog and hit their house by mistake.  What is not contained in the findings of fact is that Mr. Day also testified that the reason Mr. Beatty shot at the neighbor's dog is because the neighbor's had killed their dog first. (V2P161)

It is true that none of the Day children who were approximately 10 years younger than the Applicant  at the time they were living with the victim. It is true there is no testimony that the Day children ever saw the victim beat Tracy Beatty, however Mr. Beatty was approximately 17 at the time he was living in the house with his step-siblings.

It's true Ms. Bently could not remember one good thing to say about the Applicant, however, due to the length of time Ms. Bently can't remember anything good or bad about Mr. Beatty.  Mr. Perkins did testify that he would have not attached much mitigating value to the

18

testimony adduced at the writ hearing and considered the testimony to be more aggravating than mitigating and consequently would not have presented this evidence. Again this is an ad hoc rationalization.  Mr. Perkins rationalization was that testimony of the Day children would adduce additional aggravating evidence is untenable.  Reading  the record reflects that the majority of "bad" evidence additionally adduced as a result of this testimony being presented was already known by the jury.

Twyla Johnson testified at the writ hearing and had never been contacted by any member of the defense team at the time of trial.  It is true on one occasion that Applicant and the victim were arguing and that she heard the victim calling Applicant names in a very hateful tone of voice. However, these names being called were demeaning such as "are you retarded, your "no good." This is particularly important as evidence presented by LeeAnn Wilkerson who contrary to just testifying that the victim was eccentric, testified that the victim was a hateful, vindictive, two faced bitch.  (V4P16)

Holly Randall testified at the writ hearing that she felt that she and the defense team did a good job giving the time constraints that they had.  She felt that the testimony of LeeAnn Wilkerson regarding the victim's controlling mean spirited nature should have been presented to the jury however, (V6P69) it could not have been since the defense was unaware of this testimony.   Holly Randall was actually a State's witness at the writ hearing and on cross examination when being told about testimony of the Day children, actually testified that she felt that this evidence was so important that she would have driven to their location and picked them up herself so that they could testify.

On re-direct the State of Texas asked Ms. Randall if she felt the same way about the Day

children testifying if the Day children would also testify that Tracy Beatty stood and watched the beatings and did nothing to stop them.  The State of Texas asked if she thought it would be beneficial to Tracy Beatty to have a jury hear all the bad stuff. Ms. Randall answered no. The State then asked the question, " in your opinion do you think the bad evidence might, in that situation out weigh the good?" Ms. Randall responded very much so, yes and that was our thoughts.  (V5P63)

It is undisputed that the defense team knew of the existence of the Day children at the time of trial.  However, the Day children were never contacted by members of the defense team and they were totally unaware of any testimony that they Day children could give.  Consequently, it is impossible for the defense team to have thought that at the time of the trail that the bad evidence that the Day children could give would outweigh any good evidence.  This is the smoking gun that shows that the testimony of the defense team at the writ hearing is nothing more than an ad hoc rationalization of what they didn't do during the trial.  Consequently, Applicant contends that decision that Petitioner received Ineffective Assistance of Counsel is based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding 2254(D)(2) does not preclude itself.

**RESPONDENT'S ANSWER**

(3) Tracy Beatty proves neither deficiency nor prejudice and the State Court properly found Beatty failed to show that Counsel was ineffective.    Petitioner incorporates all previous factual allegations and legal arguments contained in his writ and the response to respondent's answer.

20

## PETITIONER'S RESPONSE

Petitioner was deprived of the Effective Assistance of Counsel in the sentencing phase of this capital murder trial.

There is controlling clearly established supreme court precedent, in determining where defense counsel was ineffective in failing to adequately investigate and present available mitigating evidence during sentencing. This Court must apply the standards set forth in **Strickland v. Washington**   466 U.S. 668 (1984) Under **Strickland** the Defendant first " most show that Counsel's representation fell below an objective standard of reasonableness which must be judged under prevailing professional norms Id at 688.   In evaluating a claim that Counsel failed to adequately investigate, **Strickland** states that Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

Secondly the Defendant must satisfy the prejudice requirement by showing that there is a reasonable probability that but for Counsels unprofessional errors the result of the preceding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  However, this test is not outcome determinative. The **Strickland** Court itself expressly rejected an "outcome determining" standard requiring the Defendant to show that Counsel deficient conduct more likely than not alter the outcome of the case.  Instead Strickland relies on whether the result of a proceeding is unreliable and hence the proceeding itself unfair even if Counsel cannot be shown by a preponderance oft he evidence to determine the outcome.  Thus the "reasonable probability" standard i.e. a probability sufficient to undermine confidence in the outcome is a less burdensome test than even the preponderance of

the evidence standard.  In **Williams v. Taylor** 529 U.S. 362 (2000) the Supreme Court reiterated this point.  The prejudice inquiry is therefore case specific in that it is an attempt to assess the effect of a Trial Counsels deficient performance had on the reliability of the outcome of the particular proceeding.

In the early 2000's the Supreme Court accepted three cases to determine and to address Effective Assistance of Counsel at the sentencing phase of a capital trial.  **Rompilla v. Beard** 545 U.S. 374 (2005), **Wiggins v. Smith** 539 U.S. 510(2003) and **Williams v. Taylor** 529 U.S. 362 (2000)in each of these cases the Supreme Court held that the clearly established law of **Strickland** mandated the finding of Ineffective Assistance of Counsel.  The AEDPA posed no barrier relief to these cases,  all set out a detailed set of instructions to the lower courts on the proper applications of **Strickland** in a capital sentence proceedings.  In **Williams v. Taylor** 529 U.S. 362 (2000) the United States Supreme Court determined that Mr. Williams did not received effective assistance of Counsel at the sentencing phase of his capital trial.  According to the opinion there wasn't much question as to the guilt of Mr. Williams.  The State also presented evidence in support of the aggravation.  The Defendant had just been convicted of a cold blooded beating death of a defenseless man for three dollars and he had a history of prior felony convictions.  Mr. Williams had been involved in numerous assaults and while incarcerated and pending trial he had set his cell on fire. Two   psychological experts testified that there was a high probability that Mr. Williams could constitute a  continuing threat to society.  Mr. Williams defense counsel at the sentencing phase of the trial presented some family member and neighbor testimony and neighbor testimony.  The Supreme Court however, concluded that the Trial Counsel performance was deficient because they failed to investigate and discover extensive

records describing Mr. Williams childhood.   What is important about **Williams** is that the Court expressly noted that its frequently true about a capital defendants's history that not all the additional evidence was favorable.  However the Court held that failure to introduce records that were never located and reviewed by Trial Counsel could not have been based on strategic considerations related to the negative information in the records.   The Court held that the failure to conduct a proper investigation was deficient performance.  The Court then determined that based upon what this investigation would have shown that  had a proper investigation been conducted,  prejudice was shown.  The holding in **Williams** is also important because the Court emphasized that whether the mitigating evidence might have resulted in a different outcome is an entirely separate question from whether it negates future dangerousness.  Mitigating evidence unrelated to dangerousness may alter the jury selection of the penalty, even if it does not undermine or rebutt the prosecutions death eligibility case.   The questions is not whether there is sufficient evidence to justify a death sentence but whether the totality of the mitigating evidence might well have influenced the juries apprising the defendant's moral culpability.  In **Wiggins v. Smith** 539 U.S. 510 (2003) the Supreme Court revisited the issue of capital defense investigation and representation.  Mr. Wiggins was assessed the death penalty in the **State of Virginia**.  Afer a verdict and during post conviction proceedings Wiggins challenged the adequacy of his representation at sentencing arguing that attorney's had rendered constitutionally Ineffective Assistance of Counsel by failing to investigate and present mitigating evidence.  In **Wiggins** Trial Counsel acknowledged that he did not retain a forensic social worker i.e. a mitigation investigator to prepare a social history. In **Wiggins** Trial Counsel was aware of Mr. Wiggins childhood including incidents of physical and sexual abuse an alcoholic mother placements in

23

foster care and borderline retardation.  The State Courts according to **Wiggins** held that Trial

Counsel had made a reasonable choice to proceed with what they thought was there best defense.

The Federal District Court granted habeas corpus relief in **Wiggins** but the 4th Circuit reversed,

holding that counsel "made a reasonable strategic decision to focus on Petitioner's direct

responsibility."   The 4th Circuit held that Counsels knowledge of at least some details of

**Wiggins** childhood was sufficient to make an informed strategic decision. The Supreme Court

held however that **Wiggins** counsel was ineffective during his trial because their investigation

failed to satisfy **Strickland** performance standard and the State Courts conclusion to the contrary

was objectively unreasonable.  After identifying the two part **Strickland** test, the Court

emphasized:

" our opinion in **Williams v. Taylor** is illustrative of the proper application of these
standards.  In finding Williams' ineffectiveness claim meritorious, we applied **Strickland,** and
concluded that counsel's failure to uncover and present voluminous mitigating evidence at
sentencing could not be justified as a tactical decision to focus on **Williams**' voluntary
confessions, because counsel had not "fulfilled their obligation to conduct a thorough
investigation of the defendant's background." 529 U.S. 396, 120 S.Ct. 1495 (citing 1 ABA
Standards for Criminal Justice 4-4-1, commentary, p. 4-55 (2d ed. 1980))... in highlighting
counsel's duty to investigate, and in referring to the ABA Standards for Criminal Justice as
guides, we applied the same "clearly established" precedent of **Strickland** we apply today.
**Wiggins** at 522.

In **Wiggins** the Court focused whether the investigation supported counsels decision not

to introduce mitigating evidence of **Wiggins** background was itself reasonable.  The Court then

cataloged the investigative efforts of **Wiggins** counsel and indeed **Wiggins** counsel had

conducted an investigative examination. However, the Trial Court's decision not to expand their

investigation fell short of the professional standards that prevail.  The Court held that the

standard practice in Maryland in capital cases at time of **Wiggins** trial include the preparation of

a social history report. Counsels conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association- standards which we have long referred to as "guides to determining what is reasonable."   The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."

The Supreme Court scrutinized counsels failure to conduct an investigation in **Wiggins** and concluded that the record of the actual sentence proceedings unscores the unreasonableness of counsels conduct by suggesting that their failure to investigate thoroughly resulted from in attention, not reasoned strategic judgment.   In reviewing Counsels actions before and during the trial, the court conducted " the strategic decision the state courts and respondents all invoke to justify counsels limited pursuit of mitigating evidence resembles more a post hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." **Wiggins** at 526

**Rompilla v. Beard** 545 U.S. 374 (2005) Two years later, in <u>Rompilla</u>, the Court held that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."   In **Rompilla** evidence was sufficient to show Mr. **Rompilla** not only killed his victim, but tortured him. Mr. Rompilla   had a significant criminal history of felony convictions including a burglary and a rape at gun point.  In **Rompilla** the defense case at punishment consisted of five family members who asked the jury for mercy.

The Federal District court held that the state court had unreasonably applied **Strickland** and granted habeas corpus relief due to defense failure to present significant mitigation evidence. The Third Circuit however, reversed.  Therefore the panel determined that trial counsel failed to discover mitigating evidence located in records, but that based on the information that Trial Counsel actually had, Trial Counsel was justified in failing to look.   In **Wiggins** Trial Counsel ignored obvious leads, in **Rompilla** the Third Circuit held that Trial Counsel did enough to reasonably conclude that further investigation would be a waste of resources.  The Supreme Court reversed the Third Circuit and granted relief holding that trial counsels investigation deficient even though **Rompilla** himself was not helpful and his contribution to any mitigation case was minimal.  In **Rompilla** the Court again relied on the ABA Guidelines for the standard of care.  After finding deficient performance under **Strickland** the Supreme Court that next turned to the prejudice inquiry which again was addressed de novo  because the state court never addressed that issue.

These cases have clarified "clearly establish law" applicable to capital cases adjudicated in state court after **Strickland** .  The following principals are inherit in Strickland and its progeny:

### **Performance:**

- Capital defense is sufficiently specialized and regulated to have a national standard, reflected both in the 8th Amendment and the ABA Guidelines. **Rompilla,** 545 U.S. at 387; **Wiggins**, 539 U.S. at 524; **William**s, 529 U.S. at 397.

- While there is not set of per se rules or checklist for capital representation, defense counsel must- in every case- engage in a thorough social history

investigation.  The ABA Guidelines reflect the "well-defined norms" of the national standard for mitigation investigation, and thus the floor below which local practices may not descend.  **Wiggins** 539 U.S. at 524-25 and **Rompilila** 545 U.S. at 380.

- Termination of mitigation investigation is only appropriate in the context of an informed decision, after a thorough investigation.  **Rompilla** 545 U.S. 395; **Wiggins** 539 U.S. 527-28.

- The fact that counsel performed some, or even extensive investigation, does not preclude a finding of deficient performance with respect to further investigation they reasonably should have done under the circumstances. **Rompilla** 545 U.S. at 388-89; **Wiggins** 539 U.S. at 527, 534.

- Federal courts, even under the deferential scheme of the AEDPA, should scrutinize claims of strategy in light of a close reading of the record and a state court finding of strategic purpose for an omission should be disregarded if it cannot withstand such scrutiny. **Wiggins** 539 U.S. 526-27.

- The duty to investigate and prepare for the punishment phase also includes rebutting the prosecution's case in aggravation.  Counsel must, at a minimum secure the information in possession of law enforcement. **Rompilla** 545 U.S. 385-87.

**Prejudice**:

- Prejudice ensues whenever the totality of the mitigating evidence "might well have influenced the jury's appraisal" of the defendant's moral culpability.

**Rompilla** 545 U.S.. 393; **Wiggins** 539 U.S. 538; **Williams** 529 U.S. 398.

- The operative question is whether there's a reasonable probability that one juror would have voted differently. **Wiggins** 539 U.S. 537

- When assessing prejudice from counsel's error or omissions, reviewing courts must look at all of the evidence in the aggregate, including the evidence adduced at trial and the evidence adduced in post-conviction proceedings. **Wiggins** 539 U.S.  536; **Williams** 529 U. S. 397-98

- Courts should not focus on trial counsel's post-trial statements regarding whether they would have used the mitigating evidence adduced in post-conviction proceedings, the relevant inquiry is whether a competent attorney would have introduced it. **Wiggins** 539 U.S. at 535.

- The failure to discover mitigation undermines the outcome even in highly aggravated cases.  The failure to provided any context or explanation for an aggravated case may render the proceeding unreliable.  The idea that considerable aggravation is per se bar to finding prejudice is no longer viable after **Williams** and **Rompilla,** both of which were highly aggravated cases.

- Prejudice inures even if the omitted evidence does not rebutt the State's case for death eligibility. **Williams** 529 U.S. 398

- Courts must look at all consequences that would have flowed from competent performance, including the impact on the work of expert witnesses. **Rompilla** 545 U.S.  592-93.

- When assessing prejudice federal courts need not make the state-law evidentiary

findings that would have been at issue at sentencing, courts merely evaluate the totality of the evidence adduced at trial and in the habeas proceedings.  Thus, a petitioner can use reliable hearsay to prove prejudice.

**1. DEFICIENT PERFORMANCE: Defense Counsel's failure to conduct a reasonable mitigation investigation and to discover relevant mitigating evidence fell below an objective standard of reasonableness pursuant to prevailing professional norms**.

The Eighth Amendment of the United States Constitution and the Fourteenth Amendment require sentencing procedures in a capital case to "focus the juries attention on the particular nature of the particular crime."   Because " an individual decision is essential, " see **Lockett v. Ohio** 438 U.S. 586,605 (1978) the Eight Amendment mandates that the sentence not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death. Relevant mitigating evidence is not limited only to evidence that would relate. Specifically to petitioners culpability for the crime he committed see **Skipper v. South Carolina** 476 U.S.  1,4 (1986) and there is no requirement that mitigating evidence even have a "nexus" to the offense or that the defendant make any showing that the criminal act was attributable in any way to the  mitigating factor see **Tennard v. Dretke** 542 U.S. 274 (2004). Relevant mitigating evidence is basically defined as any evidence that might serve as a basis for a sentence less than death.        Because the scope of mitigating evidence which may be considered by the jury in sentencing is much broader than the range of relevant information which may be considered in determining guilt or innocence, counsel is under a greater obligation to discover and evaluate potential evidence of mitigation see **United States ex rel Emerson v. Gramley** 883 F3d 898 (7th

Cir. 1996) "its imperative to case a wide net for all relevant mitigating evidence is heightened at a capital sentencing hearing."

In short the prevailing professional norms when a petitioner is tried for capital murder requires at a minium that counsel attempt through mitigation investigation presentation of evidence to provided some "explanation for petitioner's criminal propensities and some basis for the exercise of mercy." As stated in **Caro v. Woodford** 280 F3d 1247 (9th Cir. 2002) a little explanation can go a long way and might make a difference between life and death.

In addition, the ABA Guidelines which had been refereed to in Supreme Court precedent require that investigation for the penalty phase of a capital phase should begin immediately upon counsels entry into the case. The ABA Guidelines 11.4.1A; 11.8.3A. In fulfilling counsels duties the ABA Guidelines specifies that counsel should investigate the defendant's full history, including medial history, alcohol and drug use, birth trauma, family and social history. ABA Guideline 11.4.1.D.2 mandates that counsel must interview witness family with aspects of the client's history that might affect the... possible mitigating reasons for the offense and/or other mitigating evidence to show why the client should not be sentenced to death.  Counsels duty is not discharged merely by conducting a limited investigation. Counsel must "seek records, interview family members, and friends, and obtain appropriate mental evaluations well in advance for trial."

In 2006 the State Bar of Texas published its guidelines and standard for Texas Capital Counsel "SBOT" Guidelines. According to the Texas Guidelines Counsel should :[3]

---

[3]This Trial was conducted in 2004, prior to the enactment of the Texas Guidelines however the standards set forth in **Strickland, Rompilla, Wiggins**, and the ABA Guidelines all predicate the trial of this cause.

A. Make application to the court for financial assistance to the defense team

In addition the SBOT Guidelines echo the 2003 ABA Guidelines in the holding in **Rompilla,**

with respect to trial counsels duty to investigate mitigating evidence.

> The investigation regarding penalty should be conducted regardless of any statement by
> the client that evidence bearing upon penalty is not to be collected or presented.

Finally the Texas Guidelines required counsels investigation to have produced sufficient

information to allow counsel to consider presentation of th following kinds of evidence: (1)

witnesses familiar with and evidence relating to the client's life and development, that would

explanatory of the offense for which the client is being sentenced would rebutt or explain

evidence presented by the prosecutors, would present positive characters in the clients life or

would otherwise support a sentence less than death.

Applying these principals to the case at hand, the Petitioner recognizes that Trial Counsel

did not totally abrogate their duties as Trial Counsel in a capital murder case.  In deed, Trial

Counsel incorporated a defense team which involved psychological/psychiatric experts, a

mitigation investigator, a fact investigator, and a forensic expert.  However Petitioner contends

that merely by assembling this team does not constitute effective assistance of counsel per se.

As is evident from the statement of facts from the state writ of habeas corpus hearing, much was

left undone that should have been done.  As stated in case law and  the ABA Guidelines, Trial

Counsel in order to render effective assistance of counsel must immediately start preparing for

the punishment stage of a capital murder case. Although purportedly several witness were

contacted by the trial team, other witnesses were not.  Witnesses that could describe the

tumultuous relationship between Petitioner and his mother, and witnesses who could describe the

eccentricity and bizarreness of Ms. Click's personality were never contacted.  They were

available.   As Mr. Perkins stated during the writ hearing, they were looking for anything that

could possibly be mitigating.   Again, as stated in the writ hearing on direct examination had he

known of the testimony of the Day children, Leanne Wilkerson, Twyla Johnson, he would have

introduced said testimony. However, upon being questioned by the State of Texas,

" he crawfished" on this contention and stated that he would not have offered this testimony due

to the fact that in his opinion he would consider the testimony to be more aggravating than

mitigating. The problem with this contention is that any aggravating evidence that would have

been admitted through the testimony of these witnesses,  the vast majority had already been heard

by the jury.  There really wasn't anything new that would potentially harm Petitioner had the

testimony of these witnesses been introduced, that the jury wasn't already aware of.  As stated in

**Wiggins,** this post trial explanation of a strategical decision appears to be more of ad hoc

rationalization as to why an investigation wasn't conducted.  Ms. Randall, the mitigation

investigator, testified that she just didn't have enough time to do what she felt needed to be done

and consequently decisions had to be made where they could "get the biggest bang for their

buck."  This activity again, runs a foul of the holdings in **Strickland, Wiggins, Williams,**

**Rompilla** and the ABA Guidelines.  Ms. Randall recognized the import of the testimony from

the state writ witnesses and as she stated " had I know of this, I would have driven there and

picked them up myself." Its important to note that in **Wiggins**, **Strickland,** and **Rompilla** there

were actually witnesses who testified on the behalf of the defense in the actual trial of their cause.

Such was not the case here.   There were no witnesses presented by the defense and the attempt

to save Petitioner's life consisted solely that Petitioner "was a child of God."  Respondent's

Motion for Summary Judgment cite numerous 5th Circuit cases which repeatedly held that a strategic decision not to pursue and introduce evidence which possess both mitigating and aggravating qualities is objectively reasonable.  These cases can be distinguished on at least two grounds. One; the strategic decision made by Trial Counsel and those cases were made after a proper investigation and a careful consideration of the evidence. Such is not the case at hand. And two; these cases were decided prior to the holdings in **Wiggins** and **Rompilla** consequently the legal precedent of their holdings may be questioned after the decisions in **Rompilla** and **Wiggins.**   Petitioner contends he has satisfied the first prong  i.e. deficient performance of **Strickland.**  [4]


### 2. PREJUDICE: Petitioner has demonstrated that but for Trial Counsel's deficient performance calls into question the reliability of  jury's verdict.

 Prejudice;  the totality of the mitigating evidence might have a influenced the juries appraisal of the defendant moral culpable for successful claim of ineffective assistance of counsel, a reasonable probability must exists that the result of the proceeding would have been different but for trial counsels error. **Strickland v. Washington** 466 U.S. 687 a reasonable probability is a probability sufficient to undermine this courts confidence in the outcome of the proceeding.  Is there a reasonable probability of available mitigating evidence would have caused at least one juror to have struck a different balance.  In this Writ of Habeas Corpus Mr. Beatty

---

[4] In spite of Respondents contention to the contrary, Petitioner has met the test of **Anderson v. Collins** 18F3d 1208 (5th Cir. 1994).  He stated with specificity what the investigation would have revealed, what specific evidence would have been discovered, and how the evidence would have altered the outcome of the trial.

presents evidence that had not ever was presented to the trial jury. Based on the tumultuous relationship between Mr. Beatty and the victim, his mother, and the uncontroverted evidence of Ms. Click's personality and the bizarre behavior,  Petitioner contends that there is a reasonable probability that the available mitigating evidence would have forced at least one juror to have struck a different cord.  Again, as stated in the discussion regarding performance there were not any witnesses called at Petitioner's trial.  There was no evidence presented which would have given a juror a vehicle to determine that there was at least one sufficient mitigating circumstance to warrant that a life sentence be imposed rather than a death sentence.  The fact that there was no evidence presented, when the evidence adduced at the state writ hearing reflects that evidence could have been presented, and should have been presented, to at least explain, not excuse, but explain the relationship between Petitioner and his mother and the nature and character of Ms. Click.  Petitioner contends that based on the lack of an investigation to obtain this readily available information, and providing it to the jury, this constitutes deficient performance.  By failing to present this evidence calls into question the reliability and fundamental fairness of this proceeding. Consequently, Petitioner contends that prejudice has been shown.  For instance, Kamie Bently testifying that 30 years ago Ms. Click called her "stupid", "lazy", "no good." Ms. Click's  personality did not change.  According to Ms. Johnson some 26 years later she was angrily calling her grown son, "lazy and retarded."  A juror could rationally believe that Mr. Beatty, as a youngster, was treated as the Day children were treated.  Consequently, Ms. Click made Petitioner into what he eventually became. In addition, Applicant contends that the record does reflect that he instructed his defense team not to call two potential witnesses, relatives of his, at the trial of this case.  The defense team was obviously aware of the existence of these

witnesses and were aware of there potential testimony.  After discussing this matter with Applicant a strategic decision was made that these particular two witnesses should not be called at the trial of this case.  Applicant makes no contention that the failure to call these witnesses was constituted Ineffective Assistance of Counsel as guaranteed by the 6th Amendment of the United States Constitution but were rather a strategic decision made after careful consideration of the circumstances.  However, Applicant's acquiescence to the failure to call the two witnesses known to the defense team does not constitute an acquiescence to fail to call witnesses which should have been known but were no known to the defense team to testify at the trial of this cause. Prejudice has been established.

Petitioner realizes that a State Court determination is entitled to deference.  That the State Court decision will stand unless Petitioner can show that:

28U.S.C. 2254 (D) An Application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgement of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

## DEFERENCE DOES NOT MEAN ABANDONMENT

Although as previously discussed, the State Court's adjudications on the merits are

35

entitled to deference.  In the context of federal habeas deference  does not imply abandonment or

of judicial review see **Schriro v. Landigan** 550 U.S. 465 (2007)and **Miller-El v. Cockerell** 537

U.S. 322 (2003).


## SUM MARY

 **Strickland**  is the controlling Supreme Court precedent when applying 2254(D)(1). The

state courts determination that petitioner received Effective Assistance of Counsel is an

unreasonable application of **Strickland,**  and it is based on an unreasonable determination of the

facts based on evidence adduced at the State evidentiary hearing.  2254 (D)(1) and 2254 (D) (2)

do not preclude relief.


## ISSUE NUMBER 2

Petitioner received Ineffective Assistance of Counsel in violation of the 6th Amendment

of the United States Constitution by Trial Counsel's failure to properly investigate facts which

would have shown that this "killing" was murder rather than capital murder.


## RESPONDENT'S ANSWER

Beatty's claim of Ineffective Assistance at guilt/innocence is unexhausted and

procedurally barred.  Trial Counsel effectively represented Beatty during guilt or innocence.

Respondent argues that Petitioner's claim of Ineffective Assistance of Counsel at guilt/innocence

is unexhausted and procedurally barred.

## PETITIONER'S RESPONSE

Petitioner concedes that this exact claim was not contained in his original State Writ. However, after testimony was adduced at the State Writ Hearing, the Trial Court requested Findings of Fact and Conclusions of Law.  It wasn't until during the Writ Hearing that the importance of the testimony regarding the prior relationship between the Petitioner and his mother was important in the context of Texas Penal Code 19.02.  [5] As stated in federal writ pursuant to Texas Code of Criminal Procedure Article 38.36 prior relationship of the parties is admissible in a murder case.  Petitioner would show that although this issue wasn't filed with his State Writ of Habeas Corpus , this issue was litigated, evidence was adduced at the writ hearing and at the conclusion Applicant filed his proposed Findings of Fact and Conclusions of Law[6]

---

[5]Pursuant to Texas Law if the murder is not committed in the coarse of certain felonies or if the victim is of a certain protected status the murder is not capital murder. Rather it's a first degree murder with a maximum punishment of life.  The evidence adduced from the Day's , Twyla Johnson, and LeeAnn Wilkerson would tend to show that the murder was not committed in a desire to obtain property but rather Petitioner was angry with the victim.

[6] In Applicant's Finding of Fact Number 153 relevant evidence would reflect that the death of Carolyn Click was not done pursuant to a burglary but simply due to the fact that there were bad feelings between the parties, consequently the murder was simple murder not capital murder.
Applicant's Finding of Fact Number 173 evidence of Carolyn Click's character would have been relevant ....to show that the murder was not capital murder.
Applicant's Finding of Fact Number 182 Ms. Wilkerson told Tamara Beatty that there was a bad situation and Applicant and Carolyn Click were gonna rip each other's head's off... this evidence would have been relevant in showing that this was not a capital murder case.
 Applicant's Finding of Fact Number 185 Trial Counsel never learned of this evidence by failing to conduct a thorough investigation.
Applicant's Conclusion of Law Number 13 had this readily available evidence from the Day family been presented to the jury there is a reasonable probability the jury would have returned a verdict of guilty to the offense of murder rather than capital murder.
Applicant's Conclusion of Law Number 21 Petitioner received Ineffective Assistance of Counsel by Trial Counsel's failure to investigate the case and present evidence in regard to prior acts of violence between Carolyn Click and Applicant the nature of Carolyn Click's character as being mean, eccentric as described by LeeAnn Wilkerson.

which address the identical issue which is being presented here in Federal Court.  Petitioner

would then contend that this issue was fairly presented in State court and consequently this issue

has been exhausted in State Court and there is no procedural bar pursuant to 28 USC 2254

(B)(1)(A).

Petitioner agrees with Respondent's contention that the jury was able to hear Beauty's

self serving accounts from several sources who did testify at trial.  The State court found that

Beauty's many versions of the nights events were presented to the jury.  Following his arrest

Beatty confessed that he "snapped during an argument with his mother and killed the bitch."

Another version that he told trial witness Mr. Clary that he chocked his mother in self defense.

Ms. Wilkerson testified that Beatty said he killed mother during an argument. Beauty told a

police investigator that his mother started the altercation by slapping him from coming home

drunk.  In addition, evidence from the State Writ Hearing reflected no one from the defense team

ever spoke to Twyla Johnson, who would have testified that she was a neighbor of Carolyn Click

and that there was one occasion that Carolyn Click was being aggressive toward Petitioner and

was calling him stupid and retarded.  And this situation Carolyn Click was the aggressor.  Lee

Ann Wilkerson who has been previously discussed testified at the writ hearing that Ms. Click

was not a kind old lady as portrayed in the trial of this case, but could be mean a vindictive two

faced bitch.  She was controlling and manipulative.  On one occasion Ms. Wilkerson would have

testified that Petitioner was excited about getting a job and on the day of the job interview

Carolyn Click told him that she was too tired to take him. On one occasion Ms. Wilkerson called

Petitioner's  daughter and said that it was a bad situation that the Petitioner and Carolyn Click

were gonna rip each others heads off and somebody needed to do something about it.  Petitioner

contends that even though Petitioner requested a finding of fact and conclusion of law on the

issue of ineffective assistance of counsel at the guilt/innocent stage the Trial Court did not enter

any findings of fact or conclusions of law even though so requested.


## **PRAYER FOR RELIEF**

Petitioner claims that in view of the record that 28 U.S.C. 2254 (D)(1) and (D)(2) do not

bar relief in this cause and his Writ of Habeas Corpus should be granted and Petitioner

discharged from his Unconstitutional confinement restraint and/or relieved of this

unconstitutional sentence of death.


Respectfully submitted,


_____/s/_____
JEFF L. HAAS
State Bar No. 08659600
908 First Place
Tyler, Texas 75702
903-593-8338
903-593-8339 (fax)

**VERIFICATION**

Under penalty of perjury, I hereby declare that all the factual allegations made herein are true and accurate except for those allegations made upon information and belief.  This the 28th day of July, 2011.

_____/s/_____
JEFF L. HAAS

**CERTIFICATE OF SERVICE**

On this the 28th day of July, 2011, I, Jeff L. Haas, Attorney for Petitioner do certify that a true and correct copy of the foregoing instrument was filed with the Clerk of the District Court using the CM/ECF system which sent notification of such filing to the following:

1.      Georgette Oden
        Assistant Attorney General
        300 West 15th Street
        Austin, Texas 78701
        Georgette.Oden@oag.state.tx.us

_____/s/_____
JEFF L. HAAS

,