**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| TRACY LANE BEATTY, | § | |
|     Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-cv-225 |
| | § | |
| DIRECTOR, TDCJ-CID, | § | |
|     Respondent. | § | |

**MEMORANDUM OPINION AND**
**ORDER OF DISMISSAL**

Petitioner Tracy Lane Beatty, an inmate confined in the Texas prison system, filed the above-styled and numbered petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Beatty is challenging his capital murder conviction and death sentence imposed by the 241st Judicial District Court of Smith County, Texas in Cause Number 241-0978-04, in a case styled *The State of Texas vs. Tracy Beatty*.  For reasons set forth below, the Court finds that the petition is not well-taken and that it will be denied.

**I.  PROCEDURAL HISTORY OF THE CASE**

Beatty was convicted and sentenced to death for the murder of his mother, Carolyn Click, in the course of burglarizing her home.  The offense took place on November 25, 2003.  Based on the jury's answers to the special issues set forth in the Texas Code of Criminal Procedure, Article 37.071, the trial court sentenced Beatty to death on August 10, 2004.  The Texas Court of Criminal Appeals affirmed the conviction.  *Beatty v. State*, No. AP-75010, 2009 WL 619191 (Tex. Crim. App. March 11, 2009).  He did not file a petition for a writ of certiorari.

While the direct appeal was pending, Beatty filed an application for a writ of habeas corpus in state court on January 4, 2007.  The trial court conducted an evidentiary hearing on his ineffective assistance of counsel claims.  On July 16, 2007, the trial court issued findings of fact and conclusions of law, which contained 172 paragraphs.  On May 6, 2009, the Texas Court of Criminal Appeals denied the application with the following statement:

We agree with the trial judge's recommendation and adopt the trial judge's findings and conclusions with the following exceptions: Findings of Fact, paragraphs 29, 60, 61, 65, 81, 100, 131, 132, 143, 154 and 160; Conclusions of Law, last sentence of paragraph 170. Based upon the trial court's findings and conclusions and our own review of the record, relief is denied.

*Ex parte Beatty*, No. WR-59939-02, 2009 WL 1272550 (Tex. Crim. App. May 6, 2009).

The present petition (docket entry #13) was filed on June 9, 2010. Beatty presented the following grounds for relief:

1. Beatty received ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution by trial counsel's failure to properly investigate, discover and present mitigating evidence; and

2. Beatty received ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution by trial counsel's failure to properly investigate facts which would have shown that this "killing" was a murder rather than capital murder.

The Director filed an answer (docket entry #19) on March 15, 2011. Beatty filed a response (docket entry #25) on July 28, 2011.

## II. FACTUAL BACKGROUND OF THE CASE

The Texas Court of Criminal Appeals discussed the factual background of the case as follows:

Appellant and Click had a volatile and combative relationship. Appellant moved into Click's house in early October 2003. Although Click told her next-door neighbor and close friend, Betty McCarty, that appellant had assaulted her several times in the past, Click said that she was excited about appellant's arrival. Click's excitement, however, vanished shortly after appellant moved in. McCarty testified that Click told her that she asked appellant to leave sometime in October and a second time on November 25, 2003-two days before Thanksgiving and the last day Click was seen alive. Around 4:00 p.m. on November 25th, Click went to McCarty's house. Click was "stressed out and crying." Click told McCarty that she was unhappy about the way things were going with appellant and that she had asked appellant to leave:

[Prosecutor:] What did [Click] tell you?

[McCarty:] That she had asked him to leave that day, and that-she said, "I put up with all I'm going to put up with, and I had asked him to leave," and she was upset about it. And that's the last time I saw her.

[Prosecutor:] Did she tell you what time that day she had told [appellant] to leave?

[McCarty:] No, sir.

Although McCarty initially testified that Click said that she "asked" appellant to leave, she later clarified that Click said, "I told [appellant] to leave today." McCarty did not know exactly when the conversation with appellant had occurred that day or when appellant was supposed to leave:

[Defense counsel:] Did [Click] say specifically when ... she had that conversation with [appellant] or when he was supposed to leave by?

[McCarty:] No, sir. I saw her at 4:00, and I didn't know anything about it until that time. So I don't know what time she told him.

Appellant's cousin, Stacey Killough, testified that appellant arrived at her house later that day between 5:00 and 5:30 p.m. driving Click's car. Killough testified that the drive from Click's house to her house takes approximately forty-five minutes. Appellant smelled of alcohol but was not intoxicated. Noting Click's absence, Killough became suspicious because Click was "very protective" of her car and never let anyone else drive it. In fact, Killough had previously seen Click refuse to let appellant drive the car. When Killough asked appellant where Click was, appellant told her that Click was out of town with a friend and would not be back for a few weeks. Because Killough was busy, appellant stayed at Killough's house for only five to ten minutes.

Lieanna Wilkerson testified that she lived across the road from Click and that they had become close friends. Click told Wilkerson that appellant had assaulted her on several occasions in the past. Once appellant had "beaten her so severely that he had left her for dead." Click was nevertheless excited that appellant was coming to live with her and hoped that she and appellant could mend their relationship. After appellant moved in with Click, Wilkerson hired him to do odd jobs around her house because he was unemployed. The two became friends, and Wilkerson referred to appellant as "Trey." Appellant went to her house when he and Click would argue, which was daily. Toward the end of October and the first part of November, appellant house-sat for Wilkerson while she was out of town for several days. Wilkerson extended the offer to appellant because she was concerned about appellant and Click fighting, and she thought it would give them an opportunity to separate from each other. When Wilkerson returned home, appellant's suitcase was sitting in the living room. Appellant told Wilkerson that Click had packed his things and brought them over. Wilkerson understood this to mean that Click had packed appellant's suitcase in an effort to kick him out. Appellant, however, returned to Click's house and continued to live with her. According to Wilkerson, appellant and Click fought daily in November.

Wilkerson described a conversation that she had with appellant in the middle of November in which he expressed his anger with Click. Appellant told Wilkerson about missing a job interview with an electric company that he had been very excited about. Click refused to drive him to the interview, saying that "she just didn't feel like it." Wilkerson knew that appellant could not drive himself because Click refused to let appellant, who did not have a driver's license, borrow her car. Around the same time, appellant told Wilkerson that he thought about harming Click:

[Wilkerson:] I know [appellant] had said they were underpinning her house, and he had gotten upset.... And they had gotten into a huge fight, and she was yelling at him, and he just made an offhand comment, "I can't believe she handed me that hammer." He said, "Because all I could think about was hitting her in the head with it." And I said, "Trey," and he goes, "Well, I couldn't do it." He said, "If I shoved her under there, she would have just started stinking."

[Prosecutor:] She handed it-she being Carolyn Click, handed him a hammer. He thought about hitting her with it, rolling her underneath the house, but she would start to stink?

[Wilkerson:] Right. And I just thought he was joking.

3

[Prosecutor:] Did he ever make any references to hurting her, to choking her, to hitting her?

[Wilkerson:] Several times he had said he just wanted to shut her up, that he just wanted to choke her and shut her up, that-they got into horrible fights.

Wilkerson testified that, on November 25th, appellant ate spaghetti at her house around 6:00 or 6:30 p.m. and stayed at her house until 10:00 p.m., when he went home. The next day, appellant gave Wilkerson a turkey. He told Wilkerson that he had bought it for Thanksgiving, but that Click had decided to go out of town with a man named "Junior," so they would not need it.

Appellant told various people multiple stories about how his mother died. Appellant first claimed to law enforcement officials that he came home one day and discovered that Junior had killed his mother. In response to this discovery, he stabbed Junior, disposed of his body in a lake, and buried his mother in the backyard. Appellant even took officers to a couple of different locations where he claimed to have submerged Junior's body. Appellant told them that he sliced Junior's body open so that it would fill with lake water and sink. In a statement three days later, appellant reiterated the story involving Junior. But four days after that, appellant told detectives that he "really didn't mean to" kill his mother: he "came in drunk," she "started bitching" at him, he choked her, she fell to the floor, and he did not realize that she was dead until the next day.

Appellant also told his cousin, John Clary, that he had "killed the bitch." He told Clary that he "had gone into the house, and there had been an argument, and [Click] had pulled a gun on him, so he went to choke her." When Clary told appellant that he needed to turn himself in or go back home, appellant inexplicably told Clary that he could not go back there because his mother "would have the cops looking for him."

Appellant also told differing stories about his mother's death to acquaintances with whom he spent time doing drugs, using Click's credit and debit cards, and disposing of Click's belongings in the weeks after her death. He initially told these acquaintances that his "aunt" had died and left him her property. He later told them "a friend" killed his mother and that he killed the friend to cover it up. He also said that he had killed "his mother's boyfriend" after discovering that he had killed Click and that he buried both bodies in the woods.

Appellant gave differing stories to Wilkerson as well. First, he told her that he came home to find Click dead. Junior killed Click and attacked appellant, so appellant killed him. He then described in great detail how he disposed of Junior's body by submerging it in the lake. He said that he buried his mother. Later, appellant told Wilkerson that he hired a friend to kill Click and that he then killed the friend. Finally, appellant said that he killed Click on the night of November 25th, when he returned home from having dinner at Wilkerson's house. Wilkerson testified:

The very last thing that-incident that [appellant] told me what happened is he said when he left my house, he went directly across the street to her house and that she was waiting for him, and that when he came through the door, they had a horrible fight....

Appellant told Wilkerson that he ended up choking Click until she fell to the floor. He said that he did not realize that she was dead until he woke up the next morning and saw her lying in the same place on the floor.

*Beatty v. State*, 2009 WL 619191 at *1-4.

During the punishment phase of the trial, the State presented evidence regarding Beatty's extensive criminal history, including drug possession, theft, weapons possession, a brutal assault against a child under two years of age, and prior assaults against his mother, a correctional officer and others. A correctional officer testified about the prevalence of violence in prison and specifically discussed Beatty's membership in a prison gang, a physical altercation he had with Beatty, and a shank that was found on Beatty. Royce Smith, an investigator, testified about the potential for inmate violence in prison. Dr. Tynus McNeel and Dr. Edward Gripon testified that Beatty would likely pose a future danger to society.

After the State rested, a lengthy *ex parte* hearing took place on the record between defense counsel, Beatty and the trial court. 48 RR 3-22.[1] Beatty's trial counsel enumerated the steps they had taken in order to prepare for the penalty phase. He noted that a psychiatrist and a psychologist had been appointed to assist the defense, but neither found any mitigating factors and both indicated that it was their opinion that Beatty would pose a future danger. Dr. Allen specified in a letter that it would be impossible for him to testify in Beatty's behalf. *Id.* at 6. Trial counsel pointed out that they, their investigator, and their mitigation expert all attempted to locate possible mitigation witnesses without success. Beatty informed his attorneys that he did not want to testify. *Id.* at 7. Beatty stated that he understood the position that his defense team was in and concurred that he did not want to testify nor did he want two possible witnesses called. *Id.* at 17-21.

Before the jury, the defense rested without presenting any punishment evidence.

### III. LEGAL STANDARD

The petition was filed in 2009, thus review is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997). Under AEDPA, a petitioner who is in custody "pursuant to the judgment of a State court" is not entitled to federal habeas corpus relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

---

[1]"RR" refers to the trial transcript, preceded by the volume number and followed by the page number(s).

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).  "By its terms § 2254 bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)."  *Harrington v. Richter*, 131 S.Ct. 770, 784 (2011).  AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt."  *Renico v. Lett*, 559 U.S. 766, ___, 130 S.Ct. 1855, 1862 (2010) (citation and internal quotation marks omitted).  With respect to the first provision, a "state court decision is 'contrary to' clearly established federal law if (1) the state court 'applies a rule that contradicts the governing law' announced in Supreme Court cases, or (2) the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts."  *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006) (*en banc*) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)).  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).  As such, "evidence later introduced in federal court is irrelevant."  *Id.* at 1400.  "The same rule necessarily applies to a federal court's review of purely factual determinations under § 2254(d)(2), as all nine Justices acknowledged."  *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011).  With respect to § 2254(d)(2), a Texas court's factual findings are presumed to be sound unless a petitioner rebuts the "presumption of correctness by clear and convincing evidence."  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).  The "standard is demanding but not insatiable; . . . [d]eference does not by definition preclude relief."  *Id.* (citation and internal quotation marks omitted); *Goodrum v. Quarterman*, 547 F.3d 249, 256 (5th Cir. 2008).  Most recently, the Supreme Court held that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Richter*, 131 S.Ct. at 786.  The Supreme Court has explained that the provisions of AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that

state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Federal habeas corpus relief is not available just because a state court decision may have been incorrect; instead, a petitioner must show that a state court decision was unreasonable. *Id.* at 694.

## IV. DISCUSSION AND ANALYSIS

### A. Ineffective Assistance of Counsel Regarding Mitigating Evidence

The petition includes two ineffective assistance of counsel claims. He initially alleged that his attorneys, Robert Perkins and Ken Hawk, were ineffective for failing to investigate, discover and present mitigating evidence. While preparing the state application for a writ of habeas corpus, Beatty's attorney obtained the services of Sheri Stillwell, a mitigation investigator, and Sonny Monteagudeo, a fact investigator. They engaged in efforts to discover people who could have offered mitigating evidence at trial. Five people were identified as possible mitigation witnesses, including Tim Day, the victim's former husband, along with Chad Day and Kamie Day Bentley, his children from a previous marriage, and acquaintances Leanne Wilkerson and Twyla Johnson.

The state trial court conducted an evidentiary hearing regarding Beatty's state habeas claims over a four day period of time starting on May 4, 2007. Fifteen people testified during the hearing. With respect to this particular ground for relief, the hearing focused on the actions of Robert Perkins, who was lead counsel at trial, and Ken Hawk, who was co-counsel. Perkins testified that he focused on the guilt/innocense phase of the trial while Hawk focused on punishment. The trial court granted his requests to appoint several other individuals to help with the defense. Roy Linn was appointed as an investigator. Holly Randall was appointed as the mitigation expert. Dr. Allen and Dr. Self were appointed to look into the issue of future dangerousness. Dr. Frost was appointed as the medical expert to review the autopsy report. Linn, Allen and Self were brought into the case early on, while Randall and Frost were brought in during the midrange of development of the defense.

Perkins testified that the defense team worked from the beginning of the case on finding names of people who would be beneficial to the defense. The state court found that they initially attempted to find the names of potential witnesses based upon what Beatty told them about his life. Supp. CR

at 70.[2]  Beatty was not, however, helpful in providing them with sources of mitigating evidence.  The state court found that Beatty consistently told his attorneys that he did not want to get convicted of capital murder, receive a life sentence, and then spend 40 years in prison before being eligible for parole.  *Id.* at 71.  Beatty was outspoken in providing answers to his questions, but he was not helpful in providing mitigation evidence.  Hawk testified that he did not recall Beatty ever giving the defense team the name of anyone to speak to.  Beatty was aware that the defense team was trying to save his life, but Beatty was clear that he would rather have the death penalty.  The state court found that Perkins testified that they followed up on the name of any witness given to them by Beatty, however, nothing Beatty told them ultimately "panned out to be in our minds, more mitigating than aggravating." *Id.* at 72.  They supplemented their list of names based on discovery provided by the State and by their own investigative efforts.  *Id.* at 70.  Perkins testified that he was not aware of the names Tim Day, Chad Day, Tammie Bentley, Kim Patterson, Melanie Carmichael or David and Danny Wyatt.  *Id.*

The defense attorneys developed a strategy about how they would proceed with mitigating evidence.  They decided to offer evidence as mitigating evidence during the punishment phase only if it was helpful.  The state court found that the attorneys testified that they considered the good and the bad of each potential punishment witness and if the bad outweighed the good then they would not risk opening the door to overwhelming aggravating evidence in order to establish a single mitigating factor.  *Id.* at 75-76.  They made a strategic decision not to present double-edged type evidence.  Their strategy was to focus on offering helpful evidence.  Hawk testified that otherwise, "it's going to end up hurting you, because it's going to come off to the jury as you're wasting their time or floating a ridiculous theory or something else.  So it's got to help you." 3 Supp. RR 125.[3]  They decided that they would not put forth evidence that had a positive element if there would be a net loss.  Perkins further testified that he did not want to prejudice any chance Beatty had at receiving a life sentence by

---

[2]"Supp. CR" refers to the Clerk's Supplemental Record from the habeas proceeding, followed by the page number(s).

[3]"Supp. RR" refers to the transcript from the state habeas proceeding, preceded by the volume number and followed by the page number(s).

presenting evidence that could be considered double-edged in that it carried mitigating weight but could at the same time be aggravating. Supp. CR at 72. Perkins testified that they made a strategic decision that it probably was not in Beatty's best interest to testify. The state court found that Perkins thus had a problem with not having a witness who could sponsor things that Beatty told him about his background and relationship with his mother. *Id.* at 71. The state court found that Perkins believed that trying to get evidence into the punishment phase that Click was married several times would not be "more beneficial than offensive." *Id.* at 72. A decision was made not to call James Clary, who was Beatty's uncle, after talking to him because he would not have offered anything beneficial to the defense. Hawk further testified that the defense team discussed the defense strategy with Beatty and he agreed to it. Hawk testified that he did not think that there would be any verdict other than murder or capital murder in light of the evidence. Consequently, they made the strategic decision to focus on getting a conviction for murder, as opposed to capital murder. He acknowledged that the strategy did not work, but they believed that it was the appropriate strategy. Moreover, Beatty never denied murdering his mother.

Roy Linn, the investigator for the defense team, testified about his experience as a law enforcement officer and investigator. He had prior experience as an investigator in a capital murder case before he was appointed to the Beatty case. He had been appointed as an investigator for criminal defense in capital murder cases 15 to 20 times. He testified that he assisted the defense attorneys and acted at their direction. He provided them with reports as to his findings. The state court found that Linn was an extensively experienced criminal investigator and a credible witness. *Id.* He met with Holly Randall for over four hours. *Id.* at 78. The state court found that Linn testified that it is very important to get the criminal defendant's input during preparation of a defense, especially in capital cases, and that Betty was not very helpful and was very hard to communicate with. *Id.* It was further found that Linn spent many hours looking for potential mitigating witnesses, but he could not find "at least one person to testify on behalf of the defendant." *Id.* Linn described Beatty as a "loner" without many friends. *Id.* Beatty told Linn that he choked his mother until she was unconscious because she grabbed his shoulder, left her on the floor, and went to bed. Beatty told him that when he awoke, he

found Click lying dead on the floor where he had left her the night before. *Id.* The state court found that Beatty always referred to his mother as "the bitch." *Id.*

Holly Randall testified over a two day period. The state court found that Randall testified that she was an experienced mitigation specialist who was assigned to assist Beatty's defense team. *Id.* at 81. She testified that she interviewed Beatty on three occasions in an attempt to get names of witnesses she could contact regarding mitigating evidence. She spent 91 hours in preparation for trial. *Id.* She prepared a report as a result of her investigation. She included the names of anyone Beatty mentioned to her. She acknowledged that her report mentioned that Click married Tim Day in 1978, but she did not talk to Day. Randall discovered that Click had numerous boyfriends and marriages. She was aware that Beatty had step-siblings, but she was not aware by whom he had these step-siblings. Beatty lived with his grandparents. She was unable to obtain several medical records about Click that were old and had been destroyed. The state court found that she was unable to obtain medical documentation that Click shot herself in a suicide attempt while she was pregnant with Beatty. *Id.* It was found that a strategic decision was made not to present evidence of the victim's medical problems only after a "very serious" discussion between the defense team. *Id.* The state court found that Beatty did not tell Randall the names of the Day siblings nor of the Wyatts. *Id.* at 82. Randall testified that she did not feel that the evidence that was available regarding Beatty's childhood and relationship with his mother would have "change the outcome" had it been presented. *Id.* Randall testified that she felt like the defense team worked very hard and did a thorough job within the time constraints placed upon them by the scheduling of trial. *Id.* She felt that the defense team's efforts were so concentrated that they had accomplished in two months what would normally take them five months. *Id.* Randall expressed the opinion that she did a "very good job." *Id.* In her opinion, the aggravating evidence "very much" outweighed any mitigating value of the Day siblings' testimony. *Id.*

With respect to the five witnesses cited by Beatty in his petition who could have been used to present mitigating evidence, Tim Day was the first witness. He testified that he was married to Click from 1978 through 1984. He determined during their marriage that Click had mental issues. She overdosed on medications several times. He observed one physical altercation between Click and

Beatty with Click on Beatty's back. At one point during the marriage, Beatty was kicked out of the house by Click because he stole Click's vehicle and crashed it. Day described Beatty as very high strung and a hot-headed person. He had his suspicions that Beatty was using drugs, but nothing was confirmed. The state court found that he disagreed with Sheri Stillwell's affidavit which avers he witnessed Click being abusive to Beatty. *Id.* at 73. He could not say whether Beatty contributed to his marital problems with Click. He testified that he could not think of "any connection" between what he saw during the marriage to Click's murder 27 years later. The state court found that Tim Day was a credible witness whose testimony would have presented significantly more aggravating than potentially mitigating evidence to the jury. *Id.* at 73.

Chad Day, Tim Day's son from a previous marriage, testified that Click physically and emotionally abused the children. He observed Click pull out his sister's hair. He testified that she engaged in bizarre behavior. He was not allowed to have any friends over to the house. He believes that Click showed favoritism towards Beatty. He testified that it did not appear to him that Beatty was bothered by anything that was happening to him. He did not recall Beatty ever offering any help or showing signs of compassion. He specified that if he had testified, he would have told the jury that Beatty stayed in trouble a lot, he stole a car and wrecked it, and that he tried to shoot the neighbor's dog and struck their house by mistake. Beatty smoked marijuana in his presence. He was 10 or 11 at the time and Beatty was 17 years old. He stated he would have also told the jury that he saw Beatty throw Click against a refrigerator and knock her unconscious. The state court found that Chad Day was a credible witness whose testimony would have presented significantly more aggravating than potentially mitigating evidence to the jury. *Id.*

Kamie Day Bentley testified that Click subjected her to mental and physical abuse. She noted that Beatty intervened in one incident. She testified that she never saw Click physically assault Beatty. She never saw him beat her. She did not recall any arguments between them. She added that he lived in town much of the time when her father was married to Click. Other than the one incident where Beatty intervened, she could not remember one good thing to say about Beatty. She noted that it had been twenty-something years since her father and Click were divorced. The state court found that

11

Kamie Day Bentley testified that she could not remember one good thing to say about Beatty other than the single act of intercession. *Id.* The state court further found that Bentley was a credible witness whose testimony would have presented more aggravating than potentially mitigating evidence to the jury. *Id.* at 75.

Twyla Johnson testified during the writ hearing that she was an acquaintance of Click. She observed an argument between Click and Beatty. Click was abusive towards Beatty and called him "stupid," "retarded," and "dumb." She testified that she was never contacted by the defense team. The state court found that Beatty went over to Johnson's house with a turkey after he killed his mother and ate Thanksgiving dinner with her family and friends, and that she did not know at the time that he had buried the victim in the backyard of her house on the previous day. *Id.* at 76.

Leanne Wilkerson testified that she had known Click for approximately ten years. They lived across the street from each other. She met Beatty after he was paroled from prison and started living with his mother. She described Beatty as a good friend, who ate his meals with her. She heard arguments between Click and Beatty. She disputed the characterization of Click at trial as a poor, little weak disabled lady. She testified that Click sometimes became angry for no apparent reason. At times, she was a very nice lady and at other times a "mean cold hearted bitch." She described Click as eccentric, controlling, and strange. On one occasion, Beatty was excited about a job interview, but Click did not feel like taking him to the interview. Beatty was disappointed and upset. Beatty stressed in his petition that none of this evidence was presented to the jury. Since the time of the trial, she has had frequent contact with Beatty, they both signed their letters "Love" and that Beatty wrote that he loved her, although she claimed it was purely a friendship she had with Beatty. The state court found that Ms. Wilkerson was a biased witness who may let her relationship with Beatty taint her testimony to paint him in a better light. *Id.* at 77.

The state court discussed additional evidence that potentially could have been used as mitigating evidence. The court noted that Perkins was of the opinion that it would have been a disaster to put his psychological experts on at punishment because their testimony would have been that Beatty was a "very high risk for continued acts of criminal violence" and was either "a psychopath" or

12

suffered from "anti-social personality disorder," which would have hurt Beatty's case. *Id.* at 70. The state court found that Perkins did not believe that evidence of Beatty's anti-social personality diagnosed in a previous prison stay would have been helpful to Beatty at punishment because he believed that the more dangerous a capital offender appears to the jury, the more likely the jury will assess the death penalty. *Id.* at 71. It was further found that Perkins thought that evidence of Beatty's head injuries and antisocial personality would have been double-edged testimony. *Id.* at 75. The state court found that Perkins made a strategic decision not to present evidence that Beatty was enrolled in the PAMIO ("Program for Aggressive and Mentally Ill Offenders") because of the implications of the name of the program, the fact that Beatty did not "flourish" in it, and because after his discharge from PAMIO he killed his mother. *Id.* at 71. Hawk agreed with the strategic decision not to present evidence of the PAMIO program. *Id.* at 76. The state court found that Perkins would not assign any mitigating value to evidence, if it existed, that Click was addicted to drugs and alcohol. *Id.* at 72. It was further found that Perkins stated that he did not know how he could have presented evidence that Beatty was impacted by the lack of a father in his life without Beatty testifying. *Id.*

The state court found that both attorneys expressed the opinion that they provided effective assistance of counsel. *Id.* at 75, 76. The state court found that Beatty failed to overcome the strong presumption that counsel's conduct was reasonable and professional. *Id.* at 82. As a conclusion of law, the state court made the following finding regarding Sheri Stillwell, who was Beatty's mitigation specialist for purposes of the state writ proceedings:

> The Court finds and concludes that the affidavit of Ms. Sheri Stillwell, who did not testify at the evidentiary hearing, is overly biased and contains intentionally one-sided or exaggerated accounts of the witness interviews she conducted. For instance, the testimony at the hearing established that she would only ask potential witnesses about whatever they could testify negatively regarding the victim while ignoring the overwhelming aggravating evidence they had concerning Applicant to label the witness "mitigating." Moreover, she states both legal and medical conclusions regarding potential evidence that she simply is not qualified to make. The Court concludes that her entire affidavit should be discounted as unreliable and misleading, perhaps intentionally so.

*Id.* at 83. The state court concluded that Beatty had not met his burden in establishing that his trial attorneys were ineffective for making the reasonable strategic decisions to proceed in the manner they did in this case. *Id.* at 84. The state court found that Beatty was represented by counsel who provided

effective assistance of counsel. *Id.* The state court further found that there was no credible evidence before the court that his trial attorneys and defense team provided ineffective assistance. *Id.* The state court finally found that the complaints contained in the state application for a writ of habeas corpus were not well taken and should be denied. *Id.*

Beatty argued that his attorneys failed to properly investigate, discover and present mitigating evidence in violation of *Strickland v. Washington*, 466 U.S. 668 (1984). He focused on the following three Supreme Court cases in discussing the duties of counsel during the sentencing phase of a capital trial: *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Rompilla v. Beard*, 545 U.S. 374 (2005). In these cases, the focus in determining whether counsel was deficient was "on whether the investigation supporting counsel's decision not to introduce mitigation evidence ... *was itself reasonable.*" *Wiggins v. Smith,* 539 U.S. at 523. In *Wiggins,* the defense counsel's investigation was unreasonable because counsel consulted only two sources regarding the defendant's "life history": a one-page pre-sentence investigation and a city social services record. *Id.* Similarly, in *Williams v. Taylor,* counsel's investigation was unreasonable because counsel failed to obtain prison records showing Williams's nonviolent behavior and failed to obtain other records indicating Williams' "nightmarish childhood" due to counsel's incorrect belief that state law barred access to such records. 529 U.S. at 395-96. And in *Rompilla v. Beard,* counsel's investigation was unreasonable because counsel failed to review a prior conviction file used by the prosecution, a file that would have alerted counsel that further investigation was necessary. 545 U.S. at 390-91.

The legal principles governing ineffective assistance of counsel claims were established by the Supreme Court in *Strickland*. *Strickland* provides a two-pronged standard, and a habeas petitioner bears the burden of proving both prongs. 466 U.S. at 687. Under the first prong, a petitioner must show that counsel's performance was deficient. *Id.* To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688. The standard requires the reviewing court to give great deference to counsel's performance, strongly presuming counsel exercised reasonable professional judgment. *Id.* at 690. Under the second prong,

a petitioner must show that his attorney's deficient performance resulted in prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697.

In the context of § 2254(d), the deferential standard that must be accorded to counsel's representation must also be considered in tandem with the deference that must be accorded to state court decisions, which has been referred to as "doubly" deferential. *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* "If the standard is difficult to meet, that is because it was meant to be." *Id.* at 786. *Also see Morales v. Thaler*, 714 F.3d 295, 302 (5th Cir. 2013).

Beatty argued that his attorneys were ineffective because they failed to investigate, discover and present mitigating evidence. In a capital sentencing proceeding, "defense counsel has the obligation to conduct a "reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 230, 236-37 (5th Cir. 2002) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983)). *See also Woods v. Thaler*, 399 Fed. Appx. 884, 891 (5th Cir. 2010), *cert. denied*, 131 S.Ct. 2444 (2011). In assessing whether counsel's performance was deficient, courts look to such factors as what counsel did to prepare for sentencing, what mitigation evidence he had accumulated, what additional "leads" he had, and what results he might reasonably have expected from those leads. *Neal*, 286 F.3d at 237. The reasonableness of counsel's investigation involves "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. at 527. *See also Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008), *cert. denied*, 129 S.Ct. 2383 (2009). "[C]ounsel should consider presenting . . . [the defendant's] medical history, educational history, employment and

15

training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Id.* at 524 (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.8.6, at 133 (1989). The Supreme Court stated in *Wiggins* that the "investigation into mitigating evidence should comprise efforts to discover *all reasonably available* mitigating evidence." *Id.*

> The Court added, however, that the investigation into mitigating evidence has limits:
>
> [We] emphasize that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the "constitutionally protected independence of counsel" at the heart of *Strickland*, 466 U.S., at 689, 104 S.Ct. 2052. We base our conclusion on the much more limited principle that "strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." *Id.* at 690-91, 104 S.Ct. 2052. A decision not to investigate thus "must be directly assessed for reasonableness in all the circumstances." *Id.*, at 691, 104 S.Ct. 2052.

539 U.S. at 533. In *Wiggins*, the Supreme Court held that counsel's representation "fell short of . . . professional standards" for not expanding their investigation beyond the investigation report and one set of records they obtained, particularly "in light of what counsel actually discovered" in the records. *Id.* at 524-25. More recently, the Court found counsel's representation deficient when he failed "to conduct *some* sort of mitigation investigation" even though his client was fatalistic and uncooperative. *Porter v. McCollum*, 558 U.S. 30, 40 (2009). *See also Rompilla v. Beard*, 545 U.S. at 381-82 (counsel's investigation was unreasonable because counsel failed to review a prior conviction file used by the prosecution, a file that would have alerted counsel that further investigation was necessary). On the other hand, the Supreme Court has found that counsel's performance was not deficient where he gathered a substantial amount of information and then made a reasonable decision not to pursue additional sources. *Bobby v. Van Hook*, 558 U.S. 4, 11-12 (2009). Similarly, in *Strickland*, the Court found that counsel's decision not to seek more character or psychological evidence than was already in hand was reasonable. *Strickland*, 466 U.S. at 699. In order to establish that counsel was ineffective due to a failure to investigate the case, Beatty must do more than merely allege a failure to investigate; instead, he must state with specificity what the investigation would have revealed, what specific

evidence would have been disclosed, and how the evidence would have altered the outcome of the trial. *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994); *Rose v. Johnson*, 141 F.Supp.2d 661, 691 (S.D. Tex. 2001).

In the present case, trial counsel engaged in efforts to comply with professional standards, including ABA guidelines, for investigating, discovering and developing mitigating evidence. The attorneys assembled a team to discover such evidence, which included the appointment of an investigator, a mitigation expert, psychologists to look into the issue of future dangerousness and a medical expert to review the autopsy report. Beatty was interviewed in order to uncover the names of potential witnesses, although he was not helpful. Despite the fact that Beatty expressed a desire to be executed as opposed to receiving a life sentence, they persisted in conducting an investigation in order to discover mitigating evidence. In this sense, counsel's efforts were distinguishable from those described in *Wiggins* and *Porter*. Randall spent an extensive amount of time investigating possible leads, including medical leads, and Linn interviewed the people who were discovered though the investigation. Ultimately, however, the investigation failed to uncover any credible person to testify on Beatty's behalf. Trial counsel was not deficient for failing to discover mitigating evidence where no reasonable lead was available. *Blanton*, 543 F.3d at 239.

Beatty acknowledged in his petition that trial counsel did not totally abrogate their duties as trial counsel in a capital murder case. He acknowledged that trial counsel incorporated a defense team that included psychological/psychiatric experts, a mitigation investigator and a forensic expert. He argued that the assembling of the team did not constitute effective assistance *per se*. He argued that counsel was ineffective because much work was left undone and potential witnesses were not contacted. His position basically stands for the proposition that counsel was ineffective because there were witnesses who could have been discovered and their testimony could have been used as mitigation evidence. However, the defense team endeavored to discover all potential leads and to investigate them. Perkins testified that nothing "panned out." Supp. CR at 72. Once again, the defense team cannot be viewed as ineffective for failing to discover mitigating evidence where no reasonable lead was available.

Beatty argued that all potential mitigating evidence should have been brought to the jury's attention. Trial counsel, however, developed the trial strategy that they would offer mitigating evidence if the good outweighed the bad evidence. They did not want to risk opening the door to overwhelming aggravating evidence in order to establish a single mitigating factor. Their goal was to avoid prejudicing any chance that Beatty had of receiving a life sentence. For purposes of the present proceeding, Beatty disputes their approach and argued that there was not anything to lose since the vast majority of the testimony had already been heard by the jury. Nonetheless, the decision to forego presenting "double-edged" evidence was a reasonable trial strategy. *Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012), *cert. denied*, 133 S.Ct. 1244 (2013); *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir. 2003) (holding that a tactical decision not to pursue and present potentially mitigating evidence on the ground that it is double-edged in nature is objectively reasonable); *Rodriguez v. Quarterman*, 204 Fed. Appx. 489, 500 (5th Cir. 2006), *cert. denied*, 549 U.S. 1350 (2007). Defense counsel would not have presented any of the Day family members because their testimony would have been more aggravating than mitigating. For the same reason, they would not have presented Twyla Johnson or Leanne Wilkinson as mitigating witnesses.

Counsel also strategically declined to offer Click's medical records. The state court found that the members of the defense team were in agreement that it would not bode Beatty well to try to paint Click in a negative light in front of a Smith County jury when the greater weight of the evidence showed that she doted on Beatty and did nothing to deserve the cruel beating and murder she suffered at her son's hands. Supp. CR at 83. The state court found that the decision to forgo offering such evidence was a fully-considered strategical decision and that Beatty failed to overcome the strong presumption that counsel's conduct was reasonable and professional. *Id.*

After reviewing all of the evidence and testimony presented during the habeas evidentiary hearing, the state court found that Beatty failed to overcome the strong presumption that counsel's conduct was reasonable and professional. Applying the doubly deferential standard that must be accorded to state court decisions on the merits regarding ineffective assistance of counsel claims, the Court concludes that Beatty has not shown that counsel's representation was not reasonable nor that

the state court's findings were unreasonable. At best, Beatty demonstrated that fairminded jurists could disagree on the correctness of the state court's decision, but federal habeas relief is precluded because he failed to show that all reasonable jurists would disagree with the state court's conclusion that counsel's representation was not deficient. He failed to satisfy the first prong in the *Strickland* analysis.

The analysis with respect to the first ineffective assistance of counsel claim could end at this juncture; nonetheless, relief should also be denied because Beatty failed to satisfy the prejudice prong. In reviewing the issue of prejudice at capital sentencing, courts must weigh the quality and quantity of the available mitigating evidence, including that presented in post-conviction proceedings, along with the aggravating evidence. *Williams v. Taylor*, 529 U.S. at 397-98; *Blanton*, 543 F.3d at 236. The question for a court's consideration is whether the changes to the mitigation case would have a reasonable probability of causing a juror to change his or her mind about the death penalty. *Blanton*, 543 F.3d at 236; *Neal*, 286 F.3d at 241. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S.Ct. at 792 (citing *Strickland*, 466 U.S. at 693). There is no prejudice when the new mitigating evidence "would barely have altered the sentencing profile presented" to the decisionmaker." *Sears v. Upton*, 130 S.Ct. 3259, 3266 (2010) (citing *Strickland*, 466 U.S. at 700).

As an initial matter, Beatty cannot satisfy the prejudice prong because he blocked counsel's efforts to discover and present mitigating evidence. In preparation for trial, he did not provide the defense team with any names of people who could provide mitigating evidence. He expressed a preference for the death penalty, as opposed to life in prison. He would not help his attorneys develop a case in an effort to secure a life sentence, as opposed to the death penalty. During the *ex parte* hearing in the punishment phase of the trial, Beatty expressed an understanding about counsel's efforts to develop and present mitigating evidence in his behalf and he advised the trial court that he did not want to testify and did not want his possible mitigating witnesses called to testify.

"Under Fifth Circuit case law, 'when a defendant blocks his attorney's efforts to defend him, including forbidding his attorney from interviewing his family members for purposes of soliciting their testimony as mitigating evidence during the punishment phase of the trial, he cannot later claim

ineffective assistance of counsel.'" *Sonnier v. Quarterman*, 476 F.3d 349, 362 (5th Cir. 2007) (quoting *Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004)). The Supreme Court has noted, however, even though it has never imposed an "informed and knowing" requirement on a defendant's decision not to introduce mitigating evidence, it assumed without deciding that such a requirement existed. *Schiro v. Landrigan*, 550 U.S. 465, 479 (2007). *See also Clark v. Thaler*, 673 F.3d 410, 422 (5th Cir. 2012), *cert. denied*, 133 S.Ct. 179 (2012).

In the present case, Beatty was clearly informed about his right to present mitigating evidence. The possible mitigating evidence was reviewed in the *ex parte* hearing before the trial court. He then advised the trial court that he did not want to testify and that he did not want his possible mitigating witnesses to testify. His decision to forego presenting mitigating evidence was informed and knowing. Moreover, leading up to the trial, he thwarted his attorneys' efforts to develop and present mitigating evidence. Consequently, he may not now claim that his attorneys were ineffective for following his instructions and failing to present mitigating evidence.

Alternatively, Beatty has not satisfied his duty of showing prejudice. The trial attorneys explained that they would not have presented any evidence that was double-edged. They would not have presented evidence that was more aggravating than mitigating. The state court found that the evidence that could have been offered by the Days was substantially more aggravating than mitigating. Indeed, both Day children testified that they could not think of one good thing to say about Beatty other than the one incident where he intervened. Beatty has not shown that the decision was unreasonable. Wilkerson's potential testimony was likewise problematic. The state court found that Wilkerson was a biased witness, who may let her relationship with Beatty taint her testimony to paint him in a better light. Once again, Beatty has not shown that the finding as to why she would not have been called as a witness was unreasonable. With respect to Twyla Johnson, the state court found that Beatty came over to her house with a turkey after he killed his mother and ate Thanksgiving dinner with her family and friends, and that she did not know at the time that he had buried the victim in the backyard of her house the day before. The finding presumably also stood for the proposition that the evidence was more aggravating than mitigating and would not have been offered.

By comparison, the aggravating evidence presented at trial was overwhelming. In addition to the evidence of the murder, the State presented evidence regarding Beatty's extensive criminal history, including drug possession, theft, weapons possession, a brutal assault against a child under two years of age, and prior assaults against his mother, a correctional officer and others. A correctional officer testified about the prevalence of violence in prison and specifically discussed Beatty's membership in a prison gang, a physical altercation he had with Beatty, and a shank that was found on Beatty. Royce Smith, an investigator, testified about the potential for inmate violence in prison. Dr. Tynus McNeel and Dr. Edward Gripon testified that Beatty would likely pose a future danger to society. Beatty has not substantially shown that a different result would have occurred if the mitigating evidence he presented during the habeas evidentiary hearing had been presented during the punishment phase of the trial.

Beatty argued in both his petition and in his response that the Supreme Court in *Wiggins* warned against making "ad hoc" rationalizations of prior performance. In *Wiggins*, the Supreme Court actually warned against making *"post hoc"* rationalizations:

> When viewed in this light, the "strategic decision" the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing.

539 U.S. 526-27. *See also Harrington*, 131 S.Ct. at 788. Despite criticizing the use of *post hoc* rationalizations of counsel's actions, the Supreme Court has found that the *Strickland* standard in analyzing the prejudice prong "necessarily requires a court to 'speculate' as to the effect of the new evidence - regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Sears v. Upton*, 130 S.Ct. at 3266-67. A court must assess the probability of a different outcome by considering the totality of the available mitigation evidence - both that adduced at trial and the evidence adduced in the habeas proceeding - and reweighing it against the evidence in aggravation. *Id.* at 3266. As such, the impact of the possible mitigation evidence presented during the state habeas hearing in the present case must be analyzed and reweighed against the evidence in aggravation. The state trial court weighed the potential mitigating evidence and found that it lacked

much weight.  Due to the overwhelming nature of the aggravating evidence, there is no reasonable probability that, had the jury heard the evidence from the witnesses presented by Beatty during the writ evidentiary hearing, including the Days, Twyla Johnson and Leanne Wilkerson, it would not have imposed the death penalty.  The state court found that Beatty was represented by effective assistance of counsel, which implies that there was a finding that Beatty did not demonstrate prejudice, although that terminology was not specifically used.  The state court's determination that Beatty did not demonstrate prejudice was well within the bounds of AEDPA reasonableness.  At best, Beatty can only demonstrate that fairminded jurists could disagree on the correctness of the state court's decision, but federal habeas relief is precluded because he failed to show that all reasonable jurists would disagree with the state court's conclusion that Beatty was not prejudiced by counsel's representation.  He thus failed to satisfy the second prong in the *Strickland* analysis.

**B.**      **Ineffective Assistance of Counsel Regarding Failure to Show the Killing was Murder Rather than Capital Murder**

Beatty argued in his second ground for relief that his attorneys were ineffective for failing to properly investigate facts that would have shown that the killing in this cases was murder, as opposed to capital murder.  He noted that the State contended that this case was a murder in the course of a burglary or a robbery, which elevated the murder case to a capital case.  Beatty argued that Texas law recognized the importance for a jury to understand the dynamics between the parties in a homicide case.  Although there was some evidence admitted at trial showing the relationship between the parties, it was the unbending contention of the State that the decedent was a kind, weak, disabled, loving woman and Beatty must have killed her for the purpose of obtaining property or burglarizing her home. Beatty argued that although the evidence amply demonstrated during the writ hearing that she could be a kind, good natured woman, she had another side.  The other side described by Ms. Wilkerson was that she was a "mean cold hearted bitch," who initiated fights with her son and knew how to push buttons.  Beatty stressed that the witnesses who testified to Click's other side were known to trial counsel.  They were Click's neighbors, who were included on the State's witness list.  It was noted that Roy Linn spoke to Wilkerson but did not ask any questions regarding the decedent's character and

nature. Beatty argued that Perkins recognized the strategy of "dirtying up the decedent," so any post trial rationalization that had he even known of this testimony he would not have offered it is an *ad hoc* rationalization at best. Beatty argued that the failure to investigate and discover this crucial information constituted ineffective assistance of counsel.

The Director responded to the ground for relief by arguing that the claim was not brought on either direct appeal or in state collateral review. He argued that it is clear that Beatty failed to exhaust his state court remedies with regard to the claim. Moreover, it is equally clear that Beatty would be barred from raising the claim in a successive state habeas application under Article 11.071 § 5(a) of the Texas Code of Criminal Procedure. *Balentine v. Thaler*, 626 F.3d 842, 857 (5th Cir. 2010). The Director argued that relief should be denied on the second ground for relief as unexhausted and procedurally barred.

Beatty conceded in his response that he did not include the exact claim in his original state application for a writ of habeas corpus. He asserted that the importance of this testimony was not evident until the writ hearing. He argued that although this issue was not included in his state application for a writ of habeas corpus, the issue was litigated, evidence was adduced at the writ hearing and at the conclusion of the state proceedings when he filed his proposed findings of fact and conclusions of law. He argued that the issue was fairly presented in state court and thus the issue has been exhausted in state court and that there is no procedural bar pursuant to 28 U.S.C. § 2254 (B)(1)(A).

State prisoners bringing petitions for a writ of habeas corpus are required to exhaust state remedies before proceeding in federal court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective. 28 U.S.C. § 2254(b)(1). In order to exhaust properly, a state prisoner must "fairly present" all of his claims to the state court. *Picard v. Connor*, 404 U.S. 270 (1981). This means that a petitioner must have informed the state court system of the same facts and legal theories upon which he bases his assertions in his federal habeas petition. *Id.* at 276-77; *Dispensa v. Lynaugh*, 847 F.2d 211, 217-18 (5th Cir. 1988). "The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly

presented to the highest state court." *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005) (internal quotation marks and citations omitted). "It is not enough that all the facts necessary to support the federal claim were before the state courts . . . or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4 (1982); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001). Rather, the petitioner must have presented the substance of his federal constitutional claim to the state courts. *Id.; Picard*, 404 U.S. at 513. The state court must have been apprised of all of the facts and legal theories upon which the petitioner bases his assertions. *Picard v. Connor*, *supra*; *Dispensa v. Lynaugh*, 847 F.2d at 217; *Rodriguez v. McKaskle*, 724 F.2d 463 (5th Cir.), *cert. denied*, 469 U.S. 1039 (1984). Where a petitioner makes the same legal claim to a federal court which he presented to the state courts, but supports that claim with factual allegations which he did not make to the state courts, he has failed to satisfy the exhaustion requirement. *Rodriguez, supra; Burns v. Estelle,* 695 F.2d 847, 849 (5th Cir. 1983). In Texas, all claims must be presented to and ruled on by the Texas Court of Criminal Appeals. *Richardson v. Procunier*, 762 F.2d 429 (5th Cir. 1985); *Deters v. Collins*, 985 F.2d 789 (5th Cir. 1993).

When a petition includes claims that have been exhausted along with claims that have not been exhausted, it is called a "mixed petition," and historically federal courts in Texas have dismissed the entire petition for failure to exhaust. *Galtieri v. Wainwright*, 582 F.2d 348, 355 (5th Cir. 1978) (*en banc*). In recent years, however, unexhausted claims in a mixed petition have been dismissed as procedurally barred. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir.), *cert. denied*, 515 U.S. 1153 (1995). *See also Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Such unexhausted claims would be procedurally barred because if a petitioner attempted to exhaust them in state court they would be barred by Texas abuse-of-the-writ rules. *Fearance*, 56 F.3d at 642. The Fifth Circuit has held that the procedural bar contained in Tex. Code Crim. Proc. Ann art. 11.071 § 5 is an adequate state ground for finding procedural bars in light of decisions by the Texas Court of Criminal Appeals. *Ibarra v. Thaler*, 691 F.3d 677, 684 (5th Cir. 2012); *Balentine v. Thaler*, 626 F.3d 842, 857 (5th Cir. 2010). The procedural bar may be overcome by demonstrating either cause and prejudice for the

default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Fearance*, 56 F.3d at 642 (citing *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991)).

In the present case, Beatty acknowledged that he did not include a ground for relief in his state application that his attorneys were ineffective for failing to properly investigate facts that would have shown that the killing in this case was murder, as opposed to capital murder. He, nonetheless, argued that the issue was exhausted because it was litigated, evidence was adduced at the writ hearing and at the conclusion of the state proceedings when he filed his proposed findings of fact and conclusions of law. It is again noted that "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts . . . or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4 (1982); *Wilder v. Cockrell*, 274 F.3d at 259. The Fifth Circuit has held that testimony discussing ineffective assistance of counsel during a writ evidentiary hearing, without more, does not satisfy the exhaustion requirement. *Bagwell v. Dretke*, 372 F.3d 748, 756 (5th Cir. 2004). Furthermore, another factor in *Bagwell* as to why the Fifth Circuit found that he had not exhausted his state remedies was the fact that he never sought to amend his state application to include such a claim. *Id.* at 755. Beatty likewise never sought to amend his state application to add the claim. In *Bagwell*, the Fifth Circuit noted that the petitioner did not set forth the claim in his proposed factual findings and conclusions of law. *Id.* In the present case, Beatty's proposed findings of fact and conclusions of law mentioned evidence that possibly could have resulted in a conviction for murder as opposed to capital murder, but he did not couch his proposed conclusions of law about this issue in terms of an ineffective assistance of counsel claim. Finally, the original application included ten grounds for relief. The ten grounds were listed by the State in the answer. CR at 100. The decision by the Texas Court of Criminal Appeals noted that Beatty "presents ten allegations." *Ex parte Beatty*, 2009 WL 1272550 at *1. There is no indication anywhere that the present issue was considered or ruled on by the Texas Court of Criminal Appeals. Overall, the court finds that Beatty did not fairly present the claim to the Texas Court of Criminal Appeals, thus he did not exhaust the issue. Beatty did not attempt to demonstrate either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim, thus the claim is procedurally barred.

Assuming *arguendo* that this specific ineffective assistance of counsel claim is not procedurally barred, Beatty still has not shown that he is entitled to relief on the claim. The Director appropriately noted that Beatty failed to offer much additional evidence that counsel could have introduced at trial which would have explained his motive for murdering his mother, beyond the testimony already heard. Neither his step-family, nor Ms. Johnson, nor Ms. Wilkerson, nor anyone else was present during the last moments of Click's life. Even though the jury did not hear directly from Beatty, the jury heard Beatty's various versions of events that he told to others. Following his arrest, he confessed that he snapped during an argument with his mother and "killed the bitch." Supp. CR at 67. In another version, he told trial witness Clary that he choked his mother in self-defense. *Id.* Ms. Wilkerson testified that Beatty told her that he killed his mother in an argument. *Id.* at 66. Beatty told a police investigator that his mother started the altercation by slapping him for coming home drunk. *Id.* at 68. Counsel's representation cannot be characterized as deficient for failing to present to the jury minimal additional statements that his mother was a mean cold-hearted bitch and could "push your buttons."

Beatty likewise failed to show prejudice. The thrust of the claim is Beatty's argument that the additional evidence could have resulted in a murder conviction, as opposed to a capital murder conviction. He did not show, however, that the additional evidence would have made any difference. Furthermore, the issue of whether there was sufficient evidence to raise the case from murder to capital murder was fully discussed on direct appeal, and the Texas Court of Criminal Appeals found that the evidence was sufficient. *Beatty v. State*, 2009 WL 619191 at *4-5. Beatty has not shown that this cumulative evidence would have made any difference in getting him a murder conviction, as opposed to a capital murder conviction. The second ground for relief is unexhausted and procedurally barred and lacking in merit.

This ineffective assistance of counsel claim should also be analyzed in light of the Supreme Court's recent decision in *Trevino v. Thaler*, 133 S.Ct. 1911 (2013). *Trevino* concerned the application of the cause and prejudice exception to a procedural default, as discussed in *Coleman v. Thompson*. In *Trevino*, the Supreme Court held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral

proceeding, there was no counsel or counsel in that proceeding was ineffective." 133 S.Ct. at 1921 (citing *Martinez v. Ryan*, 132 S.Ct. 1309, 1320 (2012)). The Court found that this rule applies to Texas. *Id.* In this case, however, as was previously shown, the second ineffective assistance of trial counsel claim lacks merit. For purposes of the exception stated in *Trevino*, Beatty has not shown a substantial claim of ineffective assistance of trial counsel. The exception to the procedural default doctrine does not apply, and the second ground for relief is procedurally barred. There is nothing else pending before the court that arguably supports relief based on *Trevino*.

In conclusion, Beatty has not shown that he is entitled to federal habeas corpus relief. The petition for a writ of habeas corpus should be denied.

## V. CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Beatty has not yet filed a notice of appeal, the court may address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the

petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the denial of Beatty's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, the court finds that Beatty is not entitled to a certificate of appealability as to his claims. It is accordingly

**ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED** with prejudice. It is further

**ORDERED** that a certificate of appealability is **DENIED**. It is finally

**ORDERED** that all motions not previously ruled on are **DENIED**.

**SIGNED this the 16th day of July, 2013.**

_____
RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE