ORIGINAL

1

REPORTER'S RECORD

VOLUME 12 OF 51   75010

TRIAL COURT CAUSE NO. 241-0978-04

THE STATE OF TEXAS          *          IN THE DISTRICT COURT

VERSUS                      *          SMITH COUNTY, TEXAS

TRACY BEATTY                *          241ST JUDICIAL DISTRICT

INDIVIDUAL VOIR DIRE - P.M. SESSION

JULY 13, 2004

FILED IN
COURT OF CRIMINAL APPEALS

JUN 1 4 2005

Troy C. Bennett, Jr., Clerk

On the 13th day of July, 2004, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the HONORABLE JACK SKEEN, JR., Judge

Presiding, held in Tyler, Smith County, Texas:


Proceedings reported by computerized stenotype machine;

Reporter's record produced by computer-assisted

transcription.

2

```
1                      A P P E A R A N C E S

2    MR. D. MATT BINGHAM, III
     State Bar Number 00787085
3    Smith County Criminal District Attorney

4    MR. J. BRETT HARRISON
     State Bar Number 00793909
5    MS. APRIL SIKES
     State Bar Number 18348790
6    Assistant Smith County District Attorneys
     Smith County Courthouse, Fourth Floor
7    Tyler, Texas  75702
     Telephone:  903.535.0520
8    Fax:  903.535.0599

9               REPRESENTING THE STATE OF TEXAS

10
     MR. ROBERT C. PERKINS, JR.
11   State Bar Number 15790405
     MR. KENNETH HAWK
12   State Bar Number 09243650
     Attorneys at Law
13   112 East Line Street, Suite 202
     Tyler, Texas  75702
14   Telephone:  903.593.7780

15              REPRESENTING THE DEFENDANT

16

17

18

19

20

21                   REPORTER'S NOTE

22       Uh-huh = Yes - Affirmative response

23        Huh-uh = No - Negative response

24   Quotation marks are used for clarity and do not necessarily
                 indicate a direct quote.
25
```

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

3

I N D E X

VOLUME 12 OF _____

(INDIVIDUAL VOIR DIRE)

                                               PAGE  VOL

JULY 13, 2004 (P.M.)

VENIREPERSON:              STATE      DEFENSE

PATRICIA ANN NORMAN

    By Mr. Bingham          9                            12

State's motion for cause.............................42   12

Defense had no objection.............................43   12

Motion granted.......................................44   12


VENIREPERSON:              STATE      DEFENSE

JOHN M. PEARSON

    By Mr. Harrison        46                            12

    By Mr. Hawk                        101               12

Defense motion for cause............................151   12

State's objection...................................157   12

Motion denied.......................................161   12

Defense use Peremptory Number 1.....................162   12


VENIREPERSON:              STATE      DEFENSE

ANNIE WORLEY

    By Ms. Sikes          166                            12

Excused by agreement................................174   12

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

```
                                                              4
```

1                    I N D E X - CONTINUED

2                    VOLUME 12 OF _____

3                 (INDIVIDUAL VOIR DIRE)

4                                              PAGE  VOL

5    JULY 13, 2004 (P.M.)

6    VENIREPERSON:

7    BETTY CAUTHERS

8    Excused by agreement...............................176   12

9

10   VENIREPERSON:

11   CLABORN MOORE

12   Excused by agreement...............................176   12

13

14   VENIREPERSON:            STATE       DEFENSE

15   SHIRLEY JUNE GRIFFIN

16       By Ms. Sikes        179                            12

17       By Mr. Perkins                 229                 12

18   Juror accepted by both sides (Juror No. 3).........256   12

19   Juror sworn.......................................257   12

20   Court's instructions to the juror.................257   12

21

22   VENIREPERSON:

23   ANJAIL NICOLE JACKSON

24   Excused by agreement...............................267   12

25
```

```
                                                          5

1                    I N D E X - CONTINUED

2                   VOLUME 12 OF _____

3                 (INDIVIDUAL VOIR DIRE)

4                                          PAGE   VOL

5    JULY 13, 2004 (P.M.)

6    VENIREPERSON:

7    MILDRED WALKER

8    Excused by agreement..............................267   12

9

10   Court Reporter's Certificate......................280   12

11

12           ALPHABETICAL VENIREPERSON INDEX

13   VENIREPERSON:                               VOL

14   CAUTHERS, BETTY

15   Excused by agreement..............................176   12

16

17   VENIREPERSON:          STATE      DEFENSE

18   GRIFFIN, SHIRLEY JUNE

19       By Ms. Sikes        179                       12

20       By Mr. Perkins                229             12

21   Juror accepted by both sides (Juror No. 3).........256   12

22   Juror sworn.......................................257   12

23   Court's instructions to the juror.................257   12

24

25
```

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

```
                                                          6
```

ALPHABETICAL VENIREPERSON INDEX - CONTINUED

VENIREPERSON:                                            VOL

JACKSON, ANJAIL NICOLE

Excused by agreement..............................267   12


VENIREPERSON:

MOORE, CLABORN

Excused by agreement..............................176   12


VENIREPERSON:             STATE      DEFENSE

NORMAN, PATRICIA ANN

    By Mr. Bingham         9                            12

State's motion for cause..........................42    12

Defense had no objection..........................43    12

Motion granted....................................44    12


VENIREPERSON:             STATE      DEFENSE

PEARSON, JOHN M.

    By Mr. Harrison        46                           12

    By Mr. Hawk                       101               12

Defense motion for cause.........................151   12

State's objection................................157   12

Motion denied....................................161   12

Defense use Peremptory Number 1..................162   12

```
                                                         7
 1              ALPHABETICAL VENIREPERSON INDEX - CONTINUED

 2   VENIREPERSON:                                      VOL

 3   WALKER, MILDRED

 4   Excused by agreement...............................267  12

 5

 6   VENIREPERSON:              STATE      DEFENSE

 7   WORLEY, ANNIE

 8        By Ms. Sikes         166                         12

 9   Excused by agreement...............................174  12

10

11

12                        EXHIBITS INDEX

13   DEFENDANT'S

14   NO.    DESCRIPTION               OFFERED ADMITTED VOL

15   A     Venireperson John M. Pearson's    161    161   12
           criminal history
16
     B     Venireperson John M. Pearson's    161    161   12
17         questionnaire

18

19

20

21

22

23

24

25
```

8

1              P R O C E E D I N G S

2                  (July 13, 2004)

3              (Open court, defendant present.)

4              (The following proceedings were reported by

5              Kim Christopher, CSR:)

6              (Venireperson Norman enters the courtroom.)

7              THE COURT:  Ms. Norman?  Yes, ma'am.  Just

8   come right around and have a seat, please, ma'am.

9              We are on the record in Cause

10  No. 241-0978-04, the State of Texas versus Tracy Beatty.

11  State's counsel is present, defense counsel is present, and

12  the defendant is present.

13              Ms. Norman, how are you this afternoon?

14              VENIREPERSON NORMAN:  Fine.

15              THE COURT:  Doing okay?

16              VENIREPERSON NORMAN:  Uh-huh.

17              THE COURT:  You remember when we were back --

18  Thursday when we were talking about the voir dire individual

19  selection process that you were going to go through?  That's

20  about what's getting ready to take place right now, and I

21  just want to mention two or three things to you about that,

22  okay?

23              Number one, there aren't any right or wrong

24  answers to the questions that you're going to be asked.

25  Both the State's attorneys and defense attorneys just want

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

9

1  to find out how you truthfully feel about your views and

2  whether or not you can follow certain laws they're going to

3  go over with you.  They'll talk to you about the different

4  phases of the trial and sentencing procedures that come into

5  effect if the defendant is convicted of the -- of an

6  offense.

7             The oath that I gave you back on Thursday,

8  all of you as a panel, that oath still applies, so your

9  answers are under oath.

10            Can you think of anything in regard to that

11  questionnaire that you filled out Thursday that you might

12  want to tell us, anything that you need to add to that now?

13  Sometimes, you know, you fill that out, ask a bunch of

14  questions you never have thought of before.  Anything you'd

15  want to add to that now, tell us about?

16            VENIREPERSON NORMAN:  No.

17            THE COURT:  All right.  Well, I'm going to go

18  ahead, then, and let Mr. Bingham, the criminal district

19  attorney here in Smith County, ask you some questions,

20  Ms. Norman.  Thank you.

21            PATRICIA ANN NORMAN,

22  having been duly sworn as a member of the special venire,

23  was examined as follows:

24  BY MR. BINGHAM:

25      Q.   Ms. Norman, how are you doing?

10

1      A.    Okay.

2      Q.    Did you get paid your $6?

3      A.    Yes.

4      Q.    This is probably going to be the hardest $6 you've

5    ever earned, because by the time you get out of here, it's

6    not going to be worth it to you, I promise you.

7            This is a process where it takes some time,

8    and we get to field some questions to you that you have to

9    answer.  And some of them are complicated, because it's not

10   stuff you think of every day.  You know, you don't sit back

11   there and contemplate the special issues in a capital murder

12   case normally.

13           And then just when I'm done asking you some

14   questions, Mr. Perkins or Mr. Hawk will probably -- as

15   they're entitled to, will ask you some more questions.  Some

16   of them might even be different than what we've asked.  And

17   sometimes even Judge Skeen -- obviously, he can do that --

18   will ask you some questions possibly.

19           We've all been over your questionnaire.  We

20   had those provided in advance, and so we're going to talk

21   about that a little bit.  When you came in last week with

22   202 other citizens of Smith County, you probably didn't

23   know, really, what you were there on at first; is that

24   right?

25     A.    No.  Huh-uh.

11

1    Q.   And as we went through, I think at some point you

2 began to realize this probably was a pretty serious case.

3    A.   Uh-huh.

4    Q.   And then Judge Skeen told you that it was a state

5 case where the State had filed a notice of intent to seek

6 the death penalty.  At that point, what went through your

7 mind?

8    A.   Truthfully?

9    Q.   Yeah.

10    A.   I was ready to go home.

11    Q.   Ready to go home.  Yeah, I know it was a long

12 afternoon anyway.  And, actually, Judge Skeen does it a lot

13 quicker than some other judges do, you know, so it's a long

14 process.  It's a lot to cover, obviously, because of how

15 important the case is.

16        If this was just a murder case -- and I say

17 "just a murder case," because the range of punishment on a

18 murder case is, obviously, in the penitentiary.  In some

19 cases, five years -- well, in all cases, it's five years in

20 the penitentiary up to ninety-nine years or life.  So

21 there's a wide range.

22        In a capital murder case, there are only two

23 options.  If the defendant is found guilty of capital murder

24 and the State is seeking the death penalty, that's life or

25 death.

12

1                So the procedure has to be different, and

2    there are certain requirements placed upon the Judge

3    pursuant to the law, and there are requirements on us and on

4    the Defense.   There are requirements on people who are

5    qualified to sit as jurors in these type of cases,

6    obviously.

7                Would you agree that Mr. Beatty in this case

8    is entitled to an absolute, 100 percent, unequivocally fair

9    trial?

10        A.   Yes.   Everybody would be.

11        Q.   Right.   And a lot of people, you know, when you

12   think of the criminal justice system, tend to focus on the

13   person who is charged with the crime as the one who has the

14   rights, but we do, too.

15        A.   Uh-huh.

16        Q.   The State of Texas, which is represented in this

17   county by myself and the people that work in my office,

18   Mr. Harrison, who is my first assistant, April Sikes, who is

19   chief felony prosecutor, we're also entitled to a fair

20   trial.   Would you agree with that?

21        A.   Uh-huh.

22        Q.   Okay.   I know the Court's going to tell you, but

23   you have to answer yes or no because Mrs. Christopher is

24   taking it down on the --

25        A.   Yes.

13

1                    THE COURT:  I'm sorry, ma'am.  I should have

2       mentioned that to you.  That's just so our court reporter

3       can get down everything you say.

4                    VENIREPERSON NORMAN:  Okay.

5                    THE COURT:  I'm sorry.

6            Q.    (By Mr. Bingham) And rightfully so, people focus a

7       lot on the defendant as the ones that -- you know, they tend

8       to focus on we have to be able to be a hundred percent fair

9       and then kind of look at us as maybe an institution that,

10      you know, if they get it, they get it; if they don't, they

11      don't.

12                   We, too, are entitled to a fair trial.  So

13      you said you would agree with that, right?

14           A.    Yes.

15           Q.    In going through your card, obviously, there's

16      probably -- your card -- in this case, it's a questionnaire.

17      There is one thing that's going to probably pop out at us as

18      on the State side as being a red flag in a death penalty

19      case.  What part of your questionnaire do you think that is?

20           A.    When I answered that, I would agree to it.

21           Q.    Right.  And the part that you said -- and let me

22      tell you something early on in this situation.  You hear

23      terms -- out in, I guess, the sane world, outside the

24      courthouse, you hear terms like "bias" and "prejudice," and

25      to me, if I'm outside the courthouse, they have negative

14

1    connotations.  They seem to infer hate, an unwarranted

2    dislike, not a fair person.

3                Do you agree with that, that those terms have

4    a negative connotation in the normal community?

5        A.    In some ways, yes.

6        Q.    Inside the courtroom, terms like "bias,"

7    "prejudice" have a legal meaning.  That means that for some

8    reason, that person, in your case, you, because you're here

9    right now, or a juror or a witness or anybody that's

10   involved in the criminal justice system for some reason

11   doesn't agree with something, okay?

12               It's not negative because, as a citizen, you

13   don't have to agree with the law.  You just have to be able

14   to follow the law.

15               Now, with that said, when the death penalty

16   is on the table, there's a judge here that says it like

17   this, "A death penalty case death is different."  A death

18   penalty case is different, in that most people have varied

19   decided issues.  They know how they feel on that issue.

20               Some people come in and say, "You know, let's

21   string them up on the square.  Let's do it.  We don't have a

22   problem with the death penalty."  Other people -- and that's

23   not good.  I mean, you don't want to say, "Heck, yeah, the

24   death penalty all the time."  That's not right.

25               Some people come in and go, "Look, I don't

15

1  agree with it.  I think we ought to have life without

2  parole," which we don't have in the State of Texas, okay?

3  Everybody in the State of Texas is parole eligible at some

4  point.  In a life case in a capital murder, it's 40 years,

5  okay?

6           Some people come in and say, "I think there

7  are better options.  I don't believe in the death penalty.

8  I don't believe in the Government being able to seek the

9  death penalty," or -- "and I don't believe as a juror that I

10  could sit in judgment of someone and ultimately render a

11  verdict that results in the death penalty."

12           People have varying -- there's not a whole

13  lot of gray area with people on that issue.

14       A.   Uh-huh.

15       Q.   And some people come in and can say what the law

16  requires, you know, that "I could assess it under the proper

17  type of case."

18           I see yours -- what you checked there was, "I

19  can never, under any circumstances, regardless of the law or

20  facts, return a verdict regardless of the death penalty

21  being assessed."

22           You still feel that way?

23       A.   Yes.

24       Q.   Now, the thing is -- I mean, obviously, you know

25  that we filed a notice of intent seeking the death penalty.

16

1   There is nothing wrong with the way a person feels as long

2   as they're being truthful at this process.  It's very, very

3   important to us, see, and to Mr. Beatty -- just as if I had

4   somebody saying, "You know what?  I believe in the death

5   penalty all the time."

6             Well, that would not be fair to Mr. Beatty.

7   He's entitled to have a witness -- it says "witness" right

8   there, and I keep looking at it -- a juror who can look at

9   the evidence and make that decision, not just automatically

10  say, "I'm going to give it to you," just like we're entitled

11  to have a witness (sic) that says, "You know, under the

12  appropriate facts, I could assess the death penalty."

13            Many people fall in your category.  "I don't

14  agree with it, and regardless of what the facts are or what

15  the law says, I could not assess the death penalty because

16  of my personal convictions, my personal beliefs."

17            That's where you fall, isn't it?

18  A.    Correct.

19  Q.    Let's talk a little bit about the term that I was

20  talking about, the biases and prejudices, because I want you

21  to keep in mind, when we talk about those terms here, try to

22  remember those in the context of the criminal justice

23  system.

24            "I disagree with the law to the extent that I

25  can't take an oath."  Because you'll take a lot of oaths

17

1    during this.  You've taken one already to answer the

2    questions truthfully, which you've done, and we appreciate

3    it.

4            You'll take another oath before you -- if you

5    were selected, before you sat on the jury, that you will

6    fairly and accurately render a verdict in this case, that

7    you will follow the law in the case.  And some people can't

8    take that verdict (sic) in this type of case.  A lot of

9    people -- let me -- I mean, take that oath in this type of

10   case.

11           A lot of people say, "You know, bring me in

12   here on a dope case; bring me in here on a murder case;

13   bring me in here on a sexual assault case; but I'm going to

14   have a problem with the death penalty."

15           Is that how you feel?

16   A.    Uh-huh.

17   Q.    You've got to answer yes or no.

18   A.    Sorry.  Yes.

19   Q.    Let's talk a little bit about these "bias" and

20   "prejudice" words.  There's -- one of the things -- the law

21   has certain ways that you have to -- certain inquiries you

22   have to make, and I want to talk to you a little bit about

23   that.

24           One of the areas of the law -- because one

25   thing I have to do is tell you what the law is, okay, so

18

1   you're fully informed of how this works.  Then you get to

2   tell me how you truly feel, and then we see where that

3   places you in this process.

4              Judge Kent is a judge you've probably

5   heard -- you've heard of Judge Kent?

6       A.   Uh-huh.  Yes.

7       Q.   She's been a judge here a long time, and she says,

8   you know -- she often tells the jurors, look, there is no

9   thought police.  No one is going to bust in here and go, you

10  know, we're putting you in jail for not agreeing with the

11  death penalty.

12             That's your entitlement as a citizen of this

13  county and of this state and of the United States.  You

14  know, you don't have to agree with the law.  This isn't

15  Russia.

16             So what I want to do is talk to you a little

17  bit about it so you're informed, not that -- you know, I'm

18  not trying to change your mind; I'm trying to see how you

19  feel.

20             Is the death penalty, the issue surrounding

21  the death penalty, something that you've considered at

22  various times in your life, thought about it?

23      A.   Not where I would have to be giving a verdict on

24  it, no.

25      Q.   No.  I understand.

19

1          Would something you thought -- maybe a TV or

2    news article --

3        A.    Just to the fact that I knew I couldn't

4    intentionally give a verdict that someone would be put to

5    death.

6        Q.    Okay.  And let me say this to you:  It's kind

7    of -- there's two sides to it.  If you were sitting in a

8    case, let's say, an aggravated sexual assault case, range of

9    punishment was five years to ninety-nine years or life -- if

10   the person was convicted, you would actually assess -- and

11   he went to the jury -- the defendant has a choice in a

12   noncapital case where he goes to the judge or the jury for

13   punishment.

14          But let's say he goes to the jury.  You would

15   actually listen to the evidence, guilt/innocence and

16   punishment, and render your verdict.  "I think he deserves

17   40 years, 50 years, whatever."

18          In a capital murder case where the defendant

19   has been found guilty and the State has filed a notice of

20   intention to seek the death penalty, there are those two

21   verdicts:  Life or death.

22          And you don't, at any time, pick either one.

23   In other words, you won't get a verdict with a big box that

24   says, "You know, life or death, please check one," okay?

25   It's not like that.

20

1          There are -- in this case, there would be two

2   special issues, okay?  And you have those in front of you, I

3   think.  You probably have three listed, but Number 2 won't

4   apply, so 1 and 3 would be the ones applicable.

5          And if you look at the first one, you see

6   where it talks about the -- and I'm trying to get to my

7   copies.  As many times as I've read them, I would think I

8   could quote them.

9          Do you see where it says, "Is there a

10  probability that the defendant, Tracy Lane" -- it says

11  "Beat," but it should be "Beatty" -- would commit criminal

12  acts of violence that would constitute a continuing threat

13  to society?"

14          Do you see that?

15  A.   Yes.

16  Q.   What these are, are special issues that tend to

17  narrow those people that are going to get the death penalty.

18          MR. HARRISON:  Judge, may we approach the

19  bench briefly?

20          THE COURT:  Yes.

21          (At the bench, on the record.)

22          MR. HARRISON:  Judge, we had thought and have

23  thought that the special issues in general are taped up

24  there where the venireperson sits.

25          MR. BINGHAM:  We didn't put anything up

21

1    there.

2                    THE COURT:  Are the special issues up there?

3                    MR. BINGHAM:  I don't know.  They should be.

4    I didn't place them up there.

5                    MR. PERKINS:  Could we have her step out in

6    the hall?  And I'll tell you why, and it may not be anything

7    at all.

8                    MR. HAWK:  If you would have her step out.

9                    (End of bench conference.)

10                   THE COURT:  Ma'am, could you step out just a

11   moment, please?

12                   (Venireperson Norman leaves the courtroom.)

13                   MR. PERKINS:  Here's what Mr. Bingham said.

14   "There should be some special issues up there.  It says

15   'Tracy Lane Beat'; it should say 'Beatty.'"  And I thought

16   that they had actually put something up there with his name,

17   for this defendant, and that, obviously, is objectionable.

18                   THE COURT:  Okay.  So what's over there?

19                   MR. PERKINS:  Just the general special -- it

20   just kind of gave me kind of a slight heart attack.

21                   THE COURT:  You thought his name was typed in

22   to the issue?

23                   MR. HAWK:  Well, Mr. Bingham made me believe

24   that, so we wanted to stop this.

25                   MR. BINGHAM:  This is our copy, but this was

22

1    handed to me.  I was just reading along.  I just read that.

2                THE COURT:  Oh, you've got a verdict form.

3                MR. BINGHAM:  I have a special issue, and I

4    just read it, and I know we hadn't placed anything up there.

5                THE COURT:  I understand.

6                MR. PERKINS:  That's cool.

7                THE COURT:  So just for the record, what is

8    over there are the three special issues, which should be

9    over there in front of each juror -- venireperson.

10               MR. BINGHAM:  We ought to just take a copy of

11   that and mark it and make it part of the record.

12               THE COURT:  Let's just do that right now.

13   Y'all have a copy of it?

14               MR. BINGHAM:  Well, what we could do is we'll

15   run up and make a copy of it after the next juror, and then

16   we'll mark one.

17               MR. HAWK:  We can do that at the break.  No

18   problem.

19               THE COURT:  Are those your pages over there,

20   Mr. Hawk?

21               MR. HAWK:  We actually have the same thing.

22   We just don't have 2.  We have two separate sheets.

23               THE COURT:  Okay.

24               MR. HAWK:  Special Issue Number 1 and Special

25   Issue 2, but it's the exact same thing.  We didn't put any

23

1    name in there at all.

2              MR. HARRISON:  Judge, I think the special

3    issue that is taped to the witness stand, that was placed

4    there by the Court or the Court's staff.

5              We didn't have anything to do -- the State

6    had nothing to do with placing that there.  The only other

7    copies that have been given to the jurors came from the

8    Defense.  We have not provided any of the jurors anything.

9              THE COURT:  Well, what is taped up there is

10   correct.

11             MR. HAWK:  That's how I believe it to be.

12             THE COURT:  And you just looked at it to make

13   sure.

14             MR. HAWK:  I did.

15             THE COURT:  I thought it was correct.

16             MR. PERKINS:  We were just concerned that his

17   name may have been in there.

18             THE COURT:  Now I understand.  Mr. Bingham is

19   just reading out of the verdict form.

20             MR. HAWK:  Right.

21             MR. PERKINS:  Right.  But he actually said,

22   "You should have a form up there and read along with me."

23   He read Mr. Beatty's name.  That can't be, Judge, and it

24   turns out that it's not.

25             MR. BINGHAM:  No.

24

1              THE COURT:  All right.  Ready for the

2    venireperson?

3              Just ask her to step back in.

4              (Venireperson Norman enters the courtroom.)

5              THE COURT:  Ma'am, I apologize for the

6    interruption.  That was just a matter that the Court had to

7    clear up.  Thank you very much.

8       Q.   (By Mr. Bingham) You didn't do anything.  That

9    didn't have anything to do with anything that you had done.

10             The special issues that you've got up there,

11   those are -- those are the law's way of narrowing who will

12   get the death penalty, okay?  Based on how those are

13   answered, either a life sentence would be imposed or a death

14   sentence would be imposed.

15             If you answered -- the jury answered yes to 1

16   and no to Number 3, the death penalty would be imposed.  So

17   y'all don't actually say "life" or "death"; however, you

18   know by the way you answer those -- because the Court's

19   going to tell you that if you answer them this way, this

20   way, and this way, the death penalty will be imposed.

21             So when you're back there deliberating, you

22   will know by your answers what the Court's going to do

23   before you come out, okay?  But you don't actually check a

24   box.  The law doesn't want to impose on you the burden of

25   saying "life" or "death."  But the way you answer it, you'll

25

1    know what the results will be.

2              Does that make any difference to you, or is

3    it pretty much the same views, "I couldn't participate in a

4    process where the death penalty is a possibility"?

5        A.   If there was a likelihood that my -- the way I

6    voted was going to cause the death penalty, I would have a

7    problem with that.

8        Q.   Okay.  Now, a lot of times, people will ask the

9    question -- let me start off with here, and we'll keep

10   talking a little bit about it, because I want you to know

11   that for you to come in here and say how you really feel,

12   this is a very personal -- can be a personal thing to

13   people.  It's not criticized by anybody.

14             The only thing that can be a problem is when

15   people come in here and they don't tell the truth, and then

16   that can be a problem for everybody, because this process

17   only works if we know how people really feel.  Otherwise, it

18   doesn't work, and you really are not -- justice is not

19   achieved, which is really what everybody wants.

20             If I said to you take into account what the

21   terms "bias" and "prejudice" mean to you, disagree with and

22   can't follow the law, would it be fair to say that you have

23   a bias or prejudice against any phase of the law upon which

24   the State is entitled to rely for a conviction or

25   punishment?

26

1          MR. HAWK:  Judge, I'll have to go ahead and

2     object at this time.  The proper predicate hadn't been laid

3     for the proper answer to that question.  That's the only

4     objection.

5          MR. BINGHAM:  Judge, I disagree with that.

6          THE COURT:  Well, just go ahead and restate

7     your question, Mr. Bingham.

8     Q.    (By Mr. Bingham) Well, dealing with the death

9     penalty, do you understand that if the evidence -- let me

10    even back up.

11          You understand in a criminal proceeding that

12    your verdicts are based on the evidence that you hear,

13    correct?

14    A.    Yes.

15    Q.    And in looking at your Number 3, you said, "I

16    could never, under any circumstances, regardless of the law

17    or facts, return a verdict which resulted in the death

18    penalty being assessed," right?

19    A.    Yes.

20    Q.    And you still agree with that?

21    A.    Yes.

22    Q.    Knowing that the -- that your verdicts in a case

23    have to be based on the evidence, isn't it true that even if

24    the evidence suggested that you should answer these special

25    issues in such a way that it would result in the death

27

1   penalty being assessed; in other words, you heard the

2   evidence and you said, "You know what; I believe the

3   evidence beyond a reasonable doubt should be answered in

4   such a way that the death penalty would be imposed," you

5   couldn't do that; is that correct?

6       A.   That would be correct, yeah.

7       Q.   Okay.  Let me kind of back up even more than that.

8   The first special issue says, "Is there a probability

9   that" -- we're going to spend quite a bit of time on these

10  special issues.

11           Are you comfortable?

12      A.   Okay.

13      Q.   We're going to be here a little bit.

14           Okay.  The first special issue says, "Is

15  there a probability that the defendant would commit criminal

16  acts of violence that would constitute a continuing threat

17  to society?"

18           The thing that's important to note about that

19  is you have convicted someone of capital murder, so you're

20  now in the punishment stage of trial considering whether it

21  should be life or death.

22           You never answer these special issues in such

23  a way that the death penalty -- I mean -- excuse me -- in

24  such a way -- just like answer yes to that just because he's

25  been convicted of capital murder.  You always look at the

28

1    evidence.

2        A.    Yes.

3        Q.    You follow me?

4        A.    Yes.

5        Q.    The term "probability" means -- is different than

6    possibility.  Have you ever made the lottery?  Have you ever

7    bought a lottery card?

8        A.    A few times.

9        Q.    A few times.

10            Do you think when you buy the lottery card

11   that it's probable you're going to win or possible?

12       A.    Possible, yes.

13       Q.    Right.  You see the distinction between the two?

14   It's a --

15       A.    Yes.

16       Q.    -- possibility, but maybe not that likely.

17            We actually have to prove probability, okay,

18   which is more likely than possibility, that the defendant

19   would commit criminal acts of violence that would constitute

20   a continuing threat to society.

21            Now, criminal acts of violence could be any

22   criminal act that is violent, okay?  It doesn't have to be

23   another murder or capital murder that would constitute a

24   continuing threat to society.

25            And that means the society that -- or let me

29

1   ask you this:  Do you consider the society to be -- I

2   actually think there is a legal definition of society, but I

3   don't have that case at hand right now.  But do you believe

4   society to include the society that you live in in the free

5   world, like the society here in Smith County?

6       A.   Yes.

7       Q.   Do you think that people down in the penitentiary

8   can constitute a society?

9       A.   In a way, yes.

10      Q.   I mean, there are guards down there, doctors, you

11  know, and those people are entitled to have someone down

12  there that won't hurt them, too.

13      A.   Yes.

14      Q.   Now, my question is, if -- if you knew that -- and

15  the burden of proof, of proving that there's a probability

16  that -- I can't use Mr. Beatty's name, because we can't talk

17  about the facts of this case, but a hypothetical defendant

18  would commit criminal acts that would constitute a

19  continuing threat to society, the burden of proving that is

20  on us beyond a reasonable doubt.

21          Let me give you a choice.  And if we prove

22  that to a jury beyond a reasonable doubt, they would need to

23  answer that yes if we proved it to them beyond a reasonable

24  doubt.  If they answered yes, that defendant is now one step

25  closer to the death penalty, okay?

30

1             Do you believe that if you were deliberating

2   on the verdict, that if the evidence showed you beyond a

3   reasonable doubt that you should answer that special issue

4   yes based on the evidence, would you be able to do that,

5   knowing it would put him one step closer to the death

6   penalty, or would you have to abstain from even answering

7   that question?  Could you do it?

8       A.    I would have to -- yeah.

9       Q.    What would you do?

10      A.    I would have to truthfully answer whether I

11  thought he would probably commit an additional crime in the

12  future.

13      Q.    Okay.  Now, would you -- and we're going to talk

14  about the burden of proof of beyond all reasonable doubt.

15  Beyond a reasonable doubt talks about -- that's the burden

16  of proof that I have in proving someone guilty and proving

17  that first special issue, okay?  I have to -- beyond a

18  reasonable doubt doesn't have a definition.  What I have to

19  do is extinguish all reasonable doubt in your mind.

20             What the law does tell you and what the Judge

21  will tell you is that it's not a hundred percent doubt.

22  It's not -- in other words, I don't have to prove something

23  to you a hundred percent.  I don't have to prove it to you

24  beyond all doubt, okay?  And I don't have to prove it to you

25  beyond a shadow of a doubt, because that's a Hollywood term,

31

1    not a legal term.

2              Now, beyond a reasonable doubt is whatever it

3    is to you, okay?  You'll decide what is a reasonable doubt

4    and what isn't and whether I have excluded all reasonable

5    doubt in your mind, okay?  But one thing the law will tell

6    you is, it's not a hundred percent doubt or beyond all

7    doubt.

8              My question to you is, because of the serious

9    nature of this crime and because of the fact that you would

10   be making considerations on whether or not you should answer

11   these special issues in such a way that the death penalty

12   could be imposed, would you require us to prove that to you

13   a hundred percent, that there is a probability that he would

14   commit criminal acts of violence that would constitute a

15   continuing threat to society, before you could answer it?

16        A.    I would want enough evidence, yes.

17        Q.    Okay.  And would that evidence have to prove it to

18   you a hundred percent before -- I mean, would you want to

19   know a hundred percent, to answer that question, before you

20   answered it in such a way that the death penalty could

21   possibly be imposed?

22        A.    There is no possible way you could do a hundred

23   percent.

24        Q.    That's correct.  And that's my question to you.

25        A.    No, not a hundred percent.

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

32

1     Q.   Okay.  Would you require a standard higher than

2  that required by law of beyond a reasonable doubt?

3     A.   Yes.

4     Q.   Would you require us to prove it to you beyond all

5  doubt?

6     A.   I'm not sure about that.

7     Q.   Would you require us -- our proof to be higher

8  than that which would exclude all reasonable doubt?  You

9  would want to know -- require us to prove it to you beyond

10  the exclusion of all reasonable doubt?

11     A.   Yes.

12     Q.   If the standard of the law is beyond a reasonable

13  doubt, you would require us to prove it to you at a standard

14  higher than that required by law?

15     A.   Yes.

16     Q.   Do you believe, as you sit here today, that there

17  is a possibility that if you got back there, you might

18  require us to prove it to you a hundred percent?

19     A.   I don't think so.

20     Q.   Okay.  Let's talk about Special Issue Number --

21  it's really Number 3, but it'd be the second one that you

22  saw, okay?

23          It says, "Taking into consideration" -- go

24  ahead and read that to yourself.

25     A.   (Complies.)

33

1      Q.   Okay.  What that's saying is -- this is kind of a
2   safeguard.  In other words, this is the last special issue.
3   If you've gotten here, you've convicted the defendant of
4   capital murder, and you have found that he -- the answer to
5   that first special issue of him being a future danger is
6   yes.
7           So if you answer no here, the death penalty
8   is going to be assessed, okay?  This is the last thing you
9   have to consider.  If you answer no, we're going to come
10  back in here, and the Court's going to say, "The Court is
11  sentencing you to death."
12          Now, as you sit here right now, I can see
13  your facial expression kind of changes a little bit on that.
14  What do you think about when you think about walking back
15  and sitting in that jury box with 11 other jurors, listening
16  to the Court say, "The Court, based on the verdict, based on
17  the special issues, imposes on you the sentence of death"?
18     A.   I don't like it.
19     Q.   Yeah.  It runs against your personal views?
20     A.   Right.
21     Q.   Okay.  Special Issue Number 3 is the last hurdle.
22  There are really three hurdles in this case because we're
23  only using two of the special issues.  Number 3 won't
24  apply -- I mean, the second one in front of you won't apply
25  in our fact scenario.  If the State gets over Hurdle 3 and

34

1    you answer no, then he's going to get the death penalty.

2             Now, there is no burden of proof on this

3    special issue at all.  We don't have to prove that there is

4    a mitigating circumstance; neither does the Defense.  But

5    let's go over this special issue a little bit.

6             It says, "Taking into consideration all the

7    evidence, including the circumstances of the offense, the

8    defendant's character and background, and the personal moral

9    culpability of defendant, is there sufficient mitigating

10   circumstance or circumstances to warrant that a sentence of

11   life in prison rather than the death sentence be imposed?"

12            That means, really, mitigate -- number one,

13   it has to be a mitigating circumstance that is sufficient to

14   warrant life over death, okay?

15            Now, what is mitigating?  A mitigating

16   circumstance could be anything it is to you.  I mean,

17   anything in the evidence you've heard that you say, "You

18   know what?  I think that was sufficiently mitigating to

19   warrant life over death."  It could be something in the

20   defendant's background.

21            Can you think of things -- well, maybe after

22   this.  It can be anything you think it is, okay?  You could

23   just say, "I think that's sufficiently mitigating to warrant

24   life over death," and, bam, it just is, okay?

25            Now, you know that if you answer this special

35

1   issue -- you look at all the evidence, you answer that

2   special issue no, you're coming out there, and the death

3   sentence is fixing to be imposed.

4           Would you always find in every case something

5   sufficiently mitigating to warrant life over death?

6       A.   Yes.

7       Q.   Now, that is not an unfair answer because it's the

8   way you feel.  You see what I'm saying?

9           Is it fair to say that before you go into a

10  case -- and by you answering yes, you understand that that's

11  not what the law says, but that's how you feel?

12      A.   Uh-huh.

13      Q.   You have to have to answer yes or no.

14      A.   Yes.

15      Q.   Because the point being is, you always -- in your

16  views, you always pick life, right?

17      A.   Right.

18      Q.   And because you always pick life, regardless of

19  what the evidence was in a particular case, regardless of

20  what the guilt/innocence evidence showed, regardless of what

21  the punishment evidence showed, regardless of considering

22  all of the; evidence, the circumstance of the offense, the

23  defendant's character and background, the personal moral

24  culpability of the defendant, you will always find something

25  sufficiently mitigating to warrant life over death in order

36

1    to ensure that a life sentence would be imposed, right?

2        A.   That would be a true fact, yes.

3        Q.   I'm sorry.  I can't hear you.  I'm under this fan.

4        A.   Yes.

5        Q.   Yes.  Okay.

6             Now, let me talk a little bit about -- and

7    you realize, on that special issue, there is no burden of

8    proving anything.  Like I told you, I don't have to prove

9    anything; the Defense doesn't have to prove anything.

10   Either it's there or it isn't.

11            You understand that, right?

12       A.   Right.  Uh-huh.

13       Q.   So let's talk about this a little bit more, this

14   third special issue.  You understand that just how you've

15   answered, and there's nothing wrong with it, okay, that that

16   is contrary to the law?

17       A.   Yes.

18       Q.   And you understand that -- now, let me ask you

19   this question:  Do you think you understand how the law

20   applies to those special issues and the effect of how you

21   vote on those?

22       A.   Yes.

23       Q.   Let me ask you this question then:  Let's take

24   into account the third special issue.  You believe, based on

25   your views, that you would always pick life, right?

37

1    A.   Yes.

2    Q.   Do you believe, then, you would have a bias or a

3  prejudice against any phase of the law in which the State is

4  entitled to rely for conviction or punishment?

5    A.   Restate that.

6    Q.   Sure.  Do you believe -- you don't agree with the

7  death penalty, right?

8    A.   Right.

9    Q.   And you would always find something sufficiently

10 mitigating in order for a life sentence to be imposed?

11   A.   Yes.

12   Q.   Now, would you agree, then, that because you would

13 always find something sufficiently mitigating, regardless of

14 what the evidence showed, that you have a bias or prejudice

15 against any phase of the law in which the State is entitled

16 to rely for conviction of punishment, including the third

17 special issue?

18   A.   Yes.

19   Q.   Would you -- and let's talk a little bit about the

20 death penalty.  The Court would tell you that -- I believe,

21 in just talking to you, that -- and this may not be any of

22 my business -- none of my business, any of my business --

23 that you strive -- you're someone that is going to want to

24 be honest?

25   A.   Yes.

38

1     Q.   That you want to do the right thing, and you want

2 to do what you believe is right?

3     A.   Yes.

4     Q.   And you know that in this process, that you

5 probably know already that some of the answers you've given

6 disqualify you as a juror, possibly, in a death penalty

7 case, fair?

8     A.   Yes.

9     Q.   If you took an oath, you would want to know that

10 you could do what you're taking an oath to do, right?

11    A.   Yes.

12    Q.   I mean, otherwise, no one wants to take an oath

13 and say, "I solemnly swear or affirm that I will true

14 answers -- that I will base my verdict on the evidence," so

15 on and so forth, "that I will listen attentively to the

16 evidence," take an oath as a juror to do something you can't

17 do, right?

18    A.   Right.

19    Q.   In this case, can you take an oath that you will

20 be fair or that you will base your verdict -- let me back up

21 because that's going to be a confusing question.

22           What I heard you say in what is the third

23 special issue in front of you is that regardless of all the

24 evidence, the circumstances of the offense, the defendant's

25 character and background, his personal moral culpability,

39

1  that you're always going to find something sufficiently

2  mitigating, regardless of what the evidence shows, to

3  warrant life over death, correct?

4      A.   Correct.

5      Q.   So it's fair to say you could not take an oath

6  that you would answer that verdict -- these verdict forms

7  based on the evidence -- what you believe the evidence

8  showed because, regardless of the evidence, you would always

9  answer that third special issue yes?

10     A.   Yes.

11     Q.   Okay.  And you understand my questions?

12     A.   Yes.

13     Q.   Now, let me ask it in that way.  Because you would

14  always answer the third special issue based on the fact that

15  you want a life sentence to be imposed instead of the

16  evidence, would you also agree then -- I might have asked

17  you this already -- but that you have a bias or prejudice

18  against any phase of the law upon which the State is

19  entitled to rely for conviction of punishment because you

20  will always answer that third special issue yes?

21     A.   Right.

22     Q.   And because of that, let's talk a little bit about

23  the oath.  The oath is given to you by the Court as you're

24  seated in the jury box with 12 (sic) other jurors to ensure

25  that the process that you're about to participate in, that

1  you're able to do it pursuant to the law and honestly -- and

2  that you understand your duties.

3           You know, the oath says, "Do you solemnly

4  swear or affirm" -- I don't have the oath memorized, but is

5  to ensure that this step goes -- that this trial goes

6  100 percent fair to the defendant and to the State.

7           Do you believe your views on the death

8  penalty would prevent or substantially impair the

9  performance of your duties as a juror in accordance with the

10  instructions that you would receive from the Court and the

11  oath that you would be required to take?

12       A.   From what you said, yes.

13       Q.   Okay.  Now, let's talk a little bit more about --

14  about the death penalty and --

15           MR. BINGHAM:  Can I have one moment, Judge?

16           THE COURT:  Yes, sir.

17       Q.   (By Mr. Bingham) The -- I guess I could sit here

18  and talk to you for quite a while.  Do you -- the views you

19  have on the death penalty, would you consider those to be

20  strong views?

21       A.   For me, yes.

22       Q.   For you.  In other words, I can sit here all day,

23  and you're not going to say, "You know what; you've

24  convinced me that I could assess the death penalty if the

25  evidence showed it"?

41

1      A.    No.

2      Q.    No.  Okay.  I don't believe myself to be that

3 persuasive.  I mean, pretty much, what you're saying is,

4 "I'm always going to find a way to assess a life sentence"?

5      A.    Correct.

6      Q.    And if it came down to it, regardless of -- even

7 if you thought that the evidence suggested that a special

8 issue should be answered a certain way, you're always going

9 to answer the third special issue such that a life sentence

10 is imposed?

11      A.    Right.

12      Q.    Even if -- even if there was no -- or let me ask

13 it this way:  Even if you felt like there was not something

14 sufficiently mitigating, you would always find something;

15 you would always answer that question yes?

16      A.    Yes.

17      Q.    Thank you.

18           MR. BINGHAM:  Judge, we'll pass the witness

19 on that limited pass.

20           THE COURT:  Okay.  Mr. Hawk?

21           MR. HAWK:  No questions at this time, Judge.

22           THE COURT:  All right.  Thank you, Mr. Hawk.

23           MR. HAWK:  On the limited pass, we don't have

24 any questions on that.

25           MR. BINGHAM:  We don't have any further

42

1   questions, Judge.

2             THE COURT:  Oh, you don't have any further

3   questions then?

4             MR. BINGHAM:  No.

5             THE WITNESS:  So you're passing the

6   venireperson --

7             MR. BINGHAM:  Passing for all purposes.

8             THE COURT:  -- over to the Defense?

9             Full pass to you, Mr. Hawk.

10            MR. HAWK:  No questions, ma'am.

11            THE COURT:  Thank you, ma'am.  Could you step

12  outside just a moment, please?  And Carleton will show you

13  where you can wait just a moment, please.

14            (Venireperson Norman leaves the courtroom.)

15            THE COURT:  Go ahead, Mr. Bingham.

16            MR. BINGHAM:  Judge, we would challenge this

17  juror for cause.  I don't remember all the -- everything she

18  answered, but I think it's clear that she said she cannot

19  take an oath or instructions imposed by the Court.

20            Specifically, she said that her views on the

21  death penalty would prevent her substantially and impair the

22  performance of her duties as a juror in accordance with the

23  instructions given by the Court and the oath she would be

24  required to take, which is a disqualification under

25  Wainwright versus Witt, 469 United States Code 412.

43

1        Additionally, she indicated that she has a

2    bias or a prejudice, which substantially impairs the ability

3    to carry out her oath, like I just said, also under Patrick

4    versus State, 906 Southwest 2nd 481.

5        But even more specifically, under 35.16,

6    which the Court, I know, has in front of it, under

7    Section (b)(3) that she has a bias or prejudice against any

8    phase of the law for which the State is entitled to rely for

9    conviction for punishment.

10       And I think it's clear -- and under Special

11   Issue Number 3, which would be the second one we believe

12   would be submitted in this case, is that she's always going

13   to pick life.  Regardless of what the evidence shows in this

14   case, she is always going to find a sufficiently mitigating

15   circumstance to warrant life over death, regardless of the

16   evidence.

17       She is clearly a juror that is challengeable

18   for cause.  She also believed that she would create

19   mitigation even if she did not believe there was any.

20   Obviously, that would be very concerning to the State.

21       So we would make a challenge for cause on

22   those grounds.

23       THE COURT:  Mr. Hawk?

24       MR. HAWK:  We don't resist, Judge.

25       THE COURT:  The State's challenge for cause

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

44

1   as to Venireperson Patricia Norman is granted.

2                    Would you ask Ms. Norman to step back in?

3                    (Venireperson Norman enters the courtroom.)

4                    THE COURT:  Ms. Norman, we are going to be

5   able to excuse you from any further jury service in this

6   case.  I deeply appreciate your time from last Thursday and

7   all your time down here answering questions today.

8                    You're finally excused, meaning that you

9   don't have any more jury service involved in this case.

10  Thank you very much for your attendance here today and last

11  Thursday.  Thank you.  You may be excused, ma'am.  Thank you

12  very much.

13                   (Venireperson Norman leaves the courtroom.)

14                   THE COURT:  Would you get Mr. Pearson?

15                   (Venireperson Pearson enters the courtroom.)

16                   THE COURT:  Good morning, Mr. Pearson.  Just

17  come on around this way and have an end chair there, please,

18  sir.

19                   Mr. Pearson, how are you this afternoon?

20                   VENIREPERSON PEARSON:  Fine.

21                   THE COURT:  We appreciate you being down

22  here, I know as a result of a scheduling, but we appreciate

23  you being here.  This is that process we talked about

24  Thursday where an individual questioning is going to take

25  place.

45

1          One of the -- Mr. Harrison, assistant

2  criminal district attorney here in Smith County, is going to

3  be asking you some questions, asking you if you can follow

4  certain type laws that apply in this type case, asking you

5  some questions about your views on certain issues.  And then

6  Mr. Perkins or Mr. Hawk will do the same for the Defense.

7          Two or three things to keep in mind.  Number

8  one, the oath that you took Thursday still applies today, so

9  you're still under oath.

10         Also, when you answer a question, if you

11  would, like, answer out rather than -- if the answer is yes,

12  rather than nodding your head, just answer out yes or answer

13  no or whatever the answer is.  But answer out rather than a

14  shake of the head because my court reporter can't take down

15  shakes of the head.

16         VENIREPERSON PEARSON:  Okay.

17         THE COURT:  Also, there are not any right or

18  wrong answers.  Whatever question you (sic) ask, the purpose

19  of the question is just try to determine truthfully how you

20  feel about it personally.  No right or wrong answers

21  whatsoever.

22         And then have you thought of anything since

23  Thursday that you might need to add to your questionnaire

24  just by telling us about it?  Anything gone through your

25  mind, "Well, I should have put such and such and such down"

46

1   or anything you want to clarify regarding the questionnaire?

2                   VENIREPERSON PEARSON:  Okay.

3                   THE COURT:  Anything?

4                   VENIREPERSON PEARSON:  No, sir.

5                   THE COURT:  All right, sir.  Well, with that,

6   Mr. Pearson, Mr. Harrison will proceed then.

7                   MR. HARRISON:  Thank you, Your Honor.

8                       JOHN M. PEARSON,

9   having been duly sworn as a member of the special venire,

10  was examined as follows:

11                   VOIR DIRE EXAMINATION

12  BY MR. HARRISON:

13      Q.   Mr. Harrison -- Mr. Harrison -- Mr. Pearson, good

14  afternoon.  How are you doing?

15      A.   I'm doing fine.

16      Q.   Great.  I'm going to try and speak up.  That air

17  conditioner kicks on and off, and it's hard to hear

18  sometimes.

19                   What I want to do is -- first of all, we

20  appreciate you coming down.  We've been introduced.  My name

21  is Brett Harrison.  I'm the first assistant here in Smith

22  County.  To my left is Matt Bingham, the elected criminal

23  district attorney.  And next to him to his left is April

24  Sikes, our chief felony prosecutor.

25                   Next to me on my right is the defendant,

47

1   who's been charged by the Smith County grand jury with the

2   offense of capital murder, Tracy Beatty.  Next to him is his

3   lead defense attorney, Robert Perkins, and next to

4   Mr. Perkins is Ken Hawk, assisting Mr. Perkins with this

5   trial, both very fine lawyers.

6            Do you think you know any of us at all,

7   personally acquainted with any of us?

8        A.   No.

9        Q.   What I want to do is we've had an opportunity to

10  look at this really extensive book that y'all got to fill

11  out last Thursday over the lunch hour, and that really helps

12  you out.  It cuts down our voir dire, cuts out a lot of what

13  we have to question you about.

14           Unfortunately, there are some things that

15  you've answered that kind of makes us want to ask some

16  follow-up questions, and that's what I'm kind of going to

17  start out with.

18           Obviously, last Thursday, you found out from

19  the Judge that this was a capital murder case where

20  Mr. Bingham had actually filed notice of his intent to seek

21  the death penalty in this case on behalf of the District

22  Attorney's Office.

23           What did you first think about when you first

24  heard that and realized that that was the type of case here

25  that you were potentially going to have to be serving on?

48

1        A.    I knew that something was up like that when

2   everything started, and I saw all your -- you guys out there

3   in front.  I knew it was going to be something big.  And

4   that was really about all, just waiting to see what happens

5   next.

6        Q.    Okay.  Obviously, there's a significant question

7   or a couple of questions that you answered on that

8   questionnaire relating -- and you probably know where I'm

9   going -- relating to the death penalty and your feelings on

10  the death penalty.

11              I want to kind of explore that with you a

12  little bit.  It gives you a little bit of room to kind of

13  tell us how you feel and breaks it down a little bit.  But I

14  want to kind of go a little bit deeper.

15              You indicated that with regard to the death

16  penalty, you generally -- you had three choices:  No

17  opinion, generally favor, generally against.  You indicated

18  generally in favor.

19              And the next question is kind of a follow-up

20  question and what you checked was Number 1, "I believe that

21  the death penalty is appropriate in some cases."

22              Is that still how you feel?

23       A.    Yes, sir.

24       Q.    Let me ask you, when did -- have you always felt

25  that way?

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

49

1     A.    I believe I have, yes, sir.

2     Q.    At least long enough that you've been thinking

3  about it.

4            Have you ever not thought the death penalty

5  was an appropriate thing to have in the criminal justice

6  system?

7     A.    Sometimes when -- when you read about a case where

8  the guy -- and it's happened -- has been actually innocent,

9  and they've been wrongly convicted, I think about that.  And

10 you hope, of course, that's not something I personally would

11 be involved in.

12    Q.    Right.

13    A.    But that would be about the only time.

14    Q.    Okay.  Nothing to the extent -- you don't think

15 that would -- certainly would be a widespread enough issue

16 to cause you to, I guess, rethink your position on the death

17 penalty?

18    A.    Oh, no.

19    Q.    Okay.  If you were the legislature for the day --

20 legislator for the day, and I gave you the option of keeping

21 the death penalty as it stands, getting rid of it

22 completely, or changing it, what would you do?

23    A.    I would keep it.

24    Q.    Where do you -- where did you kind of start

25 forming your opinions about the death penalty?  And let me

50

1    stop for a second.

2              You know, questions I ask, questions the

3    Defense asks, if we were in any other setting than right

4    here in this court, it wouldn't be any of our business at

5    all, and I wouldn't pry, but, obviously, you understand why

6    we're doing it.

7              So with that said, what kind of helped you

8    formulate your opinions in favor of the death penalty?

9         A.   I don't really know.  You know, something has got

10   to be done as a deterrent.  I'm not sure it works all the

11   time, but if the crime fits, you know, the price you have to

12   pay, then so be it.

13        Q.   Okay.  Do you -- do you think you maybe formed

14   some of your opinions from family, as far as -- you know,

15   would your family, mother, father, whoever, be in favor of

16   the death penalty?  Was it just not a topic really --

17        A.   No.  It really wasn't a topic.

18        Q.   Do you have -- do you have any hesitancy at all in

19   serving on a case that you know is a death penalty eligible

20   case?

21        A.   Well, I support the death penalty.  I never

22   thought I myself would be somebody that would be involved in

23   it and, of course, wish somebody else could always do it,

24   but you have to step up to the plate, and somebody has got

25   to do it.

51

1    Q.   Are you the type of individual who could step up

2  to the plate and do what needed to be done?

3    A.   I think I can.

4    Q.   And when I say do what needs to be done, what I

5  mean is either find someone not guilty, if they're not

6  guilty, or guilty, if they are guilty at first?

7    A.   Sure.

8    Q.   And then -- what there are, are special issues in

9  the punishment phase of the capital murder.  You don't, say,

10  check off a box that says "life" or "death."  You answer two

11  questions.  And the way those are answered result in one of

12  two things:  Either a life sentence being imposed or a death

13  sentence being imposed.

14           Are you the type of person who can listen to

15  the evidence, look at the facts, and judge each of those

16  special issues fairly and let the chips fall where they may?

17    A.   I would like to think I am.

18    Q.   You would have a problem -- if you looked at all

19  the facts and all the evidence and the way that special

20  issues should be answered, in answering those, whether that

21  resulted in a life sentence, you could do that?

22    A.   Yes, I could.

23    Q.   You could do it if the way you answered those

24  special issues resulted in a death sentence?  You could do

25  that as well?

52

1     A.   I think I could, yes.

2     Q.   Now, when you start talking about "I think I can"

3   and "probably so," kind of a red flag goes up.  Someone in

4   our office kind of uses an example, if my wife were going on

5   a business trip and I asked her if she was going to be

6   faithful to me on this business trip, and she said, "I think

7   so," she wouldn't be going on that business trip.

8     A.   Right.

9     Q.   So let me kind of pin you down.

10     A.   Okay.

11     Q.   I need to know because, obviously, this defendant

12   is entitled to a fair trial.  Absolutely, no question, no

13   doubt about that, true?

14     A.   True.

15     Q.   The State of Texas often -- and people know that.

16   People kind of tend to feel that way automatically going

17   into a case.  The State of Texas also is entitled to a fair

18   trial.  You understand that?

19     A.   Yes, sir.

20     Q.   Are you the type person that if the special issues

21   needed to be answered in a way that meant a death sentence

22   would be imposed, you could do that?

23     A.   Yes.

24     Q.   Any question at all in your mind about that?

25     A.   No.

53

1    Q.   Just in kind of a general sense, do you think the

2    criminal justice in the State of Texas is fair?

3    A.   For the most part, I do.

4    Q.   And, obviously, you've even talked about some

5    examples where you didn't think so, but just as a general

6    rule, you think it is?

7    A.   Yes.

8    Q.   Do you think criminals who are found guilty in the

9    State of Texas are treated fairly, too leniently, or too

10   harshly just in general?  Obviously, it's going to be on a

11   case-by-case basis.

12   A.   Yeah.  I would say fairly probably overall.  You

13   know, it's not like I deal with something like this every

14   day or anything.  But as far as what I know, I've seen them

15   treated fairly.

16   Q.   What about the appeals process and specifically in

17   a capital murder case?  You know, people -- oftentimes,

18   people are upset about the length of delays when a death

19   sentence is actually imposed.  The appeal process just seems

20   to go on and on and on ad nauseam.

21            How do you feel about that?

22   A.   As a taxpayer, I think it goes on too long

23   sometimes, but, again, it's something probably that has to

24   be done, and it's something I don't know much about.

25   Q.   Are you aware that there are several automatic

54

1    appeals that the defendant is entitled to on the state and

2    federal level --

3        A.   Yes, sir.

4        Q.   -- in a death penalty case when a death penalty is

5    imposed?

6        A.   Yes, sir.

7        Q.   Do you think that's a good idea for state courts,

8    as well as federal courts, to be able to review death

9    penalty cases where death penalties have been imposed?

10       A.   Yes.

11       Q.   Kind of a way to limit any kind of mistake that

12   ever could be made?

13       A.   Yes, sir.

14       Q.   Does that make you feel better about being able to

15   sit in a death penalty case?

16       A.   Yes.

17       Q.   Those checks and balances, those appellate

18   reviews?

19       A.   Uh-huh.

20       Q.   So even though it's a lengthy process, you think

21   it's an appropriate thing to do?

22       A.   Yes.

23       Q.   Well, Mr. Pearson, let me move on and talk about

24   some other issues from your jury questionnaire.  You had

25   indicated on one of the questions that you had read or seen

55

1   or learned something about this case from the -- I guess

2   from the newspapers, is what you circled.

3       A.   Yes, sir.

4       Q.   Do you recall what you heard or what you read?

5       A.   Just the fact that a lady had been killed, and she

6   was buried in the backyard, and there was robbery or

7   something like that involved.

8       Q.   Okay.  Just kind of the general allegations?

9       A.   The general allegations of what was in the paper.

10      Q.   And, obviously, Judge Skeen asked the question to

11  the general panel about from anything you had heard, from

12  any hearsay or otherwise, had you formed an opinion as to

13  the guilt or innocence of the defendant.

14           I think maybe two people raised their cards.

15  You were not one of those, so I take it you have not formed

16  an opinion about the guilt or innocence about this defendant

17  based on what you've heard?

18      A.   No, not based on what I've heard.

19      Q.   And, obviously, you understand that -- you don't

20  work for the newspaper, do you?

21      A.   No.

22      Q.   You understand that as good as the newspaper is,

23  as much as they try to report things accurately, people

24  misreport things, and you can't really take newscasts or

25  radiocasts or newspaper articles necessarily at face value

56

1    as a juror.

2              You would have to be able to listen to the

3    evidence and form your decisions, base your verdicts on what

4    you hear from the witness stand and that's introduced into

5    evidence.

6              Do you understand that?

7    A.    Yes, sir.

8    Q.    And you could do that?

9    A.    Yes, sir.

10   Q.    And, in fact, I think the Court would -- as part

11   of the instructions, the Court places you under as a juror,

12   the Court would say you can't listen to or read anything

13   about this case.

14   A.    Right.

15   Q.    You would follow those instructions?

16   A.    Yes, sir.

17   Q.    You also indicate in your questionnaire some of

18   your feelings about the criminal justice system, and I think

19   actually you've circled that it could influence you -- your

20   ability to be fair and impartial based on the Napoleon

21   Beazley case.

22   A.    Right.

23   Q.    I want to talk to you a little bit about that.

24   A.    Yes.

25   Q.    Obviously, you filled out these questionnaires,

57

1    and you were able to give us a little bit of information

2    about that.  What you put was the Napoleon Beazley/Luttig

3    when the judge attempted to stop his execution at the last

4    moment.

5              Kind of tell me your feelings about that.

6    Obviously, it's not this judge that you were referring to.

7         A.    Right.  I thought it was a little bit of an

8    outrage when 12 people did convict him, and at the last

9    minute, a judge jumped in and tried to stop it.  And as far

10   as I'm concerned, we never got any clarification on the

11   reason why.

12        Q.    Obviously, that was a death penalty case --

13        A.    Yes, sir.

14        Q.    -- that was tried here in Smith County.  The

15   defendant was sentenced to death and, ultimately, was

16   executed.  The fact that a judge -- and, obviously, that

17   wasn't a defense lawyer or a prosecutor or one of the jurors

18   that was involved in that case, but it was the judge.

19             Would that fact alone, the fact that the

20   judge -- and I think, as it comes down and as more of it

21   unfolded, we realized that the judge was acting within

22   her -- the judge's rights in what she did.

23        A.    Uh-huh.

24        Q.    Would that affect your ability to sit as a fair

25   and impartial juror on a totally separate and distinct case?

58

1    A.    It definitely would if it was in her court.

2    Q.    Right.

3    A.    Yeah.

4    Q.    And I understand that.  It's not in her court.

5    A.    Uh-huh.

6    Q.    Understanding that that was a particular incident

7  that happened way back, several years ago, would anything

8  about that other judge doing something in some other case

9  affect your deliberations in this particular case?

10   A.    Absolutely not, no.

11   Q.    It may be different if you were down the hall and

12 in that court?

13   A.    Right.

14   Q.    But we're not, and you understand that?

15   A.    Right.

16   Q.    And nothing about that would affect your

17 decision-making in this case?

18   A.    That is right.

19   Q.    And at the time you circled yes, you know, Judge

20 Skeen had given you these instructions, and you had seen

21 him, and I don't know if you realized he would be the

22 presiding judge in this case and not that other judge.

23   A.    Right.

24   Q.    But the fact that Judge Skeen is presiding, who

25 didn't have anything to do with that situation, the fact

59

1  that it's not in that judge's courtroom, you won't consider

2  that at all in this particular case?

3       A.   Oh, no, no.

4       Q.   It will not affect your decision-making in this

5  case?

6       A.   Absolutely not.

7       Q.   One other question specifically about your

8  questionnaire.  It talks about anyone ever having been

9  arrested, charged, or convicted of a criminal offense, and

10  then you indicated that you had been, a PCS in 1996.

11           Can you describe just a little bit -- just

12  briefly.  And, again, I apologize for prying in your

13  personal life.

14       A.   That's okay.  That's okay.  We had some marijuana

15  in the car with us and basically got pulled over and caught

16  with it.

17       Q.   Who is "us"?

18       A.   Me and a friend of mine.

19       Q.   A misdemeanor?

20       A.   Yes.  Also, I forgot to put on there, I was pulled

21  over for DWI at one time, but it was reduced to -- and you

22  said don't put traffic tickets -- to a --

23       Q.   Class C, reckless driving?

24       A.   Reckless driving, yes, sir.

25       Q.   Where was the initial DWI that was pled to a

60

1    Class C?

2        A.    Probably in '96 or '5 or something like that

3    maybe.

4        Q.    Would -- first of all, do you believe you were

5    treated fairly in that case?

6        A.    Yes, sir.

7        Q.    Anything by law enforcement, prosecutors, the

8    judge, or defense lawyer that gave you -- left a bad taste

9    in your mouth?

10       A.    No.  He went out of his way to be fair to me.

11       Q.    "He" being the --

12       A.    The highway patrol.

13       Q.    -- law enforcement?

14       A.    Highway patrol.

15       Q.    Okay.  Highway patrol?

16       A.    Highway patrol.

17       Q.    What about -- I know it was actually reduced down

18   to the reckless driving.  Do you believe that you were

19   guilty of that?

20       A.    Oh, yes, sir.

21       Q.    And treated fairly just generally?

22       A.    Yes, sir.

23       Q.    What about the PCS?  Were you actually guilty of

24   that?

25       A.    Yes, sir.

61

1     Q.   Did you plead guilty?

2     A.   Yes, sir.

3     Q.   Were you treated fairly in that case?

4     A.   Yes, sir.

5     Q.   Do you recall what agency that was, what law

6  enforcement agency?

7     A.   Tyler Police Department.

8     Q.   Tyler Police Department.  Were you treated

9  courteously and professionally in that case?

10    A.   Uh-huh.

11    Q.   Any problem at all with law enforcement or

12  prosecutors or judges or defense lawyers?

13    A.   No.

14    Q.   Okay.  That's really all I have to ask you

15  about -- don't get excited yet -- about your questionnaire.

16  Now I've got to move on to some general principles and talk

17  about some general principles of law.

18            Let me start with witness credibility,

19  because I've just asked you some questions about how you

20  were treated by law enforcement, by DPS as well as Tyler

21  police officers.

22            When you have witnesses who come into court

23  and they're sworn to tell the truth and they testify, a lot

24  of people give a lot of credibility to law enforcement

25  officers, you know, that they are doing a public service,

62

1    not being paid real well to do it, take a lot of abuse from

2    people, and really respect and admire the job they do.

3              The same could be said for teachers, doctors,

4    or plumbers or just any profession that people have a lot of

5    respect for.  And some people will give them greater

6    credibility than they would other people just by what they

7    do for a living.

8              What the law says is, "Look, you can admire

9    something -- someone for what they do.  You can respect the

10   job they do, but when you're talking about them testifying

11   as a witness, you're not talking about respecting their job

12   or admiring them for what they do; you're talking about just

13   honesty."

14             What you can't do, the law says, is say, "I

15   admire them and respect the job they do, so I'm

16   automatically going to believe what they say."

17             What you have to do is you have to wait,

18   listen to what they have to say, and then judge their

19   credibility, and say, "Look, people are human, everybody is

20   human, whether it's a doctor or a priest or a teacher or a

21   lawyer.  I'm going to wait and hear what they have to say,

22   and then I'm going to decide whether they are telling me all

23   the truth, some of the truth, or none of the truth."

24             Do you understand that's kind of where the

25   law is going with that?

63

1    A.    Yes, sir.

2    Q.    Can you follow that portion of the law and wait

3 until a witness testifies before you begin judging their

4 credibility?

5    A.    I would think I can, yes, sir.

6    Q.    And, obviously, if a neurosurgeon comes in here

7 and starts talking and testifying about neurology, they have

8 specific training, so you can take their training into

9 account, into what they're saying.

10           But as far as bare bones honesty, you've just

11 got to wait and hear what they have to say and then judge

12 whether they're telling you the truth or not.

13    A.    Yes, sir.

14    Q.    Can you do that?

15    A.    Yes, sir.

16    Q.    Now, let me talk a little bit about the

17 presumption of innocence.  Are you familiar with that term?

18    A.    Yes, sir.

19    Q.    Now, let me kind of relate it to you in that

20 marijuana case you had.  Obviously, as you went into court

21 before you ever pled guilty, you had a presumption of

22 innocence, okay?  You were presumed to be innocent.

23           Now, you knew you were guilty, and you pled

24 guilty, but you had that presumption of innocence.  Anyone

25 who is ever charged with a crime has that presumption of

64

1   innocence.   Whether they're guilty or not guilty, they have

2   that presumption.

3                   Do you understand that?

4   A.   Yes, sir.

5   Q.   Do you agree with that presumption?

6   A.   Yes, sir.

7   Q.   And part of the reason people are presumed to be

8   innocent from the very beginning is that a defendant who is

9   charged with a crime has no burden.   They don't have to do

10  anything.   They don't have to prove themselves innocent.

11  They already have the presumption of innocence.   Some of

12  these principles kind of tie in together.

13                  Let me kind of relate it to the Fifth

14  Amendment right, the Fifth Amendment right against

15  self-incrimination.   No defendant has to climb up on the

16  witness stand and say, "Hey, I'm not guilty; I'm innocent."

17                  Why is that?   Why don't they have to get up

18  there and say they're not guilty?

19  A.   I don't know.

20  Q.   Well, they're presumed innocent, right?   They're

21  presumed incident, and they don't have a burden.   They don't

22  have to do anything.   It's up to the State; it's up to this

23  table over here, the State of Texas, to prove a defendant

24  guilty, right?

25  A.   Yes, sir.

65

1      Q.   All right.  Does that make sense?

2      A.   Yes, sir.  I think I know where you're going with

3  this.

4      Q.   Okay.  All of these rights that defendants have

5  that are charged with crimes kind of work together.  The

6  presumption of innocence, they're presumed to be innocent.

7  If you look at it like a race, we don't start out equal.

8  The defendant starts ahead of us.  Because he's presumed to

9  be innocent.  We have to catch up and prove him guilty,

10  okay?

11           And we don't have to have him help us.  We

12  don't have to say, "You know, Mr. Defendant, climb up on

13  that witness stand and let me ask you a bunch of questions."

14      A.   Yes.

15      Q.   Because he's got a right to do that, but he also

16  has a right not to testify.  And he doesn't have to testify

17  because he's presumed to be innocent, and we have the burden

18  of proof.

19           Does that make sense?

20      A.   Yes, sir.

21      Q.   When we talk about the burden of proof, there's a

22  standard of proof that we have to use, and it's called

23  beyond a reasonable doubt.  We have -- we, being the State,

24  have the burden of proving somebody guilty beyond a

25  reasonable doubt.

66

1          There is no definition of beyond a reasonable

2     doubt is.  It's whatever it means to you, but that's what

3     our standard is by which we have to prove somebody guilty.

4     And if we fail, if we don't prove someone guilty beyond a

5     reasonable doubt, no matter how close we come, you have to

6     find someone not guilty.

7          Does that make sense?

8     A.    Yes, sir.

9     Q.    And it's because of that -- and it kind of all

10    relates back to that presumption of innocence.  He starts up

11    here (indicating).  We put in evidence and more evidence and

12    more evidence, and we might get real close, but unless we

13    prove him guilty to your satisfaction beyond a reasonable

14    doubt, we never defeat that presumption of innocence.

15    A.    I understand.

16    Q.    Okay.  And that's why he doesn't have to testify.

17    You were a little hesitant with that Fifth Amendment right

18    not to testify, so let me talk just a little bit more about

19    that.

20          I can't call -- the only person in the world

21    I can't -- well, there are some people, but I cannot call a

22    defendant to the witness stand to testify.  His lawyer can't

23    make him testify.  That's his choice and his choice alone.

24    He can confer with his lawyers, but, ultimately, it's going

25    to be his choice.

67

1                    Let me ask you this:  Would you be curious as
2       a juror to hear from a defendant?
3            A.   Yes.
4            Q.   I think that's human nature.  I think if I asked a
5       hundred people that, I would get a hundred yeses.
6                    Do you have children?
7            A.   No.
8            Q.   Do you have a brother or a sister?
9            A.   I've got a sister.
10           Q.   When y'all were growing up -- were y'all close
11      enough in age that y'all grew up together?
12           A.   Yes.
13           Q.   When y'all were growing up, did y'all ever fight
14      or get in an argument or break something?
15           A.   Sure, yes.
16           Q.   And have your parents come say, you know, "What's
17      going on here?"
18           A.   Yes.
19           Q.   Do you remember they probably -- if they were
20      anything like my parents and like I am with my children,
21      they would probably separate y'all and say, "Hey, what
22      happened to you?"  You didn't have a Fifth Amendment right
23      in your own home, did you?
24           A.   No.
25           Q.   When they said, "Tell me what happened," you

68

1   pretty much had to tell them what happened.

2       A.   Yes.

3       Q.   You were compelled to testify against yourself,

4   and you were probably even compelled to testify against your

5   accomplice, your sister, right?

6       A.   Yes.

7       Q.   In your home, that's the way people are raised.

8   That's the way people raise their kids all the time.  There

9   is no Fifth Amendment right in my house.  I'm the dictator,

10  okay?  I get to make them testify, and I think most people

11  do that.

12              That's why most people would be curious to

13  hear both sides to a story, because that's the way people

14  are raised.  Does that make sense?

15      A.   Yes.

16      Q.   The difference is, in a courtroom, it is a

17  democracy.  There is a Constitution, and we do have rights.

18  People who are accused do have rights.  It's a democracy;

19  it's not a dictatorship; and nobody can compel a defendant

20  to get up on a witness stand and answer a bunch of

21  questions.

22              Does that make sense?

23      A.   Yes, sir.

24      Q.   Would you be able to -- even though you're

25  curious, what the law says is, "Hey, it's okay to be curious

69

1    as to what a defendant might say.  You just can't hold it

2    against him if he chooses to invoke that right he's entitled

3    to."

4              Can you follow that?

5        A.   Yes, sir.

6        Q.   That Fifth Amendment right?

7        A.   Yes, sir.

8        Q.   Let me talk to you a little bit about grand jury.

9    Obviously, people who come in here come in here with their

10   common sense, with their intelligence.

11             You were probably pretty well aware that a

12   defendant has been arrested, right?  By the time it gets to

13   this stage and we're in voir dire, you know there is an

14   indictment because the Judge read parts of it to you last

15   Thursday.

16             So you know he's been arrested.  You

17   understand that an indictment has been returned by a Smith

18   County grand jury --

19       A.   Yes.

20       Q.   -- for the offense of capital murder.

21             Have you ever heard that expression "where

22   there's smoke, there's fire"?

23       A.   Yes.

24       Q.   That doesn't really apply in a court setting.

25             Another thing that kind of is one of those

70

1    situations, when you came in Thursday, did you kind of

2    wonder what the charge was, what he was alleged to have

3    done --

4         A.    Oh, yes.

5         Q.    -- when you saw him?

6         A.    Oh, yes.

7         Q.    I think that's human nature.  Again, probably if I

8    asked a hundred people, they would all say the same thing.

9    It's human nature, it's natural to wonder what somebody has

10   been charged with, because you know they've been arrested,

11   and you know they've been indicted, and you know that -- or

12   you're familiar with that term "where there's smoke, there's

13   fire."

14             But an indictment is not evidence of guilt,

15   and the fact that he's been arrested is not evidence of

16   guilt.  The reason for that is, one, because he's got that

17   presumption of innocence.  But more importantly, a grand

18   jury proceeding is nothing like a jury trial, nothing like a

19   trial.  The grand jury proceeding is -- have you ever been

20   on a grand jury?

21        A.    No, I have not.

22        Q.    It's a secret proceeding.  A defendant is seldom

23   in the grand jury courtroom to be present.  Defense lawyers

24   are not entitled to be present.  There is not

25   cross-examination.

71

1          The standard to get an indictment issued or

2   returned against a defendant is very low.  It's probable

3   cause.  They simply find that there is probable cause to

4   believe that the defendant committed an offense.  Nothing

5   like proof beyond a reasonable doubt required at trial.

6          Do you understand that difference?

7   A.    Yes, sir.

8   Q.    Can you agree with me that the fact that he's been

9   arrested and indicted is not evidence of guilt, and you

10  wouldn't consider it as evidence of guilt?

11  A.    Yes.

12  Q.    Now, when we talk about the burden of proof, as I

13  probably said, it stayed over here.  We have the burden of

14  proof all the time.  It never shifts to the Defense.  I give

15  kind of a silly example, because these are both very

16  experienced, very fine lawyers, and they've tried many, many

17  cases, including capital murder cases.

18          But they could sit over there representing

19  Mr. Beatty; they could just sit over there mute.  They don't

20  have to say a word; they don't have to question you; they

21  don't have to question any witnesses; they don't have to

22  give an opening statement; they don't have to give closing

23  arguments; they sure don't have to present any evidence.

24          And the reason for that is the burden of

25  proof is here, and it never shifts to the Defense.  He's got

1    the presumption of innocence.  He doesn't have to do

2    anything else other than sit here politely like everyone

3    else.

4        A.    I understand.

5        Q.    Okay.  I want to -- I probably should have said

6    this at the beginning, but every question that I ask you and

7    any question that Mr. Perkins or Mr. Hawk asks you is --

8    you've got to understand that you've not heard one word of

9    evidence in this case.  They're all predicated on the fact

10   that you don't know anything about this case; you don't know

11   any of the evidence.

12              So you understand that?

13       A.    Yes.

14       Q.    Basically, what the law says to be qualified as

15   juror is you have to have an open mind.  You have to be able

16   to listen to the evidence.  You have to keep an open mind

17   and not prejudge things.

18              You can't prejudge a witness's credibility

19   like we talked about.  You can't prejudge whether somebody

20   is guilty or not guilty.  You can't prejudge somebody is

21   guilty because they've been indicted or arrested for an

22   offense.

23              You see kind of how all these work together?

24       A.    Yes, sir.

25       Q.    So if you will kind of remember one thing that we

73

1   talked about, keep in mind that what the law says is, to be

2   a qualified juror, you just have to simply say, "I have an

3   open mind.  I'm going to listen to the evidence before I

4   make a decision.  I'm going to hear the evidence before I

5   return a verdict.  I'm going to wait and listen to the

6   witness before I judge his credibility."

7           Just every time, anything that's asked of

8   you, you've just got to say, "I'm going to keep an open

9   mind, I'm going to listen, and then I'm going to make my

10  decision."

11          It's kind of like buying a car.  You wouldn't

12  want to buy a car sight unseen.  You would want to take a

13  look at it, test-drive it, look at it as a mechanic before

14  you buy it, true?

15      A.    Right.

16      Q.    That's what you've got to do to be a qualified

17  juror.  Does that make sense?

18      A.    Yes, sir.

19      Q.    Let me talk to you a little bit about -- you

20  understand that the grand jury has returned an indictment in

21  this case for the offense of capital murder.  There are what

22  are called, though, in the law lesser included offenses, and

23  I like to look at it as a ladder, okay?

24          Capital murder would be the highest rung in

25  this ladder.  That's what the indictment has been returned

74

1   for.

2           There can be situations, though, in trials --

3   and we can't talk about the evidence in this particular

4   case.  We're talking in hypotheticals, but there can be

5   situations in which you might think -- let me back up a

6   little bit further because I think I skipped over talking

7   with you about what capital murder is.

8           Capital murder is different than murder.

9   Capital murder has only two punishments that can be returned

10  if you find someone guilty of capital murder:  Life in

11  prison or the death penalty.

12          Murder, on the other hand, is a first degree

13  felony, and it's got a punishment range of not less than

14  five years nor more than the ninety-nine years or life.  So

15  five to ninety-nine years or life in the penitentiary.

16          If I -- let me give you an example.  If I

17  pulled out a gun, and I thought about it for a week or so,

18  and I decided I didn't like Mr. Bingham.  I wanted to be the

19  district attorney, and I wanted to get him out of the

20  picture.  And I didn't like the fact that he made more money

21  than me and has nicer suits than me and lives in a bigger

22  house than me, all those kind of things.

23          And I shot Mr. Bingham 50 times, and I

24  reloaded several times, and I kept shooting him, and I

25  laughed as he slowly died, because I didn't shoot him in a

75

1 major organ, I shot him in the leg or arm or neck or in the

2 shoulder, really made it hurt.

3            And I just kicked him as he was lying there

4 dying, and I said, "I hope you remember and see your

5 daughter's face as you sit here dying."  I could be the

6 worst person in the world; I could have been to the

7 penitentiary three times; I am never eligible for the death

8 penalty if that's all I do.

9            Because what that is, is that's a murder;

10 intentionally taking the life of another human being without

11 legal justification.  That's an example of what murder is.

12            The legislature said murder has that five to

13 ninety-nine-year or life range of punishment.  Death isn't

14 on the table.  It's only when you're convicted of capital

15 murder that you are death eligible.

16            So examples of capital murders, the

17 legislature has said there are certain offenses that can be

18 classified as capital murders:  Murder of a child under the

19 age of six -- and sometimes we call this murder plus,

20 because there is the murder, and then there's some other

21 circumstance that makes it a capital murder -- murder of a

22 child under the age of six; murder of a police officer or

23 fireman in the course of their duties; murder of multiple

24 individuals in the same criminal transaction --

25       A.   Okay.

1    Q.    -- murder for hire, if I pay somebody to commit a

2  murder or someone pays me and I commit the murder, kind of a

3  hitman situation, that can be a capital murder; murder in

4  the course of committing one of several felonies.

5              Murder in the course of committing burglary

6  or robbery or arson or aggravated sexual assault or

7  kidnapping, those can be capital murders as well.

8              You kind of see the distinction?  It's a

9  murder plus.

10    A.    Yes.

11    Q.    Do you have any problem with the way the

12  legislature is trying to define capital murder and death

13  eligible individuals?

14    A.    No.

15    Q.    You can see why it can be called kind of murder

16  plus?

17    A.    Yes, I can.

18    Q.    Now, let's get back to that ladder I was talking

19  about, because the grand jury in this case has returned that

20  indictment for the offense of capital murder.  There are

21  lesser included offenses at lower rungs that come within

22  what a capital murder can be.

23              Let me give you an example.  Let's say --

24  keep in mind that a capital murder can be in the course of

25  committing an aggravated sexual assault.  Let's say in a

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

77

1   hypothetical case, we're trying the case and come to find

2   out, we've presented all the evidence.

3              And you go back to the jury room, and you

4   say, "You know, I have no doubt at all that this defendant

5   committed murder.  He killed her clear as day.  I've got no

6   problem at all with that.  But I didn't see any evidence

7   that there was a rape.  I didn't see any evidence, in the

8   course of this murder, he committed aggravated sexual

9   assault.  I just don't see it."

10             Well, what you would have to do is you would

11  have to say, "Well, for capital murder, he's not guilty,"

12  right?  Because you've got the murder, but you don't have

13  the plus.  You don't have in the course of committing the

14  aggravated assault.

15             He's not guilty of capital murder, so you

16  consider these lesser included offenses, one of which could

17  be murder.  And you found sufficient evidence beyond a

18  reasonable doubt that he was guilty of murder.

19             So the proper verdict in that situation would

20  be not guilty to capital murder but guilty to the lesser

21  included offense of murder.  Do you see where I'm going with

22  that?

23       A.   Yes, sir.  Uh-huh.

24       Q.   You might have a situation that -- you know, there

25  are millions of scenarios, but you might have a situation

78

1    where a lesser included offense -- in that same scenario,

2    maybe you didn't believe that the defendant actually killed

3    her but raped her.  Maybe someone else killed her.  You

4    would find not guilty to capital murder, not guilty to

5    murder, but guilty of aggravated sexual assault.

6              Do you see what I'm saying?

7    A.    Yes, sir.

8    Q.    Basically, you just have to say, "I can

9    consider -- knowing that he's been indicted for the offense

10   of capital murder, I can listen to the evidence, I can wait,

11   judge that evidence, and decide if he's guilty of capital

12   murder or not, and I can keep an open mind to whether he's

13   guilty of any of these lesser included offenses."

14             Can you do that?

15   A.    Yes, sir.

16   Q.    All right.  And, obviously, it's not appropriate

17   at this phase to give you facts specific to this case.

18   A.    I understand that.

19   Q.    We can only talk in hypotheticals.

20             But you would have an open mind as to these

21   lesser included offenses?

22   A.    Yes, sir.

23   Q.    All right.  Let me talk to you a little bit about

24   the range of punishment for some of these lesser included

25   offenses.  And what I want to do is talk about -- before we

79

1    get there, talk about the trial system that we have in

2    Texas.

3              We have what's called a bifurcated trial

4    system.  That means we have two phases of trial in any case,

5    in any criminal case.  You have a guilt or innocence phase

6    of trial, and then you have the punishment phase.  They're

7    distinct phases of trial.

8              In the guilt or innocence phase of trial,

9    typically, you're going to hear only evidence that applies

10   to whether a defendant is guilty of what he's been charged

11   with.  And that makes sense.

12   A.   Yes.

13   Q.   If you find someone guilty of an offense, you then

14   move to the punishment phase of trial.  And in the

15   punishment phase of trial, you might hear different

16   evidence.

17             You always consider and keep in mind what you

18   heard in the first phase, that guilt/innocence phase, and

19   carry it with you, but you might hear additional evidence in

20   the punishment phase of trial, because at the punishment

21   phase, you're not worried about whether he committed the

22   crime; you're worried about what to do with it.

23             Does that make sense?

24   A.   I understand.  Yeah.

25   Q.   And in the punishment phase of trial, you might

80

1  hear evidence that wasn't relevant to whether he committed

2  the crime but is only relevant to what to do with him.  You

3  might hear evidence about prior convictions that he's had,

4  whether he's been to the penitentiary before, if he's been

5  to the penitentiary, what type of conduct he had while in

6  the penitentiary.

7           You might hear about what he's done on

8  parole.  You might hear about drug use or drug abuse.  You

9  might hear about other bad acts that he's committed.  You

10 might hear psychological/psychiatric --

11          MR. HAWK:  Judge, I just object, because

12 there's not a question in here.

13          MR. HARRISON:  There is going to be.

14          THE COURT:  I take it eventually there will

15 be.

16          MR. HAWK:  That's what we're looking for,

17 Judge.

18          MR. HARRISON:  I was an English major.  I

19 sometimes speak in long sentences.

20     Q.   (By Mr. Harrison) You might hear evidence of

21 psychiatric or psychological testing of the defendant.  You

22 might hear all those types of evidence in the punishment

23 phase that wouldn't have been relevant or admissible in the

24 first phase of trial.

25          Do you understand how that works?

81

1      A.   Yes, sir.

2      Q.   Can you agree with me that you would consider the

3  guilt/innocence phase and the punishment phase separate from

4  one another?

5      A.   Yes.

6      Q.   Make a finding in the guilt/innocence phase, and

7  if you found someone guilty, be able to then consider the

8  punishment phase?

9      A.   Yes.

10     Q.   Now, specifically as it relates to these lesser

11  included offenses -- because, as I said before, in a capital

12  murder case, if you find the defendant guilty, there are

13  only two options:  Life or death, right?

14     A.   Yes.

15     Q.   In any of those other lesser included offenses,

16  you're going to have a range of punishment.  So I'll just

17  take murder, for example.  Let's say after hearing all the

18  evidence, you had determined that somebody was not guilty of

19  capital murder but guilty of murder.

20          You would then be in the punishment phase

21  where you might hear this additional evidence, and you would

22  have this five years to ninety-nine years or life to

23  consider as far as a range of punishment.

24          What you can't do, as a juror, is say, "Look,

25  he was initially indicted for the offense of capital murder,

82

1   so I'm automatically going to give him a jacked-up sentence

2   on a murder conviction."

3              What you have to do is say, "Look, whoa, I'm

4   going to wait, I'm going to listen to the evidence, I'm

5   going to consider what I've heard, and then I'm going to

6   consider that full range of punishment, and I'm going to

7   decide where in that range of punishment this defendant

8   fits."

9              Is that fair?

10  A.     Yes.

11  Q.     And the fact that if you have found someone guilty

12  of a lesser included offense, even though they were

13  initially indicted for the offense of capital murder, it's

14  not relevant any longer that he was ever indicted for murder

15  because you've found him not guilty now.

16  A.     I see.

17  Q.     It's not relevant any longer.  Now what he's been

18  found guilty of is murder, and you have to say, "Where on

19  this punishment range does he fit?"

20             Can you do that?

21  A.     Yes, sir.

22  Q.     And for any lesser included offense, it talks

23  about murder being five years to ninety-nine years or life.

24  There could be other lesser included offenses of that even,

25  and you could get down to a situation where you've got a low

83

1   punishment range, two years to twenty years, or something

2   like that on a manslaughter, for instance.

3              And, basically, you know, I can't give you

4   specific facts.  You just have to say, "Look, I don't care

5   if the range of punishment is two years to twenty years or

6   five to ninety-nine years.  What I'm going to do is I'm

7   going to wait to hear the evidence, and then I'm going to

8   plug in where he fits.

9              "And if that's two years, that's what I'm

10  doing.  And if it's twenty years, that's what I'm doing.

11  And if it's fifty years, that's what I'm doing, but I can't

12  tell you right now.  I'm going to keep an open mind until I

13  hear what the evidence is."

14             Can you do that?

15  A.    Yes, sir.

16  Q.    Any problem at all with that?

17  A.    No, sir.

18  Q.    Let me talk with you about the sentencing phase of

19  capital murder, because that's why we're here.  As I've

20  said, in a capital murder sentencing phase, you don't check

21  off a box that says "life" or "death."

22             What you do is you have those special issues,

23  and the way that you answer those special issues dictates

24  whether a life sentence will be imposed by the judge or

25  whether a life (sic) sentence will be imposed by the judge.

84

1          You understand that?

2     A.   Yes, sir.

3     Q.   Let me first tell you that on a life sentence it's

4     not life without parole; it's not life day for day until

5     they die in prison.  We don't have life without parole in

6     Texas.  Some states do.

7          What we have is a system where a life

8     sentence on capital murder means 40 years to serve day for

9     day before they can become eligible for parole.  So there's

10    a time in the future when a defendant convicted of capital

11    murder, who is assessed a life sentence, will become

12    eligible for parole.

13          So that's what life is.  It's not truly life;

14    it's 40 years before they become eligible for parole.

15          Looking at the special issues -- do you have

16    a taped sheet there on the witness stand that's entitled

17    "Special Issues"?

18    A.   Yes, sir.

19    Q.   There are three of them.  Are there three of them?

20    A.   Yes, sir.

21    Q.   I'm going to ask you to disregard that second one,

22    but I want you to look at and read that first one to

23    yourself, if you would.

24    A.   (Complies.)  Okay.

25    Q.   Now, what I want to know, first of all, is after

85

1    looking at that special issue and understanding that we're

2    not asking a juror to come back and say "life" or "death,"

3    but coming back answering those special issues, do you think

4    that's an appropriate question to ask in determining whether

5    somebody is deserving of the death penalty?

6        A.   Absolutely.

7        Q.   Sometimes we look at those special issues as kind

8    of winnowing down the people who are death deserving.

9    Anyone who's convicted of -- well, a person can be eligible

10   for the death penalty if they're convicted of capital

11   murder.

12            Not all people are, but the people who are

13   eligible for the death penalty, in answering those special

14   issues, it kind of winnows it down for the people who are

15   actually death deserving.

16            And you can see that from that first special

17   issue, can't you?

18       A.   Yes, sir.

19       Q.   It reads, "Is there a probability that the

20   defendant would commit criminal acts of violence that would

21   constitute a continuing threat to society?"  Good question.

22   People want to know if someone is going to be a future

23   danger to society.

24       A.   Yes, sir.

25       Q.   Do you know the difference or can you make a

1    distinction between a mere possibility versus probability?

2              Let me give you an example.  Do you play the

3    lottery --

4        A.   Yes, sir.

5        Q.   -- occasionally?

6              Do you think that when you play the lottery,

7    there's a possibility or a probability that you're going to

8    win?

9        A.   There's a possibility.

10       Q.   Yeah.  It's a mere possibility, not a real good

11   one at that.  So you can see that probability is the higher

12   standard?

13       A.   Yes, sir.

14       Q.   That first special issue requires the burden of

15   proof to stay here on the State, just like it did in trial,

16   okay?  Because to get to this punishment phase, obviously,

17   the State has had to prove somebody guilty of capital murder

18   beyond a reasonable doubt, right?

19       A.   Right.

20       Q.   We've had the burden, and it's never shifted to

21   the Defense.

22              That first special issue, we also have the

23   burden, and it's the same burden we had at trial.  It's to

24   prove someone -- to prove this special issue beyond a

25   reasonable doubt.

87

1          You okay with that?

2     A.   Yes, sir.

3     Q.   Do you think that's appropriate that the State

4 ought to have that burden of proof?

5     A.   Yes, I do.

6     Q.   Do you think that's an appropriate burden of

7 proof?

8     A.   Yes, I do.

9     Q.   All right.  That probability that the defendant

10 would commit criminal acts of violence, that term, that

11 phrase, "criminal acts of violence," there's not really a

12 definition of that.

13          You're not going to be instructed that

14 criminal acts of violence have to be another capital murder

15 or another murder or anything in particular.  It's whatever

16 it means to you, whatever another criminal act of violence

17 would be to you.

18          Does that seem fair?

19     A.   Yes, sir.

20     Q.   That would constitute a continuing threat to

21 society.

22     A.   Yes, sir.

23     Q.   Let me ask you what you think about when you hear

24 the term or think about the term "society."  What do you

25 think about?

88

1     A.    Just the general public.

2     Q.    General public, the free world?

3     A.    Free world.

4     Q.    Can you see a society in the penitentiary as well?

5     A.    Yes, I can.

6     Q.    Did you know doctors work in the penitentiary?

7     A.    Yes.

8     Q.    And nurses?

9     A.    Yes.

10    Q.    And food people, who prepare food, cooks and

11    deliver food?

12    A.    Yes.

13    Q.    Guards, psychiatrists, psychologists, teachers,

14    other inmates?

15    A.    Yes, sir.

16    Q.    So you can see that there is prison society as

17    well as a society that people have here in Smith County.

18    A.    Yes.

19    Q.    If you answer this first special issue -- if we

20    proved it to you that -- beyond a reasonable doubt that he,

21    in fact, would be -- would commit criminal acts of violence

22    that would constitute a continuing threat to society, you

23    would answer that first special issue yes?

24    A.    Yes, I would.

25    Q.    What you can't do is you can't just say -- and

89

1    sometimes defense attorneys will ask this.  I don't think

2    these defense attorneys would, but sometimes they say,

3    "Look, you've already found somebody guilty of capital

4    murder.  You've already found somebody guilty of

5    intentionally killing another person.  Wouldn't you always

6    answer that special issue yes?"

7         A.    Yes.

8         Q.    Okay.  You can see that, but you wouldn't do that,

9    would you?  I mean, you wouldn't automatically say, "I found

10   somebody guilty of capital murder.  I'm always going to

11   answer this yes because it would be silly to have these

12   special issues," or you would just say, "Look, if you found

13   someone guilty of capital murder, you're always going to

14   give them the death penalty."

15               Do you see what I'm saying?

16        A.    Yes, I do.

17        Q.    I mean, that wouldn't be fair.

18        A.    No, it wouldn't.

19        Q.    What you have to do is you have to consider the

20   guilt or innocence phase of a capital murder trial on its

21   own, and then you have to take that evidence and apply it to

22   the punishment phase in addition to listening to all the

23   punishment evidence.

24               And you have to then say, "Look, exclusive of

25   what I've found already, exclusive of the fact that I found

90

1   someone guilty of capital murder, I'm going to make an

2   independent determination as to the answer to this special

3   issue.

4           "I'm going to consider that evidence from the

5   guilt/innocence phase, I'm going to consider this evidence

6   on punishment, and I'm going to think to myself, do I

7   believe that it's been proven beyond a reasonable doubt

8   there's a probability that the defendant would commit

9   criminal acts of violence that would constitute a continuing

10  threat to society?  And if I believe it's been proved beyond

11  a reasonable doubt, I'm going to put yes."

12      A.   Yes.

13      Q.   "And if I believe it has not been proved or if I

14  have a reasonable doubt, I'm going to say no."

15      A.   Right.

16      Q.   Can you do that?

17      A.   Yes, sir.

18      Q.   In other words, you wouldn't automatically say,

19  just because you found someone guilty of capital murder,

20  you're always going to find that there is a probability that

21  they would commit criminal -- continuing acts of criminal

22  violence?

23      A.   No.

24      Q.   You don't have a problem looking at the special

25  issue on its own?

91

1       A.   No, I don't.

2       Q.   All right.  Now, skip down to Special Issue

3   Number 3 and go ahead take a second to read that to

4   yourself.

5       A.   (Complies.)  Okay.

6       Q.   Have you had a chance to read that one?

7       A.   Yes, sir.

8       Q.   It sounds a little bit more complicated than it

9   actually is.  Let me tell you a little about that third

10  special issue.

11           First of all, this one also -- just like that

12  first special issue, you look at it on its own.  These don't

13  build on each other.  You don't say, "I found someone guilty

14  of capital murder, so I found -- so I find it yes to Special

15  Issue Number 1, and I'm going to find it no to Special issue

16  Number 3."

17           You look at them on their own.  You wait

18  and -- again, you wait and you hear the evidence, and then

19  you consider the special issue based on the evidence.

20           Can you do that?

21      A.   Yes, sir.

22      Q.   Now, a special issue is a little different than --

23  3 is a little different than Special Issue Number 1 in that

24  there is no burden of proof on anybody on Special Issue

25  Number 3.

92

1    A.    Uh-huh.

2    Q.    We don't have to prove anything; the Defense, like

3    they never do, never have to prove anything or present any

4    evidence on Special Issue Number 3.  There is no burden of

5    proof.

6              It's kind of one of those things -- one of

7    the jurors we had previously summed it up pretty well.  They

8    said, "It's either there or it isn't."

9              Does that make sense after reading it?

10   A.    Yes.

11   Q.    All right.  So "taking into consideration all the

12   evidence, including the circumstances of the offense, the

13   defendant's character and background, the personal moral

14   culpability of the defendant, is there a sufficient

15   mitigating circumstance or circumstances to warrant that a

16   sentence of life imprisonment rather than a death sentence

17   be imposed?"  That's what the special issue is.

18             There are a couple of things I want to kind

19   of ask you specifically about the wording in Special Issue

20   Number 3.  Taking into consideration all the evidence,

21   which, obviously, indicates you take into account the

22   guilt/innocence evidence, as well as any punishment evidence

23   you heard.

24             You consider everything you heard, not label

25   it from where it came.  You don't say, "Well, I'm going to

93

1   say the State brought me this evidence and this evidence,

2   and the Defense brought this evidence."  You can't do that,

3   because, obviously, the Defense doesn't have to present

4   evidence, but you take everything as a whole; you consider

5   it.

6              And what you do is kind of a two-step

7   process.  You say, "First of all, is there a mitigating

8   circumstance or circumstances," okay?  Mitigating is

9   something that lessens the moral blameworthiness of

10  somebody, kind of makes it -- lessens their blameworthiness,

11  okay?  Is there mitigation or mitigating circumstance or

12  circumstances, okay?

13             Do you understand kind of what you're looking

14  for?  "Is there something that I've seen from this trial

15  from either the guilt/innocence phase or the punishment

16  phase that lessens the personal blameworthiness, the moral

17  blameworthiness of the defendant," okay?

18       A.   Okay.

19       Q.   You look to see if you find something first, and

20  it can be, as it says, circumstance or circumstances.  It

21  can be one circumstance, or it can be multiple circumstances

22  that you believe is mitigation, whatever that mitigation is.

23             And I'll tell you this:  It can be whatever

24  you believe it to be.  There is not going to be a definition

25  of what it is or isn't.  If you believe it to be mitigation,

94

1   that's it.

2           And you don't have to agree with the other

3   jurors.  They might think something is mitigation, and you

4   might not and vice versa.  It's up to each individual juror

5   to consider what they believe to be mitigating circumstance

6   or circumstances.

7           Make sense?

8       A.   Yes, sir.

9       Q.   So, first of all, you identify if you see any, and

10  you might not find any, or you might find several things

11  that constitute mitigating circumstances, okay?  That's your

12  first inquiry.

13          You then -- if you find some or one

14  circumstance, you then go further, and you do that second

15  step, and you say, "Is it sufficient in my mind to warrant a

16  life sentence over a death sentence?"

17          Does that make sense?

18      A.   Yes, sir.

19      Q.   Because you might find age or might find 15 things

20  that are mitigating, whatever they are, but not one of those

21  may be sufficient to mitigate -- to warrant a life sentence

22  over a death sentence, okay?

23          Does that make sense?

24      A.   Yes, sir.

25      Q.   Or by the same token, just simply having one might

95

1  be enough, might be sufficient to assess a life sentence

2  instead of a death sentence.

3              Does that make sense?

4      A.    Yes, sir.

5      Q.    All right.  Can you answer that special issue,

6  that third special issue after considering all the evidence?

7      A.    Yes, I can.

8      Q.    Can you consider it on its own, away from and

9  apart from that first special issue, despite the fact that

10 you've already found someone guilty of capital murder?

11     A.    Yes, sir.  I think I probably could.

12     Q.    Again, think you probably could.  I know what

13 mean.  I know you are being polite, and that's how we kind

14 of phrase things, but, basically, it's like everything else,

15 like we talked about towards the beginning.

16              What you've got to be able to do to be a fair

17 juror is say, "Look, I know to get to the punishment phase

18 of a capital murder case, I've got to have found someone

19 guilty," right, or you wouldn't be in the punishment phase.

20              "So I've already found someone guilty, and

21 I've looked at the evidence, and I've answered Special Issue

22 Number 1 that there is a probability that the defendant

23 would commit criminal acts of violence that would constitute

24 a continuing threat to society.  I know that.

25              "What I'm now going to do is I'm still going

96

1  to look at all the evidence I've heard from any source, and

2  I'm going to do that two-step process.  In my mind, I'm

3  going to identify, if I find any mitigation, and then I next

4  say, do I personally -- regardless of what anyone else

5  thinks, do I find it to be sufficient to warrant a life

6  sentence instead of a death sentence?"

7           Can you do that?

8      A.   Yes, sir.

9      Q.   Despite the fact that you found someone guilty of

10 capital murder, despite you found the probability that they

11 would commit future acts of criminal violence, you could

12 still do that?

13     A.   Yes.

14     Q.   All right.  And that's all the law says.  The law

15 says -- otherwise, there would be no reason to have these

16 special issues, right?

17     A.   Right.

18     Q.   Or there would be no reason to have the third one.

19 If you find him to be guilty and you find him to be a future

20 danger, that's it.

21           Obviously, there's a reason there's this

22 third one, and it's one more check and balance.  It's one

23 more hurdle that we have to go over to narrow down those who

24 are death deserving, right?

25     A.   Uh-huh.

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

97

1     Q.   Do you think that's a fair question?  I asked you
2  that about the first special issue.  Do you think that's a
3  good question to ask?
4     A.   Yes, I do.
5     Q.   Do you see how it kind of narrows down the field
6  of those who are death deserving?
7     A.   Yes.
8     Q.   Do you have any questions about how --
9     A.   Are mitigating -- that's the things that have to
10  do, like, with the crime.  I mean, it has to do with the
11  crime that he did, but it's a reason that he did that.
12     Q.   Well, it can be.  It certainly can be.  It can be
13  anything.
14     A.   Yeah, I see.
15     Q.   It can be something -- why he committed the crime.
16     A.   I see.
17     Q.   It can be any number of things.  Again, I don't
18  want to give specific examples of what it could be or it
19  couldn't be because it's up to you.
20     A.   Right.
21     Q.   Whatever you believe is sufficient or is
22  mitigation can be used by you.
23          And then you do that second step and say, is
24  it sufficient?  Because you might find -- you know, I
25  said 15; you might find 200 reasons or circumstances that

98

1   are mitigation to you.

2              Some of them could be why he committed the

3   crime; some of them could be home life, whatever.  You could

4   find 200 of them.

5              And then in that second step, you can say,

6   "You know what?  I found 200 of them, but not any of those

7   are sufficient to warrant a life sentence over a death

8   sentence," or you can only find one and say it is

9   sufficient.  It's entirely up to you.

10       A.    I understand.

11       Q.    And you have to look at it separate from that

12   first special issue and separate from the guilt or innocence

13   phase.

14              Does that make sense?

15       A.    Yes, sir.

16       Q.    Any question at all about that?

17       A.    No, sir.

18       Q.    Let me talk to you about a couple more very quick

19   areas.  We have something in Texas called victim impact.

20   It's actually -- there are Supreme Court cases that say it's

21   legitimate in the punishment phase.

22              You could have victim-impact testimony from

23   relatives of the deceased as to how this loss, this grief,

24   has affected their lives.  It's certainly admissible.  It

25   can be brought up.  Jurors can consider it for whatever

99

1   purpose they want to.

2              You may be affected by it.  You may not be

3   affected by it.  It's like a basket of evidence.  When

4   you're looking at this case, you put in items of evidence,

5   things that you're going to consider, right?

6              Victim-impact testimony might be something

7   that you just say, "I'm going to consider it and put it in

8   that basket along with everything else."  And it might be

9   something that you say, "That doesn't really mean anything

10  to me," and you don't consider it.  That's up to you.  It's

11  deserving of whatever weight you want to give it, if any.

12       A.    I understand.

13       Q.    What you can't do is say, "I'm so affected by this

14  victim -- you know, this compelling, this victim-impact

15  testimony that I'm going to disregard the other evidence and

16  have such a thirst for revenge that I'm going to disregard

17  the evidence, and I'm going to automatically return a

18  verdict that will result in the death penalty."

19              Do you understand that?

20       A.    Yes, sir.

21       Q.    You would not do that, would you?

22       A.    No.

23              MR. HARRISON:  May I have one moment, Judge?

24              THE COURT:  Yes.

25              (State's counsel confer.)

100

1          Q.    (By Mr. Harrison) Let me -- final thing and then

2    I'm going to pass you and let you go through another torture

3    with the Defense asking you probably close to the same

4    length of time that I've had you.

5                    As we talked about, the things that you've

6    got to remember as a potential juror is you've got to have

7    an open mind.  Very important for you to remember that every

8    answer you're giving us, whether I'm asking or the Defense

9    is asking, is predicated on not knowing any of the evidence.

10                   You've got to keep an open mind and not

11   formulate opinions before you hear the testimony.  The law

12   wants to ensure that you're open-minded, that you can be

13   impartial, that you can wait to make your decisions only

14   after you hear the evidence in the case.

15                   Is that fair?

16         A.    Yes, sir.

17         Q.    Like I talked about, those general principles of

18   law, you've got to be open-minded to affording someone their

19   Fifth Amendment right not to testify.  You've got to be able

20   to keep an open mind and give them their presumption of

21   innocence that they're entitled to.

22                   You've got to wait and not judge the

23   evidence, not say, "I'm predisposed of finding someone

24   guilty of capital murder or not."  You've got to wait and

25   base it on the evidence.

101

1              You've got to say, "I'm not predisposed to

2    automatically answer the special issues in a way that's

3    going to ensure a death penalty or ensure a life sentence.

4    You just have to be able to say, "Look, I'm going to listen

5    to the evidence.  I'm going to keep an open mind.  I'm going

6    to judge fairly and do what I think is right based on the

7    evidence."

8              Can you do that?

9        A.   Yes, sir.

10       Q.   And if you do that, that's all anyone can ask.

11             Do you have any questions of me or --

12       A.   No, sir.

13       Q.   Mr. Pearson, thank you very much for your patience

14   with me.

15             MR. HARRISON:  I'm going to pass the witness

16   (sic), Your Honor.

17                  VOIR DIRE EXAMINATION

18   BY MR. HAWK:

19       Q.   Mr. Pearson, how are you?

20       A.   I'm fine.

21       Q.   Do you need to stand up and stretch?

22       A.   No.  I'm okay.

23       Q.   Okay.  The good thing is, I'm not going to talk

24   for nearly the amount of time as Mr. Harrison talked.  How's

25   that?

102

1    A.    That's fine.

2    Q.    Make you feel any better?

3    A.    Yes, sir.

4    Q.    Do you want to know the bad news?  I'm talking

5    long enough to where I've got water.  How's that?

6    A.    Okay.

7    Q.    Do you need a glass of water or something?

8    A.    No.  I'm fine.  Thank you.

9    Q.    The 24-page questionnaire you filled out has saved

10   me 24 pages of questions.  That was not an exercise in vain.

11   It really wasn't.

12        If you and me were in a different setting and

13   I saw you somewhere, we'd sit and visit, and I'd learn about

14   where you live and what you do and if you've got a family,

15   what kind of car you drive, and where you live.

16        And so we'd learn that kind of stuff over

17   time, but, basically, what happened was you take an hour to

18   do it and us taking time to review it, it saved us a lot of

19   time today, and we appreciate you doing that.

20        I'm going to ask you questions about the same

21   general topics, but I'm going to tweak your thinking a

22   little bit on most of these.  Because the way that our

23   system works is, there's a State and then there's a

24   defendant.

25        The State has called this -- as they say,

103

1    there has been a grand jury that has returned an indictment,

2    and they say that their road map leads to capital murder.

3    And if I've heard that word, "capital murder," out of his

4    mouth and the Judge's mouth one time, I've heard it 300

5    times in the last couple of hours.

6              And the way it works is that's the way the

7    road map goes.  Well, obviously, jurors may have a little

8    different opinion of that, and the evidence may have a

9    little bit different opinion of that.  So this gets back to

10   the age-old principle that no matter how flat you try to

11   make a pancake, there are two sides to it.

12             And so I want to ask you about some of these

13   principles, kind of the rubber meets the road, and look at

14   it just a little bit differently, a way you may not have

15   thought about it in the past and a way that maybe

16   Mr. Harrison didn't ask you about specifically, okay?

17        A.    Okay.

18        Q.    Hopefully, we can get you talking and telling us

19   things we never knew about before.  The job interview you're

20   going through now, have you ever gone through a two-hour job

21   interview like this?

22        A.    No, I haven't.

23        Q.    And that's what this really is.  I mean, you are

24   helping us determine whether, under the law, you are a

25   qualified juror, and you've got to answer lots of questions

104

1   from us.

2              And interestingly, your job, basically, is

3   three different things throughout the entire time.  You've

4   got to decide, if you're a juror, did the defendant commit a

5   crime, okay?  That's how you start.

6              The second thing is, if he didn't, guess

7   what?  That's the end of it, all right?

8              Does that make sense to you?

9        A.   Yes, sir.

10       Q.   The second thing is, though, if you decide, as a

11  juror in some case, and you're on it, obviously, if he

12  committed a crime, what crime did he commit, right?

13       A.   Right.

14       Q.   It may be one he got charged with; it may be a

15  crime that's close to what he got charged with but actually

16  not the one he got charged with.  It could be a lesser one;

17  it could be anything that you see in the jury instructions

18  that the Judge tells you about at the end of the case,

19  right?

20       A.   Right.

21       Q.   And the third step you get to only if you find the

22  answer to the first two is yes, and you define which crime

23  it was.  Then and only then do you get to decide as a juror

24  what's supposed to happen to him, okay?

25              And that's kind of the framework that jurors

105

1   have to go through, and that's why you're going through this

2   two-hour job interview, okay?

3       A.   Okay.

4       Q.   Your guiding principle in all this, as far as how

5   to make a decision as a juror, what is that guiding

6   principle for you?  What's the one thing you look at to base

7   your decision on?

8       A.   All the evidence.

9       Q.   That's right.  You said two things that were good.

10  One, you said evidence, right?

11      A.   Right.

12      Q.   You didn't say anger, did you?

13      A.   No.

14      Q.   I know you shook your head, but she's got to take

15  it down.

16           You didn't say emotion?

17      A.   No, I didn't.

18      Q.   You didn't say some thirst for revenge?

19      A.   No.

20      Q.   You said it was evidence.

21           And the second thing that was important was,

22  you said all the evidence, right?

23      A.   Yes.

24      Q.   Because you, as a juror, have that responsibility,

25  that obligation, and opportunity to see all the evidence in

1    the case.

2                 Now, we can't talk about it here, and we talk

3    a lot in hypotheticals and pretend cases and what ifs.  And

4    interestingly, we have to go down the whole line.  I mean,

5    we've got to get all the way as if you're on a jury, and

6    you've found somebody guilty.

7                 And you're going to hear strange questions

8    from lawyers making it almost seem like you've already found

9    either this defendant or another defendant guilty.  And the

10   weird thing is, this just has to do with what would happen

11   if you're a juror in some case.

12                You see how that works?

13   A.    Yes, sir.

14   Q.    We're not talking about Mr. Beatty; we're not

15   talking about me or you or anybody else, okay?

16   A.    Yes.

17   Q.    Now, when you say "consider all the evidence" as

18   your guiding principle, do you agree with me that using your

19   imagination as a substitute for evidence is a bad idea?

20   A.    I would think so, yes, sir.

21   Q.    In fact, the more you use your imagination to fill

22   in a gaps, the closer you get to making a mistake on a case.

23   A.    Yes.

24   Q.    That's why the Judge will instruct you that you're

25   going to make a decision from all the evidence properly

1  admitted before you.  And if you can continue to hold that

2  as your firm grip, then let the evidence take you down

3  whatever road it does, then the law says you may be

4  qualified to be a juror, okay?

5       A.   Right.

6       Q.   Does that seem right to you, though?

7       A.   Yes, sir.

8       Q.   You wouldn't want a juror that kind of looks at

9  part of the evidence or just the parts that he wants to see;

10 he actually considers all of it, right?

11      A.   Yes, sir.

12      Q.   Interestingly, you get to consider all the

13 evidence, and some of it you can disregard.

14           Now, obviously, when somebody stands up there

15 and takes a witness oath to tell the truth, you would like

16 to think that they are telling the truth, right?

17      A.   Yes, sir.

18      Q.   That's not always the way case, though; would you

19 agree with me?

20      A.   I would probably agree with that.

21      Q.   And there's kind of two different reasons for

22 that, isn't there?  One of them is they're just flat lying;

23 would you agree?

24      A.   Yes, sir.

25      Q.   The second is they may just be wrong, right?

108

1      A.   Yes, sir, could be.

2      Q.   Just because someone says something from the

3 witness stand that's not true doesn't necessarily mean that

4 they are telling a lie.  Would you agree with me?

5      A.   Yes, sir.

6      Q.   And you get to be the juror.  If you're a juror,

7 you get to be on the lookout for that.  You get to decide,

8 "You know, I know that juror said this or that witness said

9 this.  I don't believe he's right.  Either he's lying or

10 he's wrong, but I'm going to listen to it."  And you get to

11 decide that for yourself.

12           Does that sound like a good idea?

13     A.   Yes, sir.

14     Q.   The Judge, the prosecutor, the Defense, nobody

15 gets to tell you what weight to give to different witnesses

16 in evidence, and that's the way it needs to be.  And you

17 kind of want it that way, don't you?

18     A.   Yes, sir.

19     Q.   Now, I'm going to touch on some things, because

20 it's the nature of the case we're at and the nature of the

21 case that we're talking about.

22           You know, I disagree with Mr. Harrison in

23 this respect:  He said let's talk about the punishment phase

24 because that's why we're here.  Well, the reality of it is,

25 we're actually here to figure out whether or not this is the

109

1   best case for you to be on the jury.

2           Would you agree with me?

3       A.   Yes, sir.

4       Q.   And when we talk about a case involving an

5   allegation of capital murder, I need to explain to you what

6   it means to be charged with a crime as a result of

7   somebody's death in Texas, okay?

8       A.   Okay.

9       Q.   You can actually cause somebody's death in lots of

10  different ways, and a lot of it has to do with what's going

11  on in the mind of the person that causes the death.  I'm

12  going to expound on that.

13          There is something called a culpable mental

14  state, a lot of legal stuff, and I've read it and don't

15  understand, so I'll try to put it in terms I can understand.

16  Hopefully, together we'll have a meeting of the mind.

17          The first level in your mind has to do with

18  negligence.  Somebody ought to be aware of something, but

19  they're not.  The example I use, if you're driving down the

20  street and you blow a red light, you run through and hit

21  somebody.  I mean, you may not have ever seen the red light,

22  but it's your job to see it.

23      A.   Yes, sir.

24      Q.   You were just negligent about looking at it.  You

25  work up the chain a little bit, as it goes to, in your mind,

110

1    whether you're actually reckless about something.

2              Now, that's the situation that says,

3    essentially -- and there may be a legal definition given to

4    you, which really follows up.  That's where you may see a

5    red light and say to yourself, "You know, I know if I go

6    through that red light, there is a risk that I could hit

7    somebody, but I think I can make it, and I'm going to

8    consciously disregard that risk.  I'm going through the

9    light."

10             Then you do so, and you run into somebody,

11   you hurt them, kill them, whatnot.  But that's a different

12   level, and you can see it kind of moves up the chain a

13   little bit as far as responsibility goes.

14        A.   Yes, sir.

15        Q.   The last one has to do with -- and these are

16   together, but they're similar terms, different technically,

17   but basically the same.  One is intentionally and knowingly.

18   One means you just intend the result.  The other means

19   you're consciously aware of the circumstances surrounding

20   your conduct.

21             But it's the highest level in Texas of your

22   culpable mental state, okay?

23        A.   Yes, sir.

24        Q.   So those are, basically, the three mental states.

25   Let's put it where the rubber meets the road on this issue.

111

1    If you're going to cause somebody's death in Texas, there is

2    actually a statute for each one.  If you do so with

3    negligence, there is something called criminally negligent

4    homicide.  It's a state jail felony, the lowest of the

5    felonies.

6                   But you work up the chain to the higher

7    mental state.  You've got recklessness.  Now, there's

8    nothing called reckless homicide; it's called manslaughter,

9    okay?

10        A.    Okay.

11        Q.    If you cause somebody's death by being reckless.

12                   And then, obviously, there's the intentional

13   or knowingly cause of somebody's death; that is cold murder,

14   okay?  And that's the three different kinds.

15                   Now, before you came in last Thursday, did

16   you have any idea how the Texas capital sentencing scheme

17   works?

18        A.    Just a little bit.

19        Q.    Where did you learn that from?

20        A.    Probably newspapers and just reading what happens

21   to people when they get convicted.

22        Q.    Hey, have you heard things about special issues

23   and questions like that?

24        A.    Yes, sir.

25        Q.    You may know a little bit something more than some

112

1    people about how that works.  Would you agree with me?

2        A.    Maybe, yeah.

3        Q.    Did you ever think that if somebody committed a

4    first degree murder, that one we've discussed, intentionally

5    or knowingly, that depending on how bad that is, the facts

6    of that case -- you know, you hear the example Mr. Harrison

7    gave about how bad somebody can be to somebody else on a

8    regular -- if there is such a thing -- murder.  Did you ever

9    think that somebody could get the death penalty for that?

10       A.    No.

11       Q.    You always knew that there had to be actually a

12   second crime proven?

13       A.    Well, I knew there was just a few things that you

14   can get charged for capital murder for.

15       Q.    Right.  And they've got like this laundry list,

16   and I want to touch on that, because out of all the

17   different things, the only one that's applying to the

18   questions we're going to ask has to do with if you commit a

19   murder in the course of committing another offense, whether

20   it be burglary or robbery, okay?

21       A.    Yes, sir.

22       Q.    Now, in Texas -- and I'm going to do some jumping

23   around, but it all folds in, so bear with me.

24            The burden of proof being on the State, they

25   actually have to prove, to make it a capital murder, two

113

1    different crimes.  You follow me on that?

2        A.    Yes, sir.

3        Q.    They have to prove, number one, an intentional

4    murder, okay?

5        A.    Okay.

6        Q.    That's the first thing.  And that's beyond a

7    reasonable doubt.  They've got to follow that burden, okay?

8                    In addition to that, they've also got to

9    prove a second crime, whether it be robbery, burglary, ones

10   along those lines.  But there's an additional element on

11   this, and that is they've got to prove that the second one

12   I've just discussed actually occurred in the course of

13   committing the murder.

14                   Now, that's kind of a legal term, but there

15   are definitions to it, and it's pretty clear, in the course

16   of committing.  We try to give examples to accentuate or

17   explain to everybody that they've got to be connected.

18                   In your mind, you've got to be satisfied,

19   before you can ever find somebody guilty of capital murder,

20   that the State has met the burden of proving both those

21   crimes and that they happened in the course of one another.

22                   You understand that?

23       A.    Yes, sir.

24       Q.    If they fail, if the State fails -- I know they

25   say by an indictment -- if you're on a capital murder jury,

114

1    we say the evidence leads all the way to capital murder, but

2    you, as a juror, get to decide, "I don't think the evidence

3    leads that far."  It may lead to a murder maybe; it may just

4    lead to manslaughter, okay?

5         A.   Right.

6         Q.   It may lead to just a murder; it doesn't lead to

7    the other.  So it can go anywhere you think it goes, as a

8    juror, after you look at all the evidence, okay?

9              The example Mr. Harrison gave is that if

10   there was a capital murder case and you're a juror on a

11   jury, and there has been evidence or an allegation of a

12   murder in the course of a sexual assault, and you hear

13   evidence that there was a murder, but you don't hear any

14   evidence at all about a sexual assault, then you've got to

15   find somebody not guilty of the capital murder, right?

16        A.   Yes, sir.

17        Q.   I'm going to go even further.  And, again, this

18   comes to tweaking your thinking.  Not only is it that you

19   don't have to hear any, there could be a whole bunch of

20   evidence of sexual assault, but in your mind, if it doesn't

21   rise to the level of beyond a reasonable doubt, what do you

22   do?

23        A.   Not guilty.

24        Q.   That's right.  You may hear allegations,

25   innuendos, whatever kind of evidence you may want, of a

115

1    sexual assault, but in the final analysis, you may just

2    decide they didn't get there on that, and for whatever

3    reason, you, as a juror, get to decide that, because you,

4    again, are interviewing for the job in a criminal case,

5    okay?

6              Do you think it's appropriate that the burden

7    of proof ought to be on the State to prove both a murder and

8    an associated crime?

9         A.   Yes.

10        Q.   Do you think they should have to prove this

11   connection?  In the course of committing, do you think they

12   should have to prove that beyond a reasonable doubt as well?

13        A.   Yes.

14        Q.   Some people think, "Well, I think they should have

15   to prove it's more likely than not that that would happen in

16   the course of committing."

17             What do you think about that?

18        A.   No.  I think they need to prove their case.

19        Q.   It's been defined in the law that conduct

20   occurring in attempting to commit, during the commission, or

21   the immediate flight after the intent of the commission of

22   the offense, that's in the course of it, okay?

23             There's also a legal definition that talked

24   about when does the intent to commit murder have to be

25   formed, and the law says the intent to commit the offense

116

1   must be formed prior to or concurrently with the murder.

2              Here's the example:  I go into a convenience

3   store.  And when you think of a classic robbery capital

4   murder, have you ever heard on TV about the convenience

5   store robbery where the clerk gets shot?

6       A.   Yes.

7       Q.   I'm going to put some hair on that story for you.

8              Pretend that I walk into the convenience

9   store, and Mr. Perkins is the clerk.  And for whatever

10  reason -- if you knew Mr. Perkins, you'd know I'd be arguing

11  with him, and we get into just an arguing contest.

12             It has nothing to do with money; it has

13  nothing to do with merchandise.  I just get mad at him, and

14  one thing leads to another, and I pull out a pistol and

15  shoot him as dead as a hammer, okay?

16             That by itself, murder or capital murder,

17  based upon what you learned today?

18      A.   Murder.

19      Q.   Yeah.  There is no underlying felony there, is

20  there?

21      A.   No.

22      Q.   Now, let's say I leave the store, and I go back,

23  and as I'm leaving the store, I go, "You know what?  In

24  about 15 minutes, I know somebody is going to go over there

25  and see what I did."

117

1          I know everybody left afterwards.  I'm going

2   to try to sneak back over there and get me a Diet Coke,

3   maybe all the money in the till, whatever, long after I

4   actually committed the murder."

5          There's a big separation in time and in the

6   connection.  Can you see the difference between that and in

7   the course of committing?

8      A.   Yes, sir.

9      Q.   And that's what the law contemplates.  You've got

10  to be able to figure out in your mind, "Do I think" -- based

11  on the hypothetical I'm giving you or any case where you're

12  a juror, "Do I think they've proven to me beyond any

13  reasonable doubt that these two things happened one in the

14  course of the other?"  And that's capital murder in Texas.

15         Do you agree that there ought to be that

16  connection?

17     A.   Yes, sir.

18     Q.   Do you agree that there should not be the death

19  penalty for just -- if you can say such a thing, just a

20  murder case?

21     A.   Yes, I do.

22     Q.   You kind of gave me the half nod, and I've seen

23  that before.

24     A.   Yeah.

25     Q.   That means there have been times that you've been

118

1  thinking about specific murders which may be real bad or

2  whatever, where it may have been appropriate in your mind.

3          Tell me why you gave me the half nod.

4      A.   Well, just for what you said right there, where

5  somebody has killed somebody in a bad case, and it's not

6  capital murder; it's just murder.

7      Q.   Okay.  Now, that gets me to the point that flows

8  out of this.  I'm going to relate to our conversation a

9  while ago about the evidence in the case being your guiding

10 principle, not anger and emotion.

11          Let's say, if you're a juror in a capital

12 murder case, and you hear the same fact situation that

13 Mr. Harrison laid out about killing Mr. Bingham, and it was

14 just an awful killing, I mean, it was the worst you could

15 imagine, okay, and it inflames you, it incenses you, it's

16 the kind of thing that before you learned about how to do

17 capital murder cases, you would have thought would have

18 deserved the death penalty, in my case that I gave you an

19 example of me and Mr. Perkins, let's say I was just as bad

20 to him, I was awful, I mean, just the worst that you could

21 imagine, he's got a family, he's never going to see his

22 little girl again, and his pretty wife is going to be

23 without a husband, a girl without a father, and I'm just

24 awful doing that, but all of a sudden, you're looking at the

25 evidence, and in your mind, as a juror, you have a

1    reasonable doubt about the connection.

2         A.    Right.

3         Q.    Now, here's where the rubber meets the road.

4    Would the fact that the killing itself in our hypothetical

5    here was so bad, would that tend to make you short-skip that

6    requirement about proving the connection to the underlying

7    robbery?

8         A.    I would hope not.  I would seriously hope not.  It

9    could.

10        Q.    Say that again.

11        A.    I said it probably could, but I would like, again,

12   hear the evidence and decide for myself.

13        Q.    Well, and that's why I'm having to give you these

14   pretend cases, because we're not going to say tell me about

15   this case and us just do a pretend trial today about any

16   specific case.

17        A.    Yes, sir.

18        Q.    We have to prepare for any possibility, and the

19   law says you kind of have to be prepared for those

20   possibilities.  And one thing I like about your answers

21   you're giving us is you're kind of thinking.  You'll half

22   nod your head once in a while when you're thinking about

23   things, and I want to know the answers because we've got to

24   delve in here.

25              In a hypothetical case, there's just an awful

120

1    murder case, just awful the way that I've described it today

2    with me and Mr. Perkins or with Mr. Bingham or Mr. Harrison,

3    whatever.

4              And after the evidence in the case that

5    you're on a jury, whatever case that is, you in your heart

6    of hearts do have this reasonable doubt about the connection

7    because you just don't think they've proven it.

8              But then you say to yourself, "Man, that's

9    such an awful killing.  I've got to find him guilty of

10   capital murder anyway.  It's just a bad enough killing."

11             Can you see that happening to you?

12        A.   No.

13        Q.   Okay.  When you say it might or it could, tell me

14   some of your thoughts on that.

15        A.   Well, if you had any doubt at all, like you said,

16   if they didn't prove their case above a reasonable doubt,

17   then that's it.

18        Q.   Would that lower the bar for the State on proving

19   the connection "in the course of committing" to you --

20        A.   No.

21        Q.   -- if the underlying killing, the murder, was just

22   an awful fact scenario?

23        A.   No.

24        Q.   All right.  Now, I'm going to really add some hair

25   to this story.  We've talked a little bit about the

121

1   punishment range, obviously, in a murder case, okay?  It's a

2   first degree murder, five to life.  And you know the

3   concepts of death penalty case.  If you find him guilty of

4   capital murder, death or life.

5            And you made the promise, I'm thinking, that

6   you could not let the State lower this bar.  The bar stays

7   at reasonable doubt on connecting the two crimes.

8            You would do that, right?

9      A.   Yes, sir.

10     Q.   Let's say in your mind you have a reasonable doubt

11  about it, so you find somebody guilty of murder.

12     A.   Okay.

13     Q.   You say there is a reasonable doubt in your mind,

14  so this person that you're on the jury of is guilty of

15  murder, okay?

16           But then all of a sudden, there is evidence

17  in your mind or being presented to you, so you have a doubt

18  in your mind.  You know what?  This might not even be a

19  murder in the case that you're a juror on.  This might

20  actually by a manslaughter.  This might be a reckless

21  killing.

22           Well, you know, now knowing the punishment

23  range business, you know that two to twenty, two years on

24  the low ends, twenty years on the high end, is what a second

25  degree manslaughter gets you.

1          And you hear this fact scenario, and you're

2    like, "Wow, this is a bad deal."  And you can have an honest

3    question in your mind.  Is he guilty of the greater offense

4    of murder or the lesser offense of manslaughter, if you're

5    the juror in some case.

6          A.   Yes, sir.

7          Q.   If you have a doubt about which two, which one do

8    you find somebody guilty of, the greater or the lesser?

9          A.   I don't really know because I hadn't heard the

10   facts.

11         Q.   Well, I'm going to add some facts to you.

12         A.   Okay.

13         Q.   Let's say that whatever the case is, you have

14   heard the facts, and you're sitting back there.  You've

15   already deliberated a good long time, a proper time, and

16   you, in your mind, now are satisfied.

17              "I've got a reasonable doubt about whether

18   he's guilty of the greater offense.  He might have committed

19   the lesser.  I'm not sure which.  He either committed the

20   greater or the lesser, one or the other."

21              And you have a reasonable doubt about which

22   of either he's guilty of.  How do you resolve that doubt?

23         A.   Well, if I didn't think he was guilty of the

24   greater and I think he's guilty of the lesser, then that's

25   the road I would go down.

123

1      Q.   What if you're just not sure which; that's a tie

2   to you?

3      A.   I don't know.

4      Q.   If the Judge instructs you that if you have a

5   reasonable doubt about whether an individual is guilty of

6   either the greater offense or the lesser offense, you should

7   resolve that doubt in favor of the defendant.  Would you

8   agree with that?

9      A.   Yes, sir.

10      Q.   So if it's a tie, it goes to who?  The State or

11   the Defense?

12      A.   The Defense.

13      Q.   Could you do that?

14      A.   Yes.

15      Q.   What if you discover that the offense you actually

16   think the defendant is guilty of in any case you're a juror,

17   it doesn't carry enough punishment in your mind for what

18   should happen?

19           MR. HARRISON:  Judge, I'm going to object

20   only to the form of this question, because it hinged on a

21   prior question where he related it to a set of facts, a

22   horrendous murder case, a horrendous set of facts.

23           So he's applying a specific fact or set of

24   facts for this question.  That's my only objection.

25           THE COURT:  Well, I'm sure that was a good

124

1   objection.  I'm not real sure I understand exactly what the

2   objection goes to.

3            Let me just get Mr. Hawk to rephrase that

4   question.  Let me listen to that question again.  I'm not

5   sure --

6   Q.   (By Mr. Hawk) And I think I see what his objection

7   is, and I'm going to clear it up to you.

8   A.   Okay.

9   Q.   Any old case.  I don't know what case you're a

10  juror on, but let's just say you're a juror on a case.  And

11  there is a multiple choice thing here.  You've got a bunch

12  of different offenses that the defendant -- you know, he's

13  charged with one.

14           It could be a lesser.  It could be the lesser

15  of that.  You've two or three to choose from.  Your job is

16  to look at all the evidence, like you said, and decide,

17  okay?

18  A.   Yes, sir.

19  Q.   Let's say, in your mind, you have deliberated and

20  heard all the evidence in some case, and you know in your

21  mind now, "Okay.  I now know what the defendant is guilty

22  of.  I know what they've charged him with.  He may or may

23  not be guilty of that.  I know about the lesser.  He may or

24  may not be guilty of that.  I know about the lesser after

25  that."

125

1    And you know them all, but let's say you have

2  decided, "I know the State has proven the defendant guilty

3  in some case guilty beyond a reasonable doubt of this lesser

4  crime," whatever that is, okay?  But then you realize not

5  enough punishment, based upon what the law is.  "Well, if I

6  find him guilty of this, I can only do certain things to

7  him."

8    If that ever was to happen to you, how do you

9  resolve that in your mind?

10    A.    Give him the maximum of the maximum for whatever

11  the law says.

12    MR. HARRISON:  Judge, let me interpose an

13  objection as to Mr. Hawk putting in "in the mind."  I think,

14  if I heard it correctly, he's put in the mind of the juror

15  that he is -- that he, as a juror, would believe that there

16  is not enough punishment in the case.  I believe that was a

17  fact that he is now interjecting into this fact scenario.

18    MR. HAWK:  It actually is the fact, because I

19  want to find about range of punishment, and actually, I

20  think he answered it for me.

21    THE COURT:  Well, I think he did, too,

22  because -- I don't want to put words in his mouth, in his

23  answer, but I think what Mr. Hawk is asking you is, for

24  the -- you've already said you will convict the defendant

25  only of the offense you believe the State has proven him

126

1    guilty of, correct?

2                    VENIREPERSON PEARSON:  Yes, sir.

3                    THE COURT:  Then for that offense that you

4    convict him of that you believe the State has proven him

5    guilty of, there is a range of punishment for that offense.

6                    VENIREPERSON PEARSON:  Yes, sir.

7                    THE COURT:  So the question becomes,

8    regardless of what the range of punishment might have been

9    for a higher offense that you did not convict him of, can

10   you keep your mind open and consider the full range of

11   punishment for the offense that you found him guilty of --

12                   VENIREPERSON PEARSON:  Right.

13                   THE COURT:  -- and assess a sentence within

14   the full range of punishment only for the offense that

15   you've convicted him of?

16                   VENIREPERSON PEARSON:  Yes.  And he said, did

17   I feel like that -- was there enough punishment --

18                   THE COURT:  Right.

19                   VENIREPERSON PEARSON:  -- for the crime,

20   right.

21                   THE COURT:  And so if you find him guilty of

22   what Mr. Hawk's referred to as, I believe, a lesser included

23   offense, because you don't think the State proved a higher

24   offense, can you simply keep your mind open and assess a

25   punishment within the full range of punishment for the

127

1    offense you've convicted him of, regardless of what the

2    punishment might be for a higher offense that you did not

3    convict him of?

4                    VENIREPERSON PEARSON:  Yes, sir.

5                    THE COURT:  Can you do that?

6                    VENIREPERSON PEARSON:  Yes, sir.

7                    THE COURT:  Okay.  And you can keep going if

8    you want to.

9                    MR. HAWK:  No.  I think he's answered the

10   question.

11       Q.   (By Mr. Hawk) I guess the bottom line is, you

12   would sure make the commitment to find the defendant guilty

13   of only what he was guilty of?

14       A.   Yes, sir.

15       Q.   You wouldn't manufacture a different guilty

16   verdict just to kind of get a punishment range you like?

17       A.   No.

18       Q.   What does it mean to you -- when you hear the

19   phrase "burglary," what do you think of?

20       A.   Somebody breaking into your house or your

21   business.

22       Q.   In their own house or in your house?

23       A.   Any house.

24       Q.   Even their home?

25       A.   Their own house?

1    Q.   Right.

2    A.   I don't think you can burglarize your own house.

3    Q.   Well, how about robbery?  What do you think when

4 you think of robbery?

5    A.   Somebody taking something off of somebody else,

6 stealing from them.

7    Q.   Yeah.  What does somebody -- in your mind, when

8 somebody robs somebody, what do they do afterwards?

9    A.   What would they do after they rob them?

10    Q.   Yeah.  A classic situation, when you think here's

11 a robbery, what's your classic situation of what a robbery

12 is?  What does the person do afterwards?

13    A.   When somebody takes somebody's money.

14    Q.   What do they do after that?

15    A.   Probably go buy drugs with it, if they're a

16 robber.

17    Q.   Don't hang around, though, do they?

18    A.   No.

19    Q.   Those are the four different kinds of offenses

20 that we've talked about, the criminally negligent homicide,

21 if I can say that right, manslaughter, murder, and the

22 capital murder.

23        Do you think you've got a good handle on all

24 four of those four different ones and what it takes to get

25 to each one?

129

1      A.   Yes, sir.

2      Q.   Can you make the commitment that regardless of

3  what the allegation is, that you would look at the proof and

4  find any defendant that you're a juror on guilty of only

5  what he starts with?

6      A.   Yes.

7      Q.   Okay.  Now, when you came in here Thursday -- I'm

8  going to ask you a gut-check question -- did you look over

9  at Tracy Beatty and say, "What did he do?"

10     A.   Yes, I did.

11     Q.   I mean, that makes sense, though, doesn't it?

12     A.   Yes, sir.

13     Q.   Natural to do that.  Would you agree with me?

14     A.   Yes, sir.

15     Q.   It's difficult to put meaning into the concept of

16 presumption of innocence because, in our society -- and you

17 hear on TV oftentimes so-and-so is charged with a crime,

18 right?  And oftentimes, the media and the like doesn't

19 necessarily stick around for the follow-up, do they?

20     A.   No, they don't.

21     Q.   It's the headline that gets it.  Then afterwards

22 whatever happens, someone has to go find out about.  Would

23 you agree with that?

24     A.   Yes, sir.

25     Q.   And as a result of that is many people in our

130

1    society have the same feeling.  Me included, by the way, and

2    I'm sure by everybody in here.  "What did he do?"

3                To give true meaning to the concept of

4    presumption of innocence, what I'm going to ask you is, are

5    you able to intellectually, in your mind, to say it's normal

6    to ask, "What did he do?"

7         A.   Yes.

8         Q.   "But I promise to the Judge to follow his

9    instructions, to say, you know, until and unless the State

10   brings forth evidence, he didn't do anything wrong."

11        A.   That is correct.

12        Q.   Can you make that commitment?

13        A.   Yes.

14        Q.   It is a little bit of mental gymnastics, though,

15   isn't it?

16        A.   Yes, it is.

17        Q.   If anyone was sitting as a defendant in a case,

18   our country says that we're entitled to that.  And way back

19   in the day when you were younger, making foolish decisions,

20   you were also entitled to that same thing, right?

21        A.   Yes, sir.

22        Q.   On your -- you know, slang for -- we call it CCH

23   or criminal history, whatever it is, did you -- you had said

24   to us that you got arrested for possession of marijuana?

25        A.   Yes, sir.

131

1     Q.   How many times?  Did you have one or two?  How
2   many did you have of those?
3     A.   One, I think -- one, two -- no -- well, one, but
4   it was a long, long time ago, back when I was in high
5   school, and that was -- so I didn't count it.  I think it
6   was thrown out anyway.  I'm not even sure, to be honest with
7   you.
8     Q.   Okay.  You also have that same presumption, that
9   same starting place ahead of the game or not guilty to begin
10  with, right?
11    A.   Yes, sir.
12    Q.   I mean, everybody does.  This is a famous trick
13  question.  If you had to vote this minute on any case you
14  were a juror on, before you heard any evidence, how do you
15  vote?  Guilty, not guilty, or need more evidence?
16    A.   Not guilty.  Well, I need more evidence.
17    Q.   Well, you see, you had it there until you told me
18  the trick.  The trick is, if there's not any evidence at
19  all, then he starts not guilty.  So he is not guilty, right?
20    A.   Right.
21    Q.   And that has to do on every single element of an
22  indictment.  Would you agree with me?
23    A.   Yes, sir.
24    Q.   The State has to prove all evidence.  If there are
25  ten elements to a crime, they've got to prove all ten.

132

1   Would you agree with me?

2        A.   Yes, sir.

3        Q.   If they skip one or don't get there for you on a

4   specific element, could you find somebody -- in your mind,

5   if you're a juror, and they hadn't proved that element to

6   you beyond a reasonable doubt, could you find somebody not

7   guilty?

8        A.   Yes, sir.

9        Q.   And where the rubber meets the road on a case

10  involving allegations of a capital murder, has to do not

11  only with the underlying murder but also with that second

12  independent crime, right?

13       A.   Yes, sir.

14       Q.   And the connection.

15       A.   Right.

16       Q.   What do you think is worse?  Setting a guilty

17  person free or an innocent person to prison?  Which is

18  worse?

19       A.   Probably sending somebody that's not guilty to

20  prison.

21       Q.   Okay.  Now, this is a harder question.  What's

22  worse?  Sending somebody who's not guilty to prison or

23  convicting somebody of a greater crime than they actually

24  did?

25       A.   Sending somebody to prison.

133

1    Q.    You see how that kind of falls in order?

2    A.    Yes, sir.

3    Q.    Do you agree with me that none of those are good

4    results?  Right?

5    A.    I absolutely agree.

6    Q.    One of the last things that I'm going to steer

7    toward in the concept of trial procedure has to do with what

8    reasonable doubt is.  And years ago, there was no

9    definition.  Then they added one.  It did nothing but

10   confuse people, and then they took it away again.

11          And the reason they did it is because, I'm

12   guessing, they want the jurors to decide.  That's what the

13   law says.  And a reasonable doubt is whatever you want it to

14   be.

15          Now, can you live with that?  Do you like

16   that?

17   A.    Yes, sir.

18   Q.    When I say live with it, obviously, we all have to

19   live with it.  That's the law.  The question is, do you

20   agree with it?

21   A.    Yes, sir.

22   Q.    Do you think you need to have some definition to

23   tell you what a reasonable doubt is?

24   A.    Yes.

25   Q.    Okay.  Do you think you should be told from a

134

1    court what a reasonable doubt is by definition?

2         A.   Yes.

3         Q.   What happens if you're not told by the Court the

4    definition of reasonable doubt?  How are you going to handle

5    that?

6         A.   I would just look at the evidence and decide for

7    myself.

8         Q.   Okay.  And a reasonable doubt, to me, may be a lot

9    different than what Mr. Perkins' reasonable doubt is or even

10   different than Mr. Harrison's or Mr. Bingham's or anyone in

11   here.

12        A.   I understand that.

13        Q.   But if you come to be a juror, whatever that level

14   is, you get to decide that.

15        A.   Yes.

16        Q.   Okay.  It's opportunity and challenge all at once.

17   You think you can do that?

18        A.   Yes, sir.

19        Q.   Okay.  And obviously, when we look at burdens of

20   proof, there are lower ones of probable cause and clear and

21   convincing, but a reasonable doubt, that's left up to you.

22   And let's save it for the clear-cut cases.  You get to

23   decide what that is in every element of the case.

24             You see how that loops back around?

25        A.   Yes, sir.

1     Q.   Do you think that if a defendant does not testify

2   in a criminal case, that the State's case gets better?

3     A.   Yes.

4     Q.   Why?

5     A.   Because I would feel like he's hiding something.

6     Q.   That makes sense, doesn't it?

7     A.   Yes, sir.

8     Q.   You always expect to hear from a defendant or from

9   anyone it is who has gotten the finger pointed at him?

10    A.   Yes, sir.

11    Q.   Are you familiar with, on TV, this Kenneth Lay guy

12  who is the former CEO of Enron?

13    A.   Yes, sir.

14    Q.   Now, he's come out swinging in the media, hadn't

15  he?

16    A.   Yes, he has.

17    Q.   I see you don't have kids.  And you can compel

18  their testimony, because everyone, naturally, wants to hear

19  both sides of the story, right?

20    A.   (Nods head affirmatively.)

21    Q.   I see you're nodding your head again.

22    A.   Yes, sir.

23    Q.   This is one of those things to where I want to

24  follow up on, because it makes a lot of sense, and I want to

25  delve into it some.

1          The Judge may end up telling you you just

2    can't consider that at all.  Now, that's where the rubber is

3    going to meet the road.

4          A.    I understand.

5          Q.    Because just like it's easy and natural for people

6    to say, "Well, what did he do," it's just as natural for

7    them to say, "I need to hear from this guy in any case."

8          The only challenge to the fact is, no one

9    knows before you become a juror whether or not a defendant

10   is going to testify.  No one knows that.  And what I want to

11   figure out is, do you feel -- well, I'm just going to ask

12   you.  Why do you feel a defendant might be hiding something

13   if they don't testify?

14         A.    I just feel like if he -- if he did testify, then

15   get it out in the open.  Get it out in the open.  What's he

16   got to hide it?  What's he hiding?

17         Q.    Right.  It makes him look a little guilty when he

18   doesn't testify, doesn't it?

19         A.    Yes, sir.

20         Q.    And there is not much I can do to change your mind

21   on that, is there?

22         A.    Oh, you probably can being -- you know, the Court

23   and the law and seeing so many cases.

24         Q.    Okay.  I guess where it really gets down to it is,

25   if the Judge instructed you that you can't consider it that

137

1  way and you can't use it as a circumstance against him,

2  could you follow that instruction?

3       A.   I would, yes, sir.  I would like to think I could.

4       Q.   And that's fair.  I'm not going to make you --

5  that's one of my favorite things that I've heard before, and

6  I like saying it.  It never comes out when I do.

7            Judge Skeen here can tell me, "Mr. Hawk, I'm

8  ordering you -- here are your instructions.  Why don't you

9  go ahead and run through that wall behind you.  Give it your

10 best shot, but you'd better do it."

11           And I might want to and maybe even try to,

12 but the reality is I know my size, I know that wall's

13 strength, and as much as I'd like to follow it, my

14 conscience tells me I just can't do it.  I mean, I'd like

15 to; I just can't.

16           That's where we're getting to with this

17 specific issue.  It's a little easier for someone to say,

18 "What did he do?"

19           "Okay.  I can start out here and presume him

20 not guilty.  I can see that."  Lots of people can make that

21 mental gymnastics.  It gets a lot harder, though, for people

22 to honestly say, "If he doesn't testify, I'm not going to

23 think he's guilty even a little bit."

24           It's a lot more difficult.  Many people can;

25 most can't.  It just depends on who you talk to.

138

1          Which side of the camp do you fall on, if the

2     Judge gives you that instruction?  Can you do it in your

3     heart of hearts, or in your heart of hearts, are you one

4     that says, "You know, truthfully, if he doesn't testify,

5     that's going to hurt him?"  What do you say?

6          A.   I would say if he doesn't testify, it would

7     probably hurt him.

8          Q.   Any question about that really in your mind?

9          A.   No, not really.

10         Q.   Now, the answer that you gave me, I am guessing,

11    is, even in the face of -- if the Judge instructed you and

12    you're instructed that the defendant doesn't testify you're

13    not to use that as circumstance against him, even in the

14    face of that instruction, I'm guessing your answer is still

15    the same, is it not?

16         A.   Well, if after hearing the evidence, maybe I would

17    understand why he didn't want to testify.

18         Q.   Now, interestingly, this is one of those chicken

19    or the egg things where at the very end, you may say to

20    yourself, "Well, now I know why he didn't."

21         But the trick is -- and I think Mr. Harrison

22    made reference to this -- the decisions we make about what

23    we're able to do as individual jurors, we have to make those

24    decisions not knowing anything at all about how it's going

25    to come out, what the evidence is going to be or not going

139

1    to be, okay?  It may come out that if he does or doesn't

2    testify, you have different attitudes about why not.

3              The question becomes -- I mean, honestly, as

4    what you referred to before -- if it comes to pass in any

5    case in which you're a juror on, you've got to make a call,

6    "I can't do it."

7              And your heart is better than mine.  I'm not

8    going to try to railroad you into saying something you don't

9    want to say.  But if you think that as a general rule, in

10   your mind and in your heart, if he doesn't testify and

11   that's going to hurt him, that's what we need to know.

12             Now is really the only time we can.  We can't

13   wait until afterwards.

14   A.    Right.  No.  I don't think it will have any

15   bearing whether or not he testified, but that would be after

16   hearing the evidence.

17   Q.    How about before?

18   A.    No.  It wouldn't -- that's his business if he

19   wants to testify or not.

20   Q.    Now, I'm going to try to pick with you some.

21   A.    Okay.

22   Q.    A few minutes ago, you kind of got quiet and you

23   said, "You know, if he doesn't testify, that's going to hurt

24   him."  And now you're saying, "Well, you know, that's his

25   business."  You see how that --

140

1     A.    Yeah.  But you asked me if I would be -- if I

2  thought he needed to do that, which, you know, if he does --

3     Q.    And that is the question.

4     A.    Yeah.

5     Q.    As any --

6     A.    But I'm not going to hold it against anybody, if I

7  listen to the evidence, whether or not he testified.

8     Q.    If a criminal defendant does not testify, does

9  that make anything the State's witnesses say more

10 believable?

11    A.    I don't really know about that.  I would say it

12 could; then again, it couldn't, depending on the case.

13    Q.    You're going to have to decide.  This is one of

14 those things about yeses and nos and maybes and hopefullys.

15    A.    Right.

16    Q.    Because you have to make your decision about what

17 you're able to do as a juror.

18    A.    Yes, sir.

19    Q.    And like I said, it's not what you want to do, me

20 running through a brick wall --

21          MR. HARRISON:  Judge, I hate to interrupt,

22 but I'm going to object to that as a commitment question,

23 putting in a specific fact of the defendant not testifying

24 and how that would relate to the venireman's giving

25 credibility to other witnesses.  That's fact specific, and

141

1    that's a commitment question.

2              MR. HAWK:   Judge, the law is clear on this

3    part.   I'm able to ask that very question.

4              THE COURT:   Well, Mr. Hawk, also, would you

5    be sure that he understands it's not what the Court may

6    instruct him; it's what the Court is going to instruct him

7    in regard to?

8        Q.   (By Mr. Hawk) Right.   And we always use that "may"

9    and "will," because everyone has got a pretty good idea,

10   before a criminal trial starts, what the jury instructions

11   are.

12             And in any every criminal trial in which the

13   defendant does not testify, you will get the instruction

14   that if the defendant does not testify, you cannot use that

15   as any circumstance against him at all.

16       A.   I understand.

17       Q.   Now, regardless of facts, regardless whether they

18   are good, bad, or somewhere in between, you've got to be

19   able to make that commitment in every fact situation in your

20   own mind, every one of them, regardless of the facts.   It

21   can never be taken as a circumstance --

22       A.   Yes, sir.

23       Q.   -- ever.

24             Now, you see where my challenge is with you?

25   Because you said, "Well, it's going to depend on the

142

1      evidence," right?

2          A.    Yes, sir.

3          Q.    Is there ever a circumstance in your mind where

4      you may actually take that as a circumstance against him?

5          A.    That's such a wide open question, I, you know --

6          Q.    Well, I'm going to ask the upside-down question.

7          A.    Okay.

8          Q.    And I'm going to refer to what you said to me a

9      few minutes ago --

10         A.    Okay.

11         Q.    -- when you said, "If he doesn't testify, that's

12     going to hurt him."  My big question is, why would that hurt

13     him?

14         A.    Because you would feel like he had something to

15     hide.

16         Q.    So if a judge told you you can't think that way,

17     can you change your thinking --

18         A.    Yes, sir.

19         Q.    -- and just disregard that entirely?

20         A.    Yes.

21         Q.    Back in the days past and when you were young and

22     having those same troubles and being charged and going

23     through the system, did you ever have a trial?

24         A.    No.

25         Q.    Because when we get down to where the rubber meets

1   the road -- and this is the -- I'm going to leave this

2   subject alone and move to the next one -- I guess both the

3   State and the defendant desperately want to be sure that

4   regardless of the facts and circumstances, you could follow

5   the law in every situation.

6        A.   Yes, sir.

7        Q.   And from our standpoint, if you say that there is

8   some situation in your mind or it's going to hurt him, that

9   runs a red flag like in front of a bull to any lawyer.

10       A.   Yes, sir.

11       Q.   But I've also heard you say things like, "Well, if

12  the Judge instructs me not to let it affect my deliberation

13  or not to be taken as a circumstance, I can follow that."

14            So I want you to check your gut for now, and

15  in a little while, I'm going to circle back around and ask

16  you, "Look, have you thought about this," and then I want to

17  know your deep and honest answer, okay?

18       A.   Okay.

19       Q.   Now, I'm going to touch on something that

20  Mr. Harrison touched on about what society means to you,

21  okay?

22       A.   Okay.

23       Q.   This has to do with that special issue that we

24  talked about a little while ago -- or he talked about, about

25  is there a probability the defendant -- I think it's written

144

1  down up there -- would be a continuing threat to society.

2  You remember that?

3      A.   Yes, sir.

4      Q.   Now, you're not going to get a definition of that.

5      A.   Okay.

6      Q.   It gets to mean whatever you think it means, okay?

7      A.   Okay.

8      Q.   And I'm going to back that up against which you've

9  learned and what I'm sure the instructions will tell about a

10 life sentence being 40 years, calendar years, before

11 consideration for parole.  Whether you get it or not is a

12 whole 'nother issue, okay?

13           There are two different camps on this thing.

14 Some jurors think society is wherever you are, whether it's

15 in a prison, out of prison, free world, or whatever, but

16 you'll notice in the instruction, it doesn't say "free-world

17 society" or "prison society"; it just says "society," right?

18     A.   Yes, sir.

19     Q.   Other jurors are like, "You know what?  I might

20 think it's the society where the free world is.  I'll figure

21 out whether I think, based on the evidence, he's going to be

22 a danger when he gets out in 40 years."

23           You get to be the one that decides what

24 society means.  There's not going to be a definition.

25     A.   Okay.

1    Q.   Will you make the promise to the Judge to look at

2  all the evidence and make that decision based upon what you

3  think the evidence shows you based on the instructions that

4  you get?

5    A.   I'm going to do -- I'm going to do what the Judge

6  says and follow the instructions.

7    Q.   And that's all that anybody can ask you, right?

8    A.   Yes.

9    Q.   Whether my definition of society, yours or

10 Mr. Harrison's or Mr. Bingham's or whoever's, yours is the

11 one that makes a difference on a lot of different things,

12 whether it's reasonable doubt, society, things of that

13 nature, right?

14   A.   Yes, sir.

15   Q.   That's an opportunity and a responsibility, isn't

16 it?

17   A.   Yes, sir, it is.

18   Q.   Can you meet that?

19   A.   Yes, sir.

20   Q.   Now, would you expect lawyers that are

21 representing somebody who's charged with the kind of case

22 that we're involved with -- and the allegation is -- they

23 say the road leads all the way to capital murder, and, of

24 course, everything underneath that kind of falls down --

25 would you expect the lawyers to do the best they knew how to

1   do, object and plan and argue and closely cross-examine

2   people?

3       A.   Yes, sir.

4       Q.   Would you hold it against the defendant if his

5   lawyers acted a certain way?

6       A.   No, sir.

7       Q.   Because you can understand that sometimes things

8   may happen.  Jurors get to see it.  And the big question is,

9   if you don't like what I do, come on down and see me in my

10   office and tell me to knock that business off, okay?

11       A.   Yes, sir.

12       Q.   Can you make that clear not to hold it against

13   Mr. Beatty?

14       A.   Yes.

15       Q.   Now, I'm just about done talking to you.  I'm

16   going to ask you to circle back around to this business if

17   Mr. Beatty or any defendant that you sit on, if he doesn't

18   testify in any fact situation.  Have you been thinking about

19   that?

20       A.   Yes, sir.

21       Q.   If -- tell me what you're thinking.

22       A.   I'm thinking if -- maybe -- like I say, I've never

23   done this before.  Maybe he's got a reason not to testify.

24   I'm not going to hold it against him.

25       Q.   What are some of those reasons?

1    A.   But if I were -- if I felt like -- if I could

2   testify, I would want to get it out on the table and -- you

3   know, and try to convince some people that I'm trying to

4   help myself out.

5           You see what I'm saying?

6    Q.   I do.  What happens if you become a juror on a

7   case and the evidence is over from the State and you say to

8   yourself, "I can't wait to hear from the defendant," and

9   then you find out the defendant doesn't testify, and you

10  think he should have in any case that you're a juror?  How's

11  that going to affect your verdict?

12          MR. HARRISON:  Judge, I'm going to object.

13  That's injecting the facts into it.  It's an improper

14  commitment question.

15          MR. HAWK:  It's actually a directly proper

16  question, Judge.  It's not a commitment to any specific set

17  of facts.  It's about his opinion of whether he can follow

18  the law in a specific situation.  And that's just not

19  improper, Judge.

20          MR. HARRISON:  Judge, he's --

21          THE COURT:  And I'll allow Mr. Hawk to ask

22  the venireperson if he -- if you get down to that point and

23  the defendant does not testify, can you follow the Court's

24  instructions and not consider it as any evidence of guilt

25  against him if he does not testify?

148

1        Is that the question?

2        MR. HAWK:  That's a great question.

3        THE COURT:  In other words, if the State puts

4    on all of its case, the State rests -- Defense has

5    absolutely no burden.  They may call witnesses; they may

6    not.  They have no burden.  The Defense has no burden to

7    prove anything -- and the Defense finishes its case, and the

8    defendant has not testified, the instructions from this

9    Court are going to tell you that if the defendant elects not

10   to testify, that you cannot hold the defendant's election

11   not to testify as any evidence of guilt whatsoever against

12   him.

13       Can you do that?

14       VENIREPERSON PEARSON:  Yes, sir.

15       THE COURT:  And if the scenario develops like

16   Mr. Hawk said, and the Defense goes all the way down through

17   the end of its case, and the defendant has not testified,

18   can you follow the Court's instructions, which you would get

19   shortly after that, which would tell you that a defendant's

20   election not to testify cannot be considered in the event --

21   as any evidence of guilt against him?

22       Can you do that?

23       VENIREPERSON PEARSON:  Yes, sir, I believe

24   so.

25       THE COURT:  Can you follow that Court's

149

1   instructions?

2            VENIREPERSON PEARSON:  Yes, sir.

3            THE COURT:  All right, sir.

4       Q.   (By Mr. Hawk) Now, if that same instruction says

5   "shall not be taken as a circumstance against the

6   defendant," any circumstance, not just evidence, but any

7   circumstance at all, can you follow that instruction?

8       A.   If -- run that one by me again now.

9       Q.   This is about the last one or two questions.

10  Because I think I see where you're going, but I've just got

11  to make you tell the Court whether you can follow this,

12  okay?

13            You've got to be able, as you sit here today,

14  before the case even starts, and -- you've got to promise

15  the Judge that regardless of what you're about to hear, no

16  matter how good or bad, whatever you hear, that you could

17  promise that if he instructs you that if the defendant

18  elects not to testify, you're not to use that as any

19  circumstance against him, if that's what he instructs you,

20  that you can follow that in every single situation,

21  regardless.

22      A.   I would do the best I could, yes.

23      Q.   Now, that doesn't get you there.

24      A.   I understand.

25      Q.   Okay.  Can you absolutely, unequivocally say,

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

1    "Yes, I can follow that instruction"?  Can you say that?

2    You've got to say that.

3        A.    Yeah, I think I could if --

4        Q.    Would you agree with me that there are situations

5    where you just couldn't?

6        A.    That's just so hypothetical, I don't know how to

7    process that.

8        Q.    You've got to be able to make the promise,

9    Mr. Pearson, that on every situation, no matter what, if he

10   gave you that instruction, you can follow that.

11       A.    I will follow his instructions.

12       Q.    Period, end of story?

13       A.    Yes.

14       Q.    Never even come close to violating?

15       A.    Try not to.

16       Q.    You've got to do better than try.

17            MR. HARRISON:  Actually, Judge, I'm going to

18   object to that last question.  He either violates or

19   doesn't.  It's not coming close to violating.  That's my

20   objection.

21            THE COURT:  Mr. Pearson, if I give you --

22   well, there's not even an if.  I'm going to instruct you

23   that if the defendant does not testify, that the defendant's

24   election not to testify cannot be considered as any

25   circumstance of guilt or evidence of guilt against him.

151

1          Can you follow that instruction?

2          VENIREPERSON PEARSON:  I can follow that,

3    yes, sir.  Yes, sir.

4    Q.    (By Mr. Hawk) Have you had any fun at all for the

5    last hour?

6    A.    I have not had any fun, no.

7    Q.    Thank you, Mr. Pearson, for your patience.

8          MR. HAWK:  We pass the venireman.

9          THE COURT:  Thank you, Mr. Hawk.

10          Mr. Pearson, if you'll step out just a

11   moment, sir, we'll be right back with you.

12          (Venireperson Pearson leaves the courtroom.)

13          THE COURT:  Any challenge for cause from the

14   State?

15          MR. HARRISON:  No, Your Honor.

16          THE COURT:  What says the State?

17          MR. HARRISON:  We accept the juror.

18          THE COURT:  Any challenge for cause from the

19   defendant?

20          MR. PERKINS:  Yes, Your Honor.  The defendant

21   makes the following challenges for cause:  First of all,

22   that the prospective venireperson, Mr. Pearson, could not

23   afford Mr. Beatty his Fifth Amendment privilege.

24          What Mr. Pearson would say is that he would

25   do his best.  In fact, I wrote down exactly what Mr. Pearson

152

1   said while he was testifying.  He said, "I would do the best

2   that I could.  I think that I could.  I would try not to

3   violate his right against -- his Fifth Amendment rights."

4           He also said during the Defense's voir dire

5   that he would consider the failure of Mr. Beatty to testify

6   as a factor, that it could or couldn't make the State's

7   witnesses more believable.

8           And, Judge, it's a completely proper question

9   for the Defense to ask, would that fact alone make the

10  State's case better, and that prospective juror said yes, it

11  would.  Would that make the State's witnesses more

12  believable, and he says it could.  He can't say whether or

13  not he would hold it against him until after he hears the

14  evidence.  Well, that's not good enough.

15          And I disagree with Mr. Harrison's concept

16  that either he violates or he doesn't.  He has to be able to

17  give this Court and the Defense and the State his assurance

18  that he could follow that instruction prior to getting on

19  the jury.

20          It's not good enough for him to get on the

21  jury and listen to it and then say, like he said he was

22  going to do, "Well, I can decide whether or not I will hold

23  his failure to testify against him after the fact."  That's

24  not good enough.

25          He's not qualified unless he says he can do

153

1   it.   The fact is that he says over and over and over again,

2   if he didn't testify, it would probably hurt him.   "After I

3   heard the evidence, I might understand why he wouldn't want

4   to testify."   He's, at very best -- the very best

5   interpretation that the State will ever get out of what he

6   said is that he vacillates on that issue.

7              He says -- when they're questioning him, he

8   says, "Oh, yeah, I could follow that instruction."   And when

9   the Court says, "If I instruct you to do this, could you

10  follow that instruction?"   He says, "Yeah."

11             And then when we say, "Would it make the

12  State's case better, if the single factor is he didn't

13  testify," and he says, "Yeah."

14             "Would it make the State's witnesses more

15  believable?"

16             "Yeah, it would probably hurt him.   He might

17  be hiding something.   I would feel like he had something to

18  hide."

19             So at the very best interpretation that

20  you'll ever get out of all this is that he vacillates on

21  that issue.   He's not qualified.

22             We also have an additional challenge.   We

23  would challenge him that he is not a qualified juror -- and

24  I want the Court to stick with me through this -- because he

25  failed to follow the Court's instructions in filling out his

154

1 jury questionnaire.

2        Now, we were lucky enough -- and under the

3 Court's order and what we requested and what we were

4 provided with prior to individual voir dire was the local

5 criminal histories on these individuals.

6        He put down in his questionnaire that he had

7 one PCS case in 1886 in Tyler.  That's not the truth.  When

8 confronted by the State of Texas about it, he said, "Oh,

9 yeah, I also had a DWI in 1999 that was reduced to a

10 reckless driving."

11        That's still not the truth.  He didn't say

12 anything else, and, in fact, Mr. Harrison asked him, "Is

13 there anything else?"  "No."

14        But there is something else.  He had an

15 additional possession-of-marijuana arrest in 1978, according

16 to the records that we've been provided, which he did not

17 disclose until he was confronted by Mr. Hawk with that.

18        Now, it's strange because, generally

19 speaking, the prosecution relies on people not giving honest

20 answers to disqualify them from jury service.  The State

21 didn't make a challenge against him for that reason.

22        However, for the very same reason he failed

23 to disclose his criminal history, even though right on the

24 very first page of the juror questionnaire, it says -- I'm

25 sorry -- it's on the second page, "Please note" -- and this

155

1   underlined -- "these answers are being made by you under

2   oath as a jury panel member to give true and correct answers

3   to all questions propounded to you under the direction of

4   the Judge."

5               He failed to do that, Judge.  And I have sat

6   both at the prosecution side of the table and at the defense

7   side of the table and seen the prosecution make this very

8   motion in every type case and that these people were

9   disqualified for failing to follow the Court's instructions

10  and for failure to give truthful, complete, and honest

11  answers.

12              He didn't do it.  He didn't do it on Number 1

13  until Mr. Harrison started questioning him about criminal

14  history.  He didn't admit the criminal DWI, and then he

15  didn't admit his prior possession of marijuana, which the

16  records indicate.

17              And in fact, even during his voir dire, he

18  says, "Oh, that case was dismissed."  Well, that's not true

19  either, Judge.  That case was reduced, according to the

20  Smith County record, from a possession of marijuana to a

21  disorderly conduct in 1978.  So he was prosecuted for that.

22              He's lying about those things, Judge.  And

23  the only way that we've ever caught him in it is we've had

24  that access to that information and confronted him with it.

25  And Mr. Hawk said, "Now, how many times have you been

156

1  arrested, once or twice?"  And then he's like, "Oh, twice."

2  He's not telling the truth.

3          He's disqualified.  Sauce for the goose is

4  sauce for the gander, Judge.  If they're disqualified when

5  the State challenges them, they're disqualified when the

6  Defense challenges them.

7          Those are all of the reasons, not just the

8  last one, but also the Fifth Amendment.  We believe that he

9  is not qualified as a juror on either ground.

10         THE COURT:  The Court is satisfied that the

11  venireperson will be able to follow the Court's instructions

12  in not holding the defendant's election not to testify, if

13  the defendant does not testify, as any circumstance or

14  evidence of guilt against him.

15         He gave the Court an unequivocal answer to

16  that question.  The Court is satisfied he could follow the

17  Court's instructions and not hold it as any circumstance or

18  evidence or guilt against the defendant if the defendant

19  does not testify.

20         What response do you have, Mr. Harrison, to

21  the other part of Mr. Perkins' motion and reference, the

22  failure to disclose?  The Court's recollection is, you did

23  ask him about a DWI that was not listed, and he said it was

24  reduced to reckless driving, and he thought that was a

25  traffic ticket.

157

1           I recollect some explanation he had about

2  another PCS.  What's your response to Mr. Perkins?

3           MR. HARRISON:  Judge, my response is, first,

4  that the PCS was included from -- I think he said 1996 in

5  Tyler.  He indicated to myself when he was -- on the jury

6  questionnaire, on Question Number 53 on page 13, he did

7  indicate the PCS in 1996.

8           My recollection of his testimony is the

9  DWI -- and I think it's borne out on the records that were

10  run through the Smith County local computer provided to the

11  Defense, that the DWI was reduced to a reckless conduct,

12  which is a Class C, equivalent to a traffic ticket.

13           The question -- Number 53 on the

14  questionnaire says, "Do not include parking tickets or

15  speeding tickets."  He indicated on the witness stand he

16  believed it to be the equivalent of a traffic ticket.

17           THE COURT:  I recall that testimony.

18           MR. HARRISON:  I'm sorry, Judge.  The other

19  marijuana case that he indicated, he did admit to when asked

20  by Mr. Hawk, and he indicated that his belief was that that

21  case had been thrown out; therefore, it would not be

22  something that he would be required to put down, in his

23  mind, on Question Number 53.

24           My further response is that the Court has to

25  make an independent determination as to whether a venireman

158

1   is attempting to deliberately misrepresent any criminal

2   history to the detriment of either side of the attorneys.

3           Clearly, the DWI is being reduced to what

4   amounts to a traffic ticket, a Class C offense, and in his

5   mind and from his testimony, the venireman indicates that

6   the other marijuana case he believes to have been thrown out

7   would not lead anyone, in my opinion, to conclude that he

8   was attempting to hide or misrepresent anything, especially

9   coupled with the fact that when he was asked about it on the

10  stand, he admitted to it, and he had already indicated that

11  he had been arrested for a PCS case in 1996 in Tyler.

12          He wasn't trying to escape detection and

13  indicated that he had never been arrested for anything.  He

14  put down what he believed he had been arrested for would be

15  that PCS case in 1996.

16          The other one he's indicated, I believe

17  truthfully, from everything he said and from all the

18  circumstances surrounding what he said, that he believed to

19  have been thrown out and thrown out of court, so that

20  wouldn't qualify, and the DWI was reduced to what he

21  indicated was a traffic ticket, which the Court had excluded

22  in its question.

23          Clearly, the Court gets to judge the

24  credibility of the venireman and determine on its own

25  whether the venireperson was attempting to misrepresent or

159

1    mislead somebody.

2              Clearly, when he indicates that he did have

3    the PCS in 1996, that should lead to the conclusion that

4    he's not trying to represent that he's never been arrested

5    for anything and doesn't have a criminal history.

6              He gave valid and legitimate reasons why he

7    didn't come forward on the DWI case, and the other

8    misdemeanor case, that he indicated he believed to have been

9    thrown out of court.

10             THE COURT:  All right.  The Court's ruling --

11   and the Court will be consistent in the Court's ruling.  The

12   Court has to observe the demeanor of the venireperson,

13   listen to this venireperson's answers regarding the criminal

14   history questions which were asked, observing his demeanor,

15   listening to his answers and his explanations when given

16   under questioning.

17             The Court doesn't find that he was

18   intentionally -- the Court does not find that he was

19   intentionally misrepresenting information on his juror

20   questionnaire nor intentionally misrepresenting why he

21   listed or did not list information on the criminal history

22   questionnaire.

23             Taking into consideration his demeanor

24   through the entire voir dire, as well as the reasons he gave

25   why the information not listed, was not there, the Court

160

1    doesn't find him an unfit juror, so I'm going -- I'm going

2    to -- unless you have something else, Mr. Perkins?

3                    MR. PERKINS:  No, Judge.  I understand the

4    Court's ruling.  I just want -- I was going to request that

5    the District Attorney's Office provide the Court with a copy

6    of the criminal history, the local criminal history that

7    they ran, that we would mark as an appellate exhibit, and

8    also -- and I don't know how this generally works, but that

9    his juror questionnaire also be saved for appellate

10   purposes.

11                   THE COURT:  Well, the Court will include both

12   those as a part of the record, the entire questionnaire of

13   the Court on the criminal history, Mr. Perkins.

14                   MR. PERKINS:  I'm sorry?

15                   THE COURT:  The part of the criminal

16   history -- do you want the whole questionnaire in there or

17   the part on the criminal history?  There's a bunch of stuff

18   in there that doesn't relate to the issue you're talking

19   about.

20                   MR. PERKINS:  I think in the interest of

21   safety, his entire questionnaire, Judge.

22                   THE COURT:  The Court will put in the

23   questionnaire plus criminal history?  Is that what you said?

24                   MR. PERKINS:  Because, basically, what it is,

25   Judge, is --

161

1          THE COURT:  They will both be entered.

2          MR. PERKINS:  Right.  Our position is he had

3 a DWI that was reduced to reckless driving.  Obviously,

4 reckless driving is not the same thing as a traffic ticket,

5 no matter -- you know, you can call one thing one thing and

6 it be something else.

7          THE COURT:  Well, the Court has considered

8 all his answers.  I'll include in the record what you want

9 included in the record.

10          MR. PERKINS:  Obviously, the one that he did

11 disclose, he circled "arrest."  He didn't circle that he was

12 placed on probation, and, again, the record reflects that he

13 was.  We think that he is being deceptive in his answers,

14 and so I would like his entire questionnaire and the Smith

15 County criminal history that we were provided access to -- I

16 don't have one or I would mark it myself.

17          THE COURT:  Then the Court just needs to be

18 provided with a copy of each one of those.  They'll be made

19 a part of the record.  And, Mr. Perkins, is -- I don't know

20 that I ever got quite to it -- your motion for -- to

21 challenging him for cause is denied.  Those exhibits will be

22 in the record at your request.

23          If you want to mark them -- do you want to

24 mark them, Mr. Perkins?

25          MR. PERKINS:  There are actually three -- I'm

162

```
 1  sorry -- I guess four -- three stapled sets of pages and one
 2  single page.  What I'll do for --
 3                THE COURT:  However you want to do it.
 4                MR. PERKINS:  I'll just staple them all
 5  together, attach them all together, and mark them as
 6  Defendant's Exhibit A, unless we have an A already.
 7                THE COURT:  Defendant's Exhibit A is admitted
 8  as part of the record.  If you'll just hand that to
 9  Mrs. Christopher to be made part of the record.
10                MR. PERKINS:  I've handed those to the court
11  reporter or a court reporter in the case, Mr. Awbrey.
12                And given that the Court has denied our
13  challenge for cause, we're forced at this time to use our
14  first peremptory challenge on John Pearson.
15                THE COURT:  All right.  Thank you,
16  Mr. Perkins.
17                Ask Mr. Pearson to step back in.
18                (Venireperson Pearson enters the courtroom.)
19                MR. PERKINS:  Judge, what I'll also do -- my
20  questionnaire has writing and highlights all over it.
21                THE COURT:  You know, I've probably got a
22  blank one up here, Mr. Perkins.
23                MR. PERKINS:  If the Court has an additional
24  questionnaire, I would like to mark that as Defendant's B,
25  and I can tender that to the court reporter as well.
```

163

1          THE COURT:  Mr. Pearson?

2          VENIREPERSON PEARSON:  Yes, sir.

3          THE COURT:  Mr. Pearson, we are going to be

4    able to excuse you at this time from any further jury

5    service in the case.  The Court deeply appreciates your

6    response to the summons.  You spent all day down here

7    Thursday and then, obviously, came back and spent a lengthy

8    period of time today going through the individual voir dire,

9    which is part of the process.

10              Both the State's attorneys and the defense

11    attorneys have a job to do.  You've been an important part

12    of the process in being available for jury service.  The

13    Court appreciates your service, as I know both the State and

14    Defense do in this case, but the Court will be able to

15    finally excuse you from any further jury service at this

16    time.  Thank you, sir.

17              (Venireperson Pearson leaves the courtroom.)

18              (End of proceedings reported by Kim

19              Christopher, CSR.)

20              (The following proceedings were reported by

21              Steve R. Awbrey, CSR:)

22              (Venireperson Worley enters the courtroom.)

23          THE COURT:  Ms. Worley, how are you doing?

24          VENIREPERSON WORLEY:  Fine.  I'm a little

25    cold.

164

1          THE COURT:  Yes, ma'am.  I was advised of

2     that by one of the attorneys, so I turned the air

3     conditioning off.

4          We're back on the record in 241-0978, the

5     State versus Tracy Beatty.  State's attorneys present; the

6     defense attorneys are present; the defendant is present.

7          Ms. Worley, this is that procedure we talked

8     about some last Thursday called individual voir dire.  It's

9     a procedure where the State's attorneys are going to ask you

10    some questions, one of them, and then the defense attorneys,

11    one of them will ask you some questions.

12          There's not any right or wrong answers to the

13    questions.  They are both trying to select a jury in this

14    case where all the jurors will be fair and impartial and can

15    follow all the laws as given by the Court.

16          As a result, they have to ask you some

17    questions about your views on certain issues, can you follow

18    certain principles of law that guide the procedures in the

19    type case that you would be a juror on if you were selected

20    in this case.

21          You need to be sure when they ask you a

22    question that you -- like rather than, say, nodding your

23    head yes and no, that you say yes, no, or whatever the

24    answer calls for, because the court reporter over here,

25    Mr. Awbrey, he can't take down nods of the head, so he's got

165

1   to get an answer for the record, whatever your answer is.

2            Also, if you would try to keep your voice up

3   a little bit.  I just turned the air conditioner off, which

4   I suppose should help everybody, but sometimes it will come

5   back on, which it does.  If it does, it's a little hard to

6   hear.  So if you keep your voice up, that will help.

7            Also, have you thought of anything since

8   Thursday that you might want to tell us about that you need

9   to add to your questionnaire?

10           VENIREPERSON WORLEY:  On the last -- it

11  wasn't the last question, but there's a question if you know

12  any of these people on this list.

13           THE COURT:  Yes, ma'am.

14           VENIREPERSON WORLEY:  It said the list is at

15  the end.  Well, I thought there was just one page, and I

16  don't know -- there was one person that might possibly be on

17  there that I know.

18           THE COURT:  Who is that?

19           VENIREPERSON WORLEY:  Pridgen, Keith Pridgen.

20           THE COURT:  Keith Pridgen?  Keith Pridgen

21  works out at the Department of Public Safety Lab.  Do you

22  think that might be the Keith Pridgen you know?

23           VENIREPERSON WORLEY:  Yes, that is.

24           THE COURT:  Well, that's Keith Pridgen that

25  works at the Department of Public Safety Lab, and I'm sure

166

1  probably one of the attorneys will want to ask you some

2  questions about that.

3            Basically, you just didn't circle that

4  because you didn't see it or something?

5            VENIREPERSON WORLEY:  I just -- it was an

6  oversight.

7            THE COURT:  That's okay.  That's all right.

8            Okay.  I think that -- they will just make a

9  note that you do know or are acquainted with Keith Pridgen.

10  We'll go ahead and get the voir dire started.

11            Just relax, and if one of the attorneys ask

12  you a question you don't understand, don't hesitate to tell

13  them, "I just really don't understand what exactly you're

14  asking me; would you say that again," and they will rephrase

15  it for you.

16            Ms. Sikes.

17            MS. SIKES:  Thank you, Judge.

18                 ANNIE WORLEY,

19  having been duly sworn as a member of the special venire,

20  was examined as follows:

21                 VOIR DIRE EXAMINATION

22  BY MS. SIKES:

23     Q    Good afternoon, Ms. Worley.  We almost made it to

24  evening.

25     A    Almost.

167

1      Q    And when the Judge says just relax, we're all

2  going to try to do that.  It's been a long day.  We've been

3  here a long time.

4            But if there's something that I ask you --

5  you probably won't have a problem hearing me even if the air

6  conditioner starts because I'm rather loud, probably one of

7  the loudest of the group.  But if you don't hear me or if

8  there's something that doesn't make any sense, if you'll ask

9  me, I'll try to rephrase it.

10     A    Okay.

11     Q    I know we've been introduced to you before, but

12 since we have an opportunity to talk one on one, I'll just

13 say I am April Sikes, the chief felony prosecutor for the

14 DA's Office.

15           This is one of my bosses to my right, Brett

16 Harrison, who's our first assistant DA.  And then to his

17 right is the defendant, Tracy Beatty.  Sitting beside him is

18 Mr. Robert Perkins, his attorney, and Mr. Ken Hawk, another

19 one of his attorneys.

20           Seeing our faces or getting to see us up this

21 close, do you know any of us?

22     A    No, I do not.

23     Q    And speaking of knowing people, before I forget,

24 you said that you -- you mentioned that you do know Keith

25 Pridgen, correct?

168

1     A     Yes.

2     Q     Is that a personal relationship or a business

3  relationship?

4     A     He's a deacon in the church where I go to, and I

5  know his in-laws real well.

6     Q     So you attend the same church, and you know his

7  family or his in-laws?

8     A     His in-laws and his wife.

9     Q     Anything about that relationship that would affect

10 your ability to sit as a fair and impartial juror if he was

11 called to testify in this case?

12    A     No.

13    Q     In other words, if he testified, you would judge

14 his weight and credibility just as you would if a total

15 stranger testified?

16    A     Yes.

17    Q     He wouldn't start out above another witness or in

18 front of?

19    A     No.

20    Q     Now, with that said, you probably know, from being

21 here last Thursday and from having to fill out this

22 questionnaire, that this is a capital murder case.  At least

23 that's how the grand jury has indicted the case, correct?

24    A     Yes.

25    Q     And as such, the State has filed a notice of our

169

1   intent to seek the death penalty; hence, some of the

2   questions that you discussed in your questionnaire.  That's

3   why we have the opportunity -- the law provides us the

4   opportunity to sit here and visit one on one rather than

5   picking the jury from that large panel.

6            Now, I'm going to ask you some questions, and

7   just about the time -- we've said this all day -- just about

8   the time you think that there can't possibly be anything

9   else to ask, then I'll turn you over, and the Defense will

10  ask a lot more questions.  So if you'll just bear with us,

11  we'll try to make it as painless as possible.

12           There are a couple of things that I want you

13  to keep in mind as I ask you questions.  The first one is,

14  you haven't heard any evidence in the case; is that correct?

15  A     That's correct.

16  Q     And you won't today because the law doesn't

17  provide for that opportunity.  You won't know any evidence.

18  This is just the jury selection process.

19           So every question that I ask or the defense

20  lawyers ask or the Court, for that matter, is going to be

21  predicated on the fact that you don't know any evidence, and

22  we don't expect you to know any evidence.

23           Is that kind of a relief?

24  A     Yes.

25  Q     Also, say it's kind of a relief to know that

170

1    you're not charged, as you sit here today, with knowing any

2    of the law that involves murders or capital murders or any

3    of the other things that will be discussed.  That's always a

4    big relief even to me.

5            What we'll do, though, is we're going to talk

6    a little bit.  I'm going to tell you about some principles

7    of law that may or may not apply and then get your feelings

8    about that, okay?

9    A    That's fine.

10   Q    There are a couple of things that I want you to

11   keep in mind as we talk.  The first is that I've told you

12   what the law doesn't charge you with.  You don't sit here

13   today having to know the evidence or having to know all the

14   law.

15           But it does require three things of you to

16   sit as a juror:  That you can be fair and impartial to the

17   State and to the Defense; that you can follow the law that

18   the Court will give you at the end of the case in the

19   charge; and that you can -- that you're not already

20   committed to a decision; in other words, that you can keep

21   an open mind, listen to all the evidence, and wait to base

22   your verdict upon that evidence at the end of the case.

23           And as you sit here now, if you'll just keep

24   those things in mind as we go along, and maybe they'll make

25   a little more sense, okay?

171

1    A    Okay.

2    Q    Let's talk about the death penalty a little bit.

3    When you walked in last Thursday and heard for the first

4    time that the State was seeking the death penalty in a

5    capital murder case, what were some of your first thoughts?

6    A    I don't remember exactly what my first thoughts

7    were.  I was a little surprised.  I've served on juries

8    before but never on a criminal case.

9    Q    Is the death penalty something that you've had a

10   great deal -- put a great deal of thought into, or is it

11   something that you've discussed with family or friends?

12   A    I don't think I've ever discussed it with anyone

13   except maybe my husband, and that's not this but in general.

14   Q    Sure.

15   A    The death penalty, we have discussed that years

16   past.

17   Q    And in general, when I look at your questionnaire,

18   your answer to Question 67 is that you generally favor the

19   death penalty?

20   A    I favor it in certain cases.

21   Q    Sure.  And that would be the next question.  You

22   answered or you checked, "I believe that the death penalty

23   is appropriate in some cases."  Is that a fair statement?

24   A    That's generally speaking.  May I go ahead and

25   explain?

172

1    Q    Sure.  Please do.

2    A    The thought of myself being in judgment of another

3  human being is not a comfortable feeling for me.

4    Q    Right.

5    A    But at the same time, acts of pain and suffering

6  on innocent people is just as chilling to me.  So I think,

7  all things considered, in some cases, yes, I do.

8    Q    And that's all we're really looking for.  You

9  know, the law requires that we have fair and impartial

10  jurors for the defendant and for the State.  A lot of times

11  people forget or don't think about -- it's not as readily

12  available when they're thinking about fairness in a trial.

13        It wouldn't be fair to the defendant to have

14  someone sitting there saying, "You know what; I would give

15  the death penalty every single time," because, obviously,

16  every single time wouldn't be fair to a defendant.  There

17  ought to be a procedure in place, and there is, for when

18  those times are appropriate.

19        On the other hand, it wouldn't be fair to the

20  State to have a juror who said, "I would never give it."

21  You see, it's kind of a sliding scale.

22        So what -- I take it, from what you're

23  saying, is that there are times when you believe it to be an

24  appropriate punishment, and there are times when you feel

25  like it wouldn't be appropriate based upon the facts that

173

1   you hear, base upon the evidence that you hear?

2        A    In some cases, I think -- in a civilized society,

3   I think there are cases that might warrant that, if all hope

4   of rehabilitation -- maybe if there was no hope and if the

5   crime was severe enough.

6        Q    What about if you yourself was responsive -- if

7   you were responsible for -- say, we make you president or

8   head of the legislature, and you're charged with deciding

9   what we do with the death penalty.  Do we keep it as it is?

10  Do we abolish it altogether?  Where would your decision be

11  if it was up to you?

12       A    I would have to say to keep it.

13            MS. SIKES:  Can I have just one second,

14  Judge?

15            THE COURT:  Yes.

16            (Pause in the proceedings.)

17            MR. PERKINS:  Judge, could we approach just

18  briefly?

19            THE COURT:  Yes.

20            (At the bench, on the record.)

21            MR. PERKINS:  I apologize for not having this

22  done before this juror came in.  We've been looking down the

23  road, and I believe we've reached an agreement which would

24  not require her to go through individual voir dire.

25            THE COURT:  Go ahead.

174

1           MR. PERKINS:  Our agreement is 35.05 to

2   excuse the following individuals:  Juror Number 18, who's in

3   the courtroom right now, Juror Number 24 and Juror

4   Number 30.  I'll get their names and read them into the

5   record here in a minute.

6           In the interest of time, if we're going to

7   agree to do them we might as well do them now than two hours

8   from now.

9           MR. HARRISON:  We're in agreement.

10          THE COURT:  That will be Juror Number 18,

11   who's this juror, Juror Number 24, Juror Number 30?

12          MR. PERKINS:  Juror Number 30, we just got

13   some information on him.  He's in ICU, and he's got all

14   kinds of medical problems.  And we were finalizing that, and

15   we couldn't get that finalized before this juror had to come

16   in.  And that is with Mr. Beatty's consent and approval.

17          THE COURT:  18, 24, and 30?

18          MR. PERKINS:  Right now.

19          (End of bench conference.)

20          THE COURT:  Ms. Worley, the Court has been

21   advised of some information that is actually going to make

22   it possible for the Court to excuse you from jury service at

23   this time.

24          The information actually doesn't have

25   anything to do with you personally.  It's not like the Court

175

1  finding out something that the Court didn't know; it's just

2  that there is a procedure that can become available to the

3  Court, with the cooperation and agreement of the attorneys,

4  that may result in a juror being able to be excused from

5  jury service.

6         And that has taken place in your case.  The

7  Court just became aware of that.  It certainly doesn't have

8  anything to do whatsoever with anything you have done; it's

9  just as a result of this procedure.

10        I'm going to be able to excuse you from jury

11  service at this time.  We very much appreciate you coming

12  down.  I know you had to wait for some time because we were

13  running a little bit behind on the last juror, but you've

14  been a very important part of the process in being here all

15  last Thursday and making yourself available for jury service

16  and coming down and being available to go through the

17  individual voir dire today.

18        But now we'll be able to excuse you from any

19  further jury service in the case.  You are finally excused

20  with the Court's deep appreciation for being available for

21  jury service in this case and also the appreciation of the

22  State and the Defense.

23        VENIREPERSON WORLEY:  Okay.

24        THE COURT:  Thank you very much.

25        VENIREPERSON WORLEY:  Thank you.

176

1          THE COURT:  Yes, ma'am.  Thank you.

2          (Venireperson Worley leaves the courtroom.)

3          THE COURT:  Okay.  Mr. Perkins, go ahead and

4    dictate it in.

5          MR. PERKINS:  Judge, to go ahead and finalize

6    the agreement that we have reached under 35.05, the juror

7    that was in here, Annie Worley, who was a 1 and generally in

8    favor of the death penalty, we have agreed to excuse the

9    following jurors:  Juror Number 18, Annie Worley; Juror

10   Number 24, Betty Cauthen (sic); and Juror Number 30, Claborn

11   Moore.

12         Mr. Moore is the one that I was indicating to

13   the Court at the bench that we just got a note on.  He's

14   currently in ICU.  He's been in ICU eight times since March.

15   He's scheduled for 4:00 o'clock tomorrow afternoon.  We just

16   got that note and had an opportunity to look at his card,

17   visited with the State, and Mr. Beatty regarding those

18   individuals.

19         And for reasons which -- obviously, different

20   reasons between the State and the Defense, we have agreed to

21   excuse each of those individuals under 35.05.

22         THE COURT:  Then under 35.05, Juror

23   Number 18, Annie Worley, who was just on the stand and

24   started to undergo individual, is excused pursuant to 35.05

25   agreement between the State and Defense.

177

1          Also, Juror Number 24, who was scheduled for

2  tomorrow morning, Betty Cauthers, is excused pursuant to

3  35.05 agreement between the State and Defense.

4          And also Juror Claborn Lavon Moore, Mr. Moore

5  is excused pursuant to an agreement between the State and

6  Defense under 35.05.

7          Are you in agreement with all those,

8  Mr. Beatty?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  The Court had received

11  information just a little while ago in regard to Claborn

12  Moore, who was scheduled for 4:00 o'clock tomorrow

13  afternoon, which the Court handed to Mr. Hawk.  That

14  information did reflect, as Mr. Perkins obviously said, that

15  Mr. Claborn Moore is ICU at this time.  He's been in eight

16  times since March.

17          Therefore, those three 35.05 agreements are

18  approved by the Court.

19          Carleton, be sure that the staff calls Juror

20  Number 24, Betty Holley Cauthers, C-A-U-T-H-E-R-S.  She is

21  excused.  She is scheduled for 10:15 in the morning.

22          And also if they will call the family of

23  Claborn Moore, of course, and let them know that Mr. Moore

24  is excused from any further jury service.

25          THE BAILIFF:  Yes, sir, I will.

1          THE COURT:  And then would you tell Shirley

2    Griffin, who is our next juror, to come on in?

3          (Venireperson Griffin enters the courtroom.)

4          THE COURT:  Ms. Griffin, go ahead and have a

5    chair, please, ma'am.

6          VENIREPERSON GRIFFIN:  Okay.

7          THE COURT:  Ms. Griffin, how are you this

8    afternoon?

9          VENIREPERSON GRIFFIN:  Oh, I'm fine.

10         THE COURT:  Well, I'm glad we got to you, and

11   you didn't have to wait any longer than necessary out there.

12         This is the process we talked about to some

13   degree Thursday in the big room where this is going to be

14   the individual questioning of you by attorneys for the

15   State -- one of the attorneys for the State, one of the

16   attorneys for the defendant.

17         The oath that you took Thursday, you're still

18   under that oath, so your answers will be under oath today.

19         There's not any right or wrong answers to

20   their questions.  It is important that when they ask a

21   question and you answer, if you can answer out yes, no, or

22   whatever the answer calls for, because the court reporter,

23   Mr. Awbrey, cannot take down, like, shakes of the head yes

24   and no.

25         VENIREPERSON GRIFFIN:  Gotcha.

1          THE COURT:  He's got to have words to put

2  down.

3          Also, is there any information that you may

4  have thought of on your questionnaire that you filled out

5  Thursday that you need to let us know about now that maybe

6  you just missed Thursday or thought about since then that

7  you can think of?

8          VENIREPERSON GRIFFIN:  No, sir.

9          THE COURT:  I'm going to go ahead and turn

10 the questioning over to Ms. Sikes, who will be seated over

11 here to your right, the chief felony prosecutor for the

12 Smith County District Attorney's Office.

13         Just relax.  As I've said, there's no right

14 or wrong answers.  All both the State's attorneys and the

15 defendant's attorneys are trying to do is just ask

16 questions, because they're both interested and their jobs

17 are to try to select fair and impartial jurors to come into

18 the case with an open mind, who can hear the evidence, base

19 their verdict in the case on the evidence, and follow all

20 the law of the courts.

21         So with that, I'll turn it over to Ms. Sikes.

22         MS. SIKES:  Thank you, Judge.

23         SHIRLEY JUNE GRIFFIN,

24 having been duly sworn as a member of the special venire,

25 was examined as follows:

180

VOIR DIRE EXAMINATION

BY MS. SIKES:

Q    Good afternoon, Ms. Griffin.  How are you?

A    Oh, I'm fine.

Q    I started to say good morning.  It's been a long day.  It's almost good evening.

As the Judge told you, if you'll just relax.  Are you nervous?

A    A little.

Q    Kind of an unusual situation, obviously.  You know -- you've already been introduced to all of us.  Now that you see everybody here, does it appear that you know anyone?

To my right is my boss, Mr. Bingham, the elected district attorney.  Do you know Mr. Bingham?

A    No.

Q    Mr. Harrison, another one of my bosses, first assistant.

A    No.

Q    Seated next to him, the defendant, Tracy Beatty.

A    No.

Q    Mr. Perkins, his lawyer, and Mr. Hawk, another one of his attorneys.

A    Never seen any of them.

Q    All right.  With that said, we're going to --

181

1       A      Thank goodness.

2       Q      They're usually glad when they haven't seen us

3   anyway.

4              We're going to move on to the fact that you

5   know the grand jury has returned an indictment -- and we're

6   going to talk about that in a little bit -- charging

7   Mr. Beatty with the offense of capital murder.

8              And I assume -- when you first found that out

9   last Thursday, what did you think about that?

10      A      Personally, I was dumfounded that I got called.

11      Q      That you were one of the lucky ones?

12      A      Oh, yeah, real lucky.  Yeah.

13      Q      You've heard that the State has filed a notice of

14  our intent to seek the death penalty in that case?

15      A      Yes.

16      Q      And I assume that became even more clear when you

17  were asked questions in your questionnaire about your

18  opinions about the death penalty, and I'm just going to kind

19  of cut right to the chase and talk to you a little bit about

20  that.

21      A      Okay.

22      Q      Judge Skeen asked you if there was anything,

23  thinking back, that you wanted to change about your

24  questionnaire, and you said no; is that right?

25      A      Yeah.

1     Q    Question 67 says, "In general, how do you feel

2  about the death penalty?"  You were given three options,

3  either generally against it, generally in favor of it, or no

4  opinion.  And your answer, you circled no opinion.

5           Can you just tell me a little bit about what

6  you base that answer upon?  How did you arrive at that

7  decision?

8     A    Well, at that time, I had no opinion because I had

9  never -- I had never thought about it --

10     Q    Sure.

11     A    -- until it hits you like now.  So I have thought

12  about it over the weekend.  I've prayed about it.  I have

13  come up with an answer.

14     Q    A different answer?

15     A    Yes.

16     Q    And what would that answer be?

17     A    I could do it and sleep the rest of my life.  I

18  could do it.  I wouldn't want to, but I could do it.

19     Q    And that's a fair statement.  When you say could

20  do it, you mean sit on a jury, listen to the evidence,

21  assess a sentence in the case?

22     A    Yes.

23     Q    We're going to talk a little bit about that.

24           You know, you also said in the next one you

25  believe the death penalty was appropriate in some cases.  Is

183

1    that still the way you feel?

2         A    Yes.

3         Q    You know, what we're here about is -- I like to

4    say there's a long continuum of people.  You know, over here

5    on one end, there are people who say, "I would never give

6    the death penalty regardless of what the law was or what my

7    instructions from the Court were."

8              And on the opposite end, way down there

9    somewhere, there are people who say, "I would give the death

10   penalty for any case.  Wish it was for theft by checks."

11   You know, there's an extreme on either end.

12             What you're telling me -- and you correct me

13   if I'm wrong -- is that it wouldn't be an easy decision for

14   you, but you believe it is appropriate in some cases?

15        A    Correct.

16        Q    The other thing I want to talk to you about is, as

17   a juror, are you familiar with the sentencing of a capital

18   murder case?

19        A    No.

20        Q    Let's talk about that a little bit, because you

21   said you could do it, and I want you to know what that means

22   by -- if you sit on this jury, you would actually -- there's

23   not going to be a box on the verdict form.

24             And we only get to that point if you find the

25   defendant guilty of capital murder, and we're going to talk

184

1    about some special issues that are there.

2            There's not going to be a box that says

3    "death penalty," check; "life," check.  But there are two

4    options.  When -- if you find a defendant guilty of capital

5    murder, there are two sentencing options.  One is life,

6    which, in Texas, we don't have life without parole.

7            Were you aware of that?

8    A    I think I might have had an idea.  I think it

9    changed.  We used to have it.

10   Q    So you understand that the law now is that if you

11   give a life sentence, it's not without parole?

12   A    Right.

13   Q    In fact, the person would serve 40 calendar

14   years -- that means day-for-day time -- without -- before

15   they become eligible for parole.  That's one option.

16           The other option, then, would be the death

17   sentence, and that is arrived at by what are called special

18   issues.  You would answer those special issues after you

19   listened to all the evidence.  I think they're there in

20   front of you.

21           The first one says, "Is there a probability

22   that the defendant would commit criminal acts of violence

23   that would constitute a continuing threat to society?"

24           A lot of times we refer to that special issue

25   as -- is whether or not the defendant would be a future

185

1   danger.  In other words, would he continue to commit acts of

2   violence?

3               That, of course, we would have to prove to

4   you beyond a reasonable doubt.  The burden of proof is on

5   the State.  Always is.

6       A    Right.

7       Q    If you find someone guilty of capital murder, then

8   you move to -- let me start with this.

9               Do you think all people who are convicted of

10  capital murder deserve the death penalty?

11      A    That's a hard one.  Could you run that by me one

12  more time?

13      Q    You know, your answer -- I guess I should have

14  asked you a few more questions about it, so let's back up

15  just a minute.

16              You know, when you said you changed your

17  answer from no opinion, that you had thought about it --

18      A    Yes.

19      Q    -- and now would your answer be -- which choice?

20  That you generally favor it or you're generally against it?

21  Where would you come down on that side?

22      A    In the middle.

23      Q    Between favoring and being against it?

24      A    Yes.

25      Q    Would that be still consistent with your answer

186

1   that you believe it's appropriate in some cases?

2       A    Right.

3       Q    I want to talk to you about those special issues a

4   little bit.  We talked about the first one.

5                Did you read it to yourself?

6       A    Yes.

7       Q    Did you see it there, a continuing threat?

8       A    Yes.

9       Q    There's also -- you see the second one?  It's not

10  really applicable in this particular case.  It's normally

11  given when the defendant acts in concert or together with

12  other people, not when he acts alone.

13               So I don't expect that you'll see that in

14  this case.  So we're going to skip it and talk about the

15  first one and the third one.  You see the third one there?

16      A    Yes.

17      Q    Can you read it to yourself?

18      A    Yes, ma'am.  (Complies.)

19      Q    We call that special issue -- or we say that that

20  deals with mitigation.  You see what it says?

21      A    Yes.

22      Q    Taking the evidence into consideration, the

23  circumstances of the offense, the defendant's character and

24  background, personal moral culpability, if there's a

25  sufficient mitigating circumstance, which would be one, or

187

1   circumstances, more than one, to warrant a sentence of life

2   over a death sentence, right?

3        A    Okay.

4        Q    So we talked about you're not going to see a box

5   that's check "life" or check "death," but you would know, as

6   a juror in that situation, if I answer, yes, he's a

7   continuing threat to society, and, no, there's no

8   mitigation -- mitigation is anything that would lessen his

9   burden or responsibility for the crime --

10       A    Okay.

11       Q    -- you know if you answer the questions that way,

12  then the Court is going to do what?

13       A    If I --

14       Q    If he's a future danger and there's no mitigation.

15       A    Then he's going to get the death penalty.

16       Q    Then he's going to get the death penalty.

17       A    Right.

18       Q    As a juror, what you're required to do -- those

19  three questions that we've talked about -- listen to all the

20  evidence, be fair and impartial, keep your mind open until

21  you've heard everything.

22            I'm not asking you for one decision or

23  another, but what I'm asking you is, could you keep your

24  mind open and answer those questions based upon the evidence

25  that was presented to help you answer that?

188

1          You know, we have to prove the first one --

2     A    Yes.

3     Q    -- beyond a reasonable doubt.  You know, the third

4  special issue about mitigation, there's no burden of proof.

5  It's a little different.

6          There's no definition of mitigation.

7  Mitigation is something that we talked about, that lessens

8  the burden or lessens the responsibility.

9          A juror earlier, I think, said it is what it

10 is.  Mitigation to you may be one thing.  Mitigation to me

11 may be another.  And the jury is not required to agree on

12 what is mitigating but just that there is mitigation

13 involved.

14    A    Okay.

15    Q    So what I'm asking you is -- I'm going to go back

16 to the start.  What I'm asking you is specifically about

17 your questionnaire.

18          Is your mind open at this point to -- now

19 that we know you are between generally favoring and

20 generally against, your mind is open to answering those

21 special issues in a way that would either, you know, assess

22 a life sentence or assess the death penalty?

23    A    Yes.

24    Q    Now that we've gone there, I'm going to go back to

25 the start.

189

1    A    Okay.

2    Q    So if it sounds like I skipped around a little

3  bit, I did.

4            Remember when we first started, there are

5  three things that I want to talk to you about.  You can be

6  fair and impartial.  You know, the Court doesn't require you

7  at this time, the law doesn't require you at this time to

8  know anything at all about evidence in this case.

9            Is that a relief to you?

10   A    Yes, it is.

11   Q    It's always a relief to me.

12           Here's the second biggest relief.  Also, the

13 law doesn't require you to know what the law is governing

14 capital murder cases or murder cases, what are lesser

15 included offenses, and we'll talk about that a little bit.

16           Is that also a relief to you?

17   A    Yes.

18   Q    Here are the things that would be required for you

19 to be a juror on the case:  That you be fair and impartial

20 to both the State and the Defense, like we talked about;

21 that you can follow the law; in other words, you don't have

22 to know what it is, but the Court's going to give it to you

23 at the end of the trial in a charge, a written document, and

24 you're going to have to take an oath that you're going to

25 follow the law that he gives to you.

190

1          That's why we spend so much time talking

2     about issues like the death penalty, because if you have --

3     it sounds ugly -- but if you have a bias or a prejudice

4     against the law as it's written, then this is not the case

5     for you to be here.

6          Make sense?

7     A     Right.  Yes.

8     Q     So you're required to be fair and impartial, to

9     follow the law, and to have not already committed yourself

10    to a verdict; in other words, to be able to say to yourself,

11    "You know what?  I'm going to wait, and I'm going to hear

12    all the evidence and be open-minded, and then I'm going to

13    base my verdict on what the evidence shows."

14         So if you'll keep those three things in mind,

15    because I'm going to kind of keep coming back to them.

16         Do they make sense to you?

17    A     Yes, they do.

18    Q     If you yourself -- we talked a little bit about

19    the death penalty.  If you yourself were the legislature and

20    the decision today was, do you want to keep the death

21    penalty, or do you want to abolish it, what would your

22    decision be?

23    A     Keep it.

24    Q     And you think, like you've said before, it's

25    appropriate in some cases?

191

1    A    Yes.

2    Q    I want to talk for a minute about the difference

3  between murder and capital murder.  You've heard me say that

4  a couple of times already.

5              I use the term -- you hear "just murder" --

6  you will hear that many times, which sounds awful,

7  especially to the family of whoever was murdered -- or you

8  will hear the term "plain vanilla murder," but those terms

9  are used to distinguish two different crimes.

10              For example, say I take a gun and I shoot

11  Mr. Bingham in the head five times.  I hate him.  You know,

12  he's a mean boss.  He lives in a better house than I do,

13  drives a better car than I do, sleeps on a better mattress

14  than I do.  I can't stand him.  And I walk up to him, and

15  I've had it, and I shoot him in the head five times.

16              Do you think I can get the death penalty for

17  that?

18    A    Just all of a sudden, without any thought?  I

19  wouldn't think so.

20    Q    And that's a good answer.  I can't.

21              That's what we call just murder, plain

22  murder.  There has to be -- now, the legislature, for

23  that -- we'll talk about the range of punishment in a little

24  bit.  That's a first degree felony.  Range of punishment is

25  five to ninety-nine or life.  No difference, ninety-nine or

192

1   life, and we're going to talk about that in a minute.

2           But to have a capital murder charge, there

3   has to -- we call it murder plus something else.  There are

4   a lot of different ways it can be committed.

5           You can murder more than one person, if I

6   shoot Matt Bingham and Brett Harrison, I kill more than one

7   person in the same transaction; if I murder a child under

8   the age of six; if I kill someone for the money or I hire

9   someone to kill Mr. Bingham; if I murder a police officer or

10  a fireman in the line of duty; if I murder someone while in

11  the course of committing other crimes, robbery or burglary,

12  aggravated kidnapping, or sexual assault or arson.

13          Does that make sense to you, that there's a

14  distinction?

15      A   Yes.

16      Q   Tell me why there would be a difference between

17  murder and these other offenses.

18      A   Oh, let's see.  How do I put it?  Let me get my

19  thoughts together.  Because it's crime upon crime.

20      Q   Sure.  More than a murder?

21      A   Right.  Right.

22      Q   Do you think it would be to discourage those

23  things from happening?

24      A   Yes.

25      Q   Is there a reason to discourage someone from

193

1    killing a child under the age of six?

2        A    Yes.

3        Q    Or to discourage someone from -- do you know what

4    robbery or burglary, what those means to you?

5        A    Yes.

6        Q    If you're going to steal someone's things, then

7    the law would try to discourage you from killing the person.

8                  Does that make sense to you?

9        A    Yes.

10       Q    In Texas, we have what's called a bifurcated trial

11   system.  Have you heard of that before?

12       A    A what?

13       Q    Bifurcated.  Big, long, fancy word for meaning

14   there are two parts to it.

15                  The first one is the guilt or innocence

16   stage.  And all that you're going to hear about in that is

17   the crime itself.  Did a person, on or about a certain day,

18   here in Smith County, commit a crime?  That's the guilt

19   phase, guilt or innocence.  The jury makes a decision.  They

20   either did or they didn't.

21                  If you find the defendant did and is guilty,

22   then you move to the punishment phase of the trial, which is

23   a real different phase of the trial.  You hear more

24   evidence, different kind of evidence.  I say it's the good,

25   the bad, and the ugly part of the trial.  You know, you get

194

1   to hear about the defendant, about things that wouldn't be

2   admissible in the first part of trial.

3          Does that make sense to you, that you would

4   hear more about the defendant himself in the punishment

5   phase of the trial?

6   A    Yeah.  Yes, to give you a chance to know or to

7   think you know whether there was a reason, you know, of why

8   a person did something.

9   Q    Sure.  And those would be the types of issues that

10  you would hear in punishment.

11         And does it make sense that there should be a

12  level -- more of a level playing field in the

13  guilt/innocence phase, not judge a person, for example?

14         And we'll talk about some extraneous

15  offenses, but if a person, say, committed rape three times

16  before, and then they are charged with this rape, should

17  this fourth time stand on its own, the facts of this case?

18         Did the defendant rape this person in this

19  trial?  And then in punishment, you would deal with, well,

20  how many times has done it before?

21         Do you have children?

22  A    Yes.

23  Q    Do you punish your child based upon things like

24  that?  You know, we've got a prosecutor in my office --

25  A    Yes.  Yes.

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS