REPORTER'S RECORD

75010

VOLUME 21 OF 51

TRIAL COURT CAUSE NO. 241-0978-04

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VERSUS | * | SMITH COUNTY, TEXAS |
| TRACY BEATTY | * | 241ST JUDICIAL DISTRICT |

---

INDIVIDUAL VOIR DIRE - P.M. SESSION

JULY 20, 2004

---

FILED IN
COURT OF CRIMINAL APPEALS

JUN 1 4 2005

Troy C. Bennett, Jr., Clerk

---

On the 20th day of July, 2004, the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE JACK SKEEN, JR., Judge Presiding, held in Tyler, Smith County, Texas:

Proceedings reported by computerized stenotype machine; Reporter's record produced by computer-assisted transcription.

KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

2

A P P E A R A N C E S

MR. D. MATT BINGHAM, III
State Bar Number 00787085
Smith County Criminal District Attorney

MR. J. BRETT HARRISON
State Bar Number 00793909
MS. APRIL SIKES
State Bar Number 18348790
Assistant Smith County District Attorneys
Smith County Courthouse, Fourth Floor
Tyler, Texas  75702
Telephone:  903.535.0520
Fax:  903.535.0599

        REPRESENTING THE STATE OF TEXAS


MR. ROBERT C. PERKINS, JR.
State Bar Number 15790405
MR. KENNETH HAWK
State Bar Number 09243650
Attorneys at Law
112 East Line Street, Suite 202
Tyler, Texas  75702
Telephone:  903.593.7780

        REPRESENTING THE DEFENDANT








                REPORTER'S NOTE

        Uh-huh = Yes - Affirmative response

        Huh-uh = No - Negative response

Quotation marks are used for clarity and do not necessarily
            indicate a direct quote.

KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

3

1                          I N D E X

2                      VOLUME 21 OF ___

3                  (INDIVIDUAL VOIR DIRE)

4                                        PAGE   VOL

5   JULY 20, 2004 (P.M.)

6   VENIREPERSON:          STATE      DEFENSE

7   DAVID WARNER HANEY

8   (Out of order)

9       By Ms. Sikes          9                    21

10      By Mr. Hawk                    53           21

11  Juror excused for the day..........................93  21

12

13  VENIREPERSON:

14  JUAN LUIS GONZALES

15  Excused by agreement................................95  21

16

17  VENIREPERSON:

18  MICHAEL GENE PATE

19  Excused by agreement................................95  21

20

21  VENIREPERSON:

22  GEOFFREY ROBERT PERKINS

23  Excused by agreement................................95  21

24

25

4

I N D E X - CONTINUED

VOLUME 21 OF ___

(INDIVIDUAL VOIR DIRE)

                                              PAGE  VOL

JULY 20, 2004 (P.M.)

VENIREPERSON:              STATE      DEFENSE

MAE FRANCIS NELSON

(Out of order)

    By Mr. Harrison      99                        21

    By Mr. Perkins               157               21

Juror excused for the day..........................189  21


VENIREPERSON:              STATE      DEFENSE

JOSHUA LEE BENNETT

    By Ms. Sikes        194                        21

    By Mr. Hawk                 243                21

Defense exercise Peremptory Number 4...............272  21


Court Reporter's Certificate.......................279  21

5

ALPHABETICAL VENIREPERSON INDEX

| VENIREPERSON: | STATE | DEFENSE | VOL |
|---|---|---|---|
| BENNETT, JOSHUA LEE | | | |
| By Ms. Sikes | 194 | | 21 |
| By Mr. Hawk | | 243 | 21 |
| Defense exercise Peremptory Number 4...............272 | | | 21 |

| VENIREPERSON: | | | |
|---|---|---|---|
| GONZALES, JUAN LUIS | | | |
| Excused by agreement................................95 | | | 21 |

| VENIREPERSON: | STATE | DEFENSE | |
|---|---|---|---|
| HANEY, DAVID WARNER | | | |
| (Out of order) | | | |
| By Ms. Sikes | 9 | | 21 |
| By Mr. Hawk | | 53 | 21 |
| Juror excused for the day......................... 93 | | | 21 |

| VENIREPERSON: | STATE | DEFENSE | |
|---|---|---|---|
| NELSON, MAE FRANCIS | | | |
| (Out of order) | | | |
| By Mr. Harrison | 99 | | 21 |
| By Mr. Perkins | | 157 | 21 |
| Juror excused for the day.........................189 | | | 21 |

6

ALPHABETICAL VENIREPERSON INDEX - CONTINUED

VENIREPERSON:                                    PAGE   VOL

PAGE, MICHAEL GENE

Excused by agreement.................................95   21


VENIREPERSON:

PERKINS, GEOFFREY ROBERT

Excused by agreement.................................95   21

7

1                    P R O C E E D I N G S

2                       (July 20, 2004)

3            (Open court, defendant present, no jury.)

4            THE COURT:  Okay.  Back on the record in

5    Cause Number 241-0978-04.  The State is present, Ms. Sikes,

6    chief felony prosecutor, is present for the State; Mr. Hawk

7    and Mr. Perkins are present; and the defendant is present.

8                 (Venireperson Haney enters the courtroom.)

9            THE COURT:  Mr. Haney, thank you, first of

10   all, for coming in early, for allowing us to ask you to come

11   in early, and then you coming in early helped us fill in a

12   gap.

13           What we're going to do now is go through this

14   process we talked about Thursday, a week ago.  I don't know

15   how much of the comments I made about individual voir dire

16   that you recall, but, basically, what is going to take place

17   is Ms. Sikes, representing the State, is going to go through

18   and ask you some questions.  And after she finishes,

19   Mr. Hawk or Mr. Perkins are going to go through and ask you

20   some questions.

21           And they're also going to explain some

22   procedures and law that applies to the trial of this type

23   case to be sure that you can follow all the laws that are

24   involved.  They're going to ask you your opinion and views

25   on some matters that can be involved in a case such as this.

8

1          There are no right or wrong answers.  Both

2   Ms. Sikes and either Mr. Perkins or Mr. Hawk, they're just

3   trying to find out how you truthfully feel about some of

4   these issues, some of these laws.

5          So just be sure that when you do answer the

6   question, if it calls for a yes answer, like don't nod your

7   head like this (demonstrating) yes.  Just answer out yes.

8   The reason for that is my court reporter, Kim, has to get

9   down any answer of a witness, and she can't, like, put "nod

10  of a head."

11         So when you answer, if it's a yes, say yes;

12  if it's a no, say no, or whatever answer it is.  Other than

13  a yes or no, of course, you'll just be giving that answer.

14         Is there anything -- in regard to your

15  questionnaire that you filled out when you were here before,

16  Mr. Haney, that -- anything about it that you need to add to

17  or anything?  Have you thought of anything, "I wish I had

18  added that or put that down" or anything?

19         VENIREPERSON HANEY:  Not that I know of.

20         THE COURT:  Also, if either the State's

21  attorney or the Defense attorney ask you a question you

22  don't really understand what they're asking you, don't

23  hesitate to tell them that.  Don't hesitate to just say, "I

24  don't really understand what you're asking me," and they'll

25  restate the question and make it clear for you.

9

1        With that, the Court will go ahead and turn

2    it over to Ms. Sikes, representing the State of Texas,

3    assistant criminal district attorney, Mr. Haney.

4        MS. SIKES:  Thank you very much, Judge.

5        DAVID WARNER HANEY,

6    having been duly sworn as a member of the special venire,

7    was examined as follows:

8        VOIR DIRE EXAMINATION

9    BY MS. SIKES:

10   Q.    How are you, Mr. Haney?

11   A.    I'm fine.  Thank you.

12   Q.    I tell everyone -- the Judge is exactly right.

13   There are times when I talk too loud or too fast or my

14   questions aren't very understandable.  The Judge is right.

15   If you'll tell me to rephrase it or ask me or tell me you

16   don't understand it, I'll do the best I can to start over,

17   okay?

18   A.    Fine.

19   Q.    There are going to be things that we're going to

20   talk about, but the very first one I want to mention is, in

21   your questionnaire, you listed -- the Judge asked you in a

22   question if the trial that covers the dates that we have

23   estimated would interfere with any personal plans, and you

24   circled yes and wrote down there that you have a trip to

25   Arkansas planned.

1    A.   I just got back from Arkansas.  I went ahead and

2  went early.

3    Q.   Well, that was a smart thing.  So it's over now?

4    A.   It's over.

5    Q.   Did you enjoy it?

6    A.   I did.  It was very cool on Queen Wilhelmina.

7    Q.   Well, the Judge has told you who I am.  You've

8  been introduced, I think, to all of us at one point or

9  another, maybe a week ago Thursday.  I am April Sikes.  I

10 work in the DA's Office.

11        You and I don't know each other, correct?

12   A.   That's correct.  I don't know you.

13   Q.   And to my right around the table is the defendant,

14 Tracy Beatty, who has been charged under the indictment of

15 capital murder.

16        Do you know Mr. Beatty?

17   A.   No, ma'am.

18   Q.   Or his defense team, Mr. Perkins, sitting --

19        MR. PERKINS:  Hello.

20   Q.   (By Ms. Sikes) -- right there, who just said

21 hello, and Mr. Hawk on the end facing me?

22   A.   No, sir.

23   Q.   And you don't know that defense team?

24   A.   Not personally, no.

25   Q.   Okey-dokey.  We have a little different role, but

11

1    I start out just talking about that.  You know, obviously,

2    the State of Texas, me and some other lawyers who are

3    working on this case, it is our job -- this is Mr. Harrison,

4    first assistant, that's walking in.  You don't know

5    Mr. Harrison, either, Brett Harrison?

6         A.   No.

7         Q.   Our job is to represent the State of Texas in this

8    prosecution, and we're charged with -- we have the duty of

9    trying Mr. Beatty under an indictment handed down by the

10   grand jury.  That's our role in the case.  Obviously, the

11   Defense team has a different role, and that is to represent

12   the interests of Mr. Beatty.

13              Makes sense, right?

14        A.   Correct.

15        Q.   The Judge has a role, and that role is -- there

16   are some things that are obvious, conducting the trial, for

17   example.  This hearing that we're having is voir dire, but

18   he also provides the law in the case.

19              I always say it's a relief to me -- I've been

20   a lawyer 15 years, and it's a relief to me that that is the

21   Judge's role.  In other words, when you come in here as a

22   juror, you're not charged with already having to know any

23   law that governs capital murder or murder charges or

24   anything that we're going to talk about today.

25              Is that rather a relief to you?

12

1   A.   Yes.

2   Q.   And also, you don't know any of the evidence.  You

3   haven't heard any of the evidence in the case.

4   A.   No.  I don't think the newspaper -- I don't take

5   the newspaper even, so I don't know anything.

6   Q.   Okay.  So what your job would be -- if you sit as

7   a juror in this case, would be to listen to what you hear

8   from the witness stand, all the evidence that's coming in in

9   the trial, and then take the law that the Judge gives you --

10  it's a document called a charge.  It's going to be about as

11  thick as you filled out -- and take that law and the

12  evidence that you heard and see how they fit together.

13  That's what you do as a juror.

14       Kind of make sense?

15  A.   Yes.

16  Q.   I did notice that you had -- it asked you if you

17  knew anything, in your questionnaire, about the case, and I

18  think you said you may have read the newspaper one day.  It

19  said on Wednesday, July the 7th.  Was that just right

20  before -- do you remember anything about that?

21  A.   I think I read the headlines.  That's about it.

22  Q.   So nothing in that -- in what you've read in the

23  newspaper tells you anything extraordinary about this case?

24  A.   No.

25  Q.   Certainly nothing that you've read would affect

13

1   your ability to be fair and impartial?

2        A.    I don't think so.

3        Q.    I'll tell you what, really, we're trying to do in

4   this process.  Everybody at this table -- and by that, I

5   mean the State and the Defense -- all have one common goal,

6   and that's to find -- we call it fair and impartial -- but

7   to find 12 jurors who don't currently know anything about

8   the case.

9              In other words, they don't have -- they don't

10  know any evidence -- if you did, you would just about be a

11  witness -- that can follow -- have the ability to follow the

12  law that the Judge gives and that currently don't have their

13  mind made up one way or another as to guilt or to innocence

14  or as to punishment, what kind.

15             In other words, they're going to come in here

16  and say, "You know what?  I'm going to listen to all the

17  evidence, and I'm going to make a decision with my open

18  mind.  After I hear everything, I'm going to base my verdict

19  on that."

20             Does that make sense?

21       A.    It does.

22       Q.    So as we talk this morning, or now this afternoon,

23  as we talk, if you'll just keep those things in mind.

24  That's what we're trying to figure out is if you, as a

25  juror, as a potential juror, would have the ability to do

14

1   those things.

2               Keeping that in mind, you know, you heard

3   when you were with the big group and maybe in what you read

4   in the headlines that this is a case that involves -- the

5   defendant has been indicted for capital murder, and the

6   Judge told you in that big group that the State had filed

7   its notice to seek the death penalty, correct?

8       A.   That's correct.

9       Q.   And necessarily, then, we're going to have to have

10  some discussions this afternoon about the death penalty and

11  your feelings.

12              Now, in response to Question 67, you answered

13  that you generally favored the death penalty as a penalty

14  for crime.  Is that still the way you feel?

15      A.   Yes, ma'am.  That's the way I feel.

16      Q.   And in the next question, you said that you

17  believed the death penalty is appropriate in some cases.

18      A.   That's correct.

19      Q.   Have you always felt that way about the death

20  penalty?

21      A.   Yes, ma'am.

22      Q.   And can you tell us a little bit about how you

23  formed that opinion?  You know, what do you base that upon,

24  your feelings?

25      A.   Personally, I just don't believe that if a person

15

1    takes another person's life, that they ought to pay with

2    their life.

3        Q.   Is that something that you've just kind of always

4    believed?

5        A.   Yes, I've always believed that.

6        Q.   And we're going to talk about -- there are two

7    types of -- if you take someone's life, intentionally or

8    knowingly take someone's life without legal justification,

9    it can be murder or it can be capital murder.

10           In other words, the legislature has said --

11   and we're going to talk about the different ways that that

12   applies.  The legislature has said there are some cases

13   where -- for example, if I take a gun and I shoot

14   Mr. Harrison in the head, and I say, "I'm tired of him

15   telling me to ask these questions," and I just kill him,

16   don't care if he's got a wife, don't care about his three

17   kids, laugh while I do it, it's murder; I took his life.

18           But the death penalty in that particular case

19   would not be an option.  In other words, the legislature has

20   said there is a certain category of crimes -- and it sounds

21   rather offensive and forgive me -- but that would be just

22   murder.  The legislature says that there is a certain

23   category of crimes that are what we call more than just

24   murder, murder plus something else.

25           You know, if you murder two people in the

16

1   same transaction, you know, if I come in here and kill

2   Mr. Harrison and also shoot Robert Perkins, so Ken Hawk

3   doesn't have another boss in here either.  You see what I

4   mean?  Two people in the same transaction.

5              If I kill a child under the age of six; if I

6   pay someone to kill or get paid to kill someone, kind of

7   murder-for-hire situation; if I kill a police officer or a

8   fireman in the line of their duty -- you see what I mean?

9   Murder plus something else.

10             Or if during the -- if I murder someone, kill

11  someone while in the course of another felony -- and

12  enumerate a bunch of them -- robbery, burglary, aggravated

13  sexual assault, like rape is what we used to call it; if a

14  man is raping a woman and says, "You know, I'm not going to

15  leave any witnesses," and breaks her neck and kills her, you

16  see how those crimes that I've talked about are something

17  more, murder plus something?

18             In your mind, can you see why the legislature

19  would make a distinction between murder, my example with

20  Mr. Harrison, and murder plus something else?

21        A.    I believe I can.

22        Q.    And in your mind, if the law told you -- and

23  you've said already that your belief was -- you originally

24  expressed it as a life for a life.  In other words, if you

25  take a life, you ought to give your own, correct?

17

1      A.    That's correct.

2      Q.    And let me say this:  There are no thought police

3   in here.  That's why we're here.  This is my opportunity,

4   the Defense's opportunity, to talk to you and yours to me to

5   find out how you feel.

6            Because we are after 12 people who are -- you

7   know, you say fair and impartial over and over and over, but

8   you see where it wouldn't be fair to have 12 people on this

9   jury who could never give the death penalty?  Right?  It

10  wouldn't be fair to the State who seeks it.

11           It wouldn't be fair to have 12 people on a

12  jury who would always give the death penalty.  It wouldn't

13  be fair to a defendant on trial.  So we're trying to find

14  people who will be able to listen to the evidence and follow

15  the law.

16           That doesn't mean you can't have your

17  personal beliefs, because I'll tell you, I believe the same

18  as you do.  I'll tell you that.  I believe if someone takes

19  a life, then the death penalty ought to be, for lack of a

20  better phrase, on the table.

21           In other words, that, to me, would be a big

22  deterrent, to keep people saying, "Oh, if they kill

23  somebody, they might kill me."

24      A.    I have one exception on that.  Like if you

25  accidentally run over somebody in a car and killed them, it

18

1    might not be your fault.

2        Q.    Right.

3        A.    But if you just went out to do it...

4        Q.    Sure.  Where it's not intentionally or knowingly

5    taking someone's life?

6        A.    Right.

7        Q.    Here's the thing:  You are entitled to your

8    belief.  It just happens to be the same belief I have, so I

9    understand it, and that's perfectly okay.

10            What's not okay is if that belief affects

11   your ability to sit on this trial as a fair and impartial

12   juror.  In other words, if the Judge told you -- and you're

13   sitting on -- and we're just going to use a hypothetical

14   case, okay -- a murder case like I used with Mr. Harrison,

15   shooting Mr. Harrison in the head, if you were a juror on

16   that case, and the death penalty was not an option, that you

17   wouldn't -- you wouldn't base your verdict on your beliefs

18   that it should be.

19            In other words, the range of punishment on a

20   murder is five to ninety-nine or life.  You wouldn't say,

21   "Well, you know what?  Regardless of what the evidence is,

22   I'm going to give ninety-nine to life, I'm going to give the

23   maximum, because it ought to be the death penalty."

24            Do you see what I mean?

25       A.    I see what you mean.

19

1    Q.   Would you be able to put that feeling aside if the

2   death penalty was an option?

3    A.   I think that I could go with what the Judge

4   recommended was the penalty.

5    Q.   Sure.  And let me talk with you just a little bit

6   more about that.  I'm going to give you an example I've used

7   so many times I'm sure everybody here is sick of listening

8   to it.

9         Murder comes in lots of different forms.  If

10   a man eats a Girl Scout cookie, and he says, "You know what;

11   that cookie is stale; I just hate those Girl Scouts," and he

12   picks up a machine gun, and he goes down to the corner where

13   they're selling them, and he says, "The first Girl Scout I

14   see, I'm shooting her in the head," and he does, and she's

15   ten, okay -- it's not capital murder because she's not under

16   six -- murder.

17         Brutal, right?  Horrible facts?

18    A.   Correct.

19    Q.   On the other hand, 85-year-old man, been married

20   to his wife for 60 years, loves her with all his heart,

21   they've never spent a night apart, and she's dying of cancer

22   in the hospital, and the doctor comes in, and he's telling

23   the doctor, "Isn't there anything you can do; can't you give

24   her more pain medication; can't you do something; she's in

25   agony, and I can't watch it anymore," he says, "I can't; the

20

1   medicines don't work anymore; there's nothing I can do; how

2   long is she going to last"; "she's going to have to live

3   like this probably for another week or two," and the doctor

4   walks out, and he says, "I can't take it; I can't watch her

5   live the last two weeks of her life like this," and he

6   unplugs all her equipment, her life-saving equipment,

7   murder, intentionally or knowingly taking someone's life

8   without legal justification.

9            Makes sense?  But you see how very different

10  those two situations are?

11       A.   Yes, I can understand that difference.

12       Q.   And based upon, like, what I told you, then you

13  would have to listen to the evidence because you don't know.

14  If you were sitting on a murder trial, you don't know

15  whether the evidence leans toward the man killing a Girl

16  Scout or the man trying to help his wife.

17            Do you see what I mean?

18       A.   Yes.

19       Q.   And would you be able to listen to the evidence

20  and base a decision on punishment -- a decision on

21  guilt/innocence, first of all, and punishment on the facts

22  that you hear?

23       A.   I believe I could.

24       Q.   And let's get back to what I was going to tell you

25  about originally.  We'll kind of back up.  I've said this so

21

1    many times I start repeating myself.  I don't even know if I

2    remember where the beginning is, but we're going to try.

3                Texas has two parts to a trial.  It's called

4    a bifurcated system, a big, fancy word for two parts to a

5    trial.  I don't know why they call it that.

6                You've sat on juries before, right?

7    A.    Correct.

8    Q.    And how long ago was that?

9    A.    Probably five, six years.  I don't remember.

10   Q.    Well, you'll probably remember, so I may be

11   rehashing what you already know, but there are two parts to

12   a trial.

13               The first one is the guilt/innocence phase of

14   the trial, and that's where you hear about the crime itself.

15   Say April Sikes is on trial for DWI.  On or about a certain

16   day in Smith County, Texas, did she drive or operate a motor

17   vehicle in a public place while intoxicated, okay?

18               In that trial, as a juror in that case, in

19   the guilt/innocence part of the trial, you're going to hear

20   facts about the crime itself, those elements that I clicked

21   off, right?  You're not necessarily going to hear very much

22   at all about the defendant, because the focus is, did the

23   crime happen?  Was it caused by this person who is on trial?

24               Make sense?

25   A.    Yeah.

22

1      Q.    The trial ought to stand on its own.

2            If you, as a jury, say -- and the burden

3   would be beyond a reasonable doubt, and we'll talk some more

4   about that -- "You know what; I don't think she did, you

5   know" -- say, for example, the prosecutors didn't prove it

6   happened in Smith County, Texas, one of the elements.  Then

7   you would have to find April Sikes not guilty, correct?

8      A.    Right, if they didn't prove it.

9      Q.    That's right.  So she leaves, and there is no

10  second part of the trial.

11           Now, if you find beyond a reasonable doubt

12  that April Sikes was guilty, then you move on to the second

13  part, which is this punishment phase of the trial.  And

14  that's where you hear about any prior convictions she had,

15  any trips to the penitentiary, any drug abuse, any

16  psychiatric problems, other things that help you decide

17  punishment, kind of like what we talked about, you know.

18           Does that make sense?

19     A.    Yes.

20     Q.    We're going to talk first about that first stage

21  of the trial, the guilt/innocence phase.  There are

22  constitutional principles that are so basic that they apply

23  in every case.

24           Whether it's a speeding ticket case or

25  whether it's a capital murder case, they always apply across

23

1  the board.  And you've probably heard of them, and I know

2  you have, because you've sat on a jury, because you've

3  listened to this in voir dire.

4         One of them is the presumption of innocence,

5  that a defendant, as he or she sits through voir dire and

6  throughout a trial, is presumed by the Constitution to be

7  innocent.

8         Does that make sense to you?

9    A.    That's what it says.

10   Q.    And as a juror, we have to say 12 people who not

11  only, "You know what; I understand that right," but to also

12  allow the defendant to exercise that right without holding

13  it against her or him.

14         In other words, it wouldn't be worth very

15  much if someone said, "You know what, Mrs. Christopher?  You

16  have the right to be presumed innocent, but you know what?

17  I'm not going to give you that right.  You can say you're

18  presumed innocent, but you're not in my mind."  You see, you

19  have to truly hold the State to its burden.

20         Now, we don't necessarily start out even,

21  because the defendant is presumed to be innocent, right?  If

22  you heard all the evidence in the case, then you would have

23  to find a defendant not guilty.

24         Would you agree with me?

25   A.    If there was no evidence, yeah.

24

1    Q.   That's right.  Or just like what we talked about

2    in the DWI case, when I said I didn't prove it happened in

3    Smith County, I didn't prove all the elements, and you said

4    you would vote not guilty.

5              So that presumption alone is enough to find a

6    defendant not guilty, and what you have to do, as a juror,

7    is require the State to prove to you beyond a reasonable

8    doubt -- and we're going to talk about that -- the elements

9    of that case.

10              Makes sense, right?

11   A.   Makes sense.

12   Q.   And if the State doesn't, then the defendant is

13   not guilty and can be not guilty based solely upon that

14   presumption of innocence.

15              Makes sense?

16   A.   Makes sense.

17   Q.   And would you be able to do that?

18   A.   I think I can.

19   Q.   Now, I get to use my favorite example because you

20   said, "I think I can."  There are some questions that just

21   have to have a yes or a no answer.

22              Here's my favorite example:  My husband is a

23   PGA golf pro, and he used to play the tour, and there were

24   times -- we've been married -- it will be 16 years next

25   month, and there were times, a long time ago, when he would

25

1    leave, and he would be gone for four or five weeks at a

2    time.

3            If I said to him, "John, are you going to be

4    faithful to me while you're gone these next five weeks," and

5    he said, "I think so," you think I'm going to let him go?

6    A.    I don't know.

7    Q.    No.   I mentioned earlier I might let his golf

8    clubs go, but he's going to stay there.   You know, it's just

9    one of those questions where you have to have a yes or a no.

10           And if you and I were over at Don Juan's

11   having lunch, and you said, "Oh, I think so, and, you know,

12   I feel this way about the death penalty or that way," you

13   know, it wouldn't be any really big deal.   It's really none

14   of my business.   But in a case like this where we have

15   individual voir dire, this is our opportunity to find out,

16   and sometimes we just have to have a yes or no answer.

17           So would you be able to, as a defendant sits

18   in a trial, presume that defendant to be innocent and

19   require the State to meet its burden?

20   A.    Yes.

21   Q.    There we go.

22           There are other constitutional rights which I

23   know you talked about in the other trials you sat on.   One

24   is the Fifth Amendment right to remain silent or to not

25   testify.   It's another one that kind of goes along with that

26

1   presumption of innocence.  One that's not worth a whole lot

2   if we don't allow a defendant to have that right.

3           In other words, if I said, "Mrs. Christopher,

4   you're presumed to be innocent, and you also have the right

5   to remain silent," but then I held it against her if she

6   didn't testify, then it wouldn't be worth very much.

7           Do you understand that?

8       A.   I understand that.

9       Q.   The burden of proof that we're going to talk about

10  is on the State of Texas.  And it makes sense to me when you

11  think about it this way:  The grand jury -- are you familiar

12  with the grand jury process?  Have you ever been on a grand

13  jury?

14      A.   Never been on a grand jury.

15      Q.   It's really, I say, a fairly one-sided process.

16  And by that, what I mean is there are 12 people who are

17  chosen to sit as a grand jury for a particular court, okay?

18  Their job is to sift through the cases that the DA's Office

19  brings to them and decide, is there enough to hold this

20  person over for trial or not?  It's a very low burden.

21          If the grand jury decides, "You know what;

22  there is," then that's called probable cause.  There is

23  probable cause to hold a defendant over for trial.  You

24  know, if that was a felony DWI I was talking about, there is

25  probable cause to hold April Sikes over for trial.

27

1          And all that means is, you know, it tells
2   Judge Skeen's office to get another green folder and write a
3   name on it and a cause number because you've got yourself a
4   trial, right, a lawsuit or a contest.

5          It's nothing more than that, which is why I
6   think -- you'll probably remember, when you were here for
7   the big group, Judge Skeen said the fact that a defendant is
8   arrested for, charged with, indicted for an offense is no
9   evidence at all in a case.

10     A.    Right.  I think he said it was hearsay evidence.

11     Q.    And it makes sense, doesn't it?  Because if the
12   grand jury's burden is that low probable cause, then -- and
13   your burden, as a jury, like the ones you've sat on, is
14   beyond a reasonable doubt, then it's no evidence.  You know,
15   the evidence comes to you -- you haven't heard any now,
16   right?

17     A.    No.

18     Q.    And you're not going to hear any today.  We can't
19   discuss the facts with you of the case, because you ought to
20   have 12 people in that jury box who sit there and say on the
21   first day, "Now it starts," right?

22          "Now the evidence begins.  I may have seen
23   something in the newspaper; I may have read a headline; the
24   grand jury may have indicted a person; but you know what?
25   So what?  So what?  Today is the first day of this trial,

28

1   and I'm going to sit in this jury box, and I'm going to

2   listen to the people who come and testify and make my

3   decision based upon that; keep an open mind."

4            And would you be able to do that?

5   A.   Yes.

6   Q.   The burden of proof that we talked about is beyond

7   a reasonable doubt.  And, of course, depending, I guess,

8   upon when you sat on those other juries, you may or may not

9   have had a definition.  There was a time when we didn't;

10  there was time when we did; and now, once again, we do not

11  have a legal definition of beyond a reasonable doubt.

12            What I believe the Court is going to tell you

13  is that -- is a couple of things.  First of all, it's a very

14  individual burden of proof.  Would you agree that what may

15  be a reasonable doubt to you may be different than what's a

16  reasonable doubt to me or to Mr. Harrison or to Mr. Hawk?

17            You see, there's not a standard, so it's very

18  individual.  When do you know beyond a reasonable doubt?

19            Does that make sense?

20  A.   Right.  I agree with you.

21  Q.   And there are a couple of other things that I

22  can't necessarily tell you what it is, but I can tell you

23  what it is not.  It is not proof beyond all doubt, like TV

24  shows say "beyond of a shadow of a doubt."  I use Perry

25  Mason, which kind of dates me.  I don't know what the new

29

1   shows are, but it's not beyond all doubt, beyond a shadow of

2   a doubt, a hundred percent.

3            Would you agree with me that it would be hard

4   for me to prove anything to you 100 percent if we weren't

5   there?  Does that make sense?

6        A.   It makes sense.

7        Q.   What we also say is we have to extinguish all

8   reasonable doubt in your mind, which would include the fact

9   that you may have some doubts, but they may not be

10  reasonable.

11           Let's use for today -- what time did you get

12  to the courthouse today?

13       A.   About 12:30.

14       Q.   About an hour ago.  Was it raining when you came

15  inside?

16       A.   No.

17       Q.   I'm not sure what time you'll get out of here, but

18  if you go out and there is a bunch of rain droplets or water

19  droplets on your car, would it be reasonable to assume that

20  it rained on your car?

21       A.   Yes.

22       Q.   Now, are there other ways your car could have

23  gotten wet?

24       A.   Sprinkler system.

25       Q.   Sure.  The sprinkler system.

30

1          You know, we're not too far from the fire

2     department.  A fireman could have come by and said, "You

3     know what; I'm going to spray his car off for him," and done

4     that, but, you know, the possibilities become less

5     reasonable.

6               Makes sense?

7               The other thing -- we've already hit on it --

8     is that that burden of proof never shifts to the defendant,

9     ever, at any point in the trial, and mainly that's because

10    it starts with that grand jury process that we talked about.

11              You know, the State is the one that takes

12    evidence to the grand jury.  You know, the defendant has a

13    right to be there, but he doesn't have a right to have

14    counsel, so his lawyers would be out in the hall.  You know,

15    the State presents evidence, the State presents offense

16    reports, things like we talked about, hearsay things.

17              So I can assure you there has never been a

18    defendant knocking on the grand jury door saying, "Indict

19    me, please."  You see what I mean?  The State brings the

20    charges, so, therefore, it's the State's burden to prove

21    those charges beyond a reasonable doubt or not.

22              And the jury's responsibility would be to

23    listen to that evidence and say, "Did they prove it, or did

24    they not prove it," not holding that right to remain silent

25    against the defendant.

1           See, I've gone all that base circle to get

2    back to where we were a while ago.  You know, there is no

3    circumstance under which I can call a defendant to testify.

4           I can't say to April Sikes in the DWI

5    example, "I'll tell you what, April Sikes, you go take that

6    witness stand, because I've got some questions for you.  I

7    want to know how much did you drink that night, and what did

8    you drink, and who served you those drinks."

9           Makes sense?  I might like to.

10   A.    Makes sense.

11   Q.    Sure I'd like to hear it, and that's human nature.

12           You have children?

13   A.    Right.  I have two.

14   Q.    And how old are they now?

15   A.    I think the boy is 39, and the girl is about 31 or

16   somewhere along there, 32.

17   Q.    And everybody that has at least more than one --

18   everybody that has more than one says, you know -- for

19   example, if you heard arguing or fighting between the two of

20   them -- did that ever happen in your house?

21   A.    Yes.

22   Q.    I was going to say, if it didn't, we would have to

23   use hypothetical children.  But when you hear that and you

24   go back there, as a parent, you want to hear both sides of

25   that story, right?

32

1    Say something broke.  I use my little boy as

2    an example.  He had a friend over, and I heard this loud

3    crash and opened the door, and there were two boys, nine

4    years old, and one broken lamp, had one of them that said --

5    my son's name is Jacob -- had Jacob who said, "You know,

6    Mom, I'm going to exercise my Fifth Amendment right to

7    remain silent," and the other one said, "Let me tell you

8    what happened," you know, "Jacob did this, and Jacob did

9    that, and I didn't have anything to do with it," it's almost

10   human nature to think, well, you know, the one who doesn't

11   want to talk must be guilty.

12        Does that make sense?

13   A.   Yes.

14   Q.   And it's okay to think that.  It's okay to walk in

15   that DWI trial and say, "You know what?  I wonder what she

16   did.  She's sitting in court.  She's got two lawyers, you

17   know.  She's not testifying.  I wonder what she's got to

18   say."

19        All those things are perfectly fine because

20   they are human nature.  And you don't come in here -- there

21   is no requirement -- Judge Skeen does not have any machine

22   that's going to erase everything from your memory and

23   everything from your life and all your past experiences or

24   your feelings or your beliefs.

25        It's okay to feel that way.  It's just not

33

1    okay to say, "Because of those things, because of those

2    feelings, I'm then going to hold it against the State or the

3    Defense, like the right to remain silent."

4              It's okay to think, "I wonder what she did.

5    You know, I'd like to hear from her.  You know, I wish

6    Ms. Sikes could call her to the stand."  Those are fine

7    feelings to have, but you just can't then let that -- those

8    feelings affect your ability to look at the evidence and

9    make a decision based on the evidence.

10             Would you be able to look at the evidence and

11   make a decision based on the evidence if the person didn't

12   testify?

13        A.   Yes.

14        Q.   And would you also be able to not allow that --

15   the fact that somebody didn't testify affect other parts of

16   the trial?  In other words, in the DWI trial, say that

17   defendant -- she didn't testify.  You then couldn't say,

18   "Well, then the policeman must be telling the truth because

19   she wouldn't talk."

20             You see where I'm going?  Would you be able

21   to say, "Whether she testifies or not doesn't affect the

22   rest of the case," and would you be able to do that?

23        A.   Yes.

24        Q.   Talking about witnesses for a minute, there are --

25   it looks like you were raised a lot like I was.  And there

34

1    are people that are raised to believe that certain people

2    deserve respect by the positions that they hold.

3              Like I was -- like I was raised to believe

4    that teachers have a certain level of authority and respect,

5    you know, that policemen have this certain level of respect

6    and doctors and a bunch of other people.  And that's fine,

7    also.

8              You can have those beliefs.  But what the --

9    what you have to do to sit on a jury is this:  You have to

10   say, "You know what?  Every person that comes and testifies

11   in the trial has the same opportunity to be honest, to be

12   believable, to be credible."

13             Would you agree with me that some people take

14   the stand and may not tell the truth?  Would you agree with

15   that?

16   A.    That's a possibility.

17   Q.    Sure.  It's always a possibility.

18             I use this example.  A brain surgeon and a

19   janitor are on the same floor of the hospital, and an

20   assault takes place, say, between Ken Hawk and Kim

21   Christopher, and this assault then goes to trial.

22             I'm going to call, as a prosecutor, that

23   brain surgeon, who saw it happen, and I'm going to call the

24   janitor, who saw it happen.  And as a juror, you have to be

25   able to say, "You know what?  Just because he's a brain

35

1   surgeon or just because he's a janitor, there are two people

2   that I'm going to afford the same opportunity to come in

3   here and judge them the same, judge their credibility, their

4   believability the same."

5           Would you be able to do that?

6       A.   Yes.

7       Q.   And that's not to say that either one of those

8   people don't have specialized knowledge.  They both do.

9   Maybe I called the janitor as an expert in what sort of

10  floor cleaners were on there.  Could it have been slippery?

11  Could Mrs. Christopher have fallen rather than Mr. Hawk hit

12  her?

13           You see what I mean?  That's different than

14  whether or not the janitor is honest, right?

15      A.   Yes.

16      Q.   And perhaps the brain surgeon I called because Ken

17  Hawk caused a head injury to Mrs. Christopher, and I want to

18  know about that.

19           You see what I'm talking about?  Does that

20  make sense?

21      A.   Yes, that makes sense .

22      Q.   And would you be able to give every witness that

23  testifies the same opportunity to prove to you whether they

24  are believable or not?

25      A.   Yes.

36

1    Q.   I want to talk for just a second about a lesser

2  included offense.   Have you heard that term before?

3    A.   Possible.

4    Q.   I use a ladder -- a bunch of us do -- a ladder as

5  an example.

6         To sit as a juror, you have to be able to do

7  two things.   You have to be able to say, "I can consider

8  lesser included offenses."   We're going to talk about what

9  they are.   "And I can consider their range of punishment."

10        Like a murder example, the one I used

11 earlier, the man who is raping the woman and breaks her

12 neck, okay, the grand jury returns an indictment in that

13 case of capital murder.   That's like that top rung in the

14 ladder, capital murder, the highest offense that can be

15 charged.

16        Well, say you're sitting as a juror on that

17 case, and I don't prove to you that the woman was raped

18 beyond a reasonable doubt.   I proved to you that she was

19 murdered; I proved that he did that; but I can't prove to

20 you beyond a reasonable doubt that that man raped her.

21        For you to be a juror in that case, you have

22 to be able to say, "You know what?   The grand jury did

23 indict that case as capital murder, but the State didn't

24 prove that to me.   The State did prove murder, which is a

25 lesser included offense."

37

1          And then that's the range of punishment we

2    talked about, five to ninety-nine or life.  You see what I

3    mean by that?  In other words, as a juror, you wouldn't say

4    automatically, "Well, the grand jury indicted it as capital

5    murder, so it must be capital murder."

6          Would you yourself be able to consider lesser

7    included offenses?

8    A.    Yes.

9    Q.    And you would be able to consider whatever range

10   of punishment was appropriate for that lesser included

11   offense?

12   A.    Yes, I believe so.

13   Q.    And you wouldn't necessarily say, "Well, the grand

14   jury indicted it for capital murder; therefore, it must be

15   bad, so when we get down here" -- say you get down here to

16   some offense that carries a two- to twenty-year range.  You

17   wouldn't necessarily say, "Well, it started off capital

18   murder, so I've got to give the maximum punishment every

19   time."

20          You wouldn't say that?

21   A.    No.

22   Q.    You would listen to the evidence and base your

23   verdict upon what you hear?

24   A.    Correct.

25   Q.    I want to talk a little bit about the sentencing

38

1  phase in a capital murder case.  Are you very familiar, as

2  we sit here today, with that sentencing phase?

3      A.   No.

4      Q.   There are two punishments, and what we're going to

5  do is we're going to start with this assumption, as we talk

6  right now, that you have been on that capital murder case

7  where we talked about where the man murders and rapes the

8  woman, okay?

9           And we're going to assume that as a jury you

10  found beyond a reasonable doubt that he committed the murder

11  and that he committed the rape, the aggravated sexual

12  assault.  As a jury, you found that defendant guilty of

13  capital murder, okay?

14      A.   Okay.

15      Q.   I'm going to assume that.  Then you would then go

16  to the punishment phase of a trial.  If you have found the

17  defendant guilty of capital murder, and they're eligible for

18  the death penalty, there are only two options in sentencing,

19  and that is a life sentence or a death sentence.

20           Now, you don't -- which may also be a relief

21  to you -- you don't have a box or a line that you're going

22  to check and say, "Well, that's a life sentence, or that's a

23  death sentence."

24           What the legislature has said is, of the

25  defendants who have been convicted of capital murder -- I

39

1    use a funnel as an example.  This is my imaginary funnel I'm

2    holding in front of you.  That group of people who have been

3    convicted of capital murder, out of that group, some aren't

4    even eligible for the death penalty, okay?

5              And so that narrows it down a little bit.

6    Then the legislature says of those who are technically

7    eligible, who is deserving?  There has got to be a way to

8    figure that out rather than have you, as 12 jurors, check

9    "life" or check "death."

10             And the way that they narrow that down are

11   called special issues, which is just another legal word for

12   questions.  I don't even know why they did that, but that

13   narrows it down.

14             And after these questions have been looked at

15   and answered, the results should be that the people who come

16   out of that funnel are those people who are actually

17   deserving of the death sentence.

18             Does that make sense to you?  We're going to

19   talk about the questions individually, but does it make

20   sense that there are questions that narrow down the people

21   who are actually eligible for the death penalty?

22        A.   I guess.  I'm not familiar with it, but I guess

23   so.

24        Q.   We're going to back up and kind of talk about it a

25   little bit.  You know, there is a difference between

40

1    eligible and deserving.  Does that make sense?

2              Let me give you an example.  I, April Sikes,

3    am technically eligible for probation.  Say I'm charged with

4    the felony offense of shooting Mr. Harrison in the head 17

5    times and kicking him and laughing as he dies, that he's not

6    going to ever see his kids again, just a brutal, brutal

7    crime.

8              I'm technically eligible because I've never

9    been convicted of a felony in this or any other state.  Now,

10   am I deserving of probation?  It doesn't sound like it from

11   what little brutal facts you already know.

12             See, there is a difference in people eligible

13   and people who actually are deserving.  And the way that the

14   legislature has said we get to that are some questions

15   called special issues.  And I think you've got them up there

16   in front of you.  The first one -- do you see them up there,

17   two pieces of paper?

18        A.   There are three, but two of them are the same.

19   Issue 1 and Issue 2.

20        Q.   If you'll just read what's called Issue Number 1

21   and tell me when you're ready.

22        A.   (Complies.)

23        Q.   Ready?

24        A.   Yeah.

25        Q.   That first one says -- is asking if there is a

41

1  probability that a defendant would commit criminal acts of

2  violence that would be a continuing threat to society?

3           Let me first ask you if that's a good

4  question.  Do you think that's a good question, something

5  that ought to be asked in a capital murder case?

6       A.   Well, I would think it would be a fair question.

7       Q.   Sure.  Because what it's really saying -- we call

8  it future danger.  What it's really saying is, is the person

9  who has been found guilty of capital murder going to be a

10 future danger, right?  Are they going to be a continuing

11 threat to society?

12           Would that help you, as a juror, to know that

13 information in knowing whether or not the death penalty was

14 appropriate?

15      A.   I would think it would be something you would need

16 to know.

17      Q.   Sure.  Let me tell you this:  There is a burden of

18 proof on that issue, just like the trial, and that's on the

19 State.  In other words, you could -- you've already heard

20 all the evidence in the trial, and you can always consider

21 that when you're answering other questions.  But they don't

22 necessarily build on each case.

23           In other words, we can't have people in a

24 capital murder trial who say, "Well, I found that

25 defendant -- you know, she committed capital murder;

42

1   therefore, I'd always find that she is a future danger."

2           We can't have that.  We have to have jurors

3   who say, "You know what?  She committed capital murder.  I

4   found her guilty of that, but I'm open to listening to what

5   the State has, listening and seeing did they prove to me

6   beyond a reasonable doubt that she's a future danger?"

7           Does that make sense?

8   A.   It makes sense.

9   Q.   Because here -- here is what's going to happen:

10  You know, I told you there's not going to be any box to

11  check "life" or "death," but you're going to know.  You're

12  going to know, when we get finished with this conversation,

13  that the answers to your questions tell you, as a juror,

14  what sentence will be imposed by the Court.

15          For example, if the State does not prove to

16  you that that woman is a future danger, then you, as a jury,

17  would have to answer no, right?  No, she's not a future

18  danger.  Then a life sentence would be imposed, okay?

19  A.   Okay.

20  Q.   Now, if the State proved to you beyond a

21  reasonable doubt that she is a future danger, then your

22  answer would have to be yes, and that would then -- the case

23  continues.  It goes further down that funnel.  You know, you

24  get a little closer to the death sentence.  And you know

25  that as a juror because we're talking about it now.

43

1          As you sit here, not knowing any evidence and

2 knowing the law that we've talked about, would your mind be

3 open to listening to the evidence and deciding whether or

4 not the State has met its burden of proof, whether a capital

5 murder defendant is or isn't a future danger?

6      A.   Yes.

7      Q.   And you notice -- you mentioned it earlier -- in

8 that particular issue, there's the word "probability."

9 There's a difference between probability and possibility.

10         I use this silly example.  Is it possible

11 that the President of the United States could walk through

12 that door behind me?

13     A.   It's possible.

14     Q.   It's possible.  Is it probable?

15     A.   Not today.

16     Q.   No.  No, it's not.

17         And so that's what we're talking about.  It's

18 not that the State has to prove a mere possibility; they

19 have to prove a probability and do that beyond a reasonable

20 doubt.

21         There is also language mentioned there,

22 "criminal acts of violence."  You notice it doesn't say

23 "felonies," it doesn't say "misdemeanors," "other things

24 charged," "other things convicted."  It just says "criminal

25 acts of violence."  And that could be a lot of different

44

1   things.   They are what they are to you, correct?

2        A.    Correct.

3        Q.    The other word I want to talk about is "society."

4   Would you agree with me that people both in and out of the

5   penitentiary deserve protection?

6        A.    (No verbal response.)

7        Q.    Do you want me to be clearer?

8        A.    Yeah.

9        Q.    Are you aware that there are people who are in the

10  penitentiary other than inmates; for example, doctors and

11  lawyers and guards, those sorts of people?

12       A.    I'm aware of that.

13       Q.    Do you believe that those people also deserve

14  protection?

15       A.    Yes.

16       Q.    And in this question, when it's asking about

17  whether or not a defendant would be a future danger or a

18  future threat to society, would you exclude from society

19  guards, for example?

20       A.    No.

21       Q.    Or would you want to know about that?  Would you

22  exclude guards from your definition of society?

23       A.    No, no more than anybody else.

24       Q.    No more than anybody else.  And what does society

25  mean to you?

45

1    A.    All the people of the land.

2    Q.    Sure.  All the people of the land.

3          We're going to move on now to that second

4    special issue, which we have to make some assumptions.

5    We've already made the first one, that as a juror, you found

6    her guilty of capital murder.  Now we're going to make an

7    assumption that you've found that she is a future danger.

8    The State has proven that to you beyond a reasonable doubt.

9          Now, you know, these things don't build on

10   each other.  They're independent.  Make an independent

11   determination of guilt or innocence.  Make an independent

12   determination of future danger.  And all that does is then

13   shoot you to the next one.

14         And the next one says -- if you want to take

15   just a second to read it.  I won't rush you.

16   A.    Okay.  (Complies.)

17   Q.    Okay.  We call that one the question about

18   mitigation.  Before I get started, there is really one big

19   difference between that -- this question and every other

20   thing that we've talked about, and that is simply that

21   there's no burden of proof on anybody.

22         You know, there's never a burden of proof on

23   the defendant, but in this particular case, there is also

24   not a burden of proof on the State.

25         In other words, mitigation, which is

46

1    something that -- anything that lessens the amount of

2    blameworthiness, the moral blameworthiness, lessens the

3    amount of blame you place on a defendant for the crime, it's

4    either there to you or not.

5            You know, it's kind of one of those things

6    that we talked about, those individual elements.  What you

7    may consider -- and you'll hear evidence.  You may hear

8    evidence from the State; you may hear evidence from the

9    Defense.  And what you'll have to do as a juror is look at

10   all that evidence and say a couple of things.

11           First of all, "Do I see any evidence here

12   that lessens her blameworthiness?"  Any reason -- I mean,

13   you can probably think of things that you would consider to

14   be mitigating, but what you consider mitigating and what I

15   consider mitigating may be two separate stories, right?

16   A.   Yes.

17   Q.   But what the law tells you is simply this:  You

18   would be charged with determining, first of all, is there

19   mitigation?  And as a jury, it can be different.  You can

20   find two or three things that are mitigating.  I might find

21   ten; Mr. Harrison might find one.  You don't have to agree

22   on what they are, or you would probably be there forever.

23           But what you have to do is say, is there

24   mitigation, and then is it sufficient?  That's what that

25   language says.  Is it sufficient to basically justify a life

47

1  sentence over a death sentence?

2          Does it make sense to you, then, that there

3  may be mitigation, something that lessens a defendant's

4  blameworthiness for the crime, but it may not rise to the

5  level to justify life over death?  Can you envision

6  something in your mind that might tend to lessen someone's

7  blameworthiness?

8          A lot of times somebody -- you know, you hear

9  things like somebody had a bad childhood or somebody is a

10  good artist.  You know, you just hear all kinds of different

11  things.

12          Can you picture -- can you imagine something

13  that you might hear that would be mitigation, lessening the

14  blame on a defendant but yet not rise to the level of

15  justifying life over death?  It's hard to say without

16  hearing anything, isn't it?

17      A.   It sure is.

18      Q.   And that's kind of what I'm getting at.  You don't

19  know the evidence, right?

20      A.   I don't know any.

21      Q.   But you do understand what mitigation is or

22  mitigates, something that would lessen the blame on a

23  defendant, right?

24      A.   Correct.

25      Q.   So what you have to be able to do as a juror is

48

1   say, "You know what?  Ms. Sikes, I will listen to the

2   evidence, and I will determine if there is something I think

3   is mitigating, and then if there is, if I think it's

4   something sufficient to justify life over death."

5          And can you do those things?

6   A.   Yes.

7   Q.   And here is the -- the next question is, if you

8   find that there is no mitigation that rises to that level,

9   no mitigation sufficient to warrant life over death, then

10  the defendant would get the death penalty.

11         Does that make sense?  In our example, the

12  woman was found guilty of capital murder.  She is a future

13  danger, and there is nothing to mitigate the situation.

14  There is nothing to justify or warrant life over death.

15  Then the Court would assess the death penalty.

16         Does that process make sense?

17  A.   Yes.

18  Q.   And if the -- after listening to the evidence and

19  coming up with your answers to those questions, if that

20  verdict would result in a death sentence, how would you feel

21  about that?

22  A.   I would feel okay with it.

23  Q.   And on the reverse, you would be equally as open

24  to listening to the evidence and considering the answers --

25  if a life sentence was to be assessed, would you be equally

49

1  as open to that possibility?

2      A.   I believe so, yes.  I believe I would.

3      Q.   Because, you know, there are people who -- say a

4  defendant is found guilty of capital murder, the one we're

5  talking about, and then you find her to be a future danger.

6          The reverse of that is, if there is

7  mitigation rising to the level to warrant life over death,

8  meaning, as a jury, you find that there is a reason

9  sufficient enough -- and it can be one; it could many --

10 there's a reason to justify life over death, that that

11 defendant, then, doesn't get the death penalty; she gets a

12 life sentence, right?

13     A.   Correct.

14     Q.   And a life sentence -- in Texas, a life sentence

15 means you serve 40 years day for day before you're eligible

16 for parole.

17          Are you in agreement with that portion of the

18 law?

19     A.   I guess.  I don't even know the portion of the

20 law.

21     Q.   So you would understand that life wouldn't mean

22 actual life to a defendant?

23     A.   Right.

24     Q.   And you would follow any law that the Court gives

25 you?

1    A.    Correct.

2    Q.    As far as assessing punishment, you know, you now

3    understand, at least as much as we can give you in this

4    short period of time that we're together, how the capital

5    murder sentencing part of the trial works.

6         And do you see the difference now between

7    that and a lesser included offense?  You know, a lesser

8    included offense -- we use murder as an example -- I didn't

9    prove the rape, but I proved the murder.  There are no

10   special issues there, there are no special questions there,

11   because the death penalty is not an option.

12        There is a blank, actually, that says is the

13   appropriate punishment five, or is the appropriate

14   punishment ninety-nine to life, which, in essence, no

15   difference between ninety-nine and life.

16        But you see, as a jury, then you would just

17   have to listen to all the evidence and come up with a

18   number, you know, that you believed, as a jury, was the

19   appropriate punishment, right?

20   A.    Right.

21   Q.    And would you be able to do that as well?

22   A.    I think so.

23   Q.    There is that "I think so."

24   A.    Yes or no.  Yes.

25   Q.    Yes, you would be able to do that?

51

1      A.   Yes, I would.

2      Q.   The only other thing I really want to touch on is

3  the idea of victim-impact testimony.  The courts have said

4  that juries are allowed to know the effects that a crime has

5  had on a victim or a family.  You can imagine a criminal

6  case that -- where that testimony would be extremely

7  emotional.

8           I use sexual assault of a child as an example

9  because I've tried a lot of those cases.  In fact,

10  Mr. Harrison and I tried a rape of a 14-month-old baby, and

11  you can imagine that the testimony from her mother was

12  emotional, heartbreaking testimony.

13           It's like the other things that we've

14  discussed.  That's fine to have those human feelings, but

15  you have to give that testimony whatever evidentiary value

16  it has to you.

17           In other words, say a capital murder case, if

18  that emotional testimony in the punishment phase of trial

19  helps you answer those special issues, helps you know

20  whether a person is a future danger, helps you know whether

21  there is mitigation or not, then you can use it for that

22  purpose.

23           If not, if you think, "You know what; it

24  doesn't have any evidentiary value; it's very sad; it's very

25  heartbreaking; but it doesn't help me answer the special

52

1    issues," then you don't use it for that purpose.

2              Does that make sense?

3         A.   It makes sense.

4         Q.   And would you be able to do that?

5         A.   Yes.

6         Q.   Is there any reason, as you sit here today, that

7    you couldn't be fair to the State of Texas?

8         A.   Not that I know of.

9         Q.   Or on the reverse, is there any reason that you

10   know of, as you sit here today, that you couldn't be fair to

11   the defendant, Mr. Beatty, in this case?

12        A.   Not that I know of.

13        Q.   And back to now where we started -- it seems like

14   this morning -- I almost said this morning -- you've said

15   you could be fair to both sides, and the law that I've tried

16   to talk with you about, you could follow that law as given

17   to you by the Court?

18        A.   Yes.

19        Q.   And you have not at this time made up your mind or

20   committed yourself in any way, your mind is open, and you

21   would listen to the evidence and base your verdict upon that

22   evidence?

23        A.   I do not know anything about the case.

24        Q.   And you would just base your verdict upon what you

25   hear from the witness stand?

53

1     A.    Correct.

2     Q.    Keep your mind open until you hear all the

3  evidence?  Could you do that?

4     A.    Yes.

5     Q.    And you could follow the law given to you?

6     A.    Yes.

7          MS. SIKES:  I'll pass the venireperson,

8  Judge.

9          THE COURT:  Thank you, Ms. Sikes.

10          Mr. Hawk?

11              VOIR DIRE EXAMINATION

12  BY MR. HAWK:

13     Q.    Mr. Haney, how are you?

14     A.    Tired.

15     Q.    So that leads me to my next obvious question.

16  Since you've been sitting here for about an hour, would it

17  help you to stretch those arms or legs, or are we good to

18  go?

19     A.    Let's go.

20     Q.    Here's the best news for you:  I'm not going to

21  talk to you for an hour.

22     A.    Okay.

23     Q.    In fairness to Ms. Sikes, she covered lots of

24  ground, and I don't need to replow tilled ground.

25          What my hope is, is to ask you a series of

1    questions to learn more about you, which I hope I get to do,

2    to try to figure out, really, what your big philosophy is.

3    And I guess I'll start with the very first thing I always

4    think of as to a juror.

5              And you've been on a jury before, but you've

6    never had to sit and listen to this one-on-one business,

7    have you?

8         A.   No.

9         Q.   Do you like it?

10        A.   No.

11        Q.   And, you know, that's as straight ahead as you can

12   be.  I wouldn't want to be sitting over there.

13             You know, that microphone doesn't work, by

14   the way.  It's sitting in front of you.  I thought I would

15   tell you that.

16             Do you want to be on the jury in this case?

17        A.   I was summoned, so I appeared.

18        Q.   And a lot of people have come to tell us -- come

19   will say, "Yeah," others say, "Makes no difference," and

20   others say, "I'd rather not."  And this is my very first

21   thing that I'm going to try to deal with with you.

22             I think that being on a jury and being a

23   juror is like slipping on a pair of shoes.  I mean, the

24   shoes fit some people; they don't fit other people.  You've

25   listened for about an hour about what the law is, which is

55

1   kind of a description of what the shoes feel like if you put

2   them on.

3           Everybody wants to put them on, everybody

4   thinks they ought to be able to, but there may be something

5   about what's going on with your feet that don't fit the

6   shoes.  And that's what I'm going to explore for a while,

7   okay?

8       A.   Okay.

9       Q.   Have you talked to others that have been on juries

10  in the past?

11      A.   Well, sure.

12      Q.   And you've heard about people getting called for

13  jury duty.  What's usually the reaction that people get?

14      A.   Negative.

15      Q.   Yeah.  Have you ever asked somebody, "Did you get

16  picked," to somebody else?

17      A.   Sure.

18      Q.   And has anybody said to you, "No, they didn't

19  think I would be a good juror"?

20      A.   I've heard people say, "They really didn't want me

21  on that case" or something like that.

22      Q.   But I bet you've never heard somebody say, "No,

23  they discovered that I'm not a fair person."

24      A.   I've never heard anybody say that.

25      Q.   And I guess the basic reason is, is because

56

1    everybody in their own hearts want to believe that they are

2    fair, right?

3        A.    I would hope so.

4        Q.    Truth of the matter is, everyone really is fair

5    from their own heart.  Would you agree with that?

6        A.    In their own mind, I would agree with that.

7        Q.    Yeah.  There's not a whole lot of people that know

8    upfront that they are either unfair or biased or leaning one

9    way or that just walk around thinking that about themselves,

10   because we're raised right from wrong, et cetera.

11            Would you agree with that proposition?

12       A.    I agree with it.

13       Q.    And what I'm kind of driving at is this:  It

14   always makes me wonder, from the jury service standpoint, if

15   a juror who is sitting where you're sitting -- and I've

16   never got to sit up there -- is thinking, "You know, I need

17   to answer certain questions certain ways, but I don't want

18   the person asking me the question to think I'm an unfair

19   person."

20            And I don't know if that's going through your

21   head, but what I'm going to try to get home to you is this:

22   I don't know where on your foot the bunions are, the corns

23   are, or the warts are to know if it's going to fit into the

24   shoe I've been talking about.  I just don't know.  And

25   asking you to do some of things we've talked about is one

57

1   thing, but I'm going to put some flavor on it.

2            You worked for LaGloria how long?

3   A.   17 years.

4   Q.   Just a short time then, right?

5   A.   Just a short time.

6   Q.   What did you do for them?

7   A.   Well, designed computer systems, electronics

8   systems, maintenance.

9   Q.   Did you enjoy what you were doing?

10  A.   Yes, I did.

11  Q.   I mean, on any given day, I'm sure you didn't.

12  A.   Well, overall I did, or I wouldn't be there.

13  Q.   And over time, did you come to appreciate the

14  people you worked around?

15  A.   Some of them.

16  Q.   And you -- because you knew them, right?

17  A.   Right.

18  Q.   And when you left, did you retire, or did you just

19  one day decide you had had it?  How did that work out?

20  A.   I retired.

21  Q.   Left on good terms?

22  A.   Excellent terms.

23  Q.   Now, let's pretend for a minute that you get

24  called down to be on a jury, and here's what the question

25  is:  The question is, is LaGloria a good company to work for

58

1   or not?  We'll just make that pretend question.

2            That's an example of one where you, as an

3   individual, might say, "I'm a fair person, but I've got

4   certain things in my life which I believe, that I'm not

5   going to let anybody change, that may affect how I am as a

6   juror in a case, if the question is if LaGloria is a good

7   place to work."

8            Do you see that example?

9       A.    Yes, sir.

10      Q.    And it really bears upon the concept of respect.

11  When you talk to other people about their beliefs, ideas,

12  and attitudes on anything, sometimes you probably might want

13  to change their mind, right?

14      A.    I think you might.

15      Q.    But there comes a point in time where you realize

16  that changing somebody's mind is kind of interfering with

17  their business, right?  I mean, have you ever gotten to that

18  point in discussion where y'all are just going to have to

19  agree to disagree with anybody?

20      A.    On certain topics, yes.

21      Q.    And if somebody comes to you and says, "Mr. Haney,

22  you're just flat wrong about this; I don't care what you

23  think; you're wrong," what's your response to this?

24      A.    It's your opinion.

25      Q.    There you go.  Because your opinion really is

59

1  what's the most important thing on a lot of issues that

2  we're talking about today.  And I'm going to start kind of

3  where you started with Ms. Sikes, whose name I forgot for a

4  minute, but now I remember again, and that is with just a

5  basic philosophical discussion that you had with her about

6  what do you think about the death penalty.

7          I think you said to her, "I am generally in

8  favor of it, like I answered in my questionnaire; I think if

9  you take somebody's life, then you have forfeited your own,"

10  or words to that effect.  I don't want to put words in your

11  mouth.

12          Tell me what you think about it.

13     A.   Well, I think if I think -- if I thought that,

14  "Well, I need to kill you," and I just go out and kill you,

15  then I think the same punishment ought to come to me.

16     Q.   Which is -- did you learn that growing up, reading

17  the Bible, friends, neighbors, society?  What made you come

18  to that conclusion?

19     A.   I really honestly couldn't say.  That's just the

20  way I feel.

21     Q.   And you know you're not the only one that feels

22  that way.

23     A.   Well, I'm probably not.

24     Q.   Have you talked to others who have that same

25  opinion?

60

1    A.    I'm sure I have.

2    Q.    And I suspect you've talked to people who say,

3    "Well, I don't care what happens; nobody ever ought to get

4    the death penalty ever," right?

5    A.    That's correct.

6    Q.    And you had given an example earlier.  I think you

7    said, "I have an exception to my philosophy, my personal

8    belief" --

9    A.    Right.

10   Q.    -- that says, if it's some kind of car wreck or

11   something where you didn't intend to kill somebody --

12   A.    Right.

13   Q.    -- then you can't honestly give them the death

14   penalty, right?

15   A.    Well, no.

16   Q.    And that makes sense, because that bears upon

17   what's going on in somebody's mind.

18   A.    Right.

19   Q.    You'll be comforted to know that in Texas, this

20   concept of what's going on in your mind, they've got legal

21   words for it.  They call it a mental state, culpable mental

22   state.  I call it a mental state because it's easier to

23   remember.

24         Everything from the bottom of the line, like

25   negligence, which is kind of what you described, just get

61

1   into a wreck on accident and killed somebody, "Didn't mean

2   to do it; didn't think I was going to do it; I didn't see

3   the red light; I know I'm supposed to; I didn't; ran right

4   through it and killed somebody."

5           And there is actually a statute for that, if

6   you caused somebody's death.  It's called criminally

7   negligent homicide.  It's a state jail felony.  You can't go

8   to the prison for the rest of your life.  It's two years in

9   jail is all you can get for that kind of thing.

10          But when you work your way up the ladder,

11  consistent with what you're thinking, the worse someone's

12  mind gets over the deal, the worse the punishment.  If it's,

13  for example, recklessness; that's the next level up.

14          When somebody is reckless, that's kind of --

15  it's when you're aware of some kind of risk and you just

16  disregard that risk anyway, knowing what can happen.

17          And in the car wreck example, let's say

18  you're coming up, whereas before you never saw the red

19  light, well, let's say in this example you did see it, and

20  you say to yourself, "I see that red light, and I know if I

21  run it I could kill somebody.  I'm going to try it.  I think

22  I can make it.  I'm going to disregard that risk."

23          You run through the light, and you kill

24  somebody.  You see how your mind is in a little bit worse

25  condition in that one than in the first example?

62

1    A.   Correct.

2    Q.   And there's actually a statute for that as well.

3  Nothing really called reckless homicide.  It's called

4  manslaughter.  But it's a second degree felony, two years in

5  prison as a minimum; twenty years as the maximum.  Can't get

6  the death penalty; can't get life in prison.  I suspect the

7  legislature recognizes your heart wasn't there, in other

8  words, right?

9         But now we're going to move up the line to

10 kind of what you described.  If you intentionally or

11 knowingly cause somebody's death, it's your conscious,

12 objective desire to engage in the conduct that caused the

13 result, that's what Texas calls murder.

14        And I think Ms. Sikes gave the example -- I

15 don't know if she shot Mr. Harrison.  I don't know what she

16 did today, but that's a good, old-fashioned what you think

17 of as murder-type murder, and that is the first degree

18 felony that she described.  Minimum in jail is five years;

19 maximum in jail is life in prison or ninety-nine years.

20        Is that the kind of intentional killing of

21 another that you think about when you think about your

22 philosophy?

23 A.   I wouldn't think about the five to ninety-nine

24 years.  I would probably think of the death penalty in my

25 philosophy.

63

1    Q.   Exactly.  And that's what I was trying to shoehorn

2  in, to figure out where your mind is compared to what the

3  law is telling us.

4              In that specific example that I gave you, the

5  intentional killing, a lot of people say, "Well, that's one

6  where this lady or this man intended to kill somebody, and

7  that's what I think of as you ought to get the death penalty

8  for that."

9              And that's what you think of in your specific

10 philosophy, right?

11   A.   Right.  It may not be the law, but that's what I

12 think.

13   Q.   Yes.  And you notice what happened when you just

14 said that?  I notice -- was it your uncle or your brother

15 that was in World War II?

16   A.   I got an uncle.

17   Q.   Your uncle.  Well, you see, my generation -- I'm

18 40, and I was too old to get in one war and too young to get

19 in the other, so I am lucky enough to benefit from everybody

20 else's sacrifices.

21              What happened in this sacrifice is that

22 nobody came busting through that door to arrest you for

23 saying, "You know, that may not be the law, but it's the way

24 I believe."  And that is where I'm trying to figure out

25 where the shoe fits on this one.

64

1        I'm trying to figure out, if you're called

2    upon to be a juror in a case, and you, as a juror -- some

3    case, not this case, because we're not talking about this

4    case.  We're trying to talk about some pretend case.

5        You're called to be a juror on a case, and

6    you find somebody, based upon the evidence that you hear

7    beyond a reasonable doubt, guilty of the crime of murder,

8    okay?  And the Judge tells you that the minimum in prison is

9    five years, the maximum in prison is life in prison.

10        But that's the range of punishment, and you

11    have heard in your mind the evidence, and you're convinced

12    that the defendant that you're a jury on is guilty of that

13    crime.

14        Would it be -- tell me how you would resolve

15    your personal feelings versus what the Judge would tell you

16    about that punishment range.

17    A.    I would have to go with what the Judge said.  It

18    wouldn't make any difference about my personal feelings or

19    my beliefs.

20    Q.    And at that point in time, you see how your

21    feelings may separate from what the law says?  You see how

22    there is kind of a separation there?

23    A.    I think that's just natural.

24    Q.    Yeah.  That's actually not a bad thing at all.

25    But I'm going to move you forward to another example.

65

1        I want you to think that you've made a jury

2   in some case where the State has alleged the offense of

3   capital murder.  Now, from the explanation you have heard

4   from Ms. Sikes, tell me what you understand it takes to be

5   found guilty of capital murder in the state -- in Texas

6   under the law as you learned it.

7        It's confusing to a lot of people, and I want

8   me re-explain some of it, if you want me to, but I don't

9   want to waste your time.  Do you want me to go over it some,

10  or do you feel comfortable with it?

11       A.   Do you want me to answer?

12       Q.   Well, yeah.  I was going to re-explain something,

13  but if I don't need to, I won't on how capital murder

14  happens.

15       Let me give you the short explanation, okay?

16       A.   Okay.

17       Q.   In Texas, to actually ever be eligible for the

18  death penalty under the law, you've got to arrive at what

19  you've discussed in your mind, the intentional killing of a

20  human being on one side.  You've got to have that.  You've

21  got to find from the evidence beyond a reasonable doubt that

22  somebody intentionally murdered somebody.

23       You also have to find that there was the

24  commission of another crime, whether it's a robbery, rape,

25  burglary, some other specific crime.  You've got to find

66

1   beyond a reasonable doubt that this second crime happened.

2              Any questions about that part?

3        A.   No.

4        Q.   If you don't find from the evidence beyond a

5   reasonable doubt the second crime happened at all, you just

6   don't find that.  There may be some evidence of it, none, or

7   a whole bunch; you just don't think they got there.  Then

8   what you're left with is, on my left hand, the finding of an

9   intentional murder of a human being.

10             You follow me?

11       A.   I follow you.

12       Q.   And on the issue of capital murder, you would have

13  to find somebody not guilty of that, based upon the case

14  that we're talking about, you and me.

15             Do you agree with that?

16       A.   If you say so.  I mean, I don't know the law like

17  that, but if you say so.

18       Q.   Okay.  What do you think about that, that if you

19  don't find that second crime happened beyond all reasonable

20  doubt, you just think there was a murder but no second

21  crime, you would have to find somebody --

22       A.   I don't understand it.  I don't understand that.

23  But why does there have to be a second crime?

24       Q.   Yeah.  A lot of people don't get it.

25       A.   No.

67

1     Q.    Why does there have to be?

2     A.    Yeah.

3     Q.    They did this, for goodness sake.  Why does there

4    have to be another one?  And that kind of gets to be the

5    rubber meets the road in your specific case.

6           If you're a juror in a case and you find the

7    intentional murder you're talking about and the Judge

8    instructs you there has got to be a second crime, but you

9    don't think there was, what are you going to want to do?

10    A.    Well, if there has to be a second crime and they

11   can't prove it, it looks like to me they just have to

12   dismiss the case or find them not guilty.

13    Q.    Okay.  Could you do that?

14    A.    Yes, I think so.

15    Q.    Okay.  There is a third thing in Texas that

16   they're going to make the State prove.  The first thing here

17   is the murder that we've discussed.  That's on my left hand.

18   I only have two hands, so I'll use fingers.

19           The second one is the second crime, but

20   there's a third thing, and that is that the second crime

21   actually happened in the course of committing the murder, in

22   the course of committing.  Now, that's a strange legal

23   phrase, but it means something.

24           When you think of a capital murder in Texas,

25   many people have said to us, "Well, I think of a convenience

68

1    store robbery."  A guy goes in with a gun to a convenience

2    store, goes to rob the guy, kills him so he can rob him,

3    does kill him, takes the money and runs out.  That's the

4    robbery and the murder.  That is in the course of.

5              The other example we use is, what happens if

6    I go into this convenience store, and Mr. Perkins is the

7    clerk, and I just start arguing with him.  I end up killing

8    him because of the argument, and then I run out because I'm

9    afraid?

10             About an hour-and-a-half later, I realize,

11   you know, I killed Robert Perkins.  He was the clerk.  I'll

12   bet you, if they haven't figured it out yet, there is

13   probably money that I can go back and take.  So I go back

14   over there a couple of hours later to try to get some money

15   or some potato chips or whatever.

16             You see the separation in my second example

17   I'm discussing?  You see how there's a big separation in

18   time?

19        A.   Yes.

20        Q.   Texas law teaches us that the jury gets to decide

21   for themselves, based on the facts of the specific case, did

22   this murder in this second crime happen in the course of,

23   okay?

24             Here's the definition.  I don't know why

25   they've got it this long, but it is.  Any conduct occurring

69

1  in an attempt to commit, during the commission, or in the

2  immediate flight after the attempt of the commission of the

3  offense.  That's that link that you've got to have.

4              Does that make sense to you?

5      A.  I guess it makes sense.

6      Q.  Well, don't say you guess.  If you disagree, I

7  want to know.

8      A.  Well, I can understand what you're saying.

9      Q.  Do you agree the State should have to prove that?

10     A.  Well, it's the State's burden to prove anything

11 that was committed at all.

12     Q.  Yes.  And do you think it's a good idea that they

13 should have to?

14     A.  Well, yes.  In our law and everything, we're

15 innocent until proven guilty, I would think, so...

16     Q.  And so in your mind -- or I'm going to

17 fast-forward.  We're going to bring this up another level

18 and try to find out if the shoe fits, okay?

19     A.  Okay.

20     Q.  I want you to pretend that you're on a jury, and

21 you have listened to all the evidence, and you have found

22 from this evidence beyond a reasonable doubt that there was

23 an intentional killing, just like you've discussed, and

24 there was a second crime -- we'll call it kidnapping -- and

25 the State's proven to you beyond a reasonable doubt this

70

1  link, this in the course of.  They've done all three of

2  these things they have to do.

3            In that situation, you, as a juror, can say,

4  "I will find the defendant guilty of capital murder," okay?

5      A.   Yes.

6      Q.   Now, at that point in time, your personal feelings

7  should tell us what about what should happen to the

8  defendant in the case that we're talking about where you're

9  a juror?

10     A.   My personal feelings would convict him of murder.

11     Q.   Okay.  And what do you think should happen to him,

12  if you find somebody guilty of capital murder in the example

13  I'm giving you, based on your philosophy?

14     A.   Well, I personally should think that they should

15  die because they committed murder, too.

16     Q.   Okay.  Door is still closed.  No one has arrested

17  you.

18     A.   Okay.

19     Q.   I would suspect that your personal philosophy

20  makes it a little bit easier for you to move on to the

21  capital murder questions.

22            Do you agree or disagree?

23     A.   I'll agree with you.

24     Q.   Let's talk about the first short question.  We're

25  just going to call it a short name, the future dangerousness

71

1  question, rather than the long name which takes me

2  30 seconds to say.

3           The first question that you, as a juror,

4  would have to answer is the future dangerousness question.

5  You've got to be able to answer, as a juror, based upon the

6  evidence in the case, specifically the case you and me are

7  discussing, if the defendant, based on the evidence, is a

8  future danger or if he's not.

9           You're going to answer yes or no to that

10 question, all right?  That's the same example that Ms. Sikes

11 was talking about, okay?

12          If you answer no to that first question, "I

13 don't think the defendant is a future danger," what happens

14 to the defendant in the case, in this pretend case you and

15 me are talking about?  What sentence does he get?

16     A.    He would probably get a lesser sentence.

17     Q.    Lesser than what?

18     A.    Than what was described.  I mean, at the high end

19 or low end.  Is that what you're talking about?

20     Q.    Yeah, it is what I'm talking about.  But,

21 remember, on capital murder, there are just two things that

22 can happen to somebody.  It's either the death sentence or

23 life in prison.

24     A.    Right.

25     Q.    Life in prison is 40 real years before somebody

72

1   becomes eligible far parole.  Now, hopefully, I've taken

2   real good care of myself.  I'm 40.  I will probably live to

3   be 80, don't you think?

4           A.    I don't know.

5           Q.    Hopefully.  The answer is I hope so.  Somebody

6   please say I hope so.

7                 And that's the only two possibilities if you

8   find somebody guilty of capital murder.  Remember that part?

9           A.    I remember.

10          Q.    Okay.  And if that first question that you're a

11  juror on and the answer to the first danger question, if

12  you're on a jury in some case, and you say, "No, I don't

13  think the defendant is a future danger," life in prison,

14  right?

15          A.    That's right.

16          Q.    How do you feel about that?

17          A.    If that's the law, that's what I would have to go

18  with.

19          Q.    Let's talk about what happens when your personal

20  feelings butt up against that special question.

21                Do you think in your heart -- if you hear

22  evidence and you think to yourself, "I don't think the State

23  has proven to me beyond a reasonable doubt that he's going

24  to be a future danger; I don't think they've done it; but if

25  I don't say yes to this question, the guy or the girl" --

1  you know, whatever case it is -- "if I don't say yes, he

2  don't get the death penalty," do you see where that runs

3  afoul of what you believe personally?

4      A.   I see.

5      Q.   What we're trying to get at is, as a juror, you

6  don't have to be asked to violate your conscience, and you

7  can understand that, right?

8      A.   I can understand that.

9      Q.   As soon as you start compromising your beliefs,

10  that's not supposed to be the way it works, is it?

11      A.   It's not supposed to.

12      Q.   Right.

13      A.   Sometimes you have to.

14      Q.   And that's what I want to know about the "have to"

15  versus "want to" versus "can't," okay?

16             If the evidence shows you, on some case that

17  you're on, that the State has not met their burden of

18  showing you that this defendant, who you've already

19  convicted of intentionally killing somebody and some other

20  crime, you know, capital murder -- if the State hasn't

21  proven to you that he's a future danger, could you honestly

22  answer the question now no because of how you feel?  Can you

23  do it?

24             And here the thing is about "I don't know."

25  We've got to know now, not later.  So how far are you

74

1    willing to go with your personal beliefs?

2              And only you can answer that.  So can you do

3    that?  And if the answer is yes, then look at me and say,

4    "Yes, sir, I can."  If the answer is no, then say, "You

5    know, I thought about it, and the answer is no."

6         A.   Yes, sir, I can.

7         Q.   Okay.  Is there any question about that in your

8    mind?

9         A.   No.

10        Q.   Which now moves us to the second question in a

11   death penalty-type case, and we're going to fast-forward

12   now.  You've found the defendant guilty beyond a reasonable

13   doubt of intentionally taking the life of another, plus

14   because -- and the link of -- intentional link in the course

15   of committing some other crime.  That's all three things.

16             So you've found somebody guilty.  You have

17   now also said, by a verdict form, "I've considered the

18   evidence.  I think he's going to be a future danger."  So

19   now you've got those in front of us.

20             Now, you're at the very last question that

21   you're going to have to answer, okay, and that's the

22   mitigation question.

23             Now, in talking about society earlier, you

24   agreed with the prosecution, I think, when they suggested

25   that the people in the prison deserved protection as well,

75

1    right?

2         A.    Both parties deserve protection.

3         Q.    Whether you're in custody or out of custody?

4         A.    Right.

5         Q.    Whether you're a guard or a doctor or a nurse or a

6    whatever?

7         A.    Or an inmate.

8         Q.    Or an inmate.

9              Now, if in the case you and me are

10   discussing, if you found somebody is a future danger, you're

11   fixing to answer the question about mitigation.  If you say

12   no, there is no mitigation that warrants life over death,

13   the defendant gets the death penalty.

14             But if you say yes, there is some

15   circumstance or circumstances which mitigates life over

16   death, then this same defendant gets a life sentence.

17             You remember that part?

18        A.    I remember that part.

19        Q.    And then, as a juror, you just send somebody down

20   to prison to be around all those people who you think is

21   going to be a future danger to society.

22             Do you see the catch-22 you've got?

23        A.    I see the catch-22

24        Q.    How do you deal with that in your mind personally?

25   Not what you think you should deal with it, but how do you

1   actually deal with that?

2        A.   I don't know.  I've never had to face that before.

3        Q.   In our pretend situation, you're having to face

4   that now.

5        A.   Right, so I don't know.

6        Q.   I mean, this is somebody that in our pretend

7   situation, you've already found an intentional killer, and

8   he's going to be a danger.  You may find from the evidence

9   that there is some circumstances that he might ought to get

10  a life sentence, so you may want to answer that question

11  yes, there is some circumstance.  And if that's the case --

12       A.   If there is some circumstances.

13       Q.   Right, in your own mind.

14       A.   In your own mind.

15       Q.   Could you answer that question honestly, no matter

16  what would happen to the defendant in your case?

17       A.   I would hope that I could.

18       Q.   Right.  Because when you get right down to it,

19  your personal feelings makes it tough, doesn't it?

20       A.   It does.

21       Q.   Would you have to compromise your personal beliefs

22  to answer those questions honestly?

23       A.   I have to compromise every day in life.

24       Q.   Well, yeah.  I mean, I respect what you say,

25  because everybody compromises on so many different levels.

1  But when we get to core beliefs, the big question becomes,

2  can I compromise core beliefs?

3          So that's why I want to find out how strongly

4  your opinion is.  Because if your opinion is one that can be

5  changed, we need to know that.  But if it's a core belief

6  that you don't feel like changing, then we also have to know

7  that as well.

8      A.   Well, on the death penalty --

9      Q.   Yes?

10     A.   -- I think I couldn't be changed.

11     Q.   Because that really is a core belief of yours?

12     A.   It is.  I believe in it.

13     Q.   So on the one hand, if you've got a guy that you

14  find guilty of capital murder and you think, personally, he

15  ought to get the death sentence -- right?

16     A.   Right.

17     Q.   But now the State has got more work for you to do.

18  They're wanting you to jump even over more hurdles, right?

19  They're wanting you to answer a special question about

20  dangerousness, right?

21     A.   That's right.  That's what they're saying.

22     Q.   And then they're wanting to ask you if the

23  evidence shows you mitigation.

24          MS. SIKES:  Judge, I'm going to object, as

25  far as -- it's not the State requiring the hurdles; I mean,

78

1    it's the law; it's the Court's charge.

2                    THE COURT:  Mr. Hawk, you're going to need to

3    lay some groundwork here.  I mean, you know what it is.

4                    MR. HAWK:  I do.

5                    THE COURT:  I'm not instructing you what to

6    ask.

7                    MR. HAWK:  I'm with you.

8                    THE COURT:  Just be sure he understands what

9    the Court's instructions will be, and the answers are to be

10   based on the evidence.

11                   MR. HAWK:  Right.

12       Q.   (By Mr. Hawk) And I'm going to change that,

13   because I think a one- or two-word change will make it

14   better.  Because in your specific mind, we know what you

15   think -- we've talked about that too much already -- what

16   should happen somebody who is guilty of intentionally taking

17   the life of another.

18                   But now the State has the burden of proving

19   to you other things.  They've got to prove to you the

20   concept of future danger.  They've got to prove that to you.

21   That's their burden on that, okay?  And then you're going to

22   be required, by the Court's instruction, to decide the

23   evidence to decide this concept of mitigation.

24                   Do you see how the law is a little bit

25   different than your personal belief?

79

1      A.   Yes, I see how it's different.

2      Q.   Do you think your personal belief is going to

3   interfere even a little bit with you following the Court's

4   instructions?

5      A.   I would still believe just like I did before.  I'm

6   not going to change it.

7      Q.   Do you think your beliefs, your personal beliefs,

8   your core beliefs would interfere at all with your ability

9   to follow the Court's instructions?

10      A.   I would hope not, but I cannot be a hundred

11   percent sure.  You know, what I believe is the way I believe

12   it.

13      Q.   Right.  And I don't want you to think I'm trying

14   to change your mind.

15      A.   Right.

16      Q.   Nobody here is gonna -- this is a core belief.  I

17   don't have that right.  I'm not gonna; no one is gonna.  So

18   I'm going to give you the freedom to be able to say, "Hey,

19   we've been talking about freedoms here, and nobody has

20   busted the door down.  I believe how I believe."

21           I'm going to put it a different way and see

22   if this will help you answer it.  The State has the burden

23   of proving that first question to you beyond a reasonable

24   doubt, the first question of future dangerousness.

25           Would your personal beliefs lower their bar a

80

1    little bit about that?

2        A.    No.

3        Q.    You don't think so?

4        A.    No.

5        Q.    How would your personal beliefs factor in to the

6    two questions that we're talking about?  And you said a

7    little while ago, "I like to think that it wouldn't."

8        A.    Yeah.

9        Q.    So I'm trying to figure out what's in your mind,

10   how you think it might.

11       A.    I don't know.  I've never been down that street

12   before.  I mean, you know, you're asking questions to me

13   that I've never had to make that decision before.

14       Q.    This is probably the longest job interview of your

15   life, isn't it?  I hope so anyway.

16       A.    Yes, it is.

17       Q.    Okay.  What's going to happen is, is at some

18   point, when you become a juror, you've got to raise your

19   right hand and take an oath that you will a true verdict

20   render according to the law and evidence, so help you God.

21   That's what you're going to have to swear that oath about.

22              And what both sides need is somebody that not

23   only can take the oath, but the shoe has got to fit.

24   They've got to be able to follow the oath, but you've got

25   to, before you hear anything at all about the case --

81

1   because you don't know anything about this one, but you've

2   got be able to say, if you can, "I cannot only take the

3   oath, but I'm going to follow it, even if my core belief

4   rams into a Court's instruction somehow."

5             And I guess from the Defense side, from

6   Mr. Beatty's side, we have this concern.  We've heard you

7   say, if there is an intentional killing, that in your mind,

8   that ought to get the death penalty.

9        A.   Correct.

10       Q.   But yet, we know what the law says.  The law says

11  it takes more than that.  It takes a finding of a juror a

12  future danger, also, and it requires a juror deciding

13  whether there is or there isn't mitigating circumstances.

14  It takes more than just the intentional killing.  There's

15  got to be another crime, and it just requires more.

16            And we want to make sure that you're one

17  where this shoe fits, where you're going to say, "I'll make

18  the State prove everything they're required to prove, which

19  is more than me, personally."  Mr. Haney says, "Personally

20  speaking, I think he ought to prove the intentional killing,

21  so the question ought to stop there."

22            But the Judge is going to instruct you that

23  it's going to require more than that, the intentional

24  killing, plus a second crime, plus in the course of, plus

25  the finding of future danger, and plus your finding that

82

1   there is no mitigating circumstance.  There are just a lot

2   more things that you're going to have to do.

3       A.   To justify a life sentence.

4       Q.   That's right.  Yes.  To justify there either is or

5   there isn't mitigating circumstance to justify a life

6   sentence over death.  And these are requirements that you

7   personally don't hold.

8            So my question to you is, just the gut, core

9   question:  Can you do that?

10      A.   Yes, I can.

11           MS. SIKES:  Judge, I was going to object to

12  the question.  It seems like we're getting more and more on

13  commitment questions, but he just said --

14           THE COURT:  Well, he said, yes, I can.

15           MS. SIKES:  Yes, sir.

16      Q.   (By Mr. Hawk) All right.  We're almost done

17  wrapping this part up, okay?

18      A.   Okay.

19      Q.   You've heard both sides in this talk to you about

20  these special questions, and the first special question, the

21  future dangerousness, the State does have the burden of

22  proving that one.  On the second special question, there is

23  no burden at all.

24           You remember that part on the mitigation

25  part?

83

1    A.    Right.

2    Q.    If you become a juror in any case where it's a

3  capital murder allegation and you find somebody guilty of

4  capital murder, and if you find, in some case you're a juror

5  on, that a defendant is a future danger, are you going to

6  require the defendant to show any proof or have any burden

7  of showing you, as a juror, the answer on Special Issue

8  Number 2, about mitigation -- you think the defendant should

9  have to prove -- "show me why there ought to be a life

10 sentence"?

11   A.    The defendant doesn't have to prove anything, does

12 he?

13   Q.    Even on that second special question, right?

14   A.    Even on that second special question.

15         THE COURT REPORTER:  I'm sorry.  Repeat your

16 answer.

17         VENIREPERSON HANEY:  I was asking him was it

18 correct that the defendant doesn't have to show any proof.

19         THE COURT:  That is correct.  And the Court

20 would so instruct you.

21   Q.    (By Mr. Hawk) All right.  Let's talk briefly about

22 a couple of other things, and then we'll be done with you,

23 because I bet that chair is not getting any softer.

24   A.    No, sir.

25   Q.    When you saw -- did you know who the defendant was

84

1    last Thursday from looking?

2        A.    I've never seen the man in my life.

3        Q.    Could you tell which one he was?  Somebody pointed

4    out Mr. Perkins earlier, and that's why.  They picked

5    Mr. Perkins out as the defendant, and I didn't know if you

6    knew -- if you could just pick out who the defendant was

7    last Thursday or today.

8        A.    I really wasn't paying that close attention to

9    him.

10       Q.    Well, now you've learned who he is, and we're

11   going to talk about whether somebody starts out to be not

12   guilty.  You had learned something from -- about the case

13   from the newspaper, right?

14       A.    I just read the headlines, just picked it up.

15       Q.    Which headline did you read; do you remember?

16       A.    I believe it was in Wednesday or Thursday's paper,

17   just on the second or third page or something like that.

18       Q.    What was it about?

19       A.    Somebody had been charged with murder, and they

20   were fixing to start picking the jury.

21       Q.    You stopped at the headline?

22       A.    Yeah.  I didn't pay attention to all of that.

23       Q.    Didn't read enough to form any opinions, right?

24       A.    No.

25       Q.    Did you wonder to yourself, "Wonder what he did,"

85

1    when you saw the defendant?

2         A.    No.

3         Q.    Not even a little bit?

4         A.    Not even a little bit.

5         Q.    You may be the first one to say that.

6         A.    Not even a little bit.  I mean, really, it just

7    didn't strike me.  I mean, there is so much of this in the

8    paper.  You could read this stuff all day long every day.

9    You'd go crazy.

10        Q.    Yeah.  Some of it is exactly on target in the

11   newspaper, isn't it?

12        A.    Well --

13        Q.    That's right.  Now, you don't work for the

14   newspaper?

15        A.    I don't even take the newspaper.  It's day-old

16   news.  It's hearsay.

17        Q.    I had one tell us that they get Tyler's other

18   newspaper, "Thrifty Nickel."

19        A.    "Thrifty Nickel."

20        Q.    If you become a juror in any capital murder case,

21   one of the most important questions that you have to answer

22   as a juror is actually the first question.  Did the

23   defendant commit any crime at all, okay?  The second

24   question is going to be, if he did commit a crime, which

25   one?  And the third one is, if I find that he committed a

1    crime, what ought to happen to him, okay?

2              Every time Ms. Sikes had to talk about

3    questions associated with a death penalty case, capital

4    murder, future dangerousness, murder plus, and all these

5    things, and now I had to talk about it as well, my

6    inclination is to say, "I wonder if this juror, after

7    hearing all this stuff about death penalty and future

8    dangerousness and punishment phase and all these things, if

9    they already think in this case that the defendant is

10   halfway guilty."

11             Now, you have not thought that, have you?

12   A.   No, sir.  Honestly, I hadn't.

13   Q.   Because the big question becomes, rather than me

14   stand up each time and say -- every time they say "capital

15   murder," I don't stand up and say, "No, it's not," even

16   though I want to -- because this truly is a contest.  I

17   expect there will be plea of not guilty, and you, as a

18   juror, are going to have to decide.

19             Knowing your personal beliefs about the death

20   penalty, my question is focused this way:  If you're a juror

21   and you get to the part where you have to decide did the

22   defendant commit a crime and you realize in your mind, "Hey,

23   I think he is intentionally" -- not in this case; some other

24   case -- "I think the defendant in the case Mr. Haney is a

25   juror on, I think the defendant did commit a crime, but I

87

1   think it's just manslaughter; it's a lesser crime or murder,

2   an intentional crime, just something lesser than they

3   charged," could you find somebody guilty of only what they

4   did and not what they are charged with?

5              THE COURT:  You mean, what was actually

6   proven beyond a reasonable doubt?

7              MR. HAWK:  Yeah.

8        A.    Than what was actually proven?

9        Q.    (By Mr. Hawk) Yeah.  I'm trying to figure out if

10  you could find somebody, if you were on a jury someday,

11  guilty of only what's been proven to you beyond a reasonable

12  doubt, whatever crime that is, okay?

13       A.    I could.

14       Q.    Even if it's not what they were originally charged

15  with?

16       A.    Yeah, if I were so instructed.

17       Q.    Because you may get that instruction from a judge,

18  because you, as a juror, may have honest questions.  "Well,

19  I think he might have been guilty of this crime on the one

20  hand or maybe this crime on the other; I've got a question

21  about which of these two," and you're going to be given

22  instructions on how to deal with all that.

23              And if you get called to be a juror, the

24  Judge is actually going to tell you to find somebody guilty

25  only of what's been proven to you beyond a reasonable doubt,

88

1    even if it's a lesser crime.

2              Could you follow that instruction?

3    A.    Yes.

4    Q.    And then that goes right along with the punishment

5    range.  You may have a punishment range given to you for

6    some lesser crime, which may be even less than you think a

7    defendant deserves.

8              Would you ever find somebody guilty of

9    something that wasn't proven to you beyond a reasonable

10   doubt just to get to that punishment range you think is

11   fair?

12   A.    I hope not.

13   Q.    You could probably see in your mind, at least in

14   one situation or two, where you might, right?

15   A.    I don't know.  It's a possibility.

16   Q.    Right.  Because, as a juror, you're going to be

17   instructed that you have to find somebody guilty of only

18   what's been proven to you beyond a reasonable doubt.

19   A.    That's right.

20   Q.    And if you find out that what you think has been

21   proven to you beyond a reasonable doubt doesn't carry enough

22   punishment, then you're stuck again in that dilemma that

23   you've got personally, right?

24   A.    Yes, everybody is.

25   Q.    Okay.  When you said a minute ago to me, "You

89

1  know, I hope not" --

2      A.   That's right.  You hope you're fair, meaning judge

3  fair.

4      Q.   I'll ask you the exact same question and see how

5  you're thinking about it, because I don't want you to feel

6  like I'm telling you what you have to answer.  I don't want

7  you to say yes, because it's easier, or no, just because

8  it's hard or maybe.  But this is -- again, I'm trying to

9  find out if the shoe fits.  I'm not going to make it fit.

10  We've got to see.

11          If you're instructed by the Judge to find

12  somebody guilty only of what's been proven to you beyond a

13  reasonable doubt, but yet the punishment range for the crime

14  that you think the defendant committed beyond a reasonable

15  doubt isn't enough for you personally, could you still find

16  somebody guilty of that crime?

17      A.   That don't really make much sense to me, what you

18  said.

19      Q.   Well, that's not the first time I've heard that.

20          THE COURT:  What he's asking you, Mr. Haney,

21  is, you're going to get an instruction from the Court that

22  you are only to convict a defendant of a crime that the

23  State has proven to you beyond a reasonable doubt that the

24  defendant committed.  That's number one.

25          VENIREPERSON HANEY:  Right.

90

1          THE COURT:  Can you follow that instruction?

2          VENIREPERSON HANEY:  I can follow that

3    instruction.

4          THE COURT:  So that if the defendant is

5    charged with capital murder, let's say by an indictment, but

6    the State puts on all of its proof, and the State only

7    proves to you beyond a reasonable doubt that the defendant

8    committed the offense of robbery, you would have an

9    instruction from the Court that you are only to convict the

10   defendant of what the State has proven the defendant guilty

11   of.  That's basically what the instruction is going to come

12   down to.

13          Do you understand that?

14          VENIREPERSON HANEY:  Yes, sir.

15          THE COURT:  Can you follow that instruction?

16          VENIREPERSON HANEY:  Yes, sir.

17          THE COURT:  And there's going to be a further

18   instruction that if the defendant is charged with a higher

19   crime -- let's say that the defendant is charged with the

20   offense of capital murder, but the defendant only -- but the

21   defendant is proven guilty to you of the offense of murder,

22   but under the instruction, if you have a reasonable doubt as

23   to whether or not the defendant has been proven guilty of

24   capital murder or of murder, you're to resolve that in the

25   defendant's favor and only convict him of the offense of

91

1    murder.

2                    Are you following me on that?

3                    VENIREPERSON HANEY:  I follow you on that.

4                    THE COURT:  Okay.  Can you follow that

5    instruction of the Court?

6                    VENIREPERSON HANEY:  Yes, sir.

7                    THE COURT:  Okay.  And what Mr. Hawk is

8    asking you is, can you follow that instruction of the Court

9    and only convict the defendant of what the defendant's been

10   proven guilty of, even if that offense that you believe the

11   defendant has been convicted of carries a lesser punishment

12   range than a higher offense?  In other words, can you still

13   convict him only of what he's been proven guilty of?

14                   VENIREPERSON HANEY:  If that's what the Court

15   orders.

16                   THE COURT:  That's what the Court's going to

17   instruct you.

18                   VENIREPERSON HANEY:  Right.

19                   THE COURT:  Can you follow that instruction?

20                   VENIREPERSON HANEY:  Yes, sir, I can follow

21   that instruction.

22                   THE COURT:  Here's what it would amount to,

23   Mr. Haney.  If you had an defendant indicted for capital

24   murder, and for capital murder, if a defendant is convicted

25   of capital murder -- if a defendant is convicted of capital

92

1  murder, he or she is going to receive either a life sentence

2  or the death penalty, but if the State comes in and only

3  proves that the defendant is guilty, let's say of the

4  offense of robbery, which carries a punishment range of two

5  to twenty, that if you can follow the Court's instruction

6  and only convict the defendant of robbery, which you've told

7  me that you can?

8           Are you going to say, "Well, even though the

9  State has convinced me that the defendant is guilty of only

10  robbery, I'm going to want to convict him of a higher

11  offense, even though I don't think he's guilty of it, just

12  so I can have a longer range of punishment"?

13           VENIREPERSON HANEY:  No, sir.

14           THE COURT:  In other words, can you follow

15  the instruction and you will only convict the defendant -- a

16  defendant of an offense that he has committed and then be

17  able to consider the full range of punishment of the offense

18  you've convicted the defendant of?  Can you do that?

19           VENIREPERSON HANEY:  Yes, sir.

20           THE COURT:  Go ahead, Mr. Hawk.

21      A.    I'm sorry.  I just didn't understand your

22  question.  It seemed like it just --

23      Q.    (By Mr. Hawk) You know, let me tell you something.

24  You know, you've been sitting here for two hours and so have

25  I, Mr. Haney.  I thank you for your patience.

1              MR. HAWK:  We'll pass the venireperson.

2              THE COURT:  Thank you, Mr. Hawk.

3              Mr. Haney, we are going to be able to let you

4    go ahead and leave this afternoon.  What we're going to need

5    to do and what we will do is you'll get a call from the

6    Court's office tomorrow afternoon, probably somewhere up

7    around this time, and we will be able to let you know

8    whether or not you have been selected for this jury, okay?

9              VENIREPERSON HANEY:  Okay.

10             THE COURT:  Are you going to be around

11   tomorrow afternoon?

12             VENIREPERSON HANEY:  Right.  But I won't be

13   in town at this time.

14             THE COURT:  Okay.  That's okay.  Well, let me

15   ask you this --

16             VENIREPERSON HANEY:  Could you call me on my

17   cell phone?

18             THE COURT:  Yes, sir.  If you could give my

19   bailiff right there, Carleton, just give him your cell phone

20   number on the way out and the Court's office, I'll have my

21   office call you.  It will be sometime -- it may be a little

22   bit earlier than this tomorrow afternoon to let you know

23   whether or not you've been selected to be on the jury, okay?

24             And just continue to be cautious at this time

25   in between now and when you get the call, and depending on

94

1  what the call is, we'll tell you what you need to do after

2  that.

3          But don't discuss the case with anyone or

4  read anything in the media, which it doesn't sound like you

5  normally do.  But don't read anything in the media or listen

6  to any reports of the case or discuss anything about the

7  case with anyone, and we'll be in touch with you no later

8  than this time tomorrow afternoon to let you know,

9  Mr. Haney.

10          Thank you for your time, sir.  And thank you

11  again for coming in early.

12          VENIREPERSON HANEY:  Okay.

13          (Venireperson Haney leaves the courtroom.)

14          THE COURT:  Before Mae Nelson comes in, I

15  had -- I have, I believe, in regard to Saturday, just to be

16  sure that before the calls are made and a bunch of people

17  are rescheduled -- in regard to Saturday, July the 24th, it

18  is my understanding that the State and the Defense have

19  reached an agreement pursuant to 35.05 to excuse jurors

20  scheduled for this coming Saturday, July the 24th, Juror

21  Juan Gonzales, Juror Michael Pate, and Juror Geoffrey

22  Baldwin; is that correct, Mr. Perkins?

23          MR. PERKINS:  Those are all correct, YOur

24  Honor.

25          THE COURT:  Do you agree with all those,

95

1  Mr. Beatty?

2              MR. PERKINS:  Those are Jurors Number 101,

3  103, and 108 for the record, Judge.

4              THE COURT:  Thank you.  101, 103, and 108 for

5  the record.

6              Is that the agreement with the State,

7  Mr. Harrison?

8              MR. HARRISON:  It is, Your Honor.

9              THE COURT:  Now, what the Court anticipates

10  doing -- that, obviously, leaving seven jurors scheduled for

11  Saturday, is trying to take those seven jurors and move them

12  to the jurors for Wednesday --

13              MR. PERKINS:  That's fine.

14              THE COURT:  -- which will be for Wednesday of

15  next week, which would be the 28th.

16              MR. HARRISON:  That's fine, Judge.

17              THE COURT:  Is that agreeable with the State?

18              MR. HARRISON:  It is, Judge.

19              THE COURT:  Is that agreeable with the

20  Defense, Mr. Perkins?

21              MR. PERKINS:  It is, Your Honor, with the

22  understanding, obviously, that we won't make any strikes on

23  anybody until they are actually reached in order.

24              THE COURT:  That is correct.  That is the way

25  we will do it.

96

1            Is that agreeable with you, Mr. Beatty?

2            THE DEFENDANT:  Yes, sir.

3            (Recess.)

4            (Venireperson Nelson enters the courtroom.)

5            THE COURT:  Yes, ma'am.  Just come around,

6    Ms. Nelson, and watch your step up right there.  There you

7    go.  And have a seat right there.  You made that step a lot

8    easier than I do.

9            How are you this afternoon?

10           VENIREPERSON NELSON:  Fine.  How are you-all?

11           THE COURT:  We're doing fine.  Thank you.

12           We appreciate, first of all, you coming in

13   earlier from your originally scheduled -- from yesterday,

14   and you came on in earlier today at our request.  It sort of

15   helped us fill up some time we had in here, so I appreciate

16   that very much, first of all, ma'am.

17           Second of all, this is the part of the voir

18   dire process we talked a little bit about when you were in

19   the big room called individual voir dire.

20           VENIREPERSON NELSON:  Yes, sir.

21           THE COURT:  And it's a process where one of

22   the attorneys representing the State of Texas are going to

23   ask you some questions.  They're going to go through some

24   questions and ask you your views and opinions on some issues

25   that may be involved in the trial of a case such as this

97

1    one.

2            They're going to explain the procedures and

3    the law that governs the trial of a case like this, and

4    they're going to ask you about whether or not you can follow

5    the law that controls the trial of this type case, and

6    they'll have some other questions.

7            The main thing is that there is no right or

8    wrong answer to any question that they ask.  You need to be

9    sure and whatever -- like if the question calls for a yes

10   answer, answer out yes; if it calls for a no answer, answer

11   out no or whatever answer it calls for.

12           Try to speak up loud enough for all of us to

13   hear you.  Don't, like, nod your head yes or nod your head

14   no, because my court reporter, Kim, can't take down nods of

15   the head.  And for the record, she has to have an answer

16   from you, okay?

17           VENIREPERSON NELSON:  Okay.

18           THE COURT:   Now, the questionnaire that you

19   filled out last time you were here, is there anything about

20   that that you need to add anything to?

21           VENIREPERSON NELSON:  No.

22           THE COURT:  Do you think you got it all

23   covered?

24           VENIREPERSON NELSON:  I think I did.

25           THE COURT:  If one of the attorneys asks you

98

1   a question and you don't understand what they're asking --

2   and, believe me, that could happen.  You know, it could

3   happen.  I may ask you something you don't understand what

4   I'm asking, too.

5              But if we ask some question, it's a little

6   confusing, don't hesitate to say, "Could you just state that

7   again; I don't really understand what you're asking me," and

8   we'll -- we'll restate the question for you.

9              VENIREPERSON NELSON:  Okay.

10              THE COURT:  Last Thursday or -- not last

11   Thursday now, a week ago last Thursday, I gave everybody in

12   the panel in the room an oath, and that oath still applies,

13   so your answers are under oath.

14              Do you have any questions for me or anything

15   you want to ask before we get started?

16              VENIREPERSON NELSON:  No.

17              THE COURT:  Well, just relax and just

18   understand there are no right or wrong answers.  Both the

19   State's attorneys and the defense attorneys are just trying

20   to find -- just trying to find 12 fair and impartial jurors

21   that can keep their mind open, base a verdict on the

22   evidence that comes in at trial, and the laws given to

23   jurors by the courts.

24              So just listen carefully to their questions

25   and answer it, you know, as best as you can, okay?

99

1          VENIREPERSON NELSON:  Okay.

2          THE COURT:  Okay.  Thank you, Ms. Nelson.

3                MAE FRANCIS NELSON,

4    having been duly sworn as a member of the special venire,

5    was examined as follows:

6                VOIR DIRE EXAMINATION

7    BY MR. HARRISON:

8         Q.   Ms. Nelson, how are you doing?

9         A.   Fine.  How are you doing?

10        Q.   I'm doing well.  Thank you very much.

11             My name is Brett Harrison.  I'm the first

12   assistant district attorney here in Smith County.  To my

13   left is April Sikes.  We've been introduced to you before.

14             Do you recognize either of us?

15        A.   Only from the last names.  I remember faces.

16        Q.   Only from last Thursday?

17        A.   Yes.

18        Q.   To my right is Tracy Beatty.  He's the defendant

19   who's been charged and indicted by a Smith County grand jury

20   for the offense of capital murder.  To his right is his lead

21   defense attorney, Robert Perkins.  To Mr. Perkins's right is

22   Ken Hawk, also his defense attorney, working for the

23   Defense.

24             Do you recognize or think you're acquainted

25   with any of those three?

100

1    A.   No.

2    Q.   Okay.  You gave us a -- really kind of a short

3  book that we got answers to these questions, and it really

4  kind of helped us focus on the areas that we want to talk

5  with you about.  I'm going to go ahead and just jump right

6  in and ask you a few questions straight off this

7  questionnaire, if you don't mind.

8         And let me preface it by saying this:  If

9  this were in any other setting, other than right here in

10 this type of case, I wouldn't be asking you these questions

11 because it wouldn't be any of my business.

12   A.   Yes.

13   Q.   So I apologize upfront for seeming like I'm maybe

14 prying into your business.  I don't mean to be, but it's

15 just kind of the way the process works at this point.

16        I want to jump into the question about the

17 death penalty and what you think about the death penalty.

18 There was a question that asked how you felt about the death

19 penalty, and you indicated, "If all evidence is provided

20 with a doubt."  I think that probably meant "without a

21 doubt"?

22   A.   Yes.

23   Q.   And then you would follow that up with a statement

24 that you were able to put yourself in that said, "I believe

25 the death penalty is appropriate in some cases."  You went

101

1  on to say, "I'm very fair-minded and open-minded, also.  I

2  don't persuade easily."

3          First of all, are those answers kind of still

4  the way you feel?

5      A.   Yes.

6      Q.   Okay.  If I could get you to explain just a little

7  bit further to me about your feelings about the death

8  penalty and just anything else about the death penalty you

9  could -- you could kind of educate us on on your feelings

10 about it.

11     A.   On my feelings?

12     Q.   Yes, ma'am.

13     A.   My feelings, as so stated, like I said before, if

14 that person did commit the crime and if there was enough

15 evidence to say that that person should, then I think he

16 should be put to death.  If not, if there is a doubt in

17 there, then I think he shouldn't.

18     Q.   So, basically, I think you're pretty in line with

19 the law.  Some cases deserve the death penalty; some cases

20 don't.

21     A.   Yes.

22     Q.   If you were on a hypothetical jury and the State

23 proved somebody guilty beyond a reasonable doubt of the

24 offense of capital murder, and you were in the punishment

25 phase then of a death penalty case, and you had listened to

102

1   all the evidence -- and I'm going to kind of speed ahead a

2   little bit -- there are a couple of questions you answer in

3   the punishment phase of a death penalty case.  You don't

4   just say "life" or "death."

5        A.   Yes.

6        Q.   Those are the only two options when the State is

7   seeking the death penalty.  But you don't just checkmark a

8   box that says "life" or "death."  You answer two questions.

9   And the way in which those questions are answered result in

10  either a life sentence or a death sentence being imposed,

11  okay?

12       A.   Yes.

13       Q.   If you were in a hypothetical case, you had found

14  somebody guilty of capital murder, and you answered that

15  first question, and then you went on and you answered the

16  second question in a way that you knew a death penalty was

17  being assessed, if you thought those were the appropriate

18  ways to answer a question, would you have any hesitancy at

19  all in answering them in such a way that you knew,

20  intellectually, a death penalty would be imposed?

21       A.   No.

22       Q.   Wouldn't be a problem for you?

23       A.   No, wouldn't be.

24       Q.   By the same token, if you believed they should be

25  answered in a way such as would require a life sentence be

103

1    imposed, would you have any hesitancy at all in answering

2    them that way?

3        A.   No.

4        Q.   Basically, what I'm hearing from you is you would

5    listen to the evidence, you would answer the questions the

6    way you felt they ought to be answered, irrespective of what

7    the punishment might be?

8        A.   Yes.

9        Q.   How long have you been in favor of -- because it

10   sounds like you believe in the death penalty --

11       A.   Well, I do.

12       Q.   -- as a punishment.

13       A.   Yes.

14       Q.   How long have you felt that way?

15       A.   Almost all my life.  I read things.  I sort of

16   believe in it myself.

17       Q.   Do you read things about the death penalty or

18   watch programs or talk with people about it?

19       A.   Read, talk to people, just individual cases.

20       Q.   Have you ever had a time in your life where you

21   didn't believe in the death penalty or weren't in favor of

22   it or were against the death penalty?

23       A.   Sometimes, yes.

24       Q.   Okay.  Like tell me about those situations.

25       A.   Like -- it's sort of hard to explain.  Like

104

1   sometimes, you know, you'll read about a case, and the case,

2   you know, there was a death penalty, but then, to me, that

3   person did not warrant that.  Maybe if he was sort of

4   mentally ill or proven mentally ill.

5        Q.   Right.  So maybe sometimes when someone is

6   mentally ill, they don't necessarily deserve the death

7   penalty?

8        A.   Sometimes.  Now, not all the time but sometimes.

9        Q.   Other than like specific cases, has there ever

10  been a time period in your life where you just said, "Look,

11  I just don't think the death penalty is a very good idea"?

12       A.   No.

13       Q.   You've always been pretty much in favor of it?

14       A.   Yes.

15       Q.   Why do you think you're in favor of it?  Kind

16  of -- a lot of people -- let me ask you this:  A lot of

17  people say they grew up with their parents saying they were

18  in favor of it, and they just kind of pass that on to their

19  children.  Some people said for religious reasons, they're

20  in favor of death penalty.  Some people just said a life for

21  a life or an eye for an eye.

22            You know, there are lots of different --

23  death as a deterrent to crime.  Some people say that if a

24  crime is heinous enough, you know, bad enough factually,

25  it's deserving of the death penalty.

105

1          Where do you fall in there?  Why do you think

2     you're in favor of it?

3          A.   Well, if a crime has been committed and it's

4     hideous enough -- that's what I believe -- if it's hideous

5     enough, that person who committed that crime when he

6     shouldn't have, then I believe in the death penalty.

7          Q.   So based on the facts of the case, you think --

8     that's one reason why you're in favor of the death penalty?

9          A.   Yes, it is.

10         Q.   If I made you legislator for the day and gave you

11    the choice, would you keep the death penalty as it is in

12    Texas, or would you get rid of it?

13         A.   Keep it.

14         Q.   Would you change it at all?

15         A.   No.

16         Q.   Do you believe it's applied -- from what you've

17    seen and heard and read, do you believe it's applied and

18    used appropriately in Texas?

19         A.   Yes, I do.

20         Q.   Do you think it's fairly applied?

21         A.   Yes, warranted by the cases.

22         Q.   Well, sure.  Yeah, I understand.  You've told me

23    about the mentally retarded issue, but just as a general

24    matter -- you know, I think you're answering my questions

25    very appropriately under the law, because not every case is

106

1   deserving of the death penalty.

2       A.   No.

3       Q.   Not every person is deserving of the death

4   penalty.  Even if they're eligible, they may not be

5   deserving.  Some people are.  And I think that's what you're

6   telling us.

7       A.   Yes.

8       Q.   But just as a general, guiding principle, I think

9   what you're telling me is you'll listen to the evidence and

10  you'll judge each case on its own?

11      A.   Yes.

12      Q.   Any problem that you have at all with the fact

13  that -- with the possibility of sitting as a juror in a

14  death penalty eligible case?

15      A.   No.

16      Q.   Okay.  Does it -- does it cause you any kind of

17  hesitation or concern to know that you might be a juror in

18  that type of case where you might be in control of answering

19  those questions that would result in either a life sentence

20  or a death sentence?

21      A.   No.

22      Q.   Okay.  All right.  Let me do this:  Let me talk

23  with you about capital murder versus murder.

24      A.   Okay.

25      Q.   If I were to get a gun and shoot Ms. Sikes over

107

1    here ten times, and I thought about it ahead of time, and I

2    went ahead and did it --

3         A.    Uh-huh.

4         Q.    -- and I laughed about it, and I'm a bad person.

5    I've been to the penitentiary before, you know, maybe done

6    other crimes before in my life.  And I laughed about the

7    fact that her ten-year-old son wasn't going to have a mother

8    anymore.  Bad crime.  As bad as I can think of, that is what

9    we call, in Texas, murder, okay?

10        A.    Yes.

11        Q.    The death penalty isn't an option in that case.

12   What we have is a range of punishment from five years to

13   ninety-nine years or life.  Death isn't even an option in

14   that type of case because that's simply a murder case.

15              The legislature has said, "As bad as that may

16   be, that's a murder.  We are going to make death a potential

17   punishment in a certain category of murders."  And I like to

18   call it murder plus.  It's murder plus something else that

19   makes it a capital murder.

20              To be a capital murder, the legislature has

21   said, if you kill more than one person in the same criminal

22   transaction; if you murder a police officer or a fireman in

23   the line of their duties; if you kill a child, murder a

24   child under the age of six; if you -- if you -- if I am paid

25   to commit a murder or if I pay somebody, kind of a hitman,

1   that can be a capital murder; or if I commit a murder in the

2   course of committing one of several felonies; if I commit a

3   murder in the course of committing a burglary or a robbery

4   or an arson or a kidnapping or a rape, that can also be a

5   case of capital murder.

6               You can see why it's different than what I

7   did to Ms. Sikes.  It's murder plus something else.  Do you

8   understand that?  Do you have any problems with kind of the

9   legislature kind of separating those out?

10      A.    No.

11      Q.    When you have -- we've talked about it a little

12  bit, but when you have just a murder case, like what I

13  talked to you about, or any other kind of crime, you have

14  this range of punishment.  If you find someone guilty of

15  those crimes, you have this range of punishment that you

16  place their punishment in.

17              When you have a capital murder case, when you

18  find someone guilty of capital murder and the State is

19  seeking the death penalty, there's only two options at the

20  punishment phase.  There is life in prison or the death

21  penalty.

22              Life in prison -- we don't really have life

23  without parole in Texas.  What we have -- some states do; we

24  don't.  What a life sentence on a capital murder conviction

25  means in Texas is a defendant would have to serve

109

1   40 calendar years before he becomes eligible for parole.

2            So those are your two choices:  Life in

3   prison or a death sentence, if somebody has been convicted

4   of capital murder and the State is seeking the death

5   penalty.

6            Does that make sense?

7   A.   Yes.

8   Q.   Anything about that that we've talked about that

9   I've explained and talked with you about that you have a

10  question on or want to talk about any further?

11  A.   No.

12  Q.   You're following what I'm talking about?

13  A.   Yes.

14  Q.   Because I'm trying to condense a lot of law,

15  trying to make it as short a period as I can.

16  A.   Okay.

17  Q.   I'll slow down.  When she gives me that look, I

18  have to slow down.

19           Let me talk with you about just some general

20  principles of law, okay?  These are general principles of

21  law that apply to any case, whether it's a speeding ticket

22  or a capital murder case, and these would apply to any

23  citizen who is charged with a crime.

24           And before I get to those general principles

25  of law that every citizen enjoys, let me ask you

1   specifically about a couple of individuals you had listed in

2   your juror questionnaire.  You had indicated that there were

3   a couple of people that had had some dealings with the law.

4   I think your son -- is it a son, Stefan Arterberry?

5        A.   Stefan.

6        Q.   Stefan?  Is he a son?

7        A.   Yes.

8        Q.   You indicated he had worked or does work at the

9   Bradshaw Unit?

10       A.   He had.

11       Q.   Do you recall when that was?

12       A.   I think it was late '80s.

13       Q.   Late '80s.  Do you know how long he worked there?

14       A.   Five years.

15       Q.   What does he do now?

16       A.   He works at Tyler Pipe.

17       Q.   Do you know what he did there at Bradshaw?

18       A.   No.

19       Q.   Okay.  Did he talk about it much with you?

20       A.   No.

21       Q.   Did he seem to enjoy it?

22       A.   Yes, I guess he did.

23       Q.   Anything about the fact that he used to be a

24   prison guard or work at that correctional facility that

25   would cause you any problems if you were sitting on this

111

1    kind of a jury?

2        A.    No.

3        Q.    Now, it looks like also there were -- that same

4    person and Ricky Nelson, also a son, that had had some, I

5    guess, theft by checks.  You didn't really know when or

6    where; is that fair?

7        A.    Yes.

8        Q.    Do you know anything about either of those cases?

9        A.    No.

10       Q.    Do you know -- it said you're substantially

11   familiar with the facts or circumstances about the

12   experience, and you said yes, and that they were treated

13   fairly.

14              Now, obviously, you indicated you didn't know

15   when or where it happened, but was that in Smith County?

16       A.    Yes.

17       Q.    Do you know anything else, other than the fact

18   that they had theft by checks and they were handled in the

19   system and treated fairly?

20       A.    No, I do not know anything.

21       Q.    Okay.  You do know they were treated fairly?

22       A.    Yes.

23       Q.    Based on either of those situations, do you have

24   any problem with the way they were treated ever by law

25   enforcement?

112

1    A.   No.

2    Q.   Or the courts just in general?

3    A.   No.

4    Q.   Defense lawyers or prosecutors?

5    A.   No.

6    Q.   Everything about it, to your knowledge, was

7    treated -- they were treated fairly?

8    A.   Yes.

9    Q.   They didn't have either of these two fine lawyers

10   representing them, did they?

11   A.   No, not to my knowledge.

12   Q.   Anything about that situation -- either of those

13   situations that would cause you any trouble?

14   A.   No.

15   Q.   Now, there is also -- there is someone named

16   Victor Clark, a nephew, who had gone to the pen.  You didn't

17   know what type of case.  Can you tell me about it?

18   A.   He was a child.  I say a child.  He was a young

19   boy, got off on the wrong foot.

20   Q.   I'm sorry.  He did what?

21   A.   Got off on the wrong foot, I guess, and he stayed

22   in there about 20 years, and now he's out and working.

23   Q.   Now he's out and working?

24   A.   Yeah.  It's been, like, two years at the same job.

25   Q.   Do you know what kind of case put him into prison?

113

1     A.    Yes.   I believe something about some car theft.

2     Q.    Car theft?

3     A.    Uh-huh.

4     Q.    Was it here in Smith County?

5     A.    Yes.

6     Q.    Again, I would ask you, did either of these

7   lawyers represent him to your knowledge?

8     A.    I don't think so.

9     Q.    Do you know about how long ago?

10    A.    I would say 20 years.

11    Q.    It's been 20 years?

12    A.    Uh-huh.

13    Q.    Ms. -- no, it couldn't have been either one of us.

14   We haven't been around long enough.

15    A.    Huh-uh.

16    Q.    Maybe Judge Skeen may have been involved.

17    A.    I don't know anything.   I don't know.

18    Q.    Let me ask you this:  Do you know whether he was

19   treated fairly or have any idea whether he was treated

20   fairly or unfairly?

21    A.    I don't know.

22    Q.    Any reason to believe he was treated other than

23   fair?

24    A.    I guess he was treated fair.   I guess.

25    Q.    Okay.   He's never complained to you that he was

114

1    treated unfairly or anything like that?

2        A.    No.

3        Q.    Let me ask you, because you've got kind of both

4    sides of the issue, as you'll be able to see.  You've got a

5    son who was a prison guard for several years, as well as

6    being involved in the criminal system as a defendant,

7    treated fairly.  You've had both sides of it.

8              How do you feel about law enforcement

9    officers?

10       A.    Fair.  I still think it's fair.

11       Q.    Do you feel like they do a good job, generally?

12       A.    Generally, yes.

13       Q.    I'm sorry.  I don't mean to talk over you.

14       A.    Uh-huh.

15       Q.    I'm trying to speed things along.

16       A.    Okay.

17       Q.    Do you believe that they have a dangerous job,

18   police officers?

19       A.    Sometimes, yes.

20       Q.    Sometimes.  Do you respect the job that they do?

21       A.    Yes.

22       Q.    That kind of leads into my first question, one of

23   these general principles of law.

24       A.    Uh-huh.

25       Q.    Everybody who comes into a criminal case who is

1    sworn in to tell the truth, the whole truth, and nothing but

2    the truth, they are witnesses in a case.  Every witness, no

3    matter who they are, is deserving of the same opportunity at

4    credibility.

5                You can't just say, you know, Ms. Nelson, you

6    believe that police officers do a dangerous job, that they

7    do it for very little pay, very little public appreciation,

8    that you really respect the job that do; therefore, you're

9    going to give them more credibility than you would someone

10   else.

11               Or by the same token, a teacher, because I

12   respect the job teachers do and think that it's a very

13   admirable profession, I couldn't, as a juror, give them any

14   more credibility than I would any other juror just because I

15   appreciate the job that they do.

16               Does that make sense?

17        A.   Yes.

18        Q.   What you have to do to be qualified as a juror is

19   to say, "I'm going to wait, and despite what I think about

20   their profession, I'm going to wait to hear what they have

21   to say; then I'm going to judge their credibility."

22        A.   That's true.

23        Q.   "I'll wait and hear it, and then I'll start

24   judging."

25               Can you do that?

116

1       A.   Yes.

2       Q.   No matter who it is, whatever profession it is,

3   whether it's ten members of the clergy who come in or ten

4   police officers or ten plumbers, you could wait and then

5   judge their credibility after they start talking?

6       A.   Yes, I can.

7       Q.   All right.  Let me tell you this:  To be -- what

8   we're doing in this process, when I ask you questions or

9   when Mr. Perkins asks you questions, we're trying to find

10  out if you're qualified to be a juror in the case.

11      A.   Yes.

12      Q.   Okay.  We are not talking about whether we want

13  you to serve as a juror or whether the Defense wants you to

14  serve as a juror, because, you know, after this whole

15  process, I may think, "You know, that's not a very good

16  juror for me," and the Defense may say the same thing.

17           All we are trying to do is say, are you

18  qualified?  Then we choose whether we want to keep you or

19  not, okay?  So keep that in mind, is that all we're trying

20  to do is to figure out if you're qualified to sit.

21           And to be qualified to sit is very different

22  than whether we want you or not.  And to be qualified, you

23  have to keep three things in mind.  As you sit here right

24  now talking with us, whether it's me or Mr. Perkins, we're

25  asking you hypothetical situations, because we can't give

117

1    you the facts and we can't give you the evidence.  And as

2    you sit here right now, you don't know any of the facts or

3    the evidence.

4        A.    No.

5        Q.    So keep in mind that all these questions being

6    posed to you, you haven't heard one bit of evidence.

7        A.    No.

8        Q.    So you've got to say, "Look, I'm going to keep my

9    mind open, and before I judge something, I'm going to hear

10   the evidence, and then I'll make my decision," okay?

11             Can you do that?

12       A.    Yes.

13       Q.    You have to be able to follow instructions and the

14   law that comes from Judge Skeen.  He'll instruct you as to

15   what the law is.  You may have personal feelings about

16   things, and it's okay to have personal feelings about

17   things.  You may feel very strongly about an issue, and

18   that's okay, too.

19             What you have to be able to do to be a

20   qualified juror is say, "I have these strong feelings about

21   this, and it may even be different than how the Judge

22   instructs me.  My feeling may be over here, and the Judge

23   may tell me to do this."  It's okay as long as you can put

24   aside your personal feelings and follow the law.

25             The law doesn't say you have to divorce

118

1    yourself from your feelings.  It's okay to feel differently

2    than what the law tells you you have to do as a juror.  You

3    just have to be able to say, "I'm going to follow the law,

4    whatever that is."

5             Do you think you can do that?

6        A.   Yes.

7        Q.   We've talked about witness credibility.  Let me

8    talk about the fact that last Thursday, or Thursday a week

9    ago, the Judge read portions of the indictment to you.

10            So, obviously, whether a person has been

11   arrested or charged or convicted -- pardon me -- arrested,

12   charged, or indicted of a crime -- for a crime is not any

13   evidence of guilt.

14            Are you aware of that?

15       A.   Yes.

16       Q.   Because, obviously, the reason we're here and the

17   reason we're going to have a trial is to figure out if he's

18   guilty or not guilty.

19       A.   Uh-huh.

20       Q.   Simply being indicted for a crime is not evidence

21   of anything, and I'll tell you why.  One of the -- there's a

22   lot of reasons.  One of the reasons is, a defendant, any

23   defendant, has a presumption of innocence.  We don't start

24   out here even with the defendant.  The State starts beneath

25   the defendant.  He starts out ahead of us because he's got a

119

1    presumption of innocence.

2             It's our burden of proof.  We have to prove

3    him guilty beyond a reasonable doubt.  You know, very --

4    well, probably no defendant has ever gone to the grand jury

5    and said, "Please indict me so that we can have a trial so I

6    can defend myself," because he doesn't have to.  He's got a

7    presumption of innocence.  That's why an indictment is not

8    any evidence of guilt.

9             The other reason is this:  A grand jury

10   proceeding is very one-sided.  Members of the District

11   Attorney's Office present evidence, present witnesses.  The

12   grand jury can hear from a defendant but usually doesn't.

13            If a defendant testifies, which he doesn't

14   have to do, his lawyer is never inside the grand jury room.

15   He's not entitled to be inside the grand jury room, so there

16   is no cross-examination.  There is nothing like that.

17            The grand jury simply finds probable cause.

18   Means that a defendant -- there's probable cause that a

19   defendant committed a crime.  Now go have a trial.

20            For all those reasons, very low standard of

21   proof, very low.  If probable cause is down here

22   (indicating), beyond a reasonable doubt is up here

23   (indicating), right?  For all those reasons, the fact that

24   someone has been indicted for a crime is absolutely no

25   evidence of guilt.

120

1        You understand what I'm talking about?

2    A.    Yes.

3    Q.    Do you agree with that?

4    A.    Yes.

5    Q.    Think that's the way it ought to be?

6    A.    Yes.

7    Q.    That presumption of innocence, do you agree with

8    that?

9    A.    Yes.

10   Q.    Do you think all citizens should have that

11   presumption of innocence?

12   A.    Yes.

13   Q.    And that the defendant should start above the

14   State?

15   A.    Yes.

16   Q.    Okay.  Because we're not talking about an even

17   race, you know, because a defendant has that presumption,

18   and it's up to us to present evidence to prove him guilty.

19   A.    Yes.

20   Q.    Which ties into another general principle of law

21   that defendants are entitled to.  We have the burden of

22   proof.

23        A defendant and his lawyers can sit over

24   there mute.  They don't have to say a word.  They don't have

25   to question witnesses.  They don't have to give an opening

121

1   statement or a closing statement.  They don't have to make

2   argument or ask any questions at all.

3           You know why?  Why don't they have to do

4   anything?

5       A.   Because he's innocent until proven guilty.

6       Q.   Until proven guilty.  He's got the presumption of

7   innocence.

8           Now, when I say "he," he as a defendant.

9       A.   Yes.

10      Q.   Any defendant.

11      A.   Uh-huh.

12      Q.   These are fine lawyers.  I don't believe that they

13  would ever do that.  But in a case, all a defendant and his

14  lawyers have to do is show up on time and sit quietly and

15  politely, and they've done their job.

16          And if the State brings in a witness, ten

17  witnesses, or a hundred witnesses, and we bring hundreds of

18  exhibits, if we don't prove somebody guilty beyond a

19  reasonable doubt, just because they didn't do anything is

20  meaningless, because they don't have to.  They don't ever

21  have to do anything.

22      A.   Right.

23      Q.   Why?

24      A.   Because he's presumed innocent until proven

25  guilty.

122

1    Q.    That's right.   That's right.

2          And I'll tie it into something else.   He's

3    presumed innocent.   We have the burden of proof.   They never

4    have to do anything, and we have to prove it beyond a

5    reasonable doubt, so let's talk about beyond a reasonable

6    doubt.

7          I think in your questionnaire you indicated

8    that you could find someone guilty and believe the death

9    penalty was appropriate, if all evidence was provided -- and

10   I think what you indicated should have been "without a

11   doubt"?

12   A.    Uh-huh .

13   Q.    There is one key word that you left out of that

14   question, and it's "reasonable."   Because the law says and I

15   think you'll be instructed that the law in the reasonable

16   doubt -- there's no definition of what reasonable doubt is.

17   It's whatever it means to you and to your fellow jurors,

18   okay?

19   A.    Okay.

20   Q.    But I'll tell you this:   The instruction that I

21   think you'll get from the Court says that the State doesn't

22   have to prove something to you beyond all doubt.   We don't

23   have to remove all possible doubt.   We have to prove a case

24   beyond a reasonable doubt.

25          Let me ask you this just as kind of a me and

123

1  you talking.  Is there anything I could prove to you beyond

2  all doubt, to a hundred percent certainty?

3       A.   No.

4       Q.   Probably not, is there?

5       A.   No.

6       Q.   Because why -- why couldn't I prove something to

7  you beyond all doubt?

8       A.   Because you are trying to state the facts.

9       Q.   Okay.

10       A.   And stay with the facts, and then it will weigh

11  itself out eventually.

12       Q.   Sure.  For me to prove something to you beyond all

13  doubt, what would you have to do?

14            Let me ask you this:  Did you -- did you

15  drive here today?

16       A.   I don't drive.

17       Q.   Okay.  You didn't drive.  Let me ask you this:

18  Let's say -- let's say you brought a purse with you today.

19  I don't know if you did or not, but let's say you brought a

20  purse, and let's say when you got called in from outside,

21  you didn't bring your purse in with you, you left it on the

22  bench out there, okay?

23       A.   Okay.

24       Q.   If I said to one of the deputies, Deputy Clark

25  here, "Deputy Clark, go make sure her purse is still out

124

1  there," and it's just a few steps, right, it's just a very

2  short ways out there, he walked out there, he saw it, and he

3  came back, and I put him under oath, and he testified, "Yes,

4  sir, Ms. Nelson's purse is right out there, right where she

5  left it," do you know that it's still there beyond all doubt

6  whatsoever?  I mean, has that been proven to you beyond all

7  doubt, to a hundred percent certainty?

8       A.   No.

9       Q.   No.  Because you haven't seen it, right?  I mean,

10  you would probably take his word for it.

11      A.   Yes.

12      Q.   The fact of the matter is, you hadn't seen it.

13      A.   No.

14      Q.   So there is still some doubt?

15      A.   Yes.

16      Q.   Now, in reality, do you believe it beyond a

17  reasonable doubt?  I mean, it just took him two seconds to

18  go out there and look, and he reported right back.

19      A.   Yes, it could easily.

20      Q.   So you see the difference between being able to

21  prove something beyond all doubt and beyond a reasonable

22  doubt?

23      A.   Yes.

24      Q.   Let me give you another example.  This one I

25  actually just heard during this process, and I like it.

1          Let's say it's raining outside, and my job,

2    as a prosecutor, is to prove to you, as a juror, that it is

3    raining outside, okay?  So I bring someone in off the

4    street, and they testify that the reason they're soaking wet

5    is because they just walked outside in the rain before they

6    came into the courthouse.

7          And I bring Mark Scirto -- I don't know if

8    you watch the news, but he's a weatherman, a meteorologist.

9    I bring him and I say, "Mr. Scirto, you're a meteorologist.

10   Is it raining outside?"  He said, "Yeah, it's supposed to be

11   raining, thunderstorms all day, all weekend, actually."

12         Now, you didn't look outside, but have I

13   proven to you beyond a reasonable doubt it's raining?

14   A.   Yes.

15   Q.   Sure.  So that's kind of the difference.  You

16   don't have to see something, because the law says that, you

17   know, I don't have to prove something beyond all doubt but

18   just beyond a reasonable doubt.

19         Now, you know, there are other possibilities,

20   right?  In my proving it was raining situation, you know,

21   that person off the street who came in and said it was

22   raining, and he had been soaking wet, he could be lying to

23   you.  What could have happened is, it could have been sunny

24   outside, and someone could have thrown a bucket of water on

25   him.  That's a possibility, right?

126

1    A.    Right.

2    Q.    But it's not a reasonable possibility, right?

3    A.    Right.

4    Q.    You kind of understand where we are on beyond a

5    reasonable doubt?

6    A.    Yes.

7    Q.    Do you think that's a fair standard, that we have

8    to prove someone guilty beyond a reasonable doubt?

9    A.    Yes.

10   Q.    Okay.  Would you hold us to that burden?

11   A.    Yes.

12   Q.    Now, I'll tell you this:  Standard of proof of

13   beyond a reasonable doubt is the burden of proof that we

14   have, the State -- and, remember, the Defense never has a

15   burden.  We have that on any criminal case, whether it's a

16   speeding ticket up to a capital murder.

17        And you might say, "Gosh, I think a capital

18   murder is more serious than a speeding ticket, so I think I

19   could raise the burden on that, or I think I could lower it

20   on a speeding ticket."

21        But what the law says is, "Look, one may be

22   more serious than another, but that doesn't change the

23   burden of proof.  It's always on the State, and it's always

24   the same, whether serious or not serious, you know, or one

25   is more serious than the other.  It stays there.  It doesn't

127

1   move depending on the crime.  And the State either meets it,

2   or they don't every time, you know, whether it's a speeding

3   ticket or capital murder."

4              Does that seem fair?

5       A.   Seems fair.

6       Q.   Can you hold us to that burden and not lower or

7   raise the burden depending on the type of crime or how

8   serious the crime may be?

9       A.   Yes.

10      Q.   Because, obviously, I've given you two extreme

11  examples of a death penalty case and a traffic ticket, a

12  speeding ticket.  And if you're telling me that you're not

13  going to lower the burden on a speeding ticket or raise the

14  burden on a death penalty case, that's exactly what the law

15  says.  It's the same no matter what.

16      A.   Yes.

17      Q.   Let me talk to you about the Fifth Amendment

18  right.  Have you heard of the Fifth Amendment?

19      A.   I did.

20      Q.   You know that a person cannot be forced or

21  compelled to testify against themselves, right?

22      A.   Yes.

23      Q.   Why do you think that is?

24      A.   Because what he say might incriminate his own

25  self.

128

1    Q.    It might.  And you know what else he has?  What

2    else does he have that makes sense why he wouldn't have to

3    get up there on that witness stand and testify, any person

4    charged with a crime?  What's the one thing that they have

5    that tells you they're innocent?

6    A.    He has the right to be proven that he's --

7    Q.    Right.  He's got the presumption of innocence, so

8    he's got the presumption already.

9    A.    Yes.

10   Q.    He doesn't have to get up there on that witness

11   stand and say it again.  He's already got it.  And what

12   burden does any defendant have in a criminal trial?

13   A.    None.

14   Q.    None.

15   A.    It's the State.

16   Q.    That's right.  He doesn't have to do anything.

17   A.    That's right.

18   Q.    Figuratively speaking, a defendant can look over

19   at me and say, "You brought the charges.  You prove it."

20   A.    That's right.

21   Q.    "I'm not going to do anything except sit here

22   politely."  Do you think that's fair?

23   A.    It is fair.

24   Q.    You know -- you have children?

25   A.    Yes.

129

1     Q.   Have you ever had a situation when your children

2  were younger when maybe a fight broke out or an argument

3  broke out and you wanted to get to the bottom of things?

4     A.   Yes.

5     Q.   How did you do it?  What did you do?

6     A.   Listened to both sides.

7     Q.   Sure.  You know, here's the thing.  It's okay to

8  be curious to hear both sides to a story, because that's the

9  way we're raised.

10     A.   Yes.

11     Q.   I like to say in my house, even though some people

12  cringe when I say it -- in my house, there is no Fifth

13  Amendment right, because I can compel my five-year-old to

14  testify against himself, and it's pretty easy.  I can compel

15  my five-year-old to testify against his co-defendant, his

16  two-and-a-half-year-old brother.

17          So in my house, I can compel testimony,

18  probably the same way you did in your house, right?

19     A.   Right.

20     Q.   The law recognizes people raise their kids that

21  way.  It's the way we operate as parents, so it's okay to be

22  curious to hear both sides in your home, and it's okay to be

23  curious in a courtroom.

24          What the law says is, "Look, you can be

25  curious.  What you can't do is be so curious to hear both

130

1    sides to a story that you're going to put some burden on the

2    Defense, that you're going to require his testimony."

3             Does that make sense?

4    A.   Yes.

5    Q.   It's okay to be curious.  You just can't require

6    it.  You can't consider a defendant's silence for any

7    purpose whatsoever.

8    A.   Yes.

9    Q.   Because, again, it always goes back to the

10   presumption of innocence.  He's got no burden; we've got the

11   burden, right?

12   A.   Right.

13   Q.   Can you follow that instruction?

14   A.   Yes.

15   Q.   If a defendant chooses not to testify, it doesn't

16   make the State's witnesses any more credible or more

17   believable.  It doesn't make our case any better, right?

18   A.   Right.

19   Q.   Because it doesn't affect anything.  You can't

20   consider it for any reason, right?

21   A.   Right.

22   Q.   Will you agree to do that?

23   A.   Yes.

24   Q.   Let me talk to you about -- we've talked about the

25   fact that an indictment has been returned for the offense of

1  capital murder.  There are, under the law, things called

2  lesser included offenses, so let me talk to you about those.

3  Envision kind of a ladder, okay?

4           In a hypothetical case, you might have --

5  remember, capital murder is murder plus something.

6       A.   Yes.

7       Q.   You might have a capital murder charge where it's

8  murder in the course of committing a rape.

9       A.   Uh-huh.

10      Q.   Okay.

11      A.   Yes.

12      Q.   And in that hypothetical case, you might have

13  plenty of evidence about the murder, a murder occurred.  You

14  might hear from five witnesses that a defendant confessed to

15  committing the murder.

16           You've got no doubt at all about the murder,

17  but you might not be convinced beyond a reasonable doubt

18  about the rape.  You might have heard some evidence of the

19  rape but not enough to get you over that beyond a reasonable

20  doubt, right?

21      A.   Right.

22      Q.   So what do you do at that point?  You've got the

23  charge -- the indictment for capital murder.  You believe

24  the murder beyond a reasonable doubt.  You do not believe

25  the rape beyond a reasonable doubt.

132

1          What do you do with that capital murder,

2  guilty or not guilty?

3      A.   Say guilty.

4      Q.   Because the trick of this is, the murder plus to

5  make it capital murder, remember?

6      A.   Yes.

7      Q.   You've got to have murder in the course of

8  committing the rape.  So you believe the murder occurred,

9  but you don't believe beyond a reasonable doubt about the

10 rape, so you don't have the plus, right?

11     A.   Right.

12     Q.   So for that, when it's charged capital murder, you

13 would have to say not guilty, not guilty to capital murder,

14 because "I believe the murder, but I don't believe the

15 rape."  You have to have the murder plus the rape to make it

16 a capital murder, and you don't have that, do you?

17     A.   No.

18     Q.   And remember, keep in mind always when we're

19 talking about these questions, the burden of proof is right

20 here, and it's proof beyond a reasonable doubt, and if you

21 don't find someone guilty beyond a reasonable doubt ever,

22 it's always not guilty.

23     A.   Okay.

24     Q.   So you've got the murder that you believe.

25     A.   Yes.

133

1    Q.   You don't believe beyond a reasonable doubt the
2  rape, so you've found him not guilty for capital murder.  So
3  the law says there are these lesser included offenses.  You
4  could have murder as a lesser included offense, or you could
5  have manslaughter as a lesser included offense.
6            So in my situation, my hypothetical I've
7  given you, you don't believe the capital murder because you
8  don't believe the rape part, right?
9    A.   Right.
10   Q.   But you did believe there was sufficient evidence
11 to prove murder beyond a reasonable doubt, so you start
12 considering those lesser included offenses, and you get
13 there and you see murder.  Well, you believe it beyond a
14 reasonable doubt, so what do you do?  Do you find him guilty
15 of that?
16   A.   Yes.
17   Q.   The point is, the law says you can only find the
18 defendant guilty of what you believe the State proved beyond
19 a reasonable doubt.  If I don't prove capital murder beyond
20 a reasonable doubt, you must find them not guilty.
21   A.   Yes, sir.
22   Q.   But if I do prove something else, some lesser
23 offense, let's say manslaughter.  Say you don't believe
24 murder.  You don't believe it was an intentional or knowing
25 murder.  You only believe it was reckless.

134

1          Let's say, I pulled out a gun, and I was just

2    kind of cleaning it, and I shot April Sikes.  That's the

3    evidence that you heard.  Even though I was maybe charged

4    with capital murder, you didn't believe it was an

5    intentional murder.  You didn't hear enough to prove that I

6    had raped Ms. Sikes, so it's not guilty of capital murder,

7    right?

8          A.   Right.

9          Q.   To find murder, it would have to be intentionally

10   or knowingly killing Ms. Sikes, and you don't believe that

11   either.  You believe it was simply reckless.  So you find

12   not guilty to the murder, right?

13         A.   Right.

14         Q.   So you keep going down until you find one that

15   fits, if you do.  So in that situation, you might find that

16   because I recklessly killed Ms. Sikes, I'm guilty only of

17   manslaughter.

18              Does that make sense?

19         A.   Yes.

20         Q.   Taking it one step further, you might not find me

21   guilty of anything because you may think, "Look, the State

22   charged him with capital murder, but they didn't prove

23   anything.  They didn't prove -- we wasted two weeks here."

24         A.   Uh-huh.

25         Q.   They didn't prove him guilty of anything, so you

135

1   would find him not guilty, right?

2       A.    That's right.

3       Q.    Just keep in mind they're only guilty of what we

4   prove beyond a reasonable doubt.

5       A.    Okay.

6       Q.    Talking about those lesser offenses, like a murder

7   or a manslaughter or any other case, we talked about this,

8   that there is a range of punishment, because, in Texas, we

9   have what's called -- it's a big word -- it's a bifurcated

10  trial system.

11              What that means is we have two phases of

12  trial.  We have a guilt/innocence phase, and we have a

13  punishment phase.  In that guilt/innocence phase, it's

14  real -- the evidence that you'll hear is real limited.  It

15  applies only to and relates only to whether someone is

16  guilty or not guilty, right?

17      A.    Right.

18      Q.    The way it should be.  Because if you start

19  throwing in all these other extraneous things, you're going

20  to start losing focus on the real issue.  And the real issue

21  of that phase is, did he do it or did he not?

22      A.    Yes.

23      Q.    So let's say, in a hypothetical case, you find

24  someone guilty beyond a reasonable doubt of something,

25  murder, okay?  So you found them guilty beyond a reasonable

136

1   doubt of murder.

2               So then you move into a punishment phase, and

3   at that point, you're no longer worried about whether he did

4   it or didn't do it, because you found him guilty.  Now

5   you're trying to figure out where on that range of

6   punishment he fits, anywhere from five years or ninety-nine

7   years or life, right?

8       A.    Okay.

9       Q.    Anywhere in that punishment phase.  So you could

10  hear in a punishment phase of a trial additional evidence

11  that goes towards what's appropriate, what's an appropriate

12  sentence?  Where on this range of punishment does this

13  particular defendant fit?

14              So you can imagine the types of evidence you

15  might hear to help you decide where on the range of

16  punishment he fits.  What's appropriate, five years in

17  prison, fifty years in prison, life in prison?  You don't

18  know until you hear all the evidence, right?

19      A.    Right.

20      Q.    So you've got to listen to all the evidence.  And

21  you might hear evidence of a prior criminal history, whether

22  the defendant has been to the penitentiary before, how he

23  acted while he was in the penitentiary, whether he was on

24  parole, and if so, how he performed on parole, what he did

25  while he was on parole, whether he ever used drugs or dealt

137

1   drugs or had a drug problem.  You might hear psychiatric or

2   psychological testimony.

3          All those things could help you, if they do,

4   in kind of setting where in that range of punishment a

5   defendant would fit.

6          Do you see that?

7   A.   Yes.

8   Q.   And what the law says is, "Look, Ms. Nelson, as a

9   juror in a hypothetical case, you just can't say, you know,

10  it's a murder case, so I'm automatically going to give a

11  life sentence or five years.  You have to keep an open

12  mind."

13         Let me give you an example of why you have to

14  have an open mind.  What do you think of when I say

15  "murder"?  What kind of case?

16  A.   Criminal case.

17  Q.   Sure.  Criminal.  Think of violence?

18  A.   Yes.

19  Q.   Be a real bad person?

20  A.   Not necessarily.

21  Q.   Okay.  Well -- and that's right, because it takes

22  all -- there can be all kinds of people who commit all kinds

23  of murders.

24  A.   Yes.

25  Q.   The murder I gave you the first time, I think, was

138

1   me killing Ms. Sikes and laughing about it and kicking her

2   and laughing about her son not having a mother.  Obviously,

3   that's a pretty heinous murder.

4        A.   Yes.

5        Q.   You might have a situation where you have a

6   75-year-old man and woman married for 50 years.  Maybe the

7   wife's in the hospital with a terminal disease.  She's in a

8   lot of pain, and he can't live with it.  He can't see her in

9   pain.  She's only got a few weeks to live, but they're going

10  to be painful.  So he unplugs her from life support.

11            That's the intentional taking of another

12  human life without legal justification.  That can be murder,

13  also.

14       A.   Yes.

15       Q.   You can see how different those two murders are.

16       A.   Yes.

17       Q.   And that's why we have a range of punishment, and

18  that is exactly why, on any question we're asking you, you

19  have to keep an open mind.

20       A.   Yes.

21       Q.   Because, you know, when I first say "murder," you

22  might think, "Oh, gosh, I could never consider five years in

23  prison for a murder."  But now that you've seen that there

24  can be all kinds of people in all kinds of circumstances,

25  you could see that that could be something you might

139

1    consider.

2                    So the law says, "Look, Ms. Nelson, keep an

3    open mind, wait to judge until you hear the evidence on any

4    issue, whether it's guilt/innocence or whether it's where on

5    a range of punishment a person fits."

6                    Can you do that?

7    A.    Yes.

8    Q.    Anything to this point that we've talked about

9    that I need to clarify or repeat or rephrase that you have a

10   question about?

11   A.    No.

12   Q.    All of these instructions and these general

13   principles of law, if you're instructed by the Court as to

14   what we've talked about, do you think you could follow those

15   Court's instructions?

16   A.    Yes.

17   Q.    Okay.  Do you have any problem with any of those

18   principles of law we've talked about?

19   A.    No.

20   Q.    Okay.  Then let me get us to a hypothetical

21   capital murder case, and you're on the jury, okay?  Now,

22   keep in mind this is a hypothetical case, okay?

23   A.    Yes.

24   Q.    To be in a -- let's say in this hypothetical case,

25   you have heard the evidence, you've deliberated, and you, as

140

1    a jury, have found a defendant guilty of the offense of

2    capital murder, okay?  And this is a case where the State is

3    seeking the death penalty.

4                So you listen to the evidence and you vote

5    you believe beyond a reasonable doubt that he's guilty, so

6    you find him guilty, right?

7        A.    Right.

8        Q.    Now, if you believe -- if you did not believe

9    beyond a reasonable doubt that he was guilty, you wouldn't

10   find him guilty; you would find him not guilty.

11       A.    Not guilty.

12       Q.    In this case, we're in the punishment phase.

13   You've found him guilty.  We've talked about those two

14   questions that you're going to be asked, right?

15       A.    Right.

16       Q.    You understand now probably that there's not a box

17   where you check "life" or "death."

18       A.    Yes, right.

19       Q.    We've got these two special issues, is what we

20   call them.  They're really questions.  And what you have to

21   do is you have to answer those questions, and the way in

22   which you answer them will result in either that life

23   sentence being assessed or a death sentence being assessed.

24                Now, what you can't do to be qualified is

25   say -- to be qualified to sit as a juror, you can't say,

141

1  "You know, I found someone guilty of capital murder.  I

2  found someone guilty of intentionally taking the life of

3  another human being in the course of doing something else,"

4  that plus part.

5          So the law says you can just automatically

6  say, "I found them guilty of that.  I'm always going to

7  answer these special issues in a way that results in a death

8  penalty."  What the law says is, "Look, you've got to keep

9  an open mind and treat these questions on their own.  Look

10 at the evidence and then answer them, whatever way you

11 choose to answer them, but look at them on their own."

12          Is that fair?

13 A.     That's fair.

14 Q.     Because like we said, there are -- in a capital

15 murder case, there are people who could be -- and I think

16 you answered it this way in your questionnaire -- people who

17 are eligible for the death penalty who might not be

18 deserving of the death penalty; is that fair?

19 A.     That's fair.

20 Q.     So you've got those two special issues.  Take a

21 look at that first special issue that's up there in front of

22 you.  Do see which one I'm talking about?  It should say

23 Special Issue Number 1, I think.

24 A.     Yes.

25 Q.     Okay.  Take a chance and read that to see, if you

142

1    would.

2         A.    (Complies.)

3         Q.    Did you have a chance to get through that one?

4         A.    Yes.  Uh-huh.

5         Q.    That's the one that reads, is there a probability

6    that the defendant would commit criminal acts of violence

7    that would constitute a continuing threat to society, right?

8         A.    Right.

9         Q.    Basically, what we refer to that -- we lawyers

10   kind of talk about that as a future danger question.  You

11   can see what it's asking.  Is there a probability that the

12   defendant would commit criminal acts of violence and would

13   constitute a continuing threat to society?

14             First of all, do you think that's a good

15   question to ask?  When you're talking about people who may

16   be eligible for the death penalty, but you're having to

17   winnow it down to those who are deserving of the death

18   penalty, is that a good question?

19        A.    Yes.

20        Q.    Pretty fair question to want to know the answer

21   to, isn't it?

22        A.    Yes, it is.

23        Q.    Let me just talk about a few of the words in

24   there.  First of all, you see that word "probability"?

25        A.    Yes.

143

1    Q.   You know the difference between possibility and

2    probability?

3    A.   Yes.

4    Q.   It's possible George Bush is going to walk through

5    this door?

6    A.   Yes.

7    Q.   It's not real probable, though, is it?

8    A.   No.

9    Q.   All right.  That the defendant would commit this

10   phrase "criminal acts of violence."  Now, that doesn't say

11   "felony acts of violence" or "misdemeanor acts of violence"

12   or commit murder or capital murder or rapes or raping or

13   stabbing.  It just simply says "criminal acts of violence."

14          And I don't think you're going to get a jury

15   instruction on what that means, a definition of what that

16   means, so it means whatever it means to you.  So whatever

17   you believe is a criminal act of violence, whether that

18   means a -- you know, whatever it means to you.

19          What does a criminal acts of violence mean to

20   you?  I mean, just examples of it.

21   A.   Of someone doing something hurtful to someone

22   else, bodily harm.

23   Q.   Sure.  Bodily harm, doing something hurtful to

24   someone.  Whatever it means to you.

25          And then it goes on to say, "That would

1   constitute a continuing threat to society."  Now, let's talk

2   about the term "society," because you've had a son who has

3   worked inside the penitentiary as a prison guard, right?

4        A.   Right.

5        Q.   And you've had somebody -- and I can't remember

6   now who it was -- who actually was an inmate in a prison?

7        A.   Yes.

8        Q.   And that was a cousin, I think.

9        A.   Nephew.

10       Q.   Nephew.  So you've had an inmate relative, and

11  you've had an inmate who actually was a prison guard.  So

12  you know that there are inmates in the prison; there are

13  guards; there are doctors, nurses, librarians, food staff

14  people, wardens, all kinds of people who work inside a

15  penitentiary.

16       A.   Yes.

17       Q.   So when we talk about society, can you kind of

18  see -- what do you see society as?

19       A.    I see society as the community where you live,

20  neighboring counties, cities, towns.

21       Q.   Okay.  And I think that's probably fair.  When you

22  first talk to somebody about what society means, it's

23  generally where they live.

24       A.   Uh-huh.

25       Q.   This, again, is an example of one of those words I

1  don't think you'll get a definition on.  I think it's -- or

2  I know it will be left up to you to determine what you

3  believe to be society.

4          And let me ask you this:  Do you think that

5  inmates who are incarcerated in prisons deserve protection?

6      A.  Yes.

7      Q.  Do you think the guards deserve protection?

8      A.  Yes.

9      Q.  And doctors who work there and librarians and food

10  staff, people -- everybody there deserves protection, would

11  you agree?

12      A.  Yes.

13      Q.  Would you exclude prison guards, for instance,

14  from your definition of society?

15      A.  No.

16      Q.  Would you exclude inmates from your definition of

17  society?

18      A.  No.

19      Q.  Again, I'm not trying to tell you what is or is

20  not society.  I'm just trying to get you to think about --

21  I'm just trying to get you to --

22          THE COURT:  I'm sorry.  Go ahead.

23      Q.  (By Mr. Harrison) I'm just trying to get you to

24  think about what you mean by society and what it means to

25  you.  And you would not exclude those groups of people from

146

1    society, because everybody needs protection, right?

2        A.    Yes.

3        Q.    So you look at that question -- after you found

4    someone guilty of the offense of capital murder, you look at

5    that question on its own, and you evaluate the evidence that

6    you've heard both on the guilt/innocence phase, as well as

7    the punishment phase, and you look at that question.

8              Now, the State has the burden of proof, like

9    we do all the time.  We have the burden of proof, and we

10   have to prove this answer to you beyond a reasonable doubt.

11       A.    True.

12       Q.    If we prove it to you beyond a reasonable doubt,

13   could you put yes, "Yes, I do believe there is a

14   probability -- that it's been proven to me beyond a

15   reasonable doubt there's a probability that the defendant

16   would commit criminal acts of violence that would constitute

17   a continuing threat to society"?

18       A.    Yes.

19       Q.    If we failed to prove it to you, could you answer

20   that no?

21       A.    Yes.

22       Q.    All right.  Because you'll look at it on its

23   own --

24       A.    Yes.

25       Q.    -- independent of finding somebody guilty, because

147

1  you understand that just simply finding them guilty doesn't

2  make them a future danger?

3       A.   That's right.

4       Q.   You've got to look at that on its own.

5       A.   Yes.

6       Q.   Let's say that you've answered that after looking

7  at it independently, "Yes, I do believe there is probability

8  of him being a future danger."  You move on to that second

9  special issue.

10           Go ahead and read that to yourself, if you

11  would.

12       A.   (Complies.)

13       Q.   Okay.  This one, you can tell a lawyer wrote this,

14  because it's real wordy, but let me try and break it down.

15  Basically -- and this is the one that says, "Taking into

16  consideration all the evidence, including the circumstances

17  of the offense, the defendant's character and background,

18  the personal moral culpability of the defendant, is there a

19  sufficient mitigating circumstance or circumstances to

20  warrant that a sentence of life imprisonment rather than a

21  death sentence be imposed?"

22           First of all, do you think you kind of

23  understand what that question is asking?

24       A.   Yes.

25       Q.   We refer to that as the mitigation question.

148

1    Mitigation can be defined as lessening a person's moral

2    blameworthiness.

3        A.   Yes.

4        Q.   So what you have to look at as a juror is say,

5    "Again, I'm looking at it independent of finding someone

6    guilty.  I'm looking at it independent of already finding

7    them to be a future danger, probability of them being a

8    future danger.  I'm going to look at this one on its own.

9    I'm going to look at all the evidence I've heard."

10               Now, this one is a little bit different,

11   because there is no burden of proof.  The first time and the

12   only time there is not a burden of proof on the State, okay?

13   Nobody has to bring you evidence of this.  It's either there

14   or it's not.  And the Defense, of course, has no burden,

15   because they never do.

16               So what you do is you look at and you say,

17   "I've already found someone guilty of capital murder.  I've

18   found them probably to be a future danger.  Now, I'm

19   thinking to myself, and I'm looking at all the evidence, and

20   I'm saying to myself, 'Is there one thing or are there many

21   things that I think is mitigation, something that lessens

22   the moral blameworthiness of a defendant?'"

23               So, first of all, you say, is there any,

24   okay?  It's a two-step process.  And I'll tell you this:

25   There is not going to be -- you, as a juror, might have an

149

1    opinion as to what mitigation is that -- you may find

2    something to be mitigation that all the other jurors say,

3    "No, it's not.  It's something different entirely."  Y'all

4    don't have to agree on what mitigation is.  It's what it

5    means to you and your other jurors.

6                And you might look and you might not find

7    any.  You might find zero mitigating circumstances.  Your

8    juror next to you might find one thing that's mitigation.

9    The person next to that person might find ten things that

10   are mitigation.

11               So first, you identify whether there is

12   mitigation, and if there is, you go to that second step, and

13   that's where you focus on the word "sufficient."  Is there

14   some mitigation that is sufficient, important enough, to

15   meet to warrant a life sentence instead of a death sentence?

16       A.   Yes.

17       Q.   Do you understand what that's asking?

18       A.   Yes.

19       Q.   As a juror, if you find one thing that's

20   mitigation, you might look at it and say, "There is

21   mitigation," but that second step, "I don't think there is

22   anything -- it's not sufficient to warrant a life sentence

23   over a death sentence."

24               Or that juror next to you might find five

25   things that are mitigation, and they might think none of

150

1   those five things are sufficient, important enough, to

2   justify life over death.  And someone next to you might say,

3   "Well, I found one, and I do think it's sufficient."

4           Do you see how that works?

5       A.   Yes.

6       Q.   The point is, you have to be able to look at that

7   question, look at all the evidence you've heard, and make

8   your own independent determination, first, whether there is

9   mitigation, and if there's mitigation, is it sufficient to

10  warrant life over death?

11      A.   Yes.

12      Q.   Could you look at that question on its own,

13  separate from those other two, the guilt or innocence of the

14  defendant and then finding a probability of future danger?

15      A.   Yes.

16      Q.   Could you look at it on its own?

17      A.   Yes.

18      Q.   And if you believed that there was some

19  mitigation, anything that was sufficient to warrant life

20  over death, would you answer that question yes?

21      A.   Yes.

22      Q.   If you looked at it and said there is not anything

23  sufficient to warrant life over death, would you answer it

24  no?

25      A.   No.  I would still answer yes.

151

1      Q.   Oh, you would still answer yes.  You would always

2  find something sufficiently mitigating to impose life over

3  death?

4      A.   Sometimes, yes.

5      Q.   Let me make sure we're on the same page.

6      A.   Okay.

7      Q.   Is what you're telling me, that after looking at

8  all the evidence on guilt or innocence, as well as

9  punishment, you would always find something that was

10  sufficient to warrant a life sentence, something

11  sufficiently mitigating to warrant a life sentence over a

12  death sentence?

13      A.   No.  Now I understand.

14      Q.   Because I want to make sure -- because everything

15  we've talked about until now, you've said you believed that

16  the death penalty is appropriate in some cases.

17      A.   Yes.

18      Q.   And if you believed that it was warranted, you

19  would give it?

20      A.   Yes.

21      Q.   Let me make sure we're clear.

22      A.   Okay.

23      Q.   Special Issue Number 3, you would look to see if

24  there is mitigation?

25      A.   Yes.

152

1    Q.    You would keep an open mind to see if there is

2 mitigation?

3    A.    Yes.

4    Q.    And let's say you found it.  In my hypothetical,

5 you found something that's mitigation.  Your next job, as a

6 juror, is then to say, "There is mitigation.  Now, do I

7 believe it's sufficient to warrant a life sentence over a

8 death sentence?"

9              You see where that goes?

10   A.    Yes.

11   Q.    Would you keep an open mind to that, or would you

12 always, if you found something --

13   A.    An open mind.

14   Q.    An open mind?

15   A.    Yes, I would.

16   Q.    So simply finding mitigation, you understand

17 that's not enough to answer that question yes?

18   A.    Yes.

19   Q.    To answer that question yes, you have to find,

20 first, mitigation and that it's sufficient to warrant life

21 over death.

22   A.    Uh-huh.

23   Q.    You understand that?

24   A.    Yes.

25   Q.    So you wouldn't always -- you're not saying that

1    you would, in every case, no matter the facts or the

2    evidence, always find mitigation?

3         A.   Yes.

4         Q.   You're not saying that you would do that?

5         A.   No, not always.

6         Q.   You might.  You have an open mind as to whether it

7    existed?

8         A.   I'll have an open mind, yes.

9         Q.   If it existed, you would keep an open mind as to

10   whether it's sufficient enough to warrant life over death?

11        A.   Yes.

12        Q.   You're not saying it always would or it always

13   wouldn't; you'd have to determine that after you heard it?

14        A.   Yes, I would determine it.

15        Q.   So the answer to that third special issue would

16   not always be yes, and it would not always be no?

17        A.   That's right.

18        Q.   It would be whatever you believed it should be

19   based on what you've heard?

20        A.   Yes.

21        Q.   Because I'll tell you this:  You know, it doesn't

22   take a rocket scientist to understand what's happening here.

23   If you find -- as a juror in a hypothetical case, if you

24   find someone guilty of capital murder and you answer that

25   first question, "Yes, I believe there is a probability he'll

154

1    be a future danger," and then you answer that second

2    question, "No, there is not sufficient mitigation to warrant

3    life over death," you know the death penalty is going to

4    happen.

5         A.   Yes.

6         Q.   It's going to be imposed.

7         A.   Yes.

8         Q.   And if you answer any other way, a life sentence

9    is going to be imposed.  You're not saying that you would

10   manipulate your answers to ensure that a life sentence was

11   imposed?

12        A.   No, I would not.

13        Q.   And you're not saying that you would manipulate

14   your answers to ensure that a death sentence was imposed?

15        A.   No, I would not.

16        Q.   You would look at those questions, and you would

17   answer them the way they ought to be answered?

18        A.   That's right.

19        Q.   And you would follow the law on that?

20        A.   Yes.

21        Q.   And whatever the Judge instructs you is the law --

22   because I'll tell you, we can talk -- I could ask a hundred

23   million questions, and Mr. Perkins could ask a hundred

24   million and one questions, but we're not the judges of the

25   law.  Judge Skeen is the judge of the law.  He'll give you

1  the law.

2          So if we misrepresent something inadvertently

3  or if we say something that's not a hundred percent right,

4  he'll instruct you as to what the law is.  And if he does,

5  can you follow the law?

6      A.   Yes.

7      Q.   Your feelings are that you're in favor of the

8  death penalty; you think it's a good idea; you think it's

9  fair; you think some people are deserving of the death

10 penalty, and some people are not?

11     A.   True.

12     Q.   You would be able to keep an open mind as to which

13 of those people are deserving of the death penalty?

14     A.   Yes.

15     Q.   You could hold us to our burden of proof?

16     A.   Yes.

17     Q.   You would not require the Defense to put on any

18 kind of case or present any evidence at all?

19     A.   Yes.

20     Q.   You wouldn't require the defendant ever to

21 testify?

22     A.   No.

23     Q.   And you wouldn't hold it against him if he chose

24 not -- a defendant chose not to for any purpose?

25     A.   No, I would not.

156

1      Q.    You could consider the existence of lesser

2  included offenses, even though he's been charged with -- a

3  defendant was charged with capital murder, and you could

4  consider all of the ranges of punishment as instructed by

5  the Court?

6      A.    Yes, I could.

7      Q.    Bottom-line question:  Is there any reason you

8  think that you couldn't be fair to either the State or to

9  the Defense?

10     A.    No reason.

11     Q.    Do you think you could keep an open mind and wait

12 to hear all the evidence before you begin judging it?

13     A.    Yes.

14     Q.    And you think you could follow any instructions

15 that came from the Honorable Judge Skeen?

16     A.    Yes.

17     Q.    One other thing, you might hear victim-impact

18 testimony.  It's testimony that comes from the relatives or

19 family of a deceased.  It can be powerful testimony.  It can

20 be very emotional.

21          The law says you can consider that if it

22 helps you in answering those special issues.  You can

23 consider it if it helps.  You can disregard it if it doesn't

24 help.  You give it whatever weight you think it deserves.

25          The only thing you can't do is consider it to

157

1   the extent that you would exclude all the other evidence.

2   You can't be so impassioned that you would automatically

3   say, "That was so powerful, that was so emotional, I'm going

4   to automatically answer these questions in a way that a

5   death sentence is imposed."  You just can't do that.

6               You can follow that instruction?

7       A.   Yes.

8       Q.   Ma'am, Ms. Nelson, thank you very much for your

9   patience.  I really appreciate it.  I think Mr. Perkins may

10  have just a couple questions for you.

11              MR. HARRISON:  Pass the witness.

12              THE COURT:  Mr. Perkins?

13              MR. PERKINS:  Thank you, Judge.

14                  VOIR DIRE EXAMINATION

15  BY MR. PERKINS:

16      Q.   Afternoon, Ms. Nelson.

17      A.   Afternoon.

18      Q.   How are you?

19      A.   Fine.

20      Q.   I see on your questionnaire your name is Mae F.

21  Nelson.  Your middle name wouldn't be Francis, would it?

22      A.   Yes.

23      Q.   Mae Francis Nelson?

24      A.   Yes.

25      Q.   And you live down in Troup; is that right?

158

1     A.    Yes.

2     Q.    Ms. Nelson, have you ever been on a jury before,

3   ever been called for jury duty before?

4     A.    No.   Been called for minor things, but never did

5   get to serve.

6     Q.    Okay.   So you would get called and sit through the

7   big panel, but never actually sat through a trial itself?

8     A.    Uh-huh.   That's right.

9     Q.    Well, what I want to do is I want to go over with

10  you and talk to you about some of the same things that

11  Mr. Harrison visited with you about just to make sure in my

12  mind that I'm understanding what you're saying.

13        And I'm going to tell you, it is so

14  refreshing to come in here and have somebody say yes and no.

15  So many people come in here and they say, "Well, I'll try

16  to," or "I think I could" or "I hope I could," but it is so

17  nice to have somebody come in here and say, "Yes, I can; no,

18  I can't," that kind of thing, because it speeds up things so

19  much.

20    A.    Okay.

21    Q.    So while we're going through this, this is our

22  only chance.   If you get picked to be a juror on this case,

23  the very first thing that's going to happen is Judge Skeen

24  is going to instruct you not to talk to us, except maybe

25  say -- I think the word is casual greetings.   And we're not

159

1   supposed to talk to you and wouldn't get to talk to you

2   again until after the case was over.

3            So the reason it's so important is, is

4   because now is the only time we have an opportunity to visit

5   back and forth and find out how you feel about things and

6   whether or not you like this or would change this or believe

7   in that or don't believe in it.

8            And I will tell you, from my perspective when

9   I sit here and you go through the things with Mr. Harrison,

10  everything you said so far sounds like you're right along

11  with what the law would require of you.

12       A.   Yes.

13       Q.   One of the things that the law is going to require

14  of you right off the bat is to be patient.  You're getting a

15  dose of that already by having to come sit down here last

16  Thursday and sit around forever and then come and sit around

17  out in the hall out here and now go through this.

18            What the law asks you to do is, is to be

19  patient and listen to everything before you start making any

20  kind of decisions.

21       A.   True.  Uh-huh.

22       Q.   What's the biggest decision you ever felt like you

23  made in your life?

24       A.   Buying my house.

25       Q.   Buying a house.

160

1      A.    Yes.

2      Q.    Now, would you say that you would make a better

3  decision if you made that decision with your head or with

4  your heart?

5      A.    With your head.

6      Q.    Okay.  I love my wife.  I think she's fabulous,

7  and I married way above my station in life.  If my wife has

8  one failing, it's that she makes impulsive decisions, which

9  I'm probably one of those, and I was a benefit of that.  But

10  she makes impulsive decisions.

11          She'll be driving down the street, and she'll

12  see a car that she likes, and that's all I'll hear until she

13  buys that car.  And then she'll buy that car, and it will

14  turn out to ride rough and get terrible gas mileage or

15  something.

16          And that's why in the time that she's had

17  five or six cars, I've had the same truck the whole time

18  until last week.  In the last ten years, I've had one truck,

19  and she's had five or six cars because she makes impulsive

20  decisions with her heart instead of using her head,

21  sometimes, to reason out, do some research, and that kind of

22  stuff, okay?

23      A.    Okay.

24      Q.    There are people that make impulsive decisions.

25  Would you agree with me?

161

1      A.   Yes.  Uh-huh.

2      Q.   There are people who make assumptions while they

3 try to make decisions, and those people, a lot of times, end

4 up regretting their decisions.  Would you agree with that?

5      A.   Yes.  Uh-huh.

6      Q.   What I want you to do when you're going through

7 here is, if you've got a conflict between your head and your

8 heart about any of this stuff that we're talking about, let

9 us know.

10     A.   Okay.

11     Q.   They deserve to know, and Mr. Beatty right here

12 deserves to know, okay?

13     A.   Okay.

14     Q.   Now, let me start at the very start.  They, the

15 State of Texas, the Court, have said time and time again

16 this is a capital murder case.  This is a case where the

17 State is seeking the death penalty, so on and so forth.

18           Because of the procedure and the rules we

19 have to follow, I can't interrupt them.  Mr. Harrison is

20 right when he says my job is to sit here respectfully and

21 wait my turn.

22           But every time that they say this is a

23 capital murder case, I want to stand up and say, "No, it's

24 not."  What it is, is they have alleged that he committed

25 the offense of capital murder.  He is going to enter a plea

162

1    of not guilty, and that's why we're going to have a trial,

2    okay?

3                    They say it's a capital murder case.  They

4    say it's a death penalty case.  I say it's not even a

5    capital murder case in the first place.  And as Mr. Harrison

6    correctly stated to you, unless you're convicted of capital

7    murder, you can't possibly get the death penalty.

8                    You understand all of that?

9         A.   Yes, I do.

10        Q.   So it's tough sometimes to sit over here and just

11   wait.  You appreciate that we have to wait before we get to

12   talk to you.

13        A.   Yes.

14        Q.   What do you think about our legal system in

15   general?  Do you think it's good; it's always fair; it's

16   fair most of the time; it's not fair most the time?  How do

17   you feel about it?

18        A.   Good.

19        Q.   In fact, a lot of people, me included, would think

20   it's probably the best system that there is in the whole

21   world.

22                    Is that system, in your mind, incapable of

23   making mistakes?

24        A.   No, it's not incapable of making mistakes.

25   Mistakes are made every day in some kind of way.

163

1      Q.   Right.   In fact, you probably read about -- have

2  you ever read anything about people -- you know, that they

3  found out years later --

4      A.   Yes.

5      Q.   -- a mistake had been made in court?

6      A.   Yes, you hear about that all the time.

7      Q.   I noticed that in your questionnaire, you watch

8  some of the same things, some of the same programs, "48

9  Hours," "20/20," that kind of stuff.   They have a lot of

10 cases about that very subject, don't they?

11     A.   Sometimes.

12     Q.   What do you think in your own mind is worse, to

13 convict somebody who should be found not guilty or to acquit

14 somebody who should be found guilty?   Which one of those is

15 worse in your mind?

16     A.   To convict somebody who is not guilty.

17     Q.   You know, I don't know if there is a good answer

18 for that, but that's the way the system is set up.

19          As you sit here right now, do you have any

20 problem presuming that Tracy Beatty is not guilty?

21     A.   No.

22     Q.   Can you afford him, can you give him the

23 presumption of innocence?

24     A.   Yes.

25     Q.   Because a lot of people come in and they say,

164

1    "Hey, look, if he's charged with it, he's been indicted,

2    he's been arrested, he must have done something wrong or he

3    wouldn't be here," that kind of attitude.

4         A.    Uh-huh.

5         Q.    Do you feel like that at all?

6         A.    No.

7         Q.    Okay.  You understand that the fact that somebody

8    has been arrested or charged with something, the fact that

9    they've been indicted, the Court's going to instruct you --

10   this isn't my rule -- the Court's going to instruct you that

11   you're not to consider that as any evidence of guilt at all.

12              Can you follow that instruction?

13        A.    Yes.

14        Q.    The -- the next thing I want to talk to you about

15   is something that Mr. Harrison touched on a little bit, and

16   I want to talk to you some more about it, and that's the

17   Fifth Amendment, the right to remain silent.

18              You understand that a constitutional right

19   doesn't mean much if you're going to penalize somebody for

20   using it?

21        A.    Yes, I do understand.

22        Q.    I mean, that theory, "You've got this right, but

23   if you use it, I'm going to hold it against you."  That's

24   not exactly the way that works.

25              And one thing that you've said, when

165

1   Mr. Harrison asked you, can you think of a reason why

2   somebody wouldn't testify, my notes say that you said that

3   he might incriminate himself.

4       A.   Yes.

5       Q.   Do you think that everybody that invokes their

6   Fifth Amendment privilege is doing it to keep from giving

7   evidence against themselves?

8       A.   No.

9       Q.   Because that's the exact kind of thing that we're

10  trying to guard against.

11      A.   Yes.

12      Q.   You know, there may be a whole litany of reasons

13  why somebody has decided not to testify.  That's a decision

14  that we don't have to make until the very end of the trial.

15           A person may say, as Mr. Harrison correctly

16  stated, the burden is on you.  If I believed that you hadn't

17  proved it beyond a reasonable doubt, there is no reason to

18  testify.

19           Do you understand that?

20      A.   Yes, I do.

21      Q.   Okay.  The Court would instruct you not to

22  consider it for any purpose at all, not to weigh it as a

23  factor against any defendant in a case.

24           Can you do that?

25      A.   Yes.

1      Q.   And just weigh the State's evidence for what it

2   is?  Because if you take the State's evidence over here and

3   you say, "All right, well, they've proved this and that to

4   me, but I'm not convinced beyond a reasonable doubt, but

5   since the defendant didn't testify, I'm going to throw that

6   over on top of their pile; it's going to make their evidence

7   better; it's going to make their witnesses more believable,"

8   then you're actually penalizing somebody for exercising that

9   constitutional right.

10           Can you tell us, "Mr. Perkins, you don't have

11  to worry about that"?

12      A.   Yes.

13      Q.   All right.  I don't know -- and I know it was your

14  son, right, that worked as a prison guard for a while before

15  he went out to Tyler Pipe?

16      A.   Yes.

17      Q.   I assume the reason he went to Tyler Pipe is more

18  money?

19      A.   I guess.

20      Q.   Tyler Pipe probably pays a whole lot better than

21  Bradshaw State Jail, I would assume.

22      A.   Yes.

23      Q.   Is there anything at all about your having an

24  ex-prison guard -- I don't even know if he was a prison

25  guard or if he worked out there doing something different,

167

1    but is there anything about that that makes you believe that

2    police officers are more credible than ordinary citizens?

3         A.   No.

4         Q.   I'll tell you, the way I've always looked at it,

5    and I used to work in the DA's office, in fact, in this one,

6    and before that, Lubbock.  And Ken Hawk over here, too.  We

7    both worked for Mr. Skeen when he was the DA.

8              What I've always said to people is, there are

9    good and bad everything.

10        A.   True.

11        Q.   I don't care if we're talking about plumbers,

12   painters, lawyers, cops, whatever.  There are some that you

13   should absolutely trust with your life savings, and there

14   are others that you should not trust with a plug nickel.

15        A.   That's true.

16        Q.   What you have to be able to do is to say, "Look, I

17   will wait and listen to what they say, along with everybody

18   else, and then I'll decide whether to believe some of it,

19   all of it, part of it, none of it, whatever the situation

20   calls for."

21             Do you have any problem doing that at all?

22        A.   No.

23        Q.   So if a policeman came in and said "X" and another

24   witness came in and said "Y," you're not going to lean over

25   and say, "Well, the policeman said it, and he's a policeman,

1    so I'm going to believe him over this other one just because

2    he's a policeman"?

3         A.    No, I'm not.

4         Q.    Another thing that goes along with that, if a

5    defendant in a trial testifies, can you judge his

6    credibility just like you would anybody else's?

7         A.    Yes.

8         Q.    Okay.  All right.  Do you have any questions at

9    all about any of that?

10        A.    No.  Huh-uh.

11        Q.    Let me talk to you a second about reasonable doubt

12   and the burden of proof.  Mr. Harrison correctly stated that

13   the burden of proof is on the State of Texas, that they have

14   to prove each and every element of the offense charged

15   beyond a reasonable doubt.

16             A reasonable doubt is whatever you think it

17   is, and he went through, I think, a number of different

18   scenarios, one of them talking about somebody throwing water

19   off the top of the courthouse or something.

20             But what it really means, when it comes down

21   to it at the end of this is, if you've got a reasonable

22   doubt, if they have not extinguished all reasonable doubt

23   from your mind, what are you supposed to do?

24        A.    Weigh it out and determine whether it's right or

25   it's wrong and determine whether he's guilty or not guilty.

169

1      Q.   Okay.  Now, stick with me through this

2  hypothetical.  You're on the jury, and Ken Hawk is charged

3  with stealing this bottle of water, and I bet his

4  fingerprints are on here right now, and now mine are, too.

5  But let's say Ken Hawk is on trial for stealing a bottle of

6  water.

7              And you understand that they have to prove

8  each and every element of that to you beyond a reasonable

9  doubt?

10     A.   Yes, I do understand.

11     Q.   They come close.  You think, "Yeah, he probably

12  did it.  I think it's more likely than not that he did it,

13  but I am not convinced beyond a reasonable doubt.  I've got

14  some reason to doubt it, or I have a reasonable doubt in my

15  mind."  What do you with Ken Hawk?

16     A.    Wait to see if he's guilty beyond a reasonable

17  doubt.  If he is, then he is.  If he's not, he's not guilty.

18     Q.   And that's what I'm telling you.  The trial is

19  over, and you're back there, and you go through it with

20  everybody else, and you say, "Well, you know, it's more

21  likely than not that he did it, he probably did it, but I am

22  not convinced beyond a reasonable doubt that he did it."

23              In that circumstance, what do you do?  If

24  you're not convinced beyond a reasonable doubt of each and

25  every element, what do you do?

170

1    A.    I would say he's not guilty.

2    Q.    That's what the Court would instruct you to do.

3    A.    Uh-huh.

4    Q.    Now, if you make a mistake and the State just

5    failed to prove it, but in reality, he did it --

6    A.    Yes.

7    Q.    -- you wouldn't much worry about finding him not

8    guilty, would you?  Because so what?  He stole a bottle of

9    water.  I'm not really worried if he goes out and steals

10   another one, right?

11   A.    Right.

12   Q.    What I have to guard against and what we are

13   entitled to know here, the State and the Defense both is,

14   some people say, because of the allegation, it's going to be

15   either easier to prove or harder to prove.

16          Let's say now that Ken Hawk is on trial for

17   capital murder, and you hear bad stuff, I mean, bad stuff,

18   and you think to yourself, "It's more likely than not that

19   he did it, I think he probably did it, but I've got a

20   reasonable doubt.  I do not believe that the State has

21   proven each and every element of the offense charged beyond

22   a reasonable doubt."

23          What are you supposed to do then?

24   A.    Like I said, weigh it out and see which is which.

25   And if he's not guilty and has not been proven that he's not

171

1    guilty, then he's not.  But if he is, he is guilty.  Have an

2    open mind there.

3          Q.    Okay.  Let me kind of talk to you -- and I do see

4    and appreciate that you say you have an open mind and are

5    not easily persuaded.  Two things I want to talk to you

6    about.  Number one, nobody is trying to persuade you or

7    trick you.

8          A.    Yes, sir.

9          Q.    But one thing that causes me concern, if it's been

10   proven that he's not guilty --

11         A.    Uh-huh.

12         Q.    -- Mr. Hawk doesn't have any burden of proving

13   anything to you.  It's the State that must prove him guilty

14   beyond a reasonable doubt.

15               And if you get back there in the jury room,

16   and you sit there and you say, "It's more likely than not

17   that he did it; he probably did it; I might even be

18   convinced by clear and convincing evidence that he did it;

19   but the State has to prove beyond a reasonable doubt that he

20   did it, and they did not do it; I've got a reasonable doubt

21   about this or that; I've got a reasonable doubt about

22   something that they have to prove," and Ken Hawk is on trial

23   for capital murder, if you get back there and you have a

24   reasonable doubt about whether or not he's guilty, what are

25   you supposed to do?

172

1          A.    Find him not guilty, if I've got a reasonable

2    doubt.

3          Q.    Now, see, that situation for a lot of people is

4    harder to do, because if a mistake is made and Ken Hawk

5    actually did do it, and they didn't prove it, I always worry

6    about the jurors saying, "Well, I'm not going to take a

7    chance.  I'd rather err on the side of safety.  Even if I'm

8    wrong, I would rather find him guilty than take a chance of

9    being wrong, even if they didn't prove it beyond a

10   reasonable doubt."

11              Do I have to worry about that with you?

12         A.    No.  Huh-uh.

13         Q.    Because like you said before, it's worse to

14   convict somebody of something that they didn't do than the

15   other way around.

16         A.    Uh-huh.

17         Q.    Now, let me tell you what the law says, is, if you

18   could just picture -- like if I had a ladder and I leaned it

19   up against that wall, the top rung on the ladder is capital

20   murder.  What the law would tell you is, here's the top rung

21   up here.

22              If you believe beyond any reasonable doubt

23   that the State has proven capital murder, they've proven

24   each and every element of that offense beyond a reasonable

25   doubt, then you're supposed to convict that person.

1    A.    That's true.

2    Q.    If they don't, then you go down to the next rung

3  on the ladder and see, did the State prove each and every

4  element of that offense beyond a reasonable doubt?

5    A.    Uh-huh.

6    Q.    So it may be a situation where the top rung is

7  capital murder; the next rung is murder; the next rung is

8  manslaughter; the next rung is criminal negligent homicide;

9  and if they didn't prove anything, then down at the bottom

10  of the ladder is not guilty.

11              So what you do is, you start at the top.  Do

12  I have a reasonable doubt about this?  If the answer is yes,

13  then you move down to the next rung.  Do I have any

14  reasonable doubt about this?

15              Do you understand how it works?

16    A.    Yes.

17    Q.    And if they failed to prove that the defendant

18  committed any crime then?

19    A.    I would have to find him not guilty.

20    Q.    That's right.  So you actually have to go kind of

21  through a filter.  You have to go down that ladder before

22  you get to not guilty.

23              Do you understand where I'm at on that?

24    A.    Yes.

25    Q.    The other thing I want to talk to you about is, is

174

1   that the Court would give you an instruction, and the way I

2   like to look at these instructions is like this:  I told a

3   juror yesterday that I'm on a diet, and the doctor told me,

4   you know, "This is what you need to do, and this is what you

5   don't need to do; this is what you don't need to eat; this

6   is what you don't need to eat."  That's his instructions to

7   me.

8           I should follow those instructions, right?

9       A.   Right.

10      Q.   If I want to do what's right, I should follow

11  those instructions?

12      A.   Right.

13      Q.   But that doctor is not following me around.

14      A.   True.

15      Q.   He's not following me into El Charro's to see if

16  I'm eating a chicken fried steak, like I'm not supposed to

17  be, is he?

18      A.   That's right; he's not.

19      Q.   He tells me, "You ought to do this; this is what

20  you ought to do," but it's left up to me.

21      A.   That's true.

22      Q.   I'm going to tell you, quite candidly, that the

23  Judge's instructions to the jury are much the same as

24  doctor's instructions to patients.  The Court's not going to

25  go back to in there with you in the jury deliberation room

175

1    to make sure that you're following them.  It's left up to

2    the jurors to honestly say, "I took an oath to do what

3    you're going to tell me to do."

4        A.    That's true.

5        Q.    Okay.  And I'm sure, from looking at your

6    questionnaire, that you would take an oath seriously?

7        A.    Yes, I would.

8        Q.    You wouldn't say, "I'll take an oath to do this"

9    and then go back there and just disregard it, would you?

10       A.    No, I wouldn't.

11       Q.    Okay.  Well, that's good.

12             What the Court would instruct you to do --

13   let's say you're on a case.  Ken Hawk is charged with

14   burglary.  We'll make him a burglar now.  Ken Hawk is

15   charged with burglary.

16             You get back there, and you say, "Well, I

17   know that he's guilty of something, but I can't tell if he's

18   guilty of burglary or if he's just guilty of theft.  I've

19   got a reasonable doubt.  I know that he's guilty of one or

20   the other, but I'm not sure which one it is."

21             I know you don't know what the law is on

22   this, but what do you think that the law would be on this?

23   What do you think that -- how should you resolve that?  And

24   then I'll tell you whether or not you're right about that.

25   How do you think that the law would have you resolve that

176

1  difficulty?

2      A.    It would be either or it could be either one.  But

3  the way I would resolve it would say that he's not guilty.

4  Without beyond a reasonable doubt, he would be.

5      Q.    Okay.  The law says that if you -- if somebody is

6  proven to be guilty of a greater crime, burglary, or a

7  lesser crime, theft --

8      A.    Theft.

9      Q.    -- that you should resolve that in favor of the

10 defendant and find him guilty of only the lesser offense.

11     A.    Oh, really?

12     Q.    Okay.  Do you have any problem following that

13 instruction?

14     A.    No.

15     Q.    And let me try to use an example.  Let's say Ken

16 lives across the street from me, and one night when I'm at a

17 church social, he climbs in the window and steals my DVD,

18 okay?

19          He is guilty of entering a habitation and

20 taking property that did not belong to him with the intent

21 of depriving the owner, that's me, of the property.  That's

22 kind of a classic example of burglary.

23     A.    Okay.

24     Q.    Now, let's change a little bit.  Let's say that me

25 and Ken Hawk live in the same house together.

177

1  A. Okay.

2  Q. He's my roommate, and I'm gone to play bingo or

3 gone to the gambling boat or wherever I might be going this

4 time, and Ken Hawk slips in my room and steals my DVD.

5    If a juror was convinced beyond a reasonable

6 doubt that he had committed a crime, but a juror had a

7 reasonable doubt as to whether or not it was burglary or

8 theft, they should resolve that, according to the Court's

9 instructions, in his favor and convict him only of the

10 lesser offense.

11    Do you understand how that works?

12  A. Yes.

13  Q. Do you have any problems following that

14 instruction?

15  A. No.

16  Q. Do you have any questions about that?

17  A. No.

18  Q. Did you know that you were going to go to law

19 school here in two hours?

20  A. No, I did not.

21  Q. I will tell you, and I say this with all

22 sincerity.  Anybody who sits through this knows more about

23 the capital murder procedure than any of us sitting at this

24 table did when we got out of law school.  I guarantee you

25 that that's the case.

178

1    And we expect a lot out of jurors.  We expect

2  them to pick up on this stuff and learn a lot in a short

3  period of time.  So there is nothing wrong with you saying,

4  "I'm lost."

5    A.   Okay.

6    Q.   Thank you.

7         The next thing I want to talk to you about

8  are the special issues.  They are right there in front of

9  you.

10        Were you fixing to ask me something?

11        THE COURT REPORTER:  She thought you were

12  through.  She was getting ready to leave.

13    Q.   (By Mr. Hawk) Don't get your hopes up.  I'm

14  getting my second wind.  Sorry about that.  I'll give you a

15  warning when I'm nearly finished, okay?

16    A.   Okay.

17    Q.   I'm sorry to be the bearer of bad news.  I'm

18  getting close to finish, though.

19    A.   Okay.

20    Q.   The special issues are right there in front of

21  you.  What I would like to do is back up a step and touch on

22  some of the stuff Mr. Harrison talked about.

23        Everybody who is charged with capital murder

24  doesn't get the death penalty.

25    A.   That's true.

179

1    Q.   First of all, there's going to be people charged

2  with capital murder that aren't convicted of capital murder.

3    A.   Okay.

4    Q.   If they get convicted of anything other than

5  capital murder, they can't get the death penalty.  And he

6  used an example.  I think in his example he shot and killed

7  or stabbed April Sikes, as bad a murder as you could ever

8  think of.  If you looked up Brett Harrison in the dictionary

9  and it had a definition, Brett Harrison had his picture,

10  scumbag, worthless human being, I mean, all these terrible

11  things about him.

12        Even if he was the worst person in the

13  world -- and he's not even, but even if he was the worst

14  person in the world and he committed the worst murder that

15  you could ever dream of, if it's murder, he cannot get the

16  death penalty.  He can't do it.  I don't care how bad he is.

17  I don't care how bad the facts and circumstances of the

18  murder are.

19        How do you feel about that?

20    A.   That's true.  I'll go along with that, you know.

21    Q.   It's true, but let me tell you how I feel about

22  it.  I think that that is the goofiest thing I have heard in

23  the law.

24    A.   Oh, really?

25    Q.   Yeah.  I mean, why wouldn't he be eligible, is

180

1   what I would want to say.

2        A.   Uh-huh.

3        Q.   But the law says not eligible.

4             The only time that that comes into worrying

5   anybody is, is if a juror would be tempted to find somebody

6   guilty of something greater than what was proven just to

7   keep them eligible for the death penalty.

8             Would you do anything like that?

9        A.   No.

10        Q.   Good, because you wouldn't be following your oath

11   to render a true verdict if you were to do something like

12   that.  Do you understand that?

13        A.   Yes.

14        Q.   Okay.  Back to my example.

15             Everybody that's ever been charged with

16   capital murder is in this great big circle, okay?  I'm going

17   to narrow down the circle to just people who are convicted

18   of capital murder.  Those people are still in the running

19   for the death penalty, okay?

20        A.   Okay.

21        Q.   What those special issues do is they make the

22   circle smaller and smaller, okay?

23        A.   Okay.

24        Q.   The only way in Texas that anybody can get the

25   death penalty is, all 12 jurors agree beyond a reasonable

181

1   doubt that the State has proven every element of capital

2   murder.  That's the only way.  That's Step Number 1.

3           Step Number 2 is, that the State, again, has

4   the burden of proving, again, beyond a reasonable doubt that

5   the person on trial would constitute what we paraphrase as a

6   future danger to society, okay?

7       A.   Okay.

8       Q.   As Mr. Harrison told you, society means whatever

9   you think it means, okay?

10      A.   Yes.

11      Q.   They have to prove to you that there is a

12  probability that the person on trial would commit -- not

13  could commit, but would commit future acts of criminal

14  violence -- not acts of violence, you know, criminal acts of

15  violence that would constitute a continuing threat to

16  whatever you believe society was, okay?

17      A.   Yes.

18      Q.   Now, the only way to get closer to the death

19  penalty is that all 12 jurors agree that the answer to

20  Special Issue Number 1 is yes.

21      A.   That's true.  Yes.

22      Q.   If you believe that the answer to that is yes,

23  then you move to the last special issue.  That special issue

24  asks you to look at all the facts and circumstances in the

25  case, and if you find that there is a sufficient mitigating

182

1   circumstance, singular -- it can be just one thing -- or

2   circumstances, plural, to warrant that a life sentence

3   rather than a death penalty be imposed.  It's just a yes or

4   no answer.

5       A.   Yes.

6       Q.   Okay.  If you find that there is sufficient

7   mitigating circumstance or circumstances, you answer it yes.

8       A.   Yes.

9       Q.   If you don't, you answer it no.  There is no

10  burden on the Defense to show you what the answer should be;

11  there is no burden on the State to show you what the answer

12  should be because you consider all of the evidence that

13  you've heard in both stages of the case and then decide, is

14  there a sufficient mitigating circumstance, yes or no.

15      A.   Yes.

16      Q.   The only way that a person gets the death penalty

17  in Texas is all 12 guilty beyond a reasonable doubt, all 12

18  proven beyond a reasonable doubt future danger, and all 12

19  agree there is no mitigating fact or circumstance that

20  warrants a life sentence rather than the death penalty be

21  imposed.

22      A.   Uh-huh.

23      Q.   Any other combination, no death penalty.  Do you

24  understand that?

25      A.   Yes.

183

1    Q.   Now, let me talk to you just for a minute -- and

2  I'm nearly finished -- about the difference in murder and

3  capital murder.  Capital murder -- and there should be a

4  sheet in front of you that says at the top "capital murder."

5              You see it up there?

6    A.   Yes.

7    Q.   It kind of looks like that.  There you go.

8              That is a page out of, basically, the Penal

9  Code that says every possible way to commit capital murder.

10  That's all of them, okay?

11              In this particular case, the State has

12  alleged that Mr. Beatty caused an intentional murder during

13  the course of burglary and robbery.  Let me talk to you

14  about that for a second.

15              If you look down there on -- in 19.03, I

16  think it's the one with the Number 3 in the paragraph -- no,

17  Number 2 in the paragraph out beside it.  The person

18  intentionally commits the murder in the course of committing

19  or attempting to commit, and it has all those different

20  felonies listed.

21    A.   Yes, sir.

22    Q.   Okay.  You see where I'm talking about?

23    A.   You said which one was that?

24    Q.   Sometimes you have to flip it over so I can see

25  it.

184

1          19.03, and it has a little Number 2 out

2     beside it.  It's right here on the page, if you can see

3     where my thumb is pointing, way up high at the top up here

4     (indicating).

5          A.    Yeah, the very first line.

6          Q.    That tells you all the different felonies that

7     will support a capital murder conviction, okay?  You see

8     them all listed there?

9          A.    Yes.

10         Q.    What would be incumbent upon the State in this

11    case is to prove, number one, an intentional murder, okay?

12         A.    Okay.

13         Q.    It is not good enough for them to prove a murder,

14    which is not an intentional murder.  And let me explain

15    that.

16              Let's say that I am trying to get Ken Hawk's

17    watch off of him.  I want his watch.  It's a whole lot nicer

18    than mine, and I am in the course of committing a robbery.

19    I pull out a gun, and I'm trying to take property from him

20    by force, okay?

21         A.    All right.

22         Q.    Let's say that I'm trying to get his watch, and I

23    can't get it off because his hands are too big.  And so I

24    decide I'm going to shoot him in the back of his hand, and I

25    shoot him in the back of his hand, and that makes it a lot

185

1   easier to slip his watch off, okay?

2       A.   Okay.

3       Q.   If I commit a murder, a jury has to find beyond a

4   reasonable doubt that I had formulated the specific intent

5   to murder him.  If you believe that I had this specific

6   intent to cause serious bodily injury and I did an act

7   clearly dangerous to human life that resulted in his death,

8   that will not support a capital murder, okay?

9            It has to be that I had formulated the

10  specific intent to cause his death and that I had committed

11  or attempted to commit another felony and that those things

12  happened in the course of one another.

13           You understand those three things?

14      A.   Yes.

15      Q.   So you can see that there's a lot of difference in

16  proving beyond a reasonable doubt murder and proving beyond

17  a reasonable doubt capital murder.

18      A.   Okay.

19      Q.   Because not only did they have to prove an

20  intentional murder, okay, they also have to prove a second

21  felony, and it has to be one of these felonies that's listed

22  on here.

23      A.   Uh-huh.

24      Q.   So you can't have capital murder during the course

25  of credit card abuse.  You can't have a capital murder

186

1    during unauthorized use of a motor vehicle.  It has to be

2    one of those that's in there.

3              Do you have any problems following that

4    instruction?

5         A.   No.

6         Q.   Now, the last thing I want to talk to you about is

7    this:  It's called "in the course of commission," okay?  "In

8    the course of commission" is defined as conduct occurring in

9    an attempt to commit, during the commission, or in the

10   immediate flight after the attempt or the commission of the

11   offense, okay?

12             For a case to qualify as a capital murder

13   case, the intent to commit the underlying offense has to be

14   formed concurrently with, which means at the same time as,

15   or prior to the intent to commit the murder, okay?

16        A.   Okay.

17        Q.   Let me give you a different example and see if I

18   can make it much more clearer to you, because that's a bunch

19   of fancy lawyer words.

20             Let's say that I'm working in a convenience

21   store, and me and Ken Hawk have never gotten along at all.

22   And Ken comes in there, and he says, "Go get me a burrito,"

23   and so I get him a burrito from the convenience store, and I

24   get him the smallest one.  It's all torn up.  It's been

25   there for about three or four days, and I say, "Here's you a

1    burrito right here."

2              And he gets all mad about that, and we start

3    hawing back and forth at each other.  He gets mad, goes out

4    to his car, and bites into that burrito, and it's cold and

5    stale, and he's just as mad as he can be at me.  I didn't

6    give him any hot sauce or any napkins or nothing.

7              He comes back in there and decides that he

8    has had enough.  He pulls out a gun and shoots me 275 times,

9    okay, and then he leaves.  As he's leaving, he thinks, "You

10   know what?  I think I'll go back in there and get all of

11   burritos and all the money out of the cash register and

12   Robert Perkins's wallet off of him.  I'm going to get all of

13   that."

14             Well, now you're on his trial, you're on his

15   jury, and you believe beyond a reasonable doubt that he

16   committed an intentional murder.  That's been proven to you

17   beyond a reasonable doubt.

18       A.    Yes.

19       Q.    And you believe that he came back in and

20   burglarized the store, but you've got a reasonable doubt

21   about whether the intent to commit the burglary was formed

22   at the same time or that it was in the course of committing

23   the murder.

24       A.    Uh-huh.

25       Q.    The law says that if you've got a reasonable doubt

188

1   about the element of "in the course of committing," you're

2   supposed to acquit him of capital murder.

3               Does that make any sense to you?

4        A.   Yes.  Uh-huh.

5        Q.   Okay.  Because that's a different scenario than

6   where he came in there with the specific intent to rob me,

7   and in the course of robbing me, killed me to keep from

8   having a witness or whatever.  Now, he's guilty of murder,

9   and he may be guilty of burglary, too, but that's down the

10  ladder.

11              Do you understand where that's coming from?

12       A.   Yes.

13       Q.   And that's the way the law looks at it.  I'm not

14  saying that's a good idea or a bad idea.  What I'm telling

15  you is that's what the law says that you would have to be

16  able to do.

17              Do you have any problem with that law?

18       A.   No.

19       Q.   Do you have any problem following that law?

20       A.   No.

21       Q.   Now, always watch out for when a lawyer says this,

22  but I've got one more question for you, and I always put an

23  asterisk by it.

24              Do you want to be on the jury?

25       A.   No.

1   Q.   Because if you did want to be on the jury, we

2   would rush out and get you a CAT scan and make sure you were

3   all right.  I don't think anybody wants to be on the jury.

4   But you understand -- and I certainly appreciate your honest

5   and direct answers today.

6   A.   Uh-huh.

7   Q.   Somebody's got to do it, and it's a big

8   responsibility.

9   A.   Yes.

10  Q.   But somebody has to do it, and they have to take

11  it seriously.  Could you do that?

12  A.   Yes.  Uh-huh.

13  Q.   Okay.  Thank you, Ms. Mae Francis.

14  A.   Please don't call me that.

15  Q.   I appreciate it.

16          MR. PERKINS:  That's all we have, Your Honor.

17          THE COURT:  Ms. Nelson?

18          VENIREPERSON NELSON:  Uh-huh.

19          THE COURT:  What we're going to be able to do

20  now is you're going to be able to go on back home or

21  wherever you need to go.  And then what we're going to do is

22  tomorrow afternoon -- it may be up near this time or a

23  little bit before this time tomorrow afternoon -- we're

24  going to call you.

25          And when I say "we're," either probably my

190

1    court coordinator, whose name is Kristen Davis, she is going
2    to call you and be able to tell you tomorrow afternoon,
3    later on tomorrow afternoon, whether or not you have been
4    selected to serve on this jury.
5              VENIREPERSON NELSON:  Okay.
6              THE COURT:  In between now and then, be real
7    careful not to talk to this case about -- I'm sorry -- not
8    to talk to anyone about this case.  You know what I was
9    trying to say.
10             VENIREPERSON NELSON:  Okay.
11             THE COURT:  Not to talk to anyone about this
12   case, not to read anything about it in the paper, or watch
13   anything about it on TV.
14             And your home number is on your
15   questionnaire?
16             VENIREPERSON NELSON:  Yes.
17             THE COURT:  And that's the best place for us
18   to get in touch with you?
19             VENIREPERSON NELSON:  Yes, sir.
20             THE COURT:  Then we'll call you -- my court
21   coordinator, Kristen Davis, will call you tomorrow
22   afternoon.  I don't know the exact time.  It will probably
23   be sometime after the middle of the afternoon tomorrow.  And
24   she will let you know whether or not you have been selected
25   for the jury.

191

1          If you have been selected for the jury,

2     she'll be able to tell you what you need to do next.  If you

3     have not been selected, she'll be able to tell you what the

4     situation is at that point.  But we will let you know late

5     tomorrow afternoon.

6          Very much appreciate, again, you coming in

7     early, which really helped us fill in a gap in our schedule,

8     and all of the time that you spent down here answering

9     questions this afternoon.

10          So you may be able to -- you can go ahead --

11    now you can really step down.  Watch your step as you go

12    down over there, and you can go on back home or wherever you

13    need to go, and we'll be in touch with you tomorrow

14    afternoon.

15          Thank you, ma'am.

16          (Venireperson Nelson leaves the courtroom.)

17          THE COURT:  Are y'all ready for Joshua

18    Bennett?  You need a five-minute recess?

19          MS. SIKES:  Please, Judge.

20          THE COURT:  Okay.  We'll take a five-minute

21    recess.  Then we'll start with Mr. Bennett.

22          (Recess.)

23          (Venireperson Bennett enters the courtroom.)

24          THE COURT:  Mr. Bennett, come on up and have

25    a seat right here up in the witness stand.

192

1    Back on the record in this cause number.  The

2  defense counsel is present; State's counsel, the chief

3  felony prosecutor, April Sikes, is present.

4    How are you this afternoon, Mr. Bennett?

5    VENIREPERSON BENNETT:  Doing fine, sir.

6  Yourself?

7    THE COURT:  I'm doing fine.  Thank you.

8    I apologize to you for the fact that we're

9  about 45 minutes late.  You may not believe this, but we

10  don't always run right on time.

11    VENIREPERSON BENNETT:  It's better than work.

12    THE COURT:  That's no big surprise to you, is

13  it?  But I apologize to you.  You know, I know you've got

14  better things to do than sit on that hard bench out there.

15  It's just difficult to tell how the schedule will run along.

16  But I appreciate you being down here this afternoon and

17  waiting on us.

18    In this process we're going to go through now

19  is going to involve Ms. Sikes, who is an assistant criminal

20  district attorney, the chief felony prosecutor in the

21  District Attorney's Office.  She's going to go through some

22  questions with you.

23    When she finishes, Mr. Hawk is going to go

24  through some questions with you.  He represents the

25  defendant in the case, along with Mr. Perkins sitting right

193

1   there beside him.

2            So there are no right or wrong answers to the

3   questions that they are going to ask.  The oath that I gave

4   all the jurors a week ago Thursday still applies, so your

5   answers are under oath.

6            There are no right or wrong answers to what

7   they're asking.  They are mainly going to be asking your

8   opinions and views on certain type issues that are involved

9   in the trial of this type case.

10            They are going to be explaining procedures

11   and laws that apply to the trial of this type case, and they

12   are going to ask you questions like, can you follow the law?

13   Can you follow the procedures?  They're going to explain

14   them to you.

15            If they ask you a question and you don't

16   understand it, don't hesitate to just tell them, "I don't

17   really understand what you're asking me," and they'll be

18   glad to restate it or rephrase it where you'll be able to

19   understand it.

20            Be sure and answer out.  Like if they ask you

21   a question and it calls for a yes answer, answer out yes

22   rather than, like, shaking your head yes at them, or if it

23   calls for a no answer, rather than shaking your head no,

24   answer out no.

25            Answer out whatever the answer is because my

194

1  court reporter has to be able to get down your answers.  And

2  if you shake your head, she has no answer.  So she needs you

3  to answer out, and then I don't think it will be any

4  problem.

5              The air conditioner is off right now.  Just

6  be sure and keep your voice up loud enough where everybody

7  in the room is able to hear you.

8              The questionnaire you filled out when you

9  were hear before, do you have anything you need to add to

10 that?

11             VENIREPERSON BENNETT:  I don't believe so.

12             THE COURT:  All right, sir.  Let me go --

13 recognizing you've been sitting outside a while, let me just

14 get this turned over to Ms. Sikes, and she'll go ahead and

15 start.

16             MS. SIKES:  Thank you, Judge.

17             JOSHUA LEE BENNETT,

18 having been duly sworn as a member of the special venire,

19 was examined as follows:

20             VOIR DIRE EXAMINATION

21 BY MS. SIKES:

22     Q.   Well, it is afternoon.  I can almost say good

23 evening.  How are you, Mr. Bennett?

24     A.   I'm fine.

25     Q.   I'm fine.  Thank you for asking, although I am

1  kind of tired.  We've been at this process a long time

2  today.

3      A.   I can imagine.

4      Q.   The Judge is exactly right.  I may ask you a

5  question that not only may not make any sense to you, it may

6  not make any sense to me either.  If you will just stop me,

7  slow me down, ask me to repeat it, I'm going to do my best

8  to try to make sense of where I'm trying to go with it,

9  okay?

10     A.   Yes, ma'am.

11     Q.   First of all, let me ask you about your shirt.  I

12  notice it says "security" on it.

13     A.   Just a shirt.  I work for Cox Communications,

14  doing internet technical support.

15     Q.   I saw that in your questionnaire, but I thought

16  maybe perhaps you'd changed professions since the last time

17  we were here.  It seems like it's been rather a long time, a

18  little more than a week.

19     A.   Seems like that, yes, ma'am.

20     Q.   The other couple of things I want to tell you,

21  first of all, is we all have different roles here.  You

22  understand that?

23     A.   Uh-huh.

24     Q.   The Judge told you that I'm the chief felony

25  prosecutor for Smith County.

196

1      A.   Right.

2      Q.   What that means, as one of the lawyers for the

3  State of Texas, I'm charged with the duty of trying

4  Mr. Beatty based on an indictment that's been returned by a

5  grand jury.

6      A.   Okay.

7      Q.   And we're going to talk a little bit about that

8  process this afternoon.

9      A.   All right.

10     Q.   There will be another lawyer, I suspect, who will

11 come in in just a minute.  His name is Brett Harrison.  He's

12 another State's attorney.

13     A.   All right.

14     Q.   So together, we represent the State of Texas.

15     A.   Okay.

16     Q.   The defendant -- and you don't know Mr. Beatty?

17     A.   No, ma'am.

18     Q.   He's seated what would be to my right around this

19 table.

20     A.   Right.

21     Q.   And he's with his defense team that have already

22 been introduced to you, Mr. Perkins sitting beside

23 Mr. Beatty and then Mr. Hawk facing me.

24     A.   Yes, ma'am.

25     Q.   And they're his defense team, and, obviously,

197

1    their responsibility is to represent their client to the

2    very best of their ability.  And they're great lawyers, and

3    they're going to do that.

4        A.   Right .

5        Q.   Now, as a juror, your responsibility is a little

6    different than either one of the ones we've talked about.

7             Have you ever sat on a jury before?

8        A.   No, ma'am.

9        Q.   Basically, a jury's job is to decide questions of

10   fact; that is, what happened.  You know, obviously, there

11   are two sides to every story or we wouldn't be here.

12       A.   Right.

13       Q.   Makes sense, right?

14       A.   Yes, ma'am.

15       Q.   You don't know any evidence about the case; is

16   that right?

17       A.   Correct.

18       Q.   And you won't hear any today either, because this

19   part of the process is really to find 12 fair and impartial

20   jurors, which we're going to talk a little bit more about

21   what that means, but 12 people who can sit in that jury box

22   and make a decision, who haven't heard any of the evidence,

23   who can follow the law that the Court gives them, and who

24   keeps an open mind, listens to all the evidence, and then

25   bases their verdict on that evidence, in other words, hadn't

198

1   made up their mind already one way or another.

2        A.   Right.  Yes, ma'am.

3        Q.   Do those things make sense?

4        A.   They do.

5        Q.   So as a venireperson, which is what you are right

6   now, a potential juror --

7        A.   Uh-huh.

8        Q.   -- what that means is, you're not going to have

9   any evidence about the case today.  We're just going to ask

10  you general questions, hypotheticals, talk a little bit

11  about the law.

12             And you tell me at any time if there is one

13  of those things that are compromised in any way, if you

14  can't follow the evidence, if you have made your mind up,

15  any of the things that we've talked about.  If you'll stop

16  me and tell me, then we'll explore that a little bit more.

17       A.   Okay.

18       Q.   Now, if you are on the jury, like I told you, your

19  job would be, then, to get there on the first day and say,

20  "Okay.  The trial starts now."

21       A.   Okay.

22       Q.   Listen to the evidence as it comes to you from the

23  witness stand as exhibits or evidence that are introduced or

24  not in the courtroom.

25             And is it a relief to you that you don't have

199

1    to know now?

2        A.    Yes, ma'am.

3        Q.    And you don't have to know when you are on the

4    jury.  You don't have to know the law that governs this

5    case, all the law that is the law on capital murder

6    indictments.

7              Is that a relief to you?

8        A.    Absolutely.

9        Q.    I tell everybody it's relief to me, too.  I've

10   been a lawyer 15 years, and the law is going to come to you,

11   not from me or from the defense team or any of the lawyers;

12   it's going to come to you from the Court, which is Judge

13   Skeen.

14       A.    Okay.

15       Q.    At the end of the case, you're going to get a

16   charge, which is a pretty thick book, but kind of like the

17   one you filled out.

18       A.    Right.

19       Q.    A thick amount of information that's going to say

20   this is the law, this is your guiding -- your direction for

21   the case.  In other words, you listen to all the evidence

22   you get, and you plug that evidence into the law given to

23   you, and you decide how it fits together.  That's your job

24   as a juror.

25       A.    I see.

200

1     Q.    And would you be able, at this point, to do that?

2     A.    I believe so, yes, ma'am.

3     Q.    We're going to talk about -- a little bit about

4  your feelings on the death penalty.  Obviously, you know

5  that the grand jury has returned an indictment of capital

6  murder.

7     A.    Right.

8     Q.    You also know that the State has filed a notice to

9  seek the death penalty.

10     A.    Yes, ma'am.

11     Q.    Obviously, then, that's why you've been asked some

12  of the questions in your questionnaire.

13     A.    Uh-huh.

14     Q.    This is our only time to actually talk to you

15  about your feelings with regard to the death penalty.  And

16  I'll tell you this:  There is no right or wrong answer, just

17  like Judge Skeen told you.  People feel differently for

18  different reasons.  They base their beliefs on different

19  reasons.  It's just our opportunity for me to talk to you,

20  and you talk back to me.

21     A.    Uh-huh.

22     Q.    Same as well as with the Defense, and kind of

23  explore that a little bit.

24     A.    Yes, ma'am.

25     Q.    So that's what I want to do now.

201

1    A.    Okay.

2    Q.    You know, everybody at this table, whether that's

3    the State or the Defense, has one common goal, which is to

4    find those 12 people, fair and impartial jurors.

5    A.    Right.

6    Q.    Would you agree with me that it wouldn't be fair

7    to a defendant in a capital murder case if the State had 12

8    people who gave the death penalty in a capital murder case

9    every single time, regardless of the evidence?

10   A.    Yeah, that would be unfair.

11   Q.    Very unfair.

12         And would you also agree that it would be

13   very unfair if there were 12 people in the jury box who

14   couldn't ever give the death penalty, based upon their

15   personal feelings, ever, under any circumstances, regardless

16   of the evidence that they heard?

17   A.    I would.

18   Q.    So then you can see that we are trying to find

19   people who are not in either extreme --

20   A.    Yes, ma'am.

21   Q.    -- who believe that, as you answered in

22   Question 68, that the death penalty is appropriate in some

23   cases, and the reverse of that, which I assume is true and

24   you tell me if it's not, that it's not appropriate in some

25   other cases?

202

1    A.    That would be the way I would see it, yes.

2    Q.    Perfect.

3          In response to your Question 67, as you had

4    an option of do you generally favor it, are you generally

5    against it, or do you have no opinion, can you explain to me

6    a little bit about what that means, the "no opinion"?

7    A.    Personally, the way I guess that I feel about it

8    is that it would depend on the case in general.  It would

9    depend on the circumstances around it, what happened.  I

10   guess that my answer of no opinion means that I am

11   impartial, that I could see going either way.

12   Q.    And that's really what we're trying to -- for lack

13   of a better term, trying to ferret out.

14   A.    Uh-huh.

15   Q.    You know, would you be as equally able -- and, of

16   course, it's kind of hard for you to answer these questions

17   without knowing the sentencing scheme, which we're going to

18   get to, but as you sit here today, not knowing any evidence

19   in a case, would you be able to, if you were a juror on a

20   capital murder case, to equally consider the possibility of

21   a life sentence or a death sentence?

22   A.    Yes.

23   Q.    You don't have any strong feelings for or against

24   either one of those options?

25   A.    No, ma'am.