REPORTER'S RECORD

VOLUME 24 OF 51

TRIAL COURT CAUSE NO. 241-0978-04

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VERSUS | * | SMITH COUNTY, TEXAS |
| TRACY BEATTY | * | 241ST JUDICIAL DISTRICT |

---

INDIVIDUAL VOIR DIRE - A.M. SESSION

JULY 22, 2004

FILED IN
COURT OF CRIMINAL APPEALS

JUN 14 2005

Troy C. Bennett, Jr., Clerk

---

On the 22nd day of July, 2004, the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE JACK SKEEN, JR., Judge Presiding, held in Tyler, Smith County, Texas:

Proceedings reported by computerized stenotype machine; Reporter's record produced by computer-assisted transcription.

2

1                        A P P E A R A N C E S

2    MR. D. MATT BINGHAM, III
     State Bar Number 00787085
3    Smith County Criminal District Attorney

4    MR. J. BRETT HARRISON
     State Bar Number 00793909
5    MS. APRIL SIKES
     State Bar Number 18348790
6    Assistant Smith County District Attorneys
     Smith County Courthouse, Fourth Floor
7    Tyler, Texas  75702
     Telephone:  903.535.0520
8    Fax:  903.535.0599

9              REPRESENTING THE STATE OF TEXAS

10

     MR. ROBERT C. PERKINS, JR.
11   State Bar Number 15790405
     MR. KENNETH HAWK
12   State Bar Number 09243650
     Attorneys at Law
13   112 East Line Street, Suite 202
     Tyler, Texas  75702
14   Telephone:  903.593.7780

15              REPRESENTING THE DEFENDANT

16

17

18

19

20

21                     REPORTER'S NOTE

22        Uh-huh = Yes - Affirmative response

23         Huh-uh = No - Negative response

24   Quotation marks are used for clarity and do not necessarily
                 indicate a direct quote.
25

                     STEVE R. AWBREY, CSR
                 241ST JUDICIAL DISTRICT COURT
                    SMITH COUNTY, TEXAS

```
                                                              3

 1                        I N D E X

 2                   VOLUME 24 OF ____

 3                (INDIVIDUAL VOIR DIRE)

 4                                            PAGE   VOL

 5   JULY 22, 2004 (A.M.)

 6   VENIREPERSON:            STATE      DEFENSE

 7   JAMAL EUGENE PETTIGREW

 8        By Mr. Harrison      10                    24

 9   State's motion for cause..........................22  24

10   Defense has no objection..........................23  24

11   The Court's ruling - Motion granted...............23  24

12

13   VENIREPERSON:

14   CATHY STEWART

15   Excused by agreement..............................28  24

16

17   VENIREPERSON:

18   VICKI JACKSON

19   Excused by agreement..............................28  24

20

21   VENIREPERSON:            STATE      DEFENSE

22   JODY DEE SHAW

23        By Ms. Sikes        31                     24

24        By Mr. Perkins                 71          24

25   Defense exercises Peremptory Number 7.............114 24
```

4

1                    I N D E X - CONTINUED

2                    VOLUME 24 OF ___

3                    (INDIVIDUAL VOIR DIRE)

4                                           PAGE   VOL

5  JULY 22, 2004 (A.M.)

6  VENIREPERSON:              STATE     DEFENSE

7  DEAN AUSTIN SANDERSON

8       By Mr. Harrison     118                    24

9       By Mr. Hawk                    132         24

10 State's motion for cause...........................137  24

11                           STATE     DEFENSE

12      By Mr. Hawk                    151         24

13      By Mr. Harrison     165                    24

14 State reurges motion for cause....................172  24

15 Defense has no objection..........................173  24

16 The Court's ruling - Motion granted...............173  24

17

18 Court Reporter's Certificate......................175  24

19

20

21

22

23

24

25

```
                                                            5
 1                ALPHABETICAL VENIREPERSON INDEX

 2   VENIREPERSON:                                    PAGE  VOL

 3   JACKSON, VICKI

 4   Excused by agreement...............................28   24

 5

 6   VENIREPERSON:           STATE      DEFENSE

 7   PETTIGREW, JAMAL EUGENE

 8        By Mr. Harrison     10                            24

 9   State's motion for cause..........................22   24

10   Defense has no objection..........................23   24

11   The Court's ruling - Motion granted...............23   24

12

13   VENIREPERSON:           STATE      DEFENSE

14   SANDERSON, DEAN AUSTIN

15        By Mr. Harrison     118                           24

16        By Mr. Hawk                   132                 24

17   State's motion for cause.........................137   24

18                          STATE      DEFENSE

19        By Mr. Hawk                   151                 24

20        By Mr. Harrison     165                           24

21   State reurges motion for cause...................172   24

22   Defense has no objection.........................173   24

23   The Court's ruling - Motion granted..............173   24

24

25
```

6

1            ALPHABETICAL VENIREPERSON INDEX - CONTINUED

2  VENIREPERSON:              STATE      DEFENSE          PAGE   VOL

3  SHAW, JODY DEE

4      By Ms. Sikes          31                                 24

5      By Mr. Perkins                    71                      24

6  Defense exercises Peremptory Number 7..............114   24

7

8  VENIREPERSON:

9  STEWART, CATHY

10 Excused by agreement................................28   24

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1                    P R O C E E D I N G S

2                    (July 22, 2004)

3          (Open court, defendant present, no jury.)

4          (Venireperson Pettigrew enters the

5          courtroom.)

6          THE COURT:  Okay.  We're on the record in

7    Cause Number 241-0978-04.  State's counsel is present;

8    defense counsel is present; defendant is present.

9                    Mr. Pettigrew?

10         VENIREPERSON PETTIGREW:  Yes, sir.

11         THE COURT:  How are you this morning?

12         VENIREPERSON PETTIGREW:  I'm doing all right.

13         THE COURT:  Good.  Mr. Pettigrew, this

14   process we're going to go through this morning is called

15   individual voir dire.  One of the attorneys for the State of

16   Texas, representing the State, is going to go through and

17   ask you some questions.  Then one of the attorneys

18   representing the defendant is going to go through and ask

19   you some questions.

20                   It's not going to be like they're

21   cross-examining you.  They're going to be doing a lot of

22   talking, and you're going to be listening as they go through

23   and explain general principles of law that govern the trial

24   of this type case.  They're going to explain the procedures

25   that govern the trial of this type case.

8

1       All of that is to say if you'll be able to

2  follow the law and the procedures set out for the trial of

3  this type case and the Court's instructions on any matter

4  that might come up in a trial like this.

5       Also, they're going to be asking you for your

6  opinion and your views on certain issues, how you feel about

7  certain issues.  And there are right or wrong answers.  You

8  don't have to think, if you're asked a question, "Gee, I

9  wonder what the answer to that should be."  All they're

10 looking for is how you personally feel about whatever it is

11 they're asking you about.

12      The questionnaire that you filled out last

13 Thursday a week ago, is there anything about that

14 questionnaire that you think you need to add to that you

15 would want to tell us now that maybe you didn't put on there

16 that you want to put on there or anything like that?

17      VENIREPERSON PETTIGREW:  No, sir.

18      THE COURT:  The answers that you give here

19 today will be under oath, because the oath I gave you back

20 when you're in the big central panel still applies today.

21      When they ask you a question, if the answer

22 is yes, like you're shaking your head at me yes, I know

23 you're understanding and meaning yes.  I understand.  When

24 they ask you a question, if you would, answer out like yes

25 or no or whatever the answer calls for, because the court

9

1  reporter, Mr. Awbrey, has to have a spoken response from you

2  on the record.

3            So they may be asking you a question, you may

4  nod your head yes, but nothing will be in the record other

5  than a nod of the head unless you say yes, if that's the

6  answer.  If the answer is no, say no or say whatever the

7  answer is.

8            If they ask you a question and you don't

9  understand what in the heck they're talking about and you

10  don't understand what they're asking you, don't try to just

11  give an answer.  Be sure that you understand the question

12  before you answer it, okay?

13            This whole process -- I mean, you just ask if

14  you don't understand what they're asking you.  Just ask

15  them, "Would you restate your question" or just tell them,

16  "I don't understand what you're asking me," and they'll say

17  it again and try to make it clear, okay?

18            VENIREPERSON PETTIGREW:  Okay.

19            THE COURT:  This whole process is just to try

20  to arrive at a fair and impartial juror, jurors that can

21  come in and be sworn in to hear the evidence in the case,

22  base their verdicts on the evidence and the instructions of

23  the law, be able to keep their mind open on all of the

24  issues that are involved in a case like this, if they can,

25  don't have any conclusion about the case one way or the

10

1   other, haven't received any information on the case or

2   talked to anybody about the case that, you know, causes them

3   to come into the case with any feelings one way or the other

4   about what the outcome should be.

5            Do you have any questions for me?

6            VENIREPERSON PETTIGREW:  No.

7            THE COURT:  Okay.  We'll go ahead with

8   whichever State's attorney is going to go ahead and ask you

9   questions this morning, Mr. Pettigrew, and then one of the

10  defense attorneys, Mr. Perkins or Mr. Hawk, will have some

11  questions for you.

12           MR. HARRISON:  Thank you, Judge.

13            JAMAL EUGENE PETTIGREW,

14  having been duly sworn as a member of the special venire,

15  was examined as follows:

16                VOIR DIRE EXAMINATION

17  BY MR. HARRISON:

18      Q    Mr. Pettigrew, how are you doing this morning?

19      A    I'm doing fine.

20      Q    First thing out of the box, you actually were --

21  you rode up in the elevator to the fourth floor, I got on

22  the elevator, and we rode down.  I didn't know if you were a

23  potential juror in this case, but we didn't speak or

24  anything, did we?

25      A    No.

11

1    Q   And that's the reason I didn't even say "hi" or

2   anything, because, obviously, we need to be very careful in

3   this process not to speak to potential jurors or anything

4   else like that.  So I just wanted to make sure you

5   understood why.  I wasn't trying to be rude or anything like

6   that.

7              You understand why we're here.  You

8   understand that the reason we're here, as explained a week

9   ago last Thursday by the Judge, that a Smith County grand

10  jury has returned an indictment in this case against the

11  defendant for the offense of capital murder, and our office

12  has filed notice of intent to seek the death penalty.

13             So you're aware of the serious allegations

14  and the serious potential punishment in this type of case,

15  right?

16   A   Yes.

17   Q   Okay.  We were introduced to you a week ago last

18  Thursday, but let me go ahead and do it again.  My name is

19  Brett Harrison.  I'm the first assistant here in Smith

20  County.  To my left is April Sikes, our chief felony

21  prosecutor.  The elected criminal district attorney, Matt

22  Bingham, is to my right.

23             Do you know any of the three of us, do you

24  think?

25   A   No.

12

1      Q    To Mr. Bingham's right is the defendant, Tracy

2   Beatty, who was indicted by a Smith County grand jury for

3   capital murder.  To his right is his lead defense attorney,

4   Robert Perkins.

5            MR. PERKINS:  Hello.

6      Q   (By Mr. Harrison) And to his right is Ken Hawk,

7   also part of the defense team.

8            MR. HAWK:  Good morning.

9      Q   (By Mr. Harrison) Do you think you know any of

10  those three individuals?

11     A   No, sir.

12     Q   Mr. Hawk and Mr. Perkins have practiced here for a

13  long time, so I didn't know if you had seen them around town

14  anywhere.

15          Are you -- you filled out this kind of short

16  book for us, and we appreciate that, because we are able to

17  focus our questions a little bit on some particular areas,

18  so I want to go right in and ask you a few things about your

19  questionnaire.

20          It indicated that the timeframe of this case

21  could conflict with -- and I'm trying to find it -- work and

22  Air Force training.  Are you working currently?

23     A   Yes, sir.

24     Q   Okay.  Where do you work right now?

25     A   Rose City Building and Cleaning Service.

13

1     Q   I guess, is that during the days, or is that at

2  night?

3     A   During the day.  During the day.  During the day

4  like evening-time.

5     Q   Evening-time?  What kind of hours?

6     A   5:30 to 9:00.  I work some mornings, though.

7     Q   So I guess some of the time, though, you're

8  working nights?

9     A   Yes, sir.

10     Q   If -- and, obviously, your duty, if you were

11  selected to be a juror, would be during the day, and,

12  obviously, I understand when people have a job during the

13  day, and then they have to go to a job at night, and then

14  they have to come back to, say, a job like jury duty during

15  the day, that can be, obviously, difficult.

16            Is that something that would be a problem?  I

17  mean, do you still work there?

18     A   Yes, sir, I still work there.

19     Q   And are you planning on working there through the

20  next several weeks?

21     A   Yes, sir.

22     Q   Not planning on going anywhere?

23     A   Not planning on going anywhere.

24     Q   Would that be difficult for you?

25     A   I'm not for sure right now.  I'm kind of young, so

14

1    it's not going to really too much bother me.

2        Q    Little sleep isn't going to bother you too much?

3        A    Not really.

4        Q    It would for someone old like Mr. Bingham.

5             Okay.  The other thing is you had in here Air

6    Force training.  Are you scheduled to go into the Air Force?

7        A    I'm talking to my recruiter right now, so...

8        Q    If that happened, what kind of timeframe would

9    that be?

10       A    I'm going in like a week-and-a-half maybe.

11       Q    To talk with him or --

12       A    To talk, see what we're going to do, when I'm

13   going to come take my test and all that.

14       Q    So what have you done to this point in preparation

15   for that?  Have you done anything?

16       A    No, I haven't done anything.  I just decided.

17       Q    When you talk to them in a week-and-a-half or so,

18   do you know what the procedure is from that point?

19       A    I have no idea.

20       Q    So as far as the next, say, month or so, is there

21   something about that that could interfere with trial with

22   your Air Force plans?

23       A    I don't know at this point.

24       Q    A couple of other things.  You had indicated one

25   of the questions -- let me apologize upfront for asking you

15

1    questions that are personal, because if we were in any other

2    setting, it wouldn't be any of my business, and I wouldn't

3    be asking you these things, but, obviously, because of the

4    type case we're here on, we need to know some of these

5    answers.

6              You indicated that someone had died in the

7    last few years close to you, and that was a cousin.  Who was

8    that?

9         A    My cousin Bubba Hart.

10        Q    Anything about that situation?  Obviously, this is

11   a case where the allegation is capital murder, and you've

12   got the death penalty as a possible option.

13             You know, some people, when they've had a

14   loss in their lives close to them recently, it can kind of

15   affect them, cloud their judgment, make this not a

16   particularly good case for them to sit on.

17             Is there anything about that situation that

18   would cause you concerns or problems or might bleed into

19   your deliberations?

20        A    No.

21        Q    How long ago did your cousin die?

22        A    Maybe a year now.

23        Q    How old was he?

24        A    20.

25        Q    And again, I don't mean to pry, but was there an

16

1   accident?

2       A    Car wreck.

3       Q    Car wreck.  Okay.  And nothing about that, though,

4   would affect you in this case?

5       A    No.

6       Q    Were y'all close?

7       A    Yes.

8       Q    I'm sorry for your loss.

9            Let me ask you about a few other things.  Do

10  you know -- I want to ask if you know some people.  Do you

11  know -- because -- do you know an individual by the name of

12  Melvin Pettigrew?

13      A    Melvin?

14      Q    Yes.

15      A    That's my father.

16      Q    Your father?  Is that -- and I don't know if these

17  are the same people or not.  I'm trying to find -- is he --

18  did Melvin Pettigrew -- it's Melvin Pettigrew, Jr.  Who is

19  that?

20      A    No.

21      Q    All right.  Melvin Pettigrew is your father, but

22  Melvin Pettigrew, Jr., is who?

23      A    I don't know.  I have heard of him before.  I've

24  heard of somebody like getting him mixed up with him, but I

25  don't know him.

17

1    Q    Okay.  What about -- I guess Melvin Charles

2  Pettigrew, that's not anyone related to you?

3    A    No, sir.

4    Q    I just wanted to ask you a few names, because I

5  want to see if they're related or not related.

6              Carlos Pettigrew?

7    A    That's my cousin.

8    Q    Your cousin?

9              Okay.  Did you -- obviously, he's had some

10  trouble with the law here in Smith County, I guess, back in

11  2001 and 1999.  You knew about that?

12    A    Yes.

13    Q    And Mr. Awbrey has to take down what we say, so

14  you need answer out yes out loud.

15    A    Yes, sir.

16    Q    You were aware of his marijuana convictions?

17    A    Yes.

18    Q    And that's Carlos Pettigrew?  That's your cousin?

19    A    Yes, sir.

20    Q    What about -- what about Sherry Pettigrew?

21    A    No.

22    Q    What about Shakita Pettigrew?

23    A    No.

24    Q    Cora Pettigrew?

25    A    No.

18

1      Q      Cynthia Pettigrew?

2      A      No.

3      Q      Dewayne Pettigrew?

4      A      No.

5      Q      Dwight Pettigrew?

6      A      Yes.

7      Q      Who is he to you?

8      A      He's my -- I know he's my cousin or kinfolk.  I

9   don't know.  I mean, I'm not close with him, but I know him.

10      Q      Now, Dwight Pettigrew has also had a couple of

11   problems in Smith County.  Were you aware of those?

12      A      No.

13      Q      What about Eric Pettigrew?

14      A      No.

15      Q      Gloria Pettigrew?

16      A      No.

17      Q      Henry Pettigrew?

18      A      No.

19      Q      Henry Joe Pettigrew?

20      A      No.

21      Q      Jacqueline Pettigrew?

22      A      Yes.

23      Q      Who is that?

24      A      Well, that's my mother's name, also, but she's

25   never --

1     Q     Is that Jacqueline?

2     A     Yes.  It's another one I've heard of, too.

3     Q     I'm sorry.  There's what?

4     A     There's another Jacqueline.

5     Q     There's two Jacqueline Lynn Pettigrews?

6     A     No.

7     Q     Joshua Dewayne Pettigrew?

8     A     Yes.

9     Q     Who is that?

10    A     My cousin.

11    Q     Did you know about his problems with the law?

12    A     He has been in so much, I don't know.

13    Q     He's been in so much?

14    A     Yeah.

15    Q     I guess he's kind of been arrested and had some

16    convictions and -- I mean, there's probably several, true?

17    A     Yes.

18    Q     You're aware of the fact that he's been arrested

19    and convicted of things; you don't know specifics about

20    them?

21    A     No.

22    Q     What about Keith Pettigrew, Keith R. Pettigrew?

23    A     No.

24    Q     Kendrick Pettigrew?

25    A     No.

20

1    Q    LaMarcus Pettigrew?

2    A    Yes.

3    Q    Who is that?

4    A    My cousin.

5    Q    Another cousin?

6    A    Yes.

7    Q    And, again, you're probably aware that he has been

8  in trouble?

9    A    Yes.

10   Q    He's been arrested and convicted of things.  Do

11 you know what kind of offenses?

12   A    No.

13   Q    You just know that he's been arrested and

14 convicted, just not specifically what for?

15   A    Yes.

16   Q    What about Lana Pettigrew?

17   A    No.

18   Q    Larry Pettigrew?

19   A    No.

20   Q    We talked about Marvin Pettigrew.  What about

21 Melvin Charles Pettigrew?

22   A    No.

23   Q    And Sherman Pettigrew?

24   A    No.

25   Q    Bear with me on this name, Shalefras (phonetics)

21

1   Pettigrew?

2       A    No.

3       Q    And Towaski (phonetics) Pettigrew?

4       A    No.

5       Q    Okay.  So there -- I can't remember if I asked you

6   about Aubrey Pettigrew.

7       A    No.

8       Q    So as far as those individuals who you were aware

9   of, who were related to you, I think most of them were

10  cousins, I think, is what you said -- you were aware that

11  some of those individuals had been arrested and charged and

12  convicted of crimes here in Smith County, but you just

13  didn't know what they were for --

14      A    That's right.

15      Q    -- is that fair?

16           I think there were probably two or three

17  cousins that you had that -- about that, Dwight and Joshua

18  and LaMarcus?

19      A    Yes.

20           MR. HARRISON:  Judge, actually, at this time,

21  I would make a limited trial (sic).

22           MR. PERKINS:  I think if we can take a short

23  recess, we can have Mr. Pettigrew out of here quicker than

24  we had anticipated.

25           THE COURT:  Mr. Pettigrew?  Sir, would you

22

1  step right outside the room with Deputy Clark, please?  And

2  Deputy Clark will need to come back in, but if you'll just

3  stay right outside.

4          (Venireperson Pettigrew leaves the

5          courtroom.)

6          THE COURT:  Go ahead, Mr. Perkins or

7  somebody.

8          MR. HARRISON:  Judge, we would challenge

9  Juror Number 80, Jamal Pettigrew, for cause.  We believe

10  he's an unfit juror.  He gave an oath to give full,

11  complete, and honest answers on the questionnaire.  He left

12  the question that the Court had placed into the

13  questionnaire about any relative, close personal friend, or

14  himself ever having been arrested, charged, or convicted of

15  a crime.

16          In fact, the question is actually more

17  specific than that.  He circled no.  There's a final

18  question on the questionnaire asking if there's any

19  additional information he wants to give.  He said no.

20          When the Court asked him again this morning

21  if there was any additional changes or additions he needed

22  to make to the questionnaire, he again stated no.  When

23  questioned by the State, he indicated that there were three

24  relatives of his, cousins, who he knew had been arrested,

25  charged, and convicted of crimes in Smith County.  And

23

1    although he didn't know what the charges were, he still

2    answered no to the question about referencing had anyone

3    been arrested, charged, or convicted.

4                We believe he's an unfit juror.  He didn't

5    give full, complete, honest answers, and we would challenge

6    him for that reason.

7                THE COURT:  Go ahead, Mr. Perkins.

8                MR. PERKINS:  Judge, we have opted not to

9    oppose the State's motion.

10               THE COURT:  On his questionnaire, on page 13,

11   as relating to Question 53, which would cover these

12   relatives who have been arrested or charged or convicted, is

13   totally blank.

14               So recognizing there's no objection from the

15   Defense, but just for the record, 53 is blank.  In other

16   words, he didn't list anyone.  So based on the questioning,

17   his answers, and the blank questionnaire on page 13 where 53

18   is totally blank, no information is listed, the Court's

19   going to grant the challenge for cause, and the Court would

20   find he's not fit for jury service because he clearly did

21   not make any effort whatsoever to list information under 53

22   on page 13 that he readily produced in answers to the

23   State's questioning today and even told the Court he didn't

24   have anything he needed to add to the questionnaire before

25   the State started.  So the challenge for cause is granted.

24

1          Ask Mr. Pettigrew --

2          MR. PERKINS:  Excuse me, Judge.  Before he's

3  brought back in just real quickly, we were provided, as the

4  Court's aware, with a Smith County criminal history, and,

5  obviously, from us working in Smith County, I knew that

6  there had been a bunch of Pettigrews in trouble before.

7          THE COURT:  Yes.

8          MR. PERKINS:  However, when we got the

9  information from them, we had nothing at all on this guy,

10 and so if it's -- if these are same-address criminal

11 histories or that kind of thing -- and, obviously, he

12 doesn't have any criminal history, and I understand that --

13         THE COURT:  Right.

14         MR. PERKINS:  -- but if these are criminal

15 histories that are coming up same address, the Court had

16 previously ordered those to be provided to us --

17         THE COURT:  Correct.

18         MR. PERKINS:  -- prior to jury selection.

19         If it's not, then we don't have a problem.

20 But if they've got juror information, it was my

21 understanding juror information regarding to criminal

22 history and that kind of thing, then, again, I'm going to

23 ask that we be provided with those prior to these people

24 coming in here for individual questioning so we can also

25 exercise intelligent use of challenges for cause or perhaps

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

25

1    peremptory challenges.  We, obviously, don't oppose this

2    one.

3                    THE COURT:  This one has been granted.

4                    MR. BINGHAM:  I can address this real quick.

5                    There was no same address that came up on

6    this juror.  There was no criminal history.  There was no

7    same address.  Just having worked in Smith County for the

8    number of years I have, just like Mr. Perkins and Mr. Hawk

9    are familiar with, Pettigrew is a name that can be

10   recurrent.  I've prosecuted two Pettigrews, both for murder.

11   Eric Pettigrew, I know to be currently incarcerated in the

12   Smith County Jail.

13                   So just out of an abundance of caution, I

14   asked Diana Folmar to run every name Pettigrew through our

15   computer just to question him individually on whether he

16   knew those.  But there was no same address or criminal

17   history that came back to him.

18                   THE COURT:  Okay.  Thank you, Mr. Bingham.

19                   Let's get Mr. Pettigrew back in where we can

20   go ahead and release him, please.

21                   (Venireperson Pettigrew enters the

22                   courtroom.)

23                   THE COURT:  Mr. Pettigrew, the Court is going

24   to be able to excuse you from any further jury service in

25   the case.  Appreciate you being down here a week ago

1  Thursday and coming down this morning for questioning, but

2  as it has developed, the Court is going to be able to

3  finally excuse you from any further jury duty in this case.

4  We appreciate your time very much.

5             VENIREPERSON PETTIGREW:  Thank you.

6             (Venireperson Pettigrew leaves the

7             courtroom.)

8             THE COURT:  If you can, if it's all right,

9  would you get Jody Shaw?

10             MR. PERKINS:  And, Judge, also, we have a

11  35.05 that we could put on the record at some point that

12  will affect this afternoon and tomorrow morning.

13             THE COURT:  Okay.

14             MR. PERKINS:  I don't know when you would

15  want to do that.

16             THE COURT:  Well, let's get Jody Shaw, if

17  that's all right, Mr. Perkins.

18             MR. PERKINS:  That's fine.

19             THE COURT:  They're on their way, and that

20  deputy went to get him.

21             MR. BINGHAM:  Is it on the record that he

22  didn't have any objection to that?

23             THE COURT:  It's on the record.  He didn't

24  have any objection to him.  I just stated some stuff in the

25  record.  The record is clear that Mr. Perkins didn't object

1    to the granting for the motion for cause.

2                    Is that what you're talking about,

3    Mr. Bingham?

4                    MR. BINGHAM:  I was actually talking about --

5    I didn't know if y'all had been asking the defendant each

6    time if he did or not.

7                    THE COURT:  We usually do or -- I usually do

8    or Mr. Perkins usually states it.

9                    MR. BINGHAM:  That's fine.

10                   THE COURT:  Mr. Beatty, are you in agreement

11   for Mr. Perkins and Mr. Hawk not to object to the State's

12   motion to challenge for cause Mr. Pettigrew?

13                   THE DEFENDANT:  No, I don't have any problem

14   with that.

15                   THE COURT:  I'm sorry.  I couldn't hear you.

16                   THE DEFENDANT:  I don't have any problem with

17   that.

18                   MR. PERKINS:  Judge, also, under the

19   provisions of 35.05, we've had an opportunity this morning

20   to visit with the State regarding two potential jurors that

21   would be called in for individual voir dire.  The Defense

22   has no objection to Number 87, Cathy Shaw.

23                   THE COURT:  Is that tomorrow?

24                   MR. PERKINS:  This is this afternoon,

25   Judge -- I'm sorry -- Cathy Stewart.  I think I said Cathy

28

1   Shaw.   Cathy Stewart, Number 87, and Juror Number 92, Vicki

2   Jackson, being excused without individual questioning.

3                    We've reached an agreement under 35.05 with

4   the State to have those two individuals excused, and

5   Mr. Beatty has no objection to either of those individuals

6   being excused.

7                    THE COURT:  Is that correct, Mr. Beatty?

8                    THE DEFENDANT:  Yes, sir.

9                    MR. HARRISON:  We have no objection as well,

10  Your Honor.

11                   (Venireperson Shaw enters the courtroom.)

12                   THE COURT:  Back on the record in Cause

13  Number 241-0978-04.  State is present; the Defense is

14  present; the defendant is present.

15                   Mr. Shaw, thank you for being here this

16  morning, sir.  This process we're about to go through is one

17  where -- we call it individual voir dire.  It's really a

18  procedure where one of the State's attorneys, one of the

19  attorneys representing the State of Texas, is going to go

20  through and ask you some questions.

21                   What you're going to hear a lot of is a lot

22  of explanations of the procedures and the laws that would

23  govern the trial of this type case, and then you're going to

24  be asked of your opinions or views on certain issues that

25  are involved in this type case.  They're going to want to

29

1   see if you're able to follow the procedures and the laws set

2   out that govern the trial of this type case.

3                   There's not any right or wrong answers to

4   what they ask you, so if you get a question, you don't have

5   to start figuring out what the answer to that is.  You just

6   tell them how you truthfully feel about whatever it is they

7   ask you.  If you feel you can follow a law that governs the

8   trial of the case, just tell them.  If you feel like you

9   can't, just tell them that.

10                  They will be asking your personal opinions on

11  some matters and your personal views on some issues involved

12  in the case.  There's no right or wrong answers.  If they

13  ask you a question, just tell them -- if you get a question

14  from them, you don't understand what they're talking about,

15  just ask them to rephrase it or restate it to be sure you

16  understand the question before you answer it.

17                  Also, when you do answer, if you would -- if

18  you would answer out yes, if it calls for a yes answer; no,

19  if it calls for a no answer, or whatever the answer is.  But

20  be sure -- if it's, like, yes or no, don't just shake your

21  head yes or shake your head no.  We have to have an answer

22  from you on the record for Mr. Awbrey.  So whatever the

23  answer is, if you would just state the answer out.

24                  The oath that I gave that Thursday, a pretty

25  good ways ago now, when you were down there in the big room,

30

1   that oath still applies.  So your answers are under oath.

2             Is there anything on the questionnaire that

3   you filled out when you were down here before that you

4   thought of, you need to add to the questionnaire since that

5   time?

6             VENIREPERSON SHAW:  No.

7             THE COURT:  All right.  Be sure, if you

8   would -- that's a nice-looking microphone sitting there in

9   front of you.  Looks like it's real expensive.  The only

10  problem is, it doesn't work.

11            So if you could try to -- with this air

12  conditioning up -- I try to keep the air conditioning going

13  as much as I can, but with the air conditioning up, sort of

14  keep your voice up a little bit so they can all hear you out

15  there.  That will make it a lot easier.

16            Do you have any questions for me, Mr. Shaw?

17            Just relax.  They're not going to be asking

18  you questions like they're cross-examining you or something

19  like that.  You're going to probably do a little bit more

20  listening than you may even do talking.  They're going to

21  try to get you to give your views, but you're going to hear

22  some fairly lengthy explanations.

23            VENIREPERSON SHAW:  Okay.

24            THE COURT:  Thank you, sir.

25            Go ahead, Ms. Sikes.

31

1          MS. SIKES:  Thank you, Judge.

2                    JODY DEE SHAW,

3    having been duly sworn as a member of the special venire,

4    was examined as follows:

5                  VOIR DIRE EXAMINATION

6    BY MS. SIKES:

7          Q    Hi, Mr. Shaw.

8          A    Good morning.

9          Q    Before we get started, you've heard the

10   introductions.  You've met us now it's been a week ago

11   Thursday, but I'm April Sikes.  I'm one of the assistant

12   DAs.  To my right is Brett Harrison, another assistant DA,

13   and our boss, the elected district attorney, Matt Bingham.

14         A    Not personally, but I know him.

15         Q    But you know who he is?

16         A    I know who he is.

17         Q    But you don't know him personally?

18         A    No.

19         Q    And I assume anything you know about him, you

20   wouldn't hold against Mr. Harrison and myself?

21         A    I voted for him.

22         Q    That's good.  We appreciate that.

23              To his right is Mr. Beatty, the defendant

24   charged in this case.  And to his right, going around this

25   table, is Mr. Perkins that just said hello.  And the one

32

1    facing me is Mr. Hawk, Ken Hawk.  Those are his defense

2    lawyers.

3                   You don't know any of those three people?

4        A    No.

5        Q    Okay.  Before we get started, I'm going to tell

6    you a little bit about where we go from here.  Judge Skeen

7    always says don't be nervous, and then he says you probably

8    will do more listening.  I think that's because out of all

9    of the lawyers here, I do a lot more talking.

10                  But you mentioned in your questionnaire that

11   you had a partial hearing loss that you were afraid might

12   affect your ability to sit on this trial.

13       A    Yes, ma'am.

14       Q    And have you had any problem or did you have any

15   problem a week ago Thursday in that big group hearing what

16   was going on?

17       A    No, ma'am.

18       Q    Or any problem today?

19                  Judge Skeen is not -- he's probably going to

20   save this part of the record -- not as loud as I am, but did

21   you have any problem hearing what he was talking about this

22   morning?

23       A    No.

24       Q    If at any time -- you probably won't have any

25   problem hearing me because I am the loudest one of the

33

1   group, but if you do, if you'll tell me, I'll do my best to

2   repeat it or try to explain it again in a different way.

3        A    Okay.

4        Q    Let me tell you a little bit about why we're here.

5   You know that the State's job is to represent the State of

6   Texas.  We're charged with the duty of trying the defendant

7   under an indictment that's handed down by the grand jury.

8   We're going to talk a little bit about that.

9             The defense team, obviously, their job is to

10  represent a defendant, in this particular case, Mr. Beatty,

11  to the best of their ability, right?

12       A    Yes.

13       Q    And so then the question becomes, well, what does

14  a juror do and what does the Court do?  I tell everybody it

15  ought to be a relief to you -- it's a relief to me -- that

16  as we sit here today, as you sit through the entire jury

17  trial, you're not going to be required to know the law that

18  governs capital murders or murders or any of the other

19  things that we're going to talk about this morning.

20            Is that kind of a relief?

21       A    Yes.

22       Q    The one who is charged with that knowledge, who

23  knows all the law is Judge Skeen, the Court.  At the end of

24  this trial, at the end of any criminal trial, you're going

25  to get a charge.  It's going to be a book about as thick as

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

34

1   the one you filled out for us that tells you this is the law

2   in the case.

3                So your job, then, as a juror is to listen to

4   what evidence comes before you, and I'll tell you this:

5   What we talk about today, what we talked about last Thursday

6   isn't any evidence.  We'll talk about that a little bit

7   more.

8                The evidence starts when those 12 people sit

9   in that jury box and the Judge says the trial starts.  So

10  you would then listen to everything that you hear, and at

11  the end of that trial, when the Judge gives you the law,

12  your job, as a juror, is just to plug those facts, what you

13  believe is evidence, into what he gives you.

14               Does that make sense?

15      A    Yes.

16      Q    So what we're going to do here -- you're not going

17  to hear any evidence today either.  We can't tell you that.

18  But you'll hear a lot of examples, maybe some hypotheticals.

19  We're going to talk a little bit about the law.

20               And at any time -- like I mentioned before,

21  if you don't understand me, and especially in the morning

22  when I talk real fast -- I may talk too fast, and I may not

23  make myself clear -- if you'll stop me, I'll try again.  But

24  we've really got to find jurors that are fair and impartial.

25               Makes sense, right?

35

1    A    Yes.

2    Q    Everybody at this table, all the lawyers sitting

3    here have one goal in mind, and that is to find people who

4    can be fair to the State and to the Defense, who can follow

5    the law that the Judge gives them, and who, as you sit here

6    today, haven't decided one way or the other anything about

7    this case.

8              In other words, you can come in and say, "You

9    know what?  If I'm on that jury, I'm going to keep an open

10   mind, I'm going to listen to the evidence I hear, and then

11   I'm going to base my verdict at the end of this case on what

12   I've heard and the law that the Judge gives me," okay?

13   A    I can do that.

14   Q    Perfect.

15             And as we go through this morning talking for

16   a little while, if at any time I say something you think,

17   "Well, you know what?  Maybe I can't do one of those

18   things," if you'll stop me, and then we'll talk about it a

19   little more.  Deal?

20   A    Okay.

21   Q    I want to talk to you a minute about your jury

22   questionnaire.  Obviously, you know from last Thursday and

23   from this morning that the defendant in this case has been

24   indicted for the offense of capital murder and that the

25   State has filed its notice to seek the death penalty, right?

36

1  You know that?

2      A    Yes.

3      Q    So, therefore, that's why we've asked you some

4  questions on here about the death penalty, and I want to

5  talk to you a little bit more about it.

6              In response to Question 67, you circled that

7  you generally favor the death penalty.

8      A    If it's warranted.

9      Q    If it's warranted, which makes sense, because

10  Question 68, you checked, "I believe it's appropriate in

11  some cases."

12      A    Yes.

13      Q    And so would it be fair, then, to say you believe

14  there are cases where it is appropriate and cases where it's

15  not appropriate?

16      A    Yes.

17      Q    Can you tell me -- have you always felt that way

18  about the death penalty?

19      A    Pretty much.

20      Q    Is that formed based upon what?  The way you were

21  raised or the things that you've seen or heard.  Tell me a

22  little bit about --

23      A    The way I was raised.  I'm one of 12, and the way

24  I was raised, that was just part of it.

25      Q    And you believe there are some crimes that are

37

1   deserving of the death penalty, and on the reverse, some

2   that are not?

3       A    Yes.

4       Q    If I made you governor for the day and said, "You

5   know, we're not even going to deal with the legislature;

6   you're just the governor and you make all the decisions,"

7   would you decide that you kept the death penalty or you just

8   did away with it?

9       A    I would keep it.

10      Q    Is that based on what you've told me already; you

11  think it's appropriate?

12      A    Yes, in the right case.

13      Q    In the right case.  And let's talk about what the

14  right case is.  There are cases where a life is taken, where

15  death, for lack of a better word, is not on the table.  The

16  death sentence is not even a possibility.

17           For example, if Mr. Harrison said something

18  real ugly to my friend, Steve, Mr. Awbrey, and I thought,

19  "That really makes me so mad," and I get a gun, and I just

20  shoot him in the head about 15 times, and I laugh while I do

21  it, and I said, "You won't be saying anything else ugly to

22  Mr. Awbrey, and I don't care about your wife, and I don't

23  care about your three kids and all those other things,"

24  cruel, right?  A brutal crime.

25           That's murder, what we call rather

38

1   offensively just murder, because, obviously, that sounds

2   demeaning.  But we call it just murder to distinguish it

3   from murder plus something else, this capital murder

4   category that we're going to talk about.

5             In that particular case, if I murdered

6   Mr. Harrison under those circumstances, I couldn't ever get

7   the death penalty.  You understand that?  You probably

8   don't, because I haven't told you the rest of the story.

9   A     Yeah.  Well...

10  Q     But the range of punishment on that case would be

11  five to ninety-nine years.  We're going to go back and talk

12  about that in a little bit.

13            Now, what the legislature has said is there's

14  a difference.  There is murder in what I've told you so far,

15  and then there is capital murder.  In other words, there are

16  some cases where they're either just so horrific -- like

17  killing a child under the age of six as an example, eligible

18  for the death sentence, or they've done murder plus

19  something else, like you've killed two people.

20            If I came in here and said, "I don't want

21  either one of these lawyers with me representing the State,"

22  and I kill Mr. Harrison and Mr. Bingham, two people in the

23  same transaction, capital murder.

24  A     Okay.

25  Q     Or if I pay someone to kill Mr. Harrison or I pay

1   Mr. Harrison to kill somebody else, murder for hire; if I

2   kill a police officer or a fireman in the line of their

3   duty, you know, that's one of those things that's just so

4   bad.

5        A    Right.

6        Q    If I commit murder while I'm doing something else,

7   committing another felony -- and they list a bunch of

8   them -- robbery or burglary, aggravated sexual assault with

9   which we used to call rape, arson, kidnapping.

10            A man kills and rapes a woman, and in the

11   process of raping that woman, he says, "You know, I'm not

12   going to leave any witnesses," and he breaks her neck, see,

13   that's murder plus something else.

14            So for those kinds of crimes -- and there's a

15   lot of them.  Those are just some examples.  For those

16   types, the legislature has said they need to be set apart

17   from the plain murder that we talked about and that death

18   ought at least be an option.

19            Does that make sense to you?

20        A    Yes.

21        Q    That distinction?

22            Do you see the reason for that distinction?

23   What would it be to you?

24        A    It would be the type of crime -- it would be like

25   premeditated.  It would put it in the capital for me.  Heat

40

1    of passion could be different from premeditated.

2         Q    And let's talk about that a little bit.

3              In the eyes of the law, there's really no

4    difference between planned or premeditated and not.  You

5    know, if I had just walked in here this morning and thought

6    Mr. Harrison has asked one too many questions, it's 4:00 in

7    the afternoon, and I've had it with him, and I shoot him in

8    the head, that would be the same, under our murder, as if I

9    thought, "Well, you know what; if he asks another question

10   on Friday, then I'm going to shoot him on that day."

11             You see what I mean?

12        A    Yeah.  It's vague, but I'm following you so far.

13        Q    Let me bring it into a context of the trial

14   itself.  Now, you can take factors like that into

15   consideration in perhaps your punishment.  For example,

16   there are two parts to a trial in Texas.

17             I saw you were on a jury a long time ago.

18        A    Yes, ma'am.

19        Q    And there are two parts of the trial.  It's called

20   a bifurcated trial system.  Big, long word that means

21   there's two parts to it.

22             The first part is the guilt/innocence phase

23   of the trial, and then the second part is the punishment

24   phase.

25             And what Texas is saying in the

41

1    guilt/innocence phase of the trial, all you're really

2    concerned with are the facts of the case.  Did it happen on

3    or about a certain day?

4              I use DWI as an example.  On or about a

5    certain day, in the Smith County, Texas, did a defendant

6    drive or operate a motor vehicle while intoxicated, okay?

7        A    Right.

8        Q    That's the kind of stuff you're going to hear.

9    Did a defendant commit these elements?

10             Now, at that stage of the trial, it may not

11   make any difference, you see, whether the defendant -- or it

12   shouldn't -- whether the defendant thought about it one day

13   or two days.

14             Does that make sense?

15       A    Yes.

16       Q    Now, if you find that those elements are met --

17   you're not going to hear a lot about the defendant in that

18   case.

19             To use our DWI example, when you go on, if

20   the jury beyond a reasonable doubt -- and we'll discuss what

21   that is in a little while -- if the jury says, "You know

22   what?  Ms. Sikes didn't prove that.  She didn't even prove

23   it happened in Smith County.  She didn't prove it happened

24   in Tyler."

25             So you would find that defendant not guilty

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

42

1   because I haven't met all my elements.   Then there is no

2   punishment phase.

3              Now, when you get to the punishment phase,

4   that's where you hear other evidence.   You hear things about

5   a defendant, like in the DWI example, you know, how much

6   does she drink every day of her life; how many other DWIs

7   has she had; did she think about it a long time before she

8   got in the car, you know, things of that nature, more about

9   the defendant herself.

10             And when you think about it, it makes sense

11  because to punish someone -- you have children?

12  A      Yes, ma'am.

13  Q      How many children do you have?

14  A      Four.

15  Q      And you came from 12?

16  A      Yes, ma'am.

17  Q      So you know all about multiple children and having

18  to decide what punishment someone deserves --

19  A      Yes, ma'am.

20  Q      -- would that be fair?

21             Somebody the other day told me, well, their

22  children never got into any trouble, so I had to use mine as

23  an example instead.   But with four, I would assume that

24  there are times when they would get into at least

25  disagreements with each other; is that fair to say?

43

1    A    Not so much now, but when they were younger.

2    Q    When they were little?

3    A    Yes.

4    Q    As a parent, what kinds of things were important

5    to you when you determined their punishment?

6    A    Whether or not they were telling me the truth.

7    Q    Sure.  Whether they lied to you, whether they're

8    telling you the truth.

9              I use this example.  We've got one prosecutor

10   in my office, Susie Turner, and she hates to drink milk, and

11   she hates it so much that she would spill it on purpose just

12   so she wouldn't have to drink it.  Well, the first couple of

13   times she did that, she didn't get in trouble for it, but

14   after she had done it about 10 or 12 times, she got in

15   trouble.

16             So, see, those are the kinds of things

17   that -- and using that silly example, in the guilt/innocence

18   phase, it would be, did she spill it or not.  You know, in

19   the punishment phase, it would be, has she done it before?

20   A    Yes.  I got that now.

21   Q    Was that really intentional?

22             Does that make sense?

23   A    Yes.

24   Q    So you wouldn't require -- I mean, some states do

25   require premeditation in a murder case.  You wouldn't

44

1    require the State to prove that to you?

2         A    No.

3         Q    Let's talk a little bit about some constitutional

4    principles.  There are some that are just so fundamentally

5    important that they apply in all cases, whether it's a

6    speeding ticket, whether it's that case like you sat on in

7    Dallas.  It was Dallas, I think?

8         A    Yes, ma'am.

9         Q    Or whether it's a capital murder charge.  Like the

10   defendant's right to a jury trial, you know, that's an

11   absolute constitutional right.

12        A    Yes.

13        Q    And you would agree with that?

14        A    Yes.

15        Q    Another one is the presumption of innocence.  You

16   know, a defendant is presumed to be innocent now during jury

17   selection throughout the trial by the Constitution.

18             Would you agree with me that a constitutional

19   right is worth nothing if we don't actually allow a

20   defendant to enjoy and exercise that right?

21        A    Yes.

22        Q    Sure.  So in my example about -- let's use

23   Mr. Awbrey.  If Mr. Awbrey is on trial in that DWI case I'm

24   talking about, and you walk into a courtroom, and you see

25   him there, and he's got 14 lawyers with him, and he looks

45

1    scared and all of those things, as he sits there, he is

2    presumed to be innocent.

3            Now, that doesn't mean he is innocent, right?

4    A    Yes.

5    Q    But he has that presumption.  That presumption

6    really allows the Defense to start ahead of the State, and

7    the State's responsibility would be to bring evidence to you

8    until we've reached the point that beyond a reasonable

9    doubt, we had proven our case.  We had proven that he

10   actually had driven while intoxicated in Smith County.

11           Does that make sense?

12   A    Yes.

13   Q    If we don't do that -- let's say I left out Tyler,

14   which then Mr. Bingham over here would fire me.  But say I'm

15   proving my case and leave out Tyler.  Well, I don't meet the

16   elements beyond a reasonable doubt.  That presumption of

17   innocence is enough for you to find him what?

18   A    Not guilty.

19   Q    Not guilty.  Exactly.

20           And it all goes back to the things we talked

21   about.  You know, you don't know any evidence now, right?

22   A    Right.

23   Q    We're just asking about the law and an open mind.

24   As far as the other rights go, you know, we talked about

25   this, but I'll tell you again.  Judge Skeen told you a week

46

1   ago that the fact that a defendant is arrested, charged

2   with, indicted for a crime is no evidence.

3                Like I was telling you this morning, you

4   know, the evidence begins when those 12 people are in the

5   box --

6       A    Yes.

7       Q    -- and Judge Skeen says the trial starts.  The

8   fact that a defendant has been indicted by a grand jury is

9   not evidence.

10               Would you agree with that?

11      A    No, it's not.

12      Q    It's not.  And I'll just briefly tell you why.

13  Mainly, the grand jury is a real one-sided process.  The

14  State of Texas brings cases to 12 people to look at.

15      A    Yes.

16      Q    And it's an assisting process.  You know, is there

17  enough to hold a person over to trial or not?  If there's

18  not, there's no case.  If there is, it says to Judge Skeen,

19  "Get you a green folder, write a name on it, because we're

20  going to have a trial."

21               Does that make sense?

22      A    Yes.

23      Q    I want to talk a minute about beyond a reasonable

24  doubt.  You've heard me mention it a lot of times.  I've

25  been a lawyer a long time.  That's where you're supposed to

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

47

1   look surprised.

2           When I first started, we had no definition of

3   beyond a reasonable doubt; then we did have a definition;

4   now we don't have a definition.  I personally think that's

5   because the legislature just says, "You know what?  Beyond a

6   reasonable doubt is what it is to you."

7       A    That's right.

8       Q    Mr. Shaw's definition might be different than mine

9   or Mr. Bingham's or Mr. Awbrey's or Judge Skeen's.

10          Does that make sense?

11      A    Correct, yes.

12      Q    It is what it is to you.

13          I can't explain that, but what I can tell you

14  is some things that it's not.  It's not beyond a shadow of a

15  doubt.  I like to watch "Perry Mason," but it's not beyond

16  shadow of a doubt; it's not beyond all doubt; it's not

17  beyond a hundred percent doubt.

18          Would you agree with that?

19      A    Yes.

20      Q    Do you think there's really anything I could prove

21  to you a hundred percent?

22      A    You prove it to me?  No.

23      Q    No.

24      A    If I could see it, maybe.

25      Q    That's exactly right.  If you were an eyewitness,

48

1    then you would know, but you wouldn't be sitting as a juror.

2        A    That's right.

3        Q    And we can use a lot of different examples of

4    that, but I think you understand, so I'm going to move on.

5                One thing I will say about the burden of

6    proof, though, is that it's real important for me to tell

7    you, and you already know, that that burden is on me; that's

8    on the State of Texas --

9        A    Yes, ma'am.

10       Q    -- as it should be.  We brought the charges, and

11   it's our job to prove them or not prove them.  The Defense

12   never has a burden of proof.

13               Makes sense?

14       A    Right.

15       Q    Another constitutional right is the Fifth

16   Amendment right to remain silent.

17       A    Yes, ma'am.

18       Q    And that's just like that presumption of

19   innocence.  You know, it's not worth anything if we don't

20   actually afford a defendant that right.  In my example about

21   Mr. Awbrey being on trial, Mr. Awbrey don't have to testify

22   in his own case.  Doesn't have to bring any evidence at all.

23       A    Yes.

24       Q    Now, I would like to hear from Mr. Awbrey, and as

25   a prosecutor, I would love to be able to say, "The State of

49

```
 1   Texas calls Steve Awbrey," and I've got some questions for
 2   him, and I'm going to ask him things like, "Where were you
 3   when you were drinking, and how much were you drinking, and
 4   who was with you," all of those questions I would have,
 5   which it would be great to know that.  I would be curious
 6   about those things.  But you understand there's nothing in
 7   the law that allows me to do that.
 8        A    Right.
 9        Q    And you certainly wouldn't hold it against a
10   defendant if he exercised his right to remain silent?
11        A    No.
12        Q    Now, that's not to say you wouldn't like to hear
13   from him.
14        A    That's correct.
15        Q    Like your kids.
16        A    Correct.
17        Q    If one of them told you, "You know what, Dad?  I'm
18   going to exercise my Fifth Amendment right to remain
19   silent."
20        A    That wouldn't work with my kids.
21        Q    That's right.  And that's what Mr. Harrison always
22   says.  He says in his own home -- he has three kids.  Right
23   now, Ms. Tabitha, his baby, can't talk, so he has two who
24   can, and he says there's no Fifth Amendment right to remain
25   silent in his house, kind of like a dictatorship, right?
```

50

1    A    Yes, ma'am.

2    Q    I tell everybody, that's fine.  It's fine for you

3  to walk in last Thursday, a week ago Thursday, and say --

4  when Judge Skeen says there's the defendant, for you to

5  think in your mind, "You know what?  I wonder what he did."

6  That's natural, right?

7    A    Yes.

8    Q    There's nothing wrong with that.

9           What would be wrong with that would be if you

10  thought, "I wonder what he did; it must be something," and

11  then that thought affected your ability to listen to the

12  evidence and make a fair decision based on what you heard.

13    A    Well, like in the courtroom, I didn't know who the

14  defendant was for a long time.

15    Q    That's right.  A lot of people have said that.

16  And so those feelings are natural and honest, and curiosity,

17  at its best, as long as you can say, "That's fine.  I can

18  set those aside and listen to the evidence and follow the

19  law."

20           And could you do that?

21    A    Yes.

22    Q    As far as we're talking about -- as long as we're

23  talking about witnesses, I want to talk just a second about

24  witness credibility.  There are certain people -- and I know

25  from your questionnaire, you were raised a lot like I was.

51

1   There are certain people that you're raised to respect --

2        A    Yes.

3        Q    -- based upon the positions that they hold in the

4   community.  Teachers were one of them for me.  We were

5   taught "yes, ma'am" and "no, ma'am.'

6        A    Yes.

7        Q    Policemen were another one.

8        A    Yes.

9        Q    You know, if you need help, go to the police.

10            And that's also fine.  That's natural.  It's

11   the way we were raised.  The only difference is, in a

12   courtroom setting, you have to be able to say, "You know

13   what?  Every person that comes up there and takes that

14   witness stand has the same opportunity to prove themselves

15   to be credible or not to me."

16       A    Yes.

17       Q    To be believable, to tell me the truth, or not to

18   tell me the truth.  Does that make sense?

19       A    Yes.

20       Q    I use this silly example.  If Mr. Harrison and

21   Mr. Hawk are having a fight in a hospital wing, okay, and

22   Mr. Hawk just beats the tar out of Mr. Harrison, and there's

23   an assault charge filed, a brain surgeon sees it, and the

24   janitor sees it at the hospital.

25            Well, as a prosecutor, I'm going to call both

52

1  of those people as witnesses, right?  You have to be able to

2  say, "Not because of either job, I'm going to judge them any

3  differently, their ability to tell the truth.  I'm going to

4  give the janitor and the brain surgeon the equal opportunity

5  to come up here and let me decide whether I believe you or

6  not."

7       A    Yes.

8       Q    And you can do that?

9       A    Yes.

10      Q    Now, that's not to say I wouldn't call them for

11  different specialized knowledge, like the brain surgeon.

12  Maybe Ken Hawk hurt Mr. Harrison, and I need this doctor to

13  testify about some injuries he saw, or maybe the janitor had

14  just waxed the floor, and I needed his specialized knowledge

15  about what he put on that floor.

16            Does that make sense?

17      A    Yes.

18      Q    So you can listen to what they have to say, they

19  can bring you specialized knowledge, but that doesn't affect

20  their ability to tell you the truth or not.  You judge that

21  for yourself.

22      A    That's right.

23      Q    I want to talk now about the punishment phase of

24  trial.  We're going to talk about -- we're going to go back

25  to what we call lesser included offenses.  We're going to

1  talk a little bit about the capital murder sentencing scheme

2  in Texas.

3          And let me say this before we start.

4  Everything that we talk about from this point on is going to

5  assume a couple of things.  Let's use that murder/rape

6  example I talked about.  We're going to assume that you were

7  on that jury, and you found beyond a reasonable doubt that

8  the murder had happened, and the rape had happened, okay,

9  capital murder.

10     A    Okay.

11     Q    So you found that defendant guilty of capital

12 murder.

13          At that point, you then move on to the

14 punishment phase of a trial.  And there are only two options

15 for a jury in a capital murder case.  One is a life

16 sentence, and one is a death sentence.

17          This also may be a relief to you -- it is to

18 some people -- there is no box you check.  You know, you

19 don't check "life" or check "death."

20          And while we're talking about it, let me tell

21 you this:  There's no life without parole in Texas.

22          Were you aware of that?

23     A    No, ma'am.

24     Q    Most people aren't, but there's not.  And what a

25 life sentence would mean is that a defendant would have to

54

1    serve what we call calendar years, real years, before

2    they're eligible for parole.

3              So with some defendants, depending on their

4    age, it might be the rest of their life, but there is no

5    life without parole.

6    A    Yes.

7    Q    So here's what the legislature has said.  Rather

8    than having a jury check a box for "life" or "death," we're

9    going to try to figure out a way to make a difference

10   between all the people who are eligible for the death

11   penalty and the people who are deserving of the death

12   penalty.

13             Do you see the difference between eligible

14   and deserving?

15   A    It's a little vague, but yes.

16   Q    Let me use an example; I use this one.  I'm

17   eligible for probation in the State of Texas because I've

18   never been convicted of a felony in this state or any other

19   state.

20             Now, my example where I shot Mr. Harrison in

21   the head, if I'm on trial for murder, I'm eligible for

22   probation.  Now, I may not deserve it --

23   A    Okay.

24   Q    -- based upon the crime I did.  So it just

25   means -- eligible just means I'm open for a possibility.

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

55

1    A    Okay.

2    Q    Like the death penalty, I'm open for that

3    possibility; it's on the table.

4    A    Yes.

5    Q    Now, there's a big difference between technically

6    eligible and actually deserving.

7         Makes sense?

8    A    Yes.

9    Q    So here's what the legislature says:  We're going

10   to take all the capital murder cases, the people who have

11   been convicted of capital murder.  And I use a funnel.

12   That's why I've got my hand up here like this.  I use an

13   example of a funnel.

14        You take all the capital murder defendants

15   convicted.  Well, some of them aren't even eligible for the

16   death sentence, so that kind of narrows that group down a

17   little bit.

18   A    Okay.

19   Q    Out of those groups who are actually eligible, the

20   legislature said, "Well, they're technically eligible, but

21   maybe or maybe not deserving.  And so what are we going to

22   do to help the jury to figure out those who ought to

23   actually come out the bottom of that funnel and receive the

24   death penalty?"

25        And they do that by giving you what are

56

1   called special issues, just questions to answer as a jury.

2        A     Yes.

3        Q     And they ought to be there in front of you.

4               MS. SIKES:  If I could approach just a

5   second, Judge?

6               THE COURT:  Yes.

7        Q     (By Ms. Sikes) I'm going to hand you those.  The

8   first one says "Special Issue Number 1."  If you'll just

9   take a second and read that to yourself.

10       A     (Complies.)

11       Q     That first question about whether or not a

12  defendant would commit criminal acts of violence and

13  constitute a continuing threat to society, we call that

14  future danger.

15              In other words, we want to know, are there

16  are going to be continuing acts of violence?  Is he going to

17  continue to threaten -- he or she -- society?

18       A     Yes.

19       Q     You know, that man that raped and murdered that

20  woman, is he going to continue to be a threat to people?

21              Would that be something that you would want

22  to know?

23       A     Yes.

24       Q     Tell me why.

25       A     You don't put them back out there.

57

1     Q    Yeah.  Wouldn't want to put them back out there,

2  if you thought they were going to be a future danger.

3     A    That's right.

4     Q    And if they -- and here's the thing.  On this

5  issue, the State has the same burden of proof as the rest of

6  the trial, beyond a reasonable doubt.  You would be brought

7  evidence to try to prove to you, is the defendant a future

8  danger or not?

9            Now, as a juror, you have to be equally open

10  to he may be or he may not be --

11     A    Yes.

12     Q    -- depending on the evidence that you hear.

13            And would you, as we sit here now, be equally

14  open to either one of those options?

15     A    You have to be.

16     Q    You have to be.  That's exactly right.

17            And you can't base it upon the fact that

18  you've already found him guilty of the capital murder we

19  talked about.  You know, the fact that he murdered and raped

20  that woman alone can't allow you to automatically answer

21  that question yes.

22            Would you agree with that?

23     A    I agree.

24     Q    You would listen to the evidence and base your

25  decision upon that?

58

1    A    Yes.

2    Q    Now, there's a couple of things I want to talk

3  about, words within that definition.  It says "probability."

4  You know, there's a difference between probability and

5  possibility.

6    A    Yes.

7    Q    And I use this silly example.  Is it possible for

8  the President of the United States to walk through that

9  door?

10    A    Yes.

11    Q    It's possible, a mere possibility, but is it

12  probable?

13    A    No.

14    Q    No.  That's silly.  It's not.

15         So I use that example to show you that we

16  don't prove a mere possibility but a probability.

17    A    Right.

18    Q    It also talks about criminal acts of violence, and

19  you notice it doesn't say you have to prove to me today that

20  that he's been convicted of misdemeanors or he's been

21  convicted of felonies, right?

22    A    Right.

23    Q    What would criminal acts of violence be to you?

24    A    Murder, rape, robbery.

25    Q    Something violent, right --

59

1      A     Yes, violent.

2      Q     -- that would be a criminal act?  It's that

3  simple.

4            The other word I want to talk to you about is

5  society.  You know there are people in the penitentiary

6  other than inmates, doctors, lawyers, guards.  Maybe I

7  should have left lawyers out of that example, but you know

8  there are other people that work there.

9            Do you believe that those people ought to

10  also deserve protection?

11      A     Everyone does under the law.

12      Q     And is that your -- you're not going to get a

13  definition of society, in other words.  So what is society

14  to you?

15      A     People.

16      Q     People, sure.  You wouldn't exclude any of the

17  people like I named, guards or --

18      A     No.

19      Q     So what happens, then, is after you've listened to

20  the evidence and after, as a jury, you've made a decision,

21  it is, is the defendant a future danger or not?  If you

22  find, "You know what?  I don't think he is, that man that

23  murdered and raped that woman.  They haven't proven it to me

24  beyond a reasonable doubt.  The answer is no, not a future

25  danger."

60

1          Then you know -- even though you hadn't

2    checked a box, you know that that answer is going to cause

3    that defendant to receive a life sentence, the one we talked

4    about.

5          A    Yes.

6          Q    The Judge would assess that.

7               Now, if your answer is yes, you know, the

8    12 of you say yes, this person is a future danger, you then

9    move on to the next question, and it's listed there in front

10   of you.  I think it's Special Issue Number 2, if you'll just

11   read that for a second.

12         A    (Complies.)  Okay.

13         Q    We call that the mitigation question.  And, you

14   know, mitigation is just something that -- and you'll notice

15   it says "a mitigating circumstance or circumstances."  Could

16   be one.

17         A    Yes.

18         Q    So it's something that lessens the amount of

19   blameworthiness, moral blameworthiness of a defendant.

20              There's not really much more of a definition

21   you're going to get, because mitigation is, like we talked

22   about, an individual burden of proof.

23         A    Yes.

24         Q    What may be mitigating to you may not be the same

25   as what it is to me.  What you think might lessen a

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

61

1    defendants blame for causing that murder and rape might be

2    something I might agree with or not.  You know, you might

3    listen to all the evidence.

4                 Let me tell you something.  There's no burden

5    of proof in this part.  In this special issue, for the first

6    time, the State of Texas has no burden of proof.  You know,

7    we have throughout the trial.

8         A    Right.

9         Q    We did in that first question.  In this one,

10   there's no burden; certainly none on the Defense.  There

11   never is.

12                But you'll hear evidence, and your job is to

13   do a couple of things:  Listen to that evidence, keep an

14   open mind, and say, "You know what?  Is there something to

15   me that lessens that defendant's blameworthiness?  Is there

16   something that is sufficient" -- is your next step -- "to

17   justify life over death?"

18                It's kind of like the legislature's last

19   little part of that funnel.

20        A    Right.

21        Q    You know, where they say this is it.  You look at

22   the evidence, and you say, is there mitigation, something

23   that lessens his blame, and does it reach the level of being

24   sufficient enough to warrant, to justify, a life sentence

25   rather than a death sentence?

62

1      A      Yes.

2      Q      Does that make sense?

3      A      Yes.

4      Q      Does it also make sense that what you might

5  consider mitigation when you listen to all the evidence

6  might be different than mine?

7      A      Yes.

8      Q      And that we don't -- as a jury, if we're two of

9  the twelve people, we don't have to agree on what they are.

10  You might say one thing, and I might say ten things.

11              But your answer -- when you answer that

12  question, if all 12 of you say no, there's no mitigation

13  sufficient enough to justify life over death, then you know,

14  even though you hadn't checked a box, that the death

15  sentence would be imposed, correct?

16      A      Correct.

17      Q      So would you agree with me from what we've talked

18  about that all of those decisions, the guilt/innocence is

19  independent and separate from the first answer, future

20  danger, independent and separate from what the jury has

21  done, right?

22      A      Yes.

23      Q      And then your next decision must also rest alone

24  independent from the other two parts of the process we've

25  talked about.

63

1          Does that make sense?

2     A    Makes sense.  It's hard to do, but it's hard to

3  do.

4     Q    Right.  And it is hard to do, and that goes back

5  to that human nature part.  And as a juror, what you have to

6  do is say, "You know what?  I'm not going to base this on an

7  automatic answer."

8          In other words, it wouldn't be fair to a

9  defendant, the one we're talking about, the murder and the

10  rape, to say, "You know what?  I found him guilty of capital

11  murder.  You know, if he did that, he's got to be a future

12  danger, regardless of what evidence the State has brought.

13          "So I'm always going to answer yes, and then

14  I know that there's really nothing that they could ever

15  prove to me, any amount of evidence, that is going to lessen

16  his blame to justify life over death.  I'm always going to

17  answer guilty, yes, no, because it equals a death sentence."

18     A    That's not right.

19     Q    That's not right.  And you know why it's not

20  right?

21     A    Yes.

22     Q    It's not any more right than if we had 12 jurors

23  in that box who said, "I'm going to give the death penalty

24  every single time.  I know right now, day one of the trial,

25  but I know my answer is guilty, yes, no, death."

64

1           That wouldn't be fair at all on the

2   defendant.

3       A    Wonder how they got on the trial.

4       Q    Sure.  They shouldn't even be there.

5       A    Right.

6       Q    Which is this process.

7               On the same hand, it wouldn't be fair at all

8   to the State of Texas for there to be 12 jurors in that box

9   who say, "I know how I'm voting.  Not guilty.  Then I can

10  assure there's no death sentence.

11              "Or I'm going to say no future danger,

12  regardless of what evidence they bring me.  That's a life

13  sentence.

14              "Or if I get to the last question, then I'm

15  going to say there's mitigation to justify life over death,

16  so there's no way -- I know the answers, and there's no way

17  I'm going to answer them to get a death sentence."

18              You see why that wouldn't be fair either to

19  the State?

20      A    No, it's not correct.

21      Q    Would you be able to do the things that we talked

22  about, listen independently?

23      A    I believe I would.  I believe I would.

24              MS. SIKES:  Can I have just a second, Judge?

25              THE COURT:  Sure.

65

1          (State's counsel confer.)

2          MS. SIKES:  Thank you, Judge.

3          THE COURT:  You need any more time, though?

4          MS. SIKES:  That's fine.

5     Q    (By Ms. Sikes) You were exactly right when you

6  said it wouldn't be fair to anybody.  You shouldn't be on a

7  jury if you had automatic answers, right?

8     A    Right.

9     Q    That's fair.

10         So I think the part that's hard, like what

11 you said, and it is hard, it's a part where you say, "You

12 know what?  I found that man guilty of raping and murdering

13 that woman, and I do think he's a danger, a future danger,"

14 and then keeping your mind open to -- you know, as you sit

15 here today, you don't have to think of what it is because

16 you haven't heard any evidence, right?

17    A    Right.

18    Q    But just keeping your mind open to the possibility

19 that there may be mitigation out there that rises to a

20 level -- there may be reasons, in other words, that rises to

21 the level that would justify life over death.

22         Now, that doesn't mean you have to think of

23 them today.  It doesn't mean I have to give you examples.

24 It just has to mean that you have the ability as a person to

25 say, "I'm open to that."

66

1    A    Right.

2    Q    And are you open to that?

3    A    Yes.

4    Q    I want to talk just a minute about what I said

5  about lesser included offenses.  There's not a real good

6  definition, and I'm, frankly, not very good at explaining

7  it.  But I picture a ladder.  We've got a real big ladder.

8         We used to have an old, two-story house, and

9  I mean, it's a tall ladder.  And so I picture in my mind

10 capital murder being the very top rung of that ladder, okay?

11 Because that's the most serious offense in Texas you can be

12 charged with, right?

13   A    Right.

14   Q    Face the death penalty.

15        Well, underneath that, there are other

16 crimes, and they are called lesser included offenses,

17 because in some way, they are lesser.  The elements I would

18 have to prove to you are lesser, like plain murder that we

19 talked about.

20   A    Yes.

21   Q    Like the rape, like whatever we're talking about

22 is lesser than the top rung, which is capital murder.

23   A    Right.

24   Q    Let's use that example, that murder/rape.  If

25 capital murder is that top rung, you, as a juror, have to

67

1  say, "You know what?  My mind is open to other charges."

2  For example, in that case, I proved to you

3  beyond a reasonable doubt that he killed her, he broke her

4  neck, but you've heard very little, if any, evidence about a

5  rape.

6  A    Right.

7  Q    And so I certainly haven't proven the rape to you

8  beyond a reasonable doubt.

9  A    Correct.

10  Q    So as a jury, you have to say, "You know what?

11  Here's capital murder, and I know the grand jury has

12  indicted him for that.  That's no evidence of anything, so

13  she hasn't proven that to me.  She didn't prove the rape

14  which is part of it."

15  A    Right.

16  Q    So let's go down a rung and see what she did

17  prove.  Did she prove murder?  Yes, beyond a reasonable

18  doubt.  And then you stop there and consider that offense

19  alone.

20  In other words, you don't say, "Well, it was

21  originally capital murder, so I'm going to really increase

22  the punishment."  You know, it just stands alone.

23  Does that make sense to you?

24  A    Yes.

25  Q    Sure.  And like with the murder example, there's

68

1    all kinds of murders.  You know, the one I used about

2    Mr. Harrison, one of my favorite examples of a murder that

3    people don't normally think about is you take a couple

4    85 years old.

5            Her husband -- they've been married for

6    60 years.  Her husband is dying of cancer in the hospital.

7    The doctor comes in and says, "Nothing more than we can do

8    for him.  I know he's in pain, but the medicines don't work

9    anymore, but he's just going to have to suffer for probably

10   about another week."

11           And he turns around and leaves, and she's

12   says, "Not if I can help it," and she turns off all of his

13   equipment.  Technically murder.

14       A    Murder.

15       Q    Sure.  Took a life without legal justification.

16           And you see how different that example is

17   from me shooting Mr. Harrison in the head?

18       A    Yes.

19       Q    That's why that range of punishment is so broad,

20   five years to ninety-nine years or life, the same thing.

21           So there's different facts, and the

22   punishment just has to fit the crime, right?

23       A    That's correct.

24       Q    As you sit here, you're open to lesser included

25   offenses, and you're open to their ranges of punishment?

69

1    A    Yes.

2    Q    There's another kind of testimony that you are

3  likely to hear on a criminal trial.  I've tried a lot of

4  sexual-assault-of-children cases.  In fact, Mr. Harrison and

5  I tried a rape case of a 14-month-old little baby girl, and

6  you can imagine, when you get to the punishment phase of the

7  trial, that there was emotional testimony from her mom.

8    A    Yes.

9    Q    And what the courts say is that, as a juror, you

10  have a right to hear what effect a crime has on a victim or

11  their families, because you would agree with me that a

12  victim is a lot more than a name on a piece of paper.  They

13  have relatives and families, and you're allowed to hear that

14  testimony.

15    A    Yes.

16    Q    Here's what they say you can do with it.  It's

17  real simple.  It goes like this:  Whatever you want, you

18  decide whatever evidentiary value, what evidence that is to

19  you.  Like in a capital murder case --

20    A    Yes.

21    Q    -- the rape victim, say her mom that testifies and

22  talks about what this has meant on her family, if that helps

23  you answer Special Issue 1 or 2, then use it; if it doesn't,

24  then don't.

25              You just can't -- you know, obviously, like

70

1  in our example about this baby, that's emotional, traumatic,

2  powerful testimony.  It's fine to listen to it, and it's

3  fine to react to it as a human being.  It's just not fine to

4  if you let that -- those feelings override your ability to

5  listen to the evidence and be fair and impartial.

6                    Makes sense?

7       A    Yes.

8       Q    And you would be able to do that?

9       A    Yes.

10      Q    This sounds like a silly question, but do you want

11 to serve on this jury?

12      A    I'm not for or against it one way or the other.

13      Q    That's good, too.

14      A    Yeah.

15      Q    I think we would probably be worried about people

16 who came in here and said, "I absolutely want to be here,"

17 or "No, under no circumstances will I ever serve."

18      A    If I was still working, it might waffle one way or

19 the other, but not now.

20      Q    Do you look at it kind of like a responsibility or

21 a duty --

22      A    Yes.

23      Q    -- jury service?

24      A    Yes.

25      Q    So now I'm to the end, and my questions are the

71

1    same as when we started.  Any reason why you couldn't be

2    fair and impartial to the State or to the Defense?

3         A    No.

4         Q    Any reason that you couldn't follow the law,

5    whatever it is, that Judge Skeen gives you?

6         A    Other than not understanding it, no.

7         Q    And that's always a concern.

8         A    Right.

9         Q    When you don't know what it might be.  He's a real

10   understandable kind of judge.  You will be able to

11   understand it.

12              And no reason why you couldn't independently

13   consider those phases we talked about?

14        A    No reason.

15        Q    And you're open-minded, and you're just going to

16   base your verdict on what evidence you hear?

17        A    Yes.

18              MS. SIKES:  I'll pass the venireperson,

19   Judge.

20              THE COURT:  Go ahead, Mr. Perkins.

21                   VOIR DIRE EXAMINATION

22   BY MR. PERKINS:

23        Q    Good morning, Mr. Shaw.  How are you?

24        A    Okay.

25        Q    Are you having fun yet?  Is it as bad as you had

1   expected it to be?

2        A    It's not as bad as I expected.

3        Q    Well, what we're going to do in a minute is we're

4   going to turn off all the lights in here and shine the light

5   in your face and start really asking you some questions,

6   okay?

7        A    That will upgrade it.

8        Q    Where were you last night?

9             I saw Mr. Awbrey say hello to you.  Are y'all

10  Lindale neighbors or something?

11       A    He went to school with my kids.

12       Q    He went to school with your kids?  It's a good

13  thing there's a rail between y'all then, isn't there?

14       A    Oh, he's a pretty good guy.

15       Q    Is he?

16       A    Yeah.

17       Q    That's not what we heard, but that's a different

18  story.  See, I'm making him take all of this down.

19       A    You know, that's hearsay.

20       Q    What I want to do is -- and I'll give you the good

21  news first.  I'm not going to talk to you as long as

22  Ms. Sikes did.  It's not her fault.  She's covering some of

23  the same ground that I'd have to cover anyway.

24       A    Okay.

25       Q    The bad news is, I am going to talk to you.  But

73

1    what I really prefer is that you talk to me.  Because, like

2    Judge Skeen said when you first got in here, there's not

3    right and wrong answers to this stuff.

4              We're more concerned in how you feel about

5    things than anything else, and I'll give you an example.

6    Both myself and Mr. Hawk, seated over here, used to be

7    prosecutors.  We started, or at least I did -- I think he

8    did, too -- in Lubbock, Texas.  And we worked in the DA's

9    Office out there before we worked for Mr. Skeen in the DA's

10   Office when he was the district attorney.

11             When I went out to Lubbock, I had never been

12   to Lubbock before until I got the job out there, and I drove

13   up there from Houston, which is where I had a job before.

14   And I got out there, and the speed limit between -- I guess

15   it's Sweetwater where I turned and went up, was 55 miles an

16   hour.

17             And it is so ridiculous to me, because you

18   could run off the -- I assure you, I think you could go to

19   sleep in your car, run off the road, drive for an hour, wake

20   up, and you might have disturbed a rabbit maybe.

21             I could not understand, when you can see

22   from -- there's actually a town out there, Plainview, that

23   is in plain view for hours before you could get there.  You

24   can see it, but you can't get there.  It's like walking down

25   the beach.

74

1        If I was a juror on a speeding case in

2  Lubbock, I don't care if I was an assistant DA, and they

3  came in and proved that somebody was driving 65 in a 55, I

4  will tell you that I would not be a fair and impartial juror

5  to the State in that situation, because I disagreed with the

6  law.

7        A    No.  If it's 55 and you're driving 65, you're

8  breaking the law.

9        Q    Okay.  This is what I'm getting to is, you might

10  be a good juror in every kind of case.  I feel like I could

11  be a good juror in almost every kind of case.  What we're

12  trying to figure out is, if you've got anything, any

13  disagreements that would cause you difficulty in following

14  the Court's instructions.  That's what we're trying to

15  figure out.

16        Can you think -- and that's really about the

17  only example that I can think of where I would just disagree

18  with the law.  And by the way, the law caught up to my

19  thinking, because the speed limit out there now is 70.

20        So if you were driving 80 in a 70, that's a

21  different story, but back when it was 55, that shouldn't be

22  against the law.  I don't think it should be a crime.  And I

23  would have difficulty, and I would tell them, if they were

24  asking me, I disagree with that law, and even if you proved

25  to me beyond a reasonable doubt that somebody was going more

75

1   than 55, I may have a problem finding them guilty, and I

2   would tell them, because they deserve to know that.

3        A    Yeah.

4        Q    You understand where I am?

5        A    Yeah.

6        Q    Can you think of any laws that you think is silly

7   or not based on common sense?  Can you think of any example

8   like that that would fit for you, like my example fits for

9   me?

10        A    There are laws that seem silly, true, but there's

11   a lot of people go into making those laws, too.

12        Q    Some of them are silly, too.

13        A    Some of them are silly, too.  But still, it is the

14   law.  And while I might not agree with it sometimes, it's

15   still there.  You can't do anything about it.

16        Q    What I want to do is, when we go through this, is

17   to visit with you a little bit about that, because what this

18   all comes down to is whether or not there's anything that

19   would cause damage to your conscience by trying to follow

20   something that you absolutely disagree with.

21             I'll give you a different example.  I'm on a

22   diet right now.  Went to the doctor and was complaining

23   about my knee hurting, and he said, "Well, your knee is

24   plenty torn up, but the main thing you need to do is lose

25   weight."  So I was like, "Man, I didn't want to hear that."

76

1          So he tells me, "This is what you ought to be

2   eating, and this is what you shouldn't be eating.  Knock off

3   the french fries and baked potatoes and have some broccoli

4   instead," that kind of thing.

5          He gave me instructions, and he sent me on my

6   way.  That doctor doesn't follow me when I go to

7   El Charro's; that doctor doesn't follow me when I go to

8   Luby's and make sure I'm having a vegetable plate.  I'm

9   under instructions, but it's my responsibility to follow

10  them.

11      A    True.

12      Q    That's a whole lot of the way it works in a jury

13  trial.  Judge Skeen is going to give you the instructions,

14  but Judge Skeen is not going to go back in there to make

15  sure the jurors are following the instructions.

16      A    You've got to follow the law.  In the doctor's

17  case, that's not the law.

18      Q    Okay.  This is what we're getting to:  You

19  actually would take an oath to follow the law.

20      A    Yes, sir.

21      Q    And I know this is probably -- we all wish that it

22  wasn't this way, but I know, as a former prosecutor and as a

23  defense lawyer, and they know that there are people that

24  will take an oath that it's just like water off a duck's

25  back.  I don't get that impression out of you.

77

1    A    No.

2    Q    If you take an oath, I'm sure that it would be

3    taken seriously by you.

4    A    Yes.

5    Q    A lot of people don't take an oath seriously.

6    People take an oath and take the witness stand and just lie

7    like a dog.  There are people that -- in a trial that do

8    that.  There are defendants that do that, and there are

9    policemen that do that.

10         There are jurors who take an oath to render a

11   true verdict and get back there and let emotion or prejudice

12   play a role in their deliberations.

13   A    I would agree that there probably is.

14   Q    What we want to make sure, which isn't in your

15   case, is that you could follow your oath.  I mean, there's

16   no doubt in my mind that you could, and I doubt seriously

17   that the State has any doubt about that.

18         What we're trying to make sure of is that you

19   don't take an oath to follow something that you

20   philosophically disagree with.  And when I'm going through

21   this, I'm going to give you some kind of hard examples just

22   to make sure, and I'll start with one.

23         Let's say that I'm on trial for murder.  They

24   say that I took a shotgun and blasted Ken Hawk over here.

25   He's got 800 holes in him.  My trial goes on.  You hear, you

78

1   know, I did it, and you know that I had confessed to killing

2   him.  My confession is, "Yeah, you bet I killed him.  If he

3   was alive, I would kill him again," okay?

4        A    Okay.

5        Q    That confession is admissible.  Then the

6   pathologist comes in and says, "You know, the cause of death

7   isn't shooting him with a firearm like the State alleged.

8   That mean old Perkins stabbed him 800 times with an ice

9   pick.  That's why he had all those little holes in him."

10       A    That would be interesting.

11       Q    See, this is the kind of thing that -- because if

12  you took an oath to follow the law, the law in that case

13  would instruct you that unless the case -- the State had

14  proven the case to you beyond a reasonable doubt of each and

15  every element, including the element of what we call manner

16  and means, shooting him with a firearm, if you had a

17  reasonable doubt about that at the end of my trial, you're

18  supposed to find me not guilty.

19       A    That's true.

20       Q    Some people say, "That's fine.  That's the way it

21  is.  I can do it."  Other people say, "You know, that's all

22  great and everything.  That's all wonderful.  I'm supposed

23  to turn Robert Perkins loose when I know for a fact that he

24  killed him?  I can't do that.  I don't care what the law is.

25  My responsibility to the public, to the safety of people, is

1   not to turn somebody who would stab somebody 800 times with

2   an ice pick loose."

3           Being a juror is not easy at all.  There are

4   a lot of things, and that's just one example.  My question

5   to you is, could you follow an instruction that would

6   require you to turn me loose under those circumstances?

7       A   I would have to.  I would have to follow the law.

8       Q   And I'm -- that's just an example that comes to me

9   right off the top of my head.

10      A   That's what you have to do.  You have to follow

11  the law, and what the law says and what you prove is

12  something that each individual juror has to make up their

13  mind about.

14      Q   That's right.  And so the reason we take so much

15  time in a situation like this is, is because the stakes are

16  so high.  You know, only in cases where the State has

17  indicted somebody for capital murder and filed a notice of

18  intent to seek the death penalty do we get to go through and

19  talk to jurors individually.

20      A   Right.

21      Q   I want you to understand one thing, Mr. Shaw, and

22  I'm sure you probably do understand this.  Every time that

23  the State -- and we've heard this time after time.  I've

24  lost track of how many times Ms. Sikes said it today.

25          "This is a capital murder case.  We're

80

1   seeking the death penalty in this case."  I just have to sit

2   here and listen to it.  What I feel like doing is, every

3   time she says, "This is a capital murder case," I feel like

4   standing up and saying, "No, it's not."

5               "This is a case -- this is a death penalty

6   case."  No, it's not.  That's what we're all here about.

7               I'll give you example.  See that water

8   pitcher sitting between us?  Do you see that?

9       A    Uh-huh.

10      Q    The analogy I like to use is, if Ken Hawk told me

11  that that was a vase for flowers, and he said, "That's a

12  vase for flowers," and I said, "No, it's not," we're looking

13  at the exact same thing.  He sees it one way, and I see it

14  as something else.

15              If it was a trial and he was the State of

16  Texas, he would have the burden of proving beyond a

17  reasonable doubt that it was a vase for flowers.  And I will

18  agree with you, you could flip that lid open and drop a

19  flower in it, but that doesn't make it a flower vase to me.

20      A    True.

21      Q    You understand what I'm saying?

22      A    Yes.

23      Q    What the State says is that it's a capital murder

24  case.  What the Defense says is -- is, no, it's not.  You

25  have to prove beyond a reasonable doubt that it is.  And if

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

81

1   you fail in any way to prove that it's a capital murder

2   case, then you drop down to the next level and look at it

3   and say, is it a murder case?  Is it a manslaughter case?

4        A    Right.

5        Q    That's like that ladder that she described to you.

6             If the State fails to prove anything to you

7   beyond a reasonable doubt, then you come off the ladder, no

8   more rungs, not guilty.

9        A    Standing on the ground looking at it.

10        Q    That's right.  Standing right back on the ground.

11   Which brings me to my next thing, and my next thing is, is

12   this:  You understand -- and the Judge read you part or

13   maybe even all of the indictment last Thursday or Thursday

14   before last --

15        A    Part of it.

16        Q    -- that Mr. Beatty has been indicted for capital

17   murder.  You know he's sitting here.  He's got two lawyers

18   with him.  The State's got two or three lawyers over on that

19   side.

20             Do you have any tendency to feel like he must

21   have done something wrong or he wouldn't be sitting here?

22        A    No.  Nothing's happened yet, other than an

23   indictment.

24        Q    Okay.  Some people have a natural tendency to come

25   in and go, "I wonder what he did."

82

1          Well, the law requires you to say you can't
2    think like that.  It's okay to wonder, you know, what he's
3    charged with doing.  That's perfectly natural.  But if you
4    come in here and assume he must have done something wrong or
5    he wouldn't be sitting here, then you're not affording him
6    his presumption of innocence.
7       A    Like I told her, I didn't know who the defendant
8    was for quite a while.
9       Q    We had one juror come in and think that I was the
10   defendant, and Mr. Hawk said, "I think that's perfectly
11   understandable."  And if she comes in long enough, sooner or
12   later, she's going to be right.
13          The next thing I want to talk to you about
14   are the special issues, okay?  The special issues are what
15   is -- what determines whether or not a person who is
16   convicted of capital murder gets the death penalty or gets a
17   life sentence, okay?
18      A    Okay.
19      Q    As Ms. Sikes properly told you, you don't go back
20   there and check "life" or "death."  You understand,
21   basically, how that works?
22      A    Right.
23      Q    What happens is, for somebody to get a death
24   penalty -- and I used this yesterday with another juror.
25   It's a three-step process.  They have to prove that the

83

1  person on trial is guilty of capital murder, and they've got

2  to prove that beyond a reasonable doubt, okay?

3      A    Okay.

4      Q    If the person on trial is convicted of any other

5  offense, of anything else, they're out of the running for

6  the death penalty.

7      A    Say that again.

8      Q    If a person is convicted of any crime, any lesser

9  crime down that ladder --

10     A    Lesser crime.  Okay.  Got you.

11     Q    Right.  For instance, in her example, she shot

12 Mr. Harrison 15 times and kicked him and told him she was

13 happy that his kids wouldn't get to see him from now on or

14 whatever.

15     A    Right.

16     Q    If she was charged with capital murder but only

17 convicted of the lesser offense of murder, she could still

18 get up to a life sentence, but she could not possibly get

19 the death penalty.

20     A    True.

21     Q    No matter how bad a person she was, no matter how

22 bad the crime itself was.  How do you feel about that?

23     A    Capital murder, if you're convicted, you've still

24 got other steps to go through --

25     Q    That's right.

84

1        A     -- before you get to the death penalty.

2        Q     Right.  I'm talking about somebody who was charged

3    with capital murder in the first place but convicted of only

4    murder.

5        A     Okay.  The way I understand what you're saying, if

6    you're convicted of murder and not capital murder, the death

7    penalty is not an option.

8        Q     That's exactly right.  That's exactly right.

9        A     Life in prison or lesser.

10       Q     Right.  That's right.  Five to ninety-nine or

11   life.

12       A     Right.

13       Q     There's no difference in ninety-nine or life.

14       A     Right.

15       Q     Okay.  So what I'm saying is, if the proof in a

16   case causes you to have a reasonable doubt about capital

17   murder, but you were convinced beyond a reasonable doubt

18   that the person on trial was guilty of murder, could you

19   find the person guilty of only what was proven to you beyond

20   a reasonable doubt?

21       A     That's the way you have to do it.

22       Q     All right.  Some people, because of the

23   allegations, say, "Well, I'm not sure which one it is."

24   I'll tell you that the Court would give you an instruction

25   that says, if you are convinced beyond a reasonable doubt

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

85

1  that the defendant is guilty on the one hand of capital

2  murder, or on the other hand of murder, but you have

3  reasonable doubt as to which one, you're supposed to resolve

4  that in the favor of the defendant and find him guilty of

5  only the lesser offense.

6               You understand that?

7      A    That's something each individual has to do is the

8  way I look at it.  You have to make that decision yourself.

9      Q    That's right.  That's right.

10      A    And -- well, I don't think I would have a problem

11  making that decision.  I'll have to face it before I say

12  what I could do.

13      Q    Of course.  Nobody is trying to get you to commit

14  what you would do.  What we have to do is we have to deal

15  with you in hypotheticals and say, in a hypothetical

16  situation, you've heard evidence that convinces you that a

17  defendant is guilty of either murder or capital murder, but

18  you have a reasonable doubt as to which one.

19               Can you resolve that in the favor of the

20  defendant and find him guilty of the lesser offense under

21  those circumstance?

22      A    Yes.  It took me a little bit to get it, but, yes,

23  I'm with you.

24      Q    Yeah, that's the way we deal with it.  Believe me,

25  I wish that we could bring somebody in here and have the

86

1   whole trial and say what would you do.

2        A    I understand.

3        Q    Because then, boy, could we use our peremptory

4   challenges well.  We would know exactly who to take and who

5   not to.  Of course, we would never get a jury that way

6   either.

7             Okay.  Now let's go on up the steps here.

8   Let's say that you've found somebody guilty of capital

9   murder.  One of the first things you said to them, which

10  was -- that's impressive to us, was just because you're

11  guilty of capital murder doesn't mean you deserve the death

12  penalty.

13       A    That's true.

14       Q    Okay.  The law requires you to take separate

15  considerations on two other steps, okay?

16       A    Correct.

17       Q    You understand that, and Ms. Sikes went over it

18  with you.

19       A    Yes.

20       Q    My question for you is -- is, do you believe that

21  if, in a case, in a hypothetical case, a person was

22  convicted of capital murder, which means that you believe

23  beyond a reasonable doubt that that person, while in the

24  course of committing burglary, robbery, sexual assault,

25  those kind of things, kidnapping -- if a person was proven

87

1   to you, beyond a reasonable doubt, to have committed an

2   intentional murder while in the course of committing one of

3   those other felonies, in your mind, would that person, the

4   fact that they were convicted of capital murder,

5   automatically make them a future danger to society?

6        A    No.

7        Q    You agree with me that that's a separate issue?

8        A    Entirely.

9        Q    And you would require the State -- we lose track

10  because we talk to so many people.  I don't know if

11  Ms. Sikes went over this with you or not.  The burden of

12  proof is on the State of Texas to prove that issue to you,

13  too.

14       A    Correct.

15       Q    Like I wrote up there, even though I shorthanded

16  it, they have to prove that beyond a reasonable doubt, okay?

17       A    Okay.

18       Q    If they fail to prove it beyond a reasonable

19  doubt, you answer that question no.  Then the defendant gets

20  a life sentence, which she told you translates into 40 years

21  before you're eligible for parole.

22       A    Right.

23       Q    And being eligible for parole, of course, doesn't

24  mean you're going to get it.

25       A    True.

88

1  Q  Somebody would have to decide to parole you out,
2 even though you had been convicted of capital murder.  You
3 understand that?

4  A  Yes.

5  Q  Now, another fact scenario.  You, in a
6 hypothetical case, have been -- you're on a jury.  The State
7 convinces you beyond a reasonable doubt that somebody is
8 guilty of capital murder.  The State further convinces you
9 beyond a reasonable doubt that the person on trial
10 constitutes a future threat to society.  You believe both of
11 those things.

12  A  Okay.

13  Q  And you believe both of those things beyond a
14 reasonable doubt.

15     Is that enough, in your mind, to say that
16 that person deserves the death penalty?

17  A  No.

18  Q  Okay.  You understand that there is another thing
19 that has to be proven to you through the evidence?

20  A  Yes, sir.

21  Q  And what has to be proven at that point is you
22 have to decide from looking at all the evidence, is there a
23 sufficient mitigating circumstance, which is singular -- it
24 could be one thing -- or circumstances, plural, to warrant
25 that a life sentence rather than the death penalty be

89

1    imposed.

2              The only way, if you can read my chicken

3    scratch up there on the board, to get a death penalty is,

4    all 12 jurors agree guilty; all 12 jurors agree beyond a

5    reasonable doubt yes; and all 12 jurors agree that there is

6    no sufficient mitigating circumstance or circumstances that

7    warrants that a life sentence rather than the death penalty

8    be imposed.

9        A    Okay.

10       Q    That's the only combination that ever results in

11   somebody getting the death penalty.

12       A    Right.

13       Q    Anything else results in different results, okay?

14       A    Okay.

15       Q    Now, do you know a whole lot more about the

16   capital murder sentencing scheme than you did when you came

17   in here?

18       A    It's beginning to come through.

19       Q    I will tell you, quite candidly, Mr. Shaw, that I

20   guarantee you that you know more and have heard more about

21   capital murder sentencing than any of us did when we got out

22   of law school.  Guarantee you.  They don't teach you this

23   kind of stuff in law school.

24       A    Right.

25       Q    I'm still trying to figure out exactly what they

1   do teach you in law school.  I think they teach you to take

2   the bar exam, is what they're trying to teach you.  But they

3   don't say much of anything about this kind of stuff, okay?

4             We expect a lot out of jurors in a real short

5   period of time, and if it wasn't so important, I wouldn't be

6   wasting your time with all of this, okay?

7             Now, I want to talk to you about one other

8   thing, and then -- well, two other things, and then I'll be

9   through with you.  The number one thing is, is this:  If a

10  person is charged with capital murder, it is basically

11  incumbent on the State to prove three major things.

12            There's a sheet up there somewhere in front

13  of you that says "capital murder" and has all the different

14  ways that capital murder can be committed in Texas on it.

15            Do you see that?

16  A    I see it.

17  Q    Has anybody ever told you you look like Jason

18  Robards before?

19  A    No.

20  Q    Do you know who Jason Robards is?

21  A    Yes.

22  Q    I was informed to tell you that he was a handsome

23  actor.

24  A    He don't look like me.

25  Q    Well, I could have said something worse than that,

1  I would hope, but I could have said that you look like --

2  let me think of somebody.  You look like -- how about

3  Elizabeth Hurley?  Would that make you feel better or worse?

4       A    Who is she?

5       Q    She's a model.

6       A    Okay.

7       Q    What I want you to do is look on that sheet, and

8  you will see there's a whole bunch of different ways to

9  commit capital murder.  There's probably about 30 of them.

10            Mr. Beatty here is charged with two of those

11  ways:  Murder during the course of committing robbery and

12  murder during the course of committing burglary.

13            When you think of a robbery, what do you

14  think of?

15       A    Stealing something.  You'll have to explain the

16  difference between robbery and burglary to me.

17       Q    Robbery is taking property from another individual

18  with intent to keep that property --

19       A    Okay.

20       Q    -- by force --

21       A    Okay.

22       Q    -- which is different than theft, okay?

23       A    Right.

24       Q    I'll give you an example.  Let's say that these

25  belong to Ken Hawk, okay?  If I pull out a gun, and I say,

92

1   "Give me those mints, or I'm going to shoot you," and he

2   hands them over, I've committed aggravated robbery.

3         A    That's robbery?  Okay.

4         Q    If Ken Hawk is sleeping or looking up at the

5   board, and I reach over here and get them and ease off with

6   them, then I've committed theft.

7         A    Okay.

8         Q    You see the difference?

9         A    Robbery and theft.  What about burglary?

10        Q    That's the difference in robbery and theft.

11               Robbery and burglary or burglary and theft.

12   Burglary is entering the habitation or vehicle or something

13   of another --

14        A    Got you.

15        Q    -- without their effective consent and obtaining

16   property that you intend to keep.

17        A    Okay.  Got you.

18        Q    So let's say that me and Ken live across the

19   street from each other, and one day when Ken is out at the

20   mall, I go up there and raise up a window and go in his

21   house and steal his 60-inch television.

22        A    Okay.

23        Q    I have committed burglary of a habitation.

24        A    Right.  Got you.

25        Q    Now, let's say that me and Ken live in the same

93

1   house together; we're roommates.  And one day when Ken Hawk

2   is at the mall, I go in his room and get his 60-inch

3   television.

4               If you had a reasonable doubt about whether

5   or not I had permission to be in that habitation, the Court

6   would instruct you that you're to resolve that in my favor

7   and find me guilty of only the lesser offense.

8       A    Okay.

9       Q    Because one of the things that the State has to

10  prove beyond a reasonable doubt is, is that I was in the

11  habitation without the effective consent of the owner, that

12  I entered the habitation with the intent to obtain property

13  and maintain control over that property.

14      A    Okay.

15      Q    You understand the difference in those two?

16      A    Yes.

17      Q    Okay.  So it could be a situation where I'm

18  originally charged with burglary, but you say, "I've got a

19  reasonable doubt about him being in the habitation, him

20  formulating the intent to commit theft before he entered the

21  habitation.  And if I've got a reasonable doubt about that,"

22  then I might be guilty of theft rather than burglary."

23      A    Right.  Yes.

24      Q    You see all those?  There's a bunch of them on

25  there.  There are certain ways, certain crimes, even felony

94

1   crimes, that capital murder will not support.  Let me

2   explain that to you.

3        A    Yeah.  Explain that.

4        Q    Okay.  There is no such thing as capital murder as

5   committing an intentional murder during the course of

6   committing theft.

7        A    Okay.

8        Q    You're wrinkling up your brow.

9        A    You're getting a little deep, but go ahead.

10       Q    Which doesn't make you look any less like Jason

11  Robards to me.

12       A    Go ahead.

13       Q    It's not on the list.  If you believe that

14  somebody committed an intentional murder during the course

15  of committing theft, it's not capital murder.  If you

16  believe that somebody committed an intentional murder during

17  an unauthorized use of a motor vehicle, it's not capital

18  murder.

19       A    Okay.

20       Q    If you believe that somebody committed an

21  intentional murder during the course of committing

22  unauthorized use of a motor vehicle or credit card abuse or

23  possession of a controlled substance, it's not capital

24  murder, because it's not listed.  And that's the law.

25       A    Yes.

95

1      Q    Some people say -- and we shorthanded a bunch,

2  because we have to go through this a bunch.  Some people

3  say -- and I don't really object to it when the State says

4  capital murder is murder plus.  It is murder plus, but it's

5  murder plus one of those specific things.

6      A    Okay.

7      Q    It's not enough to find that a felony happened and

8  an intentional murder happened.  It gets really complicated

9  from here.

10      A    Yes.

11      Q    You understand that?

12      A    I'm with you so far.

13      Q    It's going to get more complicated, and here it

14  comes.

15           Also, to be a capital murder, there are

16  different ways to commit murder, and I think Ms. Sikes went

17  through some with you.  If I have the intent to cause

18  serious bodily injury to Mr. Hawk and I do an act clearly

19  dangerous to human life that results in his death, I've

20  committed murder.

21      A    True.

22      Q    Or if I formulate the specific intent to cause his

23  death and I do that, kill him, then I've committed murder.

24      A    Okay.

25      Q    Those are two different ways, but only one of

1  those ways will support a capital murder, and that's where I

2  have formulated the specific intent to kill him.

3             Let me give you an example.  Let's say that

4  Ken Hawk -- and I guarantee you this is right.  He is faster

5  than I am.  He can outrun me.  And I say, "You know, I like

6  your watch," pull my gun out, "Give me your watch," and he

7  takes it off and gives it to me, and I say -- boom, and

8  shoot him in the foot to keep him from being able to catch

9  me --

10      A    Okay.

11      Q    -- and Ken Hawk bleeds to death, I killed him, and

12  he's just as dead as if I had shot him 15 times.  So I have

13  committed a murder during the course of committing robbery,

14  took his property by force.

15      A    Right.

16      Q    Let's say that you're a juror on my case, and you

17  go back there, and you look at it, and you say, "Hey, he

18  committed a murder during the course of committing robbery,

19  but here's the thing is, I'm not sure.  I'm not convinced

20  that the State proved to me beyond a reasonable doubt that

21  Robert Perkins had formulated the specific intent to cause

22  his death.

23             "He shot him in the foot.  He had a gun.  He

24  could have shot him in the chest.  He could have shot him in

25  the head.  He could have shot him a whole bunch of times.  I

97

1    know that he committed a murder.  I know that it was during

2    the course of committing a robbery, but I've got a

3    reasonable doubt as to what kind of murder it was."

4         A    If it fits here, that's where the doubt

5    disappears.  Then they proved it.

6         Q    You're pointing at capital murder up there.

7         A    We're talking about capital murder, right?

8         Q    Well, that's what we're getting to.

9         A    That's what you described the circumstances fits

10   capital murder, correct?

11        Q    No.

12        A    It doesn't?  Explain it to me again then.

13        Q    If a juror has a reasonable doubt about the

14   defendant's specific intent to cause the death of the

15   individual killed; in other words, you believe beyond a

16   reasonable doubt that I intended to cause serious bodily

17   injury to him; you believe beyond a reasonable doubt that I

18   did an act clearly dangerous to human life, you believe that

19   that act resulted in his death; you believe that it was

20   during the course of committing robbery; you believe beyond

21   a reasonable doubt all of those things, that's not capital

22   murder.  It's not.

23             And that's just the way the law is.  And he's

24   just as dead, because for a capital murder to be sustained,

25   for a capital murder to be proven, each juror has to believe

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

98

1  beyond a reasonable doubt that the person on trial had

2  formulated the specific intent to cause the death of the

3  individual killed.

4       A    Okay.

5       Q    Are you with me, because I'm telling you it's

6  very, very complicated.

7       A    I'm hanging in there.

8       Q    Okay.  My question is, is, if you believe beyond a

9  reasonable doubt that a person had formulated the specific

10 intent to cause somebody's death and did it during the

11 course of a robbery, would you find him guilty of capital

12 murder?  They formulated the specific intent to cause their

13 death.

14      A    Okay.

15      Q    You believe that beyond a reasonable doubt.

16      A    And they caused their death.

17      Q    You believe beyond a reasonable doubt that it was

18 in the course of committing, and you believe that a robbery

19 had occurred or I had attempted to rob somebody, okay?  You

20 believe those things.

21           Those are the elements of capital murder.  If

22 all of those were proven to you beyond a reasonable doubt,

23 would you convict that person of capital murder?

24      A    Yes.

25      Q    Okay.  Just a little bit different scenario.  You

99

1   believe beyond a reasonable doubt that I formulated the

2   specific intent to cause his death, okay?

3       A    Okay.

4       Q    That's the first scenario.

5            The second scenario, you believe beyond a

6   reasonable doubt that I intended to cause serious bodily

7   injury to him.  You believe beyond a reasonable doubt that I

8   did an act clearly dangerous to human life.  You believe

9   beyond a reasonable doubt that my act resulted in his death.

10      A    Okay.

11      Q    That's a different situation, because that is what

12  we refer to as -- there should be a sheet up there in front

13  of you that says 19 -- it says murder, just murder, not

14  capital murder.

15           MR. PERKINS:  Can I approach, Judge?  We've

16  got an extra one.

17           THE COURT:  There's two or three sheets up

18  there.  It gets a little confusing with all of those pages

19  up there.

20      Q    (By Mr. Perkins) The situation that I've described

21  to you in the first one is up here, intentionally or

22  knowingly causing the death of an individual.  The one I'm

23  talking to you now is 19(b)(2).

24           You believe that all the elements in 19(b)(2)

25  are proven to you beyond a reasonable doubt, okay?  I intend

100

1    to cause serious bodily injury.  I committed an act clearly

2    dangerous to human life that caused the death of an

3    individual, in my example, Ken Hawk.  You further believe

4    from the evidence beyond a reasonable doubt that it was in

5    the course of committing robbery.

6         A    Okay.

7         Q    Are you with me?

8              The law says that's not capital murder.  I

9    don't know why the law makes that distinction, but it does.

10   Some people say, "If that's the law, I can follow it."  Some

11   people say, "I disagree with that.  Ken Hawk is just as dead

12   as he would have been otherwise.  I don't see -- I would

13   overlook that little bit of difference to me because it is

14   insignificant to me."

15             I don't know where you come down on this.  I

16   don't know how you feel about it.

17        A    Well, the burden of proof, beyond a reasonable

18   doubt, that's a tough one.

19        Q    I told you it was going to get harder.

20        A    Whatever the law says and what I believe the law

21   to say in my own conscience is the way I would have to go,

22   because -- I can't tell you what I would do, but that's the

23   way I feel.

24             Whatever is proven, whatever I believe,

25   whatever my conscience tells me, whatever the law says,

101

1    that's the way I would have to go.

2        Q    Okay.  Well --

3        A    That's probably not the answer you're looking for.

4        Q    I'm looking for whatever your honest answer is.

5    I'm not looking for a specific answer one way or the other.

6        A    There it is.

7        Q    Okay.  In my scenario, you believe beyond a

8    reasonable doubt --

9            MS. SIKES:  Judge, I'm going to object at

10   this time just based upon the fact that he's been questioned

11   about whether or not that's a possible challenge for cause,

12   but he's adding these facts that are unnecessary that he

13   said he can consider both of them equally.

14           When it becomes a commitment question when

15   you attempt to bind a juror to a verdict based on a

16   hypothetical set of facts, when you start adding facts

17   beyond those necessary for a challenge for cause, then it

18   becomes a commitment question.  That's my objection.

19           THE COURT:  Well, I want to be sure that you

20   understand the distinction Mr. Perkins is making, because,

21   you know, it is -- and this is what the Court's instruction

22   would be, and I think from your answers to Mr. Perkins'

23   questions and Ms. Sikes' questions, the Court has the

24   impression that you're going to be able to follow the

25   Court's instructions.

1          VENIREPERSON SHAW:  Yes, sir.

2          THE COURT:  And, really, that's what

3  Mr. Perkins is trying to find out right now.  I just want to

4  be sure that you understand the distinction that he's

5  making.  And he's making a correct distinction under the law

6  with his example.

7          In Texas, as he said, there's two ways -- at

8  least two ways you can commit murder.  You can commit murder

9  under the specific intent part of the murder statute.

10          That's where I turn around to Steve Awbrey,

11  and I shoot Steve Awbrey in the head, just like this

12  (demonstrating), shoot him in the left temple because I like

13  the machine he takes down what I say on, and then I take off

14  out of here with the machine.  That's murder in the course

15  of robbery.  Clearly capital murder.

16          And it's the first part, the murder that

17  Mr. Perkins is making the distinction on as to whether or

18  not it qualifies as capital murder.

19          If you find -- if I shoot Mr. Awbrey in the

20  left side of the head, in the temple, there's not much

21  question -- and I shoot him with a firearm, there's not much

22  question that my specific intent was to cause the death of

23  Mr. Awbrey --

24          VENIREPERSON SHAW:  Right.

25          THE COURT:  -- obviously.  And then if I

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

103

1   shoot him with the intent, obviously, which I did, to cause

2   his death, and it was for the purpose of getting his

3   transcriber machine, because I know they're -- there's just

4   no value that you can put on them, and you can sell them for

5   a lot of money, and I take that machine and take off out of

6   here with it, and I'm caught in Dallas, brought back and

7   tried, the evidence is going to show from the testimony from

8   everyone in here that I intentionally caused his death when

9   I put the gun up to the side of his head and shot him, and

10  it was in the course of getting his transcriber machine.  So

11  it's clearly a capital murder.

12           The distinction Mr. Perkins is making is that

13  under the law, there is another way that I can commit the

14  offense of murder, but it doesn't -- if I commit the offense

15  of murder in this other way, the murder in the course of

16  committing another felony doesn't fall within the capital

17  murder statute.

18           And that is that if I -- that if my intent is

19  not to cause Mr. Awbrey's death, but my intent is to cause

20  him serious bodily injury, but I do an act that is clearly

21  dangerous to human life which results in his death, I have

22  committed the offense of murder under the statute.  But it's

23  a different type murder.

24           The example would be, if I had a -- let's

25  just say that I had this gavel right here, and I had this

104

1  gavel, and, again, I want his machine, and I whack him in

2  the head with the gavel, and he falls over there, and he's

3  out cold, and I take the machine, and I run off.

4           Well, if you looked at it as a juror and you

5  felt like my intent was to cause serious bodily injury to

6  him by hitting him in the head with the gavel, but it wasn't

7  my intent to kill him; it was my intent to cause him serious

8  bodily injury by whacking him in the head with the gavel

9  because I knew it was going to knock him out so I could get

10  his machine that has tremendous value and run off -- are you

11  with me?

12           Now, what I have done is commit the second

13  type murder, if he then dies from a subdural hematoma,

14  because I've whacked him in the head, he goes out, and I get

15  the machine, I take off.

16           But under -- what Mr. Perkins' distinction

17  is, is that in this type murder, my intent -- if the jury

18  believes that Jack Skeen's intent was to cause him serious

19  bodily injury, not to cause his death but to cause him

20  serious bodily injury, but I did an act clearly dangerous to

21  human life, I hit him in the head right here in the left

22  side of the temple with this gavel as hard I could, he goes

23  over, passes out, but by the time they get him to the

24  hospital, he's got a massive subdural hematoma, his brain

25  swells, and he dies, what have I done?

105

1              I've done -- I have intended to cause him

2    serious bodily injury, I did an act clearly dangerous to

3    human life by hitting him in the head as a hard as I could

4    with a gavel, and then it results in him dying from the

5    subdural hematoma.

6              Under that example, I would be guilty of

7    murder, but I would not be guilty of capital murder.

8              VENIREPERSON SHAW:  Okay.

9              THE COURT:  You see the distinction?  The

10   distinction is the intent, and that's why Mr. Perkins says

11   it's a fine line.

12             VENIREPERSON SHAW:  Right.

13             THE COURT:  Because if the jury believes my

14   intent was just to cause him serious bodily injury, and I

15   did an act clearly dangerous to human life, my intent was to

16   cause him serious bodily injury by knocking him in the head,

17   that's an act clearly dangerous to human life from which he

18   dies, but I didn't have a specific intent to cause his death

19   when I hit him in the head, that is a murder, but it is not

20   the type murder that provides that step for it to qualify as

21   a capital murder, being a murder in the course of a robbery.

22             Do you see the difference?

23             VENIREPERSON SHAW:  Yes, sir.

24             THE COURT:  And so then the question then

25   becomes, if you're convinced under the evidence that -- if

1   you're convinced under the evidence that when I hit --

2   which, obviously, you would be if I shot him in the head --

3   that I had the specific intent to cause his death and then

4   stole his priceless machine and ran off, that's a murder in

5   the course of a robbery.

6            So under that, would you be able to follow

7   the Court's instructions using that as an example?  If the

8   evidence convinced you beyond a reasonable doubt that the

9   murder was a specific intent murder, that the defendant

10  acted with the intent to cause the death of the deceased --

11           VENIREPERSON SHAW:  Right.

12           THE COURT:  -- and committed that murder in

13  the course of one of these named felonies, would you be able

14  to find the defendant guilty of capital murder?

15           VENIREPERSON SHAW:  Okay.

16           THE COURT:  Do you follow me?

17           VENIREPERSON SHAW:  Yes.

18           THE COURT:  And then the other side of the

19  coin would be if you found that the defendant -- a defendant

20  in a case did not have the specific intent to cause the

21  death of the deceased but acted with the intent to cause the

22  deceased serious bodily injury and did an act clearly

23  dangerous to human life in the example, hitting him as hard

24  as I could in the head with the gavel, then would you be

25  able to follow the Court's instructions and just find him

107

1    guilty of the offense of murder?

2              Do you see the difference?

3              VENIREPERSON SHAW:  Now I've got to

4    understand his questions, Judge.

5              THE COURT:  That's where he's trying to go,

6    and it's a fine line, but he's trying to differentiate

7    between the type murder -- the type murder committed in the

8    course of one of these other felonies that qualifies it as a

9    capital murder and the type murder an individual can commit.

10             He's guilty of murder, but it's not the type

11   murder that qualifies it.  Even if it's in the course of

12   committing one of these other felonies, it's not the type

13   murder that jumps it to capital murder.

14             Do you see the distinction?

15             VENIREPERSON SHAW:  I've got it now.

16             THE COURT:  So the question -- the next

17   question he would go to, and I think he's already asked it,

18   is, can you follow the Court's instructions and convict him

19   of capital murder if you believe it's the type -- convict a

20   defendant of capital murder if you believe it's the

21   murder -- a type murder where a defendant intentionally

22   acted to cause the death of the deceased and committed it in

23   the course of one of these named felonies?

24             Could you convict the defendant of capital

25   under those circumstances?  That's going to be -- okay?  Can

108

1   you do that?

2              VENIREPERSON SHAW:  Yes, sir.  And that is

3   your question?  Could I make the distinction?

4              MR. PERKINS:  Yes.  That's where we are all

5   headed.

6              VENIREPERSON SHAW:  Yes.  It took me a little

7   while, but yes.

8              THE COURT:  That's where we're trying to go.

9              VENIREPERSON SHAW:  Got you.

10             THE COURT:  But you can make the decision and

11  just base your conviction on -- base your -- in that example

12  base your conviction -- convict the defendant only of what

13  you believe the State has proven beyond a reasonable doubt

14  in regard to what type murder it is and whether or not it

15  qualifies along with the felony as capital murder?

16             Can you do that?

17             VENIREPERSON SHAW:  I've got you.  Yes.

18             THE COURT:  I'm sorry.  I took a little too

19  much time, and I'm sure you are ready for the next question,

20  but I know that's what -- I'm sure -- I know that's what

21  Mr. Perkins was talking about and thought I might be able to

22  help.  But it also gave me a chance to hit Mr. Awbrey in the

23  head with my gavel.

24             MR. PERKINS:  Which I certainly didn't object

25  to.

1     Q    (By Mr. Perkins) What I would like to do is, is

2  this:  I mean, there's just -- and I don't know why the law

3  is the way that it is.  This is one of these things that I

4  think why cut such a fine line of distinction?

5          You know, if a person is just as dead, in my

6  example where I shot Ken Hawk in the foot or the Judge hit

7  Steve Awbrey in the head with his gavel, some people will

8  not do the mental gymnastics that is required to make that

9  distinction.

10    A    The intent.

11    Q    That's right.

12    A    Yeah.

13    Q    And the intent part is what matters.

14    A    Okay.

15    Q    You understand that?

16    A    Okay.

17    Q    It's not good enough, in other words, for the

18 State to just prove that a murder happened in the course of

19 whatever.  They've got to prove an intentional murder.

20 They've got to prove one of those other listed felonies, and

21 they have to prove that it was in the course of one another.

22         Last example, then I'm going to quit.  Ken

23 Hawk works in a convenience store.  I've brought him back

24 from the dead.  He's working in a convenience store.  I've

25 known Ken Hawk for a long time.  I never got along with him.

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

110

1   I go in there, we get into an argument, get into a

2   fistfight, and I beat him over the head with a 32-ounce Coke

3   until he's dead, okay?

4              I leave, I'm walking back to my house, and I

5   think, "You know, I think Ken Hawk's car is up there.  I'm

6   going to go back up there and get Ken Hawk's keys.  I'm

7   going drive off in Ken Hawk's car.  That way I don't have to

8   walk home," okay?

9        A    Okay.

10       Q    I've committed a murder.  And if the jury believes

11  beyond a reasonable doubt that I intended to cause his death

12  and did that, I'm guilty of a 19(b)(1) murder, which is an

13  intentional murder.  I intentionally murdered him.

14       A    Right.

15       Q    And if I go back up there and dig around and get

16  his keys out and drive off in his car, I'm at least guilty

17  of unauthorized use of a motor vehicle and maybe theft,

18  okay?

19       A    Right.

20       Q    It is a fact question for the jury to decide if

21  one crime was committed in the course of committing the

22  other.

23       A    True.

24       Q    And to sustain a capital murder conviction, the

25  State has to prove to you again beyond a reasonable doubt

111

1  that the specific intent to commit the underlying crime was

2  formulated at or prior to the specific intent to commit the

3  murder.

4       A    Okay.

5       Q    So if you were on that case and you heard that

6  stuff, and you said, "Hey, you know, he did this, and he did

7  that, okay, he did them both, but I've got a specific

8  reasonable doubt about the elements that they have to prove

9  of in the course of committing" --

10      A    Right.  True.

11      Q    -- "this happened on this time; this happened

12 sometime later; I've got a reasonable doubt about that

13 bridge between the two" --

14      A    True.

15      Q    -- you would be asked by the Court to find the

16 defendant not guilty of capital murder.

17      A    Okay.

18      Q    They've got to prove an intentional murder,

19 they've got to prove it was in the course of committing, and

20 they have to prove that other underlying felony, and it has

21 to be one of those listed felonies on that sheet.

22      A    Right.

23      Q    Is that complicated enough for you?

24      A    That's not as complicated as the other way.

25      Q    It's on a bell curve.

1    A    I guess I'm getting better.

2    Q    And here's the thing is, like I said before, we

3  expect -- and I don't think you and -- are you married?

4    A    Yes.

5    Q    -- you and your wife sit around and visit a lot

6  over breakfast about the capital murder sentencing scheme

7  and the difference between murder and capital.  Do y'all

8  talk about that a lot?

9    A    No.  No.

10    Q    Nobody does, and we don't expect you to.

11              I will tell you, from my perspective,

12  Mr. Shaw, that -- and I stand to be corrected by anybody

13  here that wants to correct me -- that you're one of the most

14  intelligent prospective juror that we've had in 81 jurors

15  that have come through here.

16    A    Buttering me up.  I'm sorry.  I can't be the most

17  intelligent.

18    Q    You can consider it buttering up or not, but I

19  feel like that you've got a better grasp on it than a whole

20  bunch of people that we've talked to.

21    A    That may be true, a better grasp of it.  I don't

22  know.

23    Q    Do you have any questions of me about any of this

24  stuff?

25    A    No.  You've confused me enough.  No, I don't have

113

1    any questions.

2        Q    That really is not my intent.

3        A    I understand.

4        Q    It's just that we're charged with a tremendous

5    responsibility.

6        A    Yes, you are.

7        Q    And our responsibility is to make sure that people

8    that are on the jury understand the law and can follow it.

9        A    Right.

10       Q    We don't want people getting back there and

11   shortcutting, saying, "Well, you know, whatever," okay?

12       A    Yes.

13       Q    All right.  Mr. Shaw, I appreciate your patience

14   with us.  I'm sorry that it took as long as it did.

15            THE COURT:  Mr. Shaw, thank you very much.

16   If you could just step outside briefly with Carleton, we'll

17   be right back with you.

18            VENIREPERSON SHAW:  All right.

19            (Venireperson Shaw leaves the courtroom.)

20            THE COURT:  Any motions for cause, Ms. Sikes?

21            MS. SIKES:  None, Judge.

22            THE COURT:  What says the State?

23            MS. SIKES:  The State believes that Juror 81,

24   Mr. Shaw, is acceptable.

25            THE COURT:  Thank you.

                 STEVE R. AWBREY, CSR
                241ST JUDICIAL DISTRICT COURT
                   SMITH COUNTY, TEXAS

114

1           MR. HAWK:  No challenges for cause, Judge.

2    Give us just a minute.

3           THE COURT:  Yes, sir.

4           (Defense counsel confers with the defendant.)

5           MR. PERKINS:  Judge, we're going to, at this

6    time, exercise a peremptory challenge against Mr. Shaw.

7           THE COURT:  Do you agree with the exercising

8    of a peremptory challenge, Mr. Beatty?

9           THE DEFENDANT:  Yes, sir.

10          THE COURT:  I believe that's Number 7; is

11   that right, Mr. Perkins?

12          MR. PERKINS:  That's what my calculations is,

13   Judge.

14          THE COURT:  Ask Mr. Shaw to step back in.

15          (Venireperson Shaw enters the courtroom.)

16          THE COURT:  Mr. Shaw, we are going to be --

17   the Court is going to be able to excuse you from any further

18   jury service at this time.  Let me just express my

19   appreciation to you for the time you put in last Thursday

20   and the time going through the questioning here this

21   morning.

22          I certainly do agree with Mr. Perkins.  I

23   think your answers reflected a very good understanding of

24   all the procedures in this case, and we very much appreciate

25   you being here.

1              VENIREPERSON SHAW:  Thank you.

2              THE COURT:  Thank you, Mr. Shaw.

3              (Venireperson Shaw leaves the courtroom.)

4              (Venireperson Sanderson enters the

5              courtroom.)

6              THE COURT:  Mr. Sanderson, thank you for

7    being here this morning, sir.  I know you got here a little

8    bit early, and we appreciate that.  Sorry you had a little

9    bit of a wait.

10             This is that individual voir dire examination

11   that we talked about earlier last time you were here where

12   one of the attorneys for the State is going to ask you some

13   questions, either Ms. Sikes or Mr. Harrison.  Then Mr. Hawk

14   is going to ask you some questions on behalf of the Defense.

15             It's not like some cross-examination or

16   something like that.  What they're going to be doing is

17   asking you for your personal views on the type issues that

18   are involved in the trial of this type case.

19             They're going to be making a bunch of

20   explanations to you of what the procedures are and how the

21   trial in a case like this takes place, and then telling you

22   what the law is that applies to this type case and ask you

23   if you can follow them.  Those are more the type questions

24   you're going to be asked.

25             There's no right or wrong answers.  It's just

116

1    whatever -- how you truthfully feel about it.

2                The oath that I gave down there to the voir

3    dire panel when you were here before still applies today, so

4    your answers are still under oath.

5                Be sure, when you do answer, that you just

6    answer out yes or no.  Don't shake your head yes or no

7    because the court reporter here can't get that answer down,

8    so you need to be sure and answer out so the court

9    reporter -- I think if your answer is yes, instead of

10   nodding your head yes, just say yes or whatever the answer

11   is.

12               If there's some question you're asked that

13   you don't understand from either the State's attorney or the

14   defense attorney, just ask them to rephrase it for you.  Be

15   sure and tell them if you don't understand the question,

16   because there's going to be quite a few legal principles and

17   legal procedures involved that no one expects you to be very

18   familiar with.

19               And so you may get a question and you're

20   thinking, "What are they asking me?"  Just tell them that

21   you don't understand the question, and they'll go back and

22   restate it for you.

23               Is there anything about your questionnaire

24   that you filled out when you were here before that you've

25   thought of, anything you want to add to it?

117

1       VENIREPERSON SANDERSON:  No, sir.

2       THE COURT:  All right, sir.  Now, the only

3  other thing is, while they're going through this, the air

4  conditioner may come on, and so try to keep your voice up.

5  Probably won't be a problem, but if you would try to keep

6  your voice up to make sure they can all hear your answers.

7  That nice-looking microphone sitting in front of you doesn't

8  work.

9       Do you have any questions for me you can

10  think of?

11       Just relax.  Like I said, it's not like --

12  this isn't like some questionnaire or cross-examination.

13  What we're looking for is 12 fair and impartial individuals

14  who can come into the case with their mind open to

15  considering all of the evidence and considering all of the

16  of the issues and base their verdicts on the evidence and

17  the law given to them by the Court.

18       When we go through the individual voir dire

19  in this type case, the lawyers have more of an opportunity

20  to speak personally with the potential juror and find out

21  more about them than you can ever determine in a situation

22  where everyone is sitting out there in a big group, and the

23  lawyers are answering (sic) questions.

24       So if you don't have any questions for me,

25  the State's attorney will go ahead and ask you questions now

1   and then Mr. Hawk for the Defense.

2                   MR. HARRISON:  Thank you, Your Honor.

3                   DEAN AUSTIN SANDERSON,

4   having been duly sworn as a member of the special venire,

5   was examined as follows:

6                   VOIR DIRE EXAMINATION

7   BY MR. HARRISON:

8       Q    Mr. Sanderson, how are you doing this morning?

9       A    All right.  How are you?

10      Q    I'm doing very well.  Thank you.

11                  Are you nervous to be here today?

12      A    Not really.

13      Q    We're going to really -- the bad news is I've

14  probably got an hour's worth of questions maybe for you, and

15  the other bad news is Mr. Hawk is going to follow mine up

16  with probably another at least half hour of his.

17                  I'm going to try to cover everything I can to

18  try and not -- so that Mr. Hawk doesn't have to be

19  redundant, so we can get everything covered, but just bear

20  with us, if you would.

21      A    Sure.

22      Q    Obviously, you know why you're here.  You were

23  here a week ago last Thursday when Judge Skeen read portions

24  of the indictment, so you knew at that point that the

25  defendant in this case, Tracy Beatty, seated right over here

119

1   in the blue jacket, had been indicted by a Smith County

2   grand jury for the offense of capital murder.

3              And I think you probably also learned on that

4   date that our office had filed notice of intent to seek the

5   death penalty in that case, true?

6       A    Yes.

7       Q    That's probably the first time you had ever heard

8   of this case or been aware of these allegations and the

9   potential of you being selected or being a part of this

10  process, true?

11      A    Yes.

12      Q    How did that make you feel when you first heard

13  that charge and heard that this could be a death penalty

14  case?

15      A    I really don't know.

16      Q    Did it make you any -- have you ever been called

17  for jury selection before?

18      A    Yes.

19      Q    Like in a big group?

20      A    Yes.

21      Q    When you found out that this was a capital murder

22  case where the death penalty was an option and available,

23  did it make you feel any more nervous than maybe you did in

24  the past when you were called for jury service?

25      A    A little bit.

120

1    Q    Okay.  Because of the seriousness of the crime?

2    A    Yes.

3    Q    What I want to do is -- you filled out that short

4  book for us that gave us a lot of information about you, and

5  we do appreciate that.  It kind of focuses our questions a

6  little bit and shows us where we need to kind of ask you

7  things about.  And there's a couple of things I want to jump

8  into right off the bat and ask you about.

9         One is, what is -- you said that you're

10  employed by Snoke Special Products.  What is that?  What do

11  you do there?

12    A    We build air conditioner parts for Carrier.

13    Q    So it's kind of through Carrier or for Carrier, I

14  guess?

15    A    For Carrier.

16    Q    Great.  And you've done that for about 12 years?

17    A    Going on 12 years.

18    Q    12 years.  Okay.

19         The other thing I want to ask you about is

20  something you would imagine that would probably be important

21  to both sides since this is the type of case we're here on,

22  is your feelings on the death penalty.

23         You were given a couple of questions dealing

24  with those feelings, and the first one, just generally how

25  you feel about it, you indicted no opinion, and then you

1    followed it up with, in the next question where it kind of

2    gave you categories, you said that "I believe the death

3    penalty is appropriate in some cases."

4                    First of all, do you still feel that way?

5         A    Yeah.

6         Q    Because I know when you first filled this out, it

7    was the first -- it was that Thursday when you had first

8    learned that this was potentially a death penalty case.

9                    If you're like most people, you don't sit

10   around thinking about your feelings on the death penalty all

11   the time, so I wondered if -- since that time, if you've

12   thought more about it, thought more about the fact that this

13   was a capital murder case where the death penalty was an

14   option.

15                   Did that come into your mind, or did you just

16   try to push it out of your mind until today?

17        A    Well, I haven't really been thinking about it.

18        Q    Okay.  Let me give you an opportunity to kind of

19   explain a little further what your feelings are on the death

20   penalty just generally.

21                   What do you think about the death penalty as

22   a sentencing option in Texas?

23        A    I really try not to.

24        Q    Okay.  You ever see TV shows or movies or read

25   about it or just talk about it with anyone in the past, or

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

122

1   it's just something that really has never come up?

2       A    It just don't hardly ever come up.

3       Q    Do you think we ought to have a death penalty

4   statute in Texas?

5       A    It's kind of hard to say.

6       Q    Some states have it, and some states don't.

7       A    Yeah.

8       Q    You know, we happen to live in a state that does,

9   and the death penalty is one of those topics that for a lot

10  of people, it's really a black-and-white issue.  You're

11  either very in favor of it or very against it.

12              You sound like you're not in either of those

13  two extremes; is that fair?

14      A    Yes.

15      Q    So I kind of want to try -- and let me apologize

16  upfront.  If this were a social setting, if this were any

17  other place right here, right now, none of this would be any

18  of my business, and I wouldn't be asking you these

19  questions.

20              But you know, because this is the type of

21  case we're here on and you're a potential juror in the case,

22  obviously, the defendant deserves to know kind of how you

23  feel and so does the State.

24              And both sides, I think, would agree that

25  what we're looking for is 12 jurors who could be totally

123

1   fair and impartial and follow the law with regard to a death

2   penalty case.

3               I mean, you understand that?

4      A    Yes.

5      Q    I guess I want to kind of ask you to think about

6   it a little bit in your own mind, and I'll give you another

7   question.  If I gave you the ability to either do away with

8   the death penalty in Texas, to keep it, change it, what do

9   you think you would want to do if you were in charge for a

10  day?

11     A    Probably keep it.

12     Q    Why do you think we have a death penalty?  What is

13  the reason you think we have a death penalty in Texas?

14     A    I'm not real sure.

15     Q    Some people look at the death penalty as kind of a

16  deterrent for crime.

17     A    Right.

18     Q    Some people look at it as they feel you take a

19  life, you deserve to forfeit a life at times.  Some people

20  look at it as just because of the type of crime someone

21  commits, they should forfeit their life.

22               Any of those strike a cord with you or

23  anything different as to why you think having a death

24  penalty is a good idea?

25     A    No.

124

1    Q    You may not know the answer to this, because you

2   really probably haven't given it a whole lot of thought, but

3   do you think the death penalty -- obviously, you're probably

4   aware that the death penalty is used more in Texas than in

5   any other state.  More people in Texas are executed than in

6   any other state.

7    A    Right.

8    Q    Were you aware of that?

9    A    Yes.

10    Q    Do you think that too few people are executed in

11   Texas or too many people are executed in Texas or it's about

12   right?

13    A    About right.

14    Q    Are you aware about the appellate process, the

15   appeals process, that happens after someone has been

16   convicted of a capital murder and sentenced to death, are

17   you aware of the length of the appeals process?

18    A    No.

19    Q    So nothing about the length of that appeals

20   process would bother you? ·

21    A    No.

22    Q    Okay.  Do you think -- and let me just -- I want

23   to give you some specific questions to answer.

24          Do you think that if I intentionally killed

25   somebody -- let me give you a hypothetical example.  If I

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

125

1  pull out a handgun, and I just don't like the way Ms. Sikes

2  next to me over here is looking at me, and I just pull out

3  my gun, and I shoot her 15 times and laugh about the fact

4  that her little boy is not going to have a mother growing

5  up, do you think the death penalty is a good option to have

6  in a case like that?

7      A   Yes.

8      Q   In a hypothetical case, what happens is, you've

9  got a -- if you're on a jury and you had found somebody --

10  in a hypothetical case, guilty of the offense of capital

11  murder, you get to a punishment phase, and there's only two

12  options in that punishment phase.

13          You either, as a jury, answer two questions

14  that either result in a life sentence being given to a

15  defendant or the death penalty sentence.  The way in which

16  you answer those questions will dictate which of those

17  happen, whether it's a life sentence or a death sentence.

18          Do you have any hesitation at all, as you sit

19  here right now, in being able first to sit on a hypothetical

20  capital murder jury and determine whether someone is guilty

21  or not guilty?

22      A   No.

23      Q   If you had found someone guilty in a hypothetical

24  case, would you have any hesitation at all in answering

25  those two questions in a way that would result in a death

126

1    penalty where you knew that a death penalty would then

2    result?  Would you have any problem or question at all or

3    any hesitancy at all in being able to do that?

4         A    Probably.

5         Q    Why is that?  Is it because a human life is in the

6    balance?

7         A    Yes.

8         Q    What is it about that that would cause you

9    difficulty in being able to answer those questions, knowing

10   that if you answer them a certain way, a death sentence

11   would result?

12        A    I just don't want to be responsible for putting

13   somebody to their death.

14        Q    And that's a fair answer.  I think there's a lot

15   of people who feel that way.  That's kind of one of those

16   things that the death -- that's why I said the death penalty

17   is kind of black and white.  I mean, people are either,

18   generally, very much in favor of it or very much against it.

19              If somebody has a problem morally, their own

20   moral code, whatever it is, their own ethics, whatever it

21   is, their own religious beliefs or personal beliefs, if

22   somebody has a problem sitting in judgment of another person

23   where a death penalty could be a result of what they do, I

24   think that's understandable.

25              Is that kind of what you're telling me?

127

1    A    Yes.

2    Q    Is it -- and I don't know you.  This is our only

3    opportunity to talk, and, obviously, we need to find these

4    things out before you ever get on a jury.  Some people are

5    qualified to be on a jury like this; some are not.

6         And it doesn't make you a bad person if

7    you're not qualified.  It just means that there is something

8    that you feel or think that would make you unable to sit on

9    this particular type of jury.

10        You might be very well suited for a drug

11   trial or an arson trial or a theft case or a DWI, whatever,

12   but it's been described death is different.  When you're

13   talking about the possibility of the death penalty, that's

14   different.  It's a really, really unique type of case.

15   Obviously, the most serious potential punishment is

16   available, right?

17        So it's okay.  I don't want you think that by

18   these questions, we're trying to judge you or criticize the

19   way you think, because all I want, and all I'm sure the

20   Defense wants from you, is totally, totally honest answers,

21   because we need to make decisions based on that, okay?

22   A    Okay.

23   Q    Understanding that as a juror on a capital murder

24   case where the death penalty is being sought by the State --

25   I mean, the State's ultimate goal in a case where they have

128

1   filed intent -- in a hypothetical case, where they have

2   filed the intent to seek the death sentence is the ultimate

3   execution of somebody who's been charged with a crime,

4   right?

5        A    Right.

6        Q    So you can see how, to be totally fair to the

7   State, you would have to be open to being able to answer

8   questions, listen to the evidence, and fairly evaluate them,

9   understanding that what you do may result in a death penalty

10  being given and somebody being executed.

11       A    Right.

12       Q    By the same token, you couldn't be a fair juror,

13  we and the Defense would be entitled to know, if every time

14  you found someone guilty of capital murder, in a

15  hypothetical case, you would always assess the death

16  penalty.  That wouldn't be fair either, true?

17       A    No.

18       Q    Are you telling me that -- you know, I don't know.

19  Are you telling me that because of your feelings about the

20  death penalty and not wanting to be responsible for someone

21  ultimately being executed, that you just wouldn't be able to

22  take the oath to be a fair juror and listen to the evidence

23  and base your verdict and answers on the evidence because of

24  the way you personally feel or believe?

25       A    Yes.

1    Q    You understand when I say bias and prejudice,

2  please doesn't misunderstand me.  It has a very different

3  meaning inside a courtroom than it does in the outside

4  world.  It kind of has a negative meaning outside, but when

5  you're in the courtroom, what it means is you just disagree

6  with the law or disagree with a part of the law to the

7  extent that you just couldn't follow it because of a bias or

8  a prejudice.

9              Is what you're saying, that because of your

10 personal feelings against the death penalty -- or not

11 necessarily against the death penalty, but being involved or

12 responsible, as a juror, for whether somebody might be

13 executed ultimately, you would have a bias against the part

14 of the law -- first of all, being able to take an oath to

15 sit fairly as a juror in that type of case?

16    A    Yes.

17    Q    And then beyond that, you would have a bias

18 against the law, in that you would not be able to answer

19 those questions in a way that you knew, intellectually, a

20 death penalty would then result; would that be fair?

21    A    Yes.

22    Q    And regardless of the evidence, regardless of the

23 facts, are you telling me that you personally, just because

24 of your beliefs in not wanting to be a part of finding

25 someone -- or I guess being a part of a result in execution,

130

1   as a juror, potentially, that you would be biased in this

2   particular case?

3       A   Yes.

4       Q   And you understand, obviously, that to be a fair

5   juror, to be qualified to sit as a juror, you have to be

6   open to the possibility that as a juror, you could find

7   someone guilty, in a hypothetical case, of capital murder,

8   and then answer special issues or questions in a way that a

9   death sentence would result, right?

10      A   Right.

11      Q   And you understand that that would be something --

12  that would be a part of the law that the State would have to

13  be able to rely on you, as a juror, being able to do, right?

14      A   Right.

15      Q   And you're telling me you just -- and you're

16  telling me honestly now at the appropriate time, and I

17  appreciate that -- you're just telling me that's something

18  you just couldn't do?

19      A   Right.

20      Q   Regardless of the facts, regardless of the

21  evidence, you would never be able to take part in the

22  process as a juror where a death penalty could be a result?

23      A   No.

24      Q   No, you could not do that?

25      A   I couldn't do it.

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

131

1    Q    And let me just -- and this is kind of a legal

2   question, but you're saying that you have a bias or a

3   prejudice against that part or phase of the law upon which

4   the State is entitled to rely, that being not being able to

5   sit as a juror in a case where you would answer questions

6   that could result in a death penalty being assessed to an

7   individual; is that fair?

8    A    Yes.

9    Q    And I guess -- and, ultimately -- and, again, keep

10  in mind that these aren't -- the words don't have the

11  negative meaning that they may have out there, but in this

12  particular case, you would then have a bias in favor of the

13  defendant in this case because you could never take part in

14  assessing a death penalty.

15            Do you see that how that works?

16   A    Yeah.

17   Q    Would that be a fair statement?

18   A    Yeah.

19   Q    Because you would lean towards or in favor of the

20  defendant because you would be unable to take part in

21  assessing a death penalty, right?

22   A    Right.

23            MR. HARRISON:  Judge, I would make a limited

24  pass at this point.

25            THE COURT:  Mr. Hawk?

132

VOIR DIRE EXAMINATION

BY MR. HAWK:

1
2
3      Q    Mr. Sanderson, I'm Ken Hawk, and I think you got
4  introduced to us earlier.  I saw you in the hallway, and I
5  was the one that was about 30 seconds or 35 seconds late for
6  getting in here, right?
7      A    Yes, sir.
8      Q    I'm going to back the truck up some on this,
9  because what we're trying to do is figure out how your
10  opinions match up with what the law is.
11          Is that your phone?  By the way, that's the
12  first time that hasn't been somebody else's phone going off.
13      A    I just fixed it.
14      Q    There you go.
15          There's no right and wrong answers to this,
16  and I'm glad that you're able to say, "Hey, here's what it,
17  good, bad, or indifferent."  You're not on trial, and I know
18  you're the only one sitting up there with the microphone,
19  which, by the way, is pretend; doesn't work.  But you're the
20  only one sitting up there having questions fired at you.
21          So what I'm going to try to do is approach
22  the issues a little differently, but they're the same
23  issues.  A case involving an allegation where the State says
24  there's a capital murder and the possibility of a jury
25  having to hear evidence, maybe even find somebody guilty,

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

133

1    maybe even consider whether the death penalty should be
2    imposed, is like a thousand-step process.  It just takes a
3    long time.
4              And the State's questions of you kind of
5    started at the end.  The basic gut question is, can you do
6    this?  And I have heard a lot of questioning in your own
7    mind about your ability to participate, right?
8       A    Right.
9       Q    Do you understand how the process works as far as
10   the law goes, what you would have to do just to ever be on a
11   jury involving a capital murder case?
12      A    No.
13      Q    I'm going to explain that to you a little bit.  In
14   Texas, the legislature has decided that just because you
15   kill somebody, and that and that alone, if a jury finds from
16   the evidence beyond a reasonable doubt if you kill somebody,
17   that doesn't mean you're eligible for the death penalty,
18   right?
19      A    Right.
20      Q    And I'll represent to you that's what the rule is.
21   There's a lot of different ways you can get charged with
22   being responsible for somebody's death, whether you run a
23   traffic light and hit them from being negligent, whether
24   you're reckless about what you're doing.
25              You know, there's a risk of running the red

134

1    light, and you try to make it anyway, and you kill somebody,

2    you're just reckless because you disregarded that risk or

3    whether you intentionally kill somebody.  There's statutes

4    for all of that, and there's punishments for those different

5    types of killings of other people.

6         A    Right.

7         Q    Now, the one that's on the top of the ladder as

8    far as the mental part goes is the intentional taking of

9    somebody's life.  And in Texas, there's a statute called

10   murder.

11                  MR. HAWK:  And can I approach the

12   venireperson, Judge?

13                  THE COURT:  Sure.

14        Q    (By Mr. Hawk) And I think there's a sleeve

15   somewhere up here, I'm hoping.  Yes, it's right here.

16                  I'm going to show you this.  This says murder

17   19.02, and it gives you the two ways in Texas that a juror

18   is authorized to find somebody guilty of murder.  If they

19   find from the evidence beyond a reasonable doubt, the first

20   one is the intentional taking of a human life, intentionally

21   and knowingly causing the death of another.

22                  The second way is when you intend to commit a

23   felony or in the course of committing some felony, and you

24   commit some act clearly dangerous to human life, which

25   causes that person's death.  You might not have intended to

1  kill them, but you did something that sure is dangerous and

2  you end of killing them.  Those are the two ways of murder,

3  okay?

4      A    Okay.

5              MR. HARRISON:  Judge, I guess at this point

6  I'm just going to object that this is beyond the scope of

7  the limited pass.  I know he's got to explain the law, if he

8  needs to, but this would not be a law that would relate to

9  the limited pass.

10             THE COURT:  Well, I think he's trying to lay

11  some groundwork.  Let's just try to get on into it.

12             MR. HAWK:  Because by the juror's admission,

13  he doesn't know how the process works.  For me to start at

14  the end isn't fair to him, so I'm laying groundwork, and

15  I'll get to it.

16             MR. BINGHAM:  Actually, could we approach

17  just briefly?

18             THE COURT:  Yes.

19             (At the bench, on the record.)

20             MR. HARRISON:  Judge, I guess at this point

21  the venireperson has expressed a bias, which is a challenge

22  for cause as a matter of law, because of the expressed bias

23  in favor of or against the defendant.  Pursuant to Henderson

24  versus State, the venireperson is incapable of --

25             MR. HAWK:  Our response to that, Judge, is

136

1    that this is not one of those issues where there's no

2    additional inquiry.

3            I know the statute and the interpretations

4    read that if the juror is fully informed of the process,

5    understands the law, yet still expresses a bias after all of

6    his answers, taken as a totality, the Judge determines the

7    biases by the juror saying the magic word, unlike forming

8    the opinion about the guilt or innocence issue.

9            What we're doing is we're making sure he's

10   fully informed of the law before he answers the questions,

11   and then the Court gets to determine whether he's entitled

12   to it.  Otherwise, we would never be able to have a limited

13   pass in the first place.

14           MR. HARRISON:  I think that's true on the

15   other issue as a matter of law, if it's related to --

16           (End of bench conference.)

17           THE COURT:  That's fine.  You can stand right

18   there, Mr. Harrison.

19           Mr. Sanderson, could you please step outside

20   the courtroom, please, with the bailiff and just wait out

21   there?

22           (Venireperson Sanderson leaves the

23           courtroom.)

24           THE COURT:  Let me see a case, Mr. Harrison.

25   Let me see a case that says that the Defense cannot --

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

137

1        MR. HARRISON:  I've got the cite.  I don't

2   have the actual case.

3        THE COURT:  I want to see the case.

4        MR. HARRISON:  Yes, sir.

5        THE COURT:  Go get it and bring it down here

6   that says the Defense cannot -- does not have the right to

7   ask any questions of the venireperson in terms if he

8   expresses a bias against the law, assuming that he has --

9   specifically says he has a bias against the death penalty

10  law in Texas, that they can't ask any more questions.

11       MR. HARRISON:  And it was against the

12  defendant -- in favor of or against the defendant, not

13  against the death penalty itself.

14       THE COURT:  Okay.  Go ahead.

15       MR. PERKINS:  And, Judge, two things.  Number

16  one, I would like to see a copy of that case, and even if --

17       THE COURT:  Bring two copies.

18       MR. PERKINS:  And additionally, Judge, I want

19  the Court to understand that our objection would be that if

20  he was fully apprised of the scheme or the law or anything,

21  but just for them to say, "Is it fair for me to say that

22  you've got a bias" and get them to say, "Yeah," I mean,

23  that's -- I know of no case that prevents us from being able

24  to visit with the venireperson.

25       THE COURT:  That's why I want to see the

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

138

1   case, because what I think I have to make sure of is that he

2   has been -- and maybe I'm wrong, but that he has been

3   sufficiently apprised of what the law is and the way it

4   works and that he has a bias against the law.

5            But if I understand what you're saying,

6   you're taking that his expressed bias against the law or the

7   death penalty statute, if that's what it is, over to be a

8   bias against the defendant or a bias in favor of the

9   defendant.

10           MR. HARRISON:  Correct.  It's a bias in favor

11   of the defendant in this particular instance.

12           THE COURT:  What I'm concerned about is just

13   prohibiting, cutting off and denying the Defense, period,

14   from having -- asking any questions once he says that he has

15   a -- either a bias against the death penalty law.

16           My concern is, has it been sufficiently

17   explained to him where he has a bias against it, and then to

18   go over to say a bias in favor of or against the defendant,

19   I just want to be sure that they are not entitled to ask any

20   questions.

21           MR. HARRISON:  Yes, sir.

22           THE COURT:  I'll need to see those cases

23   where I'm denying them the right to question the

24   venireperson any further.

25           (Pause in the proceedings.)

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

139

1      THE COURT:  Back on the record in Cause

2  Number 241-0978-04.  Back on the record in this cause.

3  State's counsel is present; Mr. Hawk is present; the

4  defendant is present.

5      The first question to Mr. Hawk is, is

6  Mr. Perkins -- is Mr. Perkins coming back?  In other words,

7  do you need to locate him and get him back down here before

8  the Court takes up arguments on this issue?

9      MR. HAWK:  No, Judge.

10      THE COURT:  Then let me just go ahead and

11  hear from -- I asked the State to provide the Court a case,

12  and I've read the case, and the Court's inquiry of the State

13  would be -- and I've read down under footnote 2, 3, 4, and

14  5.  This is a 1982 case, Court of Criminal appeals, Panel

15  Number 2, Anderson versus State, cited at 633 2d 851.

16      I see down here in 2, 3, 4, and 5 -- and the

17  State can point me to some other parts of the case -- where

18  the Court holds "that bias exists as a matter of law when a

19  prospective juror admits that he is biased for or against a

20  defendant."  And there's a cite of Brandon versus State,

21  599 2d 567 and some other cases cited under that holding.

22      And then over on the next page under

23  footnote 6 and 7, the Court states, "When a prospective

24  juror is shown to be biased as a matter of law, he must be

25  excused when challenged even if he states that he can set

140

1  his bias aside and provide a fair trial."

2           The issue that the Court still feels is

3  before the Court is -- I understand what the Court is saying

4  here, and I understand that that's the law.  The question

5  the Court has is whether or not, in a voir dire in a death

6  penalty case, if a prospective venireperson says that he is

7  biased for or against a defendant because of his views on

8  the death penalty or that he is biased against the law on

9  the death penalty -- and the record will reflect

10 specifically what this venireperson said -- then does that

11 at that point preclude the Defense from having any right to

12 question the juror -- the venireperson?

13          In other words, at that point, if the State

14 asks for the venireperson to be excused -- in this case, the

15 State made a limited pass, but if the State asks for the

16 venireperson to be excused and then makes a motion for cause

17 on the ground that they've shown bias exists as a matter of

18 law when a prospective juror admits that he is biased for or

19 against the defendant -- the Court's question still is, once

20 that venireperson says that, if a venireperson does say

21 that, the Court understands that there is a challenge for

22 cause, that that's a good challenge for cause.

23          In fact, it's specifically listed in 35.16,

24 that he has a bias or prejudice in favor -- or under

25 Subsection 9, that he has a bias or a prejudice in favor or

141

1    against the defendant.  That's under 35.16.

2                Of course, also under 35.16 is that he has a

3    bias or a prejudice against any phase of the law upon which

4    the State is entitled to rely for a conviction or

5    punishment.  That's over on down under 11(b)(3), that he has

6    a bias or a prejudice against any phase of the law upon

7    which the State is entitled to rely for conviction or

8    punishment.

9                As I understand Mr. Harrison here, he's

10   mainly going on the statement of the venireperson that he

11   has a bias or a prejudice in favor of or against the

12   defendant, which is specifically listed in 35.16 as

13   unquestionably a ground for a challenge for cause.

14               If you do go to 10 -- and this gets into the

15   Court's concern.  If you go to 10, as we all know, where the

16   question is asked, "From hearsay or otherwise, there is

17   established in the mind of the juror," and this would be

18   Subsection 10 under 35.16 -- "that from hearsay or

19   otherwise, there is established in the mind of the juror

20   such a conclusion as to the guilt or innocence of the

21   defendant as would influence him in his action in finding a

22   verdict, and then to ascertain whether this cause or

23   challenge exists, the juror should first be asked whether

24   his opinion or conclusion so established will influence his

25   verdict."

142

1      The point of the Court reading this is that

2  it says if he answers in the affirmative, he shall be

3  discharged without further interrogation by either party or

4  the Court.

5      Now, the Court's concern is not that if it is

6  established that the defendant has a bias or a prejudice --

7  I'm sorry -- if it's established that the venireperson has a

8  bias or a prejudice in favor of or against the defendant,

9  that that is a good challenge for cause, nor that if it is

10  established that if the venireperson has a bias or prejudice

11  against any phase of the law upon which the State is

12  entitled to rely for a conviction or punishment, that that

13  is a good challenge for cause.

14      The Court's concern is that the State's

15  position is that if a venireperson makes that statement and

16  just makes that statement in response to the State's

17  questioning, that at that point, the State can make a

18  challenge for cause, and the Defense is not entitled to ask

19  any questions at all.

20      In other words, the Defense can't go back

21  through and be sure that the venireperson -- they can't

22  explain the procedures, the sentencing scheme, or anything

23  about it in a death penalty case.  They're just cut off from

24  asking any questions, then the Court has to rule on the

25  challenge for cause based solely on the questioning by the

143

1    State.

2                The language, obviously, is not in 9 or that

3    other section, 11(b)(3), whereas it is in 10, where it says,

4    if he answers in the affirmative, he shall be discharged

5    without further interrogation by either party or the Court.

6    So, obviously, there's never been any question under 10 but

7    that there can't be any further questioning.

8                But that's the concern of the Court, and I

9    don't have any question about the Court of Criminal Appeals

10   holding in the case as to what, you know, once bias is

11   established as a -- once the juror admits that he has a bias

12   for or against a defendant, that establishes bias as a

13   matter of law.

14               My question is -- the Court's concern is,

15   once the venireperson says that, then can the State make the

16   challenge for cause, and is the Defense prohibited from

17   asking any other questions?

18               MR. HARRISON:  Judge, my response is -- I

19   understand what the Court is saying.  I understand the

20   Court's concern.  To, I guess, appease the concerns of the

21   Court, and for the sake of, I guess, being overly careful,

22   we'll withdraw our objection and allow Mr. Hawk, certainly,

23   an entire voir dire, if that's what he chooses to do.

24               However, based on the case law, my objection

25   was made in good faith based on, in part, Anderson versus

144

1   State where it does say that a bias on the part of the

2   prospective juror exists as a matter of law when a

3   prospective juror admits he is biased for or against the

4   defendant, which did occur in this case.

5           It goes on to say that when he is shown to be

6   biased as a matter of law, he must be excused when

7   challenged even if he states he can set this bias aside and

8   provide a fair trial.

9           My reading of that is that there is no way --

10  once a bias has been established as a matter of law, there

11  is absolutely no way, pursuant to this case, that a

12  venireperson can then be rehabilitated.  But to be overly

13  cautious, we'll withdraw our objection and allow Mr. Hawk a

14  full opportunity to voir dire.

15          We will reurge our challenge for cause at the

16  end of, I guess, the voir dire process.  Obviously, we still

17  reserve our right to conduct a full voir dire, but I guess

18  our position is that as a matter of law, he's expressed his

19  bias.  He is challengeable for cause and must be excused and

20  cannot be rehabilitated.

21          But we'll certainly withdraw the specific

22  objection to Mr. Hawk conducting his voir dire, certainly

23  allow Mr. Hawk to do as much voir dire as he decides is

24  necessary, and then we will reurge our challenge for cause.

25                  THE COURT:  I don't have any question but

145

1  that your challenge for cause was made in good faith.  The

2  reason that I wanted to see the case is because I wanted to

3  see a case, if there was one, that says once the

4  venireperson states that he has a bias in favor of or

5  against the defendant or a bias against any part of the law

6  that the State is entitled to rely on, that there can be no

7  further questioning of that venireperson by either party and

8  that the venireperson must be excused for cause on the

9  challenge by the State.

10          MR. HARRISON:  Yes, sir.

11          THE COURT:  I don't have any question about

12  your good faith.  I wanted to see a case that took it one

13  step further, because otherwise, I'm making a ruling that --

14  you've made your challenge for -- well, it went to a limited

15  pass, but your position is -- and I understand it's in good

16  faith, and you're relying on Anderson, your position being

17  that once he expresses a bias in favor of or against the

18  defendant, at that point, you can make a challenge for

19  cause, and the Defense cannot ask any further questions.

20          MR. HARRISON:  Judge, I think the case does

21  not say that it precludes the Defense from asking questions.

22  What the case says is that he must be excused at that point.

23          I don't think it says that the Defense, then,

24  can't ask any questions.  I think the Court is correct in

25  its reading.  It does not say that once a bias, as a matter

1  of law, has been established, the Defense is then precluded

2  from asking questions.  It simply states that once a bias,

3  as a matter of law, has been shown, he must be excused when

4  challenged, even if he states that he can set the bias aside

5  and provide a fair trial.

6                THE COURT:  And you withdrawing your motion

7  at this point, I understand, cures it.  And I don't have any

8  question about what the case says when a prospective juror

9  is shown to be biased as a matter of law, he must be excused

10  when challenged, even if he states he can set his bias aside

11  and provide a fair trial.

12                I understand your position.  The Court's

13  concern is just ruling on that challenge for cause by the

14  State and prohibiting the Defense from asking any questions

15  at all before I rule on the challenge for cause.  There was

16  a limited pass here.  That's the Court's concern.

17                And the case -- I understand your

18  interpretation of the case, Mr. Harrison.  The Court is

19  just -- the Court is just not comfortable precluding the

20  Defense from asking any further questions.

21                Now, you know, the questioning that they do

22  now on the limited pass, Mr. Hawk, does need to be on that

23  issue.  And let me hear from you.

24                MR. HAWK:  Thank you, Judge, because I've

25  been listening Mr. Harrison go through this, and I think

147

1    that everyone here clearly understands the law and the

2    holding, and no one disagrees with once a bias has been

3    established as a matter of law, that's the end of it.

4              The disagreement that the Defense has with

5    what Mr. Harrison tried to accomplish and has said he would

6    withdraw, but I think, quite candidly, whether he withdraws

7    it or not, we're right.  Here's the situation:  The Court

8    does not have to look to a sound-bite answer.  "Do you agree

9    with -- that you're biased against this and the other?"

10   "Yes."  And that's the end of it.

11             The Court, on this specific challenge, is

12   entitled -- in fact, the very next sentence in that case,

13   Judge, that you've read through, "When a prospective juror

14   is shown to be biased as a matter of law, he must be excused

15   when challenged, even if he states he can set his bias aside

16   and provide a fair trial."

17             However, it is left to the discretion of the

18   trial court to first determine whether or not the bias

19   exists, and so what we get to try to do is, when he says the

20   sound bite, which, taken by itself, could support a Court's

21   finding that there's a bias, and we tried to give context to

22   it, because I don't think the Court can establish in his own

23   mind -- not this Court, but a judge can't establish a bias

24   exists unless at least two things happen:  One, the juror

25   knows what the law is and then expresses a bias.

148

1          And by the juror's admission, he doesn't

2   understand what the law is.  And so the agreement on the

3   sound bite, yes, when Mr. Harrison asked that question,

4   isn't sufficient, in our position, to let the Court, then,

5   decide, well, there is a bias.

6          Now, after we get finished, based on the

7   totality, the Court may say, "You know, based on the

8   totality, as a matter of law, there's a bias, so it's over.

9   Got to excuse him."

10          So I don't think that there's any provision

11   for the two sides to ferret out from the juror sufficient

12   facts to let the Court decide if this bias exists as a

13   matter of law.

14          And I think the Court has discovered in those

15   other challenges for cause, at least that one in Number 10,

16   that the inquiry is so short, because there's no room for

17   interpretation as to a juror's conclusion of the guilt or

18   innocence, that is or isn't.

19          But yet there's an enormous amount of room

20   for a court to determine whether a juror understands the law

21   and if he does -- if he has a bias.  In this case, we say he

22   hasn't, which is why we're going to do a limited pass, and

23   I'm going to get right to it.  I'm not going to try do an

24   entire voir dire on it.

25          THE COURT:  It does say, however, it's left

1   to the discretion of the trial court to first determine

2   whether bias exists, so it is within the discretion of the

3   trial court to decide whether or not bias exists.

4           So if, theoretically, then a trial court

5   could find, if the Court just went on what Mr. Harrison has

6   asked and the responses, you know, a trial court could say,

7   well, I find bias exists, and then the Court could rule on

8   the challenge for cause and the Defense never have an

9   opportunity to question the venireperson.  And it's that

10  part that causes the Court concern.

11          MR. PERKINS:  I think the question on appeal

12  would be whether the Court abused discretion.

13          THE COURT:  By not allowing the Defense to

14  ask any question before the Court determined whether or not

15  bias, as a matter of law, had been established.  That's my

16  concern.

17          MR. HAWK:  That's how we see it.

18          THE COURT:  And I understand the Anderson

19  case.  Clearly, Mr. Harrison's motion is made in good faith.

20  It was based on the Anderson case.  He's produced it for the

21  Court, which I requested.  He's made clear what his -- I

22  don't know that interpretation is the right word, but he's

23  made clear what his position is with regard to what the

24  Anderson case means.

25          But the Court -- the Court feels that the

150

1  Defense should have an opportunity, within parameters, to

2  question the venireperson.  Probably if the Defense did not,

3  the Court probably would, because the Court wants to be

4  assured that the Court is within its discretion in ruling

5  that there is a bias, to first determine whether or not the

6  bias exists.

7            Mr. Hawk, if you would -- I'm going to bring

8  the venireperson back in.  I know Mr. Harrison has

9  withdrawn -- I don't remember exactly how you put it,

10 Mr. Harrison, but whatever you said.

11            MR. HARRISON:  Judge, I guess I put it this

12 way:  I have no objection to Mr. Hawk conducting his full

13 voir dire on that limited issue as he deems fit.

14            THE COURT:  Okay.  What the Court would ask

15 you to do, Mr. Hawk, is just -- he's made a limited pass.

16 Just keep it on that particular point, would you, just as

17 close as you can --

18            MR. HAWK:  I will.

19            THE COURT:  -- on whether or not he has a

20 bias against or in favor of the defendant, which is what I

21 understand Mr. Harrison was going on in his challenge.

22            MR. HAWK:  I want to clear that up, because I

23 know he said a couple of different things, and I didn't hear

24 something that maybe the Court heard.

25            I heard Mr. Harrison's question about whether

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

151

1  you have a bias for or a prejudice against the law upon

2  which the State is entitled to rely on the death penalty

3  issue, but I never heard him say he had a bias against the

4  defendant, but I'm going to clear up both.

5  THE COURT:  Actually, he did.  Actually,

6  after that, he went on and asked him, "So you have bias -- a

7  bias against the defendant or in favor of the defendant?"

8  MR. HAWK:  I'll hit those two issues, and

9  that will be it.

10  THE COURT:  Just hit those two.  The Court's

11  ruling would be I'm going to give the Defense an opportunity

12  to question on that issue.  It is a limited pass.

13  Okay.  Bring Mr. Sanderson back in.

14  (Venireperson Sanderson enters the

15  courtroom.)

16  THE COURT:  Mr. Sanderson, I apologize to you

17  for the delay, you having to wait outside.  Don't hold that

18  against either the State or Defense.  That was a matter that

19  the Court had to decide.  These things come up from time to

20  time, so we'll go ahead and proceed now.

21  There's been a limited pass from the State on

22  those issues to you, Mr. Hawk.

23  VOIR DIRE EXAMINATION (CONTINUED)

24  BY MR. HAWK:

25  Q  Mr. Sanderson, I'm going to kind of pick up where

152

```
 1   I left off.  We're going to smooth right to it, and I'll
 2   give you this overview.
 3              I heard Mr. Harrison ask you a question about
 4   if he brutally shot Ms. Sikes, if you thought maybe the
 5   death penalty ought to be one of the things able to occur.
 6              Do you remember that question?
 7   A     Yes.
 8   Q     You said, "Yeah, I can see that."  Remember that?
 9   A     Right.
10   Q     What I'm trying to do is narrow you down a little
11   bit and help you understand.  Because I promise that you're
12   about to learn more about capital murder law than any of us
13   knew even after law school.  It's complicated stuff.
14              And so we made charts for you, because I
15   guarantee you, you haven't been sitting around thinking
16   about it.  I think I heard you say you have not, so I'm
17   trying to give you some structure that will help you answer
18   questions a lot better, okay?
19   A     Okay.
20   Q     Here's how it actually works:  If you become a
21   juror in a capital case, I'm going to tell you this is what
22   you would have to go through.
23              The first thing you would have to do as a
24   juror on a capital murder case, you would be submitted a
25   question at the deliberation part about the guilty or not
```

153

1    guilty.   Is the defendant guilty of capital murder at all?

2                   And I won't go into all of what that is, but

3    capital murder is actually different than the regular murder

4    that -- if there is such a thing as regular murder -- than

5    Mr. Harrison described.  Capital murder has special

6    requirements that many murders don't have, okay?

7         A    Okay.

8         Q    In front of you, there's some charts that will

9    explain that, and we'll get into that part later, but I'm

10   going to start with this.

11                  Let's presume for a minute that you make it

12   on a capital murder jury where the allegation is capital

13   murder and that you're a juror, and you find from the

14   evidence beyond a reasonable doubt that the defendant in the

15   case that you're sitting on actually gets convicted of

16   capital murder, okay?  We'll make that presumption for right

17   now, okay?

18        A    Okay.

19        Q    The next thing in Texas is you go to a second

20   phase of trial.  The first part is guilty or not guilty; the

21   second part is what should happen to the person, okay?

22                  In a case where you have found somebody

23   guilty of the offense of capital murder, the law provides

24   only two different options.  One option is life in prison.

25   That's one option.  The other option is the death penalty.

154

1   Those are the only two options, and we'll talk later about

2   what life means.  It's not life without parole.  You

3   actually do get eligible for parole after 40 years.

4              But life in prison on the one hand or the

5   death penalty.  And as a juror, it may make you happy to

6   know that you don't have a verdict form in a death penalty

7   case where you find somebody guilty of capital murder where

8   you have to fill in a blank should the defendant get death,

9   or should he get life?

10             Does that make you feel any better?

11   A    Right.

12   Q    Did you know that?

13   A    No.

14   Q    Okay.  Because a lot of people, when they're

15   asked, what do you think about the death penalty, the answer

16   in their mind is a yes or no, should someone get it or

17   should they not.  In Texas, they actually have a process to

18   go through, and the question is not death or life.

19             Here's how it works:  If you're on a jury and

20   you've already found somebody guilty of capital murder,

21   there's a whole other phase of trial called the punishment

22   phase.  And at that punishment phase, certain things happen,

23   okay?

24             You will hear evidence or not.  You will have

25   the opportunity for both sides to present evidence, if they

1 want to.  You get to consider all of that evidence you've

2 heard at the whole trial.  But at the end of the punishment

3 phase, this is what your job would be as a juror.

4            You actually are then required to pick up a

5 question.  The first question is called a special issue.

6 It's a question.  And the first question that you would have

7 to answer is -- and it's in front of you.  We've typed it

8 out.

9            Would you look and see if there's something

10 called Special Issue 1?  Is it up there?

11           The question that a jury gets called upon to

12 answer is, is there a probability that the defendant would

13 commit criminal acts of violence which would constitute a

14 continuing threat to society, okay?  That's the first

15 question that you, as a juror, would have to answer, okay?

16           We won't go into the specifics of it.

17 There's a lot of little definitions in there, criminal acts

18 of violence, society, probability.  Some of those will be

19 defined by the Judge; some you've got to use your own

20 definitions, whatever you think it is.  But that's the

21 question you, as a juror, would ask, okay?

22           If all 12 jurors answer that question yes,

23 then the jurors are called upon to look at another question.

24 And by the way, on that first question, the State has to

25 prove that to you beyond a reasonable doubt, okay?

156

1          If all 12 jurors answer that question yes,

2     then the jurors have a second question to look at, and

3     that's typed up there for you, also.

4               It's longer.  Do you see that question?

5     A     Yes.

6     Q     Okay.  It talks about whether the jurors believe

7     that there is some circumstance or circumstances, one or

8     many, which would make it, in the juror's mind, that a life

9     sentence rather than the death sentence is appropriate.  And

10    that's the question that the jurors answer.

11              If all 12 jurors say, "Nope, we think there's

12    not," okay, then the job of the jury is finished.  You've

13    done what you're supposed to, and y'all give your answers to

14    the Judge, and here's where the -- here's where it applies.

15              If the Judge sees that the jury's answers are

16    yes to the first question and no to the second question,

17    then the Judge imposes the death penalty.

18              Now, you know, as a juror, that your answers

19    do affect that, so it's not like you're completely

20    separated, but you see how it's not you having to say, as a

21    juror, it's either life or death.  That's not what you do.

22    You have to answer those specific questions, the one on

23    future danger and the one on that mitigation.  You answer

24    those based upon the facts.

25              You follow me on this?

157

1    A    Yes.

2    Q    That's the only way someone gets the death penalty

3  in Texas.  In fact, on that first question, if the jury

4  answers the question no, we don't think there is a

5  probability the defendant will commit future acts of

6  violence that would constitute a continuing threat to

7  society, the jury says no, that's it.  Don't even answer the

8  second one.  You give your answer no to the Judge; he

9  imposes a life sentence.

10            You see, it's the answer to the questions

11  which decides what happens to a defendant who has already

12  been convicted of capital murder.  You follow that?

13    A    Yes.

14    Q    Does that make you feel a little bit better about

15  the process?

16    A    A little bit.

17    Q    Your responsibility as a juror, then, would be

18  able to -- you would have to look at the evidence, and you

19  would have to make decisions based upon the evidence on each

20  of those questions, okay?

21    A    Yes.

22    Q    I'm going to use this thing that Mr. Perkins drew

23  yesterday.  It's kind of like a stair step.  The first step

24  would have to be capital murder, if you find somebody

25  guilty.  If you don't find them guilty of capital murder,

158

1    the death penalty is not even an option.

2                    But then independently, you, as a juror,

3    would have to ask this next question.  It's a separate

4    question you have to ask.  You don't answer it a certain way

5    just because of what happened here.  B-U-Y is beyond a

6    reasonable doubt, I guess.  I can't figure out those

7    abbreviations.

8                    But the next question is that Question

9    Number 1 that we just talked about.  If that question is

10   yes, then and only then you get to the second question.

11                   Do you see the process of the stair step

12   thing?

13       A    Yes.

14       Q    The reason I want to go through this is because I

15   don't want you to think when you say, "Well, I couldn't ever

16   say death," well, I could tell that's not how it works, and

17   I wanted you to understand that.

18       A    Yes.

19       Q    Now, understanding what I've explained about the

20   stair step process or this question process, do you feel

21   like you at least have a basic understanding of the process

22   if you're a juror in a capital murder case?

23       A    Yes.

24       Q    You feel better about that, about the process,

25   your understanding of it?

159

1    A    A little bit.

2    Q    So now I'm going to get to the end questions on

3  this issue.  The first question is this:  If you, as a

4  juror, were to be on some jury involving where you found a

5  defendant guilty of capital murder and you, as a juror,

6  heard evidence, considered everything, and you in your own

7  heart thought that the answer to that first question is yes,

8  the defendant would commit criminal -- would probably commit

9  criminal acts of violence -- you know what I'm talking

10 about, the future danger.

11   A    Right.

12   Q    If you thought the answer to the first question is

13 yes, my question to you is, could you answer that question

14 yes?

15   A    Yes.

16   Q    Because some people would tell me this:  They

17 understand the stair step process, and the jurors would say,

18 "Look, I happen to know that if I say yes to that, even if I

19 believe it's yes to that first question, that gets it one

20 step closer to the death penalty."

21   A    Right.

22   Q    And so some jurors will say, "Even if I think the

23 evidence is proven to me beyond a reasonable doubt the

24 answer is yes, I'm going to answer it no anyway.  I'm going

25 to change my conscience.  I'm going to be dishonest about

160

1    it."

2                    And so we want to find out that if you in

3    your heart find that the answer is yes to that first

4    question and you believe from the evidence beyond a

5    reasonable doubt, could you answer it yes?  What do you say?

6        A    Yes.

7        Q    Okay.  Now, if and only if you do that do we get

8    to the second special issue, the second question about

9    mitigation.

10                   Now, you've read through it.  Mitigation is

11   what it is to you.  You know, who knows?  You may be given

12   tons of evidence.  Some of it may make a difference to you;

13   some may not.  It's whatever you think it is.

14                   If you think whatever fact or factor you

15   hear, as long as you consider it to answer that question, do

16   I think it reduces a defendant's moral blameworthiness?  Do

17   I think it's sufficient to impose life over death?  Just as

18   long as you, for whatever you decide, look at all this

19   evidence.

20                   Here's my question to you:  If after looking

21   at that second question, if you in your heart think the

22   answer is no to the second special issue, if you thought the

23   answer was no, could you answer the question no?

24       A    Yes.

25       Q    Because, again, some jurors would tell us, "Look,

161

1  I know that if I answer that second question no, and we give

2  our answers to the Judge, he's going to give the guy the

3  death penalty.  And because of that, I don't care what my

4  feelings are, I will never answer that question no, even if

5  I think the answer ought to be no."

6          Do you follow what I'm saying?

7      A   Yes.

8      Q   My question to you is, if you thought the answer

9  was no, could you answer it no?

10     A   Yes.

11     Q   Even knowing now that what you've done by

12 answering those questions that the law put in place for you,

13 knowing that, the Judge is about to give somebody the death

14 penalty?  Could you still do that?

15     A   I could do it.  I wouldn't like it, but I could do

16 it.

17     Q   And you're guiding principle, really, is the

18 evidence, isn't it?  If the evidence tells you what to do

19 and you follow the evidence and you follow your

20 decision-making, it's going to lay it out for you, isn't it?

21     A   Yes.

22     Q   We don't want to get you in a situation where you,

23 as a juror, say, "Because of my personal feelings, I'm just

24 not going to participate.  I'm not going to do anything.  I

25 don't care what the answers are.  I'm just not going to

162

1    answer them.  I'm not going to say yes; I'm not going to say

2    no; I'm not playing."

3                    We've had jurors tell us that, too.  Would

4    you be one of those?

5        A    No.

6        Q    Do you know anything about this specific case that

7    we're here about?

8        A    No, not really.

9        Q    There's a legal phrase, and it means so many

10   different things to so many different people.  When we're

11   out in public and you hear the word "bias" or "prejudice," I

12   mean, it kind of doesn't mean very good things, does it?

13       A    No.

14       Q    Right.  I know every person that's come in here,

15   myself, judges, and prosecutors, everybody thinks you're a

16   fair person, right?  Truth be told, you want to believe that

17   you're fair, right?

18       A    Right.

19       Q    So when we ask you this magic question about your

20   bias or prejudice to find out if you could follow the law,

21   what I'm really trying to ask you is, even though I know,

22   like you said, you wouldn't like it, and it may even be

23   tough for to you to do -- my question is:  If the Judge

24   instructed you, gave you a set of instructions on this is

25   what you've got to do, answer these questions, follow your

163

1    conscience, burden of proof, whatever the instructions were,

2    my question to you is, could you follow these instructions?

3        A    Yes.

4        Q    Even if it meant that after doing your duty as a

5    juror, somebody might end up with the death penalty?

6        A    Yes.

7        Q    It would be hard, wouldn't it?

8        A    Yeah, it would be.  It wouldn't be easy.

9        Q    And you would take your time thinking it through,

10   right?

11       A    Yes.

12       Q    And by the way, you get to do that.  It's called

13   deliberations.  Take as long as you want.  That's how it

14   works.

15            The only other thing I'll ask you, and then

16   I'll let Mr. Harrison finish talking to you, is I didn't

17   know for sure what you said, and we talked about that,

18   whether you had a bias in favor of or against the defendant

19   or the law regarding the defendant.

20            And I guess I need to follow up on that.  Is

21   that because of your feelings about the difficulty involved

22   in even being a juror on a death penalty case?

23       A    Yeah.

24       Q    Do you have any bias against the defendant as you

25   sit right here today right now?

                                                                    164

1       A     No.  I don't know him.

2       Q     Don't know anything about it, right?

3       A     Don't know anything about him.

4       Q     Do you have a bias for the State at all right now?

5       A     No.

6       Q     I know you're looking at me like why are you

7    asking me that for, because it seems like you're one of

8    those, it's like whatever the evidence tells you to do,

9    you're going to do it, right?

10      A     Right.

11      Q     Knowing no one starts out behind the eight ball,

12   in other words, in your mind?

13      A     Right.

14      Q     Thank you, sir.

15            MR. HAWK:  I'll return back to Mr. Harrison.

16            THE COURT:  Okay.  Mr. Harrison, let me

17   just -- and Mr. Harrison is going to finish up with some

18   other questions, as many as he wants to ask.  But let me be

19   sure I understand.

20            Because when Mr. Harrison was asking

21   questions, the Court had understood you to indicate to

22   Mr. Harrison that you -- and tell me whether or not this is

23   correct -- do you have any type of bias against this death

24   penalty law that we have in Texas as it's been explained to

25   you to this point or any bias towards the manner in which

1  the determination is made by a jury as to whether or not a

2  defendant will receive the death penalty or not?

3           VENIREPERSON SANDERSON:  No.

4           THE COURT:  Well, in regard to these special

5  issues, because you had expressed some -- it sounded to the

6  Court like strong personal feelings to Mr. Harrison

7  initially that -- I don't recall your exact words, but it

8  seems to me that you were indicating to him that you would

9  not be able to participate in a process that would --

10          VENIREPERSON SANDERSON:  Right.

11          THE COURT:  -- where decisions would have to

12  be made as to whether or not a defendant received the death

13  penalty or received a life sentence.

14          VENIREPERSON SANDERSON:  Right.

15          THE COURT:  Is that correct?

16          VENIREPERSON SANDERSON:  Yes.

17          THE COURT:  Well, that's what we're trying to

18  resolve.  I'm going to go ahead and let Mr. Harrison ask

19  some questions now.

20          FURTHER VOIR DIRE EXAMINATION

21  BY MR. HARRISON:

22    Q    Mr. Sanderson, it may sound like we're attacking

23  the way you feel.  One side is or one side is not.  I assure

24  you that's not what it is.

25          As I said at the very beginning, this is,

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

166

1   obviously, a very serious case, and both sides are entitled

2   to 12 totally fair jurors.

3       A    Yes.

4       Q    And what you told me, and I want you to correct me

5   if I'm wrong, but we wrote it down, and I want to make sure

6   this is what you had said to me first.

7            You indicated to me that because of your

8   strong feelings regarding the death penalty, you wouldn't be

9   able to take the oath to follow the law in a death penalty

10  case.

11      A    Right.

12      Q    And I want to make sure, because you told me that,

13  and then it sounded as if you kind of told Mr. Hawk

14  something different about that, that you could take the oath

15  to follow the law, despite your strong feelings about the

16  death penalty.

17           You did tell him that?

18      A    Right.

19      Q    You can see why it would cause -- well, you can

20  see why it would cause us concern, quite frankly, that when

21  I first asked you, you said that you could not take the oath

22  because of your strong feelings about the death penalty, and

23  then you tell Mr. Hawk you could.  You can see why that

24  would cause me concern.

25      A    Right.

167

1      Q    You also -- and correct me if I'm wrong -- you

2   told me, when I asked you that in this particular case, a

3   death penalty case, where a death penalty is a sentencing

4   option, you would have a bias in that type of case because

5   of your strong feelings about the death penalty, true?

6      A    Right.

7      Q    And then you can see why that would cause me

8   concern, right?

9      A    Yes.

10      Q    In fact -- again, correct me if I'm wrong -- you

11  told me that you couldn't do it because of your bias and

12  prejudice in this case in favor of the defendant because of

13  your strong feelings about the death penalty.

14             Isn't that what you told me?

15      A    Yes.

16      Q    And again, you can see why I would be concerned if

17  you've told me that you've got concerns about -- that you've

18  got, first of all, strong feelings about the death penalty

19  to the extent that you could not, in a death penalty case,

20  be able to take the oath to follow the law, that you would

21  have a bias in a case where the death penalty was a

22  sentencing option, and you would have a specific bias in

23  favor of a defendant in a death penalty case where death was

24  a sentencing option.  You can see why all of that would

25  concern me.

1    A    Right.

2    Q    You did tell me all of those things before

3  Mr. Hawk asked you those questions?

4    A    Right.

5    Q    You can see that it would be a further concern to

6  me that even though you've kind of changed those answers a

7  little bit, those were your first answers?

8    A    Correct.

9    Q    So -- I mean, you can see why I'm concerned.

10    A    Yes.

11    Q    Let me ask you this:  Because Mr. Hawk started out

12  with a question, does it make you feel better that you're

13  not responsible for checking "life" or "death" but rather

14  answering those questions, the way in which they're answered

15  results in either a death sentence or a life sentence.

16          Do you remember when he asked you, "Does that

17  make you feel any better?"

18    A    A little.

19    Q    Why does it?  Because you know intellectually --

20  let me just get down to bare facts here.  You know

21  intellectually that whether you check a box -- let me just

22  say in a hypothetical case, you check a box that says

23  "death," okay?  That's what you do as a juror in a

24  hypothetical case.  Let's say that.

25          Why is that any different to you than, in

1  another hypothetical case, answering that first special

2  issue yes and that second special issue no, knowing that a

3  judge is then going to, based on those answers you've given,

4  impose a death penalty?  I mean, there's no difference, is

5  there?

6      A    No.

7      Q    So why did -- and my question, I guess, to you is,

8  why does it make you feel better not having to check "death"

9  when you know intellectually the answers to your questions

10 can result in a death sentence being imposed and will if

11 they're answered in a certain way?

12     A    I don't know.

13     Q    Again, please understand me.  I'm not criticizing

14 what you're saying.  I just want to understand.  Because, to

15 me, there's no difference in checking "death" or answering

16 the questions, knowing that if I answer them in a certain

17 way, death will result.

18     A    Right.

19     Q    And you've told me already that you have strong

20 feelings about the death penalty such that you would have a

21 bias in a death penalty case.  So I'm concerned about that.

22          So let me ask you again -- I mean, because of

23 your strong feelings about the death penalty and knowing --

24 and Mr. Hawk has gone way more than in depth than I did

25 about how the law operates, and you're familiar and

170

1  comfortable with the way the death penalty sentencing phase

2  works, I guess, as much as you can be at this point?

3       A    Right.

4       Q    I want to ask you those same questions again that

5  I asked you at the very beginning, because -- I mean, you

6  haven't changed your opinion about the death penalty in the

7  ten minutes that we've been talking with you, have you?

8       A    No.

9       Q    You haven't changed any of the way you feel about

10 the death penalty, do you?

11      A    No.

12      Q    Your strong feelings about the death penalty

13 haven't been lessened in any way, have they?

14      A    No.

15      Q    So a case in which the death penalty is a

16 sentencing option, you still would have a bias in that type

17 of case, wouldn't you?  Your feelings haven't changed?

18      A    No, they haven't changed.

19      Q    And it's okay.  It's okay to have that bias.  It's

20 just not okay if you have it and you just don't let us know.

21 And I think you did, but because your feelings are still as

22 strong as they were when I first questioned you, your

23 feelings haven't changed or lessened, is it fair, then, to

24 say that you would still have a bias in a case where the

25 death penalty is an option?

1    A    Yes.

2    Q    That's fair to say?

3         I guess you can be a ping-pong ball and go

4    back and forth, but your feelings are your feelings.  Us

5    talking to you about things may change your mind, but they

6    may not, and you're telling me that your thoughts about the

7    death penalty haven't changed any.

8    A    No.

9    Q    It's still -- I'm sorry.  You've got to answer

10   out.

11   A    No.

12   Q    So in a case in which a defendant is charged with

13   capital murder where a death penalty could be assessed, I

14   mean, you would not be able to take the oath to follow the

15   law and the evidence in that type case because of your bias

16   regarding the death penalty; is that fair?

17   A    Yes.

18   Q    And you can see, based on that -- I mean,

19   obviously, you can tell that that causes me a lot of

20   concern, right?

21   A    Right.

22   Q    And because of that, in a case in which a death

23   penalty is an option for a defendant and only in that type

24   of case, you would have a bias in favor of a defendant in

25   that type of case because of your strong feelings about the

172

1  death penalty; isn't that true?

2      A    I'm not sure I quite understand.

3      Q    Let me make sure I understand.

4           MR. HARRISON:  That's all I have, Judge.

5           THE COURT:  Mr. Sanderson, if you would just

6  step outside one more time.  I assure you it will be a lot

7  shorter.

8           (Venireperson Sanderson leaves the

9           courtroom.)

10          THE COURT:  Someone go ahead.

11          MR. HARRISON:  Judge, I would challenge for

12 juror -- Venireperson Number 84, Dean Sanderson, for cause

13 based on his expressed biases regarding a bias in favor of

14 the defendant, a bias against the death penalty which would

15 be a law upon which the State would be entitled to rely.

16          And I would offer for the Court in support of

17 my challenge for cause Willis versus State, 936 SW 2d 302,

18 PDR refused.  This was a case out of the 114th District

19 Court of Tyler that I believe Mr. Perkins prosecuted, as

20 well as Anderson versus State, 633 SW 2d 851.

21          May I approach and --

22          THE COURT:  Yes.  Let me have copies of those

23 cases.

24          Go ahead, Mr. Hawk.

25          MR. HAWK:  I'll tell you, Judge, in all

173

1   candor, here's the way I look at it.  I honestly disagree

2   with whether or not he has legally established a bias.  He

3   said the magic word "bias" about 16 times, but when he got

4   to the gut-clutching question, he said he would follow the

5   law.

6               But I'll tell you something.  We've talked

7   about it over here, and after listening back and forth,

8   we're not going to resist the challenge for different

9   reasons.

10              THE COURT:  The Court is going to grant the

11  State's challenge for cause with no resistance or objection

12  from the Defense.

13              Is that correct, Mr. Hawk?

14              MR. HAWK:  Yes.

15              Mr. Beatty, that's with your consent as well;

16  is that right?

17              THE DEFENDANT:  No objection whatsoever.

18              THE COURT:  The State's motion or challenge

19  for cause is granted with no objection nor resistance from

20  the Defense with the agreement of the defendant in the case.

21              Ask Mr. Sanderson to step back in.

22              (Venireperson Sanderson enters the

23              courtroom.)

24              THE COURT:  Mr. Sanderson, I told you it

25  would be a shorter wait, and we've got some more news for

174

1   you that you might be glad to hear, and that is we're going

2   to be able to excuse you from any further jury service in

3   the case.

4                   VENIREPERSON SANDERSON:  Okay.

5                   THE COURT:  I know you came down Thursday a

6   week ago, sat through all the central panel, were here early

7   today, which we appreciate, ready to go, and you went

8   through all of this questioning.

9                   We have arrived at a point where the Court

10  has determined that the Court will be able to excuse you

11  from any further jury duty or jury service in this case with

12  a deep appreciation of the Court for all your time.  Thank

13  you, sir.

14                  (Venireperson Sanderson leaves the

15                  courtroom.)

16                  THE COURT:  All right.  We're back in at 1:00

17  o'clock.  It appears, then, I believe we have four jurors --

18  venirepeople this afternoon, starting with Peggy Norris at

19  1:00 o'clock.  We'll be in recess until 1:00 o'clock.

20                  (Lunch recess.)

21                  (Proceedings continued in Volume 25.)

22

23

24

25

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

175

1   STATE OF TEXAS   *

2   COUNTY OF SMITH *

3       I, STEVE R. AWBREY, CSR, Official Court Reporter for

4   the 241st Judicial District Court in Smith County, Texas, do

5   hereby certify that the above and foregoing contains a true

6   and correct transcription of all of the proceedings in the

7   foregoing styled and numbered cause, all of which occurred

8   in open court or in chambers and were reported by me.

9       I further certify that this transcription of the record

10  of the proceedings truly and correctly reflects the

11  exhibits, if any, offered by the respective parties.

12      Witness my hand this the _19_ day of _May_____,

13  2005.

14

15

16                    _Steve R. Awbrey_
                      STEVE R. AWBREY,CSR
17                    OFFICIAL COURT REPORTER
                      241ST JUDICIAL DISTRICT COURT
18                    SMITH COUNTY COURTHOUSE
                      Texas Certification No. 3940
19

20  My CSR license expires:   December 31, 2005.

21

22  Business Address:   221 Smith County Courthouse
                        Tyler, Texas  75702
23                      (903) 535-0603

24

25

                    STEVE R. AWBREY, CSR
                241ST JUDICIAL DISTRICT COURT
                    SMITH COUNTY, TEXAS