ORIGINAL

1

REPORTER'S RECORD       75010

VOLUME 37 OF 51

TRIAL COURT CAUSE NO. 241-0978-04


THE STATE OF TEXAS          *        IN THE DISTRICT COURT

VERSUS                      *        SMITH COUNTY, TEXAS

TRACY BEATTY                *        241ST JUDICIAL DISTRICT


---

TRIAL ON THE MERITS – A.M. SESSION

AUGUST 2, 2004

---

FILED IN
COURT OF CRIMINAL APPEALS

JUN 1 4 2005

Troy C. Bennett, Jr., Clerk

---

     On the 2nd day of August, 2004, the following
proceedings came on to be heard in the above-entitled and
numbered cause before the HONORABLE JACK SKEEN, JR., Judge
Presiding, held in Tyler, Smith County, Texas:


     Proceedings reported by computerized stenotype machine;
Reporter's record produced by computer-assisted
transcription.

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

```
                                                            2
 1                    A P P E A R A N C E S

 2   MR. D. MATT BINGHAM, III
     State Bar Number 00787085
 3   Smith County Criminal District Attorney

 4   MR. J. BRETT HARRISON
     State Bar Number 00793909
 5   MS. APRIL SIKES
     State Bar Number 18348790
 6   Assistant Smith County District Attorneys
     Smith County Courthouse, Fourth Floor
 7   Tyler, Texas  75702
     Telephone:  903.535.0520
 8   Fax:  903.535.0599

 9             REPRESENTING THE STATE OF TEXAS

10
     MR. ROBERT C. PERKINS, JR.
11   State Bar Number 15790405
     MR. KENNETH HAWK
12   State Bar Number 09243650
     Attorneys at Law
13   112 East Line Street, Suite 202
     Tyler, Texas  75702
14   Telephone:  903.593.7780

15             REPRESENTING THE DEFENDANT

16

17

18

19

20

21                    REPORTER'S NOTE

22        Uh-huh = Yes - Affirmative response

23        Huh-uh = No - Negative response

24   Quotation marks are used for clarity and do not necessarily
                     indicate a direct quote.
25
```

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

3

I N D E X

VOLUME 37 OF _____

(TRIAL ON THE MERITS)

PAGE   VOL

AUGUST 2, 2004 (A.M.)

OUTSIDE THE PRESENCE OF THE JURY:

Court's examination of Juror Bigham regarding
    county of residence..............................14   37
Court finds Juror Bigham resident of Smith County
    at time of swearing in as a juror...............17   37

State requests to lift Defense motion in limine
    regarding extraneous offenses...................18   37
Defense objection....................................20   37
State's response.....................................21   37
Defense response.....................................27   37
State's response.....................................29   37
The Court's ruling - Request granted.................33   37

State's request to lift Defense motion in limine
    regarding witnesses' statements.................36   37
The Court's ruling - Request granted.................37   37

State's request to use prior drug use................38   37
Defense objection....................................39   37
State's response.....................................39   37
Defense response.....................................40   37
The Court's ruling - Request granted.................40   37

State requests to lift Defense motion in limine
    regarding victim's statement to witness.........41   37
Defense objection....................................44   37
State's response.....................................45   37
The Court's ruling - Request granted.................46   37

Media requests coverage..............................56   37
Defense objection....................................56   37
The Court's ruling - Objection overruled.............57   37

Witnesses sworn......................................58   37

Witnesses instructed.................................60   37

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

4

I N D E X - CONTINUED

VOLUME 37 OF ____

(TRIAL ON THE MERITS)

                                                    PAGE  VOL

AUGUST 2, 2004 (A.M.)

IN THE PRESENCE OF THE JURY:

Jury sworn..........................................62   37

Announcements.......................................63   37

Further instructions to the jury....................63   37

Indictment read.....................................64   37

Defendant's plea....................................68   37

Opening statement by Mr. Bingham....................69   37

Opening statement by Mr. Perkins....................91   37

STATE'S WITNESSES:        Direct    Cross     Voir Dire

JOHN CLARY
     By Mr. Bingham      97,114                          37
     By Mr. Perkins                 108                  37

OUTSIDE THE PRESENCE OF THE JURY:

State's proffer of statement of defendant..........119   37
The Court's ruling.................................124   37

State's proffer of statement of defendant..........124   37
The Court's ruling.................................125   37

State's proffer of statement of defendant..........125   37
The Court's ruling.................................126   37

State's proffer of statement of defendant..........127   37
The Court's ruling.................................128   37

5

```
1                    I N D E X - CONTINUED

2                    VOLUME 37 OF ____

3                    (TRIAL ON THE MERITS)

4                                         PAGE   VOL

5    AUGUST 2, 2004 (A.M.)

6    IN THE PRESENCE OF THE JURY:

7    STATE'S WITNESSES:        Direct   Cross    Voir Dire

8    BETTY MCCARTY
         By Mr. Harrison    133,161                          37
9        By Mr. Perkins                        154           37

10   Court Reporter's Certificate.........................179

11

12

13                 ALPHABETICAL WITNESS INDEX

14   WITNESS:                 Direct   Cross    Voir Dire   VOL

15   CLARY, JOHN
         By Mr. Bingham      97,114                         37
16       By Mr. Perkins               108                   37

17   MCCARTY, BETTY
         By Mr. Harrison    133,161                         37
18       By Mr. Perkins                        108          37

19

20

21

22

23

24

25
```

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

6

EXHIBITS INDEX

STATE'S

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|-----|-------------|---------|----------|-----|
| 1 | Photo of vehicle | 102 | 102 | 37 |
| 2 | Photo of vehicle | 102 | 102 | 37 |
| 4 | Photo of crime scene area | 141 | 141 | 37 |
| 5 | Photo of crime scene area | 141 | 141 | 37 |
| 6 | Photo of crime scene area | 141 | 141 | 37 |
| 7 | Photo of crime scene area | 141 | 141 | 37 |
| 8 | Photo of crime scene area | 141 | 141 | 37 |
| 9 | Photo of crime scene area | 141 | 141 | 37 |
| 10 | Photo of crime scene area | 141 | 141 | 37 |
| 11 | Photo of crime scene area | 141 | 141 | 37 |
| 12 | Photo of crime scene area | 141 | 141 | 37 |
| 13 | Photo of crime scene area | 141 | 141 | 37 |
| 14 | Photo of crime scene area | 141 | 141 | 37 |
| 15 | Photo of crime scene area | 141 | 141 | 37 |
| 16 | Photo of crime scene area | 141 | 141 | 37 |
| 17 | Photo of crime scene area | 141 | 141 | 37 |
| 19 | Diagram | 161 | 161 | 37 |

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

7

1              P R O C E E D I N G S

2                (August 2, 2004)

3          (Open court, defendant present, no jury.)

4          THE COURT:  On the record in Cause

5  Number 241-0978-04, State of Texas versus Tracy Beatty.  The

6  State is present, Mr. Bingham, Mr. Harrison, Ms. Sikes; the

7  Defense is present, Mr. Perkins, Mr. Hawk; and the defendant

8  is present, Mr. Beatty.

9          Counsel, the Court became aware, I believe it

10  was Thursday, when my coordinator, Kristen Davis, was

11  calling the jurors to tell them to be here at 9:00 Monday

12  morning, she called Juror, actually, Number 1, Dominick

13  Bigham, B-I-G-H-A-M.

14          Called the number for him at his residence

15  and basically was advised by his wife, as the Court

16  understands it, that Mr. Bigham had been for apparently a

17  short time residing with his mother up in Mineola.

18          She was able to obtain that address and

19  telephone number.  I believe contacted his mother.  She told

20  his wife when we needed him here.  I believe she contacted

21  his mother, told his mother when we needed him here.

22          Then she contacted, I know, Best Buy to try

23  to get in touch with him.  He did report in to work at 2:30

24  Friday where she was able to talk direct to him, so we got

25  the word to him to be here at 8:00 this morning.  He is here

8

1   at 8:00 this morning.

2            The Court -- in trying to look at some cases

3   and statute, the Court believes the Court needs to ask

4   Mr. Bigham a few questions just related to his residence,

5   which appears to be a question of intent.  Recognizing that

6   this is a juror, the Court is going to try to keep the

7   questions just to the issue of residence of the juror at

8   this time.

9            The Court doesn't intend to get into anything

10  more related to the situation, obviously, than he and his

11  wife than absolutely necessary, and it would only go to his

12  residence.  He does appear to be staying at his mother's.

13  My understanding, from what the court coordinator --

14            Kristen, would you have a seat?

15            It's my understanding -- hang on with us just

16  a minute.

17            It's my understanding from Kristen that I

18  believe when she talked to his wife Thursday that it had

19  been a about a week, that he had been up at this mother's

20  about a week.

21            MS. DAVIS:  I actually asked him how long.

22            THE COURT:  What did he say?

23            MS. DAVIS:  He had been living with his

24  mother for a week.

25            THE COURT:  So what I would propose to do,

9

1   again, recognizing he is a juror, is just ask him some

2   questions in this regard.

3           Could I hear from the State?

4           MR. BINGHAM:   Judge, when you're questioning

5   him on that, there's one other thing I want to bring to the

6   Court's attention and the Defense's attention.

7           Friday, at maybe 7:00, I was eating at

8   Applebee's.  We went across to -- Ann had told Haley that

9   she would get her a Game Boy game for a Game Boy, so we went

10  across to Best Buy to get the Game Boy.  We walked in, and I

11  approached the cell phone -- cell phone area and was

12  approached by Mr. Bigham.  There was nothing exchanged about

13  the trial.

14          My back was turned to him, because when

15  you're facing the area I'm at, he walked up and said, "Can I

16  help you," and I had my cell phone.  I said, "I'm looking

17  for" -- and I wasn't really looking at him.  I said, "I'm

18  looking for a cover for this phone."  He goes, "We don't

19  have any for the LG," and I said, "Okay.  Thank you," and

20  walked away.  And that was the extent of our exchange, and

21  there was no contact made after that.

22          I did not see him when I walked in.  That was

23  about the extent of it.  I wanted to bring that to the

24  Court's attention.

25          THE COURT:   That's fine.  Do you -- I'm not

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

10

1   asking this for any reason other than -- do you even

2   remember when -- were you, like, even present for his voir

3   dire?

4                    MR. BINGHAM:  Judge, I questioned him.

5                    THE COURT:  Okay.  You did question him.

6                    MR. BINGHAM:  And whether I knew he worked at

7   Best Buy, I certainly didn't recall that, or I would have

8   stayed away from Best Buy.  We were over eating at

9   Applebee's, and Ann had told Haley she would get her that

10  game, so we went over there and get her that Game Boy game.

11                   When we walked in, I just went to look at the

12  cell phone covers, and my back was turned to him, and he

13  walked up.

14                   THE COURT:  Any questions, Mr. Perkins?

15                   MR. PERKINS:  No, Your Honor.

16                   THE COURT:  All right.  Let's go ahead --

17  Mr. Perkins, do you have anything you want to relate to the

18  Court in regard to this matter, I mean, as far as what the

19  Court intends to do?  I don't really know any other way to

20  proceed on it.

21                   MR. PERKINS:  No, Judge.  In fact, as far as

22  I know from previous trial experience, it really doesn't

23  make any difference where he's living now.

24                   THE COURT:  I think the evidence and the

25  record is clear.  I was going to ask him -- I've got his

11

1    questionnaire up here.  I mean, it's been reported to me

2    when he moved, but I think the evidence is going to be -- I

3    was looking at his questionnaire.  I think his answers are

4    going to be at the time he was selected and sworn in as a

5    juror that he resided at 1997 Meadow View Lane, Smith

6    County.

7                    MR. PERKINS:  And if he was a Smith County

8    resident at the time that he -- my understanding is he

9    received the summons.  I don't know.  I've never had this

10   situation arise during individual voir dire in a capital

11   murder case, previously.

12                   THE COURT:  Well, I hadn't either.

13                   MR. PERKINS:  I believe, if my memory is

14   correct, that at the time that he receives his summons is

15   the determinant time regarding juror qualifications.  If he

16   lived in Smith County, obviously, at the time that he was

17   sworn in as a juror, my understanding of the law is even if

18   he moved out of the country, he's still an eligible juror.

19                   THE COURT:  What I'm going to do -- after I

20   finish asking him a few questions, probably the best

21   procedure is for the Court to question him, unless Counsel

22   just wants to make a request to ask any questions.  This is

23   a juror.

24                   And if you're satisfied -- I'm just going to

25   ask, once I finish, if either the State or Defense has any

12

1   objections to me continuing him as a juror.  I think I know

2   what his answers are going to be, but I need to ask him for

3   the record.

4          And then I'm going to ask Counsel if they

5   have any objections, if they're agreeable to him continuing

6   as a juror.  Maybe because that's, like Mr. Perkins said,

7   his understanding of the law, if his answers are such as I

8   anticipate.

9          Let me ask this question, Mr. Perkins:  The

10  Court had -- you know, just based on what the Court has

11  seen, realizing that residency appears to be a question of

12  intent, the Court was going to ask him -- I mean, I think

13  the record is going to show at the time he got the summons

14  and at the time he was questioned and sworn in, he was

15  living at the residence, residing at the residence with his

16  wife on the questionnaire.

17          I was going to go -- I was going to ask him

18  when he moved up there, and I was going to ask him just in

19  terms of intent -- he owns -- I was also going to ask him if

20  he owned the home, because his questionnaire indicates he

21  owned the home, and if it was his intent to still be a

22  resident of Smith County and return to Smith County, had he

23  abandoned his residence, which, of course, he owns, and I

24  doubt he has, but I thought I needed to ask him.  So I was

25  going to ask him some questions about his intent.

13

1           What's your position on that?  I don't want

2     to ask a juror any more than I have to.

3           MR. PERKINS:  Judge, I think that it would be

4     sufficient, at least from the Defense's perspective, to ask

5     him if he was a resident of Smith County at the time that he

6     received his summons and if he was a resident of Smith

7     County at the time he was sworn in as a juror and leave it

8     at that.

9           THE COURT:  Then let me hear from someone

10    over there on the State, Mr. Bingham?

11          MR. BINGHAM:  We -- I'm in agreement with the

12    Defense on that, and I think the case law is pretty clear.

13    We have it here, and I know they've looked at it.  I'll

14    leave up to the Defense whether they want to question him on

15    that other issue about the Best Buy deal, leave it up to

16    them.

17          MR. PERKINS:  I'm satisfied with that, Judge.

18    I mean --

19          MR. BINGHAM:  That's fine.  We agreed with

20    them on the status of the case law on the other issue.

21          THE COURT:  Okay.  That's what I'm asking

22    about.

23          Mr. Bingham, on the other issue, if the Court

24    just makes a record of where he resided when he got his

25    subpoena, where he was residing when he answered the

14

1    questions, where he was residing when he was sworn in.

2                    And do I take it that -- both sides have

3    researched it, both sides are satisfied with it, and I'm not

4    going to have any -- everyone appears -- not to ask you to

5    commit yourselves, but you're not asking the Court to go any

6    further, and you're going -- you know, if the basic position

7    of the Court just verifies that, then you will not have any

8    objection, Mr. Perkins, you or Mr. Beatty, to me leaving him

9    on the jury; is that correct?

10                   MR. PERKINS:  That's correct, Your Honor.

11                   THE COURT:  Okay.  Let me get him on in here.

12                   Is that correct, Mr. Bingham?

13                   MR. BINGHAM:  I agreed that is correct, what

14   you stated.

15                   (Juror Bigham enters the courtroom.)

16                   (Open court, defendant and Juror Bigham

17                   present.)

18                   THE COURT:  Mr. Bigham, could you just come

19   around please, sir, and have a seat right over here?

20                   Mr. Bigham, I just have a couple of questions

21   that I needed to ask you, and we'll get you taken care of.

22                   These are the questions that -- would you

23   just state your name for the record, please?

24                   JUROR BIGHAM:  Dominick Anton Bigham.

25                   THE COURT:  All right.  Mr. Bigham, you were

15

1  selected as a juror in this case, State versus Tracy Beatty;

2  is that correct?

3          JUROR BIGHAM:  Yes, sir.

4          THE COURT:  And when you received your

5  summons to come down and appear for jury service in the

6  case, did you reside at 1997 Meadow View Lane?

7          JUROR BIGHAM:  Yes, sir.

8          THE COURT:  In Flint, Texas 75762?

9          JUROR BIGHAM:  Yes, sir.

10          THE COURT:  All right.  And when you came in

11  on what I believe was the first day of individual voir dire,

12  I may not have that in front of me right now, but the record

13  would show, I believe you came -- you were here on the first

14  day of voir dire when you were questioned by -- when you

15  were questioned by the attorneys in the case, were you

16  residing at 1997 Meadow View Lane, Flint, Texas, 75762?

17          JUROR BIGHAM:  Yes, sir.

18          THE COURT:  Which is in Smith County?

19          JUROR BIGHAM:  Yes.

20          THE COURT:  All right, sir.  And then

21  subsequently, then, after you were accepted and selected as

22  a juror in this case, on that day and the Court issued you

23  an oath as a juror, when you took the oath as a juror, then

24  you were still, of course, residing at 1997 Meadow View

25  Lane, Flint, Texas 75762?

16

1          JUROR BIGHAM:  Yes, sir.

2          THE COURT:  In Smith County; is that correct?

3          JUROR BIGHAM:  Yes, sir.

4          THE COURT:  All right.  So it's been, then,

5    at some time, approximately a week ago, when you went up to

6    stay with your mother; is that correct?

7          JUROR BIGHAM:  That's correct.

8          THE COURT:  Anything further, Mr. Bingham?

9          MR. BINGHAM:  No, Your Honor.

10         THE COURT:  Anything further, Mr. Perkins?

11         MR. PERKINS:  No, Your Honor.

12         THE COURT:  All right.  Mr. Bigham, would you

13   step back outside with Mr. Carleton, please?  Thank you very

14   much, sir.

15         (Juror Bigham leaves the courtroom.)

16         THE COURT:  Is the State going to be

17   requesting any further questioning, Mr. Bingham?

18         MR. BINGHAM:  No, Judge, we're not.

19         THE COURT:  Mr. Perkins, requesting any

20   further questioning?

21         MR. PERKINS:  No, Your Honor.

22         THE COURT:  Let me just ask the State then.

23   Does the State have any objections -- or does the State have

24   any objections to this being qualified juror to serve on the

25   jury?

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

1          MR. BINGHAM:  No, Judge.  Based on the

2    evidence that's in the record and our reading of the status

3    of the case law, we don't believe that he's disqualified.

4    We have no objection to him remaining on the jury.

5          THE COURT:  Mr. Perkins, do you or does

6    Mr. Beatty -- do y'all waive any objections to this

7    venireperson, Mr. Bigham, serving on the jury?

8          MR. PERKINS:  We don't have any objection to

9    make to his qualifications, Your Honor.

10          THE COURT:  Is that correct, Mr. Beatty?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  All right.  With that, the

13    Court's going to -- yes, Mr. Harrison?

14          MR. HARRISON:  Judge, I know this is a

15    pretrial the Court had scheduled before jury selection

16    today.  We do have a couple of matters that we would like to

17    take up regarding the Defense's motion in limine on some

18    matters prior to voir dire.  I don't know if this is the

19    appropriate time the Court wants to do it.  I assume it

20    probably would be, but we do have some things that we would

21    like to bring up and address.

22          THE COURT:  Okay.  Let me just make the

23    obvious finding from the record that Mr. Bigham, Juror

24    Number 1, selected -- actually, Juror Number 4, voir dired

25    the first day by the State and Defense accepted for jury

18

1  selection, was residing at 1997 Meadow View Lane, Flint,

2  Texas, 75762, at the time he received his subpoena for jury

3  service.

4          Also, at the time he came in and was

5  questioned by the State and Defense and was residing at that

6  address in Smith County, Texas, the Court so finds at the

7  time he was sworn in as a juror in this case, and the record

8  will reflect it's been within about the last week that he

9  went up to stay with his mother, all being clear from the

10  record that he was subpoenaed and appeared and testified at

11  voir dire and was sworn in as a juror at a time that he was

12  living at the address on his questionnaire stated by the

13  Court in Smith County, Texas.

14          Anything further on that matter before we get

15  to these other motions?

16          MR. BINGHAM:  Not on behalf of the State.

17          THE COURT:  Anything else, Mr. Perkins?

18          MR. PERKINS:  No, Your Honor.

19          THE COURT:  What is it now with the motions?

20          MR. HARRISON:  Judge, with regard to the

21  motion in limine filed by the Defense -- and I'm not certain

22  which one.  There were several.  This being the one that

23  would deal with extraneous offenses.  We would like to go

24  into during opening statement in terms with regard to

25  evidence the portion in our case in chief, two prior

19

1  assaults committed by the defendant against the victim,

2  Carolyn click, in this case.

3          One was in 1985; one was in 1991.  One of the

4  assaults resulted in a conviction out from Smith County.

5  One of a assaults was subsequently dismissed based on an

6  affidavit from the defendant.

7          We believe those would be relevant and

8  admissible under a multitude of different reasons, one being

9  pursuant to 38.36 of the Code of Criminal Procedure, talking

10  about prior relationships and evidence relating to the

11  victim and the defendant.

12          We believe it would also be admissible to

13  show the intent and motive of the defendant in that the

14  defensive theory -- one of the defensive theories in this

15  case is this was not an intentional but merely either

16  accident or manslaughter.

17          Many of the statements by the defendant

18  related to the actual killing in this case indicate a lack

19  of knowledge, a lack of intent to actually commit an

20  intentional murder, which, of course, one of the elements

21  the State would have to prove to support a conviction for

22  capital murder.

23          And we have case law in support of that

24  issue, but that would be our proffer on that issue, the 1985

25  and 1991 a assaults committed by the defendant against this

20

1    victim, Carolyn Click, that we believe would be admissible,

2    and we would like permission to lift the motion in limine

3    and go into those.

4              THE COURT:  Okay.  Go ahead, Mr. Perkins.

5              MR. PERKINS:  Obviously, the Defense objects

6    to those.  First of all, they are remote in time.  We're

7    talking about things that happened -- well, one of them,

8    some 19 years ago, if it did.  The other one, more than ten

9    years ago; close to, I guess, 13 years ago.

10             And so our first objection is, is that

11   because of the remoteness of those allegations, that they

12   are irrelevant to any proceeding.

13             The second objection we have is they are more

14   prejudicial than probative.

15             The final objection that we would have to

16   those is that I don't know -- other than the prejudice to

17   the defendant and to show the defendant in general to be a

18   bad guy, I don't know what probative value an alleged

19   assault for more than ten years ago has in relationship to

20   the allegations that Mr. Beatty is on trial for now.

21             So, obviously, the reason we filed the motion

22   in limine was to prevent the State from trying to convict

23   Mr. Beatty on the theory that he is a criminal generally.

24             So our objections are that they are remote,

25   that they're irrelevant, that the prejudicial effect

21

1   outweighs any probative value of those allegations,

2   especially, Judge, the allegation which was subsequently

3   dismissed.

4              Additionally, Judge, the only other thing is,

5   since they're wanting to lift the motion in limine, I'm -- I

6   can only assume they're wanting to go into this in opening

7   statement.  Since it is a motion in limine, not an

8   exclusionary order, it would be highly prejudicial to

9   Mr. Beatty to allow the State to mention these allegations

10  in opening statement.

11             And then if we had a subsequent hearing on

12  the admissibility of these, if they were to be ruled

13  inadmissible, then no instruction the Court could give could

14  ever cure the harm previously been done to Mr. Beatty by

15  allowing the State to go into these allegations that the

16  jury may never hear about subsequently.

17             MR. HARRISON:  Judge, I'm citing from

18  Williams versus State, 927 SW 2d 752.  I've got copies for

19  both the Defense and the Court, but relevant portions of

20  that case, which has been Shepardized and is still good law,

21  indicate that, one, the State use extraneous evidence or

22  acts of evidence to prove that the defendant had engaged in

23  continuing course of violent conduct toward the victim that

24  eventually culminated in her death at the defendant's hands.

25             That was part of the Court's rationale in

22

1   determining the admissibility of those extraneous offenses,

2   that it went towards a continuing course of violence by the

3   defendant towards the victim.

4          Additionally, the evidence that the defendant

5   had physically assaulted and threatened to kill his wife,

6   who was a victim in this case, at various times during their

7   marriage has relevance beyond character conformity.  The

8   evidence reflected the ongoing course of violent conduct

9   toward the victim tended to make it more probable that it

10  was the defendant's conscious objective or desire to cause

11  her death, intended to rebut the defensive theory the victim

12  was the aggressor, and that the defendant acted under

13  immediate influence of sudden passion.

14         Specifically with regard to rebutting the

15  defensive theories, much of this case will rest, I

16  believe -- I believe it's a fair statement that much of this

17  case will rest on whether this was an intentional murder

18  versus an accidental murder, a reckless murder, a

19  manslaughter, or an act clearly dangerous to human life as

20  evidenced by the fact that the Defense spent quite a bit of

21  time on each potential juror during voir dire talking about

22  intentional murder versus manslaughter versus recklessness

23  versus accident.

24         Additionally, to be determined relevant

25  evidence -- because, clearly, 403 would apply.  Clearly, if

23

1   the Court believes that this is evidence admissible on the

2   one hand, the Court still has to conduct a 403 balancing

3   test.   That is certainly correct.

4           Part of what goes into the balancing test

5   under 403 that Court has to consider would be the

6   relevant -- would be the ultimate issue in whether it is

7   seriously contested by the opponent.   That's one thing that

8   the Court has to consider.   Clearly, this would go to an

9   ultimate issue that will seriously be in contest, the fact

10  that it could be a intentional murder versus a reckless

11  murder, meaning a manslaughter.

12          To support a conviction for capital murder,

13  of course, the State has to prove the intentional nature of

14  this murder, that the State had other convincing evidence to

15  establish the ultimate issue to which the extraneous

16  misconduct was relevant.

17          The other evidence that the State would have

18  to rely on to prove the intentional aspect of this case,

19  other than this type of extraneous offense, would consist of

20  the pathologist and his findings in this case regarding the

21  injuries suffered to the victim and the state in which the

22  victim was discovered.   Beyond that, there is very little to

23  establish the actual intent of the defendant.

24          So, clearly, the extraneous offenses that

25  would be relevant in showing the intentional nature of this

24

1    conduct, the continuing course of violence by this defendant

2    towards this victim would be, certainly, very important

3    under those circumstances.  And the probative value from

4    misconduct evidence would not either alone or in combination

5    with other evidence be particularly compelling, the

6    misconduct was such a nature that the jury instruction to

7    disregard it for any but its proffered purpose is not likely

8    to have been effective.

9              In this case, clearly, the reason for the

10   inclusion of this evidence, the admissibility of this

11   evidence, would go towards the actual intent of this

12   defendant.

13             The Court can give a jury instruction to

14   limit their consideration of that evidence, going only to

15   the intent of the defendant, and that would be an

16   instruction that would be able to be followed by jurors, I

17   believe, because the -- because of the nature of the

18   extraneous offenses and the clear reason why they would be

19   introduced would be to going to show the intent of the

20   defendant, which would be the ultimate issue in this case.

21             And there would be no other, really, reason

22   for them to consider that evidence.  So I think that would

23   certainly be something they could follow in the way of a

24   jury instruction.

25             THE COURT:  You mentioned the balance test,

25

1   the balancing test under 403.   Balancing test under 403?

2                    MR. HARRISON:   Yes, sir.

3                    THE COURT:   Did you mention -- did you

4   mention, when you started out, about the relationship of the

5   parties?

6                    MR. HARRISON:   Yes, sir.   Under both

7   theories, under Section 38 -- 38.36 in the Code of Criminal

8   Procedure, which talks about the prior relationship between

9   the victim and the defendant, evidence -- all evidence --

10  and I don't have it in front of me, so I'm not quoting --

11  but it indicates that -- that all relevant facts and

12  circumstances surrounding the killing and the previous

13  relationship existing between the accused and the deceased,

14  together with all relevant facts and circumstances going to

15  show the condition of the accused's mind at the time of the

16  offense, are admissible.   That's Article 38.36(a) of the

17  Texas Code of Criminal Procedure.

18                   It's also -- there are also cases that

19  support that proposition.

20                   Now, it is also true that under 38.36 of the

21  Code of Criminal Procedure, the rules of evidence still

22  apply.   403, the balancing test, still apply; 404 still

23  applies.   It's kind of a three-step analysis.

24                   One, the evidence would have to go to the

25  prior relationship of the victim and the defendant, which,

26

1   clearly, this does.  Once that's established by the Court,

2   then, of course, the Court would then go to a 403 balancing

3   test.

4           But, again, the probative value -- and,

5   certainly, this would be prejudicial evidence, because it

6   goes to the intent of the defendant, and it goes to prior

7   facts acts of violence by this defendant towards this

8   victim.

9           But, clearly, as well, the probative value

10  outweighs the prejudicial effect in that it goes to

11  establish what would be an ultimate issue in this case,

12  showing the continuing course of violence by the defendant

13  against this victim and showing the actual intent which

14  would directly rebut a defensive theory of accident or

15  mistake or recklessness in this case.

16          THE COURT:  Well, what was the -- you said

17  assaults?

18          MR. HARRISON:  Yes, sir.

19          THE COURT:  What's just, basically, your

20  proffer there in terms of the assaults?

21          MR. HARRISON:  There was a 19 -- just one

22  moment, Judge.

23          The one in 1985 was actually an assault by

24  the defendant towards the victim.  It was not prosecuted

25  based on an affidavit of the victim, but we have the

27

1  detective who took the affidavit, who took the statement

2  from the victim, available for trial testimony.

3           The affidavit lays out the type of assault it

4  was.  It was beating with his -- by the defendant's fists.

5  There was a broken finger inflicted on the victim.  Her head

6  was slammed into, I believe it was a wall, on several

7  occasions.  And I believe that's the extent of the prior

8  assault.

9           THE COURT:  What was the other one?

10          MR. HARRISON:  The one -- the other one was a

11  conviction.  It was in 1991; it was a Smith County case,

12  and, similarly, it was a physical assault by the defendant

13  towards the victim.  And I don't have the manner and means,

14  but I feel confident it was a beating by his hands.

15          THE COURT:  All right.  Anything else,

16  Mr. Perkins?

17          MR. PERKINS:  Judge, first of all, the Court

18  is going to have to make a finding that either of those is

19  relevant.  And I'll use the State's case against their

20  argument.

21           Continuing course of violence, continuing

22  course of violence, and the most continuing course of

23  violence that they're proffering to the Court is something

24  from 1991.  I don't think that an assault allegation from

25  12 years prior constitutes a continuing course of violence.

28

1  So, first of all, I'm not ready to concede that it's even

2  relevant to any issue.

3           However, even if the Court believed that it

4  was relevant under 38.36, what 38.36 says is, is that those

5  circumstances -- facts and circumstances going to show the

6  condition of the mind of the accused at the time of the

7  offense.

8           So it's quite a leap of faith to say that

9  something from 12, 13 years prior is relevant to show

10  Mr. Beatty's intent 12 or 13 years later.  That's crazy.

11  I've never heard of such in my life.  Something that

12  happened 12 or 13 years ago goes to show your intent 12 or

13  13 years later.

14           Now, that's a pretty serious intent to

15  maintain throughout that 12- or 13-year period, but that's

16  what the State is asking the Court to do is to, first of

17  all, find that it's relevant to his intent at the time of

18  the alleged offense.

19           Continuing course of conduct.  They fail on

20  that regard, so our argument is, is, first of all, that it's

21  not relevant under 401, that 401, 402, and especially 403

22  will trump any request that the State has, and the evidence

23  that they're trying to proffer is more prejudicial than it

24  is probative.

25           It's just the best that they have.  It's what

29

1   they're trying to use to support their prosecution theory

2   that it's intentional.  That doesn't mean that they get it

3   because they need it.

4           THE COURT:  Mr. Harrison, in regard to what I

5   want to ask you to respond to was -- you can respond to

6   whatever you want to, but in regard to the continuing course

7   of conduct from the standpoint of one being an '85 and one

8   being in '91.

9           MR. HARRISON:  Let me say, first, in what

10  Mr. Perkins ended with, that we don't get it just because we

11  need it.  The fact that the State's evidence needs it is

12  actually spelled out in one of these cases.

13          That's a consideration for the Court in

14  determining, if the Court determines that it's admissible,

15  whether it meets the 403 test.  That is one of the

16  considerations that the Court does have to look at whether

17  the State's evidence actually needs that type of evidence.

18  So that is something that the Court does and should look at.

19          Additionally, Mr. Perkins did not mention --

20  when he cited parts of Article 38.36 of the Code of Criminal

21  Procedure, he did not cite the reminder of that statute that

22  says "and the previous relationship, the previous

23  relationship existing between the accused and the deceased."

24          Certainly, all the facts and circumstances

25  that show the condition of the state of mind of the accused

1  at the time of the killing is relevant.  That's clear, but

2  it goes on, and it says further "and the previous

3  relationship existing between the accused and the Defense --

4  and the defendant."

5          Additionally, there are a couple of things as

6  well.  The one is that defendant also, within a week, the

7  evidence will show -- and I'll make the proffer -- that

8  additional evidence will show, from one of the witnesses in

9  this case, the defendant made statements to her about

10  killing the victim one week or so before the murder actually

11  occurred.

12          Statements would be the defendant -- the

13  defendant -- the victim had handed the victim a hammer while

14  they were working on their trailer, and the defendant

15  said -- told another witness about a week before this

16  murder, "I can't believe" -- something to the effect, "I

17  can't believe she handed me a hammer.  All I could do was

18  think about killing her with that hammer, hitting her in the

19  head, killing her with that hammer and putting her

20  underneath the trailer house, but then she would just start

21  stinking, so I couldn't do that."

22          So that would be a statement within a week or

23  so of the murder, which would also go towards his intent in

24  this case, which would also be a continuing -- which would

25  also be evidence of this continuing course of violence by

31

1    the defendant towards the victim.

2              THE COURT:  Okay.

3              MR. HARRISON:  He also made mention to

4    another witness -- or to the same witness, that he had

5    thought of choking the victim just to shut her up.  That

6    would be also about a week prior to the capital murder,

7    which would, again, be evidence of this continuing course of

8    violence.

9              He also -- additionally, Judge, I think it's

10   a logical conclusion that the reason there wasn't more

11   violence in the interim from 1991 to 2004 is because the

12   defendant was incarcerated in a penitentiary during that

13   time.  And we do -- we haven't really addressed that issue,

14   but we do have evidence of that, and we have the parole

15   officer who knows when he went into the penitentiary in

16   19 -- I believe it was 1991, and was only released in 2003,

17   about a month before this capital murder occurred.

18             So that's the reason for the gap in this

19   continuing course of violence from the defendant towards the

20   victim.  It's not as if it just stopped.

21             THE COURT:  What you're asking for right now

22   to the Court -- you mentioned these statements that the

23   defendant allegedly made.  I know in response to my question

24   about the continuing course of conduct, but actually what

25   you're asking the Court to rule on right now is these two

1    assaults?

2                    MR. HARRISON:  Yes.

3                    THE COURT:  Is that correct?

4                    MR. HARRISON:  I was actually going to get to

5    those statements, also.

6                    THE COURT:  Okay.  I'm sorry.

7                    MR. HARRISON:  But because we believe, again,

8    under all those theories, under --

9                    THE COURT:  You want to mention the

10   statements?  Are you asking me to rule on all the

11   statements, too, for purposes of your opening statement.

12                   MR. HARRISON:  Yes, sir.

13                   THE COURT:  Okay.

14                   MR. HARRISON:  Those statements, those

15   threats, I guess, they would be.  They're not actually even

16   threats.  I'm not even sure they would rise to the level of

17   an extraneous offense situation, but they were statements by

18   the defendant to a witness about thoughts of killing or

19   intentionally harming the victim that would go along with

20   the assaults that we're asking the Court to rule on.

21                   THE COURT:  Okay.

22                   MR. HARRISON:  And there are additional

23   matters.  I think those are probably the ones that are

24   related to the extraneous offenses.

25                   THE COURT:  Let me go ahead -- do you have

33

```
1   anything else, Mr. Perkins, other than what you're --
2               MR. PERKINS:  (Shakes head negatively.)
3               THE COURT:  All right.  In regard to the two
4   prior assaults, the one proffered by Mr. Harrison in 1985
5   and the one proffered by Mr. Harrison in 1991 with an
6   explanation to the Court, in summary form of what the State,
7   based on the proffer, intends to prove on the 1985 assault
8   by the defendant against the victim, and the 1991 assault by
9   the defendant against the victim, based on the proffer made
10  to the Court, the Court is going to lift the motion in
11  limine as it goes to those two assaults.
12              The Court, having considered and made a
13  balancing test under 403(b), the Court does find that those
14  assaults, as proffered by the State -- the Court, in lifting
15  the motion in limine, does find that they are relevant, that
16  the probative value of those does outweigh any prejudicial
17  value.
18              Those assaults, as proffered by the State and
19  the proffer of what they've told the Court their evidence
20  will be, that those assaults would go to the intent of the
21  defendant and would, therefore, be relevant, that their
22  probative value would outweigh their prejudicial value, that
23  the Court has considered, under the case cited by
24  Mr. Harrison, the State's need for the evidence in terms of
25  supporting the State's theory in terms of it being an
```

34

1   intentional murder.

2           The Court further finds that under the

3   previous existing relationship of the parties, under 38.36,

4   that it would also be relevant and admissible under that

5   statute, and that does go to previous relationship.

6           And the Court has performed a balancing test

7   required under 403(b) and finds those two prior assaults

8   relevant and admissible to go to show the intent of the

9   defendant at the time -- at the time of the alleged murder

10  as charged in the indictment based on the proffer made by

11  the State, finds the probative value outweighs the

12  prejudicial value and has performed the balancing test

13  required by 403(b).  Therefore, the Court is going to lift

14  the motion in limine.

15          Of course, the Court would, in the event the

16  State does produce such evidence, naturally, the Court would

17  have a limiting instruction available to give to the jury.

18          What's next?

19          MR. PERKINS:  Judge, before we get off of

20  that topic, given the additional information that

21  Mr. Harrison says -- has proffered to the Court --

22          THE COURT:  Talking about those statements?

23          MR. PERKINS:  -- regarding the 1985

24  assault --

25          THE COURT:  Yes.

1          MR. PERKINS:  I understand the Court has

2   overruled our previous objections.  Without waiving any

3   future objections we would have, if they try to offer that

4   evidence, obviously, we're going to have a litany of hearsay

5   objections regarding any kind of proffer of what allegedly

6   happened through a detective or through an affidavit or --

7          THE COURT:  Well, I'm laying the --

8          MR. PERKINS:  I'm just saying that I

9   understand the Court has overruled all of our objections

10  thus far.  When we get to that point in the trial, I'm not

11  waiving any additional objections that we would have,

12  including hearsay objections.  I don't know of any way that

13  the State would be able to properly proffer what they say

14  that they can proffer through a witness, but I guess we'll

15  cross that bridge when we come to it.

16         THE COURT:  Yes, sir, because -- and I

17  understand that.  I'm lifting the motion in limine this

18  morning for their opening for the purposes of their

19  motion -- for the purposes of their opening statement for

20  the reasons enunciated by the Court.

21         I understand if the evidence is proffered, at

22  the time it's proffered, I mean, you've got all whatever

23  objections at that time that you would be making to it.

24         MR. PERKINS:  So just so the record will be

25  replete, our objections to the State being allowed to go

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

36

1  into what they've informed the Court that they would and the

2  reason that they want the motion in limine lifted, our

3  objections under the Fourth, Fifth, and Fourteenth

4  Amendments to the United States Constitution, Article 1, the

5  due course of law under the Texas Constitution, and Texas

6  Rule of Criminal Evidence 401, 402, and 403.

7          THE COURT:  Yes, sir.

8          Mr. Hawk, you had mentioned Friday --

9          Oh, Mr. Harrison, do you have something else?

10         MR. HARRISON:  There was some additional

11  matters.

12         THE COURT:  I'm sorry.  I just wanted to be

13  sure we covered all of Mr. Hawk's motions.  Go ahead.

14         MR. HARRISON:  The statements by the

15  defendant to various witnesses -- and I've already

16  referenced those thoughts of killing the victim with the

17  hammer, as well as the thoughts of choking the victim to

18  death, again, I'm not sure those would rise to any kind of a

19  criminal offense or any type of extraneous offense

20  situation, but we're, again, under the same theory.

21         We would be asking the Court to lift the

22  motion in limine to those statements by the defendant as

23  well as the prior actual assaults.

24         THE COURT:  Now, those statements by the

25  defendant in terms of what the State is proffering, that

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

37

1  allegedly the defendant said, those statements were to who?

2          MR. HARRISON:  One was to -- actually, both

3  of those statements were Leanne Wilkerson.

4          THE COURT:  Who's that?

5          MR. HARRISON:  She's a witness, a listed

6  witness.  She was across-the-street neighbor of the victim.

7          THE COURT:  Okay.  Not law enforcement?

8          MR. HARRISON:  No, sir.

9          THE COURT:  Those were approximately a week

10  before the murder?

11          MR. HARRISON:  Yes.

12          THE COURT:  So you intend to go into those in

13  your opening statement?

14          MR. HARRISON:  Yes, sir.

15          THE COURT:  Okay.  Well, if a motion in

16  limine does cover it, the Court will lift the motion in

17  limine for purposes of those statements, based on your

18  proffer of what the defendant allegedly told Leanna -- what

19  her name?

20          MR. HARRISON:  Leanna Wilkerson.

21          THE COURT:  Leanna Wilkerson, a civilian

22  witness, neighbor.

23          MR. HARRISON:  Judge, the next issue that I

24  think will probably be covered, although I don't think it

25  specifically is covered under the Defense's motion in

38

1   limine, would be the fact that from various witnesses, we

2   have evidence that the defendant was using methamphetamine

3   and marijuana leading up to the murder, as well as

4   immediately after the murder.

5                We believe that that would certainly be

6   evidence of the drug use just prior to and actually at the

7   time of the murder case would be certainly relevant evidence

8   going to the state of mind of the defendant at the time of

9   the killing.

10                Additionally, the fact that he was using

11  drugs, methamphetamine specifically, immediately after the

12  murder, we believe would certainly be relevant evidence and

13  would be admissible under 404 to show motive for the killing

14  and burglary and robbery, which is, of course, the State's

15  allegations to support the capital murder.

16                THE COURT:  Mr. Perkins?

17                MR. PERKINS:  Object to those as irrelevant;

18  object for all the grounds previously stated.

19                Again, all they're trying to do is show bad

20  character.  I don't see how, under any sort of theory, that

21  the defendant's alleged drug use can be stretched to try and

22  fit into any kind of prosecution theory.  Again, they're

23  just trying to show he's a bad guy.  He's done this; he's

24  done that; he was doing this; he was doing that, so this

25  must be the reason why.

39

1          There's no link between the drug use and the

2     murder.  So what they would like to do is get into drug use

3     so they can have the jury fabricate that link between the

4     two.  There is no rational reason.  There's no relevant

5     reason for the Court to allow that evidence in.

6               THE COURT:  What's the relevancy,

7     Mr. Harrison?

8               MR. HARRISON:  Judge, first of all, we are

9     not asking to go into the drug use and drug history,

10    generally, of the defendant.  We are specifically tying it

11    to just prior to the murder, during the murder, and

12    immediately after the murder.

13              The relevancy is -- and it comes from -- the

14    defendant actually makes statements to another individual

15    about being on drugs, about being high at the time of the

16    murder, immediately after the murder.

17              We believe the relevance would be that a

18    witness will indicate that the funds of the victim's account

19    was being drained, and cash was being used for the purchase

20    of methamphetamine.  And, clearly, that would go towards a

21    motive to commit the burglary or robbery of the victim in

22    the course of committing this murder would be to get money

23    to obtain money to obtain things of value for the purpose of

24    buying drugs.

25              MR. PERKINS:  Gee, a minute ago, Judge, I

40

1  thought he had killed her because he was mad at her and had

2  been for 12 years.  Now, apparently, he killed her because

3  he needed the money to buy methamphetamine, then -- and here

4  we go down the flip-flop theory for this reason.  "But if

5  that won't work, I'll come back to the Court and I'll say he

6  needed it for this."

7          And so what I'll say is, is that everything

8  that the State has just got through telling the Court is

9  180 degrees in opposition to what they said previously.

10        THE COURT:  Well, they're making a proffer of

11  what they're telling the Court that they've got witnesses

12  that will testify to what Mr. Harrison just said.  Based on

13  Mr. Harrison's proffer, I'll lift the motion in limine as it

14  goes to him including in his opening statement what he said

15  these witnesses would testify to.

16        The Court -- about the drug use by the

17  defendant, I think he said of marijuana and methamphetamine,

18  he said, he said, I believe -- didn't you say, Mr. Harrison,

19  just prior to the murder alleged in the indictment?

20        MR. HARRISON:  The fact that he was using

21  methamphetamine?

22        THE COURT:  Yes.

23        MR. HARRISON:  Yes, sir.

24        THE COURT:  Just prior to, at the time of,

25  and after?

41

1          MR. HARRISON:  Yes, sir.

2          THE COURT:  Okay.  The Court will find those

3    relevant under 404(b) and lift the motion of the -- motion

4    in limine, find them relevant as to motive.

5          MR. HARRISON:  Judge, I guess the last area

6    that we need to -- that we would bring up to the Court would

7    be -- and this is -- certainly, this is something that we

8    specifically want to go into in opening statement, a

9    statement by the victim to a civilian witness just prior to

10   the time of her death.

11         Ordinarily, that would be a hearsay

12   statement, but we believe that it would be admissible in

13   this case, would be an exception under the hearsay rule for

14   three reasons.  Again, those would be the victim's state of

15   mind under 803.3, the declarant's existing state of mind,

16   the emotional and physical condition.

17         The proof of motive -- because what the

18   statement -- and I should have said this before -- what the

19   statement was by the victim to a civilian witness just

20   prior --

21         THE COURT:  Just a second, Mr. Harrison.  I'm

22   having trouble hearing you.  Let me get that door shut.

23         Okay.  Go ahead.  I just couldn't hear you.

24         MR. HARRISON:  -- on the day of the murder

25   and just prior to the murder would be that she had had a

42

1    conversation with the defendant that morning, whereby she

2    had told the defendant that he must leave her residence,

3    that she was kicking him out of her house.  That

4    conversation would have been in the morning on the day of

5    the murder.

6                    The reason we believe that would be

7    admissible and relevant would be under 803.3, the

8    declarant's then existing state of mind, the emotion that

9    affects his physical condition.

10                   Additionally, we believe it would be

11   appropriate and relevant and admissible under proof of

12   motive.  And although we don't have to prove motive, the

13   Court, for instance, in Salvador versus State, found

14   testimony showing that before she was murdered, the Tejuana

15   star, Selena, told a witness she was going to fire the

16   appellant, and that that was admissible because her intent

17   to terminate the appellant's employment was relevant to show

18   the state of the relationship between the appellant at the

19   time of the shooting and to establish motive for the

20   shooting.  That was cited at 980 SW 2d 475.

21                   So while proof of motive is not a required

22   element in criminal cases, it's always relevant and

23   admissible to show the accused committed the offense, and

24   that's pursuant to Crane versus State, 786 SW 2d 338.

25                   THE COURT:  Now, who was going to be -- who

43

1   was the witness to put that in?

2                   MR. HARRISON:  That would be Betty McCarty,

3   who is an across-the-street neighbor of the victim.

4                   THE COURT:  Okay.  So that's a witness that

5   you're proffering would testify that the victim had

6   communicated to the defendant that he was going have to move

7   out?

8                   MR. HARRISON:  Yes, sir, on the day of the

9   murder.

10                  THE COURT:  On the day of the murder.

11                  MR. HARRISON:  Additionally, under 38.36,

12  that would be evidence and facts -- it talks about all of

13  the relevant facts and circumstances surrounding the

14  killing, the previous relationship existing between the

15  accused and deceased, together with all relevant facts and

16  circumstances going to show the condition of the accused's

17  mind at the time of the offense are admissible.

18                  Certainly, if he had been kicked out of her

19  house and no longer welcome to live there in her house, that

20  would be direct evidence going to the state of the mind of

21  the defendant as well as the relationship between the

22  accused and the defendant (sic).

23                  Additionally, it shows the -- it also would

24  go to the element of the lack of consent for the defendant

25  in burglarizing the victim's house.  This was not a -- it is

44

1    not necessarily a roommate situation at the time of this

2    murder, because the defendant had already been kicked out

3    and had been -- consent to be in the residence had been

4    removed at the time of the killing.   That's pursuant to

5    Anderson versus State, 15 SW 3d 177.

6                    THE COURT:   Okay.   Mr. Perkins?

7                    MR. PERKINS:   We're objecting to that, too.

8                    Now, here's Theory Number 3.   Theory

9    Number 1, he killed because he had been a mad at her for

10   12 years.   Theory Number 2, he killed her because he was on

11   drugs and needed money for drugs.   And now, Theory Number 3,

12   he killed her because he was mad because, apparently, she

13   made a hearsay statement to somebody about kicking him out

14   of her house.

15                   When?   When was he going to be kicked out?

16   How?   When?   By whom?   Had he been notified of this, or was

17   that something that was going to be doing?

18                   You know, the thing is, Judge, I didn't write

19   these rules, but 803.3 says, "The following are not excluded

20   by the hearsay rule, even though the declarant is available

21   as a witness."   That's the way that 803 starts.

22                   The declarant is available as a witness.   So

23   803.3 doesn't make a lick of difference.   It's not a -- it's

24   not a presence-sense impression.   State of mind emotion,

25   sensation or physical condition, such as the declarant's

45

```
 1   intent -- the declarant's intent, plan, motive, design,

 2   mental feeling, pain, or bodily health.  That's the --

 3   again, we do not believe that it is relevant.  We do not

 4   believe its prejudicial effect is outweighed by its

 5   probative value.

 6            ·We object for the same ground that is

 7   previously incorporated in our first and second objections.

 8            THE COURT:  Mr. Harrison?

 9            MR. HARRISON:  Judge, Anderson, which I've

10   previously cited, continues to say, "Therefore, we find that

11   Arnetta's state of mind prior to the crime is relevant to

12   demonstrate that she would not" -- Arnetta, obviously, being

13   the victim -- "that she did not and would not consent to

14   Anderson, the defendant's, entry into her home."  That's a

15   clear example of why state of mind would be relevant and

16   admissible in this case.

17            And, again, under 38.36, it goes to the state

18   of mind of the defendant at the time of the offense as well

19   as to the relationship between the victim and the defendant.

20            THE COURT:  Well, I'm going to lift the

21   motion in limine as it goes to your opening statement based

22   on what you've proffered to the Court, lifting for purposes

23   of your opening statement.

24            The Court would find it relevant.  The Court

25   would find that it would go to motive.  The Court would find
```

46

1  that the probative value outweighs the prejudicial value of

2  the statement, and the Court would find that it relevant and

3  admissible for purposes of your -- the Court lifting the

4  motion in limine for purposes of your opening statement that

5  would go to the state of mind of the defendant.  It would go

6  to the lack of consent under 38.36.

7              Therefore, the Court would lift the motion in

8  limine for purposes of you using what you proffered to the

9  Court in your opening statement.  Finding it would go to

10  motive, it's relevant, and it's relevant in that the

11  probative value outweighs the prejudicial value.  Lifting

12  the motion in limine as to your opening statement is what

13  the Court is ruling on this morning.

14              MR. HARRISON:  Judge, I've cited several

15  cases, and I've provided copies to the Defense, as well as

16  now to the Court.

17              THE COURT:  Okay.  Mr. Hawk, do you think you

18  have -- is there anything -- the Court went through these

19  motions.  I know several of them related to voir dire that

20  we've completed.

21              MR. HAWK:  Yes.

22              THE COURT:  But -- and I have up here a

23  transcript of the pretrial.  Did you get a copy of that?

24              MR. HAWK:  All except one of the pretrial

25  hearings.

47

1          THE COURT:  Okay.  Do you see any there

2     that -- I tried to go through them that you still need a

3     ruling on?

4          MR. HAWK:  I guess I couldn't see where any

5     of them didn't appear to have been ruled on.  There were a

6     lot of references to pretrial, because of the sheer volume

7     and number of motions.

8          THE COURT:  Right.

9          MR. HAWK:  So the only thing I was going to

10    ask the Court this morning was, if there's an order entered

11    in each of those motions -- and I haven't seen the Court's

12    file to know that.  And as long as we've secured a written

13    ruling or a 404 modification of a written ruling, then we're

14    satisfied.

15         But I looked through -- and I see, for

16    example, any specific motion, and it would say, "Judge, you

17    can take that up when you see it, if you get that order

18    entered, or whatever, and we'll check back later."

19         I just wanted to make sure we've got written

20    rulings on each of those, and I think I've provided orders

21    on each of those.  That's where we're at.  Otherwise, I

22    think we're ready to go.

23         THE COURT:  Mr. Hawk, I think the Court was

24    ruling on them as we went through them, and you had -- the

25    Court will -- I believe you had orders attached to the back

48

1   of them.

2                MR. HAWK: . Yes.

3                THE COURT:  And the Court will -- the Court

4   will go through and sign those orders granting or denying of

5   it, if I haven't already signed all of them.  Because I know

6   I was going off your list, and I know some of them that I

7   had marked and signed.

8                But if there are others that I need to sign

9   to enter, I will do that in terms of this -- of course, if I

10  granted the motion, like a motion in limine or whatever

11  motion I granted and I granted it from the bench and it's in

12  the record, the State knows it applies.

13               I will be sure that these are file-marked

14  today.  Will that be satisfactory to go on into the opening

15  statement?

16               Then I'll go through and check the actual --

17  I had gone through to be sure that I had ruled on them, and

18  I thought I had, but I was ruling from the bench.  And I had

19  started through a stack of your orders, but I'm not sure,

20  and I'll have to look and see if I completed it.

21               MR. HAWK:  One thing I want to bring to the

22  Court's attention.  Mr. Awbrey, I think, on Thursday or

23  Friday -- I don't remember which day -- provided me a copy a

24  copy of all the pretrial hearings.  I did notice that there

25  was one pretrial hearing that pertained to the motion to

1   secure the handwriting examplar of the defendant that I

2   don't have a copy of.

3                I don't think that's been transcribed, or if

4   so, I don't have a copy of that, because it was the one of

5   those quickly thrown-together hearings, that wasn't on the

6   pretrial docket list.

7                THE COURT:  All right.  Well, if you don't --

8                MR. HAWK:  I don't think we're going to need

9   that today.  I just wanted to let the Court know about it.

10  It was sometime before --

11               THE COURT:  You think it was sometime before

12  when?

13               MR. HAWK:  I had that list.  I will tell you,

14  because I had made a little note in here.

15               THE COURT:  It looks like the earliest one I

16  have is July -- on pretrial is July 2nd.

17               MR. HAWK:  It happened before that.  I want

18  to say it was the week before July the 2nd, before -- and it

19  was after June the 18th, which was the very first pretrial

20  hearing.  It was one of those hearings that we threw

21  together, one of those hearings that was kind of thrown

22  together.  The State filed a motion, and we showed up.

23  There was a little bit of a time issue there, but it was not

24  on a normal scheduled pretrial date.

25               THE COURT:  We'll have to look for it.

50

1          MR. HAWK:  Okay.  Also, with regard to

2   transcripts, Judge, the Court had previously visited with

3   us, and I think the court reporters have discovered who it

4   was that transcribed the examining trial, where Detective

5   Pat Hendrix testified.  We don't have that testimony yet.

6          THE COURT:  Who transcribed that?  Jill

7   McFadden?

8          MR. HAWK:  And I don't think he's going to

9   testify today after discussing that with the State, but we

10  sure need to have that in sufficient time to use.

11         THE COURT:  At your first break, could you

12  call Jill?  Jill McFadden is the one working on that,

13  Mr. Awbrey.

14         MR. HAWK:  I know Steve Awbrey has been

15  diligent in his efforts to get after her as well.

16         (Discussion off the record.)

17         MR. HARRISON:  Judge, there was one other

18  thing.  I noticed that Mr. Hawk and Mr. Perkins were looking

19  at a faxed transmission that we had sent them over the

20  weekend from our office.  That relates to an interview that

21  we conducted with John Clary, one of the potential State's

22  witnesses.

23         He, during the course of that interview that

24  we had with him up in our office over the weekend, had

25  indicated something to the effect that the defendant had

51

 1   told him that at the time of the murder the victim had a

 2   gun, that she may have pulled the gun or held the gun on him

 3   or threatened him in some way with a gun.

 4          And that could have been a cause of -- under

 5   the defendant's theory, the reason for the murder, could

 6   implicate some sort of a self-defense type claim.

 7          We -- we certainly first learned of that over

 8   the weekend during the course of our interview.  We

 9   immediately faxed the general nature of that interview to

10   Mr. Perkins and Mr. Hawk, because we didn't believe that it

11   was contained anywhere in any statement he had given

12   previously, any written statement he had given previously,

13   or anywhere else for that matter.  But as soon as we

14   received it, we faxed it to Mr. Perkins and Mr. Hawk.

15          THE COURT:  Y'all read it over there,

16   Mr. Perkins?  You're reading it?  Is that -- is there

17   anything you want to say for the record?

18          MR. PERKINS:  Judge, I guess for -- I mean,

19   everything that they've indicated is correct.  I don't

20   really understand it.  Through no fault of the District

21   Attorney's Office, or maybe even Mr. Clary, I just don't

22   understand what this means, because I'll just have to read

23   it into the record.  Pardon the blue language.

24          "I interviewed John Clary yesterday who told

25   me that Beatty told him, 'I really fucked up this time.  I

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

52

1   killed the bitch.  She pulled a gun on me, and I went to

2   take the gun from her, and I choked her.  I can't go back.

3   She will call the cops.'"

4            If that's what Mr. Clary said, then that's

5   fine.  I don't know how she's supposed to call the cops if

6   she's dead, but maybe that's the way it was expressed to

7   him.

8            MR. BINGHAM:  He didn't either.  That's what

9   was expressed to him, so we turned it over as the statement.

10           MR. PERKINS:  That's fine, Judge.  I just

11   didn't really understand that, but --

12           MR. BINGHAM:  Neither did we, and neither did

13   he.

14           MR. PERKINS:  -- if that's what was told to

15   them, then that's fine.

16           THE COURT:  Let me ask both parties this:

17   Would both State and Defense stay alert to any witness who

18   might come into the courtroom who is not -- obviously, there

19   was some of them -- a number of them for, I know, the

20   State's witnesses sworn in and instructed when Mr. Bingham

21   had them here, and they were sworn in and instructed under

22   the Rule.  But there could be someone walk in out here, and

23   the Court, certainly, would not recognize they were a

24   witness.  If y'all would be just be alert to that.

25           MR. BINGHAM:  We will be, Judge.

53

1          THE COURT:  So that if somebody walks in and

2    sits down, you get them out right away.  And then at the

3    first opportunity, the Court will swear them in and put them

4    under the Rule.

5          And then, also, of course, as usual, since

6    the Rule has been invoked, when you get witnesses going down

7    the line, if you'll be sure to let them know the Rule has

8    been invoked.

9          MR. BINGHAM:  Yes, sir.

10          THE COURT:  And then the Court will swear

11    them in as soon as you get them before the Court.

12          MR. PERKINS:  I will make sure no defense

13    witnesses come in, Judge.

14          THE COURT:  Okay, Mr. Perkins.

15          Mr. Perkins, just so the Court will know just

16    in basically informing the jury just as we start out, do you

17    anticipate, if you don't mind saying now, whether or not

18    you're going to make an open opening statement now or at the

19    start of your case?

20          MR. PERKINS:  I anticipate I probably will.

21          THE COURT:  All right.  Thank you.

22          MR. BINGHAM:  Judge, one last thing that we

23    have.  Did the Court grant our motion to fingerprint the

24    defendant?  I can't recall.

25          THE COURT:  Well, I'll grant -- I think I

54

1   did, and I'll grant the State's motion to fingerprint the

2   defendant.   I thought that had already been done,

3   Mr. Harrison.

4            MR. HARRISON:   Judge, I think the Court did

5   grant it.   I don't believe it's been done yet, and,

6   obviously, we'll arrange a time.

7            THE COURT:   Well, the Court will grant, if it

8   has not already been done, and I thought it had been.   The

9   Court will grant the State's motion to fingerprint the

10  defendant.

11           MR. HARRISON:   We did the view.   I don't

12  believe we did the fingerprints.

13           MR. PERKINS:   The only other thing I need to

14  address is, at some point in time -- it doesn't necessarily

15  need to be right now -- but we have been provided by the

16  State with transcripts of three separate interviews of Tracy

17  Beatty:   December 19th, December 23rd, and December 26 of

18  2003.

19           At some time prior to the State's proffer of

20  those, we need to visit with them about specific objections

21  that we would have to mention as to him being on parole or

22  just recently being released from prison, those kind of

23  things.

24           I've had an opportunity to go through those

25  and mark specific allegations or specific portions of those

55

1 statements that we would obviously have an objection to

2 under 403 and 404.  So I'll get with the State and the Court

3 on those.  We'll be asking the State to excise those

4 particular references from those statements.

5 　　　　　MR. BINGHAM:  We agree.  And we've already

6 done that.

7 　　　　　THE COURT:  All right.  You've already done

8 that, Mr. Bingham?

9 　　　　　MR. BINGHAM:  We've already done that, but

10 we're going to have to put back in some stuff about the dope

11 use.  We took that out in an abundance of caution, but we're

12 going to definitely redact that part.  We're not going to

13 have any problem over that.  We'll get together and do that.

14 　　　　　THE COURT:  If you can just be sure and have

15 all of that done down at the point when you get ready to

16 offer it in.

17 　　　　　MR. BINGHAM:  We will, Judge.

18 　　　　　THE COURT:  Let's be in recess for about five

19 minutes.  I believe we have to get some vehicles moved.

20 　　　　　(Recess.)

21 　　　　　(Open court, defendant present, no jury.)

22 　　　　　THE COURT:  Back on the record in Cause

23 Number 241-0978-04.  The Court does have a request for an

24 order to allow media coverage submitted by Bob Brackeen on

25 behalf of KETK television station, and the Court also has a

56

1  request for order to allow media covered on behalf of Casey

2  Knapp from the "Tyler Morning Telegraph."

3                So the Court will take those up and hear from

4  State and Defense.

5                MR. BINGHAM:  Did you say Bob Brackeen?

6                THE COURT:  That's him standing back there.

7  It must be his signature.

8                MR. BINGHAM:  That's what I thought.  We

9  don't have any objection to the coverage by either

10 Mr. Brackeen and the channel he works for, or Casey Knapp.

11 We don't have any objection to either one covering it.

12                THE COURT:  Go ahead, Mr. Perkins.

13                MR. PERKINS:  On behalf of Mr. Beatty, Your

14 Honor, we do have an objection.  The estimated length of

15 trial is supposed to be approximately two weeks.  There's a

16 large number of potential witnesses that may be called.

17                The Rule of Witnesses will be invoked on

18 these individuals, and because of the potential for trouble

19 in enforcing the Rule of Witnesses and for other reasons

20 which may deprive Mr. Beatty of a fair and impartial trial

21 in this matter, we're objecting to the presence of cameras

22 in the courtroom.

23                THE COURT:  All right.  The Court is going to

24 grant the request of Bob Brackeen representing KETK, and

25 also grant the request of Casey Knapp, representing "The

57

1    Tyler Morning Telegraph," allowing media coverage of the

2    trial.   The Court will sign and enter those orders at this

3    time.

4                    MR. PERKINS:   In that event, Your Honor, in

5    addition to the standard instructions given to the witnesses

6    under the Rule of Witnesses, I would ask that the Court,

7    directly, to the witnesses who are currently present and

8    that the State would have the District Attorney's Office,

9    and hold the District Attorney's Office responsible for

10   informing witnesses who were not present, not to watch any

11   news accounts, read any newspaper article regarding coverage

12   of the trial, testimony of witnesses, that sort of

13   instruction in addition to the regular instructions given to

14   jurors.

15                   THE COURT:   The Court will do that,

16   Mr. Perkins.

17                   MR. PERKINS:   I'm sorry.   Potential

18   witnesses.

19                   THE COURT:   I understand.

20                   MR. PERKINS:   And the same instructions,

21   obviously, to the jurors.

22                   THE COURT:   The Court will do that,

23   Mr. Perkins.

24                   MR. BINGHAM:   Judge, there are witnesses in

25   the courtroom we would just ask the Court to swear in.

58

1          THE COURT:  All right.  Those of you who are

2    in the courtroom to testify as witnesses in this case, what

3    the Court will need you to do is stand up and raise your

4    right hand, and I am going to administer you the oath of the

5    witnesses.

6          After you take the oath, one by one, starting

7    over here going this way (indicating) and on back, we need

8    you to state your name into the record, and then I have some

9    additional instructions from you.

10          So if all of you who are going to testify as

11    witnesses, stand and raise your right hand and remain

12    standing.  Just raise your right hand.

13          Do you and each of you solemnly swear that in

14    the cause now on trial, your testimony will be the truth,

15    the whole truth, and nothing but the truth, so help you God?

16          THE WITNESSES:  I do.

17          THE COURT:  All right.  Now just remain

18    standing.  You can put down your right hand.

19          But right here, ma'am, could you state your

20    full name for the record loud enough where the court

21    reporter can hear?

22          A WITNESS:  Betty McCarty.

23          THE COURT:  Yes, sir?

24          A WITNESS:  Thomas Tucker.

25          THE COURT:  Yes, ma'am?

59

1                    A WITNESS:   Tamara Beatty.

2                    THE COURT:   Okay.   Come back this way

3    (indicating).   Yes, ma'am?

4                    A WITNESS:   Tonya Walker.

5                    A WITNESS:   John Clary.

6                    A WITNESS:   Mike Killough.

7                    A WITNESS:   Stacy Killough.

8                    THE COURT:   Yes, ma'am?

9                    A WITNESS:   Leanna Wilkerson.

10                   THE COURT:   All right.   Y'all just be seated

11   right there.

12                   The ones I hadn't gotten to, if you'll remain

13   standing.   Okay.   Go ahead, ma'am.   Right there.

14                   A WITNESS:   Linda Trotter.

15                   THE COURT:   Yes, ma'am?

16                   A WITNESS:   Renee Loomis.

17                   THE COURT:   Now, all of you who --

18                   A WITNESS:   Sergeant Roy Tomlin.

19                   THE COURT:   All right.   All of you who have

20   been sworn in as witnesses are now under the jurisdiction of

21   the Court as witnesses, and you need to listen to the

22   following instructions that the Court is going to give you.

23                   The Rule of Witnesses has been invoked.   That

24   means several things.   Number one, do not discuss what you

25   anticipate your testimony will be in this case among

60

1    yourselves nor with any other person, and that means no

2    other person.  Do not testify -- do not discuss anything

3    about this case among yourselves nor with any other person.

4              After you testify, do not discuss anything

5    about what your testimony was with any other person or talk

6    to any other person about the case.  The only individuals

7    you can discuss the case with or your testimony with are any

8    of the State's attorneys or any of the defense attorneys.

9              Also, do not be present where anyone else is

10   discussing the case.  Don't be in anyone else's presence who

11   is talking about the case while you are under the Rule of

12   Witnesses.

13             After you testify, you're still under the

14   Rule of Witnesses, unless you're finally excused.  So unless

15   you're finally excused, you just absolutely cannot say

16   anything about your testimony under any circumstances to any

17   individual.  Do not discuss your testimony with anyone.

18             Also, do not -- and be especially careful --

19   do not read any newspaper accounts of this case, and do not

20   watch any television reports of this case nor listen -- nor

21   listen to or read from any other source any media coverage

22   of this case.  That is very important, and it is part of the

23   instructions of the Court to you under the Rule of

24   Witnesses.

25             What you need to do is you'll be able to

61

1    leave the courtroom at this time.  Do not come into the

2    courtroom at any time until you are called by the bailiff to

3    testify.  You cannot be in the courtroom at any time any

4    other witness is testifying.

5                And I'm sure that the State's attorneys, if

6    you're subpoenaed here as a State's witness, or the defense

7    attorneys, if you're subpoenaed as a defense witness, I'm

8    sure they will let you know when they need you to be outside

9    the courtroom to testify as a witness in the case.

10               Any further instructions, Mr. Bingham?

11               MR. BINGHAM:  No, Your Honor.

12               THE COURT:  Anything further, Mr Perkins?

13               MR. PERKINS:  No, Your Honor.

14               THE COURT:  All right.  Then if you would,

15   please step out now outside the courtroom.

16               (The witnesses leave the courtroom.)

17               (Open court, defendant present, no jury.)

18               THE COURT:  After the Court brings in the

19   jury, Counsel, the Court -- obviously, the record is going

20   to reflect that each of these jurors have already been

21   individually sworn and placed under instructions by the

22   Court.  The Court is going to reswear the entire jury as a

23   group.

24               Does either State or Defense have any -- I

25   believe you did make a request that there be an additional

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

62

 1  instruction reference media coverage; is that right,

 2  Mr. Perkins?

 3                      MR. PERKINS:  That's correct, Your Honor.

 4                      THE COURT:  And then the Court, after the

 5  jury is sworn, will call for announcements before the jury.

 6                      (The jury enters the courtroom.)

 7                      (Open court, defendant and jury present.)

 8                      THE COURT:  Good morning, Ladies and

 9  Gentlemen.  You may be seated.  Thank you.

10                      Ladies and Gentlemen, as you well remember

11  and know, the Court earlier -- as each of you were selected

12  and accepted to be a member of this jury, the Court issued

13  you individually the oath that's administered to a juror in

14  the case.  Now that you are all together as a group, the

15  Court is going to reissue that oath, so it will be given to

16  you also as a group.

17                      If you would, just stand and raise your right

18  hand, please, at this time.

19                      You and each of you do solemnly swear that in

20  the case of the State of Texas against the defendant you

21  will a true verdict render, according to the law and the

22  evidence, so help you God?

23                      (The jury answers affirmatively.)

24                      THE COURT:  Thank you.  Be seated, please.

25                      The Court, in Cause Number 241-0978-04, the

63

1  State of Texas versus Tracy Beatty will now call for

2  announcements from counsel.

3              MR. BINGHAM:  Your Honor, the State is

4  present, and we're ready.

5              THE COURT:  Mr. Perkins?

6              MR. PERKINS:  Present and ready, Your Honor.

7              THE COURT:  Thank you.

8              Ladies and Gentlemen, let me give you these

9  additional instructions since you are now together here to

10 begin hearing evidence in the case.  And that is, all of the

11 instructions that the Court gave you individually, of

12 course, still apply now to your jury service in this case

13 and will govern your conduct until such time as your jury

14 duty ends in this case.

15             Also, it's especially important, as are all

16 the instructions, but I want to also caution you to continue

17 to be careful about not reading any newspaper accounts of

18 the case.  Don't read any newspaper stories about coverage

19 of the case.

20             Also, be very careful about not watching any

21 television accounts or coverage of the case.  And be

22 cautious about avoiding any type of media coverage in any

23 manner about the case, as well as those other instructions I

24 gave you to be careful about not letting anyone discuss the

25 case with you or discussing the case with any individuals.

64

1        And if anything like that were to happen,

2   report it to me immediately if someone were to try to talk

3   to you about the case.

4        Any further instructions, on behalf of the

5   State or of the Defense requested, at this time?

6        MR. BINGHAM:  Not from the State, Judge.

7        MR. PERKINS:  No, Your Honor.

8        THE COURT:  Mr. Bingham, do you want to

9   present the indictment?

10        MR. BINGHAM:  Yes, sir.

11        THE COURT:  The defendant will rise.

12        MR. BINGHAM:  "The State of Texas versus

13   Tracy Beatty, Cause Number 241-0978-04, in the name and by

14   the authority of the State of Texas, the Grand Jurors, duly

15   selected, organized, sworn, and impaneled as such for the

16   County of Smith, State of Texas at the January-June term,

17   2004, of the 7th Judicial District Court for said County, a

18   quorum thereof being present, upon their oaths presented in

19   and to said Court that on or about the 25th day of November,

20   2003, and anterior to the presentment of this indictment in

21   the County and the State aforesaid, Tracy Beatty did then

22   and there intentionally cause the death of an individual,

23   namely, Carolyn Click, by strangling Carolyn Click with his

24   hands and pantyhose and a piece of cloth and an object

25   unknown to the Grand Jury, and that the defendant was then

65

1   and there in the course of committing or attempting to

2   commit the offense of robbery of Carolyn Click.

3            "And the Grand Jurors aforesaid do further

4   present in and to said Court that on or about the 25th day

5   of November, 2003, and anterior to the presentment of this

6   indictment in the County and State aforesaid, Tracy Beatty

7   did then and there intentionally cause the death of an

8   individual, namely, Carolyn Click, by strangling Carolyn

9   Click with his hands and pantyhose and a piece of cloth and

10  an object unknown to the Grand Jury, and the defendant was

11  then and there in the course of committing or attempting to

12  commit the offense of burglary of a habitation of Carolyn

13  Click, who was the owner of said habitation.

14           "And the Grand Jurors aforesaid do further

15  present in and to said Court that on or about the 25th day

16  of November, 2003, and anterior to the presentment of this

17  indictment in the County and State aforesaid, Tracy Beatty,

18  did then and there intentionally cause the death of an

19  individual, namely, Carolyn Click, by striking Carolyn Click

20  with a hard object and a blunt object and an object unknown

21  to the Grand Jury, and the defendant was then and there in

22  the course of committing or attempting to commit the offense

23  of robbery of Carolyn Click.

24           "And the Grand Jurors aforesaid do further

25  present in and to said Court that on or about the 25th day

66

1  of November, 2003, and anterior to the presentment of this

2  indictment in the County and State aforesaid, Tracy Beatty

3  did then and there cause the death of an individual, namely,

4  Carolyn Click, by striking Carolyn Click with a hard object

5  and a blunt object and an object unknown to the Grand Jury,

6  and the defendant was then and there in the course of

7  committing or attempting to commit the offense of burglary

8  of a habitation of Carolyn Click, who was the owner of said

9  habitation.

10         "And the Grand Jurors aforesaid do further

11  present in and to said Court that on or about the 25th day

12  of November, 2003, and anterior to the presentment of this

13  indictment in the County and State aforesaid, Tracy Beatty

14  did then and there cause the death of an individual, namely,

15  Carolyn Click, by smothering Carolyn Click with a piece of

16  cloth and pantyhose and his hands and an object unknown to

17  the Grand Jury, and the defendant was then and there in the

18  course of committing or attempting to commit the offense of

19  robbery of Carolyn Click.

20         "And the Grand Jurors aforesaid do further

21  present that on or about the 25th day of November, 2003, and

22  anterior to the presentment of this indictment in the County

23  and State aforesaid, Tracy Beatty did then and there

24  intentionally cause the death of an individual, namely,

25  Carolyn Click, by smothering Carolyn Click with a piece of

67

1    cloth and pantyhose and his hands and an object unknown to

2    the Grand Jury, and the defendant was then and there in the

3    course of committing or attempting to commit the offense of

4    burglary of a habitation of Carolyn Click, who was the owner

5    of said habitation.

6              "And the Grand Jurors aforesaid do further

7    present in and to said Court that on or about the 25th day

8    of November, 2003, and anterior to the presentment of this

9    indictment in the County and State aforesaid, Tracy Beatty

10   did then and there intentionally cause the death of an

11   individual, namely, Carolyn Click, by suffocating Carolyn

12   Click with a piece of cloth and pantyhose and his hands and

13   an object unknown to the Grand Jury, and by burial in the

14   ground, and the defendant was then and there in the course

15   of committing or attempting to commit the offense of robbery

16   of Carolyn Click.

17             "And the Grand Jurors do further present in

18   and to said Court that on or about the 25th day of November,

19   2003, and anterior to the presentment of this indictment in

20   the County and State aforesaid, Tracy Beatty did then and

21   there intentionally cause the death of an individual, namely

22   Carolyn Click, by suffocating Carolyn Click with a piece of

23   cloth and pantyhose and his hands and an object unknown to

24   the Grand Jury, and by burial in the ground, and the

25   defendant was then and there in the course of committing or

68

1    attempting to commit the offense of burglary of a habitation

2    of Carolyn Click, who was the owner of said habitation.

3               "And it is further presented in and to said

4    Court that during the commission of each of the

5    above-described felony offenses, the said Tracy Beatty did

6    use and exhibit a deadly weapon, to-wit, hands and piece of

7    cloth and pantyhose and an object unknown to the Grand Jury,

8    that in the manner of its use and intended use was capable

9    of causing death and serious injury, against the peace and

10   dignity of the State," signed by the Foreman of the Grand

11   Jury.

12               THE COURT:  To which the defendant pleads?

13               THE DEFENDANT:  Not guilty, Your Honor.

14               THE COURT:  You may seated.

15               Ladies and Gentlemen, at this time, the

16   State of Texas will make an opening statement.  The opening

17   statement is the opportunity of the State of Texas to go

18   into what the State anticipates the evidence in the case

19   will show, what the State anticipates they will prove in the

20   case in terms of witnesses.

21               The statements that are made by Mr. Bingham,

22   who will be making the opening statement, are not evidence.

23   They are his opportunity to tell you what he expects to

24   prove from the evidence in the case.

25               Once Mr. Bingham finishes his opening

69

1    statement, Mr. Perkins, I anticipate, will make an opening

2    statement to you.  Mr. Perkins is not required to make his

3    opening statement at this time.

4              If he wants to, he can reserve his opening

5    statement until after the State rests.  But if Mr. Perkins

6    chooses to make an opening statement at this time, it will

7    be the same, in that it would be Mr. Perkins' opportunity,

8    if he desires to do so, bearing in mind that the Defense has

9    no burden of proof, to outline for you, if he intends to do

10   so and wants to make the statement at this time, what he

11   anticipates the evidence in the case will show, bearing

12   again in mind that the statements of neither the prosecutor

13   nor the defense attorney are evidence in the case.

14             The Court will recognize Mr. Bingham for

15   opening statements.

16             MR. BINGHAM:  May it please the Court,

17   Mr. Perkins, Mr. Hawk.

18             THE COURT:  Ladies and Gentlemen, while

19   that's being set up, let me mention one other matter to you.

20   Mr. Awbrey, our court reporter, who is seated here who you

21   can see, there will be another court reporter sitting right

22   in front of me, Mrs. Kim Christopher, another one of our

23   court reporters.

24             At various times, as we're going to go

25   through the evidence, you're going to see one or the other

70

1  of them get up and leave.  The other will still be taking

2  everything down.  They will be coming in and out, so don't

3  let that bother you.  There is still a full record being

4  made of everything said in court.

5             All right.  Mr. Bingham.

6             MR. BINGHAM:  The first thing I want to do is

7  thank you for the sacrifices that you're going to make and

8  that your family is going make for you to serve as a juror

9  in this case.

10            I want to tell you in advance that the

11  evidence you will hear will be horrific, and the pictures

12  you see, I will submit to you, you will probably never

13  forget.  The evidence that you will hear will take you back

14  to on or about November 25th, 2003, and this evidence will

15  show that this defendant beat and strangled his own

16  62-year-old mother to death, and he buried her in a shallow

17  grave behind her house that she had lived in alone for over

18  ten years.  And he buried her nude, covered in dirt,

19  mothballs, cat litter, and garlic.

20           You will hear from witnesses who the

21  defendant told he killed his mother.  They will be from law

22  enforcement officers to witnesses the defendant knew.  And

23  you will hear from law enforcement officers that the

24  defendant took to this location on the side of Mrs. Click's

25  house where the defendant walked law enforcement to and

71

1  pointed to the ground and showed where he had buried his

2  mother.   Those witnesses that you will hear from regarding

3  the defendant's admissions to killing his mother will be

4  family members, law enforcement, and people the defendant

5  knew.

6           You will see photographs in this case of

7  where law enforcement unearthed and dug up Carolyn Click.

8  You will see pictures of her contorted, nude decomposing

9  body that was buried 11-1/2 inches under the ground on the

10  side of her mobile home where she had lived alone for years.

11  And you will hear evidence that the person that killed

12  Carolyn Click and buried her in the ground 11-1/2 inches

13  under and covered her with garlic, mothballs, and cat litter

14  is the defendant who's seated right there (indicating).

15           And the evidence you will hear of this will

16  be from his own words that he told witnesses in this case.

17  You will hear witnesses who will take you through Carolyn

18  Click's last days alive on this earth.   And you will hear

19  evidence of how the last thing Carolyn Click ever saw was

20  the son she gave birth to killing her.

21           The evidence will show you the last thing

22  Carolyn Click ever felt on this earth were multiple strikes

23  to her body by her own son and the feeling of strangulation

24  upon her body that was being caused by her son.

25           You will hear from witnesses who were with

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

72

1    the defendant as he drove her car that he had stolen from

2    her and used her credit cards that he removed from her

3    purse, that he had stolen from her and withdrew money from

4    her bank accounts to buy alcohol and methamphetamine and how

5    he continued to live in her house that she had kicked him

6    out of on the very morning that he killed her and that he

7    did all of this, as his mother lay nude and buried in her

8    backyard.

9             You will hear evidence in this case that will

10   take you through a time line of capital murder.  You will

11   hear that the defendant had moved in with his mother about a

12   month before her death.  You will hear that the defendant is

13   over 40 years of age and that the victim in this case was

14   22 -- excuse me -- 62.

15            You will hear that he moved in with his

16   mother about a month before her death and on -- the last day

17   that anyone ever saw Carolyn Click alive was November 25th,

18   2003.

19            And you will hear that on November 25th,

20   2003, Carolyn Click came over to a neighbor named Betty

21   McCarty.  That was about 4:00 o'clock on the 25th of

22   November, 2003.  She came over and told Betty McCarty that

23   she, Carolyn Click, had told her son that morning to leave

24   her house.  She said she was tired of his attitude towards

25   her and that she had had enough.  4:00 o'clock on that day

73

1  was the last time anyone ever saw Carolyn Click alive.

2          You will hear that the victim, Carolyn Click,

3  had lived at this residence for the last ten years.  And you

4  will hear that on October 2nd, 2003, the victim allows her

5  son, the over-40-year-old defendant in this case, to move in

6  with her.

7          On November 4th, 2003, you will hear evidence

8  that the victim actually tells the defendant to leave her

9  residence.  That's November 4th.  That's 21 days before her

10  life is over.  She tells the defendant to leave her

11  residence.

12          The defendant stays at a neighbor's house

13  across the street by the name of Lieanna Wilkerson he stays

14  there for about a week before he moves back in with his mom.

15  You will hear that on November 18th, 2003, now about a week

16  before his mother is killed, the defendant makes the

17  statement to this neighbor, Lieanna Wilkerson, and the

18  statement he tells her is that he was working around the

19  mobile home with his mom, and he tells Lieanna Wilkerson,

20  "She actually handed me a hammer."

21          And he goes on to tell Lieanna Wilkerson that

22  "when she handed me the hammer, I thought to myself, I can't

23  believe she's handing me that hammer."  And he said he had

24  thoughts of hitting her with that hammer and burying her

25  body underneath the mobile home, but that if he knew he did

74

1     that, she would start to stink, and he would be found out.

2     That's a week before he takes the life of his mother by

3     choking her and strangling her and beating her and

4     suffocating her.

5            On November 25th, 2003, as I told you before,

6     Betty McCarty sees the victim at 4:00.  Betty McCarty is

7     unloading groceries that she had just purchased.  The victim

8     comes over and tells Betty, "I've had enough.  I told my son

9     to leave my house this morning."  That's the last statement

10    anyone ever hears Betty McCarty (sic) make.  That's the last

11    time anyone ever sees her alive on this earth.

12           The defendant, sometime before dark, drives

13    his mother's car.  And up to this point -- up to this point,

14    no one has ever seen this defendant right here (indicating)

15    drive his mother's vehicle.  As a matter of fact, the

16    evidence will show you, when he went to take his driving

17    test sometime after moving in with his mom, he didn't use

18    his mom's car.  He had to use Lieanna Wilkerson's car.

19           On November 25th, 2003, as he continued to

20    live in her house that she's buried behind on the day he

21    kills her, and on November 25th, 2003, as he drives her car

22    that no one has ever seen him drive before, as she lay

23    buried or dead, he drives her car to Stacey Killough's,

24    house.  Stacey Killough is a relative of his.

25           He tells Killough the victim has gone away

75

1  with a truck driver for two weeks.  And as you will find out

2  from the evidence, that's a lie.  She's gone, and her body

3  is buried behind the mobile home.

4          So the defendant leaves Stacey Killough's

5  house.  He comes there, and Stacey is like, "Look, I'm very

6  busy.  I'm getting my kids ready.  Their father is coming to

7  pick them up."  It's two days before Thanksgiving, and she's

8  getting them ready to go.  And she says, "Can you just come

9  back later?"  And the defendant has been drinking.  And he

10 leaves.

11         The defendant then goes back to Lieanna

12 Wilkerson's house across the street, across the street from

13 where his mother is buried.  And Lieanna Wilkerson at

14 sometime, 7:00 on, cooks him a spaghetti dinner, and the

15 defendant drinks a bottle of wine.

16         He leaves at 10:00 o'clock, and he goes back

17 to the victim's house, despite the fact that she had kicked

18 him out that morning and despite the fact that her body lays

19 behind that house.

20         The defendant later calls Wilkerson.  Since

21 this offense has occurred, the defendant has actually called

22 Lieanna Wilkerson, and he has called her since being charged

23 with this crime, and he has admitted to her that "on the day

24 you cooked me that spaghetti dinner, that was the day I

25 killed my mother."

76

1          On November 25th, 2003, the defendant begins

2   driving the victim's car that no one has ever seen him drive

3   before.   On November 26th, the defendant takes a

4   Thanksgiving turkey over to Lieanna Wilkerson's house saying

5   to her, "Mom is gone, so she won't need it."

6          He tells Wilkerson, the next-door neighbor to

7   the victim, that the victim has gone with her boyfriend and

8   that he won't be back until -- that she won't be back until

9   December 17th.   He says she left because she couldn't deal

10  with him anymore.

11          On November 27th, the next day, Thanksgiving,

12  the defendant eats Thanksgiving dinner at another neighbor's

13  house named Twyla Johnson.   Twyla Johnson, Lieanna

14  Wilkerson, and another neighbor and the defendant come over

15  to Ms. Johnson's house for Thanksgiving dinner.

16          Wilkerson notices the defendant is very

17  nervous, and he keeps looking back at his mother's house.

18  He leaves saying he's going to go visit some relatives in

19  Athens, and he does leave, again in the victim's car, still

20  living in her home.   And the defendant goes to another --

21  goes back to Stacey Killough's house, his relative, who

22  lives outside of Smith County.

23          Stacey Killough sees on the defendant a huge

24  wad of money, a huge wad of money in the pocket of the

25  defendant who's over 40 living with his 62-year-old mother

1   with no vehicle.  And the reason she sees the money is

2   Stacey Killough is sick, she's got a cold, or whatever she

3   has.

4              Her husband, Michael, is going to go to a

5   liquor store and buy some liquor.  And she says, "Don't buy

6   a big bottle."  And Tracy Beatty pulls out this big wad of

7   money that she describes like this (indicating) and says,

8   "Don't worry.  I'm getting it.  I'm going to pay for it."

9   And he and Michael Killough leave and go to the liquor

10  store.  This is two days after his mother's death.

11             On November 28th, the defendant uses the

12  victim's gas card for the first time, and you'll hear the

13  custodian of records from the DSRM bank.  His mother is

14  dead.  The defendant is driving her vehicle, and it's the

15  first time documented that he uses her gas card.

16             The defendant goes to John Clary's house.

17  John Clary is a relative.  He's a marine.  Hasn't seen the

18  defendant; hasn't had any contact with the defendant for 12

19  years.  Hadn't thought about him; hadn't seen him; hadn't

20  talked to him for 12 years.

21             The defendant goes to his house.  Mr. Clary

22  will tell you he shows up in the victim's car, and he's

23  drunk, and Mr. Clary asks the victim (sic) where Carolyn

24  Click is, "Where is your mother?"

25             And the defendant tells him, well, the

78

1   victim -- excuse me -- the defendant tells him that the

2   victim is out of town with her boyfriend who's a truck

3   driver.  That's not true.  She's buried in her backyard

4   behind her mobile home house.

5              The defendant disappears, basically, from the

6   27th through the 29th.  On November 29th, the defendant

7   tells Wilkerson that has done so much dope with his friends,

8   that it's taken him two days to recover.

9              The evidence will show you that the money

10  that's being used to purchase that dope, and it's a

11  reasonable inference from the evidence, wasn't the

12  defendant's; it was Carolyn Click's.

13             On November 30th, the defendant goes back to

14  John Clary's house, again drunk, about 9:30 p.m.  Mr. Clary

15  will not let the defendant in his house, and he tells the

16  defendant, "You have to leave."

17             And the defendant, standing by the victim's

18  car -- excuse me -- by the victim's car in John Clary's

19  driveway says -- excuse this.  This is the evidence.  Excuse

20  my language -- "I fucked up this time.  I killed the bitch."

21  And then he tells him this:  That the 62-year-old Carolyn

22  Click "pulled the gun on me, and I had to take the gun away

23  from her and I choked her."

24             Now, John Clary says, "Well, then you need to

25  go to the police."  And the defendant says, "I can't go

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

79

1    back.  She might call the cops on me."  John Clary doesn't

2    understand this statement.  "If she's dead, how is she going

3    to call the cops on you?"  The defendant is intoxicated.

4    Clary tells him to leave.

5              You will later learn, and we'll talk about

6    this in opening statement further, that's a lie.  The

7    defendant was -- the victim never pulled a gun on the

8    defendant.  And by the end of this -- of all of the

9    evidence, the defendant would have told six stories of what

10   happened on November 25th, 2003.

11             On December 11th, the defendant meets a girl

12   named Renee Loomis, who's a dope addict.  He meets Loomis at

13   the house of one of his friends, Linda Trotter.  Loomis and

14   the defendant are together for three days.  And they are in

15   the victim's car; they are drinking.

16             They are using methamphetamine that's being

17   purchased with an ATM card belonging to Carolyn Click that I

18   believe comes in the mail after Carolyn Click is dead and

19   using the gas card that is later found on the -- in the

20   defendant's personal property.

21             And they're driving around, and they're

22   drinking, and they're going in and Pulsing $75, $300 of the

23   dead mother's money.  And the evidence will show you the

24   defendant is so distraught about it that he decides to go

25   out and purchase some methamphetamine and alcohol.  The

80

1  defendant takes Loomis and one of her friends, Melissa

2  Southern, to the victim's house.

3            The defendant puts them in the car, they get

4  into the victim's car, and he drives them to Carolyn Click's

5  house.  And he says -- tells them that this is his aunt's

6  house, who recently died, and he inherited the house.  And

7  he begins to give them property belonging to Carolyn Click.

8            The defendant later tells Renee Loomis now

9  yet another story.  He says -- he tells her, "I had a friend

10 kill my mom, and then I killed my friend, so there would be

11 no witnesses, and I buried their bodies in Cedar Creek or at

12 Cedar Creek."  So yet there's another story.  It's gone from

13 she's on a vacation to she pulled a gun to "I had a friend

14 kill her, and then I killed the friend."

15           But it won't end there.  The defendant goes

16 to -- and Loomis go to a man's house by the name of Aaron

17 Sisk where Melissa Southern is staying.  It's out at Pine

18 Trail Shores.  He's still driving the victim's car.

19           At that location, he tells Melissa Southern

20 and some of the other people that he wants to sell Carolyn

21 Click's car, and he makes a sign and posts it on her car to

22 sell it.  And he goes from like 800 to 600 to $400.  And he

23 adds guess what to the car?  The evidence will show you the

24 title.  And He throws the title at Melissa Southern, and he

25 says, "Sell it.  Do what you can for me" on the car.

1          And he burns property belonging to the victim

2   in a burn pile behind that house, property like clothing and

3   purses.  And he tells -- the defendant tells Melissa that

4   same "I killed the punk who killed my mom, and I buried

5   their body in the woods."  And then he goes on to make a

6   statement that says, "You better be sure that I buried my

7   mom a lot deeper than I did that other punk.  Maybe the

8   woods will eat him."

9          On December 17th, Roy Tomlin with the Smith

10  County Sheriff's Department goes to the victim's house and

11  speaks to the defendant who's still living there about the

12  victim being missing.

13         And the defendant then gives yet another

14  story.  He says his mother is with a guy named Junior in

15  Jacksonville, Texas, and that she should be back the next

16  day on the 18th.

17         On December 18th, the Smith County Sheriff's

18  Office receives an anonymous call that the car -- the

19  victim's car has been seen at Pine Trail Shores.  They go

20  out there and confirm the car's location there at Aaron

21  Sisk's house -- at the house of Aaron Sisk, and they get a

22  warrant to search the car, and they seize the car.

23         On December 19th, Pat Hendrix gets consent --

24  he's with the Sheriff's Department -- from Aaron Sisk to

25  search the burn pile behind Mr. Sisk's house, and they

82

1    collect evidence.  Detectives Pat Hendrix and Frank Blake
2    interview the defendant, Tracy Beatty, on December 19th, and
3    the defendant tells them, hey, the victim is okay.  "Don't
4    worry.  She's okay.  She's with Junior."
5              The defendant says the victim has come back
6    recently and picked up her car, the car he's got sitting out
7    at Pine Trail Shores with a for sale sign on it.  Picked up
8    her car and some of her belongings on Wednesday, the 17th,
9    so he knows she's okay.
10             Well, immediately, what does Pat Hendrix say,
11   "No" -- who's just seized the car from Pine Trail Shores?
12   The evidence will show you Pat Hendrix says, "He's lying.  I
13   know she doesn't have the car.  We have it."
14             The defendant never mentions anything to law
15   enforcement on the 19th -- never, zero, at no time does he
16   ever mention anything to them about hiring a man to kill his
17   mother or Junior killing his mother.  He says, "Hey, she's
18   okay.  Relax.  Relax.  She's in Jacksonville."
19             And the defendant tells law enforcement he
20   hasn't seen his mother since Thanksgiving.  The defendant
21   admits to using her money and draining her account to smoke
22   dope, to buy and use methamphetamine.
23             And in the interview, the law enforcement
24   officers know some things, and they say, "You know, we have
25   information that maybe you've buried your mother."  And he

1   goes, "Buried.  Why would you say buried?"  Interview over.

2             December 23rd, Smith County Sheriff's Office

3   deputies bring a cadaver-sniffing dog, and they start from

4   Shreveport, Louisiana, from a team down there, and they

5   begin to search locations in Henderson County.

6             Beatty then agrees to an interview with

7   Investigators Ray Nutt and Ron Shields.  And during the

8   interview, guess what?  See, on the 19th when he said, "Hey,

9   she's with Junior," remember, Pat Hendrix was interviewing

10  her (sic) on the 19th.  He tells Pat Hendrix, "Hey, she's

11  with Junior.  She's okay.  She came back on the 17th to pick

12  her car.  Hey, don't worry about it."

13            Pat Hendrix asks the defendant, "Do you think

14  Junior would hurt her?"  Well, nowhere in that interview

15  does he ever mention anything about Junior hurting him

16  (sic).  But the evidence will show you it puts something in

17  his mind.

18            And on the 23rd, he's talking to

19  Investigators Ray Nutt and Ron Shields, and Beatty says to

20  them, "Junior killed the victim."  Here we go.  Story

21  Number 4.  "Junior killed the victim, so I killed Junior."

22            The defendant then states, "I dumped the

23  bodies in the lake."  The defendant says, "You know what?

24  I'll take them to the bridge where I dumped the bodies."  So

25  they say, "Good.  Let's go."  They take him out there.  Do

84

1  you think they found any bodies?  The evidence will show you

2  they did not.  No bodies were located.

3          The defendant then admits for the first time

4  to burying his mom behind her house, finally.  She's been

5  there a month.  Smith County deputies go to the victim's

6  house where the defendant is still living, now the

7  defendant's house because Carolyn Click is dead, buried back

8  there on a corner of her house behind the fence with lumber

9  and cat litter stacked on top of dirt, which is stacked on

10  top of moth balls and garlic, nude, contorted, with her face

11  covered with a towel and pantyhose.

12          And the pantyhose are on her face.  The legs

13  of the pantyhose are wrapped around her neck tight, three

14  times, and tied in a knot.  And that's where she's been the

15  past month while he's been out doping and drinking and

16  spending her money and driving her car and living in her

17  house.

18          So they take him back there.  He points out

19  to where the body is buried.  Detective Noel Martin digs up

20  her body, which is nude, 11 and a half inches under the

21  ground.

22          Well, the defendant is interviewed by Pat

23  Hendrix on the 23rd.  And he tells Pat Hendrix, "Well, I

24  found my mother laying dead inside her house."  Here we go.

25  Story Number 5.  "I found my mother laying dead in her

85

1  house.  As I was leaving the victim's house, I went to look

2  for Junior."

3            Now, he says that as he was driving away from

4  the house, Junior -- towards the house, Junior was driving

5  away.  And he describes turning around and confronting

6  Junior in the yard and that he stabs Junior to death because

7  Junior killed his mom and maintains that he -- continues to

8  maintain that he dumped the body -- Junior's body under the

9  bridge in Cedar Creek somewhere.

10            So on the 26th of December, to be completely

11  thorough, guess what law enforcement does?  The evidence

12  will show you they load up again and head to Cedar Creek.

13  And no body is found.  What investigators learn later is

14  there is no body of this Junior.  Junior didn't kill his

15  mom.

16            How did they find out that Junior didn't do

17  this, and there is no body of Junior?  Because the defendant

18  admits to him that he's the one that killed his mom, after

19  all of this.

20            On December the 29th, Pat Hendrix obtains an

21  arrest warrant for the offense of capital murder.  On

22  December 30th, Detectives Pat Hendrix and Sean Parrish are

23  with the defendant, and the defendant says spontaneously,

24  "You know, I didn't mean to kill her.  I came in drunk, and

25  she started bitching, and I just start choking her.  Hell,"

86

1  he says, "I didn't even know she was dead until the next

2  morning when I saw her laying on the living room floor."

3          Well, he also makes some other admissions.

4  During the book-in procedure, after he's been arrested on

5  this offense, the defendant tells a Smith County jailor --

6  he says this -- here we go again.  He says, "I was on drugs

7  the night I killed her.  I had been up for four days."

8          He tells the jailor that while he was high on

9  dope or been up for four days after being on dope, "I'm

10  drinking a fifth of whiskey.  My mom grabs him" -- he says,

11  "My mom grabs me and pulls the bottle away from me."  It's

12  at this point he states that he grabbed the victim until she

13  became limp.  Then he just went to bed.  He realized there

14  might be a problem the next morning when the victim was

15  still laying on the floor where she had fallen.

16          During the same time period, the defendant's

17  with a -- next to an inmate by the name of Michael Hibbler,

18  and the evidence will show you -- do you know how many deals

19  we made with Michael Hibbler?  None.  None.  Has nothing

20  pending here.  No deals.

21          But he's going to come in, and he's going to

22  tell you this:  The defendant -- he's by the defendant, and

23  the defendant told him that he had come home, and his mom

24  had confronted him at the front door.  I mean, how dare she

25  confront him in her home.  He states that the victim started

87

1   a physical confrontation with him and that the victim had

2   been drinking.

3           And the evidence is going to show you that

4   the victim has a .05 ethanol in her system.  What the

5   pathologist is also going to tell you is that upon

6   decomposition of a body, bacteria begins to form a substance

7   that reads for ethanol.

8           And it's very consistent in autopsies, where

9   there is this level of decomposition, to have a .05 or .07

10  ethanol reading in your system, consistent with showing that

11  she had been drinking when, in fact, it's the bacteria that

12  forms during the decomposition stage.

13          But he says, "I come home.  My mom confronts

14  me."  He starts -- she starts a physical confrontation with

15  him, and he pushes the victim, and she falls, hitting her

16  head on the coffee table.  The pathologist will tell you

17  that's a lie.

18          He says he went to sleep and saw his mom on

19  the floor the next morning and that according to the

20  defendant, he leaves the body there, goes through the house

21  taking cash and property, is what he told Michael Hibbler.

22          Since the evidence will show you he has

23  killed his 62-year-old mom and buried her nude in a hole in

24  the backyard with moth balls, cat litter, and garlic, the

25  evidence will show you the defendant has told six different

88

1   versions of how his mother died.

2              One, she's okay; she's traveling with Junior;

3   she'll be back on the 18th.   That's one.

4              The evidence will show you the second story

5   is that his mother pulled a gun on him; he took the gun away

6   from her and choked her.

7              Story Number 3.   He had Junior kill her, then

8   he killed juror, and he buried both of them in Cedar Creek.

9              Story Number 4.   He found Junior killed his

10  mother, then he killed Junior, buried his mom in the

11  backyard and dumped Junior in the lake.

12             Story Number 5, that he was on dope and

13  drunk, his mom grabbed the bottle away from him, and he

14  choked her.   Then he got up the next day, and she had not

15  moved.

16             Story Number 6, that the victim started a

17  physical confrontation with him, that she had been drinking,

18  he pushed her, and her head hit a table, and he thought

19  something might be wrong when she didn't move.

20             The evidence will show you that one person

21  took them to where the body was buried -- law enforcement --

22  under the ground:   The defendant.

23             The evidence will show you that Junior did

24  not kill her.   The defendant admitted to Lieanna Wilkerson,

25  John Clary, Fabian Arteaga, Michael Hibbler, Detective Pat

89

1  Hendrix, Detective Sean Parrish, he admitted to all of them

2  that he killed his mother.

3             The evidence will show you that she's not

4  buried out by Cedar Creek.  She was found buried in a hole

5  in her own backyard at the house she had lived in for ten

6  years.

7             The evidence will show you that he did not

8  just choke her and wake up the next day and notice she

9  hadn't moved.  The evidence will show you that he did not

10 just push her and her head hit a table.

11            What the evidence will show you is that this

12 defendant intentionally took the life of his mother, and he

13 buried her body nude in the backyard, and he did this with

14 the intent of robbing and burglarizing her, and he took her

15 personal property, lived in her home, took her car and took

16 her money.

17            You will hear evidence from which you can

18 rationally conclude that the defendant formed the intent to

19 obtain the victim's property either before or during the

20 commission of the murder and that the murder occurred in the

21 course of robbing or burglarizing Carolyn Click and that the

22 appropriation of her property, her car, her home, her money

23 occurred the day the murder occurred and continued

24 thereafter.

25            The evidence will show you when -- the day

90

1  Carolyn Click died, November 25th, 2003, that was the very

2  day that she told this defendant, "You can no longer live on

3  my property.  You can't drive my car.  You can't eat my

4  food.  You can't use my money."  The evidence will show you

5  he killed her with the intent to rob and burglarize her.

6           You will hear from Dr. Dolinak, the deputy

7  chief medical examiner of Dallas County at the Southwest

8  Institute of Forensic Sciences.  Dr. Dolinak will tell you

9  this was an intentional crime.  It was an intentional

10 murder.

11          Dr. Dolinak will tell you Carolyn Click was a

12 62-year-old female weighing 131 pounds, standing 5 feet 5

13 inches tall; that she was strangled; that she had numerous

14 blunt force injuries to her head, her torso, and her arms;

15 that she had a sponge-like cloth wrapped over her face,

16 which in turn had a pantyhose ligature wrapped tightly

17 around Carolyn Click's neck three times.

18          He will tell you that in his opinion, this

19 was an intentional act, not only due to the fact that she

20 had multiple injuries all over her body, but she had a

21 fractured sternum.  She had a hyoid bone in her neck that

22 was fractured.  She had a bilateral fracture of her thyroid

23 cartilage.  She had cracked ribs.  She had numerous blunt

24 force injuries on her head.  Her hands and her arms had

25 blunt force injuries.

91

1        And you'll see the pictures of when he cut
2   her arm open, what those injuries are.  Defensive wounds.
3   And he believes -- Dr. Dolinak will tell you, in his
4   opinion, it's not just an intentional act just because of
5   the extensive trauma to different parts of her body, but
6   also to the fact that she has pantyhose wrapped three times
7   around her neck.
8        The evidence will show also show you that in
9   1991, this defendant took his hand and struck his mother in
10  the face.  Then the evidence will show you that on November
11  25th, 2003, he could have left.  He had done it before.
12  Gone to Lieanna Wilkerson's house.  He could have just
13  walked away.  The evidence will show you the very day that
14  Carolyn Click told her son to leave, she was never seen
15  again.
16        Ladies and Gentlemen, the evidence you will
17  listen to in this case will be horrific, shocking, sad.
18        I appreciate in advance for your service in
19  this case and for listening to the evidence in what is a
20  very important case for the State of Texas, the District
21  Attorney's Office, and the family members of the victim.
22        Thank you very much.
23        THE COURT:  Mr. Perkins.
24        MR. PERKINS:  May it please the Court.
25        THE COURT:  Yes.

92

1          MR. PERKINS:  Counsel for the State.

2          Ladies and Gentlemen of the Jury, listen to

3   me when I say this:  Tracy Beatty is guilty.  Tracy Beatty

4   is guilty.  He's guilty of unauthorized use of a motor

5   vehicle, he's guilty of credit card abuse, he's guilty of

6   debt card abuse, he's guilty of theft, and he's guilty of

7   murder.  The evidence is going to show you that he's guilty,

8   guilty, guilty, guilty of all of that stuff.  You know what

9   he's not guilty of?  Capital murder.

10          What the evidence is going to fail to show

11   you is, is that there's any concausal connection between

12   this theory of robbery, this theory of burglary, and the

13   murder.  The State has laid out for you six different

14   stories that Tracy Beatty has told.  Tracy Beatty is guilty

15   of lying to the police; he's guilty of using drugs.

16          The State of Texas is guilty of getting those

17   mixed up with a capital murder.  The fact that somebody is a

18   drug user, the evidence is going to show you, doesn't

19   constitute capital murder.  The fact that somebody is guilty

20   of lying to the police doesn't constitute somebody is guilty

21   of capital murder.  The fact that somebody is a bad guy and

22   does bad things does not equal capital murder.

23          What you're going to hear is this:  Tracy

24   Beatty and his mother have had a stormy relationship for a

25   long, long time.  He lived with her, didn't live with her,

1   you know, out of the house, back in the house, whatever.  If

2   there's any evidence, as Mr. Bingham told you, "You can't

3   use my car; you can't spend my money."  If there's anybody

4   that comes in here and says that, it will be a shock to me.

5   There's not going to be any evidence of that.  There's not

6   going to be any evidence of that, and what he said isn't

7   evidence.  You watch and see.  There's not going to be any

8   evidence of that.

9          Tracy Beatty is guilty of a lot of things.

10   Tracy Beatty was living with his mother for about a month or

11   so, okay?  At some point in time, Tracy Beatty was out of

12   the home, and then he was back in the home, whatever.  He

13   was in the home; he had permission to live in the home; he

14   had been living in the home; and he moved back and continued

15   to live in the home.

16          At a point subsequent to that, Carolyn Click

17   is dead.  And then Tracy Beatty starts lying to anybody and

18   everybody about how it goes.  And remember those six

19   stories?  Only one of them is the truth, and I believe it

20   was Mr. Bingham's Number 5 story.  One story is the truth.

21          Tracy Beatty and his mother got into a fight.

22   He strangled his mother.  They got into a brutal fight, and

23   he killed his mother.  And then about -- oh, let me think --

24   two weeks or so after that, her debit card comes in the

25   mail.  The evidence is going to be that this debit card

94

1   wasn't even mailed from the bank.  And I don't know how many

2   of you get things mailed to you.  Here's a credit card;

3   you're preapproved, that kind of stuff.  Unfortunately, we

4   get them a lot.

5           One of these things comes about two weeks

6   after Carolyn Click is dead, and Tracy Beatty and one of the

7   State's witnesses, Renee Loomis, get on that.  Renee Loomis

8   activates the card, and they start dumping out her account.

9   Guilty of debit card abuse.  That doesn't equal capital

10  murder.

11          The theory -- and I want you to understand

12  that the evidence is going to show you -- and what

13  Mr. Bingham says, just like what I say, is not evidence.

14  But what Mr. Bingham says is, and it's very carefully

15  crafted, nobody had ever seen him use the car until after

16  she was dead.  That may be the case.  That may be the case.

17          For him to be guilty of capital murder, the

18  intent to commit robbery or burglary, as alleged against

19  him, has to be formulated prior to or concurrently with the

20  murder.  Robbery of what?  Burglary of what?

21          Ladies and Gentlemen, I'm going to ask you to

22  do this, and to do what each of you individually promised us

23  that you would do in jury selection:  Make your decision

24  with your heads and not with your hearts.  Do not be guilty

25  of making a decision based on emotion and horrible pictures

95

1    and that kind of thing.  Do what the law requires you to do.

2    Find Tracy Beatty guilty of what he did.   The evidence will

3    show you that he is guilty of a lot of things.  He is not

4    guilty of capital murder.

5                     Thank you.

6                     THE COURT:  Thank you, Mr. Perkins.

7                     Carleton, would you move the stand?

8                     THE BAILIFF:  Yes, sir.

9                     THE COURT:  Call your first witness,

10   Mr. Bingham.

11                    MR. BINGHAM:  Judge, the State would call

12   John Clary.

13                    THE COURT:  John Clary, Carleton.

14                    MR. BINGHAM:  Could I get my notes on the

15   podium I left?

16                    THE COURT:  Yes, you may.

17                    (The witness enters the courtroom.)

18                    MR. HAWK:  Judge, can we approach briefly?

19                    THE COURT:  Yes, you may.

20                    Has this witness been sworn?  Just a second.

21                    Mr. Clary, have you been previously sworn as

22   a witness?

23                    THE WITNESS:  Yes, sir.

24                    THE COURT:  All right.  Just have a seat,

25   please.

96

1          If you would, sort of pull that chair up

2   where you're pretty close to the microphone.  That will

3   work, so if you'll stay close to it.

4          (At the bench, on the record.)

5          MR. HAWK:  Judge, there's a person in the

6   courtroom named James Clary who may later testify.

7          MR. BINGHAM:  He's not going to testify.

8   That's the victim's brother.  We're not going to call him.

9          MR. HAWK:  That's the victim's brother, and

10  we may be calling him as a witness, so...

11         MR. BINGHAM:  Okay.  We weren't intending to,

12  so I didn't ask him to leave.

13         THE COURT:  Well, then if you know who he is,

14  then, Mr. Bingham, would you please ask Ms. Sikes to get him

15  out of the courtroom, please --

16         MR. HAWK:  Thank you, Judge.

17         THE COURT:  -- and have him sworn as a

18  witness as soon as we get to a break.  Just ask him to --

19         MR. BINGHAM:  Okay.  We weren't going to call

20  him, so I didn't ask him to leave.  I didn't know they were

21  going to.

22         MR. HAWK:  And please understand that I'm not

23  saying that the State left him in here intentionally.

24         MR. BINGHAM:  No.  I understand.

25         THE COURT:  Are you telling the Court you may

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

97

1   call him as a witness?

2                   MR. HAWK:  Yes, Judge.  Thank you.

3                   (End of bench conference.)

4                   THE COURT:  Proceed, Mr. Bingham.

5                   MR. BINGHAM:  Thank you.

6                        JOHN CLARY,

7   having been first duly sworn, testified as follows:

8                   DIRECT EXAMINATION

9   BY MR. BINGHAM:

10      Q.   Mr. Clary, how are you doing this morning?

11      A.   Doing well.

12      Q.   Thank you.

13           If you would, introduce yourself to the jury

14   by telling them your name and spell your name for the court

15   reporter, because she has to take everything down.

16      A.   My name is John Clary.  That's C-L-A-R-Y.

17      Q.   Okay.  Mr. Clary, if you would, tell the jury what

18   you do for a living.

19      A.   I'm in the military.

20      Q.   Okay.  What branch of the military?

21      A.   Marine Corps.

22      Q.   And how long have you been in the Marine Corps?

23      A.   19 and a half years.

24      Q.   Okay.  And what is your current rank in the Marine

25   Corps?

98

1    A.    I'm a master sergeant, which is an E-8.

2    Q.    Okay.  Are you the one in the movie that yells at

3  everybody?

4    A.    There you go.  That's lower than me.

5    Q.    You can tell I've not been in the military, but we

6  appreciate your service.

7    A.    Thank you.

8    Q.    How are you related to Tracy Beatty?

9    A.    First cousins.

10   Q.    Okay.  Do you see the person you know as Tracy

11  Beatty in the courtroom today?

12   A.    Yes, sir.

13   Q.    Could you point to him and identify for the Court

14  and for the jury something he's wearing by describing an

15  article of clothing?

16   A.    The dark blue tie with the polka dots or with the

17  white dots on it (pointing).

18   Q.    Okay.

19   A.    Gray hair.

20        MR. BINGHAM:  Your Honor, if you would let

21  the record reflect that he pointed to the defendant and

22  identified an article worn by the defendant.

23        THE COURT:  The record will reflect the

24  witness has identified the defendant.

25        MR. BINGHAM:  Okay.

99

1      Q     (By The Court) How long prior to December -- or

2   excuse me -- November of 2003 had it been since you had

3   seen, a number of years, Tracy Beatty?

4      A.    Approximately -- probably about ten years.

5      Q.    Now, tell the jury --

6            MR. BINGHAM:  Judge, may we approach the

7   witness briefly with Mr. Hawk or Mr. Perkins and say

8   something real quick?  It's something I overlooked.

9            THE COURT:  Yes.

10           MR. BINGHAM:  Mr. Perkins.  I'm sorry.  Real

11  quick.  It's something I overlooked.

12           THE COURT:  Yes.

13           (Off-the-record discussion.)

14           MR. PERKINS:  That's fine.

15           MR. BINGHAM:  If I may have one moment.  I

16  had to inform Mr.Perkins what I was going to say.

17           THE COURT:  Yes.

18           MR. BINGHAM:  Thank you, Judge.  That was

19  pursuant to some Court's orders.

20     Q     (By Mr. Bingham) When did you first see the

21  defendant in Thanksgiving of 2003?

22     A.    It was the day after Thanksgiving.

23     Q.    And that would have been the 28th?

24     A.    27th, 28th.

25     Q.    Okay.  But you knew it to be the day after

100

1   Thanksgiving?

2       A.   Yes.

3       Q.   Okay.  And what time did he show up?

4       A.   It was probably around 7:00 o'clock at night.

5       Q.   Now, where did you live -- where did you live at

6   that time?

7       A.   In Eustace.

8       Q.   And how far is that from Tyler?

9       A.   About 45 miles.

10      Q.   Okay.  What county is that in?

11      A.   Henderson.

12      Q.   Who did you reside there with?

13      A.   My family lives there.

14      Q.   Okay.  And that would be your wife and your two

15  daughters?

16      A.   Yes, sir.

17      Q.   Was there anyone else living there with you at the

18  time?

19      A.   Yes, sir.  My former daughter-in-law was staying

20  with us.

21      Q.   Okay.  Tell the jury -- the defendant showed up

22  about 6:00 or 7:00.  Do you know how the defendant arrived?

23      A.   He was driving a car, a white little station

24  wagon, kind of like a panel van.  It had the wood panels on

25  the side of it.

101

1      Q.    And had you ever seen that vehicle before?

2      A.    No, sir.

3      Q.    Could you tell the defendant's mental state when

4   he arrived?

5      A.    His mental state was -- he had been drinking.

6      Q.    Okay.

7      A.    He was pretty inebriated.

8      Q.    Okay.  And at the time that he arrived and you

9   noticed he was inebriated, what was the defendant talking to

10  you about?

11     A.    Just family ties and the need for them to be

12  stronger.

13     Q.    Okay.  He wanted the -- he was saying your family

14  should have been -- should have stuck together, been closer?

15     A.    Yes, sir.

16     Q.    Now, did the defendant bring with him any alcohol

17  that you observed?

18     A.    Yes, sir.

19     Q.    Okay.  Where was that?

20     A.    It was in the car.

21     Q.    Okay.  Now --

22              MR. BINGHAM:  May I approach the witness,

23  Judge?

24              THE COURT:  Yes, you may.

25     Q    (By Mr. Bingham) Let me show you State's

1   Exhibits 1 and 2, even though the 2 is upside down.  Do you

2   recognize those?

3        A.   Yes, sir.

4        Q.   What is State's Exhibits 1 and 2?

5        A.   That's the vehicle that was being driven that

6   night that he was driving.

7        Q.   Okay.  He being the defendant?

8        A.   Yes, sir.  I'm sorry.  That Tracy was driving.

9             MR. BINGHAM:  I'll show State's Exhibit 1 and

10  2 to Mr. Perkins.

11            MR. PERKINS:  Are you offering them?

12            MR. BINGHAM:  We are going to offer them.

13            MR. PERKINS:  No objection.

14            THE COURT:  Are you offering them,

15  Mr. Bingham?

16            MR. BINGHAM:  I am, Judge.

17            THE COURT:  State's Exhibit Number 1 and

18  State's Exhibit Number 2 admitted without objection.

19       Q    (By Mr. Bingham) Now, this -- let me show you

20  State's Exhibit Number 1.  I'll turn it like this so the

21  jury can see it.  This is the vehicle that Tracy Beatty was

22  driving when he came to your house inebriated?

23       A.   Yes, sir.

24       Q.   I believe State's Exhibit Number 2 is the other

25  side of that vehicle; is that correct?

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

103

1      A.   Yes, sir.

2      Q.   Now, in that vehicle, did you notice where the

3   defendant had the alcohol?

4      A.   No, sir.  I didn't go out to the car.

5      Q.   Did you allow the defendant to come in to your

6   home?

7      A.   Yes, sir.

8      Q.   Did he make any statements about driving the

9   victim's vehicle?

10     A.   Yes, sir, that he had borrowed it.

11     Q.   Okay.

12     A.   And was -- because he was borrowing it while

13   Carolyn was gone so he could feed the dogs and go see his

14   daughter.

15     Q.   Now, did you make. in inquiry of him as to where

16   Carolyn Click was?

17     A.   No, sir.

18     Q.   Did he mention to you where Carolyn Click was?

19     A.   No, sir.

20     Q.   Did he give you an explanation for where she might

21   be?

22     A.   No, sir.

23     Q.   Now, how long did the defendant stay?

24     A.   Approximately an hour and a half.

25     Q.   Okay.  And at that point -- so he leaves about

104

1   8:30?

2       A.   Yes, sir.

3       Q.   Do you see him again any time after that?

4       A.   Couple of days later.

5       Q.   Okay.  How many days after Thanksgiving was that?

6       A.   It would have been three days after.

7       Q.   So on the -- what was that, the 29th?

8       A.   Yes, sir, the 30th, 31st.

9       Q.   Okay.  What time did he show up that day?

10      A.   It was probably around 9:00 o'clock that night.

11      Q.   Now, how long had it been since you had seen

12  Carolyn Click?

13      A.   '95.

14      Q.   Okay.  How did you know Carolyn Click to be

15  related to Tracy Beatty?

16      A.   That's his mother.

17      Q.   When he showed up three days after Thanksgiving,

18  how did he arrive at your house?

19      A.   Driving the same car.

20      Q.   Could you tell whether or not he had been

21  drinking?

22      A.   Yes, sir, he had been.  He had beer in his hand

23  when he showed up.

24      Q.   Now, did you allow the defendant into your home?

25      A.   No, sir.

105

1    Q.   Did the defendant make any statements to you that
2  you thought were unusual?

3    A.   Yes, sir.

4    Q.   Okay.  Tell the jury what the defendant said and
5  what you replied.

6    A.   Well --

7    Q.   When the defendant came up to you, did he make any
8  statements about his mother and what had happened?

9    A.   Yes, sir.  He said he had screwed up.

10   Q.   Is that the word he used?

11   A.   No, sir.

12   Q.   Spell the word, if you don't want to say it.
13  We're in a court of law.  What the evidence is, it is.

14   A.   He stepped up and walked up to where I was at and
15  told me he had fucked up.

16   Q.   Okay.  What did he say after that?

17   A.   That he had killed the bitch.

18   Q.   Okay.  Now, what did you say to him at that point?

19   A.   I actually told him that -- I asked him, number
20  one, I didn't want to know nothing that he was into, because
21  he had already said he had already screwed up, so I didn't
22  want to deal with him anyway.  I wasn't going to let him in
23  my house.  I told him that he needed to go turn himself in.

24   Q.   Okay.  What did he say at that point?

25   A.   That that wasn't going to happen.

106

1    Q.   Okay.  Did he make any statements to you regarding

2  how the offense had occurred, how he had killed -- what had

3  prompted him?

4    A.   Yes, sir.  He said that he had gone into the

5  house, and there had been an argument, and Carolyn had

6  pulled a gun on him, so he went to choke her.

7    Q.   All right.  When you stated to him that he needed

8  to go to the police or turn himself in to authorities, what

9  was his response?

10    A.   That he wasn't going to do it, they would have to

11  take him dead.

12    Q.   Okay.  Did he make any statements about regarding

13  going back to where Carolyn was?

14    A.   Yes, sir.  When I told him that he needed to turn

15  himself in or go back there, he said he couldn't go back

16  there because she would have the cops looking for him.

17    Q.   Now, was there anything unusual about that to you?

18    A.   Yes, sir, it's kind of contradiction of statements

19  there.

20    Q.   Okay.  Now, how long does he remain at your house

21  that night?

22    A.   Probably 10 to 15 minutes.

23    Q.   Okay.  And does he ever come into your home?

24    A.   That night?

25    Q.   Yes.

107

1    A.   No, sir.

2    Q.   At that point, does -- he's talking to you.

3  You've made that exchange.  Do you tell him to leave?

4    A.   Yes, sir.

5    Q.   Does he?

6    A.   He left.

7    Q.   Okay.  And at that point, had you seen him again

8  at all?

9    A.   No, sir.  I watched him until he drove off.

10   Q.   What do you mean?

11   A.   I watched -- my house is on top of a hill, so I

12 can see a couple of corners that you have to make to exit

13 the house, and I watched to make sure that the vehicle

14 lights had cleared the last hill before I went back inside.

15   Q.   Now, the statement he made to you on the first

16 time that he came to your house, that he was borrowing the

17 victim's car while she was gone, do you recall that?

18   A.   Yes, sir.

19   Q.   Based on his statements the second day or the

20 second time that he came out there, meaning having killed

21 her, that first statement on the 27th or the 28th would

22 not have been accurate?

23   A.   Yes, sir, true.

24   Q.   Because she would have been dead?

25   A.   Well, that I don't know.  I know that the night,

108

1  the second time he showed up is when he told me that.

2      Q.   And in both trips to her house he was in her

3  vehicle?

4      A.   Yes, sir.

5              MR. BINGHAM:  May I have one moment, Judge?

6              THE COURT:  Yes.

7              (State's counsel confer.)

8              MR. BINGHAM:  If we could just have one

9  moment, Judge.

10             (State's counsel confer.)

11             MR. BINGHAM:  Judge, we'll pass the witness.

12             THE COURT:  Mr. Perkins?

13             MR. PERKINS:  Thank you, Judge.

14                  CROSS-EXAMINATION

15  BY MR. PERKINS:

16     Q.   Morning, Mr. Clary.  How are you?

17     A.   Good morning.

18     Q.   My name is Robert Perkins.  We never have seen or

19  talked to each other before, have we?

20     A.   No, sir.

21     Q.   Mr. Clary, what I want to do is kind of touch on a

22  couple of things that shouldn't take a couple of minutes.

23             If I understand what you're testifying about,

24  if -- Carolyn Click was your aunt; is that right?

25     A.   Yes, sir.

109

1    Q.    Now, is that your mother's sister?

2    A.    That was my father's sister.

3    Q.    Father's sister?

4    A.    Yes, sir.

5    Q.    Okay.  And according to what I heard you say this

6    morning, you hadn't seen her since 1995?

7    A.    Since my uncle's funeral.

8    Q.    Okay.  So that would have been -- let's see.  My

9    math is not too good, but that would have been about --

10   A.    Nine years.

11   Q.    -- nine years ago?

12   A.    Yes, sir.

13   Q.    And you hadn't seen Tracy Beatty for even longer

14   than that; hadn't seen him in like more than ten years?

15   A.    Yes, sir.

16   Q.    The day that you first saw Tracy Beatty, you say

17   was either the 27th or 28th.  You don't remember exactly

18   which day?

19   A.    I know it was the day after Thanksgiving.

20   Q.    Okay.  And so if Carolyn had died on November the

21   25th, that would have been two or three days after her

22   death?

23   A.    Yes, sir.

24   Q.    And he shows up that evening about 7:00, and

25   that's in Eustace over in Henderson County?

110

1      A.    Yes, sir.

2      Q.    Driving that station wagon that we see in those

3  two pictures; is that right?

4      A.    Yes, sir.

5      Q.    On that occasion, you said that he had been

6  drinking, and I think the word that you used was

7  "inebriated."  The word I'm going to use is -- is "drunk."

8      A.    Intoxicated.

9      Q.    Do you think he was drunk that day?

10      A.    I think he was intoxicated, yes, sir.

11      Q.    And you said something, and I didn't really

12  understand this part.  You said there was alcohol in the

13  car, but that you didn't go out to the car.

14      A.    No, sir, because he kept going to the car to get

15  another beer.

16      Q.    Okay.  So he had like an ice chest or something in

17  the car, and he was going back for it?

18      A.    Yes, sir, I assumed.  I don't know if he had an

19  ice chest or just sitting in the seat.

20      Q.    Okay.  And that's the day that he was talking to

21  you about needing the family ties to be stronger?

22      A.    Yes, sir.

23      Q.    And when he told you that he had borrowed the

24  vehicle to feed his dogs and to see his daughter, do you

25  know which daughter he made reference to?

111

1    A.    The daughter that lived in Dallas.

2    Q.    You don't know what her name is?  He didn't say;

3  you don't remember?

4    A.    No, sir.

5    Q.    Okay.  All right.  And then again, you saw

6  Mr. Beatty driving the car, and this -- and I -- you said

7  either the 30th or the 31st.  If I told you there was only

8  30 days in November, it would have been the 30th or

9  December 1st.

10    A.    It would have been the 30th.

11    Q.    Okay.  So the end of November, first of December,

12  one of those days?

13    A.    Yes, sir.

14    Q.    He came back driving the same car, and, again, he

15  was drinking?

16    A.    Yes, sir.

17    Q.    Do you think on that occasion -- I mean, you've

18  seen people that were -- and I'll use drunk -- before,

19  inebriated, whatever you want to say, intoxicated.  Do you

20  believe he was intoxicated on that day?

21    A.    Yes, sir.

22    Q.    Okay.  This time you didn't know if he had more

23  beer in the car, because you basically didn't let him in.

24  You didn't spend as much time around him that time?

25    A.    Yes, sir.  He never went back to the car except to

112

1  leave.

2      Q.   And this is when he used that -- told you "I

3  really --" I'll say messed up.  We all know what he really

4  said.  "I killed her.  She pulled a gun on me.  I went to

5  take the gun, and I choked her."

6      A.   Yes, sir.

7      Q.   "I can't go back, she'll call the cops."

8      A.   Correct.

9      Q.   That didn't make any sense to you then, did it?

10     A.   No, sir.

11     Q.   Because if she was dead, she couldn't call the

12  cops?

13     A.   Exactly.

14     Q.   Okay.  At the time that he said this to you, did

15  you -- other than, you know, keep from coming in the house

16  and watching him -- telling him to leave and then watching

17  him leave, did you call the cops and tell them anything?

18     A.   No, sir, because there was too much in conflict of

19  interest, and I knew that they had had their scuffles before

20  or their arguments.

21     Q.   Okay.  So you just kind of wanted to stay out of

22  it?

23     A.   Yes, sir.

24     Q.   You didn't inform the police that he had said that

25  he had killed her, or you didn't inform them even, "Hey,

113

1  he's drunk and driving down the road"?

2      A.   No, sir.

3      Q.   You were doing what a lot of people in a family

4  would, is just basically kind of staying out of it.  Is that

5  safe for me to assume?

6      A.   Yes, sir.

7      Q.   When is the first time you told anybody with law

8  enforcement, whether it was the DA's Office or investigators

9  or policemen or anything?  When is the first time you ever

10 told anybody that Tracy Beatty had admitted to you killing

11 his mother after she had pulled the gun on him?

12     A.   It was approximately around the middle of December

13 when they called me.

14     Q.   Around the middle of December?

15     A.   Yes, sir.

16     Q.   And who did you tell that to?

17     A.   One of the investigators that called my workplace.

18     Q.   Do you know who that was?

19     A.   I can't recall if it was exactly Allen Beam or

20 not, but it was one of the investigators that was working

21 for the District Attorney.

22     Q.   Okay.  And that was December of what year?

23     A.   2003.

24     Q.   December of 2003?

25     A.   Yes, sir.

1      Q.   Okay.  And at the -- as far as this business about

2   pulling a gun on him, do you know -- I mean, I know it had

3   been a long time since you had seen your aunt.  Do you know

4   whether or not she even owned any guns?

5      A.   No, sir, I have no idea.

6      Q.   You don't know?

7      A.   No, sir.

8      Q.   Okay.  And when you say that, that you were

9   basically kind of staying out of it because they had had

10  their scuffles and arguments, are you referring to Tracy and

11  his mother, Carolyn?

12     A.   Yes, sir.

13     Q.   Mr. Clary, I appreciate you being down here, sir.

14          MR. PERKINS:  We pass the witness, Your

15  Honor.

16               REDIRECT EXAMINATION

17  BY MR. BINGHAM:

18     Q.   Mr. Clary, what type of scuffles were you aware

19  that they had had in the past?

20     A.   I just know that there had been loud arguments,

21  and I don't know if there was any physical activity or not.

22  I know that before earlier, back in, I guess, late '8os,

23  early '9os, there was -- that they had conflict of interest.

24     Q.   Okay.  And had you known Carolyn -- when you knew

25  her, did she live at that residence in Whitehouse?

115

1       A.   No, sir.

2       Q.   Okay.   That's been since -- where did she live

3   prior to 1995?

4       A.   I couldn't tell you, sir.

5       Q.   You had never been to her house?

6       A.   No, sir.

7       Q.   Now, the law enforcement that you spoke to, did

8   you ever speak to anyone from the Sheriff's Department that

9   you remember?

10      A.   Not that I can recall.   I may have.

11      Q.   Do you think it was the DA's Office that contacted

12  you first?

13      A.   Yes.

14      Q.   And -- Mr. Clary, I appreciate it.

15           MR. BINGHAM:   We don't have any further

16  questions for this witness.

17           THE COURT:   Mr. Perkins?

18           MR. PERKINS:   Can I have just a second,

19  Judge?

20           THE COURT:   Yes, sir.

21           MR. PERKINS:   I don't have any further

22  questions.

23           THE COURT:   Mr. Bingham?

24           MR. HARRISON:   Judge, we ask that he be

25  finally excused.

116

1          THE COURT:  Sergeant, thank you very much.

2    You may --

3          Mr. Perkins?

4          MR. PERKINS:  Judge, I would like for him to

5    be able to be allowed to go back to do whatever he's doing,

6    but leave him under the -- he's subpoenaed under the Rule of

7    Witnesses.

8          MR. BINGHAM:  May we approach on that?

9          THE COURT:  Yes.

10         (At the bench, on the record.)

11         MR. BINGHAM:  He's not going to be staying

12   because he has to fly to 23rd Psalms -- I didn't say that.

13   He has to fly to Iraq tomorrow, and he's going to be gone.

14   And I don't want the defendant to know that, and he was very

15   concerned about that because he does not want the defendant

16   to know he's alone and his wife is alone.  And that's why I

17   didn't bring that up.

18         MR. PERKINS:  Let me just talk to him real

19   quick.

20         (Mr. Perkins confers with the witness.)

21         (End of bench conference.)

22         MR. PERKINS:  That's fine, Judge.  He can

23   finally be excused.

24         THE COURT:  Sergeant, you are finally excused

25   as a witness in the case, which means you're released from

1   all the Court's instructions.  And being a finally excused

2   witness, you may go wherever you need to.  Thank you,

3   Sergeant.

4               THE WITNESS:  Yes, sir.

5               (The witness leaves the courtroom.)

6               THE COURT:  Who do you have next,

7   Mr. Bingham?

8               MR. BINGHAM:  Judge, we have Betty McCarty.

9               THE COURT:  Betty McCarty.

10              MR. BINGHAM:  And, Judge, while she's coming

11  in, may we approach?

12              THE COURT:  Yes.

13              (At the bench, on the record.)

14              MR. HARRISON:  Judge, this is one of the

15  witnesses that the victim made statements to.  I know

16  there's probably going to be hearsay objections.  I just

17  wanted to take it up, I guess, as a preliminary matter at

18  this point.

19              The Court's aware -- the Judge is aware that

20  the statements that we referred to in the pretrial about

21  having -- that she had a conversation with the victim on the

22  day of the murder about having told the defendant to leave

23  her house, to kick him out of her house.

24              Those are, I guess, the Defense's position,

25  that it's going to be hearsay statements under our position

118

1    that they're not admissible.

2                    THE COURT:  Okay.  We'll take about a

3    ten-minute recess.

4                    MR. HAWK:  That's fine.

5                    THE COURT:  I think it's about time, and we

6    can just do it outside the presence of the jury.  Whatever

7    else additional, you can put on outside the presence of the

8    jury.

9                    MR. HAWK:  That's fine.

10                   (End of bench conference.)

11                   THE COURT:  Carleton, up here.

12                   Ladies and Gentlemen, we're going to take

13   about a ten-minute recess.  It won't be any longer than

14   that, but just a short break.

15                   All rise for the jury.

16                   (The jury leaves the courtroom.)

17                   (Open court, defendant present, no jury.)

18                   THE COURT:  Okay.  Let's go back on the

19   record in Cause Number 241-0978-04, the State versus Tracy

20   Beatty.  State's counsel is present; defense counsel is

21   present; the defendant is present.

22                   Mr. Harrison, you indicated this next

23   witness -- what was the witness's name?

24                   MR. HARRISON:  Betty McCarty.

25                   THE COURT:  That Betty McCarty, this next

119

1   witness, was the witness who you had proffered the testimony

2   earlier to the Court in regard to her testifying something

3   to the effect that she was present and heard -- I believe

4   this was -- was this on the day of the murder?

5                    MR. HARRISON:  Yes, sir.

6                    THE COURT:  Heard the decreased, Carolyn

7   Click, make -- what was the statement you said?

8                    MR. HARRISON:  Judge, the --

9                    THE COURT:  Something to the effect that she

10  had to move out today or something like that.

11                   MR. HARRISON:  She had come over and told

12  Tracy, her son, to leave, that she was tired -- Carolyn

13  Click was telling Ms. McCarty that she was tired of his

14  attitude toward her and she had had enough, that she was

15  stressed out at that time.

16                   THE COURT:  All right.  Go ahead.

17                   I'll give Mr. Perkins -- I know he's already

18  responded to some degree when I lifted the motion, but go

19  ahead and state the basis, the legal basis, on which you

20  believe that testimony of Ms. McCarty -- is it --

21  admissible.

22                   MR. HARRISON:  McCarty.  And, Judge, there

23  are other statements that actually came from the victim,

24  Carolyn Click, to Betty McCarty, statements made by the

25  victim to Ms. McCarty that we would be going into.

120

1              THE COURT:  Okay.

2              MR. HARRISON:  Those statements would be --

3    they would include -- and I think the --

4              THE COURT:  Are these all on the same day, or

5    how far back are we going back here?

6              MR. HARRISON:  No.  These would not

7    necessarily be on the same day.  Some of them would have

8    been from mid-November up and through and including the

9    25th of November.

10             THE COURT:  Okay.  Go ahead.

11             MR. HARRISON:  For instance, in mid-November,

12   the victim had told Ms. McCarty that she had told the

13   defendant to get out.  That was one of the times that she

14   had kicked him out of her residence.

15             THE COURT:  All right.

16             MR. HARRISON:  She related that information

17   to Ms. McCarty.  She also related information on the 25th,

18   as we have indicated, that she had told the defendant that

19   morning to leave and that she was stressed out and tired and

20   fed up with what he had been doing.

21             She, the victim, Ms. Click, had told the --

22   Ms. McCarty that the defendant had beat her up on two

23   separate occasions.  Now, I don't have a time for when that

24   statement was relayed from the victim to Ms. McCarty, but

25   she did state that she had been beat up by the defendant on

1   two occasions.  The victim told Ms. McCarty that the

2   defendant and she argued all the time.

3                MR. PERKINS:  Maybe we should take these up

4   one at time and see if I have any objections, Judge.  I

5   didn't know there was going to be laundry list of them.

6                THE COURT:  Well, that's fine.

7                Go ahead.

8                MR. HARRISON:  And, really, I think the law

9   is going to be -- I don't know that there is going to be a

10  distinction based on time, but we can certainly take them up

11  individually.  I guess, we can start with the victim having

12  told Ms. McCarty that the defendant beat her up on two prior

13  occasions.

14                MR. PERKINS:  We object to that.

15                MR. HARRISON:  The reason we believe that

16  it's admissible would be threefold.  One, it goes to the --

17  under 803.3, the declarants existing -- then existing mind

18  of emotions, sensation, or physical condition.  And it's

19  irrelevant whether the declarant is available or unavailable

20  as a witness.

21                THE COURT:  Mr. Harrison, that this defendant

22  had beat her up on two separate occasions.  I believe you

23  said her position is the time frame doesn't make any

24  difference.  About when did you say that took place?

25                MR. HARRISON:  Judge, I'm not sure when that

122

1   statement was made to Ms. McCarty.

2            THE COURT:  Okay.  Go ahead.

3            MR. HARRISON:  The second reason that would

4   be admissible would be pursuant to 38.06 under the Code of

5   Criminal Procedure.  In prosecutions for murder, all

6   relevant facts and circumstances surrounding the killing and

7   the previous relationship existing between the accused and

8   the deceased, together with all relevant facts and

9   circumstances, go in to show the condition of the accused's

10  mind at the time of the offense are admissible.

11           There is case law in support of that.

12  Jaggers versus State, 125 SW 3d 661; Dorsey versus State,

13  117 SW 3d 332.  And specifically under those two exceptions,

14  we believe that that statement and that testimony would be

15  admissible and would be excepted from the Hearsay Rule.

16           THE COURT:  All right.  That's the statement

17  the defendant had beat her up on two separate occasions.

18           MR. HARRISON:  Yes, sir.

19           THE COURT:  All right.  Mr. Perkins, I know

20  you've already objected to it.  Do you have anything else

21  you want to add?

22           MR. PERKINS:  Yes, we would object to it as

23  being hearsay, as that's not an exception to the Hearsay

24  Rule.  38.36 does not provide an exception to the Hearsay

25  Rule.  There's no time frame to put this in any kind of

1   context.  You know, we don't know if these are the occasions

2   in 1985 or 1991 or if they're -- and we're just left to

3   conjecture just as the jury would be left to conjecture on

4   it.

5           The probative value of it is virtually zero.

6   The prejudicial value is enormous toward Mr. Beatty.  So it

7   denies us our right of confrontation.  So for all the

8   reasons previously stated into the record, we object.  We

9   don't feel like that that should be properly admitted before

10  the jury in this case.

11          THE COURT:  Anything further on that one,

12  Mr. Harrison?

13          MR. HARRISON:  Just that, additionally, it

14  goes to the proof of motive.  And although proof of motive

15  is not something specifically required as proof by the

16  State, it has always been held to be relevant pursuant to

17  Saldibar versus State, which is 980 SW 2d 475.

18          And that was a case in which it was held

19  admissible when the victim in a case -- in this case, Tejana

20  star, Selena, had told a witness she was going to fire the

21  appellant -- and it was held admissible, because her intent

22  to terminate the appellant's employment was relevant to show

23  the state of the relationship between the complainant and

24  the appellant at the time of the shooting and to establish a

25  motive for the shooting.

1          THE COURT:  All right.  The Court will, based

2     on the State's proffer -- based on the State's proffer, if

3     this is the testimony of the witness, as proffered by the

4     State, the Court will admit the testimony of the witness to

5     the effect that the defendant had beat her up on two

6     separate occasions under 803 and under 38.36.  And the Court

7     finds the testimony relevant, and the Court's -- the

8     testimony will be considered to show motive and that the

9     probative value outweighs any prejudicial values.

10          So let me correct -- probative value

11    outweighs any prejudice.  Further, the Court will admit the

12    statement of the witness, the defendant beat her up on two

13    separate occasions.

14          MR. PERKINS:  So the defendant's objections

15    to that is overruled?

16          THE COURT:  Yeah. I'm sorry, Mr. Perkins.

17    It's overruled.

18          Go ahead, Mr. Harrison.

19          MR. HARRISON:  Judge, the next statement

20    would be that the victim had told Ms. McCarty that the

21    victim and the defendant argued all the time, with the

22    defendant constantly yelling at her.  Under the same

23    provisions that I previously articulated, we believe that

24    that would be admissible.

25          MR. PERKINS:  I'm sorry.  What was the

125

1  proffer, Judge?

2                  MR. HARRISON:  That the victim had told

3  Ms. McCarty that the victim and the defendant argued all the

4  time, with the defendant yelling at her constantly.

5                  MR. PERKINS:  We don't object to that.

6                  THE COURT:  Okay.  That will be -- well, when

7  we get to it, if that is the testimony, then that will be

8  admitted based on the proffer with no objection.

9                  What else have you got, Mr. Harrison?

10                 MR. HARRISON:  The next statement would be

11 that in mid-November, the victim told Ms. McCarty that the

12 victim had told the defendant to get out of her house.  And

13 under the same reasons previously articulated, we believe

14 those would be admissible statements.

15                 MR. PERKINS:  Can I have just a second,

16 Judge?

17                 THE COURT:  That's on November the 25th then,

18 the day of the murder?

19                 MR. HARRISON:  No, sir.  That was

20 mid-November.

21                 THE COURT:  I'm sorry.  Mid-November.

22                 MR. HARRISON:  It's not dated specifically,

23 but it would have been early to mid-November.

24                 THE COURT:  All right.  That's the first one

25 that you started with, mid-November?

126

1          MR. HARRISON:  Correct.

2          THE COURT:  That Ms. McCarty, in your

3  proffer, had said that the victim had told the defendant to

4  get out of her house?

5          MR. HARRISON:  Yes, sir.

6          So the record is clear and not muddled, there

7  were two separate occasions on two separate time frames

8  where the victim had told Ms. McCarty she had told the

9  defendant to get out of her house.  This would be the first

10  to get out of the house.

11          THE COURT:  The mid-November and then on the

12  date of the offense?

13          MR. HARRISON:  Correct.

14          MR. PERKINS:  We object to those under the

15  grounds previously stated, Judge, that it's hearsay, that

16  it's irrelevant, that the prejudicial effect outweighs any

17  probative value.

18          THE COURT:  All right.  The Court will find

19  those two -- the statements are basically the same; is that

20  correct, Mr. Harrison?

21          MR. HARRISON:  Referencing those two separate

22  times, yes, the statements are essentially the same.

23          THE COURT:  All right.  The statements to the

24  effect in mid-November that the witness has proffered to

25  testify to, that the victim told the defendant to get out of

127

1    the house.  And then on November the 25th, the proffer that

2    the victim told the defendant to get out of the house.

3              Is that again the same statement, okay.

4    Mr. Harrison.

5              MR. HARRISON:  Yes, sir.

6              THE COURT:  The Court will find -- the Court

7    finds those statements relative -- I'm sorry -- the Court

8    finds those statements relative and admissible under 803.3,

9    38.36, and that the probative value outweighs the

10   prejudicial value -- the prejudice -- the probative value

11   outweighs the prejudice.  The motion (sic) is overruled on

12   those two, also, Mr. Perkins.

13             Is that it?

14             MR. HARRISON:  Judge, there is one more

15   that -- and, again, because there are two, I wanted to be

16   specific.  This would be the mid-November time when the

17   victim had related to Ms. McCarty that the victim had kicked

18   out the defendant -- kicked him out of her house.

19             THE COURT:  Okay.  Well, that --

20             MR. HARRISON:  At that same, she told -- the

21   victim told Ms. McCarty that the victim had called his

22   parole officer and relayed that she had kicked him out of

23   her house and was no longer living there and that that

24   should be used for whatever purpose the parole officer

25   thought it should be used for.

128

1          And I want to expand on the reason why we

2    believe that that would be admissible.

3          THE COURT:  Okay.  As I understood, he

4    first -- to get out of her house, is that -- is the

5    statement in mid-November, get out of her house, or she

6    kicked him out of her house?

7          MR. HARRISON:  Well, that she had kicked him

8    out and told him to leave the house.

9          THE COURT:  Okay.  Kicked him out and told

10   him to leave the house in mid-November.

11         All right.  My ruling is the same on that.

12         And on the day of the offense, is the

13   statement she told him to get out of the house, or she

14   kicked him out of the house?

15         MR. HARRISON:  She had told Tracy, her son,

16   to leave -- what's in her written statement is she had told

17   Tracy, her son, to leave.  She said she was tired of his

18   attitude toward her, and she had had enough, and she was

19   stressed at this time.

20         THE COURT:  Okay.  That's my ruling is what I

21   stated on that, that one on the 25th of November, the date

22   of the offense, that it's relevant and admissible under

23   803.3 and 38.36.  It goes to motive and probative -- the

24   probative value outweighs the prejudice.

25         So Mr. Perkins' objection on that one is

129

1   overruled.

2              Now, go to this other one about the parole

3   officer.

4              MR. HARRISON:  Judge, I'm going to withdraw

5   that request.

6              THE COURT:  Okay.  So there is not going to

7   be any reference to the parole officer?

8              MR. HARRISON:  No, and I've told her, and

9   I'll tell her again before she takes the stand, not to

10  mention anything about the parole officer or felony

11  convictions, incarcerations.

12             THE COURT:  Be sure and do that.

13             All right.  Are we ready for the jury then?

14             MR. HARRISON:  If I could just tell her.

15             MR. PERKINS:  Judge, if the Court will allow

16  me, rather than having to make these objections --

17             THE COURT:  Yes, I will.

18             MR. PERKINS:  -- in the presence of the jury,

19  to incorporate my objections to any statement that was

20  allegedly said to Betty McCarty by Carolyn Click,

21  incorporate the same objections, that being hearsay, being

22  irrelevant, and being more prejudicial than probative, if

23  the Court would allow me to incorporate those objections now

24  rather than have to make them in the presence of the jury.

25             THE COURT:  Mr. Perkins, I will unless it

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

130

1   goes outside what the proffer is.  I mean, I --

2            MR. PERKINS:  If it goes outside the proffer,

3   I'm going to have a different objection that I'll make.

4            THE COURT:  Well, I'm ruling on what the

5   proffer is that's been made to me.  My ruling has been on

6   what proffer Mr. Harrison has made to me.

7            Now, if I -- you know, if there's some

8   response outside the proffer, Mr. Harrison, that may be a

9   problem.  You understand?  In other words, because I'm

10  ruling on what you stated the proffer is.

11           MR. HARRISON:  And, Judge, I've given all the

12  statements that came from the victim that Ms. McCarty has

13  told me about.

14           THE COURT:  Okay.

15           MR. HARRISON:  So those are the only ones

16  that I'm going to be asking her about.

17           THE COURT:  Okay.  Now, are those the

18  statements that the Defense has?

19           MR. HARRISON:  Judge, the only one that's

20  actually in her written statement is the one about the one

21  about the kicking him out on November 25th.

22           THE COURT:  Okay.  Well, did you like prepare

23  something, like put it on paper that they have, or is this

24  what they're getting right now?

25           MR. HARRISON:  The one from the 25th is in

131

1  her written statement --

2           THE COURT:  Okay.

3           MR. HARRISON:  -- that has been previously

4  turned over to the Defense.

5           THE COURT:  All right.  The others you've

6  just proffered they're getting them now?

7           MR. HARRISON:  Well, they're getting them

8  through our proffer.

9           THE COURT:  That's what I mean.

10          MR. HARRISON:  Yes.  Yes, that's correct.

11 They're not in written statements.

12          THE COURT:  Okay.

13          MR. HARRISON:  They were just...

14          THE COURT:  Okay.  I just want you to be sure

15 and state on that proffer in terms of what she's going to be

16 asked or --

17          MR. HARRISON:  Yes, sir.  That is what I

18 intend to ask her, and those are the responses that she has

19 given me during my interview with her prior to today.

20          THE COURT:  Okay.

21          (Off-the-record discussion.)

22          THE COURT:  Carleton, would you go get the

23 jury?

24          (The jury enters the courtroom at 11:20 a.m.)

25          (Open court, defendant and jury present.)

132

1          THE COURT:  Be seated, please.

2          Carleton?

3          THE BAILIFF:  Yes, sir.

4          THE COURT:  This is on the record.

5          (At the bench, on the record.)

6          THE COURT:  Anything she had -- we need to be

7  sure that she is not tape-recording anything taking place in

8  court.  That's probably just something she's got for

9  interviews.

10          THE BAILIFF:  Kristen had spoke with her and

11  said that she had gave her something for you to sign.

12          THE COURT:  Okay.  Just be sure that --

13          THE BAILIFF:  She assured me that she was

14  doing nothing but rewinding the tape up to this point.

15          (End of bench conference.)

16          THE COURT:  All right, Mr. Harrison.

17          MR. HARRISON:  Judge, we would call Betty

18  McCarty.

19          THE COURT:  Betty McCarty.

20          (The witness enters the courtroom.)

21          THE COURT:  Ms. McCarty?  Yes, ma'am.  Just

22  come on down here, please.  Come right on around to the end

23  chair here where the microphone is.

24          You were just sworn earlier this morning as a

25  witness, correct?

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

133

1           THE WITNESS:  Yes, sir.

2           THE COURT:  All right, ma'am.  Just have a

3  seat right there.  And you can pull the chair up a little

4  bit towards the microphone, if you would.

5           THE WITNESS:  (Complies.)

6           THE COURT:  There you go.  Thank you, ma'am.

7           Just a second.

8           MR. HARRISON:  May I proceed?

9           THE COURT:  Yes.

10                   BETTY MCCARTY,

11 having been first duly sworn, testified as follows:

12                 DIRECT EXAMINATION

13 BY MR. HARRISON:

14    Q    Ms. McCarty, would you state your name and

15 introduce yourself, where you live for the jury?

16    A    Okay.  I'm Betty McCarty.  I live in Whitehouse,

17 Texas.

18    Q    And how long -- where do you live, first of all,

19 in Whitehouse?

20    A    On County Road 2323.

21    Q    Is that in Smith County, Texas?

22    A    Yes, sir.

23    Q    How long have you lived at that residence?

24    A    Eleven years.

25    Q    And what type of residence is that?

134

1        A      It's a mobile home.

2        Q      Can you describe kind of that -- the general area?

3   What's out there in your area?

4        A      Are you talking about the roadways or --

5        Q      Well, are there other mobile homes?  Are there --

6        A      Yes.  It's -- on 2323 there, it is -- it's not

7   like a mobile home park, but it's big lots, and it's all --

8   all the whole street.  It's a dead-end street, and it has --

9   it's just mobile homes.

10       Q      Okay.  So each mobile home would then have land

11  that the mobile home sits on?

12       A      Yes, uh-huh.

13       Q      All right.  And the land, I guess, would belong to

14  each individual lot owner --

15       A      Yes.

16       Q      -- or mobile home owner?

17       A      Yes, sir.

18       Q      All right.  You've lived out there for about the

19  last 11 years.

20       A      Yes.

21       Q      Let me ask you, are you familiar with an

22  individual by the name of Carolyn Ruth Click?

23       A      Yes, sir.

24       Q      How did you know Carolyn Click?

25       A      I met her about 11 years ago when she moved her

1   mobile home next door to us there.

2       Q    So she was one -- Carolyn Click was one of your

3   neighbors?

4       A    Yes, sir.

5       Q    Did she live in a mobile home?

6       A    Yes, sir.

7       Q    Did she have a lot or property upon which her

8   mobile home sat?

9       A    Yes, sir.

10      Q    You indicated she had moved there about 11 years

11  ago?

12      A    Uh-huh.

13      Q    All right.  Is that an estimate?

14      A    Estimate, uh-huh.

15      Q    All right.  Could you describe your relationship,

16  as far as whether you were social, whether you were

17  friendly, what kind of relationship you had with Carolyn

18  Click?

19      A    Well, we had become very close.  It wasn't a day

20  that I didn't see her or talk to her.  And we -- we were

21  good buddies, talked over everything and visited and saw one

22  another through, you know, hard times and everything.  But

23  we were very close.

24      Q    Is your residence within eye shot of her

25  residence?

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

136

1      A    Yes, sir.

2      Q    Can you describe kind of the layout between your

3  home to her home, kind of how far they were apart, anything

4  in between them?

5      A    Well, like the -- her --

6      Q    Let me ask you this:  Would it help you to be able

7  to draw kind of the layout of the houses around you?

8      A    Yeah, 'cause --

9      Q    Could you do that?

10     A    Yes.

11              MR. HARRISON:  Judge, may I approach the

12  board?

13              THE COURT:  Yes.

14              MR. HARRISON:  And may the witness step down?

15              THE COURT:  She may.  And, Mr. Harrison, if

16  you're going to be questioning her while she is at the

17  diagram or having her explain it -- ma'am, if you're being

18  asked questions and you're over there at the diagram, would

19  you try to turn towards the jury so they can hear you

20  'cause -- and then keep your voice up, would you, please --

21              THE WITNESS:  Yes, sir.

22              THE COURT:  -- so we can get everything down.

23              MR. HARRISON:  Judge, actually, I'm going to

24  wait until we get a pad.  There's only the board right now.

25  Mr Bingham is going to get a pad.  I can move on to

137

1    something else.

2                    THE COURT:  Okay.

3                    MR. HARRISON:  May I continue to approach?

4                    THE COURT:  Yes.  I'm sorry, Mr. Harrison.

5    Go ahead.

6        Q    (By Mr. Harrison) Let me show you some

7    photographs, Ms. McCarty, starting with State's Exhibit

8    Number 4.  I want to just ask if you, first of all,

9    recognize what it is.

10       A    That's the back of Ms. Click's mobile home.

11       Q    Okay.  Does this fairly and accurately depict how

12   the back of her mobile home appeared?

13       A    Yes, sir.

14       Q    All right.  Now, you started to call her a

15   different name than Carolyn Click.  What was that name?

16       A    Callie.

17       Q    Do you know her as Callie?

18       A    Yes, sir.

19       Q    Is that the same individual -- if you refer to her

20   as Callie, are you referring to Carolyn Click?

21       A    Yes, sir.

22       Q    Let me show you State's Exhibit Number 5.

23       A    Yes, sir.  That's the end of the mobile home.

24       Q    And, again, does it fairly depict the mobile home

25   of Carolyn Click?

138

1    A    Yes, sir.

2    Q    Show you State's Exhibit Number 6.  Can you

3 identify what that is?

4    A    Yes.  It is the -- it's the gate that divides hers

5 from another next-door neighbor.

6    Q    Does it fairly -- basically, what I want to know,

7 do these photographs fairly depict what they purport to,

8 that being the home of Carolyn Click?

9    A    Yes, sir.

10   Q    All right.  Looking at State's Exhibit Number 7,

11 do you recognize that?

12   A    Yes, sir.

13   Q    And does it fairly depict the land and part of the

14 home of Carolyn Click?

15   A    (Nods head affirmatively.)

16   Q    I'm sorry.  You need to answer out.

17   A    Yes, sir.

18   Q    State's Exhibit Number 8, do you recognize that?

19   A    Yes, sir.

20   Q    And does it fairly depict the portion of the

21 backyard of Carolyn Click's house?

22   A    Yes, sir.

23   Q    State's Exhibit Number 9, can you identify that?

24   A    I can identify the area.

25   Q    Okay.  And is this area part of the land owned by

139

1    Carolyn Click?

2         A    Yes, sir.

3         Q    And does it accurately portray that?

4         A    Yes, sir.

5         Q    Looking at State's Exhibit Number 10, can you

6    identify what that is?

7         A    Yes, sir.  That's the front of her mobile home and

8    her yard.

9         Q    Does if fairly depict the front of her home and

10   yard?

11        A    Yes, sir.

12        Q    State's Exhibit Number 11, the different angle, is

13   it the home of Carolyn Click?

14        A    Yes, sir.

15        Q    And does it fairly and accurately depict the home

16   as it appeared in November of 2003?

17        A    Yes, sir.

18        Q    State's Exhibit Number 12, can you identify that?

19        A    That's the back of her mobile home.

20        Q    And "her," you mean Carolyn Click?

21        A    Carolyn.  Callie.  Excuse me.

22        Q    All right.  Callie and Carolyn Click?

23        A    Yes.

24        Q    Does it fairly and accurately depict the back of

25   her mobile home?

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

140

```
 1       A    Yes, sir.

 2       Q    State's Exhibit Number 13?

 3       A    Yes, sir.

 4       Q    What is this?

 5       A    That's farther on in the backyard.

 6       Q    Okay.  Of Carolyn Click?

 7       A    Uh-huh.

 8       Q    And is this, again, the property owned by Carolyn

 9  Click?

10       A    Yes, sir.

11       Q    State's Exhibit Number 14, can you identify that?

12       A    Yes, sir.

13       Q    And what is that?

14       A    It's the far backyard of Callie's.

15       Q    Okay.  Looking at State's Exhibit Number 15, can

16  you identify this?

17       A    Yes, sir.  That's closer to our backyard.

18  Ms. Click's yard connects with mine.

19       Q    Okay.  Looking at State's Exhibit Number 16, can

20  you identify that?

21       A    Yes, sir.

22       Q    And what is this?

23       A    That's the far backyard of Ms. Click's.

24       Q    And State's Exhibit Number 17, can you identify

25  that?
```

141

1    A    Yes, sir.  That's directly behind that second

2  trailer that's in her backyard.

3    Q    Is this on the property owned by Carolyn Click?

4    A    Yes, sir.

5         MR. HARRISON:  Judge, at this time, having

6  shown to defense counsel State's Exhibits 4 through and

7  including State's Exhibit Number 17, we would offer 4

8  through 17.

9         MR. PERKINS:  No objection to any of those.

10         THE COURT:  All right.  State's Exhibit

11  Number 4 through 17 are admitted with no objection.

12         MR. HARRISON:  And, Judge, may I set up the

13  tripod?

14         THE COURT:  Sure.

15         MR. HARRISON:  And may the witness step

16  around?

17         THE COURT:  She may.

18         Mr. Harrison, she may -- can you get through

19  there, Ms. McCarty?

20    Q    (By Mr. Harrison) Now, I'll mark this for

21  identification purposes as State's Exhibit 19.  If you

22  could, could you just kind of just roughly draw the homes

23  around you and Carolyn Click's home and kind of how they're

24  laid out?

25    A    Okay.  Do you want more than mine and hers -- mine

142

1    and Ms. Click's?

2        Q    Any of them that are in the immediate area, yes,

3    ma'am.

4        A    (Complies.)

5                MR. PERKINS:   Judge, may I move around so I

6    can see?

7                THE COURT:   Sure.

8        A    This would be the mobile home on the right side of

9    Ms. Click's mobile home (indicating).

10       Q    (By Mr. Harrison) Do you know who owned this

11   mobile home?

12       A    I can't remember his last name.   This would be

13   Ms. Click's mobile home.

14       Q    Go ahead and put "C.C." for Carolyn Click, if you

15   would --

16       A    Okay.  (Complies.)   And then this would be the

17   trailer that I live in (indicating).

18       Q    Okay.  Go ahead and put your initials there, if

19   you would.

20       A    (Complies.)

21       Q    Be "B.C." for Betty McCarty?

22       A    Yes, sir.   This on to the -- on to the left is a

23   vacant lot (indicating).

24       Q    And then I guess put "V" for "vacant."

25       A    (Complies.)

143

1    Q    Or go ahead and put "V-A-C."

2    A    (Complies.)  On down is an empty small mobile home

3    that they're going to put a craft shop in, but it's

4    unoccupied.

5    Q    If it's empty, go ahead and just label it empty, I

6    guess.

7    A    (Complies.)  Now, on the other side, I don't know

8    the people's names, but there are one, two, three, four,

9    five -- about five more mobile homes as you turn onto the

10   street.

11   Q    If you're talking about from Carolyn Click's home,

12   you're talking about to the -- what would be to the -- if

13   you're looking at --

14   A    If you're looking at it to my right.

15   Q    To your right?

16   A    Uh-huh.

17   Q    Okay.

18   A    About six more.

19   Q    So they extend on this way (indicating)?

20   A    Uh-huh.

21   Q    All right.  Are there any across the street from

22   Ms. Click's on either side?

23   A    Yes, sir.  There's -- there's one going from

24   ours -- let's see.  And I do not know these people's names,

25   but there's one directly across from our trailer.  There's

144

1   one directly across from Carolyn -- Callie's here

2   (indicating).

3        Q    Do you know who lives there, the one directly

4   across from Ms. Click's?

5        A    First name is -- I can't think --

6        Q    That's all right.

7        A    I can't think of her name.

8        Q    And --

9        A    And then this one (indicating) belongs to

10  Ms. Wilkerson.

11       Q    Lieanna Wilkerson?  Is it Lieanna Wilkerson?

12       A    Uh-huh.

13       Q    Go ahead and label with an "L-W."

14       A    (Complies.)

15       Q    Now, you put that across from your mobile home?

16       A    Uh-huh.  I still can't remember her name.

17       Q    Do you know a Twyla Johnson?

18       A    That's her.

19       Q    Okay.  Where you've marked "T-J," is that where

20  Twyla Johnson lives?

21       A    Uh-huh.

22       Q    That's fine.  Now, is there a mobile home here

23  where you've started making one and stopped (indicating)?

24       A    I'm trying to figure if I'm going the right way.

25  Next to -- I'm looking at it like I'm -- that's right.

145

1   That's right.   There is another mobile home.   In other

2   words, there's mobile homes across the street all the way.

3        Q    So, essentially, you have people who live across

4   the street from one another?

5        A    Uh-huh.

6        Q    Do each of these mobile homes you've identified

7   have lots that are with those mobile homes?

8        A    Yes, sir.

9        Q    Thank you, ma'am.   You can go ahead and make it

10  around.

11              THE COURT:   Is that 18 up there,

12  Mr. Harrison?

13              MR. HARRISON:   That's 19.

14       Q    (By Mr. Harrison) Now, Ms. McCarty, can you still

15  see what I've marked as State's Exhibit 18?   You can still

16  see it from where you are?

17       A    Yes, sir.

18       Q    All right.   I'm sorry.   Number 19.

19              THE COURT:   All right.

20       Q    (By Mr. Harrison) You can see what I've marked as

21  State's Exhibit Number 19.   Now, across the street, directly

22  across from Carolyn Click's house, is Twyla Johnson's house?

23       A    Uh-huh.

24       Q    Kind of catercornered across the street would be

25  Lieanna Wilkerson's house?

146

1       A    Yes, sir.

2       Q    And you are an immediate next door neighbor of
3  Carolyn Click?

4       A    Yes, sir.

5       Q    What is separating your mobile home from Carolyn
6  Click's mobile home?

7       A    There's a fence.  Her front yard is completely
8  enclosed in a fence.  And then ours has a fence going down,
9  and there's like a driveway in between our fence and her
10 mobile home.

11      Q    What type of fence; is it a Cyclone fence or wood
12 fence?

13      A    Around her house is a Cyclone fence, and ours is
14 just a regular wire fence going up our side.

15      Q    Now, you indicated that Ms. Click had lived next
16 door to you for about 11 years or so?

17      A    Yes, sir.

18      Q    From the time she moved in 11 years before, did
19 she move in with somebody?  Did she live with someone, or
20 was she the sole occupant of that mobile home?

21      A    In this mobile home?

22      Q    Yes, ma'am.

23      A    She was the sole occupant.

24      Q    All right.  So she actually moved in by herself
25 and lived by herself?

147

1      A    Yes, sir.

2                  MR. HARRISON:  May I approach again, Your

3    Honor?

4                  THE COURT:  Yes.

5      Q    (By Mr. Harrison) Now, these have already been

6    offered into evidence.  What I want to do is I want to show

7    you State's Exhibit Number 4.  What is this a photograph of?

8      A    This is the back of her mobile home.  The back

9    door opens into -- opens into the hall that has the

10   bathroom, and this is a back bedroom (indicating).

11     Q    So this would be the back door (indicating) to her

12   mobile home?

13     A    Yes, sir.

14     Q    Whose fence is this (indicating)?

15     A    That belongs to -- it's a Spanish gentleman, and I

16   can't remember his name.

17     Q    Is that to the other side of Ms. Click than you

18   are?

19     A    Yes, sir.

20     Q    So that would be that one that's unlabeled next to

21   Carolyn Click?

22     A    Yes, sir.

23     Q    All right.  Looking at State's Exhibit Number 5,

24   is this the same area, same fence?

25     A    Yes, sir.  That's the wooden fence that's next to

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

148

1   the other side of her than us.

2       Q       And closer up here (indicating), you can see the

3   grills that are here and the garden hose that's kind of

4   coiled up?

5       A       Yes, sir.

6       Q       Was this, I guess, the corner of the backyard of

7   Carolyn Click?

8       A       Yes, sir.

9       Q       All right.  And I guess this little fence right

10  here (indicating) that's shorter than the side fence, that

11  would lead out to the front or the side of the mobile home

12  into the front yard?

13      A       Into the front yard.

14      Q       Okay.  State's Exhibit Number 6 would just be a

15  close-up of that area that we just talked about?

16      A       Yes, sir.

17      Q       And you can see these, I guess, wooden posts or

18  beams that are here in this back corner?

19      A       Yes, sir.

20      Q       Laying on the ground?

21      A       Yes.

22      Q       Looking at State's Exhibit Number 7, I guess this

23  would be the same area we've been talking about from a

24  different view?

25      A       Yes, sir, it's the same area.

149

1    Q    Now, looking out, you see a mobile home directly

2    across from Carolyn Click's house.  Would that be the mobile

3    home of Twyla Johnson?

4    A    I believe that's Twyla's, yes.

5    Q    So it would be pretty much directly across from

6    Ms. Click's house.

7    A    Yes, sir.

8    Q    And, again, you can see, short of this side fence,

9    the barbeque equipment and these beams or posts that are

10   laying on the ground scattered?

11   A    Yes, sir.

12   Q    State's Exhibit Number 8, would that be a close-up

13   view of the beams and posts still in that same back corner

14   of Ms. Click's house?

15   A    Yes, sir.

16   Q    Can you see on top of these boards and then around

17   the ground -- can you see that gray stuff?

18   A    Yes, sir.

19   Q    I don't imagine you know what that is, do you?

20   A    No, sir.

21   Q    All right.  State Exhibit 9 would be another

22   close-up of the view of those posts and the wood that's in

23   that back corner of Ms. Click's house?

24   A    I'm not familiar with the wood part.  The fence

25   over on the right I recognize.

150

1     Q    And this would be the same general area that we've

2  been talking about with regard to State's Exhibits 6, 7, 8

3  true?

4     A    Yes, sir.

5     Q    You can see the wood boards and part of the grill

6  and part of the curled-up hose?

7     A    Yes, sir.

8     Q    Looking at State's Exhibit Number 10, what does

9  this depict?

10    A    This is -- the side of our mobile home is on this

11 side of the fence here.

12    Q    On the right-hand side?

13    A    Uh-huh.  We're to the left of -- this end of the

14 mobile home is ours.

15    Q    Let me ask you this:  Whose mobile home is this in

16 the middle of the picture?

17    A    That's Callie's.

18    Q    Okay.  Carolyn Click?

19    A    Yes, sir.

20    Q    This yard, I guess if you're looking at the

21 photograph on the left-hand side of the fence, would that be

22 her yard?

23    A    Yes, sir.

24    Q    What is this fence?  This metal fence, what does

25 it separate?

151

1      A      It separates -- it goes all the way around the

2    lot.  It separates her yard from the driveway between us.

3      Q      Okay.  So you would be the next door neighbor here

4    looking at the photograph on the right-hand side to the

5    right of her mobile home?

6      A      Yes, sir.

7      Q      So you actually -- I mean, there's nothing really

8    blocking your view of her mobile home.  There's no wooden

9    fence separating your view?

10     A      No, sir.

11     Q      Was it fairly easy to kind of keep tabs on

12   Ms. Click?

13     A      Yeah.  Yes, sir.

14     Q      Would you consider yourself, you and Ms. Click to

15   be good neighbors, people who would keep tabs on each other?

16     A      Very much so.

17     Q      I don't mean that in a negative way.

18     A      Yeah, very much so.

19     Q      Y'all cared for each other?

20     A      Yes, sir.

21     Q      State's Exhibit Number 11, is this Ms. Click's

22   mobile home?

23     A      Yes, sir.

24     Q      What is this fence here (indicating) in the front

25   of the photograph?

152

1     A     That's a continuation of the fence that's on the

2  side that goes around the front of the lot and up the side,

3  also, there where they connect.

4     Q     Did you say this (indicating) was the front or the

5  back of her mobile home?

6     A     That's the front.

7     Q     All right.  Looking at State's Exhibit Number 12,

8  whose mobile home is this?

9     A     It's Ms. Click's, and it's the back of the mobile

10  home, backyard.

11     Q     This would be the back door (indicating)?

12     A     Yes, sir.

13     Q     And it just shows around to the left of the mobile

14  home?

15     A     Beg your pardon?

16     Q     It goes on to show around to the left of the

17  mobile home?

18     A     Yes.

19     Q     What is shown in State's Exhibit Number 13?

20     A     This is where another fence separates her main

21  yard from a backyard.  That's where she kept two of her

22  dogs, back in there, but it was fenced in.  It's all fenced

23  in.  And this is the little store room mobile home she had,

24  and, of course, her swing set.

25     Q     All of this land or property, it goes with the

153

1   mobile home that belongs to Carolyn Click?

2       A    Yes, sir.

3       Q    Looking at State's Exhibit 14, what does this

4   show?

5       A    Okay.  This goes into the backyard where she kept

6   her dogs, and it's divided by a fence behind this storage

7   building here (indicating).  It was a big wooded area, and

8   she kept her dogs out there.

9       Q    Is this part of Carolyn Click's property, also?

10      A    Yes, sir.

11      Q    Part of her lot?

12      A    Yes, sir.

13      Q    How many dogs did Ms. Click have?

14      A    Let's see.  One, two, three (counting) -- five.

15      Q    Looking at State's Exhibit Number 15, what does

16  this show?

17      A    This is that backyard again where the dogs were

18  kept.  And this is real close to our fence, this area of it

19  is (indicating).

20      Q    Whose property is this that's shown in the

21  majority of the photographs?

22      A    That's Ms. Click's property.

23      Q    And the same thing with State's Exhibit Number 16,

24  is that Ms. Click's property, also?

25      A    Yes, sir.

154

1       Q     Now, you can kind of see this area right here in

2   the middle photograph that I've circled with my finger.   Do

3   you know what that is by any chance?

4       A     There was a burn pile out there.

5       Q     All right.   Burn pile, was that on Ms. Click's

6   property?

7       A     Yes, sir.

8       Q     All right.   And kind of a closer-up, State's

9   Exhibit Number 17, is this -- what I'm circling, is that the

10  burn pile that you're talking about?

11      A     The burn pile.

12            MR. HARRISON:   Judge, at this time, I would

13  go ahead and offer what's been marked State's Exhibit

14  Number 19, the drawing Ms. McCarty drew, or the sketch.

15            MR. PERKINS:   If I could just ask a couple of

16  questions of the witness on voir dire just to make sure that

17  I don't have any objections to it.

18            THE COURT:   Go ahead.

19            MR. PERKINS:   Can I approach the board, Your

20  Honor?

21                  VOIR DIRE EXAMINATION

22  BY MR. PERKINS:

23      Q     Ms. McCarty, my name is Robert Perkins.   I don't

24  think we've ever talked before, have we?

25      A     No, sir.

1      Q    I just have a couple of questions.  I'm a little

2   bit mixed up here, which happens from time to time with me.

3           I want to show you what the State has marked

4   as State's Exhibit Number 5.  Do you remember seeing that?

5   This fence, this is the back of Carolyn Click's mobile home

6   (indicating)?

7      A    Yes, sir.

8      Q    And this fence that runs beside it is between her

9   mobile home --

10     A    I can't see.

11     Q    I'm sorry.  I'm trying to get where everybody can

12  see, and I can't do it.

13     A    Now, what were you asking me?

14     Q    This is the back of Carolyn Click's mobile home

15  (indicating)?

16     A    Yes, sir.

17     Q    And this fence right here (indicating --

18     A    Yes, sir.

19     Q    -- divides her from the Hispanic man that lives in

20  the one next to it?

21     A    Yes, sir.

22     Q    And we're looking at the back of her house, right?

23  Is that right?

24     A    This (indicating)?

25     Q    That's the back of the house?

1      A    Yes, sir.

2      Q    Can you see 19 from where you're sitting, ma'am?

3  I'll try to turn it a little bit so you can, if I can.

4           If I'm looking at this right, I'm going to

5  put my finger up here.  I didn't bring anything to write

6  with.  I'm going to put a little "X" right here

7  (indicating).  Is this the front where I put that "X"?  Is

8  this the front of her house (indicating)?

9      A    Well, that -- yeah, that would be.  Since I put

10 the other people across the street, that would be the front

11 of Ms. Click's.

12     Q    The street goes through here right (indicating)?

13     A    Yes, sir.

14     Q    If we're looking at the back of her house --

15     A    Yes, sir.

16     Q    -- this would be the back corner, right

17 (indicating)?

18     A    Yes, sir.

19     Q    The back corner of her house?

20     A    Uh-huh.  Yes, sir.

21     Q    And say you live right here (indicating)?

22     A    Yes, sir.

23     Q    Wouldn't you be on this side of her, if I'm

24 looking at this right, and I may be completely wrong.

25     A    Excuse me.  This end of the house is -- facing me,

1   is to the right.  The end of her house is to the right, if

2   you're looking at the front of the house.  If you're looking

3   at the front of our houses and you're standing out there --

4        Q    Yes, ma'am.

5        A    Okay.

6        Q    ·If you were looking at her house, straight in

7   front of you, would your house be on the -- if you were

8   standing out in front of her house and you were looking at

9   her trailer house, would your house be to the right of hers

10  or to the left of hers?

11       A    It would be to the right.

12       Q    So actually, this is all reversed, right?  You

13  should be over here (indicating); isn't that right?  You

14  should be over here (indicating), and this fence that we're

15  talking about is right there?

16       A    No, sir.  No, sir.

17       Q    If you were standing out in the street in front of

18  her house looking at her house.  Take your time.  I mean,

19  that's fine.  I just want to make sure I've got it right.

20            THE WITNESS:  May I stand up?

21            THE COURT:  Yes, ma'am.

22       A    If you're looking at our mobile home --

23       Q    (By Mr. Perkins) Yes, ma'am.

24       A    -- this is ours.  The front of the house is facing

25  me.

1   Q   Yes, ma'am.

2   A   Okay.  So I am to -- I'm over here on this side

3   (indicating).

4   Q   Okay.  So if you were looking at the front of her

5   house, your house would be on the right-hand side?

6   A   If I was turned looking at the backyard, it would

7   be on my right.  But I am to the left going down the street.

8   Do you understand what I'm saying?

9   Q   No, ma'am.  I'm sorry.

10  A   Let me show you.

11  Q   Sure.  Just pretend like you were standing out

12  here in the street in front of the Carolyn Click's mobile

13  home.  I'll get this over there closer to you so you don't

14  have to climb that.

15          If you were standing -- we'll make this line

16  that I drew right here, we'll make it the street, okay?

17  A   Okay.

18  Q   Just say you were standing in the street looking

19  at Carolyn Click's mobile home.  Would your mobile home, it

20  would be on the right-hand side, wouldn't it?  If you were

21  looking at the front of her mobile home, wouldn't your house

22  be on the right-hand side, ma'am?

23  A   That's just what I said.

24  Q   Okay.

25  A   If I'm looking at the front of her house --

159

1    Q    Yes, ma'am.

2    A    I'm over to the right, if I'm standing facing it.

3    Q    So this would be your trailer house here then

4    (indicating)?

5    A    Why am I not looking to the right?

6    Q    Wouldn't this be the back of the mobile homes?

7    A    No, sir, not if I'm looking -- I'm standing out in

8    front of the house.  I'm looking at the front.  If I'm

9    standing at the back of the house, I'm still going to be

10   on -- you go down -- you turn off this street and go down

11   the street, you get midways, Ms. Click is here (indicating).

12   There's a driveway between us, and I am here, and that's

13   looking this way (indicating)?

14   Q    Can you just draw like right down street or

15   something so we'll be clear how all of this sets up.

16   A    (Complies.)

17   Q    So if you were standing in the street and you were

18   looking at Carolyn Click's house --

19   A    At the front.

20   Q    Can you put "C-C" on there?

21   A    (Complies.)  This is the front I'm looking at

22   (indicating).

23   Q    Yes, ma'am.  You can write "front" on there if

24   you'd like.

25   A    (Complies.)

160

1      Q      And then can you put your "B-M-C"?

2      A      (Complies.)

3      Q      So if this was the street -- if this was the

4   street right here (indicating) --

5                   THE COURT:  Mr. Perkins --

6      Q      (By Mr. Perkins) -- and you were standing out in

7   the middle of the street --

8                   THE COURT:  You've got some jurors who's

9   going to have a hard time seeing what you're doing.

10                  MR. PERKINS:  I'm sorry, Judge.

11                  THE COURT:  I know -- do you need the witness

12   to step down?

13                  MR. PERKINS:  No, Judge.  She's fine right

14   there.

15     Q      (By Mr. Perkins) If this were the street and you

16   were standing and this was the front of Carolyn Click's

17   house right here where the "X" is, if you were standing

18   there looking at that "X," your house would be on the

19   right-hand side right here where I wrote B-M-C; isn't that

20   correct?

21     A      You're right.  I'm just turned.

22     Q      Yes, ma'am.  It's kind of confusing, because this

23   is drawn like this.  But this is actually the Hispanic guys

24   house that we see where the fence is.

25     A      This is the way we're situated on the street on

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

161

1    the front right here (indicating).

2        Q    All right.  So the fence that we see in this

3    picture that you've talked about in State's Exhibit Number 5

4    is actually right here (indicating) between Carolyn Click's

5    mobile home and this one where the Hispanic gentleman lives?

6        A    Yes, sir.

7        Q    Can you scratch out that "B-M-C" and just write

8    "Hispanic," so we'll have that clear.

9        A    Carmella (phonetics).

10       Q    Carmella.  That's good.

11       A    I'm sorry.  I couldn't remember it.

12       Q    Thanks, ma'am.

13       A    Yes, sir.

14            MR. PERKINS:  Judge, I don't have any

15   additional questions.

16            Thank you, Ms. McCarty.

17            THE WITNESS:  Yes, sir.

18            THE COURT:  With those additions, then

19   State's 19 is admitted without objection.

20            MR. HARRISON:  May I approach one more time,

21   Judge?

22            DIRECT EXAMINATION (CONTINUED)

23   BY MR. HARRISON:

24       Q    Ms. McCarty, just so we're all on the same page,

25   directly across the street, then, across from Carolyn

162

1    Click's house would be Twyla Johnson's house?

2        A    Yes, sir.

3        Q    And directly across the street from you would be

4    Lieanna Wilkerson's house?

5        A    Uh-huh.

6        Q    Okay.  You indicated that this road, this street

7    that we've labeled -- actually, that Mr. Perkins had you

8    draw that you labeled street, was County Road 2323?

9        A    Yes, sir.

10       Q    Is that in Smith County, Texas?

11       A    Yes, sir.

12       Q    So Carolyn Click's residence would be in Smith

13   County, Texas?

14       A    Yes, sir.

15       Q    Her mobile home and the lot on which her house

16   sits?

17       A    Yes, sir.

18       Q    Now, you indicated that she had lived there for

19   about the last 11 years, and she lived alone.

20       A    Yes, sir.

21       Q    Was there some point in time in which someone else

22   began staying with or living with Carolyn Click?

23       A    Well, her son came.

24       Q    Do you know her son's name?

25       A    Tracy Beatty.

163

1     Q     And her son who came at some point, do you --

2     first of all, have you met -- did you know that individual?

3     Did you meet him at some point?

4     A     No, sir.

5     Q     After he came, did you meet him?

6     A     Yes, sir.

7     Q     Do you see the individual you've identified as

8     Carolyn Click's son, Tracy Beatty, here in the courtroom

9     today?

10    A     The gentleman in the middle (pointing).

11    Q     Now, I see you pointing.  Can you -- is he wearing

12    that blue tie with the white dots?

13    A     I can't see.  Yes, sir.

14          MR. HARRISON:  Your Honor, could the record

15    reflect the witness has pointed to and identified an article

16    of clothing worn by the defendant?

17          THE COURT:  The record will reflect the

18    witness has identified the defendant.

19    Q     (By Mr. Harrison) Now, when did you first realize

20    that Tracy Beatty had come to stay with his mother, Carolyn

21    Click?

22    A     She had told me he was coming to stay with her.

23    Q     When was that approximately, as best you can

24    remember?

25    A     I believe it was around October.

164

1      Q    October of 2003?

2      A    Yes, sir.

3      Q    All right.  Did you see Mr. Beatty coming and

4 going from the mobile home or there at the property?

5      A    They were -- usually, went somewhere together.

6      Q    What kind of car did Ms. Click drive?

7      A    I'm not sure what kind it was.  It was a white

8 with a tan -- kind of like a little station wagon.

9              MR. HARRISON:  May I approach the evidence,

10 Your Honor?

11              THE COURT:  Yes.

12     Q    (By Mr. Harrison) Looking at State's Exhibit

13 Number 2, is that Carolyn Click's car?

14     A    Yes, sir.

15     Q    All right.  That was the car she drove?

16     A    Yes, sir.

17     Q    Is that the only car she owned, to your knowledge?

18     A    Well, she owned one, but it was not in working

19 order.

20     Q    Is that the only one that worked?

21     A    Yes, sir.

22     Q    All right.  Is that one that she drove?

23     A    Yes, sir.

24     Q    Now, you indicated that the defendant first began

25 living with Ms. Click in October of 2003?

1     A    Yes, sir.

2     Q    Can you -- did this -- as far as Ms. Click's

3  relationship with the defendant, did she describe how it had

4  been to you?

5     A    When he first came?

6     Q    Yes, ma'am.

7     A    She was pleased that he was there.

8     Q    Let me ask you this:  Did she ever indicate to you

9  any particular problems between she and the defendant, Tracy

10  Beatty, that occurred in the past?

11     A    Only later on.

12     Q    Sometime in November of 2003, did she indicate to

13  you any past problem between she and Tracy Beatty?

14     A    She came over at the house November the 25th.

15  That was the Tuesday before Thanksgiving, and she told me

16  that she had told Tracy --

17               MR. PERKINS:  Judge, I'm sorry.

18               Sorry to interrupt, ma'am.

19               I'm going to have to object as to hearsay and

20  incorporate the other objections that I've made previously.

21               THE COURT:  Overruled.

22     Q    (By Mr. Harrison) On November 25th, 2003, did you

23  have contact with Carolyn Click?

24     A    Yes, sir.

25     Q    About what time was that that you had -- was that

166

1  a face-to-face contact with Ms. Click?

2       A    Yes, sir.  She came over at the house.

3       Q    About what time did she come over to your house?

4       A    It was about 4:00 in the afternoon.

5       Q    4:00 p.m. on November 25th, 2003?

6       A    Yes, sir.

7       Q    Did she indicate to you anything about her

8  relationship with Tracy Beatty at that time?

9       A    She was unhappy --

10      Q    What did she tell you?

11      A    She was unhappy about it and had -- did he say I

12 couldn't say what I --

13      Q    Ma'am, you can.

14      A    That she had asked him to leave that day, and

15 that -- she said, "I put up with all I'm going to put up

16 with, and I had asked him to leave," and she was upset about

17 it.  And that's the last time I saw her.

18      Q    Did she tell you what time that day she had told

19 Tracy Beatty to leave?

20      A    No, sir.

21      Q    And this was on November 25th, 2003?

22      A    Yes, sir.

23      Q    And when you say "she" told you that, was it

24 Carolyn Click who told you that?

25      A    Yes, sir, Ms. Click.

167

1       Q      Now, that was November 25th, 2003, at any time

2  before that had Ms. Click talked with you about Tracy Beatty

3  living in her house or not living in her house?

4       A      No, sir.

5       Q      Was there any other time that Ms. Click had told

6  you about kicking Tracy Beatty out of her house?

7                     MR. PERKINS:   Your Honor, I'm going to object

8  to leading the witness.

9                     THE COURT:   Sustained.

10      Q      (By Mr. Harrison) Was there any other time

11 sometime that month, earlier of that month in November, that

12 you had had a conversation with Carolyn Click about Tracy

13 Beatty?

14      A      Yes.  She had asked him to leave one time before.

15      Q      About when was that?

16      A      Sometime in October, I believe.

17      Q      Now, you've talked about the two times Ms. Click

18 told you she had told Tracy Beatty to leave her house.

19      A      Yes, sir.

20      Q      Did Ms. Click ever talk with you about any

21 problems that she had had with Tracy Beatty before he began

22 living with her in October of 2003?

23      A      She had told me that he had assaulted her several

24 times.

25      Q      Do you recall when she told you that that -- when

1   she told you about those times?

2      A    I'm not sure when it was.  Just after we got to

3   know one another and everything, she told me that in just

4   general conversation.

5      Q    When -- let me move you back to November 25th,

6   2003, at around 4:00 when Ms. Click told you that she had

7   told the defendant to leave.  Can you describe what Carolyn

8   Click's demeanor was when she was telling you this?

9      A    Well, she was stressed out and crying and very

10  stressed out over it.

11     Q    This would have been 4:00 p.m.

12     A    Yes, sir.

13     Q    On November 25th, 2003?

14     A    Yes, sir.

15     Q    Did you ever again, after that, see Carolyn Click

16  alive?

17     A    No, sir.  She left my house and walked back over

18  to her house, and then I had another appointment and I left,

19  and I never saw her again.

20     Q    Did you ever speak to her again after that

21  conversation?

22     A    No, sir.

23     Q    Did you ever see Tracy Beatty again after that

24  conversation?

25     A    No, sir.

1    Q    When was the next time you recall seeing Tracy

2    Beatty?

3    A    Well, not speaking or talking to him, but I saw

4    him Thanksgiving.  I saw him coming from a neighbor's house

5    walking over to Ms. Click's.

6    Q    Which neighbor did you see him coming from on

7    Thanksgiving?

8    A    Ms. Wilkerson's.

9    Q    So you saw the defendant, Tracy Beatty, coming

10   from Lieanna Wilkerson's house back to Ms. Click's house on

11   Thanksgiving?

12   A    Yes, sir.

13   Q    Do you recall what date Thanksgiving was?

14   A    Let's see.  Tuesday was the 25th -- be the 27th.

15   Q    And when you saw the defendant going from

16   Ms. Wilkerson's house back to Ms. Click's on November 27th,

17   2003, what did you see him do?

18   A    I didn't -- I just saw him walking towards the

19   house.  I didn't see him go in or anything.

20   Q    Did you ever see the defendant, Tracy Beatty,

21   driving?

22   A    He started -- he drove her car the weekend after

23   Thanksgiving.

24   Q    And when you say "he," you're talking about Tracy

25   Beatty?

170

1     A    Yes, sir.

2     Q    You're talking about driving her car.  Which car

3  was that.

4     A    Carolyn Click's.

5     Q    Is that same station wagon that you previously

6  identified?

7     A    Yes, sir.

8     Q    That would have been the weekend after

9  Thanksgiving?

10    A    Yes, sir.

11    Q    From that point, the weekend after Thanksgiving

12  where you saw him driving Carolyn Click's car, did you see

13  Tracy Beatty on a fairly regular basis?

14    A    No, sir.  I would see him out in the yard and

15  talked to him on occasions.

16    Q    And from, let's say, November 27th, which would

17  have been Thanksgiving, through December, let's say, 17th,

18  during that time frame, how often would you estimate that

19  you saw Tracy Beatty over at Carolyn Click's house?

20    A    Let me get my --

21    Q    In --

22    A    He was there regularly.

23    Q    All right.

24    A    Yeah.  He would come and go, but he was at the

25  house, yes, sir.

171

1    Q    You would see him coming and going?

2    A    Yes, sir.

3    Q    What would he be driving during that time period

4    when he was coming and going?

5    A    Ms. Click's vehicle.

6    Q    Was that unusual to you?

7    A    Well, he had never driven it.  She always drove

8    him when they would go somewhere.

9    Q    During any of the 11 years that Ms. Click was your

10   next door neighbor and specifically during any of that time

11   period and specifically, once Tracy Beatty had moved in with

12   her in October of 2003, before November 25th, have you ever

13   seen Tracy Beatty drive Carolyn Click's car?

14   A    No, sir.

15   Q    At any time ever?

16   A    No, sir.

17   Q    Did you at some point have a conversation with or

18   speak with Tracy Beatty?

19   A    Yes, sir.

20   Q    When was that?

21   A    It was the next week after Thanksgiving.

22   Q    So sometime in early December?

23   A    Yes, sir.

24   Q    Did you ask Mr. Beatty about Carolyn Click at all?

25   A    Yes, sir.  He was outside and I was outside, and

1  we talked at the fence, and I asked him where -- may I call

2  her Callie?

3      Q    Yes, ma'am.

4      A    Where Callie was.

5      Q    Why were you concerned about Callie or Carolyn

6  Click at this point?

7      A    Well, it was so out of ordinary, because we always

8  kept in touch, especially on holidays, and she usually would

9  tell me if she was going to be gone.  And I thought that was

10  very unusual, and I just wanted to find out where she had

11  gone.

12     Q    Now, for the last 11 years with Callie as your

13  neighbor, have you ever seen her on Thanksgiving Day in

14  times past?

15     A    Yes, sir.

16     Q    What would Carolyn Click do on Thanksgiving for

17  you?

18     A    I would usually go to my daughter's, and she would

19  bring Tommy some Thanksgiving dinner to tide him over until

20  I got home.

21     Q    Who's Tommy?

22     A    Tommy Tucker that lives in the mobile home, also.

23     Q    Lives with you?

24     A    Yes, sir.

25     Q    And when you say that you would be at your

173

1   daughter's and she would bring over food for Tommy --

2        A    Uh-huh.

3        Q    -- "she" would be Carolyn Click?

4        A    Yes, sir.

5        Q    Would that be a regular occurrence on

6   Thanksgivings in the past?

7        A    Yes, sir.

8        Q    To your recollection, was this year the first

9   Thanksgiving in many years that she had not done that?

10       A    She either brought food over or she called us on

11  the phone and wished us Happy Thanksgiving.

12       Q    Was this the first time she had not done any --

13  either of those things?

14       A    Yes, sir.

15       Q    Were you concerned about Carolyn Click at this

16  point?

17       A    At that point, I wondered, but I didn't get

18  alarmed until I didn't hear from her on Wednesday -- I mean,

19  after -- by Thursday, I got concerned then.  And then when

20  we didn't have any -- hear anything from her then, yes, sir,

21  we did.

22       Q    Was it unusual for Carolyn Click to be gone and

23  you not know her whereabouts?

24       A    Yes, sir.

25       Q    Can you explain that?

174

1      A      Well, she always wanted somebody to watch her

2   house, and it was vice versa with us.  And feed her animals

3   if she was going to be gone.  She wanted to make sure that

4   they were all taken care of and that her house, we watched

5   it.

6      Q      Let me move ahead now to the conversation you had

7   with the defendant, Tracy Beatty.

8      A      Yes, sir.

9      Q      You said that was between y'all's fence?

10     A      Yes, sir.

11     Q      That was sometime in early December?

12     A      Yes, sir.  Yes, it was after Thanksgiving the next

13  week?

14     Q      Did you ask Tracy Beatty about Carolyn Click,

15  about her health or whereabouts or what her status was?

16     A      I asked Tracy where Callie was, and he told me

17  that she had gone off with a man named Junior, and they had

18  gone to Kansas.

19     Q      Let me ask you this:  Did you know any man named

20  Junior?

21     A      I didn't know him by Junior.

22     Q      Had you known any man that Carolyn Click -- that

23  you might have thought Carolyn Click would go off with?

24     A      No, sir.

25     Q      Once he tells you she's gone to Kansas with

175

1   Junior, what did you think?

2        A    I just thought it was strange for her to go off

3   without telling -- Ms. Click to go out without telling us

4   anything.

5        Q    Did you ask anything further, or did Tracy Beatty

6   tell you anything further about where she might be?

7        A    He told her (sic) at Kansas at the time, and then

8   later on, when she didn't come back, I asked him again where

9   Ms. Click was, and he said that they had stopped in Oklahoma

10  to visit Junior's sister.  I believe he said his sister.

11  And that she wouldn't be -- she would be home about the next

12  Thursday.

13       Q    Did he say anything else about -- at any other

14  time about where Carolyn might be?

15       A    After she didn't come home on Thursday, well, I

16  asked him again when she was coming home, and he said that

17  she was staying with someone in Jacksonville and that she

18  would be home about the 17th of December.

19       Q    Did he tell you anything else about when Carolyn

20  Click came home on December 17th, what was going to happen?

21       A    She was going to wait until he left the house, and

22  she wanted him gone by the 17th, because that's when she was

23  coming home.

24       Q    That's what Tracy Beatty told you that Carolyn

25  Click told him?

176

1    A    Yes, sir.

2    Q    She wanted him out by December 17th?

3    A    Yes, sir.

4    Q    And that was the date that Tracy Beatty told you

5   that she would be arriving back in Tyler?

6    A    December the 17th.

7    Q    Are you getting more and more concerned?

8    A    Very, yes, sir.

9    Q    Did you or Thomas Tucker ever call anybody, notify

10   the police or report anything?

11   A    Yes, sir, Tommy did.

12   Q    Who did he call, if you know?

13   A    I'm not sure who he talked to at that time.

14   Q    Did he call the police?

15   A    The Sheriff's Department.

16   Q    Still sometime in early December, did you have an

17   opportunity to look in the backyard of Carolyn Click and see

18   anything peculiar?

19   A    Well, I went over to water the dogs, but I didn't

20   pay any attention to anything.  I just went over and took

21   care of the animals.

22            MR. HARRISON:  May I approach the evidence,

23   Your Honor.

24            THE COURT:  Mr. Harrison, we're going to have

25   to recess for the noon hour.  I apologize for interrupting

177

1   your direct, but we're going to need to recess for the noon

2   hour.

3                   MR. HARRISON:  I actually only have a couple

4   more questions.

5                   THE COURT:  Go ahead and finish up.  I was

6   trying to wait.  I thought you might be getting close.

7        Q    (By Mr. Harrison) Ms. McCarty, showing you State's

8   Exhibit Number 17, you had previously said that you thought

9   that was a burn pile from Ms. Click's house?

10       A    Yes, sir.

11       Q    Sometime in December, while Carolyn Click was away

12   from her house, did you see this burn pile?

13       A    Yes, sir.  Tracy was out most of the day burning

14   things in that backyard.

15       Q    Do you know -- do you have personal knowledge what

16   he may have been burning?

17       A    No, sir.  I really didn't pay that much attention

18   to it.

19       Q    But you saw him out burning sometime in early

20   December?

21       A    Yes, sir.

22       Q    Had you been asked to water the dogs, or did you

23   just do it because Ms. Click was gone for so long?

24       A    I did it when no one was there to water them.  She

25   always expected me to, Ms. Click did.

178

1      Q     And during this time period, from November 25th to
2   December 17th, you saw the defendant, Tracy Beatty, coming
3   and going from the house?

4      A     Yes, sir.

5      Q     And coming and going in Ms. Click's car?

6      A     Yes, sir.

7      Q     And prior to November 25th, you had never seen
8   Tracy Beatty drive her car?

9      A     I didn't -- never saw him drive her car,
10  Ms. Click's car.

11                  MR. HARRISON:  Thank you, Ms. McCarty.

12                  Your Honor, I'll pass the witness.

13                  THE COURT:  Ladies and Gentlemen, we're going
14  to recess now for the noon hour.

15                  Ms. McCarty, if you just remain seated there
16  just a moment, ma'am.

17                  THE COURT:  All rise for the jury.

18                  (The jury leaves the courtroom.)

19                  (Lunch recess.)

20                  (Proceedings continued in Volume 38.)

21

22

23

24

25

179

1   STATE OF TEXAS    *

2   COUNTY OF SMITH *

3       We, STEVE R. AWBREY, CSR, Official Court Reporter, and

4   KIM CHRISTOPHER, CSR, Deputy Official Court Reporter, for

5   the 241st Judicial District Court in Smith County, Texas, do

6   hereby certify that the above and foregoing contains a true

7   and correct transcription of all of the proceedings in the

8   foregoing styled and numbered cause, all of which occurred

9   in open court or in chambers and were reported by us.

10      We further certify that this transcription of the

11  record of the proceedings truly and correctly reflects the

12  exhibits, if any, offered by the respective parties.

13      Witness our hand this the _19_ day of

14  _May_, 2005.

15

16

17

18

19  KIM CHRISTOPHER, CSR              STEVE R. AWBREY, CSR
    Texas CSR Number 4219            Texas CSR Number 9940
20  Expiration date:  12-31-06       Expiration date: 12-31-05
    Deputy Official Reporter         Deputy Official Reporter
21  241st Judicial District Court    241st Judicial District Court
    Smith County, Texas              Smith County, Texas
22  100 North Broadway, Room 304     100 North Broadway, Room 221
    Tyler, Texas  75702              Tyler, Texas  75702
23  Telephone:  (903) 535-0575       Telephone:  (903) 535-0603

24

25

STEVE R. AWBREY, CSR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS