ORIGINAL

REPORTER'S RECORD

VOLUME 38 OF 5/

TRIAL COURT CAUSE NO. 241-0978-04

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VERSUS | * | SMITH COUNTY, TEXAS |
| TRACY BEATTY | * | 241ST JUDICIAL DISTRICT |

---

TRIAL ON THE MERITS - P.M. SESSION

AUGUST 2, 2004

---

FILED IN
COURT OF CRIMINAL APPEALS

JUN 1 4 2005

Troy C. Bennett, Jr., Clerk

---

On the 2nd day of August, 2004, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the HONORABLE JACK SKEEN, JR., Judge

Presiding, held in Tyler, Smith County, Texas:


Proceedings reported by computerized stenotype machine;

Reporter's record produced by computer-assisted

transcription.

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

2

```
 1                      A P P E A R A N C E S

 2     MR. D. MATT BINGHAM, III
       State Bar Number 00787085
 3     Smith County Criminal District Attorney

 4     MR. J. BRETT HARRISON
       State Bar Number 00793909
 5     MS. APRIL SIKES
       State Bar Number 18348790
 6     Assistant Smith County District Attorneys
       Smith County Courthouse, Fourth Floor
 7     Tyler, Texas  75702
       Telephone:  903.535.0520
 8     Fax:  903.535.0599

 9            REPRESENTING THE STATE OF TEXAS

10
       MR. ROBERT C. PERKINS, JR.
11     State Bar Number 15790405
       MR. KENNETH HAWK
12     State Bar Number 09243650
       Attorneys at Law
13     112 East Line Street, Suite 202
       Tyler, Texas  75702
14     Telephone:  903.593.7780

15            REPRESENTING THE DEFENDANT

16

17

18

19

20

21                    REPORTER'S NOTE

22         Uh-huh = Yes - Affirmative response

23         Huh-uh = No - Negative response

24     Quotation marks are used for clarity and do not necessarily
                   indicate a direct quote.
25
```

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

3

I N D E X

VOLUME 38 OF _____

(TRIAL ON THE MERITS)

                                          PAGE   VOL

AUGUST 2, 2004 (P.M.)

STATE'S WITNESSES:          Direct    Cross    Voir Dire

BETTY MCCARTY
      By Mr. Harrison      35                            38
      By Mr. Perkins                 12                  38

OUTSIDE THE PRESENCE OF THE JURY:

Defense objection to State's Exhibits 3 and 18.......52   38
The Court's ruling - Objection overruled.............61   38

Defense proffer of testimony.........................62   38

STATE'S WITNESSES:                      Voir Dire

BETTY MCCARTY
      By Mr. Perkins                      63             38

State's objection....................................66   38
The Court's ruling - Objection sustained.............68   38

Defense Bill of Exception............................70   38

STATE'S WITNESSES:          Direct    Cross    Voir Dire

BETTY MCCARTY
      By Mr. Harrison      72, 90                        38
      By Mr. Perkins                 75                  38

ROY TOMLIN
      By Mr. Bingham       92                            38

JAY PATZKE
      By Mr. Harrison      112                           38
      By Mr. Perkins                 115                 38

```
                                                        4
1                    I N D E X - CONTINUED

2                    VOLUME 38 OF ____

3                  (TRIAL ON THE MERITS)

4                                          PAGE  VOL

5    AUGUST 2, 2004 (P.M.)

6    OUTSIDE THE PRESENCE OF THE JURY:

7    STATE'S WITNESSES:                 Voir Dire

8    JAY PATZKE
          By Mr. Perkins              115,121    38
9         By Mr. Harrison             120        38

10   Defense Motion for Mistrial.......................119  38
     The Court's ruling - Objection overruled...........121  38
11               Motion for Mistrial denied.....121  38

12   STATE'S WITNESSES:      Direct   Cross   Voir Dire

13   JAY PATZKE
          By Mr. Harrison     126,128                38
14                            131                    38
          By Mr. Perkins              127,130        38
15                                    132            38

16   STACEY KILLOUGH
          By Mr. Bingham      135,153                38
17                            202                    38
          By Mr. Perkins              157, 196  152  38

18

19   Court Reporter's Certificate.......................207  38

20

21              ALPHABETICAL WITNESS INDEX

22   WITNESS:                Direct   Cross   Voir Dire   VOL

23   MCCARTY, BETTY
          By Mr. Harrison     35, 72                 38
24                            90                      38
          By Mr. Perkins              12, 75   63    38

25
```

**STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR**
**241ST JUDICIAL DISTRICT COURT**
**SMITH COUNTY, TEXAS**

5

ALPHABETICAL WITNESS INDEX - CONTINUED

| WITNESS: | Direct | Cross | Voir Dire | VOL |
|---|---|---|---|---|
| KILLOUGH, STACEY | | | | |
|     By Mr. Harrison | 135,153 | | | 38 |
| | 202 | | | 38 |
|     By Mr. Perkins | | 157,196 | 152 | 38 |
| PATZKE, JAY | | | | |
|     By Mr. Harrison | 112 | | | 38 |
|     By Mr. Perkins | | | 115 | 38 |
| (No jury) | | | | |
|     By Mr. Harrison | | | 120 | 38 |
|     By Mr. Perkins | | | 115,121 | 38 |
| (With jury) | | | | |
|     By Mr. Harrison | 126,128 | | | 38 |
| | 131 | | | 38 |
|     By Mr. Perkins | | 127,130 | | 38 |
| | | 132 | | 38 |
| TOMLIN, ROY | | | | |
|     By Mr. Bingham | 92 | | | 38 |

EXHIBITS INDEX

STATE'S

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 3 | Cross ring | 50 | 62 | 38 |
| 18 | Photo of victim | 50 | 62 | 38 |
| 20 | Divorce decree | 43 | 43 | 38 |
| 21 | Betty McCarty's statement | 37 | [41] | 38 |
| 22 | Photo of defendant | 97 | 97 | 38 |
| 23 | Blowup photo of ring on finger | 16 | 16 | 38 |

DEFENDANT'S

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 1 | Certificate | 126 | 126 | 38 |
| | | (Record only) | | |

6

P R O C E E D I N G S

(August 2, 2004)

(Open court, defendant present, no jury.)

THE COURT:  Are we on the record, Kim?

THE COURT REPORTER:  Yes, sir.

THE COURT:  Well, hang on a minute.

All right.  Back on the record in Cause Number 241-0978-04, State's present; defense counsel is present; defendant is present.

Go ahead, Mr. Harrison.

MR. HARRISON:  Actually, if I could just have a moment.

THE COURT:  Sure.

MR. HARRISON:  Judge, are we on the record?

THE COURT:  We're on the record.

MR. HARRISON:  Judge, I guess at this time we would have -- I would make an oral motion in limine to prohibit the Defense -- pardon me -- from going into questioning regarding an alleged suicide attempt by the victim while she was -- during her teenage years.

I discussed it with Mr. Perkins, and he's indicated that that might be an area that they would want to go into.  I don't believe it would have any relevance at all on any issue.

THE COURT:  With this witness?

7

1               MR. HARRISON:  Yes, Judge.  I think the

2   victim had talked with Mr. --

3               THE BAILIFF:  All rise for the jury.

4               (The jury enters the courtroom.)

5               (Open court, defendant and jury present.)

6               THE COURT:  Be seated, please.  Thank you.

7               (At the bench, on the record.)

8               MR. HARRISON:  Judge, I think the victim had

9   told Ms. McCarty at some point that she had attempted

10  suicide as a teenager, and that's the reason why there's a

11  bullet that's actually still in the body of Ms. Click, the

12  victim.  Our position would be that it would have no

13  relevance to any issue in this case, and I don't believe

14  that it would be admissible.

15              THE COURT:  What would be the relevance?

16              THE COURT REPORTER:  I didn't hear that.

17              MR. HARRISON:  I didn't say anything.

18              THE COURT:  What would be the relevance?

19              MR. PERKINS:  The relevance is this:  First

20  of all, there's been testimony from this very witness that

21  he had previously assaulted her, that the defendant had

22  previously assaulted Carolyn Click.

23              There's going to be evidence later on during

24  the autopsy that they recovered a bullet from her body.  I

25  think it's referred to in the autopsy as a remote, unrelated

8

1   gunshot.  We feel like we're entitled to clear up the fact

2   that he did not shoot her.

3                  THE COURT:  Okay.  Here's what I'll do.  I

4   want this witness -- I want this witness kept under the

5   Rule, subject to re-call, where the testimony comes in from

6   the pathologist like to have that bullet recovered from her.

7   I'm going to let you explain --

8                  MR. HARRISON:  We're not going to go into

9   that with the pathologist.  We're not bringing up any

10  testimony about that.  That doesn't have anything to do with

11  this case.

12                 MR. PERKINS:  Well, here's the --

13                 THE COURT:  What's the relevance?  If I

14  understand, that's the -- your relevancy is that a bullet

15  was recovered from her body would be able to explain that he

16  didn't shoot her, that she tried to commit suicide?

17                 MR. PERKINS:  That's right.

18                 THE COURT:  Well, if there was a bullet, then

19  I'll allow you to re-call this witness or put someone else,

20  if you have someone else, that would be able to testify to

21  that.

22                 MR. PERKINS:  And, Judge, the other thing it

23  goes to is as to how much she confided in this witness.  She

24  talked about they talked about lots of things.  And the

25  State got to talk about her saying that she had been

9

1   assaulted in the past by him and stuff.  I mean --

2                  THE COURT:  Well, here's the thing.  I don't

3   think the fact that right now as it stands, I don't think

4   the fact that she tried to attempt -- she attempted suicide

5   as a teenager is relevant.

6                  MR. PERKINS:  Number one, I don't think it

7   was as a teenager.

8                  THE COURT:  Well, I don't know when it was.

9                  MR. PERKINS:  Well, and here's the thing, is

10  neither do I exactly.  All I know is, is that it happened,

11  that it's the truth, and I don't want this jury to be left

12  with the false impression later on that this was somehow the

13  fault of the defendant in this case, and we feel like we're

14  entitled to clear that up.

15                  THE COURT:  That's what I just said.  What

16  I'm saying is, if it comes into evidence, Mr. Perkins, that

17  it was probably removed from her, then you've got to be able

18  to clear that up.

19                  MR. HARRISON:  And I'll tell the Court we're

20  not going to proffer any evidence about any bullet.

21                  THE COURT:  That's the relevancy that I see

22  right now.

23                  MR. PERKINS:  So is the Court preventing me

24  from asking the question regarding her knowledge of the

25  alleged victim attempting suicide?

10

 1          THE COURT:  Unless you can show some

 2   relevance to it.  As it stands right now, I don't see any

 3   relevance, based on her testimony, that this bullet --

 4   what's the relevance as it stands right now?

 5          MR. PERKINS:  Well, I guess I could argue the

 6   same thing that the State argued, that it goes to show the

 7   prior relationship between the parties.

 8          THE COURT:  How does it show the prior

 9   relationship if you're saying that she attempted suicide

10   herself?

11          MR. PERKINS:  Well, I would like to explore

12   with this witness exactly what she told her about that.

13          THE COURT:  Well, we'll have to take that up

14   outside the presence of the jury.  Can you go through what

15   you need to go through, and if you want to take that up

16   later on, I need to excuse them and do it outside the

17   presence of the jury.

18          MR. PERKINS:  Okay.  That's fine.

19          (End of bench conference.)

20          THE COURT:  Okay.  Go ahead, Mr. Perkins.

21          (At the bench, on the record.)

22          MR. HAWK:  I'm having a hard time keeping up

23   with a lot of these witnesses on the witness list because I

24   don't know who they are.  And what I don't know is if a

25   bailiff is checking people's names when they come in.  And

1  here's why:  Because there's another person in the courtroom

2  that I believe to be one of the witnesses who may or may not

3  be called.

4             THE COURT:  Are y'all watching the witnesses?

5             MR. HARRISON:  Judge, as best we can, we're

6  trying to have somebody watching the door.

7             THE COURT:  Well, the thing about it is he's

8  got a whole list of -- a page full of witnesses.

9             MR. HAWK:  As long as I can find out who it

10  is that comes in, I'll check the list.

11             THE COURT:  I'll get the names of -- get the

12  name of anyone that comes into the courtroom.

13             MR. HAWK:  That will be great, and I'll be

14  checking the list then, Judge.

15             MR. HARRISON:  And, Judge, obviously, the

16  list that we've provided is exhaustive.  We're only calling

17  a very small portion of those people to actually testify.

18             MR. HAWK:  Well, I understand that.

19             Thank you, Judge.

20             (End of bench conference.)

21             (Off-the-record discussion.)

22             THE COURT:  Go ahead, Mr. Perkins, if you're

23  ready.

24             MR. PERKINS:  I'm ready, Judge.

25             THE COURT:  Are you ready?

1          MR. PERKINS:  Just whenever, Judge.

2          THE COURT:  Get her.

3          (The witness enters the courtroom.)

4          THE COURT:  Ms. McCarty, come on back around,

5   please, to the witness stand.  Just have a seat.

6          Okay, Mr. Perkins.

7          MR. PERKINS:  Thank you, Judge.

8                BETTY MCCARTY,

9   having been previously sworn, testified as follows:

10                CROSS-EXAMINATION

11  BY MR. PERKINS:

12     Q.    Afternoon, Ms. McCarty.

13     A.    Good afternoon.

14     Q.    What I want to do is I want to talk about some of

15  the things that you talked about with Mr. Harrison before

16  lunch, go back over some of the things that you talked about

17  and make sure that I understand them.

18          Now, you live next door to Carolyn Click; is

19  that right?

20     A.    Yes, sir.

21     Q.    And if I understand your testimony, you say that

22  she lived at that residence by herself -- by herself for

23  about 10 years, 10 to 11 years?

24     A.    Eleven.  Yes, uh-huh.

25     Q.    Okay.  During that 10-plus years, are you saying

1   that nobody lived there at the residence with her at all

2   during that time?

3       A.   Well, she -- no one ever lived there.  Somebody

4   might stay there a week if they needed a place to stay, but

5   that was only one time.

6       Q.   Okay.

7       A.   No one ever lived there.

8       Q.   So other than Tracy Beatty, her son, living with

9   her starting in -- I believe your testimony was that he was

10  coming to stay with her in October of 2003?

11      A.   Yes, sir.

12      Q.   So October, November, and then him staying there

13  December, other than those three months, that nobody lived

14  in that mobile home with Carolyn Click other than Carolyn

15  Click?

16      A.   Yes, sir, that's right.

17      Q.   Okay.  Do you know who James Everett Click is?

18      A.   She married him while I was not at the -- living

19  at the mobile home.  I didn't -- I did not know him.

20      Q.   Okay.  I guess maybe I need to back up then

21  because I'm a little mixed up about something.  She was

22  married to James Everett Click until -- they were divorced

23  in like November of 1997.  Do you know about that?

24      A.   She told me that she had divorced him.  I'm not

25  sure of the date.

14

1    Q.   Okay.  Maybe my math is just a little bit messed

2  up.  Did James Everett Click live there with her during that

3  timeframe?

4    A.   Yes, sir.  That's what she told me.  I did not

5  know the gentleman.

6    Q.   Okay.  Let me back up then.  How long have you

7  been living next door to her?

8    A.   I -- it was about 11 years ago, and then -- then

9  we moved to my house on Benchman for about a year and then

10  went back to the mobile home, and she married him in that

11  time, I presume, because I never knew him.

12    Q.   So you think that they were married and divorced

13  during the period of time that you didn't live next door to

14  her?

15    A.   Yes, sir.

16    Q.   So let me make sure that I understand this.  You

17  lived next door to her; she lived there by herself.  You

18  moved away; it's your belief, from talking to Carolyn Click,

19  that during that time she got married to James Everett

20  Click.

21    A.   Yes, sir.

22    Q.   They got divorced.  When you moved back there to

23  the same place, she was living there alone again.

24    A.   She was living alone then, but the divorce was in

25  proceedings at that time.

15

1     Q.   Okay.

2     A.   But he did not live there.

3     Q.   Okay.  So you would have moved back sometime

4  probably then in 1997, if you remember?

5     A.   I'm not sure of the date, no, sir.

6     Q.   Okay.  If they were divorced in November of 1997,

7  would that have been during the time that the divorce was

8  pending for lack of a better word?

9     A.   Pending because it was not complete until after I

10  had -- we had gone back over there.

11     Q.   So when you say that she lived there by herself

12  for 11 years, you don't mean 11 consecutive years.  She

13  didn't live there by herself?

14     A.   No.  He -- he came while we were gone.  At the

15  time that we were there, she has lived alone.

16     Q.   Okay.  All right.  I just wanted to clear that up.

17     A.   Yes, sir.

18     Q.   The other thing is, is that -- if I understand

19  what you testified to, that you saw the defendant, Tracy

20  Beatty, starting, I believe, in October of 2003 over at

21  Carolyn Click's mobile home, and you knew that he was living

22  there.

23     A.   Yes, sir.

24     Q.   And I believe you characterized her as -- let me

25  see where I wrote it down -- as being excited that he was

16

1   coming to live with her?

2       A.   Uh-huh.  She was glad that he was coming, yes.

3       Q.   And then when you saw them together -- and I would

4   say this would be when?  In October, November of 2003 --

5   that it would be fair to say that there were times when you

6   would see Tracy Beatty there when Carolyn Click would not be

7   there and vice versa?

8       A.   You mean after I didn't see her?

9       Q.   No.  No, ma'am.  Before -- before, let's say,

10  Thanksgiving, there would be times when Tracy Beatty would

11  be there when Carolyn Click would not be there.

12      A.   I don't remember talking about that, but --

13      Q.   I'm just asking you.

14      A.   I'm sure she might have gone to the grocery store,

15  but usually he rode with her.  They would go to the grocery

16  store, and I would see them up at the gas station together,

17  but I'm not sure on that.

18      Q.   Okay.  Did you ever see Tracy Beatty driving a

19  vehicle other than Carolyn Click's station wagon?

20      A.   He drove a pickup at one time.

21      Q.   He drove a pickup?

22      A.   Yes, sir.

23      Q.   How many times did you see him driving that pickup

24  truck?

25      A.   A couple of times.

17

1      Q.   Okay.  Do you know who that truck belonged to?

2      A.   I'm not sure of his name, no, sir.

3      Q.   Okay.

4      A.   It had something to do with the mobile home, but I

5  don't know his name.

6      Q.   Okay.  You said it had something to do with a

7  mobile home?

8      A.   With mobile homes.  Tandem Mobile Homes, I believe

9  is where he's located.

10      Q.   Okay.  So --

11      A.   He does cleanups and things.

12      Q.   All right.  And was that truck Tracy Beatty was

13  driving -- to your knowledge, was that in conjunction with

14  his work?

15              MR. HARRISON:  Judge, objection.  That's

16  going to be either speculative or based on hearsay.

17              THE COURT:  All right.  Well --

18              MR. PERKINS:  If she knows.

19              THE COURT:  -- if she knows.

20      A.   Well, I don't know about his work, but I know he

21  drove it, but I didn't have any contact with him or know

22  what he was doing.

23      Q.   (By Mr. Perkins) All right.  Did Carolyn Click

24  tell you anything about how he was driving this other truck?

25      A.   Well, she wasn't available at that time.

18

1     Q.   So he was driving the truck when?

2     A.   When I saw him was afterwards, that I didn't see

3 her anymore.

4     Q.   After Thanksgiving?

5     A.   Yes, sir.

6     Q.   Okay.  And how many times -- I mean, this may

7 sound silly, and it may be, but like you live right next

8 door to them for -- well, October, November, and then as

9 Tracy Beatty stayed into December.

10    A.   Uh-huh.

11    Q.   At least those three months, and at least two

12 months when the two of them would be there together; is that

13 safe...

14    A.   From October to November.

15    Q.   October to November?

16    A.   Yes, uh-huh.

17    Q.   Almost all of November?

18    A.   Yes, uh-huh.

19    Q.   On like a weekly average, how many times would you

20 see Tracy Beatty there at Carolyn Click's?  Would it be

21 unusual to see him like every day, every other day, a few

22 times a week?

23    A.   They were out and about most of the time, yes.

24    Q.   You testified earlier that they usually went

25 places together and that -- and correct me if I'm wrong on

19

1    this, but most of the time she would be driving?

2         A.   Yes, sir.

3         Q.   Okay.  Does that mean that some of the time he

4    would be driving?

5         A.   I never saw him drive the vehicle.

6         Q.   Okay.  Then when you testified before lunch, why

7    didn't you say that all of the time she drove?  Why did you

8    say that most of the time, she drove?  Why didn't you say

9    that most of the time, she would be driving?

10        A.   I don't know unless it meant -- the times I saw

11   him he wasn't driving.  I don't know if he drove other times

12   or not.

13        Q.   Okay.  And that's fair.

14        A.   Yeah.

15        Q.   The times that you recall seeing them together,

16   she would be driving?

17        A.   She was driving, yes, sir.

18        Q.   Did you ever see her riding with him in the truck?

19        A.   No, sir.

20        Q.   Okay.  I want to talk to you for a minute about

21   your relationship with Ms. Click.  You described that

22   relationship as close, that you were good buddies.

23        A.   Yes, sir.

24        Q.   You talked over many things, and you mentioned

25   some of those things, when you were asked by the State,

20

1   regarding her relationship with Tracy Beatty; is that right?

2       A.   Her relationship with him?

3       Q.   Yes, ma'am.

4       A.   Well, she mentioned that he had assaulted her,

5   yes.

6       Q.   Okay.  Do you recall when, during this period of

7   time that she mentioned that he had assaulted her?

8       A.   Well, I can't remember the date.  It was after we

9   had gotten to know one another better.  I mean, it wasn't

10  something she told me when we first met.

11      Q.   Was it -- it was, obviously, after the time that

12  you had moved back and were living next door to her.

13      A.   Yes, sir.

14      Q.   It's not before; is that safe to say?

15      A.   I can't say exactly, but it -- like what I'm

16  trying to say, it wasn't something that she opened up to me

17  when I first met her.

18      Q.   Okay.

19      A.   We got to be --

20      Q.   I'm sorry.  Were you finished?

21      A.   Yeah.

22      Q.   I'm sorry.

23      A.   Yes, sir.

24      Q.   What I'm trying to put into context is -- here is,

25  was this -- I'm trying to put these two things together.

1   You say on one hand that she mentioned to you that he had

2   assaulted her -- I don't -- a couple of times?

3        A.   Uh-huh.

4        Q.   Several times?

5        A.   Yes, sir.

6        Q.   I don't know what you said.

7             Did she mention that to you before or after

8   she said that she was happy that he was moving back in with

9   her?

10       A.   That was before.

11       Q.   Okay.  So, obviously, any assault that she says

12  happened to her happened before the time where she said,

13  "He's moving back in with me, and I'm pleased about this"?

14       A.   Yes, sir.

15       Q.   Okay.  Do you recall -- do you have any way of

16  knowing when this alleged assault or assaults had occurred?

17       A.   No, sir.

18       Q.   Did she tell you anything about that?

19       A.   You mean the ones before he came or something?

20       Q.   Yes, ma'am.

21       A.   She didn't -- no.  She didn't tell me.  She just

22  told me that he had done that to her.

23       Q.   Okay.  And despite that, she told you, you know,

24  "I'm -- he's coming to stay with me in October of 2003," and

25  she expressed what you considered to be that she was excited

22

1  or happy about that?

2      A.   She was glad to have him back.

3      Q.   All right.  You also testified, Ms. McCarty, if I

4  got this down right, that she had asked -- and let me stop

5  to ask you a question.  Is there -- in your mind, is there a

6  difference in me asking you to do something and me telling

7  you to do something?

8      A.   Uh-huh.

9      Q.   And what would that difference, in your mind, be?

10     A.   If you ask me, I really don't have to say

11  anything; if you tell me, I have to.

12     Q.   Okay.  Which one do you think would be more

13  forceful in your mind:  To ask somebody to do something or

14  tell somebody to do something?

15             MR. HARRISON:  Well, Judge, I'm going to

16  object.  It's not relevant in this witness's mind.

17             MR. PERKINS:  I'll make it relevant on my

18  next question, Judge.

19             THE COURT:  Okay.  I'll allow her to ask.

20     Q.   (By Mr. Perkins) Which one is more forceful in

21  your mind?  If I ask you to do something or tell you to do

22  something, which one, in your mind, is more forceful?

23     A.   Well, from an authority figure, it would probably

24  be tell me.

25     Q.   Okay.  The reason I ask you that is instead of

23

1    telling you that -- the reason I ask you that is, is because

2    I noticed that in your testimony before lunch, you said

3    that, on a couple of occasions -- once before she had asked

4    him to leave; is that correct?

5        A.    Uh-huh.

6        Q.    That she told you -- I'm sorry.  You have to say

7    "yes" or "no."  "Uh-huh" and "huh-uh" look the same to the

8    court reporter.

9        A.    I'm sorry.

10       Q.    That's all right.

11              That Carolyn had asked Tracy to leave one

12   time prior to November of 2003 --

13       A.    Uh-huh.

14       Q.    -- is that right?

15       A.    The first time?

16       Q.    Yes, ma'am.

17       A.    Yes, sir.

18       Q.    And when asked, he did leave for a period of time;

19   is that correct --

20       A.    Yes.

21       Q.    -- also?

22       A.    That's correct.

23       Q.    And apparently, whatever had prompted her to ask

24   him to leave in the first place was mended over; is that

25   safe to say?

24

1    A.    I couldn't answer that.  I don't know.

2              MR. HARRISON:  Objection, speculation.

3    A.    I don't know what they -- transpired between them.

4              THE COURT:  Overruled.

5              Just let me rule on his objection, which is

6    overruled.  She's answered the question.

7              Go ahead.

8    Q.    (By Mr. Perkins) Did she talk to you about why she

9    moved back in?

10   A.    No, sir, she did not.

11   Q.    Did she express to you any kind of unhappiness or

12   displeasure that he was moving back in?

13   A.    No, sir.

14   Q.    In fact, wasn't it after he moved back in that she

15   told you that he was -- she was happy that he was there?

16   A.    The second time?

17   Q.    Yes, ma'am.

18   A.    No, sir.

19   Q.    Okay.  When was --

20   A.    You're talking about the first time.

21   Q.    No, no, no.  She asked him to leave; he left.

22   A.    Uh-huh.

23   Q.    He moves back in.

24   A.    That's not the time I was talking about, the

25   second time.

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

25

1    Q.   Okay.

2    A.   I was talking about the first time that he was

3    coming to live with her.

4    Q.   Okay.  All right.  And that's when she said that

5    she was happy that he was coming?

6    A.   The first time.

7    Q.   Okay.  All right.  She asked him to leave.  He

8    leaves for about how long, if you know?

9    A.   It was about a week and a half, I think.

10   Q.   Okay.  And then he comes back into the house.  And

11   after that, she expressed no displeasure with him until the

12   second time she asked him to leave; is that fair?

13   A.   She didn't say much about it, no, sir.

14   Q.   Okay.  And then she asked him again to leave --

15   didn't tell him but asked him to leave again in November; is

16   that correct?

17   A.   No.  Her words to me that afternoon is, "I told

18   Tracy to leave today."

19   Q.   Ms. McCarty, I know that it's hard to remember

20   exactly what was said.  Isn't it true that before lunch you

21   said that she asked him to leave?  Didn't you say that

22   before lunch?

23   A.   I might have used that phrase, but I remember her

24   what -- what I've been telling all along is she told him to

25   leave that day.

26

1    Q.   Okay.  Did she say specifically when or when she

2    had that conversation with him or when he was supposed to

3    leave by?

4    A.   No, sir.  I saw her at 4:00, and I didn't know

5    anything about it until that time.  So I don't know what

6    time she told him.

7    Q.   And I know that you've previously given a sworn

8    statement to the police department or the Sheriff's

9    Department, and you've had an opportunity, I'm sure, since

10   lunch to even talk to the District Attorney's Office,

11   haven't you?

12   A.   About my testimony?

13   Q.   Yes, ma'am.

14   A.   No, sir.

15   Q.   You haven't --

16   A.   You mean after lunch?

17   Q.   Yes, ma'am.  Between the time that --

18   A.   About my --

19   Q.   Between the time -- I'm sorry.  Between the time

20   that you stopped testifying and you started back this

21   afternoon, you have not visited with any member of the State

22   about your testimony?

23   A.   About the testimony that I wrote, no, sir.

24   Q.   About your testimony today.

25   A.   About my testimony -- no, sir.  No, sir.  You mean

27

1  did they confront me about what I had already said?  Is

2  that --

3      Q.   Did they talk to you -- did any of those three

4  people sitting at that side of the table or anybody else in

5  the District Attorney's Office talk to you at all between

6  the time you stopped testifying at 12:15 today and started

7  testifying back at 1:15 today?  Did you talk to any of those

8  people sitting over there?

9      A.   They asked me what you asked -- wanted to know.

10  I'm sorry.

11      Q.   So the answer to that would be yes, you did; is

12  that right?

13      A.   Yes, sir.

14      Q.   Okay.  All right.  So you did talk to them about

15  it about your testimony and what we were talking about.

16      A.   No.  It didn't concern my testimony, what you

17  asked me.

18      Q.   Do you consider what you're doing right now

19  testifying?

20      A.   Yes, sir.

21      Q.   Now, let me ask you, you indicated that after the

22  25th when you had this conversation with Ms. Click at about

23  4:00 p.m. -- is that right, ma'am?

24      A.   Yes, sir.

25      Q.   That that's the last time you saw or talked to

28

1    her.

2         A.    Yes, sir.

3         Q.    Okay.  Did you know where Tracy Beatty was at that

4    time?

5         A.    No, sir.

6         Q.    Had you seen him over at the house earlier that

7    day?

8         A.    No, sir.  I had been gone most of the day.

9         Q.    Did you see him over at that house anymore that

10   day?

11        A.    No, sir.

12        Q.    Or the next day, which would be the 25th -- I'm

13   sorry -- the 26th.

14        A.    The 26th, that was on a Wednesday?

15        Q.    Yes, ma'am.

16        A.    No, sir.  I worked all day.  I didn't see him.

17        Q.    In fact, before lunch, you testified that the next

18   time that you saw Tracy Beatty was that weekend when you saw

19   him driving the car the weekend after Thanksgiving; is that

20   right?

21        A.    No.  I said that I saw him Thanksgiving morning

22   going from Ms. Wilkerson's over to Ms. Click's.

23        Q.    Okay.  That's right.  You saw him walking --

24        A.    Yes, sir.

25        Q.    -- over in that direction.  You said that you

29

1    didn't --

2        A.   I didn't see him go in.

3        Q.   You didn't see him go in the house, but you

4    assumed -- reasonably assumed, because you had seen him

5    going in and out of that house before, that that's where he

6    was headed?

7        A.   Yes, sir.

8        Q.   And you thought that that was strange that a

9    Thanksgiving would come and go without hearing anything out

10   of your friend, Callie; is that right?

11       A.   Yes, sir.

12       Q.   But you saw him on Thanksgiving morning --

13       A.   Uh-huh.

14       Q.   -- is that right?

15       A.   Yes.

16       Q.   And the first time you saw him driving the car

17   wasn't until the Saturday after?

18       A.   Yes, sir, the weekend.

19       Q.   Okay.  So you saw her on Tuesday?

20       A.   Yes, sir.

21       Q.   And then Wednesday, Thursday, Friday all go by,

22   and then sometime Saturday is the first time you saw the

23   defendant sitting to my left right here driving the car?

24       A.   Yes, sir.

25       Q.   All right.  Where was the car sitting in the

30

1    meantime?

2         A.   It was -- they parked it in a -- she -- Ms. Click

3    pulled in the backyard and parked it in the backyard of the

4    house in between her trailer and the storeroom trailer.

5         Q.   Okay.  And can you -- and I don't really know, and

6    you can't really tell from those pictures exactly, but is it

7    where -- the fence that divides your yard from Ms. Click's

8    yard, can you see over or through that fence to see the car

9    out there?

10        A.   Yes, sir.  It's only about a 4-foot fence.

11        Q.   Okay.  Is it a chain link fence?

12        A.   No, sir.  It's a wire fence.

13        Q.   Just a wire fence?

14        A.   Yes, sir.

15        Q.   And I think we can kind of see it in that picture.

16   I don't -- do you see that picture that's looking at me.

17   The jury can't see it, but you see that -- is it a fence

18   like that fence and --

19        A.   No.  That -- excuse me.  That fence -- that fence

20   runs behind that storeroom trailer.  That's not our house.

21        Q.   Yes, ma'am, but is it a fence like that?  I know

22   that's not the exact fence, but is it a wire fence like that

23   was?

24        A.   Yes, it's -- yes, it's similar.

25        Q.   Okay.  And during the time between Tuesday and

31

1  Saturday, you could see Carolyn Click's car sitting behind

2  the house?

3      A.   Yes, sir.

4      Q.   Okay.  During the time starting on Thanksgiving --

5  and let me just back up.

6           Tuesday is the last time you saw or talked to

7  Carolyn Click?

8      A.   Yes, sir.

9      Q.   Wednesday, you don't see anything out of her; you

10  don't hear anything out of her; you don't see anything or

11  hear anything out of Tracy Beatty?

12      A.   No, sir, I worked all day.

13      Q.   Okay.  Thursday you see him walking from Lieanna

14  Wilkerson's house towards his house?

15      A.   Uh-huh, across the road towards Ms. Click's.

16      Q.   Okay.  Friday you don't see or hear anything out

17  of either one of them?

18      A.   No, sir.  I work, again, on Friday.

19      Q.   Okay.  And then Saturday -- do you remember what

20  time it was Saturday that you saw Tracy Beatty driving the

21  car for the first time?

22      A.   I don't remember.  I don't remember what time

23  because I -- I just don't remember.  I'm sorry.

24      Q.   That's fine.  And I know it's been a long time

25  ago.  So if you knew, great, and if you didn't, that's fine,

32

1    too.

2                    But it was that Saturday, that following

3    Saturday --

4        A.   Yes, sir.

5        Q.   -- which is one, two, three, four days after the

6    last time you saw or talked to her.

7        A.   Uh-huh.  And then that -- yeah, that was the last

8    time I saw her, was on a Tuesday.

9        Q.   Okay.  All right.  During the time after that

10   Saturday when -- you would say that you would see him on

11   occasion, talk to him on occasion, see him out in the yard?

12       A.   Yes, sir.

13       Q.   And "him," I mean Tracy Beatty.

14       A.   Tracy, yes, sir.

15       Q.   When you would see him out in the yard, what would

16   he be doing?

17       A.   Just working around in the yard, and there was a

18   lot of cats and animals out there, and, you know, he would

19   just be walking around and talking to the animals or

20   whatever.

21       Q.   Tending to the animals?

22                    Did Carolyn have cats in addition to the five

23   dogs that you talked about?

24       A.   Uh-huh.

25       Q.   And I know that you're saying yes, but I --

33

1      A.    I'm sorry.  Yes, sir.

2      Q.    It's so hard to get used to that, and I'm as

3 guilty of it as anybody.

4            So it wouldn't be an uncommon thing to see

5 him at the house; the uncommon part of it was not seeing her

6 at the house; is that safe?

7      A.    That's correct.

8      Q.    Did you ever -- you know, in this conversation

9 that you had with Ms. Click, did she ever tell you, "Tracy

10 Beatty can't eat my food anymore"?

11     A.    No, sir.

12     Q.    Did she ever say, "Tracy Beatty can't use my car

13 anymore"?  Did she ever say anything like that to you?

14     A.    Directly stating those, no, sir.

15     Q.    You never heard anything like that, did you?

16     A.    No, sir.

17     Q.    And if I understand what you've testified to, you

18 say Tommy Tucker, who -- does he live in the same trailer

19 with you?

20     A.    Yes, sir.

21     Q.    He eventually called the Smith County Sheriff's

22 Office, and this was on into December sometime, early

23 December --

24     A.    Yes, uh-huh.

25     Q.    -- is that right?

34

1      A.    That's correct, sir.

2      Q.    And this was during the time where nobody would be

3   over there for an extended period of time, and you would go

4   over and water the dogs and make sure that they had water

5   and stuff out there for him?

6      A.    Uh-huh, yes, sir.

7      Q.    And you saw Tracy at some time in December of 2003

8   out behind the house, and I believe that is in that picture

9   that we can see -- again, my eyes aren't that good enough to

10  tell you what State's exhibit that is -- burning stuff out

11  in that burn area.

12     A.    Yes, sir.

13     Q.    But you didn't know anything -- anything of that

14  at the time?

15     A.    No, sir.

16     Q.    And again, that was even further removed in time

17  from the last time that you saw Carolyn Click back

18  Tuesday -- you know, it was weeks after; is that safe to

19  say?

20     A.    Well, it would have been like that next week or

21  so.

22     Q.    A week or ten days after?

23     A.    Uh-huh.

24     Q.    Okay.

25     A.    Yes, sir.  I'm sorry.

35

1           MR. PERKINS:  May I have just a second,

2    Judge?

3           THE COURT:  Yes, sir.

4           (Defense counsel confer.)

5           MR. PERKINS:  Ms. McCarty, I appreciate you

6    being down here.

7           We pass the witness, Your Honor.

8                  REDIRECT EXAMINATION

9    BY MR. HARRISON:

10      Q.   I've got a few more questions for you,

11   Ms. McCarty, if I may.

12      A.   All right.  Thank you.

13      Q.   Ms. McCarty, Mr. Perkins asked you if it was

14   uncommon to see Tracy Beatty in the victim's yard, and I

15   think you said no, he had lived there.  Was it uncommon to

16   see him there in the victim's yard after November 25th,

17   2003, since she had kicked him out of the house?

18      A.   Well, since I hadn't talked to her, I wondered why

19   he was -- you know, why he had come back.  But I -- since I

20   hadn't talked to or saw her, you know, I...

21      Q.   Is it fair to say the last conversation you ever

22   had with Carolyn Click, she had told you how she had told

23   the defendant --

24      A.   Told him to leave.

25      Q.   -- to get out of her house?

36

1    A.   Yes, sir.

2    Q.   And in that -- you never had any other

3 conversations with her after that?

4    A.   No, sir.

5    Q.   So that's the last thing --

6    A.   That was the last time I saw or talked to her.

7    Q.   And Mr. Perkins had asked you about asking the

8 defendant to leave versus telling the defendant to leave.

9           MR. HARRISON:  May I approach, Your Honor?

10         THE COURT:  Yes.

11    Q.   (By Mr. Harrison) Let me show you for record

12 purposes what I've marked as State's Exhibit Number 21 and

13 ask you to identify what that is, just what it is.

14    A.   Yes.  That's my statement that I made describing

15 my last contact with her, and in there, that she had told --

16    Q.   Well, hold on real quick.

17    A.   Oh.

18    Q.   Was this a statement you gave law enforcement on

19 December 18th, 2003?

20    A.   Yes, sir.  Yes, sir, it is.

21    Q.   And can you identify it with your signature there

22 at the bottom?

23    A.   Yes, sir.

24    Q.   And did you actually hand-write this statement?

25    A.   Yes, sir, I did.

37

1    Q.    Okay.  Now, what I want to ask you is, did you, in

2    writing out this handwritten statement that's dated

3    December 18th, 2003, did you indicate on the written

4    statement that she had -- that Carolyn Click had asked Tracy

5    Beatty to leave or that she had told Tracy Beatty to leave?

6    A.    Well, she had told -- she had told him to leave

7    because that's -- that's what I remembered.

8    Q.    And that's what you wrote on the statement.

9    A.    Yes, sir.

10    Q.    And that's what the conversation was.

11    A.    Yes.

12    Q.    And let me show you, I guess, the unhighlighted

13    copy that I've marked State's Exhibit 21.  Is this that same

14    document, other than it's the copy that I just showed you?

15    A.    Yes, sir.

16    Q.    Is this the -- still your same statement

17    indicating by your signature there on the bottom that was

18    given on December 18th, 2003?

19    A.    Yes, sir, it is.

20              MR. HARRISON:  I tender to Defense State's

21    Exhibit 21.

22              MR. PERKINS:  Can we approach?

23              (At the bench, on the record.)

24              MR. PERKINS:  If they're planning on offering

25    this, I would have an objection to it.

38

1          MR. HARRISON:  We are planning to offer it,

2     Judge -- oh, I'm sorry.  We are planning to offer it, Judge,

3     to rebut the allegation of recent fabrication.

4          MR. PERKINS:  All I asked her is why she used

5     the word "asked" instead of "told" before lunch.  I didn't

6     compare it to that.

7          THE COURT:  Is this the same as she was just

8     reading right now?

9          MR. HARRISON:  Yes, Your Honor.  That's the

10    same that she had which she was just answering questions on.

11         THE COURT:  Okay.  So she used this to -- I

12    know you had a marked-up copy on that.

13         MR. HARRISON:  Correct.

14         THE COURT:  She just testified that in the

15    statement she said she told --

16         MR. HARRISON:  That's correct.

17         THE COURT:  Okay.  Now, you want to put the

18    whole statement in?

19         MR. HARRISON:  Yes, sir, to rebut the

20    allegation of recent fabrication based on the questions

21    asked by Mr. Perkins on cross-examination.

22         THE COURT:  Okay.  Well, she just testified

23    to it.  You still want to put it in?

24         MR. HARRISON:  Yes, sir.

25         MR. PERKINS:  I object to it as improper

39

1   bolstering of the witness, and it wasn't used to

2   cross-examine her.  They can try whatever they want to try.

3   I'm objecting to it.

4           THE COURT:  I understand you're objecting to

5   it.

6           Okay.  Tell me why -- she just sat up here

7   and testified about what she put in the statement, that --

8   she just testified that --

9           MR. HARRISON:  She did.  She --

10          THE COURT:  What I'm inquiring about is

11  you're offering the statement of the witness, but she just

12  testified to that.

13          MR. HARRISON:  Well, just to document the

14  fact that that is what's in the statement.  She did testify

15  to that.

16          THE COURT:  On -- the statement has got other

17  things -- the statement has a lot of different -- there

18  are other matters in it.

19          MR. HARRISON:  I'm sorry?

20          THE COURT:  It's got other matters in it

21  besides that.

22          MR. HARRISON:  That's the entirety of her

23  statement, that's right.

24          THE COURT:  It wasn't used to cross-examine

25  her.  You're offering it because it's only to rebut --

40

1    here's what I'm trying to be clear about.  She's testified

2    about what was in the statement, correct?

3                    MR. HARRISON:  That's correct.

4                    THE COURT:  And she's testified to what was

5    in the statement.  You're still offering it?

6                    MR. HARRISON:  Yes, sir.  Our position was

7    that based on defense counsel's questions, that he was

8    making allegations of recent fabrication, the difference

9    between the written statement versus her testimony.  And our

10   position is that we can put in the statement to rebut that

11   allegation of recent fabrication.

12                   THE COURT:  In addition to what she's

13   testifying is in the statement?

14                   MR. HARRISON:  Well, I believe we can.  I

15   believe we can.  But if the Court believes that that would

16   be bolstering, then...

17                   THE COURT:  Well, I mean, she just testified

18   to what was in the statement.

19                   MR. HARRISON:  That's right.  She did.

20                   THE COURT:  She just testified -- you just

21   specifically asked her, and that was in the statement where

22   she said -- she's saying that she was -- she came over and

23   told her that she had told Tracy, her son, to leave.  I

24   believe you just specifically --

25                   MR. HARRISON:  I did just ask her about that,

41

1    yes, sir.

2                   THE COURT:  So she specifically testified to

3    what was in the statement.  So it stands to me, at this

4    point, that she specifically said she gave that statement,

5    and it was in the statement, so then just to offer the

6    statement without any -- she just testified what's in it,

7    and the statement is more than -- how does that rebut the

8    recent fabrication of her testimony?

9                   MR. HARRISON:  Well, it probably doesn't any

10   more than the testimony itself.  It's just a written form

11   rather than testimony.

12                  THE COURT:  I'm going to sustain the

13   objection because she testified directly out of that

14   statement, that it was in that statement and that that's

15   what was in the statement and that she put in the statement

16   exactly -- that she told him to leave.

17                  So I think it would just be bolstering or

18   just putting in the statement when you just had her to

19   testify to, plus some other stuff that's not...

20                  (End of bench conference.)

21                  THE COURT:  All right.  Any other questions,

22   Mr. Harrison?

23                  MR. HARRISON:  Yes, I do have some

24   additional...

25        Q.    (By Mr. Harrison) Ms. McCarty, from -- Mr. Perkins

42

1   was asking you about a prior marriage to a James Everett

2   Click.   Did you know James Everett Click?

3       A.   No, sir, I did not.

4       Q.   Now, you had indicated that during the time of

5   that marriage, you actually were not living next door to

6   Ms. Click?

7       A.   No, sir, I wasn't.

8       Q.   From the time that the divorce proceedings, I

9   guess, were entered into and during the pendency of that

10  divorce and then after that divorce, would it be fair to say

11  that Ms. Click was living alone during that time?

12      A.   Yes, sir.

13      Q.   And that would have been from 1997 on into the

14  future -- into the present, from 1997 to 2003?

15      A.   '97 -- yes, uh-huh.

16           MR. HARRISON:   Judge, may I approach the

17  witness?

18           THE COURT:   Yes, you may.

19      Q.   (By Mr. Harrison) I'm showing you what I've marked

20  as State's Exhibit Number 20.   Do you recognize this as a

21  court document?

22      A.   Yes, sir.

23      Q.   And, obviously, a divorce decree with James

24  Everett Click and Carolyn Click?

25      A.   That's correct.

43

1          MR. HARRISON:  I'd tender to defense counsel

2     State's Exhibit Number 20.

3          MR. PERKINS:  Judge, we've seen that

4     previously, and we don't have any objection.

5          THE COURT:  State's 20 is admitted with no

6     objection.

7     Q.    (By Mr. Harrison) And you can see this has the

8     raised seal from the State of Texas showing that it's a

9     certified document?

10    A.    Yes, sir.

11    Q.    All right.  And you can see also it has a

12    file-mark with the Brad Burger, County Court at Law

13    Number 2?

14    A.    Yes, sir.

15    Q.    All right.  This would be a final decree of

16    divorce between James Everett Click and Carolyn Ruth Click?

17    A.    Yes, sir.

18    Q.    With regard to -- the part on page 6, it talks

19    about the confirmation of separate property.  Do you see

20    that?

21    A.    Yes, sir.

22    Q.    All right.  Is -- in a portion of that first

23    paragraph, under "the confirmation of separate property" in

24    this file-marked divorce decree, refer to the mobile home on

25    Lot 30, Crestview Addition, located at 18853 County Road

44

1    2323, Whitehouse, Texas, 75791?

2         A.    Yes, sir.

3         Q.    And that was going to be confirmed as the separate

4    property of Carolyn Ruth Click?

5         A.    Yes, sir.

6         Q.    All right.  Now, Mr. Perkins asked you about

7    seeing the defendant drive any vehicle.  You indicated that

8    you saw the defendant drive, on two occasions, a pickup?

9         A.    Yes, sir.

10        Q.    Do you -- when was that?

11        A.    That was after Thanksgiving.  As well as I can

12   remember, it was after that.

13        Q.    And you indicated you saw him driving it two

14   times?

15        A.    Yes, sir, because it was back after he was -- the

16   reason I'm saying when it was, it was after that I didn't

17   see Ms. Click anymore.  So it was during that time.

18        Q.    All right.  You don't know who the truck belonged

19   to?

20        A.    No, sir.  All I know is -- I don't know his name.

21   He has a mobile home where he buys and sells mobile homes

22   and things like that.

23        Q.    And other than those two times, you had never saw

24   the defendant driving even that truck again?

25        A.    No, sir.

45

1     Q.   So this truck that you saw the defendant driving

2   two times would have belonged to some man who had something

3   to do with moving mobile homes?

4     A.   Yes, sir.

5     Q.   Did you ever -- prior to the 25th of November, did

6   you ever see the defendant driving Carolyn Click's station

7   wagon?

8     A.   No, sir.

9     Q.   Did you ever see Carolyn Click -- prior to

10   November 25th, 2003, Carolyn Click allowing the defendant to

11   drive, with or without her, in her station wagon?

12     A.   No, sir.

13     Q.   The times that you saw Carolyn Click and the

14   defendant together in the -- in her station wagon, did you

15   ever at any time see the defendant driving that car?

16     A.   No, sir.

17     Q.   I had asked you about the written statement that

18   you gave where you had, in your own handwriting, written

19   that Carolyn Click had told Tracy, her son, to leave, right?

20     A.   Yes, sir.

21     Q.   Was there any question in your mind at all that

22   that's what happened, that she told you that she had told

23   him to leave?

24           MR. PERKINS:  Objection.  It calls for

25   speculation, plus it's a comment on hearsay.  Not only are

46

1    they asking her a hearsay question, but now they're asking

2    her to tender as -- her belief as to the truthfulness of the

3    hearsay statement.

4              MR. HARRISON:  Judge, my question is, was

5    there any question in her mind that that was told by the

6    victim.

7              THE COURT:  I'll overrule the objection to

8    that question, "Was there any question in your mind about

9    what you were told?"

10    A.    Was there any question in my mind about what she

11    told me?

12    Q.    (By Mr. Harrison) Yes, ma'am.

13    A.    No, sir.

14    Q.    From Thanksgiving and -- from Thanksgiving on

15    through and into December, did you see Tracy Beatty go in

16    and out Carolyn Click's residence?

17    A.    Yes, sir.

18    Q.    On few or many occasions?

19    A.    Well, you'll have to understand I wasn't at home

20    all the time.

21    Q.    Sure.

22    A.    But I saw him on several occasions over there

23    going in and out, yes, and we talked.

24    Q.    All right.  Now, you had indicated that the first

25    time you actually saw Tracy Beatty drive Carolyn Click's car

47

1   would have been on what date?

2        A.   The weekend, Saturday --

3        Q.   Saturday after Thanksgiving?

4        A.   Yeah, after Thanksgiving.

5        Q.   Do you know -- first of all, where do you work?

6        A.   I work at Foley's.

7        Q.   What are your hours?

8        A.   I work for a fragrance vendor.  I have different

9   hours.  And that being Christmas, I was working eight to

10  nine hours a day, which would be --

11       Q.   Do you recall --

12       A.   -- get off maybe at 7:00 and maybe went in at

13  10:00 or 11:00.

14       Q.   Okay.  I'm sorry.  Get off at approximately

15  7:00 p.m.?

16       A.   7:00, yes.

17       Q.   And then in December around Christmas-time, would

18  it be light or dark out?

19       A.   It would be dark.

20       Q.   From the -- do you recall seeing, for the first

21  time, Tracy Beatty driving Carolyn Click's station wagon on

22  the Saturday after Thanksgiving?

23       A.   All I can remember is the weekend.  I'm sorry.  I

24  think it was Saturday, but it was the weekend.  He was gone

25  in it.

48

1    Q.   Do you know whether Tracy Beatty drove prior to
2  that, before that?
3    A.   Before the weekend?
4    Q.   Yes, ma'am.
5    A.   In between the 25th and that?
6    Q.   In other words, that's the first time you actually
7  saw him driving?
8    A.   Yes, sir.
9    Q.   Do you know whether he drove at any time before
10  that?
11    A.   No, sir, I do not.
12    Q.   And obviously, you can't say whether he did or
13  not.  The first time you saw him driving, though, would have
14  been the Saturday?
15    A.   The weekend, yes, sir.
16    Q.   Do you recall, did you work that week, the week of
17  Thanksgiving week?
18    A.   Yes, sir, all but Thanksgiving day.
19    Q.   All right.  So you would have been at work from
20  sometime in the morning, 9:00, 10:00 o'clock in the morning
21  until 7:00 p.m. at night?
22    A.   That's correct.
23    Q.   Let me ask you this, Ms. McCarty:  Did you ever
24  have any occasion to see anyone else besides Carolyn Click
25  drive her station wagon?

49

1      A.    No, sir.

2      Q.    So the only person you have ever seen -- prior to

3   November 25th, 2003, the only person you've ever seen drive

4   her station wagon was Carolyn Click?

5      A.    Yes, sir.

6      Q     I want to ask you a question about something

7   Mr. Perkins talked with you about on cross-examination.  He

8   asked you if you had talked over the lunch break or any time

9   after, I guess, we recessed to any of the three of us about

10  your testimony.  You said you had not talked to us about

11  your testimony.

12     A     That's correct.

13     Q     Was there a time that Mr. Perkins approached you

14  and talked with you over the lunch break?

15     A     Yes.

16     Q     Did you tell Mr. Bingham that Mr. Perkins had

17  approached you and asked you a specific question?

18     A     Yes, sir.

19     Q     Did you do that over the lunch break?

20     A     Yes, sir.

21     Q     Did you talk about testimony at all or simply

22  inform Mr. Bingham that Mr. Perkins had asked you a

23  question?

24     A     If Mr. Bingham asked me any question?

25     Q     No.  Did you talk about your prior testimony?

50

1     A    No, sir.

2     Q    Or did you simply inform Mr. Bingham that

3  Mr. Perkins had approached you and asked you a question?

4     A    I told him that they had approached me.

5              MR. HARRISON:  May I approach the witness,

6  Your Honor?

7              THE COURT:  Yes.

8     Q    (By Mr. Harrison) Ms. McCarty, let me show you

9  what I've marked State's Exhibit No. 3.

10    A    Yes, sir.

11    Q    Can you identify anything about the person in

12  State's Exhibit No. 3?

13    A    I recognize the ring was Ms. Click's.

14             MR. HARRISON:  Tendering to defense counsel

15  State's Exhibit No. 3.  And we're going to offer State's

16  Exhibit No. 3.

17             MR. PERKINS:  May we approach?

18             THE COURT:  Yes.

19             MR. PERKINS:  And there's going to be several

20  things, Judge, so it may be better that we take these it up

21  outside the presence of the jury, because I'm going to have

22  another proffer as well.

23             MR. HARRISON:  In that case, can I do one

24  more before we go outside the presence?

25             THE COURT:  Yes.

51

1    Q    (By Mr. Harrison) I'm showing you State's Exhibit
2    No. 18, Ms. McCarty.  From anything present here, can you
3    identify this individual?
4    A    Yes, sir, the tattoo over the breast.
5    Q    Can you identify the person in the photograph?
6    A    Yes, sir.
7    Q    Who is it?
8    A    It's Carolyn Click.
9    Q    I don't know if I asked you on State's Exhibit
10   No. 3.  Who is the individual in State's Exhibit No. 3?
11   A    Carolyn Click.
12        THE COURT:  All right.  Ladies and Gentlemen,
13   I'm going to have to excuse you for about 15 minutes.
14   Mr. Carleton will be right back to get you.
15        All rise for the jury.
16        (The jury leaves the courtroom.)
17        (Open court, defendant present, no jury.)
18        THE COURT:  All right.  The jury is now out
19   of the courtroom.  The Defense is still present; the
20   defendant is present.  The State's present; the Defense is
21   present; the defendant is present.
22        Outside the hearing of the jury.
23        MR. HARRISON:  Judge, I think we had offered
24   State's Exhibit No. 3 and 18.  These are photographs that
25   the Court saw.  I think the photographs --

52

1          THE COURT:  Hold your left one up a little

2     bit further, I think, what you're referring to.

3          MR. HARRISON:  (Complies.)

4          THE COURT:  Okay.  All right.  What numbers;

5     3 and what?

6          MR. HARRISON:  3 and 18.

7          THE COURT:  All right.  Go ahead.

8          MR. PERKINS:  The defendant objects to both

9     State's Exhibit 3.  First of all, for the following reasons,

10    State's Exhibit No. 3 is -- I don't know -- I would say a

11    hundred times life size would be my guess.  It's a picture

12    of a ring.  The witness on the stand indicates that she

13    could identify the ring as belonging to Carolyn Click.

14         If they want to excise the portion regarding

15    the ring, we have no objection to that.  There is no other

16    reason to put that into evidence other than to prejudice the

17    defendant.

18         As far as State's Exhibit No. 18, again, she

19    says she can identify the person in that photograph by

20    the -- I believe she testified the tattoo over the breast.

21    Again, if they want to excise this particular portion from

22    that picture, which I'll tell the Court, is poster-board

23    size, for the record.  Probably a poster board, full frontal

24    nudity picture of the deceased in the case.

25         If they want to excise the portion regarding

53

1   the tattoo, which allows her to identify the alleged victim

2   in the case, then we would have no objection.

3              Again, there is no reason, and it is

4   uncontroverted by the Defense that the defendant in the case

5   killed Carolyn Click.  There's no controversy about that.

6   There's no need for the State to proffer these, except to

7   try to inflame the jury against the defendant and cause, by

8   prejudicial effect, an adverse verdict to the defendant.

9              So since there is no contest regarding the

10  identity of the person who was killed or the identity of the

11  person who did the killing, then this is wholly unnecessary.

12             Our objection is that these photographs are

13  irrelevant, prejudicial, and are way out of proportion under

14  a balancing test, under 403, that any relevant purpose that

15  these may serve would be greatly outweighed by showing

16  decomposing -- photos of decomposing bodies to a jury when

17  it's absolutely for the purposes proffered by the State,

18  unnecessary.

19             THE COURT:  With this witness, the lay

20  witness on the stand now, what would be the purpose with

21  this witness, the lay witness whose testimony, as the Court

22  understands it, is an identification of the ring on a

23  finger?  What would be the purpose of the offer of the State

24  on up through the measuring device and further on up with

25  this lay witness?

54

1          MR. HARRISON:  Judge, the only witnesses who

2   can identify the body are actually lay witnesses.  The

3   purpose of having it with the measuring device is that ties

4   it to the pathologist, who conducted the autopsy, who will

5   testify to the injuries suffered by this person named

6   Carolyn Click, who can only be identified Carolyn Click, the

7   son of -- pardon me -- the mother of Tracy Beatty through

8   lay witnesses.

9          The identity, although not contested, I

10  guess -- Mr. Perkins says it's uncontroverted.  It's still

11  an element that we have to prove.

12          THE COURT:  Well, what are you saying about

13  the pathologist's testimony would be in regard to State's 3?

14          MR. BINGHAM:  Can I have one second?

15          THE COURT:  Sure.

16          MR. HARRISON:  Judge, this measuring device

17  with the numbers that are on it is the pathologist's way to

18  identify through case numbers, the pathologist's case

19  number, the autopsy number.  The fact that this ring is

20  identified by a lay witness as belonging to Carolyn Click

21  ties this ring to this person that the autopsy was performed

22  on.

23          THE COURT:  I understand that.  My question

24  is in regard to 3, as it goes on up.  In other words, as it

25  goes on up above the measuring device -- I think my question

55

1   is, do you need the measuring device?

2          Go ahead -- I mean, I'm talking about with

3   this lay witness.  So if the pathologist, who was there when

4   the picture was taken, if there's something with regard to

5   the measuring device and on up above the measuring device

6   that a pathologist is going to testify to, that would be

7   another question.

8          With this lay witness, her testimony seems to

9   go to being able to identify that watch.  So I guess my

10  question is, up through the measuring device on up, what is

11  a necessity with this witness?

12         MR. HARRISON:  Judge, we can take from above

13  the measuring device.

14         MR. PERKINS:  I don't see why the State needs

15  any of this.  As you look at it, to the left of it, and

16  below the measuring device.

17         THE COURT:  Hold it up.  Just a second,

18  Mr. Perkins.  I can't see it down there.  Hold it up.

19         MR. PERKINS:  And, Judge, if they want to

20  excise the portion out of here that has the ring and the

21  measuring device, then I have no objection to it.  But to

22  put in all that other stuff is --

23         THE COURT:  Well, if they excise out -- and I

24  don't know where -- apparently, you need to use this again.

25  And I suppose at this point, it would be a matter of to --

56

1   when you say "excise," to cover sufficiently from the

2   measuring device up?

3                MR. HARRISON:  Just above the measuring

4   device?

5                THE COURT:  What is the purpose of the

6   measuring device with this lay witness?

7                MR. HARRISON:  It's not necessarily -- the

8   case number is not relevant to this particular lay witness.

9   What's relevant is that this case number goes to this body

10  upon which a ring was on the finger that was then

11  identified -- the ring being identified as that belonging to

12  the victim through this lay witness.

13               THE COURT:  All right.  Then in regard to --

14               MR. PERKINS:  Well, Judge, here's the thing.

15  They have another witness that can come in and say,

16  "Identify this ring by this picture."

17               What they're trying to do is try to put as

18  much of that dead, rotted hand in as they can so they can

19  get the jury good and fired up against Tracy Beatty.  Let's

20  just get to the facts here.

21               MR. HARRISON:  The fact that this is Carolyn

22  Beatty's (sic) ring proves nothing -- Carolyn Click's ring

23  does nothing to show that this person is Carolyn Click.  The

24  only fact that this is relevant is that this is Carolyn

25  Click's ring and that it is on her body.  Otherwise, this

57

1    ring could have come out of the jewelry --

2              THE COURT:  I understand that.

3              MR. BINGHAM:  -- box.  The fact of the matter

4    is that this is going to be relevant, this picture to the

5    pathologist, obviously, because of the decomposition is

6    dated.

7              The point of it is, if there's some part of

8    this that Mr. Perkins and the Court order us to remove,

9    that's fine.  The part of what's relevant to the jury

10   through this witness is that this ring that she can identify

11   is on Carolyn Click's body.

12             THE COURT:  Well, are you saying that you

13   need the -- you're saying that that's why you need the

14   number?

15             MR. BINGHAM:  Right.  Judge, all of this

16   might be irrelevant, but the fact that this ring is on her

17   body, and this ring belongs to Carolyn Click.

18             THE COURT:  What about the area that

19   Mr. Perkins is objecting to over to the left underneath the

20   measuring device?

21             When we say "excise," I think we're really

22   talking in terms of sufficiently covering up.  That's

23   probably, I take it, the only photograph like that you've

24   got?

25             MR. BINGHAM:  Judge, we can blow them up.

58

1           THE COURT:  Okay.  In regard to that State's

2   Exhibit 3, then, from --

3           MR. BINGHAM:  You're talking about right here

4   (indicating)?

5           THE COURT:  Right there up.

6           MR. BINGHAM:  So we just take --

7           THE COURT:  You're going to leave the number,

8   correct?  There you go.  It's basically, you're excising

9   from the number and the ruler up, and then --

10          MR. BINGHAM:  Right.  We're excising from the

11  ruler all the way up in the photograph and then from the 4

12  over to the edge.

13          THE COURT:  All right.  And then this ruling

14  obviously is with this witness.  We don't have to hear

15  another witness' testimony.  If that same photograph is

16  reoffered with another witness.

17          All right.  Then that's State's Exhibit No. 3

18  is -- now you're offering State's Exhibit 3?

19          MR. PERKINS:  Cut off your sticker.

20          THE COURT:  Get the sticker on there.

21          MR. HARRISON:  We have redacted and cut by

22  Mr. Bingham, we would reoffer State's Exhibit No.  3.

23          THE COURT:  With regard to State's Exhibit 3,

24  as redacted, Mr. Perkins, do you have any objection?  I

25  believe those are basically the areas, as I was

59

1   understanding your objection.

2                    Do you have some tape down there?

3                    MR. PERKINS:  We don't have any additional

4   objections, Your Honor.

5                    THE COURT:  The Court's ruling, the Court has

6   made clear, the redactions that have been made, and the

7   Court's ruling thereto goes to this witness' identification

8   of the ring.

9                    If there is a subsequent witness that the

10  full photograph is offered with, the Court will have to rule

11  on that, once the Court determines what the witness'

12  testimony would be in reference to the full photograph.

13  Which is the other one?  The full photograph is State's 3.

14                   MR. HARRISON:  State's Exhibit 18.

15                   THE COURT:  Now, in regard to State's

16  Exhibit 18, if I understood the witness' testimony, she

17  referenced a tattoo; is that correct, which is what you're

18  pointing to?

19                   MR. HARRISON:  That's correct.

20                   THE COURT:  And also she identified this as

21  the victim, Carolyn Click?

22                   MR. HARRISON:  Correct.

23                   THE COURT:  If that testimony is based on --

24  which -- I mean, obviously, it would be from the tattoo and

25  the face of Carolyn Click, that would -- then with this

1   witness, what would be the need for going down below the

2   tattoo area with this witness?

3               MR. BINGHAM:  Judge, so you're asking us from

4   the tattoo below?

5               THE COURT:  Yes, sir.

6               MR. BINGHAM:  From the tattoo below, with

7   this witness, we have no objection to removing from the

8   tattoo down, except from the No. 1.

9               THE COURT:  Well, all right.  With the

10  number -- your identification number can stay.  Your

11  identification number -- now, I'm talking about with this

12  witness, your identification number can remain.  But in

13  terms of -- I think that's your objection, isn't it,

14  Mr. Perkins?

15              MR. PERKINS:  Well, Judge, my objection is,

16  is this:  This witness did not testify that she recognized

17  her from her face and the tattoo.  This witness testified

18  that she recognized her from the tattoo.  So there's no

19  reason to show the face.  So my objection is to show

20  anything other than the tattoo.

21              THE COURT:  No.  She said she could

22  recognize -- my recollection of the testimony is she said

23  she could recognize that as Carolyn Click.

24              MR. PERKINS:  That's not my recollection of

25  it.  But we object to it, in any event, Judge.  If she says

61

1   she can recognize her from her face, then she's subject to

2   cross-examine on that.

3            THE COURT:  That's right.  Mr. Perkins, what

4   I believe her testimony was, was that she could recognize

5   the person in there as Carolyn Click.

6            MR. PERKINS:  Because of the tattoo, is

7   exactly what she said, Judge.  We could have the court

8   reporter read it back.  She said, because of the tattoo over

9   the breast, she could recognize her.  We could argue about

10  it, but it's in the record that she identified her from the

11  tattoo.

12            If they want a picture of the tattoo in, I

13  have no objection.  But if they want to put in a full,

14  frontal, nudity picture of a corpse, then --

15            THE COURT:  Mr. Perkins, in regard to your

16  objection and the Court's ruling, I'm going to allow the

17  photograph, including the face, to come in that the State

18  excised down below the tattoo, and they can leave their

19  identification number in.

20            MR. PERKINS:  I have the same objections,

21  Judge.

22            THE COURT:  They're overruled with them

23  making the excisions, with them excising the parts they're

24  excising now.

25            On what State's exhibit is that,

62

1   Mr. Harrison?

2                    MR. HARRISON:  Exhibit 18.

3                    THE COURT:   18.  On State's Exhibit 18.

4                    So State's 3 is excised.  The objection is

5   overruled, and State's 3, as it stands now, after having

6   portions having been excised, and in regard to State's

7   Exhibit 18 -- hold that up a little higher.

8                    In State's Exhibit 18, do you have any

9   further objections to it, Mr. Perkins?

10                   MR. PERKINS:  No, Your Honor.  I've made all

11  the objections I'm going to do to that.

12                   THE COURT:  Okay.  State's Exhibit 18, as it

13  is now excised, the objection is overruled and it will be

14  admissible.

15                   So State's 3 and 18, the Court will admit as

16  excised.

17                   Did you have anything else?

18                   MR. PERKINS:  I did, Judge.  Since the jury

19  is not present in the courtroom, I did want to go ahead and

20  make a proffer of the question, especially in light of the

21  State's redirect of this witness, regarding Ms. Click's

22  previous suicide attempt.  I figured now is as good a time

23  to take that up outside the presence of the jury.

24                   THE COURT:  Outside -- and the record will

25  continue to reflect we're outside the presence of the jury.

63

1          MR. PERKINS:  May I proceed with that, Your

2    Honor?

3          THE COURT:  Yes, you may.

4                  VOIR DIRE EXAMINATION

5    BY MR. PERKINS:

6          Q    Ms. McCarty, we had an opportunity right after

7    1:00 today to visit just for a second, because when you had

8    talked about having confided or having had Ms. Click confide

9    in you, I asked you if you had any knowledge regarding a

10   prior suicide attempt.

11         A    Yes, sir.

12         Q    You remember us talking about that out in the

13   hall?

14         A    Yes, sir.

15         Q    And you told me at that time that she did?

16         A    Yes, sir.

17         Q    That you were aware that Carolyn had at some point

18   in the past shot herself; is that right?

19         A    She had told me that, yes, sir.

20         Q    Do you know when it was that she told you that?

21         A    Oh, it's been five or six years ago at least.

22         Q    What did she tell you about that, ma'am?

23         A    She just told me that she was young, and I don't

24   know if she had told me about the details and everything.

25   She did try to kill herself and that she tried to shoot

1    herself -- I mean, she shot herself.

2        Q    So she did shoot herself and try to kill herself?

3        A    Yes, sir.

4        Q    Did she tell you anything about what led up to it,

5    what had caused her to get to that particular point in her

6    life?

7        A    No.  She just said that I was just upset, and she

8    didn't go into detail of what anything was about.  But I

9    don't know if it was a boyfriend or whatever, but she didn't

10   say anything about what it was.  She just told me what she

11   had done and opened that up to me, and that was it.

12       Q    But you don't recall as to what it was that caused

13   her to shoot herself?

14       A    No, sir.

15       Q    And do you recall whether or not those events had

16   anything to do with Tracy Beatty?

17       A    Not that I'm aware of.

18       Q    So you don't know if it did or don't know if it

19   didn't?

20       A    No, sir.

21       Q    Do you know how old she was at the time that she

22   tried to commit suicide by shooting herself?

23       A    No, sir.  No, sir, I don't know how old she was.

24       Q    And she told you this, you say, approximately five

25   years ago.  This would have been around 1999 that she told

65

1   you this, give or take?

2        A     Give or take, because we had known one another for

3   a while where we got to talking, opening up to one another.

4   But somewhere along in there.

5                    MR. PERKINS:  Judge, it's my opinion that,

6   especially in light of the State's questions regarding what

7   they had specific questions, what we had asked you about,

8   that kind of thing, we visited with you after the lunch

9   hour, that kind of thing that the State addressed in their

10  redirect.

11                   THE COURT:  Yes, I know what you're referring

12  to in terms of the testimony.

13                   MR. PERKINS:  Right.

14                   My area of inquiry was regarding her changing

15  from "had asked him to leave" to "telling him to leave."

16  However, the State, then, opened the door to us being able

17  to ask what did you visit with the State about.  Because as

18  it stands in front of the jury right now, it looks as though

19  it's something that could possibly be improper for us to

20  visit with her or for the State to visit with her.

21                   The State has left an impression with the

22  jury, basically, that that leaves them to wonder.  And it's

23  our opinion, Judge, that since Ms. McCarty has been able to

24  come in and talk about confidences that were expressed to

25  her by Ms. Click regarding undated, untimed assaults by

66

1   Tracy Beatty, I don't know when, just at some time in the

2   past he has assaulted her, that we are entitled for the jury

3   to know and to understand all of the details which were

4   confided to this witness by Ms. Click, including her prior

5   suicide attempt, for whatever relevancy it may have, for

6   whatever weight and value.

7           We don't believe it's inadmissible.  We

8   believe that the jury ought to be able to determine what

9   weight or relevance to give to that, if any.  So as it's

10  left right now, the State has gone right up to the thing,

11  and I don't know why -- what would prevent me to ask her,

12  since it's been asked in front of the jury, what did you

13  visit with the State about, what did you talk to Mr. Bingham

14  about.  I don't see what would prevent me from doing that.

15          THE COURT:  Mr. Harrison?

16          MR. HARRISON:  Judge, as I understand it,

17  what was just said and my recollection is that Mr. Perkins

18  on cross-examination is the first person ever to ask this

19  witness if she visited with the State over the lunch hour.

20  And that was done on cross-examination.  We had asked

21  nothing -- I mean, obviously, we couldn't have asked

22  anything about that because we hadn't had a lunch break when

23  I passed the witness.

24          Mr. Perkins, on cross-examination, asked did

25  she visit with any of the three of us.  So my question in

67

1  response to that, in direct response to direct examination

2  was, did we visit with you about testimony, or did you

3  simply alert us to the fact that Mr. Perkins had come and

4  asked you a specific question.

5          There wasn't -- we -- I didn't preface

6  anything about what the question was in front of the jury.

7  I simply was responding to the question that was asked of

8  this witness on cross-examination by Mr. Perkins to let the

9  jury know that we hadn't talked about testimony, which was

10  the implication from the question on cross-examination.

11          That doesn't open the door to anything.  As

12  far as why we're entitled to get into -- the Court's already

13  ruled that the statements by the victim to this witness

14  about Tracy Beatty specifically referring to the

15  relationship and the prior relationship between the victim

16  and Mr. Beatty is admissible on several grounds, not the

17  least of which is Article 38.36 of the Texas Code of

18  Criminal Procedure.

19          The information related to the victim to this

20  witness has nothing at all to do with Tracy Beatty.  There's

21  no evidence that it has anything to do with Tracy Beatty.

22  It's not related to any relationship between Tracy Beatty

23  and the victim.  It's not relevant.  There's nothing

24  probative about it.  Doesn't go to any issue in this case.

25  It doesn't go to any past or any past relationship between

68

1    the parties.

2                    THE COURT:  Is that it?

3                    MR. HARRISON:  That's the extent of it.

4                    THE COURT:  All right.  The Court's going to

5    sustain the objection.  I believe you earlier made an

6    objection, Mr. Harrison, to the question when it was

7    first -- y'all first approached the bench.

8                    MR. HARRISON:  I asked for a motion in

9    limine, Judge.

10                   THE COURT:  Yes, a motion limine.  Well, the

11   Court's going to sustain.

12                   MR. HARRISON:  And I'll object to the

13   question.

14                   THE COURT:  The Court is going to sustain the

15   objection.  The Court is going to grant your motion in

16   limine.

17                   And at this time, Mr. Perkins, the motion in

18   limine is granted not to ask the witness about anything that

19   she was told in reference to some attempted suicide at some

20   earlier time by Carolyn Click.  And I sustained -- I'm

21   sorry.

22                   MR. PERKINS:  I do have one other matter I'd

23   like to bring to the Court's attention.  I understand the

24   Court's ruling.  There's one other area which has not quite

25   been breached yet by the Defense.

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

69

1          We feel like it may be probative.  I don't

2   see how the State can stand up here and say it has nothing

3   to do with Tracy Beatty when their witness says it may or

4   may not, I don't know.

5          But I don't see how the State can stand up

6   here and say it's totally irrelevant, when the witness on

7   the stand says, "I don't know if it had anything to do with

8   him or not."

9          What I will say is this:  Their previous

10   witness indicated that Tracy Beatty had told him that

11   Carolyn Click had pulled a gun on him and that it was

12   necessary for him to take the gun away and choked her while

13   taking the gun away.

14          We believe that it's relevant on the issue of

15   Carolyn Click's propensity, if you will, to produce a gun

16   and to use a gun, either against herself or to other people.

17   So the relevancy of the fact that she would shoot herself,

18   I'll make an argument like I know the Court made in Kerry

19   Max Cook's case.  If you'll take a razor blade and saw the

20   end off of your own penis, it probably would be a less

21   intrusive thing to take a pair of scissors and cut

22   somebody's labia off.

23          So let me make this particular argument to

24   the Court:  If Carolyn Click was willing at one point in

25   time to produce a gun and shoot herself in the spine, I

70

1   would say that at some subsequent point in time it may add

2   credibility to the defendant's version that he had to take

3   the gun away from her to defend himself in self-defense to

4   strangle her.

5           So on that basis, I would tell the Court that

6   we believe that it's relevant and probative on the issue of

7   a possible self-defense claim, which has already been

8   produced into evidence by the State's first witness.  So,

9   again, we believe that it's relevant and probative on that

10  issue.

11          THE COURT:  The Court is going to grant the

12  motion in limine and sustain the objection for defense

13  counsel not to ask the witness anything relative to what she

14  was told by Carolyn Click, reference an attempted suicide by

15  Carolyn Click at some time earlier in her life.  That's the

16  Court's ruling.  As the record stands at this time, the

17  Court's ruling it's not relevant.

18          Now, if at some time in the -- in some future

19  testimony, if you will raise it, the Court will take it back

20  up in terms of whether or not it becomes relevant.

21          MR. PERKINS:  That's fine, Judge.  I

22  understand the Court's ruling.  Will the Court allow me to

23  offer my questions to her and her responses on a bill of

24  exception at this time?  Obviously, if it becomes relevant,

25  we're going to obviously offer that in the form of testimony

1    again.  But at least at this point in time, to offer that on

2    a bill of exception?

3                    THE COURT:  Well, I think that's what -- you

4    just made a bill.  Didn't you just make a bill on it?

5                    MR. PERKINS:  That's what I'm offering it now

6    on a bill of exception.

7                    THE COURT:  On a bill of exception outside

8    the presence of the jury.

9                    MR. PERKINS:  Since the Court -- my

10   understanding is the Court's granted a motion in limine.

11   The Court has not excluded that testimony.

12                   THE COURT:  As the record stands now, the

13   Court has granted the motion in limine of the State and

14   sustained the State's objection to asking this witness about

15   any matter relative to her being told by Carolyn Click or --

16   and that's the only offer so far about an attempted suicide

17   by Carolyn Click at some earlier point in her life.  So

18   that's the Court's ruling at this time.

19                   If at some point, the Court doesn't -- the

20   Court finds it's not relevant at this time.

21                   Are we ready for the jury, Mr. Perkins?  Can

22   I get the jury?  Do you have anything further?

23                   MR. PERKINS:  No, Judge, we're ready.

24                   THE COURT:  Let's get the jury back in.

25                   Do you have anything else, Mr. Harrison?

72

1            MR. HARRISON:  No, Your Honor.

2            THE COURT:  Before the jury gets back in,

3  Mr. Perkins, I might say I might have to consult the record

4  before I reference the exact words used in that argument.

5  Maybe you have a better memory than me.

6                (The jury enters the courtroom.)

7                (Open court, defendant and jury present.)

8            THE COURT:  Have a seat, please, Ladies and

9  Gentlemen.  Thanks.

10           Go ahead, Mr. Harrison.

11           MR. HARRISON:  May I continue to approach?

12           THE COURT:  Yes.

13           DIRECT EXAMINATION (CONTINUED)

14  BY MR. HARRISON:

15     Q    Ms. McCarty, I had previously shown you State's

16  Exhibit No. 18.

17     A    Yes, sir.

18     Q    And you had -- let me just ask you:  Can you

19  identify the individual contained in this photograph,

20  State's Exhibit No. 18?

21     A    Yes, sir.

22     Q    By what method can you identify this individual?

23     A    Well, as I was saying, the tattoo.  As I was

24  saying, the tattoo, but across in here (indicating).

25     Q    Now, I've seen you make a gesture with your hand

73

1    kind of under your nose.

2         A    The nose area.

3         Q    So you can identify the individual in this

4    photograph as Carolyn Click?

5         A    Yes, sir.

6         Q    Through both tattoo as well as her nose?

7         A    Yes.

8         Q    Now, looking at State's Exhibit No. 3, can you

9    identify the individual or anything in this photograph?

10        A    I can identify the ring.

11        Q    Whose ring is that?

12        A    Carolyn Click's.

13             MR. HARRISON:  We would offer, Judge, State's

14   Exhibit 18 and 3.

15             MR. PERKINS:  I have no additional

16   objections, Your Honor.

17             THE COURT:  State's Exhibit 3 and 18 are

18   admitted.

19             MR. HARRISON:  May we publish, Judge?

20             THE COURT:  Yes.

21        Q    (By Mr. Harrison)  Let me start with State's

22   Exhibit No. 3.  Now, you've indicated that you can identify

23   this as Carolyn Click's ring?

24        A    Yes, sir.

25        Q    And I guess you're obviously referring to this --

74

1    I guess it's a pinky ring?

2         A    Pinky ring.

3         Q    Can you tell what hand that is worn on?

4         A    I was trying to think back.  I believe it was on

5    the right hand.

6         Q    Do you know it to be a ring, a pinky ring?

7         A    Yes, sir.

8         Q    And with regard to State's Exhibit No. 18, you had

9    indicated that you could recognize this body as that of

10   Carolyn Click's?

11        A    Yes, sir.

12        Q    And you base that both on the nose --

13        A    Nose.

14        Q    As well as a tattoo over her left breast?

15        A    Yes, sir.

16        Q    And have you seen this tattoo on Carolyn Click

17   before?

18        A    Yes, sir.  I couldn't describe it to you, but I

19   had seen it.  She pulled her blouse down one time and showed

20   it to me.

21        Q    And is this tattoo that's on State's Exhibit

22   No. 18, the tattoo that's on the body of Carolyn Click?

23        A    Yes, sir.

24        Q    This is going to sound like a silly question, but

25   when she was alive prior to November 25th, 2003, was Carolyn

75

1   Click an individual, a live human being?

2        A    Yes, sir.

3        Q    And after November 25th, 2003, did you ever see or

4   speak to Carolyn Click again?

5        A    No, sir.

6        Q    Thank you, Ms. McCarty.

7             MR. HARRISON:  I'll pass the witness.

8             THE COURT:  Mr. Perkins.

9             MR. PERKINS:  Thank you, Judge.

10                    CROSS-EXAMINATION

11  BY MR. PERKINS:

12       Q    Ms. McCarty, I promise I'll try to get you out of

13  here as quick as I can.  I appreciate your patience with us.

14            Do you know who Donna Wilcox is?

15       A    Donna Wilcox?

16       Q    Yes, ma'am.

17       A    No, sir.

18       Q    Did the truck that you saw Tracy Beatty driving,

19  had you ever seen that truck before?

20       A    It was parked behind -- I believe it was the one

21  that was parked behind that vacant mobile home next to ours.

22       Q    Down in the lot next to where -- I think you

23  described is a place where they were going to make it into a

24  craft place?

25       A    Yes, sir.

1      Q     Do you know who owned that truck?

2      A     The gentleman that has the lots out there.

3      Q     Okay.

4      A     That is his property there.  They were going to

5  put a little hobby shop in it or something.

6      Q     Yes, ma'am.  Did you ever talk to Lieanna

7  Wilkerson about seeing the defendant, Tracy Beatty, driving?

8                MR. HARRISON:  Judge, I'm going to object.

9  That's going to call for hearsay.

10                MR. PERKINS:  If I asked her if she talked to

11  somebody?

12                MR. HARRISON:  Asking about the content what,

13  if anything, was discussed.

14                THE COURT:  He hasn't asked that yet.  All

15  he's asked is, did you talk to Lieanna.  He can ask her did

16  you talk to the person, Lieanna.  Overruled as far as the

17  question, did she talk to someone.

18      Q     (By Mr. Perkins)  Did you ever talk to Lieanna

19  Wilkerson about seeing Tracy Beatty driving?

20      A     No, sir.

21      Q     Did you know -- maybe you do or maybe you don't --

22  do you know whether or not Tracy Beatty had a driver's

23  license or when he got a driver's license?

24      A     They did tell me he had gotten a --

25                MR. HARRISON:  Judge, I'm going to object to

77

1    hearsay.

2              THE COURT:  I'll sustain the objection.

3         Q    (By Mr. Perkins)  Don't tell me what they told

4    you.  Who told you that he got a license?

5              MR. HARRISON:  Judge --

6              THE COURT:  I'll sustain the objection.  It

7    will be hearsay.

8         Q    (By Mr. Perkins)  Let me ask it a different way.

9    Did Carolyn Click ever talk to you about the defendant or

10   the defendant having a driver's license?

11        A    No, sir.

12        Q    Okay.  Did somebody else talk to you about it?

13             MR. HARRISON:  Judge, I would object.  This

14   is all -- the question has hearsay in it.

15             THE COURT:  I'll sustain the objection.

16        Q    (By Mr. Perkins)  You say you had known Callie, as

17   you referred to her, over a period of 10 to 11 years,

18   something like that?

19        A    Yes, sir.

20        Q    You visited in her home?

21        A    Yes, sir.

22        Q    Do you know whether or not she had any firearms in

23   her home?

24        A    No, sir, I do not know that.

25        Q    Did you ever have any conversation with her where

78

1   she indicated that she owned or at any time previously

2   possessed a firearm?

3        A    No, sir.

4        Q    So let me make sure that you understand what I'm

5   asking.  Is it your testimony today that you have no

6   information that Carolyn Click ever possessed a firearm?

7                MR. HARRISON:  Judge, I would object.  May we

8   approach?

9                THE COURT:  Yes.

10               (At the bench, on the record.)

11               MR. HARRISON:  Judge, this is directly in

12  violation of the motion in limine.

13               MR. PERKINS:  No, it's not.

14               MR. HARRISON:  This is --

15               MR. PERKINS:  That motion in limine doesn't

16  cover her possessing a firearm.

17               MR. HARRISON:  Well --

18               THE COURT:  Okay.  Now, I wanted to make

19  clear to this witness -- and if we have to go back outside

20  the presence -- where you're asking about, did you ever have

21  any knowledge that she was in possession of --

22               MR. PERKINS:  That's all I'm going to ask

23  her.

24               MR. HARRISON:  No, no, no.

25               THE COURT:  And here's why.  Here's why.

79

1   Because I think it would reasonably link to a response that

2   the Court has already determined is not admissible or

3   relevant.

4               MR. PERKINS:  I'm just going to ask her yes

5   or no.  That's all.

6               THE COURT:  I want the witness to understand

7   the Court's ruling in reference to the motion in limine,

8   because that question you're asking, though it might call

9   for a yes or no answer, could result in a response.

10              MR. PERKINS:  I'll rephrase the question.

11              THE COURT:  If she doesn't understand the

12  motion in limine --

13              MR. PERKINS:  I'll rephrase the question.

14              THE COURT:  -- you can see where that can

15  easily go.

16              MR. PERKINS:  I'll rephrase the question.

17              MR. HARRISON:  Judge, I want to be able to

18  make sure the witness understands what she can answer

19  because I think, as I recall, she was in here when the Court

20  granted our motion, and I just want to make sure she

21  understands what she can answer because --

22              MR. PERKINS:  He can go up there and talk to

23  her.  I don't care.

24              THE COURT:  Well, I just want to be sure.  I

25  just want to make sure because that question -- I'm not

80

1   saying that that's what you intend, it's just that that

2   could elicit that response.  I'm going to get Mr. Harrison

3   to talk to her.

4                   MR. PERKINS:  That's fine, if you want to go

5   talk to her.

6                   MR. HARRISON:  Does that mean that the fact

7   that she had received information about this shooting, this

8   suicide attempt -- I guess from that, that she would have to

9   say yes, she has information?

10                  MR. PERKINS:  That's as far as I'm going with

11  it.

12                  THE COURT:  That's the problem with that.

13                  MR. HARRISON:  Because she's already been

14  instructed that there's a motion in limine about testimony

15  related to that.

16                  THE COURT:  Are you objecting to -- if she --

17  if it's made plain to the witness what the motion in limine

18  is...

19                  MR. HARRISON:  Well, yes.  My objection is

20  still that that would constitute hearsay still because it

21  doesn't specifically relate to the victim and the

22  defendant's prior relationship.  That's why it is admissible

23  for us to ask those questions.

24                  We've asked about prior assaults and that

25  type of thing.  This question would be based on hearsay,

81

1   because it would be something that the victim had related to

2   her, that she had a gun and tried to commit suicide.

3            That has no relevance or relationship between

4   the parties; therefore, it's simply hearsay, and it's not

5   relevant.

6            MR. PERKINS:  I think the fact that alleged

7   the victim -- or at least according to one version from the

8   defendant, which has already been proffered -- had a gun at

9   the time that she was disarmed and killed.  The fact that

10  the alleged victim had it at least at some point prior, in

11  possession of a firearm, would be relevant.

12           I don't plan on going any further, and I

13  don't plan on violating the motion in limine, but I think

14  it's a dream world that the State's living in to think that

15  that's not relevant for any purposes.

16           MR. HARRISON:  It's still hearsay.  It's

17  still hearsay because it's not going towards the

18  relationship between the victim and the defendant.

19           MR. PERKINS:  How do you know?

20           MR. HARRISON:  There's no testimony that she

21  can offer that it had anything at all to do with any

22  relationship or anything to do with Tracy Beatty.  So unless

23  I --

24           MR. PERKINS:  Do I have to depend on this

25  witness to prove up every fact of everything?  The answer is

82

```
 1   no, I do not.
 2              THE COURT:  Here's -- the question has got to
 3   be made clear with this witness what the motion in limine is
 4   and what she can respond to.
 5              MR. PERKINS:  That's fine.  I'll go up there
 6   and talk to her.
 7              THE COURT:  If you are asking her, has she
 8   ever -- do you have any information -- has she ever been
 9   told that the victim owned a firearm, because we don't --
10   she can answer that question, and if she can answer that
11   yes, then I'll let her answer that question yes.  But be
12   sure she understands.
13              MR. PERKINS:  I'll just go talk to her.
14              (End of bench conference.)
15              MR. PERKINS:  May I proceed, Your Honor?
16              THE COURT:  Yes, sir.
17        Q    (By Mr. Perkins)  Ms. McCarty, I'll try to
18   remember my question, if I can.
19              My question to you is, do you have -- just
20   yes or no, do you have any information that Carolyn Click
21   was ever in possession of a firearm?
22        A    No, sir, I don't.
23        Q    That's your answer today?
24        A    If I was aware of her having possession of a
25   firearm?  I was not aware if she had one.
```

83

1      Q    Let me make sure that you understand what I'm

2  asking.  Did Carolyn Click tell you -- again, yes or no --

3  did Carolyn Click tell you that she was in possession of a

4  firearm at any time prior to her disappearing in November of

5  2003?

6      A    No, sir.

7                MR. PERKINS:  Judge, I --

8                THE COURT:  Counsel, approach the bench.

9                (At the bench, on the record.)

10               MR. PERKINS:  I think that she set herself up

11  for impeachment, Judge.  What am I supposed do here?

12               MR. HARRISON:  I think she's relating it to

13  this time in November.

14               THE COURT:  She is.  She doesn't understand.

15               MR. HARRISON:  Judge, you know what?  Just

16  let him ask the question.

17               MR. BINGHAM:  I mean, is the question -- is

18  the question that you want to ask is, did she ever try to

19  commit suicide?

20               (Counsel confer.)

21               THE COURT:  She --

22               MR. PERKINS:  All I want her to say is yes.

23  That's all I want her to say.

24               THE COURT:  She is relating this question to

25  whether or not she had any information that Carolyn Click

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

84

1   had a firearm sometime leading up to when she disappeared.

2                    MR. PERKINS:  I don't doubt that at all.

3                    THE COURT:  She is not understanding what

4   you're asking her.

5                    MR. PERKINS:  I'll try to ask it a different

6   way.

7                    THE COURT:  Let's just see if we can get this

8   hammered out.

9                    (End of bench conference.)

10      Q      (By Mr. Perkins) I want to make sure you

11  understand my question.  The question -- I'm not asking you

12  the circumstances surrounding it.  I'm not asking you to say

13  anything other than yes or no.

14                   Did Carolyn Click ever talk to you about

15  being in possession at any time prior to November of 2003?

16  Did she ever have a conversation with you where she

17  indicated that she had ever held in her hand a firearm?

18      A      No, sir.  I'm sorry.  I can't say that.

19                   THE COURT:  Just a second, ma'am.  Don't

20  answer any other question that you're not asked or don't

21  volunteer anything.  I'm sorry.

22                   MR. PERKINS:  I think we need to approach

23  again, Judge.  I'm sorry.

24                   MR. HARRISON:  Mr. Harrison, one of y'all

25  come up here.

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

85

1              (At the bench, on the record.)

2              MR. PERKINS:  I think the only thing that I

3     can do now is ask her, is -- have you --

4              MR. HARRISON:  Shhh.  They can hear

5     everything that's been said up here back there.

6              THE COURT:  Well, there's nothing I can do

7     about that.

8              MR. PERKINS:  I know.  I'll try to talk

9     softer.  I don't know what I'm supposed to do here.

10              THE COURT:  I don't believe it's relevant.

11    Also, I don't believe this witness understands what you're

12    talking about.  So could somebody explain to this witness

13    what you're talking about?

14              MR. PERKINS:  Let's go up there and talk to

15    her.

16              THE COURT:  What's your position,

17    Mr. Harrison?

18              MR. HARRISON:  Could I have just a second?

19              THE COURT:  Yes.

20              Just a second, Mr. Perkins.

21              (State's counsel confer.)

22              MR. HARRISON:  If the Defense wants to ask

23    this witness if she has ever told her about -- the victim

24    ever told her about an attempt to commit suicide in her

25    past, we're going to withdraw our objection to that

86

1    question.

2                    MR. PERKINS:  That's fine, Judge.

3                    THE COURT:  Can you go up there and explain

4    to her what the question is?

5                    MR. PERKINS:  Yeah.  And what I was planning

6    on doing is asking not just about a suicide attempt but

7    shooting herself.

8                    MR. HARRISON:  Well, if that's --

9                    MR. BINGHAM:  I mean --

10                   MR. PERKINS:  Or we can go up there and talk

11   to her.  I don't care which.

12                   MR. BINGHAM:  I don't know what purpose --

13   what the Defense is trying to get out.

14                   THE COURT:  I've already sustained the

15   State's motion in limine.  Let me -- I've already ruled that

16   it's not relevant.  The problem now is they're trying

17   to just ask -- he's trying to ask -- he's trying to ask the

18   question just -- I just don't see the relevancy.

19                   MR. BINGHAM:  We can probably tell her and

20   explain to her that years ago she mentioned she held a gun.

21                   MR. PERKINS:  That's fine.  I don't care what

22   they tell her.  She just doesn't get it.  And I don't know

23   how to ask the question any other way.  I've tried to ask it

24   as wide as I could.

25                   THE COURT:  The problem is that she does not

87

1    understand.

2                     MR. PERKINS:  I don't doubt that at all.

3                     (End of bench conference.)

4         Q    (By·Mr. Perkins)  Ms. McCarty, I'm going to try

5    this one more time.

6         A    Okay.

7         Q    My question to you -- just so you will make sure

8    that you understand the question.  My question to you is, do

9    you know from talking to Carolyn Click whether or not she

10   ever at any time prior to her disappearance in November of

11   2004 (sic) possessed a gun?

12        A    Yes, sir.

13        Q    Now, is the answer to that yes or no?

14        A    Yes.

15        Q    Thank you.

16                  Now, moving to -- moving onto something,

17   hopefully, we can get answered a whole lot quicker.  You've

18   identified on Ms. Clicks's body a ring; is that correct?

19        A    Yes, sir.

20        Q    And, obviously from the state of her body, this

21   was after Ms. Click's body was recovered after being buried

22   for a period of about a month; is that right?

23        A    Yes, sir.

24        Q    I don't know if you know when they recovered it or

25   not.  I'm sure it probably caused quite a commotion over

88

1   there in the neighborhood.

2              But you saw that she was buried with her ring

3   on, at least one ring?

4        A    Yes.

5        Q    And you recognize that ring?

6        A    Yes, sir.

7        Q    You also have testified that you work at Foley's.

8        A    Yes, sir.

9        Q    And worked there at least during Christmas -- and

10  I don't know -- you may work there a lot, but longer hours

11  during the Christmas times; is that right?

12       A    Yes, sir.

13       Q    This may seem like it doesn't have anything at all

14  to do with the case, but Foley's, like a lot of other

15  department stores, has trouble with people stealing stuff,

16  don't they?

17       A    Yes.

18       Q    Y'all have a lot of people steal from Foley's and

19  come back to Foley's time and again bringing the stuff back

20  to Foley's and coming right back to Foley's to shoplift

21  something, come right back to Foley's with it?

22              MR. HARRISON:  Judge, I'm going to object to

23  relevance with people stealing things from Foley's.

24              THE COURT:  Is there some relevancy here?

25              MR. PERKINS:  I'm just going to ask her if

89

1    she ever had that occasion where people would come to

2    Foley's, steal something, leave, come right back to Foley's

3    with the exact same property.  I just want to know if she's

4    ever heard of that happening.

5                    MR. HARRISON:  Objection, relevancy.

6                    MR. PERKINS:  I'll withdraw the question,

7    Judge.

8                    THE COURT:  I'll sustain it on relevance,

9    Mr. Perkins.

10                   MR. HARRISON:  Ask the jury to disregard.

11                   THE COURT:  The jury will be instructed to

12   disregard the last question, which never was answered.

13       Q    (By Mr. Perkins)  During the time that you knew

14   Ms. Click did you ever know her to work for Nighthawk

15   Security?

16       A    Yes, sir.  That was before I met her.

17       Q    Do you know what her job responsibilities were

18   with Nighthawk Security?

19       A    They had extra security to come in for Foley's.

20       Q    So actually, she worked -- were you working at

21   Foley's, then, too?

22       A    Yes, but I didn't know her at that time.

23       Q    Okay.  Do you know as a member of Nighthawk

24   Security whether or not Carolyn had any training with or

25   qualifications to carry a handgun, or do you know?

90

1      A    No, sir, I don't.

2      Q    Ms. McCarty, sorry that it took so long and it was

3  so difficult to get through, but I appreciate you being

4  here.

5           MR. PERKINS:  I'll pass the witness, Your

6  Honor.

7           THE WITNESS:  Yes, sir.

8                REDIRECT EXAMINATION

9  BY MR. HARRISON:

10     Q    Ms. McCarty, I just have a couple of questions for

11 you.  When Mr. Perkins was asking you questions about

12 whether Ms. Click had ever talked with you about being in

13 possession of a gun, did you take that to mean in October or

14 November, 2003, at first?

15     A    Yes, I did.

16     Q    So when you said no, you were referring to the

17 fact that she did not ever tell you anything about any gun

18 in November or October of 2003?

19     A    That's right.

20     Q    When Ms. Click did tell that you she had ever been

21 in possession of a gun, how long ago did she indicate that

22 was?

23     A    It was about six years ago, after we became

24 friends.

25     Q    When -- okay.  She told you that about six years

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

91

1   ago?

2        A     Yes.

3        Q     So six years ago, Carolyn Click told you she had

4   at one time been in -- had held a gun?

5        A     Yes.

6        Q     So she would have told you that sometime in 1998

7   or so?

8        A     Yes, sir.

9        Q     Did she tell you when the time that she had ever

10  held a gun, when that would have been?

11       A     I don't know that.  She was young person, but she

12  didn't put a date on it.

13       Q     So in other words, the time that she held a gun

14  wasn't in 1998.  That's when she told you she had held a

15  gun?

16       A     Yes, sir.

17       Q     Ms. McCarty, thank you.

18             MR. HARRISON:  That's all I have.

19             MR. PERKINS:  I don't have any other

20  questions.

21             THE COURT:  I didn't think you did,

22  Mr. Perkins.  Thank you.

23             Ms. McCarty, at this time, you may step

24  down.  You will still be under the Rule subject to re-call,

25  so you do not discuss your testimony with any other person

92

1    in the case, other than the attorneys.  So you may step down

2    at this time.  You will be subject to re-call by either the

3    State or Defense, if they wish to do so at any later time.

4    Thank you.

5                    (The witness leaves the courtroom.)

6                    THE COURT:  Who will you have next,

7    Mr. Harrison?

8                    MR. BINGHAM:  Judge, we have Roy Tomlin,

9    Smith County Sheriff's Department.

10                   THE COURT:  Roy Tomlin.

11                   (The witness enters the courtroom.)

12                   THE COURT:  Sergeant Tomlin, come around,

13   sir, if you would.  Have the witness stand, please.

14                   You were sworn in this morning?

15                   THE WITNESS:  Yes, sir.

16                   THE COURT:  Go ahead, Mr. Bingham.

17                        ROY TOMLIN,

18   having been first duly sworn, testified as follows:

19                   DIRECT EXAMINATION

20   BY MR. BINGHAM:

21       Q    Sergeant Tomlin, if you would, introduce yourself

22   to the jury and tell them how you're employed.

23       A    I'm Sergeant Roy Tomlin.  I'm employed with the

24   Smith County Sheriff's Department.

25       Q    How long have you been in law enforcement?

93

1    A    17 years.

2    Q    That whole time with the Smith County Sheriff's

3  Department?

4    A    Yes, it is.

5    Q    And obviously you're a certified peace officer in

6  the State of Texas.

7    A    Correct.

8    Q    Back in October, November, and December of last

9  year, were your duties the same as they are today?

10   A    Yes, it was.

11   Q    And what duties -- what do you do at the S.O.?

12   A    I'm a supervisor over the Patrol Division.  I also

13  assist them in answering calls when needed.  My

14  responsibility is the schedule of these patrol deputies and

15  make sure that they do their job within the boundaries of

16  the -- excuse me -- policy and procedure.

17   Q    Now, the police department has jurisdiction within

18  the City?

19   A    Correct.

20   Q    As do you with the Sheriff's Department, but it

21  also expands to the County?

22   A    Correct.

23   Q.   Now, the police department has jurisdiction within

24  the county.

25   A.   Correct.

94

1      Q.    But like the Department of Public Safety would

2  have jurisdiction state-wide?

3      A.    Correct.

4      Q.    Is it one of the -- is it one of the main

5  functions of the Sheriff's Department to oversee the jail

6  and the security of the courthouse?

7      A.    Yes, sir, correct.

8      Q.    Now, the Patrol Division is a separate division

9  within the Smith County Sheriff's Department that would

10  actually answer calls of assistance that are called in to

11  911?

12      A.    Correct.

13      Q.    Did you have an occasion on 12-17 of '03 to

14  respond to County Road -- to 18853 County Road 2323?

15      A.    Yes, that is correct.

16      Q.    And were you able to -- is that location within

17  Smith County, Texas?

18      A.    Yes, it is.

19      Q.    And were you able to determine whose residence

20  that was?

21      A.    It was my understanding that it was -- I believe

22  her name was Carolyn Click.

23      Q.    Now, when you responded out there on 12-17-03,

24  what was the purpose of you going to 18853 County Road 2323

25  in Smith County?

95

1       A.    It was my intention to go out there and try to

2  make contact with Ms. Click, to check her welfare.

3       Q.    Okay.  Now, were you able to -- did you have any

4  contact with Ms. Click?

5       A.    No, I didn't.

6       Q.    If you recall, did you walk around the residence

7  at all?

8       A.    Yes, I did.

9       Q.    Did you see any vehicles at the residence, if you

10  recall?

11       A.    The best I can recall, I believe there was one

12  vehicle there.

13            MR. BINGHAM:  May I approach the evidence,

14  Your Honor?

15            THE COURT:  Yes, you may.

16       Q.    (By Mr. Bingham)  Let me show you State's Exhibit

17  No. 2, although the 2 is upside down and ask you if you

18  recognize that.

19       A.    Yes, I believe that is the vehicle.

20       Q.    And this vehicle was at the residence on

21  December 17th when you responded there?

22       A.    Yes, correct.

23       Q.    Did you make any contact with any individual at

24  Mrs. Click's residence when you went there?

25       A.    I made contact with a white male subject by the

96

1   name of Tracy Beatty.

2       Q.   Tracy Beatty.

3               MR. BINGHAM:  May I approach the witness?

4               THE COURT:  Yes.

5       Q.   (By Mr. Bingham)  Let me show you State's

6   Exhibit 22 and ask you to look at that photograph and see if

7   that image would look familiar to you.

8       A.   Yes, it does.

9       Q.   Okay.  Who is portrayed in State's Exhibit No. 22?

10      A.   Do what now?

11      Q.   Who's image is portrayed in State's Exhibit

12  No. 22?  Who is that?

13      A.   That is Tracy Beatty.

14      Q.   Okay.  Is that the individual that you contacted

15  as he appeared when you contacted him?

16      A.   Yes, it is.

17              MR. BINGHAM:  May I approach again?

18              THE COURT:  Yes.

19              MR. BINGHAM:  Tender State's Exhibit 22 to

20  Mr. Hawk.

21              MR. HAWK:  The only objection we've got,

22  Judge, is to relevance right now, but no other objections as

23  to the exhibit.

24              THE COURT:  Overruled.

25              MR. BINGHAM:  May I approach the witness,

97

1    Judge?

2                    THE COURT:  Yes.

3        Q.   (By Mr. Bingham)  Now, as you look at State's

4    Exhibit No. 22, it's a small photograph.

5                    THE COURT:  It's admitted.

6                    MR. BINGHAM:  I'm sorry, Judge.  I thought

7    that's what you said.  I apologize.

8                    THE COURT:  Go ahead.

9        Q.   (By Mr. Bingham)  Do you see, Officer Tomlin,

10   State's Exhibit 22 there?

11       A.   Yes, I do.

12       Q.   Do you see that defendant anywhere in the

13   courtroom today?

14       A.   Yes, I do.

15       Q.   Could you point him out and identify an article of

16   clothing worn by him?

17       A.    It would be the gentleman that would be to the

18   left of Mr. Perkins, wearing the dark suit, polka-dotted

19   tie, shoulder-length hair.

20       Q.   Okay.

21                   MR. BINGHAM:  Your Honor, if you would let

22   the record reflect he identified the defendant and pointed

23   to the defendant, also.

24                   THE COURT:  The record will reflect that the

25   witness has identified the defendant.

98

1    Q.   (By Mr. Bingham)  Now, in this photograph,

2  Mr. Beatty has some facial hair; is that correct?

3    A.   Yes, he did.

4    Q.   Now, can you see on Mr. Beatty over his left eye

5  he's got a little tear drop tattooed underneath his eye?

6  Are you able to see that?

7    A.   I don't recall.  I don't recall seeing that out

8  there.

9    Q.   Do you see in here, this little thing right here

10  (indicating) on his eye right here, on State's Exhibit 22?

11  You see that little dot right there?

12    A.   Yes, sir.

13    Q.   Can you look over there and recognize that he's

14  got some dot under his left eye?

15    A.   Yes, I can.

16    Q.   So you're able to say that this person in State's

17  Exhibit 22 is the same person that sits over there at that

18  same table?

19    A.   To the best of my knowledge, he looks like the

20  same person.

21        MR. BINGHAM:  Okay.  May I publish this to

22  the jury, Judge?

23        THE COURT:  Yes.

24        MR. BINGHAM:  For them to pass around for

25  them to look at.

99

1      Q.    (By Mr. Bingham)  Now, when you got out there and

2  you made contact with the defendant, Mr. Beatty, how did you

3  make contact with him?  Was he outside?  Did you knock on

4  the door?

5      A.    We knocked on the door, and he came to the door.

6  He was inside the residence.

7      Q.    Okay.  Do you recall how he was dressed?

8      A.    No, I can't recall how he was dressed.

9      Q.    Okay.  Now, when he answered the door, were you

10  able to tell how he appeared, I guess, physically?  Did he

11  appear sober to you, or do you recall?

12      A.    The best I recollect he was sober, yes.

13      Q.    Did you -- what did you say to him when he

14  answered the door?

15      A.    We introduced ourselves.  I introduced who I was

16  and why I was there.  I asked if Ms. Click was there, you

17  know, that I needed to see her and talk to her.

18      Q.    Okay.  What did he say?

19      A.    He told me that she wasn't there.

20      Q.    Okay.  Now, about what time of night was this; do

21  you recall?

22      A.    This was during the daytime.

23      Q.    During the daytime?

24      A.    Yes, sir.

25      Q.    And do you recall what day of the week

100

1   December 17th was?

2       A.   No, sir, I don't.  All I know is it was on the

3   17th of December.

4       Q.   Okay.  You're sure about that date, just not the

5   day of the week?

6       A.   Correct.

7       Q.   Now, when you asked where Ms. Click was and he

8   said she was not there, did you make any inquiry as to

9   whether or not he knew where she was?

10      A.   Yes, I did.

11      Q.   Okay.  What did he tell you?

12      A.   He told me that she had gone to Kansas with her

13  boyfriend, and he gave me the name of Junior Reynolds.

14      Q.   Now, did the location in Jacksonville, Texas, ever

15  come up?

16      A.   That's where he told me that they were at was in

17  Jacksonville.

18      Q.   That they had gone to Kansas and were now in

19  Jacksonville, Texas?

20      A.   He first told me that they went to Kansas.  They

21  stopped off, I believe, in Oklahoma and now they were in

22  Jacksonville at her boyfriend's house.

23      Q.   Okay.  And did he say when the last time he had

24  seen Carolyn Click was?

25      A.   He told me the day before Thanksgiving.

101

1    Q.   Okay.  Did he mention whether he might be

2  expecting her back?

3    A.   He told me that night.

4    Q.   Okay.  On the 17th?

5    A.   Yes, correct.

6    Q.   Now, did you make any inquiry as to whether or not

7  he knew anything about Junior Reynolds?

8    A.   The best I recall reflecting to my report, I

9  believe I asked him if he knew an address or a phone number.

10   Q.   Okay.  And what did he state he knew about this

11 individual, Junior Reynolds?

12   A.   He told me that he only -- he stated that he just

13 knows he lives in Jacksonville and drives a blue Dodge

14 dually, and that's all he could tell me.

15   Q.   Were you able to confirm whether or not there was

16 a Junior Reynolds?

17   A.   I wasn't.  I did contact Dispatch to see if they

18 could find anything on the name.

19   Q.   Anything come back?

20   A.   They advised they couldn't find nothing on it.

21   Q.   Okay.  So your dispatch advised negative on Junior

22 Reynolds?

23   A.   Correct.

24   Q.   Now, did you -- how were you to make contact with

25 Carolyn Click when she was to supposedly return home that

102

1    night?

2         A.    I advised Mr. Beatty there that as soon as she got

3    home that she needed to call the Sheriff's office and make

4    contact with us so, you know, we could follow up on the

5    welfare concern, to make sure that she was all right.

6         Q.    To your knowledge, did Dispatch ever hear from

7    Carolyn Click that night?

8         A.    Not that I'm aware of.

9         Q.    Were you there when the -- when the deputies began

10   to excavate the body of Carolyn Click?

11        A.    No, I wasn't.

12        Q.    Now, you stated that December 17th of '03 is the

13   date you went out there.  Do you recall if that was a

14   weekday or a weekend?

15        A.    I'm wanting to say -- I was thinking it was on a

16   Saturday.  I may be wrong.

17        Q.    And it would have been during the daytime, so

18   before --

19        A.    It was around midday, to the best of my knowledge.

20        Q.    Was midday noon?

21        A.    Correct.

22        Q.    Was anyone else at the residence with Tracy

23   Beatty?

24        A.    Not that I observed, no.

25        Q.    The car that was parked, was it behind the mobile

103

1   home?

2       A.   Yes, it was.  It was in the back of the residence.

3       Q.   Now, at that point, did -- on 12-17, did the

4   defendant ever admit to you that Junior had killed his

5   mother?

6       A.   No, he didn't.

7       Q.   Did he ever mention to you that he came in and saw

8   Junior standing over his -- the body of his mother so he

9   killed Junior?

10      A.   No.

11      Q.   Did he ever mention anything to you about Cedar

12  Creek?

13      A.   No, he didn't.

14      Q.   How about did he ever mention to you that he

15  pushed his mom, and his mom's head hit a table?

16      A.   No, he didn't.

17      Q.   Did he ever mention to you at all about knowing

18  that his mother was dead or any of maybe one or two or three

19  or four or five or six different stories?

20      A.   No, he didn't.

21              MR. BINGHAM:   Judge, may I approach the

22  evidence?

23              THE COURT:   Yes.

24      Q.   (By Mr. Bingham)  When he walked around the house,

25  do you recall if -- do you recall seeing this area right

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

1  here in State's Exhibit 6, this being the back of the mobile

2  home (indicating)?

3      A.   This is going to be --

4      Q.   Let me show you a bigger picture.  It would be a

5  better reference of -- that was State's 6.  Let me show you

6  State's Exhibit 4.  This would kind of give you a better

7  reference point.

8      A.   Yeah, I do recall something similar to that, yes.

9      Q.   Now, at the time that you went out there, you

10  obviously had no indication that the body of Ms. Click

11  laid --

12          MR. HAWK:  Objection, Judge, to leading.

13  He's just leading.  I'm going to ask him to ask questions,

14  Judge.

15          THE COURT:  Well, I'll sustain the objection.

16          MR. BINGHAM:  We would ask him not to make a

17  speaking objection.

18          THE COURT:  Well, he's just objecting to you

19  leading.

20          MR. BINGHAM:  Sure.  I'll rephrase it.

21          THE COURT:  Don't lead the witness.

22          MR. BINGHAM:  I'll rephrase it.

23      Q.   (By Mr. Bingham)  At the time that you went out

24  there, did you have any reason at all to be suspicious at

25  all of this area underneath the timber?

105

1    A.    No, I didn't.

2    Q.    At that time, were you aware that -- or did you

3    know whether or not the body of Carolyn Click, as portrayed

4    in State's Exhibit No. 18, was underneath that timber or cat

5    litter?

6    A.    No, I didn't.

7    Q.    Let me ask you something, Sergeant.  What was the

8    mood of the defendant?  The reason I'm asking -- what was

9    his mood and mannerisms?

10    A.    My opinion of his mood is he didn't appear to be

11    nervous.

12    Q.    He did?

13    A.    He did not.

14    Q.    He didn't appear to be nervous.  Did he appear to

15    be upset?

16    A.    No, sir, he didn't.

17    Q.    Did he appear to be sad or distraught?

18    A.    Maybe -- I wouldn't call it upset.  No, I wouldn't

19    call it either one, really.

20    Q.    Did he appear in any way to be upset about the

21    fact that his mom was buried behind the mobile home where he

22    buried her?

23    A.    Not to my knowledge, no, sir.

24    Q.    Now, at that point, unable to contact Carolyn

25    Click or get any additional information, you leave; is that

1   correct?

2        A.   That's correct.

3        Q.   And was that basically -- on that call, was that

4   the last involvement you had in this case?

5        A.   Yes, it was.

6        Q.   And at any point, did you have any other official

7   involvement in this case whatsoever?

8        A.   No.  No, I didn't.

9        Q.   Now --

10                MR. BINGHAM:  May I approach the witness,

11   Judge?

12                THE COURT:  Yes, sir.

13        Q.   (By Mr. Bingham)  Let me show you this piece of

14   paper, this calendar, and see if this refreshes your memory,

15   this calendar as to what date the 17th would have been on.

16        A.   On a Wednesday.

17        Q.   It was on a Wednesday.  So on December 17th,

18   2003, which was a Wednesday around noon, this defendant is

19   where?

20        A.   At this residence.

21        Q.   Sergeant Tomlin, thank you.

22                MR. BINGHAM:  We'll pass the witness.

23                THE COURT:  Mr. Hawk?

24                MR. HAWK:  No questions, Judge.

25                THE COURT:  Sergeant, you may step down.

1          May this witness be finally excused, or do

2   you wish him to stay subject to re-call?

3          MR. BINGHAM:  Subject to re-call, Judge.

4          THE COURT:  Sergeant, you'll be subject to

5   re-call.  Be sure the State can get in touch with you.

6   Thank you, sir.

7          (The witness leaves the courtroom.)

8          THE COURT:  Who do you have next,

9   Mr. Harrison?

10          MR. HARRISON:  Judge, can we approach real

11   quick?

12          THE COURT:  Yes, sir.

13          Are y'all doing okay?  I know we've been up

14   here a little bit.  Okay.

15          (At the bench, on the record.)

16          MR. HARRISON:  Judge, I apologize.  Our next

17   witness is Jay Patzke.  He's with the parole office.  We

18   need to, I guess, talk about how to reference where he

19   works.  I certainly am not -- I dare not mention that he's

20   from parole or works for parole.  There are very specific

21   questions I'm going to be asking him about records from

22   parole.

23          I'm not going to reference them as parole

24   records certainly, but I don't know -- Judge, there's

25   records about his -- the fact that the defendant was

1   unemployed during October, November, and December of 2003

2   that I'll be asking him about.  I'm going to reference the

3   fact that he has possession of certain records related to

4   Tracy Beatty but not that he's in any way affiliated with

5   the parole office.

6           And I guess I just wanted to ask guidance

7   from the Court on what to advise him.  I've advised him not

8   to mention that he works for parole or that these are parole

9   records or that Tracy Beatty was ever on parole, but I just

10  need to know how the Court wants me to, I guess, refer to

11  the records.

12          THE COURT:  Well, I don't see -- you can

13  refer about the records.  Just ask him if he has records.

14  Be sure he understands --

15          MR. HARRISON:  Yes, sir.

16          THE COURT:  -- not to say anything other than

17  these are records.

18          MR. BINGHAM:  Judge, in the past, we've

19  referred to him as working for a state agency and just left

20  it at that.

21          MR. PERKINS:  We're going to have some pretty

22  major objections to this --

23          THE COURT:  I think -- go ahead.

24          MR. PERKINS:  -- because I believe that it

25  would leave an impression in the jurors' mind exactly what

1   state agency it would be and why he would be keeping track

2   as to whether or not he was employed.   It's going to leave

3   them with the only impression that either he's a probation

4   officer or a parole officer.

5               THE COURT:   I think you can have him state

6   his name.   I think you can say that he works here in Tyler

7   and that -- he does have records, and he's familiar with the

8   records that would show whether or not the defendant, Tracy

9   Beatty, was employed in the months of October.

10              MR. HARRISON:   October, November, and

11   December of 2003.

12              THE COURT:   He would say, "Yes, I do have

13   those records" and say, "What do they show?"   And his

14   response would be, "They show he was not employed in" --

15              MR. HARRISON:   October, November, and

16   December of 2003.

17              THE COURT:   I think that's all.

18              MR. HARRISON:   Okay.   Yes, sir.

19              And then there's one other document that I

20   want to ask him about, and I'm not offering any of these

21   documents into evidence certainly, but I want to reference

22   the document that the defendant filled out that has a

23   specific question about whether he's ever had thoughts of

24   killing someone.   And that's contained also in those parole

25   records that he's custodian of.

1          And, again, I won't reference anything about

2    what agency or anything that we've already talked about, but

3    those are the only areas that I intend to ask him about.

4          MR. PERKINS:  Obviously, we're going to have

5    to see some predicate as to what those circumstances --

6    those kinds of things are.

7          MR. HARRISON:  Sure.  I'll lay the proper

8    predicate other than -- if I need to outside the presence --

9    and if I need to lay the predicate to get past the hearsay

10   objection, then I'll do it outside the presence of the jury

11   for record purposes.

12          But this would be -- Mr. Perkins has probably

13   seen this.  It's dated October 13th of 2003 where he

14   specifically asked if he ever had thoughts of killing

15   somebody, and he said yes.  And the following questions are,

16   has he ever tried, and he said yes.

17          So that's my question.

18          MR. PERKINS:  And that's relevant to what?

19          MR. HARRISON:  Well, if he's formed the

20   intent to kill Carolyn Click on November 25th.  I think

21   whether he's had thoughts of killing someone is relevant.

22          THE COURT:  I can rule on the relevancy right

23   now.  I'm trying to understand that -- you want to continue

24   asking him about does he have records and --

25          MR. HARRISON:  Yes, sir.

111

1      THE COURT:  -- and without reference to -- I

2 mean, you can't make any reference to the record.

3      MR. HARRISON:  No.  I understand that.

4      MR. PERKINS:  Well, we're going to object to

5 all of this, and we'll stand ready with an objection to

6 any -- I mean, this is dangerous ground that they're on.  I

7 think they realize that or they would not have approached in

8 the first place.

9      MR. HARRISON:  Well, Judge, clearly, I'm not

10 going to -- I think it would be improper to in any way

11 reference that this is a parole officer.  That's why I'm up

12 here at the bench outside the presence of the jury.

13      THE COURT:  And you can't make it -- I mean,

14 and, obviously, you know that.  This is in the record.

15      MR. HARRISON:  No, absolutely not.

16      THE COURT:  I think you know that.  Well --

17 okay.  Mr. Perkins will have his objection at the time.

18      (End of bench conference.)

19      THE COURT:  Okay.  Call your next witness,

20 Mr. Harrison.

21      MR. HARRISON:  I call Jay Patzke.

22      THE COURT:  Jay Patzke.

23      (The witness enters the courtroom.)

24      THE COURT:  Mr. Patzke, just come around and

25 have a seat here at the end chair where the microphone is.

1          Were you sworn earlier?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  If you would, just sort of adjust

4   that microphone where you can speak into it, please.

5          Go ahead, Mr. Harrison.

6                    JAY PATZKE,

7   having been first duly sworn, testified as follows:

8                DIRECT EXAMINATION

9   BY MR. HARRISON:

10     Q.    Can you introduce yourself to the Ladies and

11  Gentlemen of the Jury?

12     A.    My name is Jay Patzke.

13     Q.    Do you live here in Tyler?

14     A.    No, sir.  I live in Palestine, Texas.

15     Q.    I want to ask you a few questions about an

16  individual by the name of Tracy Beatty.  Do you have

17  knowledge or information about Tracy Beatty pertaining to

18  work history and things of that nature?

19     A.    Yes, I do.

20     Q.    Do you have information or knowledge about whether

21  Tracy Beatty was employed or had employment in December of

22  2003?

23     A.    Yes, sir, I do.

24     Q.    Was he or did he have employment in 2003?

25     A.    No, sir, he was not.

113

1     Q.    Was he unemployed in December of 2003?

2     A.    Yes, sir.

3     Q.    Do you have information as to see whether Tracy

4  Beatty was employed or not employed in November of 2003?

5     A.    Yes, sir.

6     Q.    Was he employed or was he unemployed?

7     A.    He was unemployed.

8     Q.    And that would be in November of 2003?

9     A.    Yes, sir.

10    Q.    Do you have information or knowledge as to whether

11 Tracy Beatty was employed or unemployed in October of 2003?

12    A.    Yes, sir, there is.

13    Q.    And was he employed or unemployed in October of

14 2003?

15    A.    I would have to review the record that would

16 indicate that, sir.

17    Q.    To yourself, if you need to, that's fine.

18          MR. HARRISON:  Oh, I'm sorry.

19          May I approach the witness, Your Honor?

20          THE COURT:  Yes.

21          MR. HARRISON:  Bates stamped 255.

22    Q.    (By Mr. Harrison) And just review it to yourself.

23    A.    Yes, sir.  He was unemployed during that time.

24    Q.    Unemployed during October of 2003?

25    A.    Yes, sir.

114

1      Q.   The months that I've talked with you about,

2   December -- let me start in reversal order, which would be

3   chronological order, October, November, and December of

4   2003, was that information given to you by Tracy Beatty?

5      A.   It was reported to the individual that made that

6   record, yes, sir.

7      Q.   And is it reported by Tracy Beatty?

8      A.   Yes, sir.

9      Q.   Now, Mr. Patzke, do you have any information as to

10   whether Tracy Beatty was asked by another individual, "Have

11   you ever thought seriously about killing others?"

12      A.   Yes, sir.  That's present in the records.

13      Q.   Would that information have been obtained on

14   November 13th, 2003?

15      A.   Yes, sir, I believe that's the correct date.

16      Q.   And would that information have been perceived or

17   given by Tracy Beatty?

18      A.   Yes, sir.

19      Q.   And in response to "have you ever thought

20   seriously about killing others," what was the response by

21   Tracy Beatty?

22      A.   Yes.

23           MR. PERKINS:  Judge, I'm going to object to

24   that answer and would like to take the witness on voir dire

25   for the purpose of possible objection.

1                THE COURT:  Go ahead.

2                   VOIR DIRE EXAMINATION

3 BY MR. PERKINS:

4      Q.   Mr. Patzke, am I pronouncing that right?

5      A.   Yes.

6      Q.   Mr. Patzke, my name is Robert Perkins.  I have a

7 question for you, sir.  This is in response to a question

8 propounded to Mr. Beatty by you or someone under your

9 direction; is that correct?

10      A.   Yes, sir.

11              MR. PERKINS:  Judge, I have a matter I need

12 to take up outside the presence of the jury.

13              THE COURT:  All right.  Ladies and Gentlemen,

14 we'll be in recess for ten minutes.

15              All rise for the jury.

16              (The jury leaves the courtroom.)

17              (Open court, defendant present, no jury.)

18              THE COURT:  All right.  For the record,

19 Mr. Perkins is on voir dire for potential objection.  We are

20 outside the presence of the jury.

21                  VOIR DIRE EXAMINATION

22 BY MR. PERKINS:

23      Q.   Mr. Patzke, for purposes of the record, you work

24 for the State Board of Pardons and Paroles; is that correct?

25      A.   No, sir.  I work for the Texas Department of

116

1   Criminal Justice, Parole Division, sir.

2       Q.   Okay.  And there is a difference between those

3   two?

4       A.   Yes.

5       Q.   All right.  For your purposes, if somebody, who is

6   on parole, still under the supervision and in the custody of

7   the State of Texas?

8       A.   I believe that's the legal definition, yes, sir.

9       Q.   Okay.  So you would agree with me, then, that

10  Tracy Beatty is in custody for purposes of having to report,

11  having to come in, and having to answer questions, those

12  sort of things?

13      A.   At this time, sir?

14      Q.   At the time of the questions that the State was

15  asking you about?

16              THE COURT:  And specifically that last one.

17      A.   Yes, sir.

18      Q.   (By Mr. Perkins)  Prior to him coming in to answer

19  questions on the date and times in question, the one that

20  Mr. Harrison was asking you about, when the questions were

21  propounded to him if he had ever thought about killing

22  someone, did you or anyone under your direction Mirandise

23  Mr. Beatty?

24      A.   No, sir.  I believe part of that record also

25  indicates that Mr. Beatty requested a placement, and the

117

1    form mentioned is a screening form utilized for all

2    referrals through the Andrews Center.

3        Q.   So the answer to my question would be that no one

4    at your direction Mirandised Mr. Beatty; is that correct?

5        A.   That's correct, sir.

6        Q.   No one informed him that he had the right to

7    remain silent and not make any statement at all; is that

8    correct?

9        A.   That's correct.

10       Q.   No one told him that any statement that he made at

11   this parole hearing or placement hearing, or whatever you

12   want to call it, could be used against him at his trial;

13   nobody told him that?

14       A.   I believe part of the form indicates that we can

15   release the information available to us, sir.

16       Q.   And I'm asking you specifically, Mr. Patzke, if

17   anybody told him that any statement that he made would be

18   used against him at a subsequent trial?  Did anybody tell

19   him that?

20       A.   Not to my knowledge, sir.

21       Q.   Did anybody tell him that any statement that he

22   made may be used against him as evidence in court?

23       A.   Not to my knowledge, sir.

24       Q.   Did anybody inform him that he had a right to have

25   a lawyer present to advise him prior to and during any

118

1  questioning?

2      A.    Not to my knowledge, sir.

3      Q.    Did anybody inform Mr. Beatty that if he was

4  unable to employ a lawyer, he had the right to have a lawyer

5  appointed to advise him prior to and during any questioning?

6      A.    Not to my knowledge, sir.

7      Q.    Did anybody inform him that he had a right to

8  terminate the interview at any time?

9      A.    Not to my knowledge, sir.

10     Q.    Now, it's previously your testimony that for

11  purposes that Mr. Beatty is, for lack of a better word, in

12  custody at the time that he is propounded these questions;

13  is that correct?

14     A.    Yes, sir.

15     Q.    And you would agree that your employer, the Texas

16  Board of Pardons and Paroles, Tyler District Parole Office

17  is a state agency?

18     A.    Yes, sir.

19     Q.    Do you consider yourself to be a member of law

20  enforcement?

21     A.    No, sir.

22     Q.    Do you work for an agency that works closely with

23  law enforcement agencies?

24     A.    Yes, sir.   Texas Government Codes, Section 508.313

25  allows me to release information released, sir.

119

1          MR. PERKINS:  That's all we would have on the

2     voir dire, Your Honor.

3          I think the Court probably understands what

4     our position is, that the last question asked and answer

5     given was taken in violation of 38.22.  According to this

6     witness, Mr. Beatty was in custody, was questioned without

7     Miranda warnings, and his answers have been, despite the

8     fact that no warnings were given, that he had no opportunity

9     to have counsel provided for him, that he knew that his

10    answers would be used against him or could be used against

11    him in court, he was asked questions.  And in response to

12    those questions, he responded in a way that that has now

13    been proffered in front of this jury by the State of Texas.

14          It is improper.  Those questions and the

15    answers propounded to those questions are improperly taken,

16    inadmissible, highly prejudicial, not probative, and in our

17    opinion, are grounds for a mistrial.

18          THE COURT:  Are you talking about the last

19    one that he asked?

20          MR. PERKINS:  I'm talking about the last

21    question that he asked.  And I don't know.  I could have the

22    court reporter read it back about where you ask a question

23    about have you ever thought about killing somebody, and

24    Mr. Patzke's answer, during my objection, was yes.

25          THE COURT:  Go ahead.

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

1          MR. HARRISON:  Well, Judge, parole officers

2    aren't peace officers.  They're not law enforcement.

3    They're specifically excluded from being peace officers.

4    This was not -- despite the testimony that Mr. Beatty was in

5    custody, he was not under arrest.  He was not free to leave.

6    This was not a custodial interrogation by a peace officer.

7    He was not in custody.  He could have left at anytime.  He

8    was not under arrest.

9          This is a parole officer giving him a

10   screening test that the defendant requested, asking him

11   questions and writing down the answers.

12          THE COURT:  Okay.  Did the witness testify to

13   who it was that was asking him the questions?

14          MR. HARRISON:  He did not testify -- I can

15   ask him.

16          THE COURT:  Go ahead and ask him.

17               VOIR DIRE EXAMINATION

18   BY MR. HARRISON:

19   Q.    Who was the parole officer asking these questions?

20          THE COURT:  Well, I mean, was it a parole

21   officer?  I just want to get this ironed out before we get

22   the jury in here.

23   Q.    (By Mr. Harrison)  Was this a parole officer?

24   A.    Yes, sir.  It was a parole officer, Simone Norman.

25   Q.    Does she work for -- who does she work for?

1      A.    She works for the Texas Department of Criminal

2   Justice, Parole Division.

3      Q.    Is a parole officer a peace officer?

4      A.    No, sir.

5      Q.    Is a parole officer a law enforcement?

6      A.    No, sir.

7      Q.    As a parole officer, if a parolee is reporting to

8   his parole officer and chooses not to answer any questions,

9   is he free to leave?

10      A.    Yes.

11            THE COURT:  Anything else?

12            MR. HARRISON:  No.  That's all I have.

13            THE COURT:  Well, while we're outside the

14   presence of the jury, I'll overrule the objection and deny

15   the motion for mistrial.

16            MR. PERKINS:  Judge, I have an additional

17   question on the voir dire.

18            THE COURT:  Okay.  I'm sorry.  Go ahead.

19                 VOIR DIRE EXAMINATION

20   BY MR. PERKINS:

21      Q.    Mr. Patzke, are you saying that if somebody on

22   parole came in and decided not to answer any questions, they

23   have the right to just walk out, not answer any questions,

24   and they're free to leave at any time?

25      A.    Yes, sir.  At this time, that happens regularly.

1   We don't have the power of arrest.  We have to go through a

2   warrant request process and so forth.  Yes, sir.

3        Q.   And so what are the ramification of leaving

4   without answering any questions?

5        A.   It would depend on what the questioning was about,

6   what the requirement was, whether it was a requirement of

7   parole to participate in a particular program.  On this

8   particular individual, I do not recall.  I don't believe he

9   had a psychological requirement by the Parole Board, so his

10  voluntary request was just that, a voluntary self-referral

11  that "I want to go for treatment to the Andrews Center."

12              MR. PERKINS:  I don't have any additional

13  questions.

14              THE COURT:  Okay.  The Court's -- do you have

15  anything else?

16              MR. HARRISON:  No.

17              THE COURT:  The Court's considered the

18  additional testimony.  The Court maintains its ruling and

19  overruling the objection and denying the motion for

20  mistrial.

21              MR. PERKINS:  And, Judge, just while we're

22  off the record and the jury is not present, it's my

23  understanding that the State -- they've asked one question,

24  have you ever thought about killing someone, and the

25  defendant's answer was yes.

1          The next question, I believe, Judge, and I

2   don't recall exactly.  Maybe Mr. Harrison could help me out

3   with this.

4          THE COURT:  Mr. Harrison, what's the next

5   question?  What's the next question?

6          MR. HARRISON:  Judge, the next question was

7   if yes, which the answer was yes, have you tried.  And the

8   response by Mr. Beatty was yes.

9          MR. PERKINS:  I don't see how that's relevant

10   or probative to anything, unless this is after Carolyn

11   Click's death.  Again, the 40 -- not like it makes a whole

12   lot of difference at this point in time, but, again, the

13   prejudicial value of that -- what is the purpose in asking

14   that question?  I mean, really, what's the purpose of asking

15   that question, other than prejudicing the defendant?  How is

16   that relevant to anything?

17          THE COURT:  All right.  Is that your

18   objection?

19          MR. PERKINS:  No, that's part of it, Judge,

20   but that's the plain part of it.

21          THE COURT:  Well, I'm trying to wait until

22   you finish.  Do you have anything else you want to add to it

23   other than that at this time?

24          MR. PERKINS:  Well, other than it being

25   irrelevant, being more prejudicial than probative, having

124

1  nothing to do with the facts and circumstances of the case

2  on trial, other than those three minor things, I can't think

3  of anything right now.

4          THE COURT:  I just didn't want to go any

5  further until I was sure that you were through with your

6  objection.  That's what I was waiting on.

7          MR. HARRISON:  I'm not going to ask that

8  question.

9          THE COURT:  Go ahead.  What's the State's

10  position?

11          MR. HARRISON:  I'm not going to ask the

12  question.

13          THE COURT:  I'm sorry?

14          MR. HARRISON:  I think it would be

15  admissible, but I'm not going to ask that question.

16          THE COURT:  Which question are you not going

17  to ask?

18          MR. HARRISON:  I'm not going to ask the only

19  one left that I haven't asked yet, which is yes, have you

20  tried.  I'm not going to ask that.

21          The last question I asked was, have you ever

22  thought seriously about killing others, the answer is yes,

23  I'm going to leave it there.

24          THE COURT:  But that's the one question

25  you're going to ask and then --

125

1              MR. HARRISON:  Actually, I believe I've

2    already asked it.  I'll ask it again.

3              THE COURT:  Mr. Perkins was trying to make an

4    objection at the time of the answer, so the Court is going

5    to allow you to ask that question.

6              MR. HARRISON:  I'll ask that question and

7    nothing else.

8              THE COURT:  All right.

9              MR. PERKINS:  Well, if he's already asked it

10   and it's already been answered, I'm going to object to it as

11   being asked and answered.

12             THE COURT:  Well, I'll overrule it,

13   Mr. Perkins.  I think the answer was given, as I think you

14   pointed out earlier at the time you were trying to object,

15   so the Court is going to allow him to ask that question and

16   that one question be answered.

17             Allen or Jim, will one of y'all get Carleton

18   and tell him to bring the jury in, please?

19             MR. HAWK:  Judge, if we could, for purposes

20   of preserving the right of Mr. Beatty on appeal on this

21   specific issue with regard to the record --

22             THE COURT:  Yes, sir.

23             MR. HAWK:  -- we're going to offer, if we

24   can, the certificate of mandatory supervision from this past

25   October and December.

126

1              THE COURT:  You've got it marked?

2              MR. HAWK:  I don't have it marked yet, but

3    I'm about to.

4              THE COURT:  Just mark it.

5              MR. HAWK:  We just want that as an exhibit

6    outside the presence of the jury.

7              MR. HARRISON:  Can I see what it is?

8              THE COURT:  Sure.

9              MR. HAWK:  It's an actual certificate that

10   requires as a condition submitted to Counsel.

11             THE COURT:  Defendant's Exhibit --

12             MR. HAWK:  And I don't have it marked yet,

13   Judge, until the reporter allows me to.  We'll mark it as

14   Defendant's Exhibit 1.

15             (The jury enters the courtroom.)

16             (Open court, defendant and jury present.)

17             THE COURT:  I'm sorry.  Please be seated.

18   Thank you very much.

19             Go ahead, Mr. Harrison.

20             MR. HARRISON:  Thank you.

21             DIRECT EXAMINATION (CONTINUED)

22   BY MR. HARRISON:

23        Q.   Mr. Patzke, we were talking about information that

24   you received from November 13th, 2003, would this

25   information have been obtained from Tracy Beatty?

127

1      A.    Yes, sir, it would have.

2      Q.    And the question that was posed to Mr. Beatty,

3  have you ever thought seriously about killing others, what

4  was Mr. Beatty's response?

5      A.    Yes.

6      Q.    And this would be information coming directly from

7  Tracy Beatty?

8      A.    Yes, sir.

9      Q.    All the information that you've described was

10  given by Tracy Beatty himself?

11      A.    Yes, sir.

12      Q.    Thank you, sir.

13              MR. HARRISON:  That's all I have.

14              THE COURT:  Mr. Perkins?

15              MR. PERKINS:  Just briefly.

16                  CROSS-EXAMINATION

17  BY MR. PERKINS:

18      Q.    Good afternoon, Mr. Patzke.  Just a couple of

19  questions for you with regard to this unemployment issue and

20  the other issues that you've talked about.

21              Have you ever heard of the term "junk in,

22  junk out"?  It's a computer term.  Have you ever heard that

23  term?

24      A.    Not really, no, sir.

25      Q.    Basically, what it means is, it's like the output

128

1  is as only reliable as the input, okay?  If a person lies,

2  then the results that y'all are gonna have are gonna be lies

3  as well, right?  You have to depend on the honesty of the

4  answers, don't you, to some extent?

5      A.   Under these circumstances, depending on the

6  answer, we would have verified that information, yes, sir.

7      Q.   Okay.  And you personally did not take these

8  answers --

9      A.   No, sir.

10     Q.   -- from Mr. Beatty?

11     A.   No, sir, I did not.

12     Q.   In fact, you don't even know Mr. Beatty, do you?

13     A.   No, sir.

14          MR. PERKINS:  I don't have any other

15  questions.

16          THE COURT:  Mr. Harrison?

17          MR. HARRISON:  Just briefly.

18              REDIRECT EXAMINATION

19  BY MR. HARRISON:

20     Q.   So when Mr. Perkins references junk in and junk

21  out and you have to take at face value what a person tells

22  you, I guess somebody who was asked are you employed in the

23  month of November of 2003 could have said no, when, in fact,

24  they were and they were just lying about it.  Is it

25  possible?

129

1    A.    Sure.  If they had indicated that they were

2    employed, we would have asked for verification, such a as

3    check stub or a time card and so forth.

4    Q.    But stating that they were actually unemployed

5    could be a lie when, in fact, they were employed?

6    A.    Yes, sir.

7    Q.    Stating that they were unemployed in November of

8    2003, could be a lie if, in fact, they were?

9    A.    Yes, sir.

10    Q.    Stating they were unemployed in December could be

11    a lie if they, in fact, were employed?

12    A.    Yes, sir.

13    Q.    Stating that they had thoughts of killing people,

14    stating, "Yes, I have had thoughts of killing people," could

15    be a lie if you really hadn't had thoughts of killing

16    people?

17    A.    Yes, sir.

18    Q.    Does it seem to you more likely that someone would

19    lie about having thoughts of killing someone or not having

20    thoughts of killing people?  I mean, which would you expect

21    to be more likely to lie about?

22    A.    I would think a rational person wouldn't tell you

23    their -- their thoughts about killing someone.

24    Q.    And again, this information is coming from the

25    defendant?

130

1    A.    Yes, sir.

2              MR. HARRISON:  That's all I have.

3              THE COURT:  Mr. Perkins?

4              MR. PERKINS:  Just briefly.

5                  RECROSS-EXAMINATION

6    BY MR. PERKINS:

7    Q.    And I guess saying that you were unemployed may or

8    may not have benefits over telling the truth about your

9    employment if your employment was something maybe it

10   shouldn't be.

11             Let me give you a hypothetical.  Let's say

12   that I am -- oh, I don't know -- a dope dealer, and I got a

13   lot of money from dealing dope.  I might be better off

14   saying I was unemployed in certain circumstances, wouldn't

15   I?

16   A.    Yes, sir.

17   Q.    I mean, you would agree with that, wouldn't you?

18   A.    I agree.

19   Q.    So you can see you depend on the veracity of the

20   person who is giving the answers.  And a rational person in

21   that situation may say, "Hey, I'm unemployed."  Wouldn't

22   that make more sense to you?  How are you going to verify

23   something -- oh, I don't know -- as nefarious as that?

24   A.    Job interviews, employment contacts.

25   Q.    You got a lot of job interviews when you're

131

1    dealing dope?

2        A.   Workers' Commission, documentation for food

3    stamps, yes, sir.  There are ways that document.  No, we

4    don't know where he was at 24 hours a day.

5                 MR. PERKINS:  Okay.  I don't have any other

6    questions.

7                      REDIRECT EXAMINATION

8    BY MR. HARRISON:

9        Q.   So under Mr. Perkins' hypothetical, a drug dealer

10   situation, I guess that person would just be lying about

11   having thoughts of killing someone.  Why would you hide --

12   why would you admit to having thoughts of killing someone,

13   as a dope dealer in this hypothetical situation, yet lie as

14   to whether you're employed?

15       A.   I don't draw that conclusion myself that you can

16   make a leap from being unemployed and being a dope dealer to

17   admitting you had thoughts of killing someone.  I don't see

18   the connection myself.

19       Q.   That seems like the worst thing to lie about, when

20   you admit to having thoughts of killing people.

21       A.   Yes, sir.

22                 MR. HARRISON:  Could I have just a moment,

23   Judge?

24                 THE COURT:  Yes, sir.

25                 MR. HARRISON:  May I approach the witness,

132

1   Judge?

2            THE COURT:  Yes, sir.

3       Q.   (By Mr. Harrison)  I believe this is Bates stamped

4   253, it looks like.  To yourself, would you read this

5   notations there, to yourself?

6       A.   (Complies.)

7       Q.   Mr. Patzke, do you have information regarding

8   whether Tracy Beatty lived at home during the -- with his

9   mother, Carolyn Click, during the month of November 6th,

10  2003, or whether he was living elsewhere?

11      A.   The record indicates that his mother had indicated

12  he was residing elsewhere.

13      Q.   Had she called in with that information?

14      A.   Yes, sir.

15      Q.   Thank you.

16           MR. HARRISON:  Pass the witness.

17           THE COURT:  Mr. Perkins?

18                 RECROSS-EXAMINATION

19  BY MR. PERKINS:

20      Q.   Did you talk to her?

21      A.   No, sir.

22      Q.   Did you make these notes that the State's showing

23  you?

24      A.   No, sir.

25      Q.   So you're relying on information that was

133

1    supposedly told to somebody, not you, that was supposedly

2    written down by somebody who knew, who supposedly heard it

3    from somebody else?

4        A.    I'm referring to the official record, sir.

5        Q.    Okay.  The official record is that somebody, not

6    you, wrote down something which you have absolutely,

7    positively no personal knowledge of.  Is that safe to say?

8        A.    I have no knowledge of it, yes, sir.

9        Q.    No personal knowledge?

10       A.    No personal knowledge of it.

11       Q.    At all?

12       A.    That's correct, sir.

13       Q.    Would you say that that's the most reliable

14   information you've ever come across?  Is it common for you

15   to come in here and testify about stuff that you have

16   absolutely no personal knowledge of?

17       A.    As a keeper of records, yes, sir, I've testified

18   in court and presented records.

19       Q.    So the answer is that's common for you to come in

20   and testify about stuff that you have absolutely no personal

21   knowledge of?

22       A.    I don't understand "common," but I have done that

23   task, sir, as a keeper of records.

24       Q.    Okay.  Where is the person that has the knowledge,

25   that has that personal knowledge?

134

1      A.   I'm not sure, sir.  I'm here.

2                MR. PERKINS:  Okay.  I don't have any other

3   questions.

4                THE COURT:  Is that about it?

5                MR. HARRISON:  Subject to re-call, Your

6   Honor.

7                THE COURT:  All right.  So you will be

8   subject to re-call.  You will remain under the Rule of

9   Witnesses.  If you will just be sure that the District

10  Attorney's Office can get in touch with you in case the

11  State or Defense will need to call you.  Thank you, sir.

12               (The witness leaves the courtroom.)

13               THE COURT:  Who will you have next,

14  Mr. Bingham?

15               MR. BINGHAM:  Judge, we'll have Stacey

16  Killough.

17               (The witness enters the courtroom.)

18               THE COURT:  Ms. Killough, just come around to

19  the witness chair.

20               Were you sworn in this morning?

21               THE WITNESS:  Yes, sir.

22               THE COURT:  All right.  Just pull the chair

23  up and adjust the microphone.  Speak into the microphone,

24  please.  Thank you.

25               Go ahead, Mr. Bingham.

1          MR. BINGHAM:  Thank you.

2               STACEY KILLOUGH,

3    having been first duly sworn, testified as follows:

4               DIRECT EXAMINATION

5    BY MR. BINGHAM:

6        Q.    Ma'am, if you would, introduce yourself to the

7    jury and state your name.

8        A.    I am Stacey Killough.

9        Q.    Okay.  Could you spell it for the court reporter?

10       A.    S-T-A-C-E-Y, K-I-L-L-O-U-G-H.

11       Q.    Ms. Killough, where do you reside?

12       A.    1602 West End Schlueter Loop, No. 12, Killeen,

13   Texas.

14       Q.    Killeen, Texas.

15             And back in November of 2003, where did you

16   reside?

17       A.    403 Hillcrest in Malakoff.

18       Q.    Now, do you know an individual by the name of

19   Tracy Beatty?

20       A.    Yes, I do.

21       Q.    Do you see him in the courtroom today?

22       A.    Yes, I do.

23       Q.    Could you point to him and identify an article of

24   clothing worn by him?

25       A.    Blue suit (pointing).

136

1     Q.   Okay.  Did you point?  I'm sorry?

2     A.   Yes.

3               MR. BINGHAM:  Your Honor, let the record

4     reflect the witness identified and pointed to an article of

5     clothing worn by the defendant and pointed to the defendant.

6               THE COURT:  The record will reflect the

7     witness identified the defendant.

8     Q.   (By Mr. Bingham)  How long have you known Tracy

9     Beatty?

10    A.   34 years.

11    Q.   How are you related to him?

12    A.   That's my cousin.

13    Q.   Okay.  And how would you characterize your

14    relationship?  Well, let me back up before that.

15              You are cousins through your --

16    A.   My aunt was Carolyn Click.

17    Q.   Okay.  Now, how would you describe your

18    relationship with Carolyn Click?  How frequently did you see

19    her?

20    A.   Family reunions, periodically through the years.

21    Q.   Had you ever been to her residence in Whitehouse?

22    A.   She lived there ten years, yes.

23    Q.   How long did you know her to live at that

24    residence?

25    A.   Ten years.

137

1      Q.    Had she lived there mostly alone, or had there

2  been other people live there with her at times?

3      A.    Mostly alone.

4      Q.    Was there ever a James Everett Click?

5      A.    Not that I recall.

6              MR. BINGHAM:  May I approach?

7              THE COURT:  Yes.

8      Q.    (By Mr. Bingham)  Was she ever -- in the time that

9  you knew her to live there in the ten years, was she ever

10 married to -- was she ever married in that time that you

11 know?

12     A.    Yes.

13     Q.    Who was she married to?

14     A.    I only knew him as Mr. Click.

15     Q.    Okay.  Mr. Click.  And did you ever know him to

16 live at that residence?

17     A.    No, sir.

18     Q.    At the time they were married, did he reside

19 somewhere else?

20     A.    Yes, sir.

21     Q.    Did their marriage last very long?

22     A.    That I do not know.

23             MR. BINGHAM:  May I approach, Judge?

24             THE COURT:  You may.

25     Q.    (By Mr. Bingham)  Let me show you this vehicle

138

1    here.  Do you recognize this as State's Exhibit No. 1?  Do

2    you recognize that?

3        A.    Yes, I do.

4        Q.    And who's vehicle is that?

5        A.    Carolyn's.

6        Q.    And when you say "Carolyn's," is that Carolyn

7    Click?

8        A.    Yes.

9        Q.    Now, how long did you know her to have that

10   vehicle?

11       A.    I know of two years.

12       Q.    Two years, at least, that she had it?

13       A.    At least.

14       Q.    In her opinion, was she protective of that vehicle

15   or not protective?

16       A.    Oh, yes, very protective.

17       Q.    Very protective?

18       A.    Very protective.

19       Q.    Had you ever known her to allow anyone to drive

20   that vehicle?

21       A.    Oh, no.

22       Q.    If you ever saw that vehicle and she wasn't in it,

23   would you be -- would that ring a bell with you?

24       A.    That would raise suspicion.

25       Q.    Did you ever hear the defendant to ask to drive

139

1   the vehicle?

2       A.   Once.

3       Q.   Okay.  Now, did Carolyn Click allow him to?

4       A.   No.

5       Q.   So you had actually heard the defendant request

6   Carolyn Click and say -- how did he -- what did he call her?

7       A.   Mom sometimes.  It was mostly Carolyn.

8       Q.   What did you hear the defendant ask her?

9       A.   "May I drive the car?"

10      Q.   Okay.  And what was her response?

11      A.   No.

12      Q.   Okay.  So that was not inconsistent?

13      A.   No.

14      Q.   Now, do you recall about when that was?

15      A.   The end of October, I believe.

16      Q.   So this was the end of October, 2003?

17      A.   Yes, sir.

18      Q.   Where did that occur?

19      A.   At my sister's house in Athens, Texas.

20      Q.   What's your sister's name, for the record?

21      A.   Tonya Walker.

22      Q.   Tonya Walker.  Now, do you recall the defendant

23  coming to your house in November?

24      A.   Yes.

25      Q.   Do you recall the date?

140

1     A.   The 25th of November.

2     Q.   2003?

3     A.   2003.  I'm sorry.

4     Q.   Do you recall who was there at the time he showed

5 up?

6     A.   My children.  I have three, and my adopted

7 daughter, Christina Ogeda.

8     Q.   How do you spell that?

9     A.   C-H-R-I-S-T-I-N-A, O-G-E-D-A.

10    Q.   Now, when he arrived on the 25th, November 25th

11 of 2003, do you know the exact time?

12    A.   Exact, no.  A rough estimate, it was before dark,

13 I would say, between 5:00 or 5:30 on that particular day.

14    Q.   What were you giving your children -- what were

15 you doing at the time he arrived?

16    A.   At the time, I was getting my kids ready to go to

17 their dad's for Thanksgiving.  It was his weekend.  We were

18 divorced.  He informed me that he would be there around

19 8:00, 8:30 to pick them up and take them to Rowlette, his

20 mother's house, for Thanksgiving.

21    Q.   And when the defendant showed up, were you

22 expecting him to show up?

23    A.   No.

24    Q.   And when he showed up, what vehicle was he

25 driving?

141

1    A.    He was driving Callie's car.

2    Q.    Now, who is Callie?

3    A.    Carolyn Click.

4    Q.    Now, Carolyn Click was Tracy Beatty's mom?

5    A.    Yes.

6    Q.    The defendant's mom.  And you knew her or called

7  her Callie?

8    A.    Callie.

9    Q.    Was that yours alone, or did many people call her

10 that?

11   A.    Everybody called her Callie.

12   Q.    Now, when you saw the defendant show up in her car

13 without her, what did you think?

14   A.    I answered the door, and I looked out and I saw

15 her car.  And the first thing out of my mouth was, "Where is

16 Carolyn?"

17   Q.    Was that again because of --

18   A.    Suspicion.

19   Q.    Okay.

20   A.    And I know she's very protective of her vehicle.

21   Q.    Now, when you asked -- because here's her vehicle,

22 the defendant is driving it, and you've already heard once

23 him asking her to go.  What did you ask him?  Do you recall

24 what -- do you recall you asked where Carolyn was?

25   A.    I asked where Carolyn was.

142

1    Q.    What was his response?

2    A.    She went out of town with a friend.

3    Q.    Did he say about how long before she would be

4  back?

5    A.    Couple of weeks.

6    Q.    Now, this is actually -- this is November 25th?

7    A.    Yes, sir.

8    Q    This is November 25th, and at the time -- had you

9  driven from your house to Carolyn's house?

10    A    Have I?

11    Q    Yeah.

12    A    No.

13    Q    How long does it take, if you know?

14    A    Roughly 45 minutes.

15    Q    Okay.  From where you were living back then?

16    A    Yes.

17    Q    I'm not talking about Killeen, from where you were

18  living back then.

19    A    Right.

20    Q    About 45 minutes.  And this was around 5:00 or

21  5:30?

22    A    Yes, sir.

23    Q    Now -- so you could get from Carolyn's house at

24  4:30 to your house by 5:30?

25    A    Easily.

143

1      Q     What?  I'm sorry.

2      A     Easily.

3      Q     Okay.  Now, did he ever mention anything to you on

4    the -- November 25th, 2003, that Carolyn Click was dead?

5      A     No.

6      Q     Did he ever mention anything about seeing her dead

7    or himself killing her?

8      A     No.

9      Q     Now, let me show you --

10               MR. BINGHAM:  May I approach the evidence?

11               THE COURT:  Yes.

12     Q     (By Mr. Bingham) Let me show you State's

13   Exhibit 18 right here.  Do you know who this is portrayed in

14   State's Exhibit 18?

15     A     That looks like Carolyn.

16     Q     So it would be your opinion that the person in

17   State's Exhibit 18 is who?

18     A     My aunt.

19     Q     Okay.  And when you say "Carolyn," Carolyn Click?

20     A     Carolyn Click.

21     Q     Okay.  Now, do you recognize -- let me show you

22   State's Exhibit 4.  Do you recognize that?

23     A     It almost looks like Carolyn Click's backyard.

24     Q     Okay.  That -- the mobile home in Whitehouse?

25     A     Yes.

144

1     Q    And you've never seen the photographs of the

2  house, have you?

3     A    No, sir.

4     Q    Let me show you State's Exhibit Number 11 and ask

5  you if you recognize that.

6     A    That's the front.

7     Q    Front of the --

8     A    Of Carolyn Click's house.

9     Q    Carolyn Click's house.

10           Now, when the defendant showed up on

11  November 25th, 2003, sometime between 5:00 and 5:30, could

12  you -- were you able to determine whether or not he had

13  consumed alcohol on that day?

14     A    I smelled it, but -- I didn't get up on him and

15  engulf it, no, but I smelled it, yes.

16     Q    Did he appear to have consumed alcohol, or in your

17  opinion, would he have been intoxicated?  Were you able to

18  judge that based on his mannerisms?

19     A    I don't feel that he was intoxicated that -- at

20  that time.

21     Q    Okay.  That maybe he had drank some --

22     A    Right.

23     Q    -- but that he did not appear intoxicated?

24     A    Right.

25     Q    All right.  Now, did you invite -- how long did

1   the defendant stay -- let's start there -- on November 25th,

2   2003?

3        A    Probably five to ten minutes.  No more than that.

4   Because I was trying to get my kids ready to go to their

5   dad's, and I was right in the middle of packing their bags

6   and getting their medication together and whatnot.

7        Q    Okay.  What did you ask the defendant to do?

8        A    Could he come back at another time.

9        Q    And did he leave?

10       A    Yes.

11       Q    And if he arrived there at between 5:00 and 5:30,

12  he stayed about ten minutes and left?

13       A    Right.

14       Q    Do you recall what date he returned?

15       A    On November 27th.

16       Q    Was that Thanksgiving?

17       A    Thanksgiving evening.

18       Q    What time did you --

19       A    It was dark.

20       Q    It was dark then?

21       A    Yes.

22       Q    When the defendant arrived, do you recall how he

23  arrived?

24       A    He was in Carolyn Click's car.

25       Q    Now, at this point, you've seen him now twice in

146

1  Carolyn Click's car without Carolyn Click.

2      A      Right.

3      Q      And he's told you that she's out of town.

4      A      Right.

5      Q      When he shows up the second time, do you

6  notice any -- anything in the defendant's -- or do you see

7  the defendant pull anything out of his pockets?

8      A      That evening, yes.  I was very ill, and my

9  ex-husband was going to go get me a small bottle of whiskey

10  to make a hot toddy to try to break some phlegm up.  Tracy

11  needed to go get some beer, is what he told me, was he

12  needed -- he was running out of beer, and he needed to get

13  some more and --

14      Q      Tracy, the defendant?

15      A      The defendant.

16      Q      Okay.

17      A      He said, "Well, I'll go with him or he can ride

18  with me," and my ex-husband and Tracy left to go to the

19  liquor store.

20      Q      Okay.  Whose car did they leave in?

21      A      Carolyn Click's.

22      Q      Now, what type of -- what size bottle did you want

23  to buy?

24      A      Just a small one.  Just --

25      Q      Okay.

147

1    A    I don't know the sizes.  I'm not a drinker.

2    Q    Okay.  And how were you to pay?

3    A    My ex-husband bought it.

4    Q    Okay.  Did -- when did you see Tracy Beatty pull

5  something out of his pocket?

6    A    At my house on Hillcrest in Malakoff.

7    Q    What did you see the defendant pull out of his

8  pocket on November 27th that --

9    A    There was a wad of cash.

10   Q    Okay.

11   A    I mean, it was folded in half, but there was a

12  stack probably an inch to an inch and a half.

13   Q    Okay.  So when you flipped the wad over, it was an

14  inch to an inch and a half thick folded?

15   A    Folded, yes.

16   Q    Okay.  Describe for the jury the denominations of

17  currency that you saw in that wad of cash?

18   A    There were -- I know there were several one

19  hundred dollar bills.

20   Q    Okay.

21   A    There was a couple of twenties.

22   Q    Okay.

23   A    And maybe five or ten ones.

24   Q    Okay.  Now --

25           MR. BINGHAM:  May I approach the witness,

148

1    Judge?

2                    THE COURT:  Yes.

3        Q    (By Mr. Bingham) Now, let me show you State's

4    Exhibit 22.  Do you know who that is?

5        A    Yes.

6        Q    Okay.  Who's that?

7        A    Tracy.

8        Q    Okay.  Is this how Tracy appeared to you on

9    November 25th and 27th?

10       A    Yes.

11       Q    Now, did he have the same physical appearance in

12   State's Exhibit 22 that he -- I mean, is this how he looked?

13       A    Yes.

14       Q    Okay.  Now, do you know -- were you surprised to

15   see a wad of money folded over that was an inch to an inch

16   and a half tall knowing that he had a couple of -- at least

17   a couple of hundreds?  What -- did you see any other

18   denominations?

19       A    No, sir.

20       Q    Okay.  Of course, a couple of hundreds would be a

21   long ways from equaling --

22       A    Exactly.

23       Q    Okay.  And Tracy just pulled -- I mean, how did it

24   come to come out of his pocket; do you recall?

25       A    If I'm not mistaken, he said something about

149

1  having to get gas that evening as well because he was going

2  to go see his daughter in Dallas, and my ex-husband asked

3  him, "Well, I don't know if I have the money for all of

4  this" or something, and Tracy said, "Well, I've got my own

5  money.  You don't have to worry about it."

6      Q    Okay.  What did you think when you saw that inch

7  and a half wad of money with a couple of hundreds?

8      A    I was startled because I knew that Tracy wasn't

9  working.

10     Q    Now, the -- how long has the defendant gone in

11 Carolyn Click's car with his wad of money and your husband?

12 How long are they gone?

13     A    20 or 30 minutes.

14     Q    Okay.  And when they come back, what have they

15 purchased?

16     A    Tracy bought some beer, he bought a small bottle

17 of whiskey, and my ex-husband bought a small bottle of

18 whiskey for me.

19     Q    Okay.  How long did Tracy -- how long did Tracy

20 Beatty stay that night?

21     A    Oh, he stayed for a while that evening.

22     Q    Did you see the amount of liquor that Tracy Beatty

23 consumed on November 27th, 2003?

24     A    Did I watch him drink it?  No, sir, I did not.  I

25 know that he was -- to my judgment, he was drunk, and I

150

1   figured that he would leave the house driving, and that

2   scared me.

3        Q    Okay.  Did he leave the house?

4        A    Yes.

5        Q    Okay.  And did he come back?

6        A    Yes.

7        Q    How long was he gone before he leaves and comes

8   back?

9        A    He was gone about 20 or 30 minutes, and then he

10  came back.

11       Q    When he came back, what did he say to you?

12       A.   He said, "I think I'm too drunk to drive.  I took

13  out a couple of signs."

14       Q    Okay.  So he took Ms. Click's car, got back on the

15  road drunk, took out a couple of signs, and came back to

16  your house?

17       A    Yes, sir.

18       Q    Okay.  Now, what did you -- what did you say to

19  the defendant at that point?

20       A    I said, "Come on in, and I'll grab you a blanket

21  and a pillow, but let me have the keys."

22       Q    Okay.  Did he spend the night there?

23       A    Yes, he did.

24       Q    Now, did you -- was he there when you woke up the

25  next day?

151

1    A    Yes, he was.

2    Q    What time did you see him the next morning?

3    A    It was between 8:30 and 9:00.

4    Q    Okay.  And this is on November 28th?

5    A    The 28th of 2003.

6    Q    Okay.  And when he woke up, what was he doing?

7    A    He had beer in his hand.

8    Q    Okay.  So at 9:00 o'clock the next morning, he has

9    a beer in his hand, and what do you say to him?

10   A    I made a comment about, "Isn't it kind of early

11   for that already?"

12   Q    Okay.  Now, did you stay at your house with the

13   defendant?

14   A    All day, no.

15   Q    Okay.  What time did you leave the house?

16   A    I left about 9:15, 9:30.

17   Q    Okay.  And where were you going?

18   A    I was on my way to the emergency room.

19   Q    How long would you say you were gone once you left

20   your house before you returned to your house?

21   A    I would say I was at the emergency room probably

22   four to five hours.

23   Q    Okay.  Did the defendant leave your house -- or

24   did anyone remain at the house with the defendant?

25   A    Yes.

152

1    Q    Who?

2    A    My 13-year-old son.

3    Q    Okay.  Did you give the defendant explicit

4  instructions?

5    A    "Don't take my son anywhere.  Don't leave this

6  house.  You've been drinking already."

7    Q    Okay.  So you think that he's going stay at the

8  house with your son?

9    A    Yeah.  I was hoping he would, yes.

10   Q    Okay.  Did he follow your instructions?

11   A    No, he did not.

12   Q    What did he do?

13   A    He went to my sister's house.  He went to put gas

14  in the car.

15           MR. PERKINS:  Judge, can I take the witness

16  on voir dire for the purpose of a possible objection?

17           THE COURT:  Yes.

18              VOIR DIRE EXAMINATION

19  BY MR. PERKINS:

20   Q    Is it Ms. Killough?

21   A    Killough (pronouncing).

22   Q    Killough?

23   A    Yes, sir.

24   Q    Ms. Killough, this may seem like kind of an

25  obvious question, but if you weren't there, how do you know

153

1   what Tracy Beatty did?

2       A    My son told me.

3       Q    Okay.

4            MR. PERKINS:  Then I'm going to object to

5   hearsay, Judge, and ask for an instruction to disregard.

6            THE COURT:  Well, I sustain the objection as

7   to any response that is based on hearsay, what she was told,

8   and I'll instruct the jury to disregard any response that is

9   based on what she was told by her son.

10           MR. BINGHAM:  I'll rephrase it.

11           DIRECT EXAMINATION (CONTINUED)

12  BY MR. BINGHAM:

13      Q    Did you talk to the defendant about it?

14      A    Yes.

15      Q    When you got home and you found out some things

16  you weren't happy about, did you confront the defendant?

17      A    Yes, I did.

18      Q    What did you say to him?

19      A    I asked him why he decided to disregard what I

20  told him, and he was jeopardizing my 13-year-old son's life.

21      Q    Did you confront him about where he had gone?

22      A    Yes, sir.

23      Q    Where did you tell him you knew he had went?

24      A    I told him that I knew he had went to Wal-Mart --

25  or to -- well, across from Wal-Mart, which is a Texaco gas

154

1   station in Athens, I know that he went to my sister's house,

2   and I know he went to Brookshire's to get something to eat

3   and also to Sack-a-Burger.

4       Q    Okay.  And when you confronted him about, "I know

5   where you've been, I know who you went with, that you took

6   my son, and I told you not to," what did the defendant say?

7       A    He said, "I'm not too drunk to drive," and it was

8   okay.

9       Q    Okay.  Now --

10              MR. BINGHAM:  Can I have one second, Judge?

11              THE COURT:  Yes.

12      Q    (By Mr. Bingham) So if I made the comment, "Well,

13  you've never -- there's no evidence that the defendant could

14  not use Carolyn Click's car, you've actually heard the

15  defendant request it and Carolyn Click say no?

16      A    Correct.

17      Q    Now, let me ask you this.

18              MR. BINGHAM:  Can I have one second, Judge?

19              THE COURT:  Yes.

20      Q    (By Mr. Bingham) Let me show you State's

21  Exhibit 3 -- excuse me -- 23.  Do you recognize that?

22      A    Yeah.

23      Q    What is State's Exhibit Number 23?

24      A    Carolyn Click's cross ring.

25      Q    Okay.  How many times would you say you've seen

1   this ring on the finger of Carolyn Click?

2        A    Three times that I know of.

3        Q    All right.  And would you consider this to be a

4   ring that is unique?

5        A    Yes.

6        Q    Now, do you know how long she's had that ring?

7        A    No, sir.

8                  MR. BINGHAM:  Your Honor, may -- I'm sorry.

9   I'll tender State's Exhibit 23 to Mr. Perkins and Mr. Hawk.

10                 (At the bench, on the record.)

11                 MR. PERKINS:  Again, Judge, at this point in

12  time, I'm going to object to State's Exhibit 23, it's being

13  more prejudicial than probative.  They have excised a

14  portion but not a sufficient portion in our minds to make

15  that -- there's a -- well, the Court can see it.

16                 We're talking about a ring, the photograph of

17  a ring that's apparently still on the body of Carolyn Click.

18  I'm sure that the State could have and probably does have in

19  its possession the actual ring itself to proffer into

20  evidence.

21                 If they choose to proffer this one, which is

22  still on the corpse of Carolyn Click, through this witness,

23  we object to it under 403 and object to its relevancy as to

24  try to publish through this witness this particular State's

25  Exhibit Number 23.

156

1           THE COURT:  Your response?

2           MR. BINGHAM:  Judge, State's Exhibit 23 is

3    the -- is, in fact, a ring -- is, in fact, a ring that was

4    found on the body of Carolyn Click.  It's relevant.  We have

5    excised a large portion of the actual hand of Carolyn Click,

6    but it's very relevant because this is a unique ring.

7           This witness can testify that she's seen this

8    ring on the hand of Carolyn Click, and, in fact, this ring

9    was found on the body of the individual taken out of the

10   grave behind Carolyn Click's house.  It's relevant for

11   purposes of identification of that body, and we have excised

12   or taken off a -- more than -- or at least half of this

13   photograph.

14          THE COURT:  The Court finds that the

15   photograph is relevant for -- the Court finds the photograph

16   is relevant for identification purposes of the ring by the

17   witness as being the victim, Carolyn Click's, ring.

18          The Court applies the balancing test and

19   finds the appropriate probative value outweighs the

20   prejudicial effect, and State's Exhibit Number 23 -- your

21   objection is overruled.  State's Exhibit 23 is admitted as

22   it appears.

23          The State has excised a significant portion

24   of the photograph out of how it originally appeared and cut

25   it down to an area just showing the ring, of course, on the

157

1    finger with a measuring device and the identification number

2    that the -- to lay out where the autopsy was done.

3                THEREFORE, the Court will overrule your

4    objection.

5                (End of bench conference.)

6                MR. BINGHAM:  We would offer State's

7    Exhibit 23.

8                THE COURT:  State's Exhibit 23 will be

9    admitted.

10   Q    (By Mr. Bingham) Do you recognize this to be a

11   ring belonging to Carolyn Click?

12   A    Correct.

13   Q    Would you consider this to be a ring that is

14   unique?

15   A    Yes.

16   Q    Now, you had seen this ring on the hand of Carolyn

17   Click on --

18   A    Three different occasions.

19   Q    Three different occasions.

20               MR. BINGHAM:  Judge, we'll pass the witness.

21               Thanks, ma'am.

22               THE COURT:  Mr. Perkins?

23               MR. PERKINS:  Thank you, Judge.

24                    CROSS-EXAMINATION

25   BY MR. PERKINS:

1    Q    Ms. Killough, hi.  My name is Robert Perkins.  And

2   Other than us visiting a few minutes ago briefly, we haven't

3   talked or met before, have we?

4    A    No.

5    Q    Ms. Killough, what I want do is I want to go back

6   over some of the stuff that you testified to and kind of see

7   if I can get some clarification --

8    A    Okay.

9    Q    -- as to exactly what it is that you say that you

10  witnessed, okay?

11        I want to start off by asking you, do you

12  think your memory of these events is better now than it was

13  back say last December?

14   A    Are they better now?  No.  They're the same.

15   Q    Your memory now is the same as it was back last

16  December?

17   A    Yes.

18   Q    Ms. Killough, you had an opportunity two days shy

19  of Christmas last year to meet with Smith County Sheriff's

20  Deputy Steve Chaney.  Do you remember meeting with him and

21  giving a handwritten statement?

22   A    Yes, sir.

23   Q    And actually, my understanding is that you wrote

24  it out yourself; is that right?

25   A    Yes, sir.

159

1    Q    They gave you some blank pages and let you write

2   as little or as much as you wanted to; is that right?

3    A    Yes, sir.

4    Q    I'm sorry.  I --

5    A    Yes, sir.

6    Q    Okay.  And this was contemporaneously or at the

7   same time -- let me quit using big lawyer words.  This was

8   about the same time as the disappearance of your aunt was

9   being solved --

10   A    Correct.

11   Q    -- is that about right?

12   A    Yes, sir.

13   Q    The questions that I have for you -- would you

14  agree with me that your recollection today is different than

15  your recollection back last December when you talked to

16  Steve Chaney?

17              MR. BINGHAM:  Objection.  Asked and answered.

18              MR. PERKINS:  Judge, I'll withdraw it.

19              THE COURT:  It's withdrawn.

20   Q    (By Mr. Perkins) Are you telling the jury the same

21  thing you told Steven Chaney?

22   A    Yes, sir.

23              MR. BINGHAM:  Judge, I'm going to object to

24  the form of that question.  That is an improper question.

25  It's not an impeachment question.  Doesn't comply with the

160

1    Texas Rules of Evidence, and I object to the form of the

2    question.

3                    THE COURT:  Rephrase, Mr. Perkins.

4                    MR. PERKINS:  I'll clear it up, Judge.

5                    THE COURT:  Clear it up.

6        Q     (By Mr. Perkins) Ms. Killough, you wrote a

7    two-page statement, didn't you.

8        A     Yes, sir.

9        Q     And you would agree with me that nowhere in that

10   two-page statement is there a single word about you ever

11   having heard Carolyn Click deny Tracy Beatty the right to

12   drive her car.  There's not one mention of that in there, is

13   there?

14       A     No, sir.

15       Q     But you recognize the significance of it now that

16   we're in trial, don't you?

17       A     No, sir.

18       Q     You don't?

19       A     No.

20       Q     So you've never visited with anybody from the

21   State of Texas about whether or not you ever heard Carolyn

22   Click deny him access to that car?  Is that what you're

23   telling me and this jury over here?

24       A     When I wrote that statement, that's what I was --

25   I was writing the truth.  That's how I remember it.

161

1    Q    That's not the question I asked you, ma'am.

2         The question I asked you was, did you visit

3    with anybody from the State over here, an investigator with

4    the District Attorney's Office, an assistant district

5    attorney, anybody in the District Attorney's Office about

6    Carolyn denying Tracy Beatty use of the car?

7    A    They talked to me Friday.

8    Q    Friday did they talk to you about that?

9    A    They asked me what happened, and I told them.

10   Q    Okay.  And so Friday you suddenly remembered this

11   conversation that you failed to put in your statement that

12   you gave to Steve Chaney December the 23rd of 2003.  Is that

13   what we're to understand?

14   A    I omitted it, yes.

15   Q    You omitted it?

16   A    Yes.

17   Q    Why did you omit it then, but now you've suddenly

18   remembered it at trial?

19   A    At the time I wrote that statement, when Steve

20   Chaney -- I think you said his name was -- there was 15

21   detectives sitting there, and I had cadaver dogs in my yard.

22   And they asked me to write a statement, so I wrote a

23   statement.

24   Q    Okay.  You didn't think it was important then?

25   A    At the time I was trying to put everything down on

162

1  paper that I could remember at that time with them going

2  through my property.

3      Q   Okay.  And you say that this conversation, "May I

4  drive the car," and Carolyn Click saying no was not

5  significant to you at the time that they were searching for

6  Carolyn Click's body in your yard?

7      A   No, I didn't.

8      Q   Do you understand, Ms. Killough, that Tracy Beatty

9  is charged with capital murder, the basis of the capital

10  murder being robbery and burglary?  Has that been explained

11  to you by somebody?

12      A   I was explained that on Friday.

13      Q   Okay.  This is the same time you met with the

14  District Attorney's Office Friday?

15      A   Correct.

16      Q   And at that time, for the first time, you informed

17  them of this conversation that you overheard between Carolyn

18  Click and Tracy Beatty where he asked --

19      A   "May I drive the car?"

20      Q   -- "May I drive the car," and she says no?

21      A   Correct.

22      Q   Ms. Killough, let me ask you about a couple of

23  other things.

24             You indicate today, if I understand -- again,

25  correct me if I'm wrong about this -- that on November the

163

1    25th, that Tracy Beatty showed up at your house at about

2    5:00 to 5:30 in the afternoon.

3         A    Correct.

4         Q    Before dark.

5         A    Correct.

6         Q    Okay.  You indicate that it takes about 45 minutes

7    to drive between your house -- which I believe was in

8    Malakoff?

9         A    Malakoff.

10        Q    Am I right about that, Malakoff?

11        A    Right.

12        Q    And Whitehouse, Texas.

13        A    Correct.

14        Q    Okay.  He's there by 5:00 to 5:30.

15        A    Correct.

16        Q    Can't say exactly, but --

17        A    Close enough.

18        Q    -- that's the window that we're talking about.

19             Today you say that when he showed up, you do

20    not believe he was intoxicated.

21        A    At the time that he arrived on the 25th, I don't

22    feel that he was intoxicated at that time.

23        Q    Ms. Killough, didn't you tell Steve Chaney that at

24    the time that he drove up on the 25th, that in your own

25    handwriting, you wrote, "And he was extremely drunk"?

164

1    A    If that's what I put on there.

2    Q    Well, which one is the truth?

3    A    I don't feel that on the 25th, he was drunk.  I

4    believe on the 27th he was drunk.

5    Q    Okay.  Then when you wrote the statement, which

6    was also a voluntary statement under oath, to Steve Chaney,

7    why did you put in your statement that you wrote

8    December the 23rd of 2003, that at the time that he showed

9    up showed up, he was extremely drunk?

10    A    When I was writing the statement, there was a lot

11    going on, and I could not even remember when Thanksgiving

12    was at that time.  And I asked Mr. Chaney, on the 25th, what

13    day was that on, because I can do Monday, Tuesday, Wednesday

14    better than I can the 25th, 26th, 27th.

15    Q    Okay.  So what you're saying is, today, when you

16    come in here and testify, he showed up at 5:00 to 5:30, and

17    he was not drunk, but back closer in time to when it

18    actually happened, that's -- instead of it being like, you

19    know -- today is what?  August of 2004?

20    A    Right.

21    Q    So not quite, but nearly a year ago, in December

22    of 2003, when you wrote this statement about something that

23    supposedly happened a month before, you put down that he was

24    extremely drunk.

25    A    He was very drunk on the 27th.

1      Q    Okay.  I want to talk to you about the 27th for a

2  second --

3      A    Okay.

4      Q    -- but I'm not through with the 25th yet.

5      A    Okay.

6      Q    You indicate today, when you come in and testify,

7  that when you saw Callie's car, and Callie wasn't there,

8  that you were extremely concerned.  Am I right about that?

9      A    I was questionable, yeah.

10      Q    Okay.  And the first thing that you asked was,

11  "Where is Carolyn?"

12      A    Right.

13      Q    Would you agree with me that there's not one word

14  about any of that in your statement to Steve Chaney?

15  There's not one word in there.

16      A    Would I agree?  Yes.

17      Q    So that wasn't significant to you either.

18      A    The time that I wrote that statement, they asked

19  me specific -- a specific situation, such as December when

20  he was arrested from my house.

21      Q    I'm not talking about that, ma'am.  I'm talking

22  about them handing you blank pieces of paper and letting you

23  write it out.  And you would agree with me that despite the

24  fact that you had the opportunity to write down, "He showed

25  up without Carolyn, and I asked where is Carolyn, and he

166

1   told me out of town with friends, she'll be out of town for

2   a couple of weeks," even though you will come into court and

3   testify to that today, there is not one word about any of

4   that in the statement that you gave to the police less than

5   a month after these events.  Is that true or not true?

6        A    That's true.

7        Q    Let me keep talking to you about the 25th.  Today

8   you said that you were very ill on the 25th.  When he showed

9   up, you were busy trying to get the kids packed up, because

10  their father was taking them somewhere for Thanksgiving or

11  something; is that right?

12       A    Correct.

13       Q    And that you asked Tracy Beatty to leave and to

14  come back another time.

15       A    Yes.

16       Q    That's what you testified to today?

17       A    Yes.

18       Q    Isn't it true, ma'am, that in the statement that

19  you gave to Lieutenant Chaney that you informed Lieutenant

20  Chaney at that time that you begged him -- being him, being

21  Tracy Beatty -- to stay the night, but he was adamant about

22  going to his daughter's house?

23       A    On the 27th, not on the 25th.

24       Q    Did you put anything -- let me just clear this up

25  right now.  Did you put one single solitary word in your

167

1    entire statement about ever seeing Tracy Beatty on the 27th?

2        A    Did I put it in my statement?  No.

3        Q    But today you've come in and told this jury that

4    you had another encounter with him, not on the 25th but on

5    the 27th as well?

6        A    Correct.

7        Q    So in your sworn statement to Lieutenant Chaney

8    where you said that you begged for him to stay on the 25th,

9    would you agree with me that that directly contradicts what

10   you testified to today, that you asked him to leave and come

11   back another time?

12       A    Yes, sir, it does contradict.

13       Q    Let me talk to you about another detail that

14   apparently has come back to you between then and now.  Let's

15   talk about this wad of cash for a second.

16       A    Okay.

17       Q    First of all, you would agree with me that there's

18   not one mention in the statement that you gave to Lieutenant

19   Chaney a month after these events unfolded about ever seeing

20   a wad of cash?

21       A    I mentioned it to him, but I did not put it in my

22   statement.

23       Q    You mentioned it to him?

24       A    Yes, I did.

25       Q    But just didn't put it in your statement?

168

1      A    Correct.

2      Q    So despite the testimony today that you were -- I

3 believe the word you used was "shocked" to see Tracy Beatty

4 with a 1 to 1-1/2 inch roll of money or a wad of money or a

5 fold of money, whatever you want to call it, it wasn't

6 significant to you enough at the time less than a month

7 after these events to include it in the written statement

8 that you had a chance to make?  There wasn't one word about

9 any money in there, was there?

10     A    No, sir.

11     Q    There wasn't one word in there about a couple of

12 hundreds, was there?

13     A    No, sir.

14     Q    Not one word in there about a bunch of $20s, was

15 there?

16     A    No, sir.

17     Q    Not one word in there about five to ten ones

18 folded up, was there?

19     A    No, sir.

20     Q    Not one word in there about, "I've got it, I've

21 got my own money," was there?

22     A    No, sir.

23     Q    Not one word in there about the trip to the liquor

24 store, was there?

25     A    In the statement, no, sir.

169

1      Q     Let me talk to you about another detail.  You

2  indicate today in your testimony that you were shocked

3  because you knew that Tracy Beatty wasn't working.

4      A     Correct.

5      Q     According to your statement to Steve Chaney, and

6  clear me up on this.  Before you saw Tracy Beatty on the

7  25th, when was the time that you saw him before that?

8      A     October.

9      Q     October?

10     A     Yes, sir.

11     Q     So from October to -- what are we talking about --

12 November the 25th.  When was it in October you saw him?

13     A     I'm not sure.

14     Q     Where was it that you saw him?

15     A     At my sister's house.

16     Q     And so is this information that you say you had

17 about that you know that he's not working, did you hear that

18 from somebody?

19     A     No, sir.

20     Q     Are you keeping tabs on whether or not he's

21 working?  I'm kind of mixed up here.

22     A     No, I'm not keeping tabs on him.

23     Q     Nobody told you he wasn't working, and you don't

24 know that for yourself.  So I guess the only question

25 remains is how could you possibly know that he was or was

170

1    not working?

2        A    Tracy told me the day he come in on the 25th.

3        Q    On the 25th?

4        A    November 25th.

5        Q    Would you agree with me that there's not

6    anything -- well, first of all, there wasn't anything in

7    your testimony today about him telling you that, was there?

8        A    No, sir.

9             MR. BINGHAM:  Judge, I'm going to object.  I

10   didn't ask her that question.  If he said anything on the

11   25th about whether or not he was working or how she knew.

12            THE COURT:  I'll overrule the objection.

13   Mr. Bingham, you can come back on redirect.

14            Go ahead.

15            MR. PERKINS:  Thank you, Judge.

16       Q.   (By Mr. Perkins) Okay.  When the State was asking

17   you questions, you didn't indicate that's where you knew it

18   from.  Would you agree with that?

19       A    No, sir.

20       Q    You wouldn't agree with that?

21       A    No, sir.

22       Q    In your statement to Steve Chaney that you gave

23   December 23rd of 2003, you didn't mention that.

24       A    You're right, I didn't.

25       Q    You didn't mention the money.

171

1     A     No, sir, I didn't.

2     Q     Okay.  Let me talk to you about one other.  This

3  trip with your -- when you left, you say today that on

4  November the 27th, you were sick?

5     A     Yes, sir.

6     Q     Now, was that the 25th or the 27th?

7     A     The 27th.

8     Q     That's what you say today.  You were sick and went

9  to the emergency room?

10     A     On the 28th, I went to the emergency room.  I

11  started getting sick on the 24th.

12     Q     On the 28th, you went to emergency room?

13     A     Yes, sir.

14     Q     And when you came back -- actually, before you

15  left, you told Tracy Beatty, "Look, you've been drinking.

16  You got up with a beer in your hand.  I don't want you -- my

17  13-year-old son is here with you.  I don't want you going

18  anywhere with him.  I don't want you endangering my son's

19  life."

20     A     I don't want you leaving in the car.  You're

21  already drinking.

22     Q     And today you come in and testify that when you

23  got back, you talked to your son, confronted Tracy and he

24  had been to Wal-Mart and your sister's house and some burger

25  place that I can't remember the name of.

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

172

1     A    Sack-a-Burger.

2     Q    Sack-a-Burger?

3     A    Yeah.

4     Q    Okay.  Ma'am, are you sure about that?

5     A    Yes, sir.

6     Q    Ms. Killough, why then on December 23rd of 2003,

7   why did you, in this sworn statement to Steve Chaney, tell

8   him that on the 25th that your ex-husband took you to the

9   ER, "and Tracy stayed at my house with my 13-year-old son

10  until I returned"?

11     A   When I made that statement, I did not know I was

12  going to have to put the exact dates on everything, because

13  that's why it says on or about November 25th.

14     Q   No, I'm not talking -- I don't care about the

15  date, ma'am.  I really don't.

16     A   That's what you're asking.

17     Q   No, what I'm asking you is, why did you in this

18  sworn statement right here, why did you write on here "Tracy

19  stayed at my house with my 13-year-old son until I

20  returned"?  Why did you write that in your own handwriting,

21  a sworn statement, and then come in here and tell this jury

22  the story you told them today?

23     A   That's what -- he was at my house on November 28th

24  watching my 13-year-old son.  I was at the emergency room.

25     Q   There's not one word in that statement, that sworn

Case 4:09-cv-00225-SDJ   Document 81-1   Filed 10/28/22   Page 173 of 207 PageID #: 7706

1  statement to Lieutenant Chaney about him leaving, about you

2  telling him not to leave, about him going to the Wal-Mart or

3  any burger place or your sister's house or anything else, is

4  there?

5       A    Not in the statement, no.

6       Q    In fact, it says that he stayed there with your

7  13-year-old son until you returned.  Would you agree that's

8  maybe a slight bit inconsistent with your testimony today?

9       A    It probably seems to be, yeah.

10      Q    Is the answer to that question as truthful as the

11 rest of your testimony?

12           MR. BINGHAM:  Judge, that question is -- and

13 he knows it's an objectionable question.

14           THE COURT:  I'll sustain the objection.

15           MR. BINGHAM:  Ask the jury to disregard it.

16           THE COURT:  I sustained the objection.

17      Q    (By Mr. Perkins) Carolyn Click was your aunt,

18 wasn't she?

19      A    Yes, sir.

20      Q    And you loved your aunt, didn't you?

21      A    Yes.

22      Q    And you want to see whoever killed your aunt to be

23 punished justly; is that all correct?

24      A    Yeah.

25      Q    Do you think it's right for you or any other

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

174

1    witness to come in here and exaggerate?

2         A    Do I think it's right?  No.

3         Q    Do you think it's right for you or any other

4    witness to come in here and to tell material falsehoods?

5                   MR. BINGHAM:  Judge, I'm going to object to

6    the form of the question unless he wants to ask her if she's

7    done that.

8                   MR. PERKINS:  I'll ask her --

9                   MR. BINGHAM:  And the question leaves a wrong

10   impression with the jury by stating facts.

11                  THE COURT:  Mr. Bingham, he can ask her that

12   question.

13                  Ask her, Mr. Perkins.

14        Q    (By Mr. Perkins) I'll just ask you, do you want

15   him to get the death penalty?

16                  MR. BINGHAM:  Judge, we'll go into that.

17                  THE COURT:  No.  Mr. Perkins, as -- no,

18   Mr. Bingham.  I'll overrule the objection.  Direct the

19   question to her about whether or not she's testified to any

20   falsehoods.

21                  MR. BINGHAM:  Judge, is the Court precluding

22   me from going into things that she might know?

23                  THE COURT:  Mr. Bingham, I'm not precluding

24   you at this point from going into anything.  What I'm trying

25   to do is rule on your objection to Mr. Perkins' question.

1           MR. BINGHAM:  Thank you, Judge.  I'm sorry.

2           THE COURT:  That's what I'm doing at this

3  point.  And your objection is overruled.

4           Go ahead.  You may have to restate it,

5  Mr. Perkins.

6      Q    (By Mr. Perkins) Do you understand the question?

7      A    Yes.  Do I want him to go to the death penalty?

8  No.  He's family.

9      Q    No.

10          THE COURT:  No, ma'am, just a minute.  The

11  objection to that was sustained.  I'm talking about your

12  other question.

13          MR. PERKINS:  She's answering the wrong

14  question.

15          THE COURT:  Yes.  That's why I said I think

16  it would probably be better if --

17     Q    (By Mr. Perkins) Do you think it's right -- do you

18  think it's right for you or any other witness to come in

19  here and materially -- intentionally, materially mislead a

20  jury?

21     A    No, it's not right.

22          MR. PERKINS:  I don't have any other

23  questions.

24          MR. BINGHAM:  Thank you.

25          REDIRECT EXAMINATION

176

1   BY MR. BINGHAM:

2        Q     Did you do that?

3        A     No, I did not.

4        Q     Let me ask you something. As we come in here, the

5   process is the lawyers get to go to law school and they get

6   to do this for 15 years, 10 years.  And we get to come in

7   and say, "You know, this is what's important to put in a

8   statement."  How many statements would you say you've

9   written in regards to a criminal offense?  Is this the first

10  statement you've ever given the police?

11       A     No.

12       Q     How many have you given in the past?

13       A     Probably two.

14       Q     Regarding someone else?

15       A     Correct.

16       Q     Now, if I asked you -- remember Mr. Perkins

17  saying, did they talk you to about being charged with

18  capital murder, tell me what the capital murder statute

19  says.

20       A     I don't know.

21       Q     Can you tell me what section it is out of the

22  Penal Code?

23       A     No.

24       Q     Can you tell me what would and would not be

25  important in proving capital murder?

177

1    A   No.

2    Q   Well, can you tell me -- if I ask you what would

3  be important evidence for me to know that you know about

4  Tracy Beatty in proving capital murder, could you tell me?

5    A   No.

6    Q   When law enforcement got you out there at the

7  scene that day and gave you that statement, did they tell

8  you what to write?

9    A   No.

10    Q   What did they tell you?

11    A   Write a statement.

12    Q   Now, they told to you write a statement.

13    A   Correct.

14    Q   They gave you no details about what would or would

15  not be important?

16    A   Correct.

17    Q   Did they try to influence you in any way as to

18  what to write?

19    A   No.

20    Q   I mean, Mr. Perkins is taking you through and

21  saying, "Well, nowhere in the statement did you talk

22  about -- that Carolyn Click denied letting -- that Carolyn

23  Click told the defendant he couldn't drive her car." Well,

24  think about that.  In the scheme of the death of Carolyn

25  Click, would that be very -- do you think that that would be

178

1   very important to you?

2        A    I don't feel it would be.

3        Q    Well -- okay.  That's the point.  You don't know

4   anything about capital murder, do you?

5        A    No.

6        Q    I mean, if you're writing a statement about what

7   you know, do you think that one statement that was made some

8   time previous that she denied letting Tracy Beatty use the

9   car, do you think that would be something important to put

10  in your statement?

11       A    No.

12       Q    Might be important to lawyers, right?

13       A    Correct.

14       Q    But it might not be important to you?

15       A    Correct.

16       Q    Now, if Tracy Beatty had said to you, "I killed

17  her," would that be something important to you?

18       A    Yes.

19       Q    You don't know the specifics of prosecution of

20  capital murder cases, fair?

21       A    Fair.

22       Q    Well, how about the fact that he stopped at

23  Sack-a-Whack or Sack-a-Burger, whatever it's called, would

24  you think the fact that he stopped at Sack-a-Burger would be

25  important to you, would be important in the prosecution of

179

1  him for capital murder?

2      A    No.

3            MR. PERKINS:  Objection as to relevancy,

4  whether she thinks it's important or not doesn't matter,

5  Judge.

6            THE COURT:  Overruled.  Go ahead,

7  Mr. Bingham.

8      Q    (By Mr. Bingham)  I mean, Mr. Perkins is sitting

9  here called you, basically, a liar.

10           MR. PERKINS:  Judge, I object to that.

11           THE COURT:  I'll sustain the objection to

12  that.

13           MR. BINGHAM:  I'll rephrase it.

14     Q    (By Mr. Bingham) Mr. Perkins has gotten here

15  because you've given testimony against his client that

16  hurts.

17     A    Correct.

18           MR. PERKINS:  I object to that, Judge.  I

19  object to that, Judge.  Ask to approach the bench for a

20  side-bar.

21           THE COURT:  Just a second, Mr. Perkins.  I

22  sustain the objection and instruct the jury to disregard

23  Counsel's statements about testimony that hurts.

24           MR. PERKINS:  Ask to approach the bench for a

25  side-bar, Judge.

180

1          THE COURT:  That's fine.  Go ahead.

2          (At the bench, on the record.)

3          MR. PERKINS:  I'm not going to allow him to

4  continue to strike at the defendant over my shoulder, Judge,

5  and if he's going to stand up and preach and say, "I'm

6  calling her a liar" and stuff, he's going to get a preaching

7  objection right back on him.  Fair warning.

8          THE COURT:  Just instruct -- you don't have

9  to warn the Court.  Just instruct them --

10          MR. PERKINS:  I'm not talking to the Court.

11          THE COURT:  I've just instructed the jury to

12  disregard.  Let's go.

13          (End of bench conference.)

14          THE COURT:  The next question, Mr. Bingham,

15  unless you need to rephrase that one or go back over it.

16          MR. BINGHAM:  I'll rephrase it.

17     Q    (By Mr. Bingham) My point is, Carolyn, you

18  heard -- excuse me -- Stacey, you heard him say to you -- I

19  think the last thing Mr. Perkins said to you was something

20  about do you think it's right to give false testimony under

21  oath, do you think it's right to mislead a jury; do you

22  remember that?

23     A    Yes.

24     Q    Now, Mr. Perkins is asking you those questions.

25  Let's put it in the context of what is and is not important

1   in the prosecution of a capital murder case and what you as

2   someone who did not go to law school, is not a prosecutor or

3   a defense attorney would know to be important.  Do you think

4   it would be important that at some point Carolyn Click had

5   denied the defendant the use of her car?

6       A    Would I think it's important?  No.

7       Q    Do you think it's important that at some point he

8   stopped at Sack-a-Burger?

9       A    No.

10      Q    Do you think it was important that the second time

11  he showed --

12              MR. BINGHAM:  Can I approach the witness?

13              THE COURT:  Yes.

14      Q    (By Mr. Bingham) Is this your same statement right

15  here, State's Exhibit 24 (indicating)?

16      A    Yes.

17      Q    Both pages?

18      A    Yes.

19              MR. BINGHAM:  We would offer State's

20  Exhibit 24, show to Mr. Perkins.

21              MR. PERKINS:  Approach, Judge?

22              THE COURT:  Yes.

23              (At the bench, on the record.)

24              MR. PERKINS:  Same objection as previously.

25  This was not used to impeach her.  Additionally, it contains

182

1  extraneous information in there.

2              MR. BINGHAM:  Yeah.  We're offering it, and

3  I'll tell you why.  Because he has made it look like

4  she's -- he is questioning her -- he has questioned her

5  about her report extensively.

6              THE COURT:  I'm sorry.  What?

7              MR. BINGHAM:  Mr. Perkins has questioned this

8  witness extensively about what you did and did not put in

9  her statement.  What she did put in her statement is a lot

10 of relevant information on the issue, but Mr. Perkins --

11 about the fact that this defendant, for instance, was

12 arrested at her house on the 18th, which I skipped over, and

13 Mr. Perkins went right into, and the fact that this

14 defendant had a hand cut out there that night.

15              Now, she is putting that in her statement and

16 including that information and a lot of other information

17 that she deems relevant.  And he -- Mr. Perkins comes and

18 cross-examines her like her statement contains no relevant

19 information.

20              And our point is she gave the law enforcement

21 a lot of relevant information, information that she deemed

22 to be appropriate, and that statement includes it.  ,

23              THE COURT:  Well, do you -- are you asking --

24 you're offering her whole statement.  You can go over with

25 the witness in response to that cross-examination if it's

183

1  admissible in -- if you have admissible statements in there

2  that she put in.

3            MR. BINGHAM:  Well --

4            THE COURT:  And I'll have to read the

5  whole -- I don't know what all is in here.

6            MR. BINGHAM:  Okay.

7            THE COURT:  Mr. Bingham, I will allow you to

8  go through, in response to their cross, and ask her about

9  information or statements that she put in this statement

10  that he will be able to object to, you know, them if he

11  doesn't believe they're admissible.

12            Is it your position everything in this

13  statement is admissible?

14            MR. BINGHAM:  Yes, sir, absolutely.  I think

15  he has put it into issue.  He has put her statement into

16  issue.  "You didn't include this; you didn't include this;

17  this is not true; that's not true."

18            I can corroborate that handgun through my --

19  through other people, and that is the truth off her

20  statement.  I can go through here and show all of the stuff

21  she put in her statement.  It is consistent.

22            THE COURT:  What would be the basis of your

23  objection, Mr. Perkins?

24            MR. PERKINS:  My objection is, first of all,

25  when confronted with prior inconsistent statements, she

184

1    acknowledged that they were prior inconsistent statements.

2              THE COURT:  Yeah, that's correct.

3              MR. PERKINS:  So that's not admissible.  That

4    doesn't make it admissible that she's been confronted with

5    prior inconsistent statements.  And for them to think, "Hey,

6    we get to put in this extraneous stuff," I didn't ask one

7    word about the defendant's arrest or one word about that

8    extraneous offense.  I didn't ask one word about that.

9              And so for them to think I can't properly

10   cross-examine a witness without making the entirety of her

11   statement admissible is just nuts.  I've never heard of

12   such.

13             MR. BINGHAM:  Judge --

14             THE COURT:  The first part there in terms of

15   extraneous offense?

16             MR. PERKINS:  And the last part of it, Judge,

17   I didn't ask her anything about that.

18             MR. BINGHAM:  But he asked questions her on

19   the times that she had actually been to the house.  That's

20   where that October date came up.

21             THE COURT:  Mr. Bingham, I'll allow you to go

22   through and ask her about what is in the statement to show

23   that she didn't tell Detective Chaney, but she admitted

24   that -- I mean, on cross, she agreed with Mr. Perkins, that

25   what he was asking her was not in the statement.

1            MR. BINGHAM:  I'll tell you what, I will not

2  get --

3            THE COURT:  That's the thing.  She didn't --

4  she admitted it was not in the statement, everything asked

5  her about, that you can go over.

6            MR. BINGHAM:  Okay.  I won't get into the

7  extraneous.

8            THE COURT:  There's some extraneous offenses

9  in here, and the Court is not just going to admit the

10  statements of those extraneous offenses.

11            MR. BINGHAM:  Okay.  Well, I understand the

12  Court's ruling.  I do.  And I'll keep it to what he --

13            THE COURT:  I mean, if you have the --

14  obviously, there's other matters in there, but if you want

15  to go through and ask her about what she did tell Lieutenant

16  Chaney --

17            MR. BINGHAM:  Okay.

18            THE COURT:  -- in response to the

19  cross-examination, and the cross-examination tended to show

20  that she didn't tell him certain things, but I'll allow you

21  to do that.  I'm not going to admit that statement with

22  those extraneous offenses.  You're just offering the whole

23  statement with the extraneous offenses?

24            MR. BINGHAM:  Correct.  Okay.

25            THE COURT:  I'm not going to admit it under

186

1    those circumstances.

2                    (End of bench conference.)

3        Q    (By Mr. Bingham) Ms. Killough, when law

4    enforcement gave you the statement, did they do this:

5    "Ms. Killough, here's blank sheets of paper, go write down

6    what you know"?

7        A    Basically, yeah.

8        Q    Did they add anything else?

9        A    No.

10       Q    Now, when you came to the District Attorney's

11   Office, we had already had the benefit of your statement,

12   didn't we?

13       A    Yes, sir.

14       Q    And you would have to assume, judging by the

15   amount of stuff on our desks, a lot of other information?

16       A    Correct.

17       Q    And we asked you very specific questions, did we

18   not?

19       A    Yes, you did.

20       Q    Did anyone in the District Attorney's Office ever

21   suggest to you how to answer a question?

22       A    No.

23            MR. PERKINS:  Object to leading.

24            THE COURT:  I'll overrule the objection.

25       Q.    (By Mr. Bingham) Did they ever suggest to you

187

1   how to answer a question?

2          A      No, you did not.

3          Q      But did we ask you very specific questions based

4   on --

5                      MR. PERKINS:  Object to leading.

6                      MR. BINGHAM:  I'll rephrase it.

7                      THE COURT:  Rephrase it.

8          Q      (By Mr. Bingham) What type of questions did we ask

9   you?

10         A      Very direct, specific questions.

11         Q      Now, in this case, when Mr. Perkins asked you,

12  "Well, don't you think it would be important that Carolyn

13  Click denied the defendant the use of her vehicle," to this

14  date, do you know why that is or is not important?

15         A      No.

16         Q      And when you filled out your statement, is that

17  something that you knew about?

18         A      I knew when I filled my statement out that that

19  question had been asked by Tracy to his mom.

20         Q      But did you think it was important in proving that

21  a capital murder had or had not occurred?

22         A      No.

23                      THE COURT:  Ma'am, be sure and keep your

24  voice up a little bit.  Speak directly into the microphone

25  so the jurors over there in the back can hear.

188

1      MR. BINGHAM:  May I approach the witness?

2      THE COURT:  Yes.

3      Q    (By Mr. Bingham) The questions that Mr. Perkins

4  propounded to you about your statement regarding the dates,

5  the 25th and the 27th, you don't include the term 27th

6  there, do you?

7      A    Correct.

8      Q    But are the facts that are consistent with both

9  dates in your statement?

10     A    Most of them, yes.

11     Q    Now, in fact --

12     A    What I felt was important.

13     Q    You talk about Mr. Beatty's showing up on the

14  25th, do you not?

15     A    Yes, I do.

16     Q    And you go on into facts on the 27th, but you

17  don't put the 27th?

18     A    Right.

19     MR. PERKINS:  Judge, I'm going to object to

20  leading.

21     THE COURT:  That is leading.

22     MR. BINGHAM:  I'll rephrase.

23     THE COURT:  I'll sustain the objection.

24     Q    (By Mr. Bingham) As you go through this statement,

25  what facts from what -- let me back up and ask it this way.

189

1          Are all the facts in this statement, did they
2   all occur on one date?

3      A    No.

4      Q    Are they in a proper chronological order?

5      A    Yes.

6      Q    But what is missing is what?  What date is
7   missing?

8      A    The 27th.

9      Q    Now, at the time in here in your statement,
10  Mr. Perkins talks about never saying the defendant was drunk
11  on the 27th.  In fact, you put extremely drunk in your
12  statement.

13     A    Yes, I do.

14          MR. PERKINS:  Judge, object to leading.

15          THE COURT:  Don't lead her.

16          MR. BINGHAM:  I'm sorry.

17     Q    (By Mr. Bingham) Go ahead and read after where you
18  say -- use the term "extremely drunk."  Go ahead and read
19  through here and into that next part right there
20  (indicating).

21          MR. PERKINS:  Judge, I'm going to object to
22  her reading from a document that's not in evidence unless
23  he's asking her to read it to herself.

24          MR. BINGHAM:  Sure I'm asking her to read it
25  to herself.  I'm sorry.

190

1            THE COURT:  Ma'am, he's asking you to just

2    read it to yourself.  Don't read it out loud.  Then he will

3    have a question for you.

4            THE WITNESS:  Okay.

5        Q    (By Mr. Bingham) In your statement, right after

6    the extreme -- the part where you talk about Mr. Beatty

7    being extremely drunk, what do you discuss?

8        A    Him staying.

9        Q    And do you discuss anything about him leaving and

10   coming back?

11       A    Yes, sir.

12       Q    Now, isn't that what you testified to he did on

13   the 27th?

14       A    Yes.

15       Q    But what you did is you left out what?

16       A    The day.

17       Q    The day being which?

18       A    November 27th.

19       Q    Now, does that mean -- does that make you a liar

20   or someone who misrepresents things under oath?

21       A    No.

22       Q    So because you don't know what exact facts --

23   because you don't think that the fact that the defendant --

24   that Carolyn Click denied the defendant the use of her car

25   would prove a capital murder, because you don't know that,

191

1    and because you left out the 27th, you're supposed to be, I

2    guess, misrepresenting something?

3                    MR. PERKINS:   Judge, is there a question in

4    here?

5                    MR. BINGHAM:   I'll rephrase it.

6                    MR. PERKINS:   Just let them switch seats, and

7    it will be a lot faster.

8                    THE COURT:   I think he was asking her if

9    she's misrepresented anything.  Just rephrase the question,

10   Mr. Bingham.

11                   MR. BINGHAM:   Sure.

12                   THE COURT:   Is that an objection,

13   Mr. Perkins?

14                   MR. PERKINS:   Yes, that was.

15                   THE COURT:   I'll sustain the objection.  Just

16   rephrase it.

17        Q    (By Mr. Bingham) Did you misrepresent something

18   when you left out that Carolyn Click denied the defendant

19   the ability to drive her car?

20        A    Did I misrepresent it?

21        Q    Yes?

22        A    No, I don't feel that I did.

23        Q    Were you trying to misrepresent anything when you

24   left out the date, the 27th?

25        A    No.

192

1      Q    Now, you didn't put in here in your statement
2    Mr. Perkins talked to you about the -- about you asking the
3    defendant where Carolyn was, right?
4      A    Correct.
5      Q    Did you think that that was going to be important,
6    the fact that you had asked the defendant where Carolyn was?
7      A    No, sir.
8      Q    In fact, what you did write is two pages of
9    information that you knew regarding those days.
10     A    Correct.
11     Q    Now, you never mentioned -- when you wrote your
12   statement on December 23rd, where were you?
13     A    At my sister's house.
14     Q    Who all was there?
15     A    Oh, my gosh.  Cadaver dogs from Shreveport,
16   Louisiana, Henderson County Sheriff's Department, Smith
17   County Sheriff's Department, investigators.  I believe that
18   was all that was there.
19     Q    How long had you known that Carolyn Click -- how
20   long had you known Carolyn Click's body had been found, that
21   she was dead?
22     A    At the time that I made the statement, I didn't
23   know.
24     Q    At the time you gave this statement -- something
25   else.  When you're talking about not including information

193

1   at the time when you gave this statement, did you even know

2   Carolyn Click was dead?

3        A   No.  I was told she was missing.

4        Q   So if you don't know Carolyn Click is dead, how

5   would all the specific -- would the specific information

6   about Carolyn Click be important to you about whether or not

7   a capital murder was committed if you don't even know she's

8   dead?  Would that even be important to you?

9        A   No.

10       Q   Did you know anything about the facts of the case?

11  Did you know any specifics about the facts of the case so

12  you could say, "Yeah, well, this information would be

13  important"?

14       A   I didn't know anything.

15       Q   So when you gave this statement, number one, you

16  didn't know Carolyn Click was even dead; is that true?

17       A   True.

18       Q   Did you know any facts about the case?

19       A   No.

20       Q   Did you know anything about the capital murder

21  statute?

22       A   No.

23       Q   Did you know what would or would not be important

24  in the prosecution of a capital murder case, should Carolyn

25  Click be found dead?

194

1    A    No.

2    Q    Did you know any -- let me back up.

3              When you gave this statement, did you try to

4    provide law enforcement with what -- did you try to write in

5    this statement -- so I don't ask a leading question, what

6    did you try to write in this statement?  What information

7    did you try to write in there?

8    A    Things that I knew for sure.

9    Q    And things that you thought would be important?

10   A    Yeah.

11   Q    Now, did you put in here the description of

12   Carolyn's car?

13   A    Yes, sir.

14   Q    What did you put?

15   A    It's on the second page, I believe.

16             MR. BINGHAM:  May I approach the witness,

17   Judge?

18             THE COURT:  Yes.

19   Q    (By Mr. Bingham) Go ahead.  Just show me on here

20   real quick, if you could.

21   A    (Complies.)

22   Q    All right.  Okay.  Now, why did you put that?

23   A    They asked me if I could describe Carolyn's car

24   because they didn't -- at the time she was missing, nobody

25   knew, really, anything.

195

1      Q      And that was the specific something that you were

2  asked when?

3      A      The 23rd.

4      Q      Was it before -- that was before, obviously, you

5  did your statement, they questioned you some?

6      A      Yes.

7      Q      Now, did you put in here a physical description of

8  Tracy Beatty?

9      A      No.

10     Q      I mean, my gosh, why not?  I mean, I'm just kind

11 of, you know -- I mean, why not?  Tracy Beatty is someone

12 they're talking to you about, and you don't even put in here

13 a physical description of Tracy Beatty?  Were you trying to

14 mislead somebody?

15     A      No.

16     Q      Wouldn't that be important?

17     A      I guess.

18     Q      Well, I mean, I'm just wondering, if they're

19 investigating Tracy Beatty, do you see my point?  Do you

20 understand?

21     A      Yes.

22     Q      Let me talk about -- when you came up, when was it

23 that we talked to you?

24     A      Friday.

25     Q      When you came up Friday, we talked to you for

1   about how long would you say?

2        A    Maybe an hour.

3        Q    At any time, did anyone ever suggest what you

4   should say?

5        A    No.

6        Q    Did we ever provide you with an answer to any

7   question, tell you what your answer should be?

8        A    No.

9        Q    Did we ask you very specific questions?

10       A    Very direct and specific, yes.

11       Q    Were you informed that what we expected you to do

12  was tell the truth?

13       A    Yes.

14            MR. BINGHAM:  We'll pass the witness.

15                     RECROSS-EXAMINATION

16  BY MR. PERKINS:

17       Q    When you visited with the District Attorney's

18  Office this past Friday -- and there's nothing wrong with

19  you talking to the State prior; that's expected.

20            When you talked to the District Attorney's

21  Office Friday, did you tell them, "Hey, even though my

22  statement to Steve Chaney says he was extremely drunk, that

23  was the wrong date?"

24       A    When they asked me about my statement if it was

25  true, I said yes with the exception of I didn't know that

197

1   the dates have to be right in there.

2        Q    So you told them that?

3        A    I told them that.

4        Q    And did you tell them, "Hey, I know that my

5   statement says that he stayed at my house with my

6   13-year-old son until I returned, but the truth is this

7   other thing?"

8        A    No, they --

9        Q    Did you tell them that?

10       A    No.  They specifically asked me on what day did.

11       Q    I'm not talking about the date, ma'am.  I'm

12  talking about you in your own handwriting, writing down

13  "Tracy stayed at my house with my 13-year-old son until I

14  returned."

15       A    They asked me on what day.

16       Q    I'm not talking about the day.  When you wrote

17  those words down, those were the words that you picked?

18       A    Yeah.

19       Q    Right?

20       A    Correct.

21       Q    When you met with the DA's Office on Friday, did

22  you tell them, "Hey, look, I know that I wrote this down.

23  Tracy stayed at my house with my 13-year-old son until I

24  returned, but really what happened was this other thing?"

25       A    No.  They asked me on what day did that happen.

1    Q    So today, when you testified, is the first time

2  they had heard all of this business about going all of these

3  different places?

4    A    No.

5    Q    I don't doubt you at all, Ms. Killough, when you

6  say that you didn't know that it was important at the time

7  you wrote your statement.

8         MR. BINGHAM:  I'm going to object to his

9  statement.  It's not a question.

10         MR. PERKINS:  I'll rephrase it.

11         THE COURT:  Go ahead.

12    Q    (By Mr. Perkins)  Do you remember when Mr. Bingham

13  was asking you, at the time, you wrote your statement, did

14  you think that this was important.  At the time that you

15  wrote your statement, did you think that that was important?

16  Do you remember all of those questions?

17    A    Yes, sir.

18    Q    You would agree with me at the time you wrote your

19  statement, you had as much time as you wanted to write it.

20  Nobody was standing there telling you hurry up and finish.

21    A    Correct.

22    Q    You could write as little or as much as you wanted

23  to.

24    A    Correct.

25    Q    And that as hindsight goes, you left out a lot of

199

1    things that are now significant.  Would you agree with that?

2        A    Yeah.

3        Q    You don't know?  Are you telling us what is

4    significant now?  I don't care about what was significant

5    then.  I want to know what you think is significant now.

6                MR. BINGHAM:  Objection to relevance is what

7    she thinks is significant or not significant.

8                THE COURT:  I'll overrule the objection.  If

9    she can answer the question, she can answer it.

10       A    Do I think it's significant now?  No, it's the

11   truth.

12       Q    (By Mr. Perkins) Are you telling this jury that

13   you don't know anything more about what constitutes the

14   difference between murder and capital murder, as you sit

15   here on this witness stand right now, after having visited

16   with the State of Texas for an hour, after understanding

17   that Tracy Beatty has been charged, indicted for capital

18   murder, that as you sit here right now on August the 2nd,

19   2004, that you don't have any more idea about the difference

20   in murder and capital murder than you did at the time you

21   wrote this statement?

22       A    I do not know the difference.

23       Q    Don't know the difference?

24       A    No, I don't.

25       Q    State's never discussed with you what the State

200

1    has to prove?

2        A    No.

3        Q    Never?

4        A    No.

5        Q    Who was around to hear this alleged conversation

6    between Tracy Beatty and Carolyn Click about the use of the

7    car?

8        A    My sister was there.

9        Q    What's her name?

10       A    Tonya Walker.

11       Q    Tonya Walker.  And who else?

12       A    Her, Tonya's husband, James Walker was there, but

13   he's deaf, so...

14       Q    What was Mr. Beatty's reaction when he asked for

15   permission and was denied permission to use the car?

16       A    He didn't have a shocked look on his face.

17       Q    Just let it go?

18       A    Yeah.

19       Q    Ever seen Tracy Beatty driving anything other than

20   Carolyn Click's car?

21       A    No.

22       Q    Have you ever seen him driving at all?

23       A    No.

24       Q    Have you ever known as to whether or not he had a

25   driver's license?

1            MR. BINGHAM:  Objection, Judge, be based on

2  hearsay.

3            MR. PERKINS:  I'm just asking if she's seen a

4  driver's license.

5            THE COURT:  If she knows, she can answer.  If

6  she doesn't know, she can answer.

7    A    If I know if he has a driver's license, that I do

8  not know.

9    Q    (By Mr. Perkins) You don't know one way or the

10  other.

11           MR. PERKINS:  If I could have one more

12  second, Judge.  I think I'm finished.  I certainly hope so.

13    Q    (By Mr. Perkins) Now, when you say -- let me get

14  this straight, because back on the 23rd of December, when

15  you told Steve Chaney it was the 23rd that he was extremely

16  drunk.  Today you say it was the 27th, right?

17    A    It was the 27th.

18    Q    On the 27th when he was extremely drunk, ran over

19  the signs, came back --

20    A    Yes, sir.

21    Q    -- did you call the police that day?

22    A    No, sir.

23    Q    On the 28th when you say that he was drinking and

24  that he took your son to all of these different places, did

25  you call the police that day?

                                                                    202

1        A     No, sir.

2        Q     I don't have any other questions of you, ma'am.

3                    MR. BINGHAM:  Just one question, Judge.

4                    THE COURT:  Just one.

5                          REDIRECT EXAMINATION

6    BY MR. BINGHAM:

7        Q     When did you tell Steve Chaney it was the 23rd

8    instead of the 27th?

9        A     Of what?

10       Q     I don't know.  Mr. Perkins just asked you.

11                   MR. PERKINS:  The 25th.

12                   MR. BINGHAM:  I thought the record said 23rd.

13                   THE COURT:  I think you said the 23rd.  Go

14   ahead and ask your question.

15       Q     (By Mr. Bingham) Well, I'm just wondering.

16   Mr. Perkins just asked you, you told Steve Chaney it was the

17   23rd.  When did you ever tell Steve Chaney the 23rd?

18       A     I never -- that's the day my statement was made.

19                   MR. BINGHAM:  We don't have any further

20   questions, Judge.

21                   THE COURT:  Anything else, Mr. Perkins?

22                   MR. PERKINS:  No, Your Honor.  I would just

23   like for her to remain subject to re-call.

24                   THE COURT:  She will.

25                   Ma'am, you will be able to step down from the

1  witness stand now.  You will be still under the Rule of

2  Witnesses, so do not discuss your testimony with any other

3  person.  You will be subject to re-call by either the State

4  or Defense, so be sure the District Attorney's Office has a

5  number where they can reach you.

6            You may step down.  Thank you.  Ma'am, you

7  can go ahead and step down.

8            (The witness leaves the courtroom.)

9            THE COURT:  Ladies and Gentlemen, we're going

10  to go ahead and recess now.  It's 5:30.  I know it's been a

11  little bit of a lengthy afternoon, I'm sure, for you.  But

12  we're going to go ahead and recess now, and we'll see you at

13  8:30 in the morning in the jury room.  Just remember all of

14  your instructions.

15            All rise.

16            (The jury leaves the courtroom.)

17            (Open court, defendant present, no jury.)

18            THE COURT:  Okay.  Mr. Bingham?

19            MR. BINGHAM:  Judge, we want to call Tonya

20  Walker, but I don't want anyone from our office to contact

21  her or the Defense to contact her based on -- and I don't

22  know if the Defense would.  Would the Court -- if we gave

23  the Court the number -- she's been sworn in.  Could the

24  Court staff call her to come to court tomorrow, based on the

25  fact that he says she was present?  I just don't want our

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

1   office to call her, so that Mr. Perkins could question her,

2   "Well, the State talked to you last night."  You see what

3   I'm saying?

4              THE COURT:  Let me see if I understand what

5   you're saying.  You're asking that the Court staff contact

6   the witness to have the witness to come here tomorrow?

7              MR. BINGHAM:  Yes.  I don't know -- is she

8   coming any way?

9              MR. HARRISON:  She's here now.

10             MR. BINGHAM:  Would the Court instruct her to

11  be back at 8:00 tomorrow?

12             THE COURT:  Have her come into the courtroom.

13             What time do you want her back?

14             MR. BINGHAM:  What time do we start?  8:30?

15             THE COURT:  8:30 it will be.

16             Ask her to come in, Mr. Jim.

17             What's her name?

18             MR. BINGHAM:  Tonya Walker.

19             THE COURT:  Ms. Walker, yes, ma'am.  Could

20  you step around, please?

21             Ms. Walker, the Court has been advised that

22  you will be the State's first witness in the morning at

23  8:30.  Have you already been sworn in?

24             THE WITNESS:  Yes, sir, earlier.

25             THE COURT:  If you would please be back

205

1   present right outside the door to this courtroom a little

2   ·bit before 8:30 in the morning.  You will be the State's

3   first witness.

4                    THE WITNESS:  Yes, sir.

5                    THE COURT:  Thank you, ma'am.

6                    We're in recess.

7                    (The witness leaves the courtroom.)

8                    (Open court, defendant present, no jury.)

9                    THE COURT:  Let me get back on the record

10   while Mr. Beatty is still here.

11                    Okay.  Back on the record in Cause

12   No. 241-0978-04, the State versus Tracy Beatty.  State's

13   counsel is present, defense counsel is present, the

14   defendant is present.

15                    Mr. Hawk, we have offered for purposes of a

16   hearing outside the presence of the jury in regard to the

17   witness -- what was the witness' name.

18                    MR. HAWK:  Jay Patzke.

19                    THE COURT:  Patzke.  What did you finally

20   mark that so I can be sure --

21                    MR. HAWK:  I think I put Defendant's

22   Exhibit 1 right on it.

23                    THE COURT:  All right.  Defendant's Exhibit 1

24   is admitted for -- what was it?

25                    MR. HAWK:  It was -- this is a certificate of

206

1    mandatory supervision, and it was offered in support of our

2    objections to his testimony.

3              THE COURT:  That Defendant's Exhibit 1 is

4    admitted for purposes of the hearing regarding the witness'

5    testimony.  I believe that hearing -- that was the hearing

6    outside the presence of the jury.  That's admitted.

7              MR. HAWK:  This is also a record regarding

8    this certificate for mandatory supervision.  It's in the

9    same group of records that he brought with him today.

10             MR. BINGHAM:  Is that just for record

11   purposes only?

12             THE COURT:  For record purposes only.  For

13   record purposes only, for purpose of the hearing outside the

14   presence of the jury.  Record purposes only.

15             Mr. Hawk had marked it, and I just don't

16   think I ever got it admitted.

17             MR. HAWK:  Thank you, Judge.

18             THE COURT:  We'll be in recess.

19             (Proceedings continued in Volume 39.)

20

21

22

23

24

25

207

1    STATE OF TEXAS   *

2    COUNTY OF SMITH *

3        We, STEVE R. AWBREY, CSR, Official Court Reporter, and

4    KIM CHRISTOPHER, CSR, RPR, Deputy Official Court Reporter,

5    for the 241st Judicial District Court in Smith County,

6    Texas, do hereby certify that the above and foregoing

7    contains a true and correct transcription of all of the

8    proceedings in the foregoing styled and numbered cause, all

9    of which occurred in open court or in chambers and were

10   reported by us.

11       We further certify that this transcription of the

12   record of the proceedings truly and correctly reflects the

13   exhibits, if any, offered by the respective parties.

14       Witness our hand this the _19_ day of

15   _May_, 2005.

16

17

18

19   _____          _____
     KIM CHRISTOPHER, CSR, RPR     STEVE R. AWBREY, CSR
20   Texas CSR Number 4219         Texas CSR Number 3940
     Expiration date:  12-31-06    Expiration date: 12-31-05
21   Deputy Official Reporter      Deputy Official Reporter
     241st Judicial District Court 241st Judicial District Court
22   Smith County, Texas           Smith County, Texas
     100 North Broadway, Room 304  100 North Broadway, Room 221
23   Tyler, Texas  75702           Tyler, Texas  75702
     Telephone:  (903) 535-0575    Telephone:  (903) 535-0603
24

25

STEVE R. AWBREY, CSR AND KIM CHRISTOPHER, CSR, RPR
241ST JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS