ORIGINAL

75010

REPORTER'S RECORD

VOLUME 39 OF 51

TRIAL COURT CAUSE NO. 241-0978-04

THE STATE OF TEXAS * IN THE DISTRICT COURT
VERSUS * SMITH COUNTY, TEXAS
TRACY BEATTY * 241ST JUDICIAL DISTRICT

TRIAL ON THE MERITS - A.M. SESSION

AUGUST 3, 2004

FILED IN
COURT OF CRIMINAL APPEALS
JUN 14 2005
Troy C. Bennett, Jr., Clerk

On the 3rd day of August, 2004, the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE JACK SKEEN, JR., Judge Presiding, held in Tyler, Smith County, Texas:

Proceedings reported by computerized stenotype machine; Reporter's record produced by computer-assisted transcription.

A P P E A R A N C E S

MR. D. MATT BINGHAM, III
State Bar Number 00787085
Smith County Criminal District Attorney

MR. J. BRETT HARRISON
State Bar Number 00793909
MS. APRIL SIKES
State Bar Number 18348790
Assistant Smith County District Attorneys
Smith County Courthouse, Fourth Floor
Tyler, Texas 75702
Telephone: 903.535.0520
Fax: 903.535.0599

REPRESENTING THE STATE OF TEXAS

MR. ROBERT C. PERKINS, JR.
State Bar Number 15790405
MR. KENNETH HAWK
State Bar Number 09243650
Attorneys at Law
112 East Line Street, Suite 202
Tyler, Texas 75702
Telephone: 903.593.7780

REPRESENTING THE DEFENDANT

REPORTER'S NOTE

Uh-huh = Yes - Affirmative response

Huh-uh = No - Negative response

Quotation marks are used for clarity and do not necessarily indicate a direct quote.

# I N D E X

VOLUME 39 OF ____

(TRIAL ON THE MERITS)


| | Direct | Cross | Voir Dire | PAGE | VOL |
|---|---|---|---|---|---|
| AUGUST 3, 2004 (A.M.) | | | | | |
| STATE'S WITNESSES: | Direct | Cross | Voir Dire | | |
| SIMONE NORMAN | | | | | |
| By Mr. Harrison | 7, 19 | | | | 39 |
| | 23, 24 | | | | 39 |
| By Mr. Perkins | | 22, 24 | 19 | | 39 |
| TONYA WALKER | | | | | |
| By Mr. Bingham | 26 | | | | 39 |
| LIEANNA WILKERSON | | | | | |
| By Ms. Sikes | 33 | | | | 39 |
| By Mr. Perkins | | 64 | | | 39 |
| OUTSIDE THE PRESENCE OF THE JURY: | | | | | |
| State's proffer of testimony | | | | 92 | 39 |
| Defense objection | | | | 99 | 39 |
| The Court's ruling - Proffer denied | | | | 102 | 39 |
| STATE'S WITNESSES: | Direct | Cross | Voir Dire | | |
| LIEANNA WILKERSON | | | | | |
| By Ms. Sikes | 117 | | | | 39 |
| By Mr. Perkins | | 104 | | | 39 |
| DON WILCOX | | | | | |
| By Mr. Harrison | 123,137 | | | | 39 |
| By Mr. Perkins | | 134 | | | 39 |
| Court Reporter's Certificate | | | | 146 | 39 |

ALPHABETICAL WITNESS INDEX



| WITNESS: | Direct | Cross | Voir Dire | VOL |
|---|---|---|---|---|
| NORMAN, SIMONE | | | | |
| By Mr. Harrison | 7, 19 | | | 39 |
| | 23, 24 | | | 39 |
| By Mr. Perkins | | 22, 24 | 19 | 39 |
| WALKER, TONYA | | | | |
| By Mr. Bingham | 26 | | | 39 |
| WILCOX, DON | | | | |
| By Mr. Harrison | 123,137 | | | 39 |
| By Mr. Perkins | | 134 | | 39 |
| WILKERSON, LIEANNA | | | | |
| By Mr. Harrison | 33,117 | | | 39 |
| By Mr. Perkins | | 64,104 | | 39 |



EXHIBITS INDEX

STATE'S



| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 26 | Spiegel receipt | 54 | 55 | 39 |



EXHIBITS INDEX

DEFENDANT'S



| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 2 | Calendar | 107 | 107 | 39 |

P R O C E E D I N G S

(August 3, 2004)

(Open court, defendant present, no jury.)

THE COURT: Okay. Let's go on the record in Cause Number 241-0978-04, the State of Texas versus Tracy Beatty. State's counsel is present; defense counsel is present; defendant is present.

The Court had earlier had a motion by the State, which the Court had orally granted for the State to obtain the fingerprints of the defendant, Tracy Beatty. The Court has signed an order, which is file-marked, for the State to obtain the fingerprints of Tracy Beatty. And it's my understanding that -- I believe that those fingerprints were just obtained a few minutes ago; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. So that order has been complied with. I believe I saw Noel Martin here a minute ago; is that correct, Mr. Harrison?

MR. HARRISON: Yes, sir.

THE COURT: Noel Martin took the fingerprints, so that order has been complied with.

All right. Carleton, would you bring the jury in?

MR. HARRISON: Our next witness is another parole officer, but, again, we've given her the same

instructions. We're not going to ask anything about employment, where she works, what type of records they are.

THE COURT: Is that Tracy Walker?

MR. HARRISON: No, sir. It's Simone Norman.

THE COURT: Okay. Well, I believe I told Tracy Walker -- she should be right outside the door. I told her she would be the first State's witness.

So who is going to be the very first State's witness?

MR. HARRISON: She will be very quick. I just wanted to make sure that everyone knew she was a parole officer, that we've given her the same instructions as Jay Patzke.

THE COURT: What is the first witness that you're going to call first?

MR. HARRISON: Simone Norman.

THE COURT: Simone Norman. All right.

(The jury enters the courtroom.)

(Open court, defendant and jury present.)

THE BAILIFF: All rise for the jury.

THE COURT: Good morning, Ladies and Gentlemen. Be seated, please.

Call your first witness, Mr. Harrison.

MR. HARRISON: I call Simone Norman.

THE COURT: Ms. Norman, were you sworn

earlier as a witness?

THE WITNESS: No, sir.

THE COURT: Okay. Would you raise your right hand, please? Thank you.

Do you solemnly swear that the testimony you will give in the cause now on trial will be the truth, the whole truth, and nothing but truth, so help you God?

THE WITNESS: Yes, sir.

THE COURT: All right. Please be seated there in the witness chair. Adjust that microphone and speak into it, please.

Go ahead.

MR. HARRISON: Thank you, Your Honor.

SIMONE NORMAN,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARRISON:

Q. Ma'am, would you just introduce yourself to the Ladies and Gentlemen of the Jury and just tell them what your name is and where you live.

A. Simone Norman. I live in Waco, Texas.

THE COURT: Ma'am, could you keep your voice up some, please?

THE WITNESS: Yes, sir.

THE COURT: Thank you. I know you're

soft-spoken.

Q. (By Ms. Harrison) And, Ms. Norman, do you know an individual by the name of Tracy Beatty?

A. Yes, I do.

Q. How long -- just how long have you known Tracy Beatty?

A. I met him 10 of '03.

Q. Okay. October of 2003?

A. Yes.

Q. Have you had face-to-face interactions or meetings with Tracy Beatty?

A. Yes.

Q. You've personally spoken with him one on one?

A. Yes.

Q. All right. I want to first start with October. Did you talk with Tracy Beatty in October of 2003 about whether he was employed?

A. Yes, I did.

Q. What did he indicate about whether he was employed or not?

A. He said that he was not.

Q. He was not employed?

A. Yes.

Q. Did you talk with Tracy Beatty about whether he owned a vehicle?

A. Yes.

Q. Did he indicate he had a vehicle or did not have a vehicle?

A. He did not have a vehicle.

Q. Was that information obtained by you in a face-to-face contact, personally, from Tracy Beatty?

A. Yes, it was.

Q. And did you keep records of your conversation?

A. Yes, I did.

Q. Did you talk with Tracy Beatty on November 13th, 2003?

A. Yes.

Q. Did you ask Mr. Beatty whether he was employed?

A. Yes.

Q. Was he employed?

A. No.

Q. Did you ask him whether he owned a vehicle?

A. Yes.

Q. Did he own a vehicle?

A. No.

Q. And, again, was that conversation a one-on-one, personal conversation between you and Tracy Beatty?

A. Yes.

Q. And did you keep notes or make records of that?

A. Yes.

Q. And in December of 2003, December 5th, 2003, did you have a personal conversation with -- a face-to-face conversation with Tracy Beatty?

A. Yes.

Q. Did you ask whether he was employed?

A. Yes.

Q. Was he employed?

A. No.

Q. Did you ask him whether he had a vehicle?

A. Yes.

Q. And what was his response?

A. He did not have a vehicle.

Q. And, again, did you keep records of that conversation?

A. Yes.

Q. Now, did you -- going back to November, November 6th of 2003, did you have contact with the mother of Tracy Beatty?

A. I believe so. The dates I'm not --

Q. All right.

MR. HARRISON: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (By Mr. Harrison) I believe it's Bates stamped 253. Just to yourself, if you would review this to see if

it refreshes your memory as to the date.

A. Okay.

Q. Did you have contact with the mother of Tracy Beatty?

A. Yes.

MR. PERKINS: Judge, I'm going to object to anything that this witness would proffer through somebody that she believes might have been Tracy Beatty's mother as being hearsay, to which there is no exception.

THE COURT: Well, let me go ahead and hear his question. I'll overrule the objection to that question he just asked.

MR. PERKINS: Can we approach, Judge, because I believe the leading nature of the question would suggest the answer?

THE COURT: That's fine.

(At the bench, on the record.)

MR. PERKINS: This witness can't identify the person she talked to on the phone as Tracy Beatty, not -- and, Judge, they're trying to offer hearsay through this witness as to something that Carolyn Click supposedly told her.

They've laid no predicate that she recognized that as Carolyn Click's voice, that she's ever met Carolyn Click. There is no way they can get this in, Judge, without

an objection.

THE COURT: Well, I thought that you were referring the record that you have.

MR. HARRISON: It is a record; it's a business record, Judge.

MR. PERKINS: But it's hearsay within the business record. There's no exception for the hearsay within the hearsay.

THE COURT: Let me hear from Mr. Harrison.

MR. HARRISON: It's not hearsay, first of all, because it's a business record.

Second of all, because it's under 38.36, this goes directly to the relationship between the victim and the defendant. This is a statement for the victim that she had kicked Tracy Beatty out of her home in November of 2003, which would be just weeks before the murder.

THE COURT: Is this statement in a business record?

MR. BINGHAM: It is, Judge.

THE COURT: And was the statement taken by this witness?

MR. BINGHAM: It was. It was. It's contained in the chronological that she kept as part of her duties through her employment.

THE COURT: You can prove that up as a

business record?

MR. HARRISON: Yes, sir.

THE COURT: Well, apparently, you're going to need to lay the predicate for it.

MR. PERKINS: First of all, 38.36 is not an exception to the hearsay rule, and I don't know if I need to go to the basic evidence here to teach a class.

THE COURT: Well, let me say this.

MR. PERKINS: But there is no exception for the hearsay, which is within the hearsay. And the business record is fine. It's made by a person with personal knowledge and so on and so forth.

THE COURT: Mr. Perkins --

MR. PERKINS: She has no personal knowledge of the information that they're offering and if -- it is hearsay because it's being offered for the truth of the matter asserted.

THE COURT: You don't need to go back to any basic course. Don't need to go back to any basic course.

The Court was trying to determine what it was that the State was offering. The statement from - if they can lay a predicate of a business record and the statement is in a business record and they lay the proper predicate, then that would be grounds for the Court to consider the admissibility of the statement. And then it would go to

whether or not there would be any relevancy to the statement of the Court.

So if they're going to lay a predicate from this statement, the Court would have to hear that.

MR. PERKINS: I agree, and I hadn't heard any of that.

THE COURT: Well, I know. That's why I was asking.

Go ahead and ask.

(End of bench conference.)

Q. (By Mr. Harrison) Ms. Norman, did you bring records with you today?

A. No.

Q. Okay. Have you been provided copies of records?

A. Not copies. I've viewed records.

Q. You've viewed records?

A. Yes.

Q. Are you, through your employment, a custodian of those records?

A. Yes.

Q. Are you an individual who has personal knowledge of the entries in those records?

A. Yes.

Q. Did you, in fact, write the entries into those records?

A. Yes.

Q. Were the entries made at or near the time that the information was gathered by you?

A. Yes.

Q. Is that -- are those records kept in the ordinary and normal course of your business?

A. Yes.

Q. And you are custodian of those records?

A. Yes.

Q. Okay.

MR. HARRISON: Judge, I, again, offer the statement.

MR. PERKINS: Same objection, Judge. If I could take the witness on voir dire for the purpose to clarify my objection.

THE COURT: No, not right now.

Is that the substance of your predicate?

MR. HARRISON: Yes.

THE COURT: Okay. Approach the bench a minute.

(At the bench, on the record.)

THE COURT: Do you have the foundation for business records in front of you?

MR. HARRISON: Yes, sir.

THE COURT: Okay. What is it?

MR. HARRISON: What is it?

THE COURT: Yeah. Go ahead.

MR. HARRISON: Do you want me just to read it?

THE COURT: Yes. I want to see if all the elements are there. Go ahead.

MR. HARRISON: "A memorandum, report, record, or data compilation in any form of facts, events, conditions, opinions, or diagnosis made at or near the time by or from information transmitted by a person with knowledge, if kept in the course of a regularly conducted business activity and if it was the regular practice of the business activity to make the memorandum, report, record, or data compilations, all as shown by the custodian or other qualified witness or by affidavit that comprise this rule, 1902.10, unless the source of information or the method of circumstances or appropriation indicate lack of trustworthiness."

THE COURT: Okay. Is it basically your position that you do not have to have any testimony that there is no reason to question the report that was in the document?

MR. HARRISON: No, Judge. It's our position that it's presumed trustworthy unless there is an indication of lack of trustworthiness.

THE COURT: Okay. So did you ask if there was any occasion if there was any lack of trustworthiness?

MR. HARRISON: No, I did not. I certainly can, but this information came directly from the defendant that she wrote down into her records -- is where the information came. I can ask her that.

THE COURT: Okay. You can ask her -- well, if you prove that up, then as far as the predicate that you're laying for this being a business record, you know, the Court would overrule the objection as it goes to the predicate of the business record.

Now, what is the statement that you intend to go into?

MR. HARRISON: The statement is that the mother called, and as of two days ago, the defendant had moved out of her house. And this was November 6th.

THE COURT: Did she identify herself as the mother?

MR. HARRISON: Yes, sir.

THE COURT: All right. Mr. Perkins, I'm going to overrule your objection. If you want to make it again for the record, that's fine.

MR. PERKINS: And I still want to take the witness on voir dire today to see if she can identify --

THE COURT: Okay. Well, let him finish with

what I think it's the predicate, then you can take her on voir dire.

(End of bench conference.)

Q. (By Ms. Harrison) Ms. Norman, the information contained in the document that I just approached and showed you, the information that you wrote down in your records, that came from the defendant -- from Tracy Beatty?

A. Yes.

Q. And did you personally write it down as you received it?

A. Yes.

Q. Into this record?

A. Yes, I did.

Q. And that was done in a face-to-face setting with Tracy Beatty?

A. Yes.

Q. On 11-6-2003, did you receive a phone call from someone identifying herself as Carolyn Click?

A. Yes.

MR. HARRISON: Judge, that would be the predicate.

THE COURT: Do you want to take the witness on voir dire?

MR. PERKINS: I would like to, Judge. Thank you.

VOIR DIRE EXAMINATION

BY MR. PERKINS:

Q. Is it Ms. Norman?

A. Yes.

Q. Ms. Norman, hi. My name is Robert Perkins. I just have a couple of questions for you.

First of all, this person calls up and identifies herself as Carolyn Click. Had you ever talked to Carolyn Click before?

A. Yes.

Q. Did you recognize her voice on a time that she called you on this occasion?

A. Yes.

MR. PERKINS: I don't have any other questions, Judge. Thank you.

THE COURT: Okay. Go ahead, Mr. Harrison.

DIRECT EXAMINATION (CONTINUED)

BY MR. HARRISON:

Q. When Carolyn Click called you on November 6th, 2003, did she indicate anything about where Tracy Beatty was living?

A. I would need to see my notes.

Q. Sure.

MR. HARRISON: May I approach again, Judge?

THE COURT: Yes.

MR. HARRISON: Again, it's Bates stamped 253. And just read it to yourself.

A. (Complies.)

Q. (By Mr. Harrison) Did she indicate where Tracy Beatty was living as of -- pardon me -- November 6th, 2003?

MR. PERKINS: Judge, again, I have to reurge my previous motions as to hearsay and the improper predicate being laid.

THE COURT: They will be overruled.

A. Per that conversation, she stated that Mr. Beatty had moved out of her residence as of two days ago and that she felt that he was living with a neighbor across the street.

Q. (By Mr. Harrison) And two days ago, this contact was November 6th, 2003?

A. Right. So that would have been the 4th.

Q. November 4th, 2003, would have been the date?

A. Yes.

Q. Now, looking at the next day, on November 7th, 2003, did you receive a call from Tracy Beatty?

A. Yes.

Q. Was he scheduled to come in and talk with you?

A. Yes.

Q. Did you, in fact, talk with him on that date?

A. By phone.

Q. Did you have to reschedule the time to come in personally and talk with you?

MR. PERKINS: Object to leading.

THE COURT: Overruled.

A. Yes.

Q. (By Mr. Harrison) Why did you have to do that?

A. Mr. Beatty stated that he didn't have transportation.

Q. And that was on November 7th, 2003?

A. Yes.

THE COURT: Do you have something else, Mr. Harrison?

MR. HARRISON: Yes. May I have one moment, Judge?

Q. (By Mr. Harrison) Ms. Norman, did you have the opportunity to speak with Tracy Beatty on November 13th, 2003?

A. Yes.

Q. And was that an occasion whether you were speaking with him in person?

A. Yes.

Q. Did you ask Tracy Beatty at that time whether he had previously thought of killing people?

A. Yes.

Q. And what was his response?

A. Yes.

Q. And did you make note of that question and response?

A. Yes.

Q. Ms. Norman, thank you very much.

MR. HARRISON: I'll pass the witness.

THE COURT: Mr. Perkins?

CROSS-EXAMINATION

BY MR. PERKINS:

Q. So, Ms. Norman, on the 13th of November, Tracy Beatty apparently did have transportation?

A. Yes.

Q. And on the 4th of November he apparently had transportation?

A. I don't recall every date, if I saw him on November 4th.

Q. Is that the day that you met with him?

A. I would have to view my documents.

Q. Let me sum it up this way, instead of going through and nitpicking. Every single time that you met with him in person, your assumption is he had transportation?

A. Yes.

MR. PERKINS: I don't have any further questions.

THE COURT: Mr. Harrison.

MR. HARRISON: May I have just a moment, Judge?

REDIRECT EXAMINATION

BY MR. HARRISON:

Q. Ms. Norman, do you know whether somebody drove Tracy Beatty those times when you spoke with him in person?

A. On at least one occasion.

Q. On at least one occasion?

A. Yes.

Q. Do you know how he arrived on those other occasions?

A. Not that I recall.

Q. So you don't know how he arrived on those other occasions, but the time you do remember is somebody drove him?

A. Yes.

Q. Do you know who that was?

A. Yes.

Q. Who was that?

A. His mother.

Q. And you're just unaware of how he would have arrived at the other two occasions?

A. I don't recall. I could assume, but I don't remember.

Q. Thank you, ma'am.

MR. HARRISON: That's all.

THE COURT: Mr. Perkins?

RECROSS-EXAMINATION

BY MR. PERKINS:

Q. Ms. Norman, this may be outside your field of knowledge, but do you know when and if Tracy Beatty had a Texas driver's license?

A. Not right off. I could review my notes.

Q. Would there be some period of time during your contact with Mr. Beatty that he was not allowed to drive because he did not have a valid Texas driver's license?

A. Yes. That's the general rule.

Q. Okay. And when you're not allowed to drive, generally, it's better to have people take you places than drive on your own, isn't it?

A. Correct.

MR. PERKINS: I don't have any other questions, Judge.

THE COURT: Any other questions, Mr. Harrison?

MR. HARRISON: Yes, Judge.

REDIRECT EXAMINATION

BY MR. HARRISON:

Q. Ms. Norman, in all fairness, you don't know whether Tracy Beatty -- if he didn't have a driver's license

during some period of time, you don't have any idea whether he complied with that law or not, do you?

A. Correct.

Q. I mean, you just don't have any knowledge?

A. That's right.

Q. Thank you, ma'am.

MR. PERKINS: I don't have any other questions.

Thank you, Ms. Norman.

THE COURT: May Ms. Norman be finally excused, or do you need to keep her under the Rule?

MR. HARRISON: Judge, subject to re-call.

THE COURT: Okay. That's fine.

MR. PERKINS: We don't object if they change their mind, Judge.

THE COURT: Okay. That's fine, Mr. Perkins.

Ms. Norman, you're going to be subject to re-call, which means you may return to work or wherever you need to go. If you would just be sure -- and I think that they already would -- the District Attorney's Office has a number where they can reach you in the event that sometime during the trial either the State or the Defense needs to re-call you as a witness, they may be able to do so. So you're still under the Rule of the Witnesses not to discuss your testimony with any other person, okay?

THE WITNESS: Yes, sir.

(The witness leaves the courtroom.)

THE COURT: Who will you have next, Mr. Harrison?

MR. BINGHAM: Judge, Tonya Walker.

THE COURT: Tonya Walker.

(The witness enters the courtroom.)

THE COURT: Mrs. Walker, just come up here and have the witness chair, please. Were you sworn in yesterday?

THE WITNESS: Yes, sir.

THE COURT: Just have the witness chair and adjust that microphone up, please, where you can speak right into it and push it up.

THE WITNESS: I'm pretty loud. I don't know that I'll need it.

THE COURT: Well, that's fine. You may not need it.

Go ahead, Mr. Bingham.

TONYA WALKER,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BINGHAM:

Q. Ms. Walker, how are you this morning?

A. A little nervous.

Q. Let me start off. Do you know Tracy Beatty?
A. Yes, I do.
Q. Do you see him in the courtroom today?
A. Yes, I do.
Q. Could you point to him and identify something he's wearing?
A. He's got a navy jacket on and a blue, looks like, polka-dotted tie.
Q. Okay.
MR. BINGHAM: Your Honor, if you would allow the record to reflect that she pointed to the defendant and identified an article of clothing worn by the defendant.
THE COURT: The record will so reflect that she's identified the defendant.
Q. (By Mr. Bingham) How do you know Tracy Beatty?
A. He's my biological cousin.
Q. Okay. And you have in the -- let me back up.
Do you know Carolyn Click?
A. Yes, I do.
Q. How would you characterize your relationship with Carolyn Click in the time that you've known her?
A. She was my aunt. We weren't -- she was my aunt.
Q. Not as close as you could have been?
A. Not as close as we could have been.
Q. Do you recall an occasion where you would have

been -- or an occasion at your house where Carolyn Beatty, Tracy Beatty, and Stacey Killough were present?

A. Yes, I do.

Q. Do you recall, approximately, what date that would have been?

A. It was approximately November 18th.

Q. Now, do you recall how Tracy Beatty got to your house -- arrived at your home?

A. On that particular day, he arrived with his mother in her car.

Q. Now, was Stacey already there? How did she get there; do you recall?

A. I don't recall.

Q. During that conversation, during the time in your home, were -- were y'all always together, or would you leave the room? How did that --

A. No, we were just about the house. Sometimes a few of us would be outside; a few of us would be inside. I mean, we were never constantly together, if that's what you're asking.

Q. Well, that's what I'm asking. The reason I'm asking is, if there was a conversation that took place between the individuals, you might have been there and might not have been there.

A. Exactly.

Q. I want to ask you, if you were present to hear a conversation, do you recall any -- any request by Tracy Beatty to Carolyn Click to use her car?

A. I can't testify to that.

Q. Are you saying you don't recall?

A. I don't recall.

Q. And in saying that -- and let me ask you this question, too: You met up at the District Attorney's Office when? I can't recall. Was it a Saturday?

A. Yes.

Q. And you spoke to who?

A. April.

Q. Okay. The lady behind me?

A. Yes, sir.

Q. As of yesterday or since Saturday, has anyone from the District Attorney's Office talked to you other than to say come down here for court to schedule your appearance?

A. No.

Q. Okay. On Saturday, did anyone from the District Attorney's Office attempt to influence your testimony at all?

A. Not at all.

Q. Okay. Were we -- was Ms. Sikes specific in her questions to you?

A. Yes.

Q. In any way did she tell you at all about the capital murder statutes or what your testimony must have in order to prove him guilty of anything?

A. No, she did not.

Q. Did she tell you just to relax and tell the truth?

A. She told me to tell the truth.

Q. Do you know -- how often would you see Carolyn Click in the course of a normal month, say, or a year?

A. Probably twice a year, maybe.

Q. Okay.

A. We lived in separate -- I mean, she lived in Whitehouse, and I lived in Athens.

Q. Okay. How close to -- did -- during this time of October through December of '03, how close did Stacey -- am I pronouncing that right -- Killough?

A. Killough.

Q. How close did she live to you?

A. Stacey?

Q. Yes, ma'am. I'm sorry.

A. Stacey lives about ten minutes from me.

Q. Now, on November 18th, when Carolyn Click and the defendant arrived at your home, do you recall who was driving?

A. I do not.

Q. Okay. Thank you, Ms. Walker. Thank you very

much.

MR. BINGHAM: Your Honor, we'll pass the witness.

THE COURT: Mr. Perkins -- or Mr. Hawk? I'm sorry.

MR. HAWK: Judge, I've got no questions of this witness.

THE COURT: Thank you, Mr. Hawk.

Ms. Walker -- do you wish this witness to be held under the Rule, subject to re-call?

MR. HAWK: We do, Judge.

THE COURT: Ms. Walker, you're going to be subject to re-call in the case. That means you're still under the instructions to witnesses not to discuss your testimony in this case or talk to anyone else about this case.

Be sure that the District Attorney's Office has a number where they can reach you, because if at sometime during the trial, either the State or the Defense needs to re-call you as a witness, the District Attorney's Office will need to be able to get in touch with you.

THE WITNESS: Yes, sir.

THE COURT: Thank you, ma'am. You may step down.

(The witness leaves the courtroom.)

THE COURT: Who will the State have next, Mr. Bingham?

MS. SIKES: The State would call Lieanna Wilkerson.

THE COURT: Lieanna Wilkerson?

MS. SIKES: Yes, sir.

THE COURT: Is Lieanna Wilkerson late? Do you know where she is?

MR. BINGHAM: May I check, Judge?

THE COURT: Yes.

(Pause in proceedings.)

(The witness enters the courtroom.)

THE COURT: Ms. Wilkerson, come around, please, to the witness chair all the way down to the front.

Ms. Wilkerson, were you sworn in yesterday as a witness?

THE WITNESS: Yes, sir.

THE COURT: All right. Just have the witness chair, please, and adjust the microphone where you can speak straight into the microphone and try to keep your voice up, please, ma'am.

THE WITNESS: Yes, sir.

THE COURT: Thank you.

Ms. Sikes, go ahead.

MS. SIKES: Thank you, Judge.

LIEANNA WILKERSON,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. SIKES:

Q. Good morning, Ms. Wilkerson. How are you?

A. Good morning. Fine.

Q. Are you nervous?

A. Very.

Q. It's easy for us to tell everybody to relax, but it's not so hard (sic) to actually do. But I want to talk for just a minute about your health condition, if it's all right.

A. Yes.

Q. You were just released from the hospital on Saturday?

A. Yes.

Q. And have you been released even to go back to work?

A. No.

Q. Without getting into too much detail, do you have a heart problem?

A. Yes.

Q. You've had previous heart attacks?

A. Yes.

Q. Currently are having continuing problems with

that?

A. Yes.

Q. With that said, do you feel like you can testify this morning?

A. Yes.

Q. If at any time questioning from either side causes you what you believe to be physical problems, will you just agree with me that you'll stop or you'll say something to either myself or to the Court?

A. Yes, ma'am.

Q. With that said, you and I certainly have had an opportunity to -- to visit while we are preparing for this case. Fair?

A. Fair.

Q. But the jury doesn't know who you are.

A. No.

Q. So if you'll just state and spell your name and tell them where you live.

A. My name is Lieanna Wilkerson, L-I-E-A-N-N-A, W-I-L-K-E-R-S-O-N. I live at 18876 County Road 2323, which is across the road from Ms. Click.

Q. And you know Ms. Click?

A. Yes.

Q. And can you tell the jury how you know Carolyn Click?

A. I've lived across the street from her or right next door to her for nine years.

Q. And what kind of relationship did you have with Carolyn Click? Was it distant or close or what kinds of things did you do together?

A. Girlfriends. We did everything together. We would go to the grocery store. We would go eat out for dinner. She would come to my house and eat dinner. We played in our yard. Dug in the dirt, she called it. We would plant plants and do things. We were just very good friends. We spoke every day.

Q. And you say that's for about nine years?

A. Uh-huh.

Q. Do you know now a man by the name of Tracy Beatty?

A. Yes.

Q. And do you see Mr. Beatty in this courtroom today?

A. Yes.

Q. And I asked you if you would be able to point to Mr. Beatty and identify an article of clothing that he's wearing, would you be able to do that?

A. Yes.

Q. And would you do that?

A. He's wearing a blue jacket.

Q. And can you point to the defendant?

A. Seated beside the red-haired gentleman (pointing).

MS. SIKES: May the record reflect that the witness has pointed to and identified the defendant, Tracy Beatty?

THE COURT: Yes. The record will reflect the witness has identified the defendant.

Q. (By Ms. Sikes) Can you tell me when you first met Tracy Beatty?

A. When I first officially met Trey, which is what I knew him by was Trey, was when I walked across the street and he and Callie were in her front yard, and I introduced myself.

Q. Let's get a couple of the names. You mentioned the name Trey.

A. Yes.

Q. And is that the name by which you know Tracy Beatty, the defendant?

A. Yes.

Q. And you mentioned the name Callie.

A. And that's what I knew -- what I called Carolyn Click was Callie.

Q. Now, that was the first time you met him. Let's back up.

A. Okay.

Q. Were you aware or did you know that Mr. Beatty was coming to live with Carolyn?

A. Yes.

Q. When did you first become aware of that?

A. She told me herself.

Q. Did you do -- do you know when that was, when he was going to come live with her?

A. I believe sometime in early October.

Q. And did you do anything in preparation for meeting Mr. Beatty?

A. Yes, I had invited them to dinner. I invited Callie and Trey over to dinner so that I could meet him.

Q. And do you remember about when that was or about how long Mr. Beatty had lived with her?

A. That was about two or three days after he had gotten there.

Q. Just shortly after he arrived?

A. Yes.

Q. And did you, in fact, have dinner with Ms. Click and Tracy Beatty?

A. No, an incident happened.

Q. Can you tell the jury about that?

A. I had dinner ready. I saw headlights and heard a car drive up and heard her screaming and yelling. And, of course, I ran to the door and opened the door, and Tracy was walking down the street, and she's telling him, "Well, just go on. You know, you just go on." And I asked her what's

wrong, and she said, "He's mad." And I said, "Well, what in the world is he mad about?"

She said, "He's mad because I got in my car and drove to your house," which I'm just a little cater-cornered from her. She said, "He does not understand my physical condition for me. You know, coming here was not hard, but going back up the hill in the dark is going to be difficult for me. And so I drove my car."

And she said, "He just doesn't understand that, and he just got angry." And I said, "Well, do you want to come on in and eat dinner?" She said, "No, I'm sick at my stomach now. I'm upset." And I said, "Well, let me fix you something to take." And I went back in the house and picked up a couple of pie plates with food and carried it to her, and she drove back across the street.

Q. Was she crying?

A. Yes, she was very upset.

Q. So you didn't get to meet Mr. Beatty on that date?

A. No, ma'am.

Q. From -- and then the next time I believe you said you actually did meet him, how long ago was that? How far in time from that first dinner?

A. That was maybe four or five days after that.

Q. And at some point, did you then -- or why don't you just tell the jury what kind of relationship developed

between you and Tracy Beatty.

A. Callie and I had talked, and she knew that he needed to do something to earn some money of his own. He did not have a job and was trying to seek a job, but he did not have a driver's license. He did not have transportation other than where she took him.

And I had had the heart attack in January and was not able to take care of my own yard. I couldn't -- I had just got a new mobile home, and they had pulled out my old deck and left -- you can imagine -- a horrible mess, and I was not able to physically get out and do any of those things. And I said I would be willing -- I couldn't pay much -- but I could pay him to come and help do those things, and he did.

Q. And what kind of amounts of money are you talking about?

A. We're not -- I don't think I ever paid him more than $40, if that much. I mean, I didn't have a lot of money either. I was a divorced woman, single woman living on my own, so I didn't have a lot of money, but I paid him what I could.

Q. For odd jobs around your house?

A. Yes.

Q. And so that relationship just sort of developed through your relationship with Callie?

A. Through my friendship with Callie, yes.

Q. With Ms. Click?

A. Yes.

Q. Do you remember a time when the defendant came to your house the latter part of October and house-sat for you?

A. Yes.

Q. And how long was he at your home?

A. Maybe five or six days.

Q. What were the circumstances? How did that happen?

A. We were getting ready to go on our trip. My daughter is in the military. She's stationed in Monterey, California. She's in the Navy. Sorry. Proud mom.

Anyway, she was flying to her father's in Missouri, and we were going to drive and meet her there with her boyfriend and bring them back with us to Texas so she could take her car to the base where she is stationed. She's in the Defensive Learning Institute, and of course she wanted her car, so she's in California and wanted her car.

So we were getting ready to go do that, and Trey was over there helping us, you know, get everything loaded and get everything ready. And at the last minute, I did not feel comfortable leaving for five, six, days with, you know, not knowing as often as they fought, I was really concerned. I took my boyfriend, Hugh, aside, and I asked him how would you feel if we asked Trey to house-sit for us.

At least that gives him a place to go. They can separate. If they get into an argument, he's got somewhere that he can go.

Q. And was that pretty much the norm? I mean, if Mrs. Click and her son got into an argument, would he come to your house?

A. Yes.

Q. And he had done that on how many occasions?

A. Daily.

Q. So he spent a great amount of time at your home?

A. Yes, he did.

Q. Eat dinner with you or your family?

A. He would generally watch for my car, and when I drove in the driveway, by the time I got in the house, he was generally not far behind me, yes.

Q. So it wasn't like you just let a stranger stay at your home?

A. No. No. I had felt like I knew Trey, even though I had not been introduced to him, because Callie and I had talked about him for over the previous, you know, eight years that we had known each other. So I knew a lot more about Trey than he knew about me.

Q. So he did stay at your home?

A. Yes.

Q. For how many days do you think?

A. Five or six.

Q. Was that -- and you told me. Was it the latter part of October or first part of November?

A. Last part of October, first few days of November, yes.

Q. Was anything unusual -- or did you notice anything unusual when you arrived at your house as far as whether or not the defendant was living there?

A. When I arrived home, he was waiting for us at the house. My house was spotless. It was immaculate, and there was a suitcase sitting in the living room. And I asked Trey what that was, and he said that Callie had packed his things and brought them over to him while he was at the house while we were gone. And I said, "What are you going to do," and he said, "Don't worry about it. I'll handle it," and he picked up his suitcase and he left.

Q. That was the first part of November?

A. Yes.

Q. I want to, then, move on to the next couple of weeks. Were there more fights?

A. Yes.

Q. Do you remember in particular about the middle of November a conversation about whether Tracy Beatty felt like hurting Carolyn Click?

A. He had gotten really angry. He had told me

that -- well, he had told me the night before that he had a job interview with an electric company that he had called and had an interview the next day, and he was really excited about the possibility of getting a job and getting out on his own.

And when I came home from work the next day, he came over and was just furious. I mean, the way he came through the door, he was just mad. And "What's wrong?" You know, I kept asking him what's wrong, and he said, "That stupid bitch." And I said "What is wrong?"

He said, "I told her I had --" you know, he said, "She knew I had the job interview, and I told her, you know, this morning that I needed to go," and she said, "She just didn't feel like it today." And he said, "You know, how am I ever going to get a job?" And was really angry.

And is that the incident that you were referring to?

Q. Did she let him take the car? Did he tell her?

A. No. No, he never drove her car while she was there to my knowledge.

Q. But she would drive him places?

A. Yes.

Q. Did he tell you on that date that he asked to borrow her car?

A. No, not that I recall.

Q. Did -- did you remember after that point a conversation about Tracy Beatty and his mother working on the underpinning of the house?

A. Yes.

Q. Was that about the same time frame, the middle of the month?

A. It's hard to remember in what order exactly. I know he had said they were underpinning her house, and he had gotten upset. Everything he would try -- she would say, "We need to do this. We need to take the air conditioner units out of the windows and put them out in the storage building, because it's getting cold." They were preparing her house for the cold weather.

And so Trey went to the window and started taking the window unit out, and she goes, "No, no, not now. I don't feel like that today." He was really frustrated about that. Well, they went outside, and they were putting the underpinning back on her house.

She was notorious for -- she had a lot of time on her hands, so she was always digging up a plant, moving it. She didn't like where it was, taking the underpinning off her house. She worked on pipes. Very independent woman. And was putting the underpinnings back around her house, getting ready for the winter.

And they had gotten into a huge fight, and

she was yelling at him, and he just made an offhand comment, "I can't believe she handed me that hammer." He said, "Because all I could think about was hitting her in the head with it." And I said, "Trey," and he goes, "Well, I couldn't do it." He said, "If I shoved her under there, she would have just started stinking."

Q. He actually told you --

A. Uh-huh.

Q. -- she handed it -- she being Carolyn Click, handed him a hammer. He thought about hitting her with it, rolling her underneath the house, but she would start to stink?

A. Right. And I just thought he was joking.

Q. Did he ever make any references to hurting her, to choking her, to hitting her?

A. Several times he had said he just wanted to shut her up, that he just wanted to choke her and shut her up, that -- they got into horrible fights.

Q. I want to talk now about the latter part of November.

A. Okay.

Q. Did you see Tracy Beatty on November the 25th, which was two days before Thanksgiving?

A. Yes.

Q. Under what circumstances?

A. He ate dinner at my house.

Q. You cooked dinner that night?

A. Uh-huh.

Q. Do you recall what time it would have been that he was at your home?

A. The latest would have about 6:00, 6:30. I alternated weeks. I worked either 9:00 to 6:00 or 8:00 to 5:00, and depending on what it was that week, but it would have been 6:30 at the latest that he would have been there for dinner.

Q. Do you remember what you cooked?

A. Spaghetti.

Q. And did y'all eat dinner together then?

A. Yes.

Q. And how long was he at your home?

A. Until 10:00 o'clock.

Q. And do you know where he went after that?

A. Home.

Q. Did you then see Mr. Beatty on the 26th, the day before Thanksgiving?

A. Yes.

Q. Under what circumstances?

A. He brought me a turkey.

Q. Did you think that was unusual? Did he tell you anything about that?

A. I thought it was very unusual, because he had not said anything -- I had invited him, because he and Callie were fighting. I had invited him to dinner with my next door neighbor. It was her first Thanksgiving dinner she had ever cooked, and she had asked for my help to do the turkey and the dressing and everything, because she had invited her family and her grandmother, and I had --

Q. Who was that neighbor?

A. I'm sorry. Twyla Johnson.

Q. Okay.

A. And I had invited Trey to that dinner. You know, if it's uncomfortable being at home with Callie and y'all aren't getting along, why don't you come eat dinner with us. And Twyla had agreed, yeah, tell him to come and have dinner. She had met him and she said, "Yeah, tell him to come on." But he had not mentioned bringing anything over for the dinner, so I was surprised.

Q. Did you ask him where he got it?

A. Yes.

Q. Did you ask him why Ms. Click wasn't cooking it?

A. Yes.

Q. What did he say?

A. His reply was that Carolyn was not there, that she had left with a man named Junior, and that he had bought it for Thanksgiving, and he thought we would enjoy it more

anyway, because she was not there to cook dinner.

Q. That's what he told you?

A. Yes.

Q. And did you see him again on Thanksgiving Day, the next day?

A. Yes.

Q. And just tell the jury about that. He came over to your house, or where did y'all go?

A. He came over to my house, and I was cooking the -- getting things ready at the last minute. I think I was making a green bean casserole, and I had cooked a turkey, and I was getting everything ready. And he came over, and we weren't quite ready to go over there, so he left and went back across the street.

And I called him and said, "Come on, you know it's time to go to dinner," and he said, "Well, you know, I don't know if I want to go." Kind of hem-hawed around. And I said, "Well, get your butt over here and help me carry all this stuff over there. You're gonna come have dinner with us." So he came across the street, and he helped carry everything next door to Twyla's for dinner.

Q. And did y'all eat dinner then?

A. Yes.

Q. How did Mr. Beatty act during that time?

A. Very nervous. He kept looking out the door,

getting up and going to the door, coming back and sitting down. And I assumed it was because he had not been around a lot of people. He was at my house every day, but it was just him and me. Twyla's grandmother, mom, stepdad, you know, brother, there were probably 15 people at her house, and I assumed that's why he was so nervous.

Q. Appeared nervous?

A. Yes.

Q. Let me stop and ask you this: Would it have been odd for Mrs. Click to leave without telling you where she was going?

A. At that time, she was angry at me for having let Trey house-sit, so she probably would not have told me. But it was odd for her to not have let my neighbor across the street know.

Q. And which neighbor is that?

A. That's Betty and Thomas, Thomas Tucker and Betty.

Q. Betty McCarty?

A. Yes.

Q. So she wasn't the kind of person in the nine years you've known her just to go off and tell nobody where she was going?

A. She never went to the chiropractor without letting me know or Betty know where she was going. She didn't even go to the grocery store that we didn't know where she was.

Q. So it's Thanksgiving Day. Mr. Beatty is acting nervous, going back and forth to the door. I think you said looking out, looking across the street.

A. Uh-huh.

Q. And how long was he at Ms. Johnson's house?

A. We left Twyla's about 8:00 o'clock.

Q. And do you know where he went?

A. He went back home with me. He helped me carry some things back over to my house, and we turned on the TV, like we always did. We always ate dinner and watched TV, and he went home at 10:00. So we sat -- you know, I sat down to watch TV, and he sat down, got up and went to the door, sat back down, got up went back to the door.

Finally, about 8:30, he said he was going to Athens -- or he went home. He said he was going home. Went across the street. And I don't remember what time it was he called me and told me that he was going to Athens, and that he would not be back until probably Sunday.

Q. And was it several days before you saw him again?

A. It was Sunday before I saw him.

Q. And did he tell you where he had been, what he had been doing?

A. Just that he had been -- been down to Athens to visit friends down there.

Q. Did he tell you about any drug use?

A. He said he had gotten very, very drunk. And I'm trying to remember exactly what he said. I think he said he understood now how hard that was on your body, that's why he didn't -- I can't remember his exact words, but it was like he hadn't done that in a long time, and it sure was hard on him.

Q. Using drugs?

A. Yes, using the drugs and the alcohol.

Q. When he got back, it had now been -- when the last time you saw Carolyn Click?

A. The last time I had seen her was -- I had seen her in her yard the Tuesday, the Tuesday before Thanksgiving.

Q. On the 25th?

A. Yes.

Q. So by this time when he gets back on -- and he being the defendant -- when the defendant gets back on Sunday, have you heard from or seen --

A. No.

Q. -- Ms. Click?

A. No.

Q. Did you find that to be unusual?

A. Yes, yes, because -- I mean, every morning when I got in my car and started towards work, she would be there sitting on her front porch waving at me, you know, because she knew what time I went to work, or she was out working in

her yard.

Q. Did you ask the defendant where she was?

A. Yes.

Q. And what did he tell you?

A. That she had left with a man named Junior, and they had told him that she would not return until the 17th.

Q. When you asked about -- would it be fair to say that you asked about her several times?

A. Yes.

Q. Would his demeanor -- or what was his demeanor like when you would ask about where she was?

A. At first, it was just no, she's not -- you know -- you know, have you heard from her? No, no, no.

The longer on it went, I asked him -- you know, every time I would ask him, it seemed like he would get a little bit more frustrated. And finally he said, "I am not going to hear from her. You know, she -- that man wherever she was at Junior's is probably poisoning her mind against me, and I don't expect to hear from her again."

Q. Did you ask any more after that?

A. No, he was really real, real frustrated with me constantly asking. You could tell he was really getting impatient.

Q. So you just stopped asking?

A. Yeah.

Q. I want to fast-forward a second to December the 15th.

A. Yes.

Q. That was a Monday.

A. Uh-huh.

Q. Does that day stick out in your mind for any specific reason?

A. Yes.

Q. Why is that?

A. I couldn't sleep that night, and I got up to check my e-mail on my computer. My computer is in my bedroom or was in my bedroom at that time. I got up to check my e-mail, and there was a piece of paper on my printer. And I picked up the piece of paper and looked at it, and it was a confirmation sheet from a Spiegel catalog company.

I thought Spiegel catalog, I haven't even heard of that in a million years, do they still have a catalog. I thought that was strange, and I read through there, and it was a list of items that had been ordered from the catalog, over $800.00 worth.

And I'm thinking, I did not do this. You know, this was not me. And I read to the bottom, and it had been charged to Carolyn Ruth Click's Visa card and ordered to be delivered at her address during the first week of January.

MS. SIKES: May I approach the witness, Judge?

THE COURT: Yes.

Q. (By Ms. Sikes) I'm going to show you what's been marked as State's Exhibit 25, and this envelope that I hold you'll notice is in a sealed condition, correct?

A. Yes.

Q. I'm going to ask you, if you will, to open it at a location other than where you see the red tape.

A. (Complies.)

Q. I'm going to show you what I've marked as State's Exhibit Number 26. Do you recognize this document?

A. Yes.

Q. Is this the document about which you've previously testified?

A. Yes. Yes, it is.

Q. That you found on your computer?

A. Yes, it is.

MS. SIKES: I'm tendering to the Defense what the State would offer what's been marked as State's Exhibit 26.

MR. PERKINS: Can we have just a second?

THE COURT: Yes.

MR. PERKINS: We don't object to State's Exhibit 26, Judge.

THE COURT: Thank you, Mr. Perkins.

MR. PERKINS: And for the record, there are two pages, which Ms. Sikes is now affixing with a paper clip, and only the first page is marked. I have no objection if they want to drive a staple between the two.

MS. SIKES: Which is my next question. May I approach the stapler?

THE COURT: You may. Staple them together. State's 26 is --

MS. SIKES: May I continue to approach?

THE COURT: -- admitted with no objection.

You may continue to approach.

Q. (By Ms. Sikes) Ms. Wilkerson, you testified earlier over $800. This State's Exhibit Number 26 show $805.95?

A. Yes, ma'am.

Q. To Spiegel.

A. Yes, ma'am.

Q. And it lists some items. It looks like bracelet with -- antique charm bracelet and some software around some sort of DVD/VCR player, different items.

A. Yes, sir.

Q. You yourself order any of these items listed?

A. No, ma'am.

Q. Do you have an account with Spiegel?

A. No, ma'am.

Q. Do you recognize the address for delivery --

A. Yes, ma'am.

Q. -- to be that of Ms. Click?

A. Yes, ma'am.

Q Did you ever have -- let me start with this: You know, we talked about Ms. Click, you said, didn't let anybody drive her car?

A No, ma'am.

Q Would it be fair to say she was protective of that car?

A Yes, ma'am.

MS. SIKES: May I approach the exhibits?

THE COURT: Yes.

Q (By Ms. Sikes) I'm going show you what's been marked State's Exhibit Number 2. Do you recognize that vehicle?

A Yes, ma'am. That's Callie's car.

Q Callie's car being Carolyn Click's?

A Yes, ma'am.

Q Did you ever at any time see the defendant drive that vehicle?

A Yes, ma'am, frequently.

Q When was that?

A Anytime she ever went anywhere, that was her

transportation, was that car.

Q I said the defendant.

A I'm sorry.

Q That's quite all right.

A I apologize.

Q I was confused. I had asked two separate questions. Did you ever see the defendant, Tracy Beatty, drive her car?

A Yes, ma'am.

Q And when was that?

A That was after Thanksgiving.

Q Ever see him drive that car before Thanksgiving?

A No, ma'am.

Q Did you and Ms. Click ever have a conversation about prior assaults upon her by Tracy Beatty?

A Yes, ma'am.

Q What did she tell you?

A She told me that he had beaten her so severely he had left her for dead.

Q At some point in, let's say, the middle of December --

A Uh-huh.

Q -- would it be fair to say that you were extremely concerned about Carolyn Click?

A I got concerned before the middle of December,

yes, ma'am.

Q Highly out of character for no one to know where she was?

A Absolutely.

Q Did you learn from the defendant himself what had happened to her?

A Yes, ma'am.

Q What did he tell you?

A He called me the night that I came home from work. It was after dark. The mobile coroner's unit was in the driveway of Carolyn's yard, and of course, our street was just lined with police cars.

And the phone was ringing when I came through the door, and it was Trey, and he said he wanted to tell me himself what was going on. And I said, "What's happened?" And he said, "Momma is dead." And I said, "Trey, what happened?" And he said, "I came and I showed them where she's buried."

And I was pretty numb. I didn't know what to say after that. I didn't know what to ask. I said, "Trey, what happened?"

He said he came home one day -- or one afternoon, and when he came through the door, Callie was laying in the floor, and the guy, Junior, was sitting in a chair, and apparently, that Junior had killed her and that

he had gotten into a struggle with him, had stabbed him with a knife, had drug him out in the backyard, propped him up against the propane tank, left him overnight, and then taken him the next day to Cedar Creek Lake and sunk his body in the lake.

Q And he told you he buried his mother?

A Yes.

Q "He" being the defendant?

A Yes.

Q Now, at some point, did Tracy Beatty tell you a different story about what happened?

A Yes.

Q And --

MS. SIKES: Can I have just a second?

THE COURT: Yes.

(State's counsel confer.)

THE WITNESS: Your Honor?

THE COURT: Yes, ma'am.

THE WITNESS: May I have a drink of water?

THE COURT: Yes, ma'am, you sure may.

(Off-the-record discussion.)

MS. SIKES: May we approach briefly, Judge?

THE COURT: Yes.

(At the bench, on the record.)

MS. SIKES: The next questions that I want to

ask, he called her from the jail and told her a different story and asked her to come pick up the credit cards and his property. But before I mention that he was in jail, in an abundance of caution, I wanted to let you know where I planned to --

MR. PERKINS: I appreciate that, and I don't care.

MS. SIKES: Okay.

(End of bench conference.)

Q (By Ms. Sikes) Are you still doing okay?

A I'm fine.

Q We still have the same deal; you'll stop me if you're not?

A Oh, yeah. I'm just dry mouthed.

Q So Tracy Beatty had told you this story, killing Junior and dragging him outside and -- he did what with him?

A That he had propped him up against the propane tank in the backyard and left him, you know, overnight, had taken his body the next morning to Cedar Creek Lake and submerged him in the lake.

Q Did he tell you this story in great detail?

A Oh, yeah. He said that he had used a knife to slice open his chest and held him down until the chest cavity filled with water so the body wouldn't float. I mean, great detail.

Q Very graphic?

A Yes.

Q At some point in time, then, did Tracy Beatty call you from the jail?

A Several.

Q Several times?

A Yes.

Q Do you know about when this was?

A No, because there were a lot of times I would get home, and there would be things on the answering machine that would say there had been a call from Smith County, and of course, I hadn't been home to accept it. I usually didn't except a call from him when someone was at the house.

Q Because those calls come in collect.

A Yes.

Q And during one of those calls, did Tracy Beatty tell you a different story about what had happened to his mother?

A Yes.

Q And what was that story?

A He told me that he had had a friend kill his mother, and then he had killed the friend.

Q Had actually hired somebody to kill her?

A Yes.

Q And then killed both of those people?

A Yes.

Q Did he tell you what he did with those bodies?

A No.

Q Was there another conversation when he told you a different story?

A I asked him, because I had seen something in the newspaper about -- they had mentioned nylon in the newspaper but had not been real specific. And I asked him what was the nylon about in the newspaper. He said that when she was dead, that he had put her in a -- stripped her down, had washed her, had put her in a nylon bag that he had found that she kept old purses in and that he had buried her in that nylon bag.

Q And is that the last story that he told you?

A I didn't ask any more details about...

Q Did he ever make any requests of you to come to the jail?

A Yes.

Q And what did he ask you?

A He asked me to come get his personal belongings.

Q Did he tell you what was contained in those personal belongings?

A He didn't the first couple of times he asked me to, and I asked him, "Don't you want Tiffany" -- his youngest daughter -- "Don't you want her to have your

personal belongings?" He said, "No. I just need you to come get them for me."

And I said, "What is the big rush for me to come get your stuff?" And he said that when they had taken him out to -- for him to show them where he had buried her, that he had asked if he could get a pack of cigarettes from the truck and that when he had gone to the truck, he had recovered some things from inside the truck and had somehow got them back into his personal belongings at the jail and that they were Carolyn's charge cards, and he wanted me to come get his belongings that had her charge cards in it.

Q And did you ever do that?

A No. I called the detective and told him what Trey had said and said, "What do you want me to do? Do you want me to come down there and get it? What do I need to do?" He said, "I'll call you back." He never called me back.

And when Allen served me the subpoena, I repeated the conversation to him, and he said he would handle it, for me not to do anything and not to worry about it.

Q When you say "Allen," is that Allen Beam, one of my investigators --

A Yes, ma'am.

Q -- with the DA's Office?

A Yes, ma'am.

MS. SIKES: Could I have just a second, Judge?

THE COURT: Yes.

(State's counsel confer.)

MS. SIKES: Pass the witness, Judge.

THE COURT: Thanks, Ms. Sikes.

Mr. Perkins?

MR. PERKINS: Thank you, Judge.

CROSS-EXAMINATION

BY MR. PERKINS:

Q Good morning, Ms. Wilkerson. How are you?

A Fine.

Q Same goes for me when I'm going through this. If you need a break or feel bad -- and I hope you feel -- do you feel all right now? Do you feel more relaxed?

A No.

Q I'm sorry about that.

This isn't a test or anything, and I don't really believe that you're even going to be up there that much longer. I just want to cover some of the same things that Ms. Sikes talked to you about. How's that?

A That's fine.

Q If I ask something that doesn't make any sense, say, "That doesn't make any sense to me," and I'll try to ask it a different way, all right?

A All right.

Q Where I want to start is, is that -- back where you started with Ms. Sikes. And one of the things that you talked about is when you first met Tracy Beatty, that you call Trey -- when you say "Trey," we'll know you're talking about Tracy Beatty. When you say "Callie," we'll know you're talking about Carolyn Click.

A Yes, sir.

Q Did you call her Callie?

A Yes, sir.

Q Okay. Now, do you recall about what month it was in 2003 when you met Trey?

A I just -- in October, I believe is when I met him.

Q Okay. So like in October, is that about when he started doing these odd jobs for you --

A Yes, sir.

Q -- that you've talked about?

A Yes.

Q So he was working for you occasionally, mowing the yard, cleaning out the shed, had done some kind of deck work at your place?

A Well, where they had pulled the deck out of there, they had left rocks, plants, dirt. They had left --

Q A big mess.

A -- a horrendous mess.

I had a greenhouse that someone had built for me out of PVC pipe, and of course, the plastic was always blowing off of that or the wind was trying to blow it away, and Trey was frequently there helping me stake it down or fix whatever was going on. But, yeah, he was pretty much there on a daily basis.

Q Okay. So he was pretty consistently working for you, even though you didn't have a bunch of money and didn't pay him a bunch of money?

A Yes.

Q Okay. And was that true in October of 2003?

A Yes, sir.

Q Did he continue into November of 2003?

A Sometime in November, he went to work for my other boss. I have two jobs.

Q Okay. And so he went to work in November working for somebody else?

A Yes, sir.

Q Okay. And who was he working for in November?

A Don Wilcox.

Q Don Wilcox?

A Yes, sir.

Q What does Don Wilcox do, ma'am?

A Don Wilcox is the general sales manager of Tandem Mobile Homes.

Q Tandem Mobile Homes?

A Yes, sir.

Q And I'm jumping way ahead. In fact, I'm going to jump way ahead to one of the last things that you talked about. And one of the last things that you mentioned on your direct testimony was that Trey -- and I'll call him Trey just so you'll know who I'm talking about -- that Trey had gone -- when he had taken the investigators back to where he buried his mother --

A Yes, sir.

Q -- that he had asked for a pack of cigarettes, and he went to the truck.

A Yes, sir.

Q The truck that you're talking about, that's the truck that he drove in conjunction with his work; is that right?

A Yes, sir.

Q Okay. So actually, he had access to a truck?

A Yes, sir.

Q And by December of 2003, he had a driver's license?

A Yes, sir.

Q That wasn't always the case, though, was it?

A No, sir.

Q In fact, you had indicated previously -- and I

know you had an opportunity to give a written statement to Steve Chaney with the Smith County Sheriff's Department. You remember doing that, don't you?

A Yes, sir.

Q And in that statement, you took your time and wrote out -- I believe it was seven pages of what you recalled about the case; is that right?

A It was not taking my time; it was very hurriedly written.

Q Okay. You wrote -- well, I'll tell you this: You wrote seven pages of handwriting that's better than anything I could write taking my time, so you have very good handwriting.

A If you could see my regular handwriting, you might realize I was very nervous and trying to think of everything and just -- yes.

Q Okay. You remember giving that statement, though, back in December of 2003?

A Yes, sir.

Q And in that statement, you talked about all of the things that you talked about today.

A Yes, sir.

Q And one of those things that you talked about was him -- him, Trey, not having a driver's license.

A Yes, sir.

Q And it's safe for me to assume, isn't it, that Carolyn Click wasn't real crazy about the idea of him driving her car without a driver's license.

A Oh, no, sir.

Q Did she talk to you about that?

A Oh, yes, sir.

Q And it's clear from her conversations with you that she wasn't going to let him drive with no driver's license.

A That's right.

Q In fact, you told Detective Chaney back then in this written statement that you were nice enough to provide that the defendant in this case, Trey, actually asked to borrow your car.

MS. SIKES: Object as to hearsay, eliciting a response that --

MR. PERKINS: I'll ask it a different way.

Q (By Mr. Perkins) Was there ever an occasion where you loaned your car to Trey?

A Yes.

Q For what purpose did you loan the car to him?

A He came to my place of work after Thanksgiving and asked if he could borrow my --

MS. SIKES: Again, Judge, my same objection, eliciting the statements of his client, hearsay.

THE COURT: If you're asking her -- sustained, if you're asking her what the defendant said to her, Mr. Perkins.

Q (By Mr. Perkins) I'm not asking you what he told you. Why did you loan him the car?

A To go to the Department of Public Transportation to get his driver's license.

Q And when was that, ma'am?

A Sometime after Thanksgiving.

Q Okay.

A I don't know the date.

Q All right. In fact, in this statement that you gave to the police when they came out to talk to you, you told Steve Chaney about that.

A Yes.

Q Okay. And told him not only that he didn't have a driver's license, but that after he went and took the test, he came back and showed you his driver's license.

A He showed me his --

Q His temporary permit.

A Yes.

Q Okay. And this was all after Thanksgiving?

A Yes.

Q It was all after Carolyn Click had disappeared and now you know was dead.

A Yes.

Q I want to talk to you a minute about these arguments. I think the word that Ms. Sikes used was "fights" --

A Yes, sir.

Q -- between Carolyn Click and Tracy Beatty.

And correct me if I'm wrong because you think you were writing fast. I'm trying to write down -- and I don't have one of those machines -- what you're saying, so I might have gotten this wrong. But you say that he would be over at your house daily?

A Yes, sir.

Q Is it because they were arguing on a daily basis?

A Yes, sir.

Q You live -- and we used to have a --

MR. PERKINS: Can I approach the witness, Judge?

THE COURT: Yes.

MR. PERKINS: I think it's about halfway in between here.

Q (By Mr. Perkins) Believe it or not, on State's Exhibit Number 19, which I'll show to you somehow, you are "L.W."

A Yes, sir.

Q And I don't know if this is going to be right or

not, so let me see if I can get this to stay up here somehow where, apparently, in Smith County, they've run out of tape, so I will hold it right here so you can turn around and look.

THE COURT: Are there some thumbtacks up there, Mr. Perkins?

MR. PERKINS: I didn't see one, Judge.

THE COURT: Sometimes -- or maybe an eraser up there? Sometimes they're laying up in there. Okay.

MR. PERKINS: Now, this is kind -- thanks. I'm going to stick this up here for a second, if I can, so I can get out of the way.

Q (By Mr. Perkins) Now, this is the street right here (indicating), okay, that runs between -- or between the trailer houses that are across the street from one another, okay?

A Okay.

Q So if I can, I'll get you oriented here. This is Carolyn Click's trailer house (indicating). This is where Betty McCarty lives (indicating).

A Uh-huh.

Q Now, I'm not sure if this is right.

A That's not correct.

Q Yeah. It was turned around at one point, and I think we started fixing it. But where would you live? And

you can just show me. You don't have to stand up or anything. Just --

A I live directly across the street from Thomas and Betty.

Q So actually, you live right here (indicating)?

A Right there.

Q Okay. I think this whole thing got turned. It's a long story we don't need to go into. But you live down here (indicating) --

A Down there.

Q -- right across from Betty McCarty?

A Yes, sir.

Q All right. Now, I don't know exactly what this word means. I always call that catercornered.

A Catercornered.

Q Catercornered.

Were you close enough that you could see people coming and going from Carolyn Click's house?

A Yes.

Q Okay. Is there a driveway or some way to park cars in front of, beside, behind Carolyn Click's house?

A Beside and behind.

Q Beside and behind. Which side -- using your -- you're going to be that blank square up there that doesn't have anything written in it --

A Uh-huh.

Q -- okay? From your trailer house, which side is the driveway of Carolyn Click's trailer on? Is it on the side closest to you or the side furthest from you?

A Closest to me.

Q Closest to you. So the driveway is between Betty McCarty's house and Carolyn Click's house.

A Correct.

Q Okay. Now, you say that they argued pretty consistently, that you had known Callie for about eight years; is that right?

A Yes, sir.

Q And at some point during that time -- and maybe you can orient me as to when exactly in time it was -- that you had Trey housesit for you for five or six days.

A Okay.

Q Can you tell me about when that was?

A It was like the last two days of October and the first few days into November.

Q So from the end of -- last few days in October, somewhere around Halloween --

A Yes, sir.

Q -- and then into the first part of November, you were going out of town and --

A Yes, sir.

Q -- didn't feel comfortable leaving the place by yourself?

A Right.

Q Okay. Do you have animals or anything that needed tending to, or you just wanted somebody there to watch over your --

A I think all I had at that time was fish.

Q Fish.

A Yeah.

Q Somebody to feed the fish and watch the place?

A No. I mean, I could -- it wasn't to keep my house. I wasn't concerned about my house. I have excellent neighbors that -- I can't have a strange vehicle drive up in my driveway where I don't get a phone call at work. I was not concerned about my house; I was concerned about leaving Tracy and Carolyn alone.

Q Okay. Because they didn't get along?

A Correct.

Q And in fact, she had told you -- and I believe -- and again, I hate to skip around on you, but when Ms. Sikes was talking to you, you said that you had had prior conversations with Carolyn about a prior assault where he had beaten her so severely that he had left her for dead?

A That's what she said.

Q I want to ask you two questions about that.

Number one, when did she tell you about that? And the second question that I have is, when in time did that occur, if you know?

A I do not know when that actually occurred, and it was probably about two months before Tracy came to Carolyn's house that she told me the full story.

Q Okay. Now, that leads me to ask you another question. Did you ever talk to Carolyn about Tracy moving in with you before Tracy moved in with her?

A Yes.

Q How did she seem about that?

A We argued about that.

Q Okay. It -- pardon me for saying this, but it seems kind of -- I don't know -- crazy, if somebody is beating you like this for you to be excited or -- how did you feel about that?

A I was worried.

Q Okay. Since y'all argued about it, I take the position then by your answer, since y'all argued and you were worried, that she wasn't.

A This -- for her to want him to come there was such an absolute reversal from anything she had ever told me about Trey, I could not understand her change of heart. And we argued about that. You know, everything that she had ever told me, why she was in fear of him, I threw back at

her when she said she wanted him to come there.

Q And yet she was still -- would you say excited or looking forward to him coming back to live with her?

A The final thing that she said to me before Tracy came there was that she hoped that they could mend the hurts and their bridges and finally make peace with Trey.

Q Okay. They have been at war with each other for a long, long time.

A Yes.

Q According to everything you've ever heard from her, there's been hard feelings for as long as you know between the two of them.

A She -- yes.

Q And not only hard feelings, but physical confrontations.

A Yes.

Q Did you ever witness any physical confrontations between the two of them?

A No.

Q But you had heard and were witness to verbal arguments?

A Yes.

Q Heard him yelling at her?

A Yes.

Q Heard her yelling at him?

A Oh, yes.

Q And it's -- and maybe it's me. You know, I don't know. But when you say "yes" to one and "oh, yes" to the other, is there any significance, any difference in your mind between the number of times you would hear him yelling at her and the number of times you would hear her yelling at him?

A Well, he was on the road, going down the road when she was yelling at him, so I could hear him. But, of course, she was right in front of my door, so I could certainly hear her much better than I could hear his words.

Q And these were not kind words that they were passing back and forth.

A Oh, no.

Q Some of these arguments were his fault, and some of them were her fault in your mind?

A Yes.

Q Okay. Going back to the housesitting -- and again, I apologize for jumping around on you.

A That's okay.

Q That's just the nature of the beast. You came back. You had been gone, I believe you said, five or six days.

A Yes.

Q You come back. Your house is -- the word you used

was "immaculate."

A Yes.

Q Okay. And if there was a suitcase in the floor, apparently, during the time that you were gone, Callie had packed for him to leave; is that right?

A Yes.

Q And this was in the first part of November after you get back?

A Yes.

Q Apparently, there had been some kind of fight in the interim?

A While we were gone, yes.

Q Okay. And obviously, you don't know about that.

A I have no idea.

Q Did you ever talk to Callie about that subsequently?

A No.

Q Okay.

A She was very angry that I had allowed him to housesit for us.

Q Well, let me ask you -- let me ask you about that, because I know that you had mentioned that she was angry at you for letting Trey housesit, is what you said. Why would she -- did you pay Trey to do that?

A No.

Q It got Trey out of her house. It separated the two.

A Correct.

Q They couldn't get along.

A Correct.

Q He gets to live close by but not in the same house with her.

A Right.

Q And she's mad about it.

A Yeah.

Q Can you explain that to me?

A I never understood it myself, so I can't explain it to you.

Q I did not know Ms. Click. Would you characterize Ms. Click as a controlling-type individual?

A Yes.

Q Let me go back to where I was. At the time that you came back from -- was it vacation, so I'll know, so I'll try to quit fumbling around. Was it vacation?

A It was to help my -- bring my daughter home --

Q Okay.

A -- so she could take her car to California.

Q That's right. There we go. The Navy.

A Yeah. Navy girl.

Q Navy girl.

When you came back from that trip, suitcase was packed, he's in the house, in your house, and you basically asked him what's going on.

And if I got what you said on your direct testimony, you asked him where he was going to go, and he said, "Don't worry about it." Did he seem, at that time, to be angry, upset, hostile, or -- the word I would use nonplussed about it? Do you know what nonplussed means?

A Yes. I think I was more upset about it. I was real uneasy about him taking that suitcase and walking back across the street. I didn't sleep much that night. I was worried.

Q Okay. This is what -- was the suitcase packed for him to leave -- was it your understanding to leave from your place, or was the suitcase packed for him to leave Carolyn's place?

A Carolyn's place.

Q Okay. And so do you know where he went when he left your place?

A No. I just assumed he went right back across the street.

Q Okay. Was there a gap in time there where you didn't see him anymore or --

A No. I saw him the next day.

Q Okay. And did Carolyn ever complain to you -- you

know, "I tried to kick him out, but he won't leave"?

A She was not speaking to me for letting him housesit.

Q Okay. All right. This argument that you were describing where she's basically, I guess for lack of a better word, following him down the street when he's leaving and she's down at --

A No. She never left her car. She was still standing at the open door of her car.

Q She's in the -- in her car when they were having that argument that you described?

A Yes.

Q Was that before or after the suitcase incident, as I'll refer to it?

A Before.

Q Before. Okay. I was just trying to put this in some kind of timeframe.

Now, I want to talk to you a second about this job interview with the electric company.

A Yes.

Q When in these sequence of events did that occur where Mr. Beatty, apparently, had some kind of job interview, tried to get a job with the electric company?

A More towards Thanksgiving.

Q Okay. Closer to Thanksgiving.

So if I understand your direct testimony, Mr. Beatty is -- is it this time -- is this during the time where he was working for you, working -- helping his mother, doing the underpinning, that kind of -- the handyman kind of stuff around there?

A Even when he was working for Mr. Wilcox, he would still, you know, be at my house frequently, you know, meet me there, "How are you doing," have dinner, watch a little TV, let me know what was going on, what he had done that day, and then go home; he went to bed.

Q Do you know what kind of job Don Wilcox gave him, I mean, what his responsibilities were?

A Don Wilcox owns several rental properties, and it would be to go and clean up that rental property. You know, people leave places generally, especially mobile homes, pretty trashed. And it was Trey's job to go down there and clean that up, haul that stuff to the dump and get it cleaned up, you know, ready for an actual cleaning woman to come in and clean the house to get it ready.

Q And do you know how frequently on a -- like on a -- like most people work five days a week -- how many days a week -- was there any kind of set schedule, or was it just kind of as needed?

A I think it was on an as needed.

Q So there would be periods of time where he

wouldn't work and periods of time where he was working?

A Right.

Q Okay. Anyway, back to this job about -- the job interview with the electric company. When in this sequence of events -- you say it's closer to Thanksgiving. It's, obviously, prior to Thanksgiving?

A Yes.

Q Okay. If I understand what you said on your direct testimony, Trey was upset that he had a job interview with the electric company, that he had tried to go to the interview, but -- and I don't know if I wrote this down right or wrong. Did he use the B word to describe his mother?

A Yes.

Q That the B wouldn't take him?

A Yes.

Q Okay. And did you ever have a conversation with Carolyn about that?

A No.

Q How would you describe Mr. Beatty's state at that point about not being able to go to his job interview that he had set up?

A Angry, very angry and frustrated.

Q Was this during the time that Carolyn was still not talking to you?

A Yes.

Q How long after you got back at the first week in November was it before Carolyn started talking to you again?

A She never spoke to me in a civil manner after that.

Q Not ever?

A No.

Q Was there anything else between the two of you that would cause her to be so angry, or was it just about the housesitting?

A Well, there was an incident that was a result of housesitting that I didn't realize until later, and I don't know how much of that might have caused her anger.

Q Okay. All right. So at some point in time -- was it prior to Trey going to work for Don Wilcox? Was it prior to the time that you loaned him the car so he could go take his driver's test?

A (Nods head affirmatively.)

Q And I can see you shaking your head --

A Say that again, please.

Q Thank you. See, when I don't make sense, that's what you do.

Was it prior to the time where he started doing that as-needed work for Don Wilcox that you had loaned Trey your car so he could go take his driver's test?

A I had told Trey that he could not work for Don Wilcox without a valid Texas driver's license.

Q Okay. And I think that you mentioned on your direct testimony that one of the things that Trey had -- that you had characterized as his frustration was -- is that "how was I ever going to get out on my own, how was I ever going make any money on my own if I can't get a job, I can't work," that kind of thing?

A Yes.

Q Is that what you testified to on direct?

A Yes.

Q When in all of this time line -- and I'm as guilty as anybody of jumping around on you, but when in this time line did this -- the thing that you said was an offhanded comment about hitting her on the head with a hammer, when did that occur?

A That was probably around the last of October.

Q So that was before all of the --

A Yes.

Q -- Don Wilcox business?

A Yes.

Q It was before the missing-the-job-interview business?

A Yes.

Q And that was at a time where, I believe, if I

understand what you testified to, Ms. Click was getting ready for winter and putting the underpinning back on her house and --

A Yes, sir.

Q -- that Trey was helping her do that?

A Yes, sir.

Q And Trey is the one that told you about, "I can't believe she handed me a hammer."

A Yes.

Q "All I could think about doing was hitting her in the head with it."

A Right.

Q You described that during your direct testimony as an -- I believe the word you used was an "offhanded comment"?

A Yes.

Q And at the time -- you know, you hear people say that, and at that time, you thought that he was joking?

A I just fluffed it off, yes.

Q Right. In fact, I believe you said that -- in your direct testimony, that when you said, "Trey," he said, "Well, I couldn't do it" --

A Yeah.

Q -- something to that line.

These fights that you described them getting

into, you've characterized as horrible fights, but you never saw physical violence between them --

A No, sir.

Q -- even though physical violence had been reported to you --

A Yes, sir.

Q -- by Carolyn from a previous incident?

A Yes.

Q But you don't know when in time that previous incident --

A No.

Q -- would have been?

A No, I don't.

Q Do you recall what kind of things -- what kind of things Carolyn would say to him during these -- I'll call them arguments? Because unless somebody is throwing punches, I don't consider it to be a fight -- during these arguments?

A The only one that I heard individually -- you know, personally myself was the one where he was walking down the street, and she was saying, you know, "You just keep walking. You just keep on walking."

Q Okay.

A And -- you know, that. And then that she was very concerned that he did not understand her physical condition,

that she could not do the things that he thought that she could do, and he just doesn't -- and she was in tears.

Q Okay. The one that you described to Ms. Sikes when she was --

A Yes.

Q -- standing at the car door.

A Yes, sir.

Q All right. The other thing I want to make sure that I understand is, is that you saw Ms. Click for the last time on Tuesday, the 25th.

A Yes, sir.

Q I don't believe -- and maybe I missed it, and there's always that possibility -- that on Wednesday, the 26th, I don't believe that you -- there was anything of any significance that you testified about --

A No, sir.

Q -- is that right?

A No, sir.

Q And then on Thursday, the 27th, is when Trey brought the turkey over?

A No, sir. He brought the turkey before Thanksgiving. He brought the turkey the day before.

Q Oh, he brought the turkey the day before, and y'all ate it on Thanksgiving.

A Yes, sir.

Q Does that make more sense?

A Yes, sir.

Q That shows you what I know about cooking a turkey.

And then on Friday, the 28th, Saturday, the 29th, you didn't see him at all?

A No, sir.

Q That was during the time that in your direct testimony, you said he had said something about going to Athens to see his relatives or something --

A And that he would be back on Sunday.

Q And did you see him come back on Sunday?

A He called me on Sunday when he got back.

Q Okay. So not only did you see him, you talked to him?

A Yes, sir.

Q Or did you just talk to him?

A Sir?

Q Did you see him and talk to him or just talk to him?

A I talked to him first and then saw him later that day.

Q Okay. At some point in time, obviously, you started to get concerned about not seeing or hearing anything out of Carolyn despite the fact that y'all were -- how should I say this -- on the outs?

A Yes, sir. We had had arguments before, disagreements before, and she would get upset, and she might not talk to me for a month or two, and she would get over it, and we would pick up our friendship where we left it off if -- girls are that way.

Q Well, I'm not going to have any comment on that.

At some point in time -- and I know that you were concerned about her and you asked about her on a number of occasions, and at some point in time, Mr. Beatty just ended up telling you, "I'm not going hear from her." And --

A He said, "I do not expect to hear from her again."

Q Okay. And then at that point in time, you could tell he was getting frustrated with you asking questions about it --

A Yes, sir.

Q -- and you just stopped asking questions about it --

A Yes, sir.

Q -- is that right?

A (Nods head affirmatively.)

Q I want to talk to you a second about what you discovered on December the 15th. Now, my -- I've got a blank calendar here.

THE COURT: Mr. Perkins, right here I believe we need to take about a ten-minute recess.

MR. PERKINS: Oh, that's fine, Judge.

THE COURT: A short break.

All rise for the jury.

(The jury leaves the courtroom.)

(Recess.)

THE COURT: Let's go back on the record in Cause Number 241-0978-04. Back on the record. The State is present; defense is present; defendant is present.

Go ahead.

MR. BINGHAM: Judge, we instructed Lieanna Wilkerson to not mention anything about parole. It is well-established through comments that Ms. Click had made to her that the reasons why her son was living there was because he needed an address while on parole.

When Mr. Perkins elicited the comment from her, it was in direct opposition of what Callie had told me before, and she was very worried about it.

THE COURT: Wait a minute. What witness are you talking about?

MR. BINGHAM: Lieanna Wilkerson, the one that's on the stand.

THE COURT: Okay.

MR. BINGHAM: She made the comments that we argued about it, she was worried about it, that direct opposition to what Callie had told me before. And they

don't understand the picture of what's going on.

Ms. Click is allowing her son to come there because he's on parole. And the reason a lot of these arguments develop between them is because she's on parole -- because he's on parole.

We didn't go into that with her, but Mr. Perkins elicited extensively about the comments about -- from her about, "Well, how did Ms. Click feel about him being there?"

"Well, she was very --" she said that -- Lieanna Wilkerson said, "Well, I was worried," and it was in direct opposition of what Ms. Click said. And see, she's not answering because we've instructed her not to mention that.

And yet it leaves an impression with the jury, the reason that they're worried, the reason that it's in direct opposition, the reason he can't leave and that he keeps going back over is because he's on parole. That's his address that he's reported to parole on.

This is not explaining. The jury is misled, and I believe to an extent confused by the fact that why does he keep going back over there, why doesn't he just leave, how come she's worried, how come it's in direct opposition to what she's told me in the past.

The fact of the matter is, is that all of

this is occurring because he can't leave. He's on parole. He's paroled to that address. And I think it is -- we should at least be able to get in on the fact that based on the questioning by Mr. Perkins, the fact of why he has to go back there, why she's worried, why it's in direct opposition. That's a direct response to direct questions by Mr. Perkins. And I think it's --

THE COURT: Why is it in direct opposition? What are you talking about there?

MR. BINGHAM: Well, remember, Ms. Wilkerson said, "Yeah --" Robert had asked her -- Mr. Perkins asked her, you know, their exchange about how did she feel about her son coming there. She said, "Well, I was confused. It was in direct opposition to what she had told me about the defendant in the past."

See, Carolyn Click had talked to Lieanna Wilkerson about her son. He's been in the pen. He's done these things. And what she's sitting there saying is, "I didn't understand why she was letting him come live with her based on all these things she told me about him in the past."

And all of this has been put in front of this jury about him going -- about him not leaving the residence, about them being worried, but the jury doesn't understand the full picture.

THE COURT: Are you saying that you want to get the full picture before the jury by the Court allowing you to put in testimony that the defendant --

MR. BINGHAM: Had paroled to that address.

THE COURT: -- was on parole?

MR. BINGHAM: Had paroled to that address. Not what the parole -- I mean, if we're going to go into was Ms. Click excited about it, had she talked to you about it, was she worried about it, you know -- I mean, without saying why she was worried, I think it leaves a false impression with the jury. The reason that they had these conversations and exchanges was because he had paroled there.

THE COURT: Okay. If the evidence showed that he had paroled there, I mean --

MR. BINGHAM: What does that add?

THE COURT: Well, I guess my question would be -- in other words, she could have said -- I don't know what the evidence would show, but she was -- she had allowed him to come and live there.

You're saying, because he was on parole and he needed an address to stay, but she could have said, "You'll will have to find some other place." I mean, I'm not following --

MR. BINGHAM: The point of it is, is that the reason the defendant doesn't leave -- see, he leaves and he

goes back because that's his parolable address.

THE COURT: Can you change a parolable address?

MR. BINGHAM: I don't know. I guess you could. But that's the address he gave to parole.

THE COURT: I think you probably can change a parolable address with the approval of your parole officer.

MR. BINGHAM: If you had someplace to go.

THE COURT: If you had someplace go. I don't know whether he had anyplace to go or not, and I don't know who's going to testify whether or not he had anyplace to go or not.

MR. BINGHAM: I don't know. If he's that upset and mad at her, it seems like if he had someplace else to go, he would have.

THE COURT: Well --

MR. BINGHAM: The point of the matter is -- Judge, I just think it leaves a false impression to go into all of that testimony about who's worried, who's not worried, why that was in direct opposition to what Callie said.

THE COURT: Well, this witness has testified that she was worried about him going back over there and staying over there. I'm not following what -- okay. Let me tell what you I'm not following.

I'm listening to the testimony of the witness, and I'm listening to the testimony of the witness, and -- I mean, the part where the witness said that based on what all the deceased had told her about her relationship with her -- with the defendant, something to the effect she didn't understand or she was surprised that she was letting her (sic) come and live there.

Now, that is the only thing that -- is that what you're talking about that you think leaves a false impression?

MR. BINGHAM: I think when the statement is, "We argued about him coming back," which is on the testimony, that she was worried about the defendant coming back and that him coming back was in direct opposition to what Carolyn Click had told her in the past.

THE COURT: Right.

MR. BINGHAM: The other thing this witness --

THE COURT: I understand that.

MR. BINGHAM: -- asked the defendant is why he just doesn't leave.

THE COURT: Say that again.

MR. BINGHAM: At one point -- and this testimony has not been elicited -- but the witness asked the defendant, "Why don't you just leave?" Because, see, the part of the thing is they argued. Mr. Perkins -- they

argued back and forth constantly, the defendant and Carolyn Click, but he never leaves.

And the reason is, is because the defendant said that he doesn't have time to change -- the defendant told this witness he doesn't have time to change his address. He's supposed to parole off December 17th, and that's why he's not leaving, because he doesn't have time to change his address.

He's -- he's got to parole off December 17th. He can't leave. He doesn't have time to do that. That's why he's not leaving. That's why Carolyn Click can't get rid of him.

THE COURT: Okay. And I understand what you're saying, but what the --

MR. BINGHAM: Also goes to the issue of whether or not he had consent even to be in that house. I mean, if Carolyn Click tells him to leave, and he doesn't leave, and he's not leaving because he knows he doesn't have time to change his parole address, then the fact that he's on parole is relevant. He's walking down the neighborhood leaving, but he's always going back, and she finally tells him to leave.

So it becomes relevant. It becomes relevant, number one, to explain what the Defense has gotten into. And it also becomes relevant to show why a mother could not

get rid of her son, because he won't leave. He can't leave on parole.

THE COURT: How does that bear on whether or not she had given him consent or not to be there?

MR. BINGHAM: Well, if she's trying to get rid of him and he won't leave and there's a reason we can explain why he wouldn't, then that would be relevant to the allegations of burglary in the indictment.

THE COURT: Okay. Well, you're asking the Court to allow you to put in -- I know you're asking the Court to allow you to put in in the guilty phase of the trial -- guilt or innocence phase of the trial the fact that the defendant is on parole based on this testimony --

MR. BINGHAM: At this point.

THE COURT: -- of the witness about how he kept going back to where he resided.

Let me hear from you, Mr. Perkins.

MR. PERKINS: We object to it, Judge.

THE COURT: Well, I figured you would object to it. Do you have anything else that you want to say?

MR. PERKINS: Here's the thing: Everything that the State stands up and says is built upon supposition. If we could do this and if we could do that, then we could make it relevant that he's on parole.

If we could do -- if the Court will assume

with us that the reason that he couldn't leave is because maybe he doesn't have somewhere else, what a house of straw, Judge. It is not relevant to any material issue of fact at the trial.

And I'd like to point out one thing. It was on the State's direct examination of Betty McCarty that the State elicited testimony that according to Betty McCarty yesterday, that the victim in the case, Ms. Click, was excited. It was her word on direct testimony that they elicited yesterday.

What I did was is ask another neighbor how she felt about it, and she said that Callie didn't have any -- was not worried about it. The only one that was worried about it was the neighbor, and she explained why she was worried about it; because they had prior trouble with one another.

There's no misimpression with the jury, even though I could stand here and argue that the jury probably already knows that he's on parole, because the State calls people to come in here, "Did you meet with him on this month; did you have a scheduled meeting with him on this month" and all of that other stuff.

What they want do, what they've been doing all along is, is trying to convict him of capital murder by being a criminal generally, to introduce prejudicial

evidence before the jury to show that he has been in trouble before, that he's on drugs, that he beat up his mother, now that he's on parole, to try to prejudice him so much in the eyes of the jury that they overlook the laws and the facts, and they convict him of something that he is not guilty of.

Our objection is under relevancy. It's irrelevant, it's not admissible for any purpose, and it's outweighed by the danger of unfair prejudice -- greatly outweighed by any probative --

THE COURT: I think there has been a -- certainly under instructions to the witnesses, the earlier witnesses that, in the Court's view, the fact that the defendant was on parole is not in this case right now.

I don't think that -- I don't think that any -- I don't think that any witness that has been before this jury has in any way, in any answer to any question, intimated in any way nor could the jury draw that conclusion. And I think that if it is interjected now, this will clearly be the first time it's been interjected.

Go ahead, Mr. Bingham.

MR. BINGHAM: The other thing was -- that Mr. Perkins did was he asked her, "If they're having these confrontations, why would she let him back in the house? Why would she let him back in the house?" Ms. Wilkerson sits up there and goes, "I wondered that myself." I can

explain that with one witness, the parole officer.

That's why Carolyn Wilkerson -- Carolyn Click let the defendant back in her house. See, Mr. Perkins goes up there and asks, "If she (sic) assaulted her so many times and they had these confrontations, why would she let her (sic) back in the house?" Well, we could call Simone Norman and explain that.

THE COURT: Well, to testify that -- I suppose what you're saying is that to testify that that's his address for purposes of parole and that -- but that address for purposes -- and this is -- I mean, there's no evidence in the record. Obviously, the witness hasn't testified to it, obviously, but a parole address can be changed.

MR. BINGHAM: That's correct.

THE COURT: So what I'm saying is, at this point, I don't see that there is a sufficient grounds for you to call a parole officer or to put in -- right now, I don't believe the record is sufficient for you to put in before this jury or the Court to allow you to put in before this jury right now the fact that the defendant is on parole --

MR. BINGHAM: Right.

THE COURT: -- as the Court sees the record right now.

MR. BINGHAM: The other thing is just -- and I'm not trying to get tit for tat -- but -- and I've done it so I'm guilty of a side-bar comments, only to the extent of comments that either party makes that are not questions to elicit evidence, comments such as -- I'm just going to ask the Court to -- I believe Mr. Perkins has done it, and I'm guilty of it myself -- but not to make side-bar comments, direct questions to the -- or statements to the witnesses that are not eliciting questions.

THE COURT: Well, both -- all of y'all are very experienced trial attorneys. The Court will instruct you not to make side-bar comments. Direct questions to the witnesses. Don't make any comments other than the question contained (sic) to the witness. I mean, you all are very experienced trial lawyers. You all know that, but be careful in that regard and don't make any side-bar comments.

But the Court is not going to -- the Court at this time, Mr. Bingham, based on the record before the Court, doesn't believe that the fact that the defendant was on parole is admissible, based on the record as it stands now.

MR. BINGHAM: Thank you, Judge.

THE COURT: So I'll continue the ruling at this time until the Court feels, if it does, for some reason, it becomes admissible, that that should not be

brought up before the jury nor referred to in front of the jury about any witness on questioning.

Can we get the jury now? Anything else?

Get the jury, Carleton.

THE BAILIFF: All rise for the jury.

(The jury enters the courtroom.)

(Open court, defendant and jury present.)

THE COURT: Be seated, please.

Carleton, would you get the witness, please?

(The witness enters the courtroom.)

THE COURT: Ma'am, just come back around, please, and have a seat. Thank you.

Okay. Mr. Perkins.

MR. PERKINS: Thank you, Judge.

CROSS-EXAMINATION (CONTINUED)

BY MR. PERKINS:

Q. Ms. Wilkerson, that was one of those ten-minute lawyer time outs.

A. That's fine.

Q. One of those ten-minute things that kind of stretched out longer than that.

The last thing that I was talking to you about was the e-mail, the confirmation e-mail that you got on December the 15th of 2003 when you couldn't sleep. Do you recall that testimony?

A. Yes, sir.

MR. PERKINS: If I could approach, Your Honor?

THE COURT: Yes, sir.

Q. (By Mr. Perkins) I've got a blank calendar that I'm showing to the State, and I've marked it as Defendant's 2.

MR. PERKINS: If I could approach, Your Honor?

THE COURT: Yes, sir.

Q. (By Mr. Perkins) It's just a blank calendar for October, November, and December of 2003. What I'd like to do, and I need to go back down there and get the confirmation. Have you ever ordered anything online.

A. Yes, sir.

Q. So you know, basically, you can go to somebody's website, Amazon.com or whatever, BestBuy buy you something, and they e-mail you back a confirmation?

A. Yes, sir.

Q. Can you look on here and see the date on here? I think you've already testified about it.

A. Yes, sir.

Q. This was on what date, ma'am?

A. December the 15th.

Q. December the 15th. What I would like for you to

do, first of all, on Defendant's Exhibit 2, which is a three-page -- October, November, and December, a three-page sheet. I would like for you to put an "X" on the last day that you saw Callie, Carolyn Click.

A. Was this Thanksgiving?

Q. Thursday the 27th, I believe, would be Thanksgiving. In fact, just write, "The last day I saw Callie?"

A. (Complies.)

Q. And then the 27th, if you will circle that, and write "Thanksgiving." I believe that's the day that the Cowboys got beat by the Vikings.

And then the day of this Spiegel receipt would have been -- if you will mark it -- December 15th of 2003, just write on there "Spiegel receipt," I guess, would be good.

A. (Complies.)

Q. That looks good to me.

Now, this is one of these silly things that lawyers have to do sometime because the record can't see us. What I would like for you to do for me is, is to count the number of days from the last day that you saw Callie until the day that you got this receipt showing that somebody had charged $805 worth of women's jewelry and DVD theater system to her credit card.

A. (Counting.) Twenty days.

Q. Okay. That's 20 days. Okay. Thank you, ma'am.

MR. PERKINS: I'd offer what's now been marked --

Q. (By Mr. Perkins) And I'll tell you what, since you're the one that did this, write your name on here instead of me. Let me get you to write your name down here at the bottom of the -- December of 2003, if you will just write your name. You write better than me anyway.

A. (Complies.)

Q. And you've written, for the record, Lieanna Wilkerson on there; is that correct?

A. Yes, sir.

MR. PERKINS: We offer what has been marked as Defendant's Exhibit Number 2, Your Honor.

MS. SIKES: No objection.

THE COURT: Defendant's Exhibit Number 2 is admitted without objection.

Q. (By Mr. Perkins) Now --

MR. PERKINS: And I should have left that up there. I'm sorry, Judge. If I could approach again?

THE COURT: Sure.

Q. (By Mr. Perkins) This State's Exhibit Number 26, that was stuff that was charged on that, I guess, Spiegel website or whatever it was, you had indicated -- and I

really hadn't looked at that too good.

There was like a charm bracelet. I know that Ms. Sikes talked to you about there was a charm bracelet, and then I missed this. Was it software or silverware? I know it was some kind of something-ware.

A. Eclipse W3 Software.

Q. Software. So there was software for a computer of some sort. I don't know what that is. And then a charm bracelet?

A. Yes, sir.

Q. And what else?

A. A DVD/VCR theater system and a DVD/VCR.

Q. So I guess one of those DVD/VCR combination things or something. And all of that was charged, apparently, in one order; is that correct?

A. Yes.

Q. And that was supposed to be delivered to Carolyn Click's address on -- I believe it said it would ship out no later than January the 2nd?

A. Yes, sir.

Q. And this was 20 days after the date that you saw Carolyn Click for the last time?

A. Yes, sir.

Q. I want to talk to you for a second about Trey calling you -- Mr. Beatty calling you and telling you these

stories that he told you.

A. Yes, sir.

Q. The way I understand it -- and, again, correct me if I'm wrong -- the first time he called you, the police were over there at the mobile home park. He called you --

A. The police were not there at the time yet, no, sir. The police were at Carolyn's house, but they were not at my house.

Q. Okay. That's what I meant, but I didn't ask that very well.

A. Yes.

Q. The police were over at Carolyn's house, and that's what you were talking about all the police were up and down the street and that kind of stuff, which is certainly understandable.

A. Yes, sir.

Q. You got a call from Trey saying that -- and he told you that his mama was dead?

A. Yes, sir.

Q. Now, this is where I'm not real sure about which story was which, but was it on that occasion where he told you that he came and showed you where she was buried?

That didn't make any sense, not even to me.

A. That was not --

Q. Was that first conversation where he told you --

is this what you testified to previously that he told you, "I came and showed them where she was buried"?

A. Yes.

Q. Okay. On that conversation, is that the same conversation where he told you that big bunch of baloney about Junior Reynolds and all of that?

A. Yes.

Q. So that's the same story. That's not like call one and call two? That's when he was telling you all that business about came in, Junior Reynolds was there's, he had killed her, so I killed him thing. Is that all in the same conversation?

A. Yes.

Q. Is that where he told that story about killing Junior Reynolds and sinking him in Cedar Creek Lake?

A. No, he told me that later.

Q. That was a different conversation. Okay. This is where I'm getting confused.

So Conversation Number 1 was that somebody named Junior Reynolds had killed his mother, right?

A. Yes.

Q. I see you shaking your head, but --

A. I'm sorry. Yes.

Q. That's fine. That's another one of those things. A record can't take down a head shake.

Story Number 1 was somebody named Junior Reynolds killed mama?

A. Yes.

Q. "And I showed them where mama was buried."

A. "Junior Reynolds killed my mother; I killed Junior Reynolds," is the first story.

Q. Okay. All right. The second story was that Junior Reynolds got sliced up and thrown in Cedar Creek Lake?

A. Yes.

Q. Sunk in Cedar Creek Lake.

A. That is how he disposed of Junior's body.

Q. On the first story, did he tell you that he had killed Junior Reynolds, but he didn't tell you how he disposed of it? This is where I'm getting mixed up.

A. No. I'm sorry. I'm getting mixed up.

The first story was that he had come through the door, had found Carolyn -- Callie laying on the floor and that I knew by the way she looked that she was dead, and that Junior was sitting in a chair just staring at her, and that they had had a huge fight.

Junior had attacked him, that he had killed him, had drug him outside and propped him against the propane tank, and then come back in, take his mother to the tub, and had tried to clean her up. She was dead. And then

the next morning took -- he said he got drunk that night, and the next morning took Junior's body to Cedar Creek Lake and disposed of it there. That was the first conversation.

Q. That was all in that first conversation?

A. Yes, sir.

Q. The second conversation is where he went into the details that you described on your direct testimony about how he sunk him in the lake?

A. Yes.

Q. Okay. I guess the third conversation, maybe the second story, maybe a different story, is the one that you've described to Ms. Sikes where he called you and told you that he had a friend kill his mother and then he killed his friend.

A. Correct.

Q. Did he say who the friend was?

A. No, sir.

Q. Did you assume that it was the same Junior Reynolds or determined --

A. No, sir, I had -- by then, I thought I don't know. I don't believe any of this anyway.

Q. Okay. And then apparently he had called you another time and given another story. And what was -- it would be better for you to just tell me what that story was than for me to try to remember what it was.

A. You mean the very last story that Trey told me about what happened?

Q. I haven't skipped a story, have I?

A. No, sir.

Q. Okay. The last one then.

A. The very last thing that -- incident that Trey told me what happened is he said when he left my house, he went directly across the street to her house and that she was waiting for him, and that when he came through the door, they had a horrible fight, and that he turned around to start down the hall, and that she grabbed him by the back of his head by his hair, and that he turned around and put his hand on her throat and told her to let him go, and that she reached up with her other hand and grabbed him by the hair on the other side of his head and was shaking his head saying, "You are going to listen to me."

And he said he reached up with the other hand and started squeezing her neck and told her to let go, "Let me go." And he said he squeezed her neck until she released him, and when he felt her let go of his hair, he let go of her. And as she was falling, he turned to go down the hall to his room, and that he did not know that she was dead until he found her laying in the same place she fell the next morning.

Q. When he would tell you these things, specifically

when he told you the last thing that you've just described about the horrible fight, being grabbed by the hair, grabbing her by the throat, squeezing her by the neck until she released him, slumped to the floor and found dead the next morning -- when he told you that story where he finally admitted killing his mother to you, that it wasn't somebody named Junior Reynolds, that Junior Reynolds wasn't dead, that it wasn't some friend, but that he had done it, what do you say to him?

A. I asked him why, why didn't he come get me when that happened, why didn't you come let me know right then, why didn't you come to the house.

Q. Was it at some point after that -- or was it in the same conversation -- if you know, fine; if you don't, that's fine, too -- that he had requested you come down to the jail to get his belongings? Was that in that same conversation, or was that at a subsequent time?

A. No, it was in another conversation.

Q. Okay. Do you know about -- and I'll try to sequence these things so we'll know. The last conversation that you had with him, obviously, you relayed that information to the police as well?

A. Correct.

Q. And much as you should have done, when he contacted you and told you I need you to come down here and

get my property, you didn't do that. You called the police and told them this is what he wanted me to do.

A. Well, by then, I knew that he killed his mother, and anything to do with it would be evidence in some way.

Q. Sure.

A. Yes.

Q. And so you did what any normal person would do, you called the police and said, you know, he's told me this and now he wants me to do that; is that right?

A. Yes, sir.

Q. When was it, if you remember, approximately that he told you this story about getting into a fight with his mother and her grabbing him by the hair and him choking her until she slumped to the floor?

A. That was one of the conversations that he called me and I accepted the phone call at home and he knew that Junior was alive and that that story had been proven as false.

Q. Okay. Do you know the approximate time that this was on into 2004, or was it still in 2003, or would you have any way of knowing?

A. You would have to check the phone records from the jail, and you could probably find the date.

Q. Now, at some subsequent time then, after he had finally admitted to killing his mother to you, he called you

another time and requested that you come get that property that you've described; is that right?

A. Yes.

Q. Do you know about when that was?

A. That was after he had been moved to Smith County from Henderson County.

Q. Okay.

A. So, no, I don't know, because he asked me in two different conversations. They were several days apart.

Q. And obviously you didn't go and get it.

A. No, sir.

Q. Who was it that you told about that conversation?

A. The detective that I talked to the night that they found Callie's body. He was the one that I called, Hendrix, I think.

Q. Pat Hendrix?

A. Yes. I had called him.

Q. Kind of a dark-headed guy about my size?

A. Yes.

MR. PERKINS: Can I have just a second, Your Honor? I think we're about finished.

THE COURT: Yes, sir.

MR. PERKINS: Ms. Wilkerson, I appreciate you being down here.

Pass the witness, Your Honor.

THE COURT: Thank you, Mr. Perkins.

Ms. Sikes.

MS. SIKES: Thank you, Judge.

REDIRECT EXAMINATION

BY MS. SIKES:

Q. Ms. Wilkerson, I just have a few questions.

You said just a while ago in response to Mr. Perkins' question, when Tracy Beatty told you -- finally admitted that he killed his mother.

A. Yes, ma'am.

Q. You asked him why?

A. Yes.

Q. You said something like why didn't you just come to my house?

A. Yes.

Q. And that was always an option, right?

A. Yes.

Q. And if he turned around that same night?

A. Yes.

Q. You know now that he killed his mother on what day?

A. Two days before Thanksgiving.

Q. And he told you that?

A. Yes.

Q. How did Tracy Beatty relate that to you? When he

told you, how did he make the date stick in your mind?

A. He told me it was the night that I fixed him spaghetti.

Q. So you know that's the 25th?

A. Yes, ma'am.

Q. And had he left your house and gone and had another fight with his mother, he was certainly welcome to come back to your home?

A. Yes. He knew I was very concerned.

Q. And it ended up being you had a right to be concerned?

A. Yes, ma'am.

Q. With respect to when you first saw Tracy Beatty driving his mother's car, I think you told me -- and you correct me if I'm wrong -- that that was after Thanksgiving.

A. Yes.

Q. Do you remember what day?

A. It couldn't have -- well, it was that night. It was Thanksgiving night, because he had to take her car to Athens. He drove her car that night.

Q. You knew he didn't have a driver's license on that day?

A. Yes, I did.

Q. And in fact, he had told you when he got back that he knew she would be, quote, pissed that he was driving her

car?

A. Well, I told him, "You know how upset she's going to be that you're driving her car." And his response was, "Since she's kicking me out anyway, I really don't care."

Q. And you know now that she was already dead?

A. Yes, ma'am.

Q. So you knew he couldn't have had her permission to drive that car?

A. No, ma'am.

Q. And you remember for a fact that he didn't test for that driver's license until after Thanksgiving?

A. Yes, ma'am.

Q. You said that you and Mrs. Click -- that she was upset with you over the whole allowing Tracy Beatty to stay there that week or four or five days he was at your house, right?

A. Yes, ma'am.

Q. And then the questions were, well, you never talked to her again. And the reality of that is, you got back from your trip, do you know what day?

A. Not the exact day.

Q. The first part of November?

A. First part of November, yes, ma'am.

Q. And then her son killed her the 25th.

A. Yes, ma'am.

Q. So you only had about three weeks for her not to be speaking to you.

A. Yes, ma'am.

Q. And he told you that -- about wanting to hit her head with a hammer and put her under the house, but he couldn't do it because she would start stinking.

A. Yes, ma'am.

Q. Did that fit in with the things that you had been told about the assaults? Did that worry you? You said you were worried.

A. Yes, ma'am, that concerned me very much.

Q. I want to go now to the last story that Tracy Beatty told you.

A. Yes, ma'am.

Q. Did you say where that took place, that fight?

A. In her home.

Q. Do you know where in her home?

A. In the living room or at least between the kitchen and the living room, because he made reference to her falling in the living room.

Q. In the living room?

A. Yes, ma'am.

Q. Did he ever mention to you that she pulled any kind of weapon on him?

A. No, ma'am.

Q. Did he ever mention to you that he beat her, caused blunt force injuries to her head?

A. No, ma'am.

Q. To her torso?

A. No, ma'am.

Q. To her hands and to her arms?

A. No, ma'am.

Q. Did he ever mention to you that he wrapped pantyhose around her in the case three times and tied a knot in them?

A. No, ma'am.

Q. Did he ever mention to you that he cracked her ribs?

A. No, ma'am.

Q. Never any explanation for how she received all the blunt force injuries to her body?

A. He only said he touched her neck.

MS. SIKES: I'll pass the witness, Judge.

MR. PERKINS: I don't have any additional questions of Ms. Wilkerson. Thank you very much.

THE COURT: Ms. Wilkerson, thank you very much. You may step down. I believe that you will be --

Do you want Ms. Wilkerson kept subject to re-call?

MS. SIKES: Yes, Your Honor.

THE COURT: Ms. Wilkerson, you will still be under the Rule of witnesses, not to discuss your testimony with any person. You will be subject to re-call by the State or Defense, if they decide to do that. And I'm sure the District Attorney's Office has a number where they can reach you, but you can step down and go back home or wherever you need to be, as long as they know where to be in touch with you.

Thank you very much, ma'am.

(The witness leaves the courtroom.)

THE COURT: Who will you have next?

MR. HARRISON: I call Don Wilcox.

(The witness enters the courtroom.)

THE COURT: Come on up this way, Mr. Wilcox. On down here. Thank you.

Mr. Wilcox, were you sworn yesterday as a witness? Did I swear you yesterday as a witness?

THE WITNESS: No, but you just swore me the other day.

THE COURT: Earlier?

THE WITNESS: Earlier, but if you want to again, I'll be glad.

THE COURT: Raise your right hand.

THE WITNESS: Okay.

THE COURT: Do you solemnly swear that all

the testimony you give in the cause now on trial will be truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT: Thank you. Mr. Wilcox, just come around and have a seat. Pull sort of up to that microphone where you can speak into the microphone, please. Thank you.

Okay. Mr. Harrison.

MR. HARRISON: Thank you, Your Honor.

DON WILCOX,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARRISON:

Q. Mr. Wilcox, you can consider yourself doubley sworn.

A. Okay. Good. Thank you.

Q. Mr. Wilcox, could you introduce yourself to the Ladies and Gentlemen of the Jury and tell them what you do for a living?

A. I'm the sales manager at Tandem Mobile Homes here in Tyler out on 31 West.

Q. How long have you held that job?

A. I've held the job with Tandem Mobile Homes for about 16 years.

Q. And I think you said you're a sales manager?

A. Yes, I am.

Q. Do you have people under your, I guess, authority and control, people that work for you?

A. Yes, sir. I have four salespeople and a receptionist.

Q. Okay. And do you also engage in selling mobile homes?

A. Oh, yes, very definitely.

Q. Do you have any other type of employment or other type, without getting too specific, any other type of income?

A. Oh, sure, very definitely.

Q. What else do you do that relates to mobile homes?

A. Okay. You know, I'm in the note business. I buy and sell mobile homes. I finance them for people. I generally buy land and put homes on them, and then note them out to people.

Q. And when you say "note them out," do you carry the mortgage?

A. Yes, I do. I carry the mortgage.

Q. You finance the property?

A. That is correct.

Q. How long have you been doing that type of thing?

A. Since 1985.

Q. Okay. Let me ask you, are you familiar with

Lieanna Wilkerson?

A. I am.

Q. Do you actually hold her mortgage? Do you finance her property?

A. I do.

Q. Are you familiar with the area in which she lives?

A. Yes, I am.

Q. And you're familiar, then, that there are many different mobile homes there and kind of in her neighborhood?

A. Yes, there's 36 lots in the Crestview Addition.

Q. And it's the Crestview Addition.

A. That is correct.

Q. That Crestview Addition is located here in Smith County, Texas?

A. That is correct.

Q. Do you have -- do you do financing for other lots and mobile homes there in that Crestview Addition?

A. Oh, yes, very definitely.

Q. So you're familiar with that area?

A. Oh, yes.

Q. Do you, through that, have personal dealings with, for instance, Lieanna Wilkerson?

A. Yes.

Q. Did you ever have -- did you know Carolyn Click?

A. Yes.

Q. Did you finance her lot and mobile home, or did she hold that through someone else?

A. No, I didn't. It had to be through someone else if it was financed. I have no personal knowledge.

Q. You were not involved in the financing of that?

A. No, I personally was not involved.

Q. I'm sorry. I'm going to slow down.

In dealing with Lieanna Wilkerson --

A. Yes.

Q. -- would you have occasion to go out to her property to get money for the, I guess, mortgage payment?

A. Yes, I'm -- I've gone, you know, out to the property not only to, you know, collect payments, but also just to step in and see, you know, how -- how she's doing.

Q. You actually have more of a personal relationship with Ms. Wilkerson?

A. Yes, I do, and it's through several different ways. She is also a weekend receptionist for me at Tandem Mobile Homes and has been for some time. And, of course, I've known her for, gosh, I guess eight or nine years now.

Q. You've known about her medical problems?

A. Oh, yes, very definitely. Uh-huh.

Q. Let me ask you this: Through knowing Ms. Wilkerson, did you at some point come to meet an

individual by the name of Tracy Beatty?

A. Yes, I did.

Q. The individual that you met, that you know as Tracy Beatty, do you see that individual in the courtroom today?

A. Yes, I do.

Q. Would you point to him and describe something he's wearing?

A. Okay. He's just to the right of the attorney here with the, I guess, you would call red hair.

Q. I certainly would.

A. Is that fair?

Q. It is.

MR. HARRISON: Your Honor, could the record reflect that the witness has pointed to the defendant?

THE COURT: It will. The record so reflect that the witness has identified the defendant.

And that was a good description, Mr. Wilcox. Thank you.

Q. (By Mr. Harrison) Mr. Wilcox, did -- when did you meet Tracy Beatty?

A. You know, I want to say it was approximately around, you know, December 10th, somewhere in that neighborhood.

Q. Okay. At that time, did you know his last name or

just know him as Tracy?

A. No, I think they called him Trey as opposed to Tracy. But, no, I did know his last name. Yes.

Q. Did you talk with him about employment or working for you?

A. Well, how it came up, Lieanna mentioned to me that he needed -- and he was there that evening, and he mentioned that, you know, that he needed to make, you know, some money and --

Q. So did he actually come to you or talk with you first about working for you?

A. No. Lieanna brought it up to me, you know, in front of him, and, of course, I guess it was kind of a mutual, three-way conversation at that point.

Q. Okay. Through that, did you agree to and allow Tracy Beatty to do some work for you?

A. Yes, I did.

Q. So that would have been sometime after -- I guess the actual work would have been sometime after December 10th?

A. That is correct.

Q. All right. Now, what type of work did you have him do for you?

A. Well, it was just an odd job-type of thing. I had several lots there in the Crestview Addition that needed

cleaning up, and so, consequently, I did ask him to, you know, to do that.

Q. Okay. So that was the type of work you were going to have him do?

A. Yes.

Q. What kind of vehicle did he use, if any, to do that?

A. I let him use my pickup truck.

Q. Okay. Prior to December 10th, you had never met Tracy Beatty?

A. No, I had not.

Q. So I assume, then, prior to December 10th, he had never used any of your vehicles.

A. No.

Q. Did you ask or did Tracy Beatty ever tell you anything about Carolyn Click, his mother?

A. Not specifically, you know, that I recall. You know, I knew his -- that was her son.

Q. You knew Ms. Click?

A. Oh, very definitely. I've known Ms. Click ever since she moved to the Crestview Addition.

Q. When you were out there December 10th and started talking with Lieanna Wilkerson and Tracy Beatty, was Ms. Click there?

A. No.

Q. Did you ask where she was or how she was doing or anything about her welfare?

A. No. There was a conversation came up somewhere along the line that -- that she was out of town and was with a truck driver somewhere travelling the roads. That's all I knew.

Q. Out of town with some trucker out on the road?

A. That's right.

Q. And that came from Tracy Beatty.

A. You know, I don't know whether that came from Tracy or Lieanna, you know, or how it all came up in the conversation, but that's what I was aware of, yes.

Q. Now, you said that that you had offered Tracy Beatty work.

A. Uh-huh. Yes.

Q. About how many days did he work for you?

A. You know, probably four or five days maybe at most. You know, it -- it was, you know, within kind of a week span there.

Q. It wasn't every day?

A. Oh, no. No. There was a couple of days in there that he didn't work.

Q. Okay. And from when you met him around December 10th --

A. Yes, sir.

Q. -- through, let's say, December 18th --

A. Right.

Q. -- how many times do you think he worked for you? How many days did he work for you?

A. I would say probably four, four to five max.

Q. Was -- did you give Tracy Beatty permission to do anything else with your truck, other than use it specifically for work purposes?

A. Absolutely not.

Q. And did you tell him specifically that he could use your truck for work purposes and for those purposes only?

A. Yes, that is correct.

Q. Now, you said that he worked for you four days, five at the most?

A. That is correct.

Q. How much would you estimate that you paid Mr. Beatty?

A. Well, you know, I want to say it was less than $200. I'm going to say about 150 is about, you know, what my recollection is.

Q. Okay. And that's in total for all the work he did for you those four or five days?

A. Yes.

Q. So if Tracy Beatty was wondering around on

November 27th of 2003 with a big wad of money, a big wad of cash, that cash didn't come from you?

A. Definitely not.

Q. You didn't know Tracy Beatty until December 10th, 2003?

A. That is correct.

Q. The truck that you allowed him to use for work purposes, do you remember what truck that was, what it looked like?

A. Yes, sir. That's kind of red/cream 1986 Ford F-350 dually.

Q. The cleanup, I guess, in these lots that you were having him do for you, was that the Crestview Addition?

A. Yes. I was trying to think back. It seems like to me that he did go to the mobile home park down in -- my mobile home park down in Troup and maybe hauled a couple of loads out of there. But, basically, it was, you know, there in the Crestview Addition is what I was interested in taking care of.

Q. Okay. So the Crestview Addition and then possibly a couple of trips to Troup?

A. Right. That's correct.

Q. And those would have been work-related?

A. Oh, yes, very definitely.

Q. Just specifically, were you very clear with

Mr. Beatty that that was the only purpose, work was the only purpose he was to drive your truck?

A. Very definitely.

Q. Now, did you ever have, I guess, sometime between December 10th, 2003, when you met him --

A. Uh-huh.

Q. -- until December 18th of 2003, was that about the last time he had done any work for you on December 18th?

A. Yes.

Q. Okay. Between those times, that window from December 10th until December 18th, did you ever personally interact with Tracy Beatty?

A. Oh, I interacted with him, you know, on several times. He came by my office out there at Tandem Mobile Homes several times. I saw him down in the Crestview Addition. I also saw him over at Lieanna's house again. So, you know, yeah, I saw him several times.

Q. And I guess part of the time would be to give him payment occasionally?

A. Right.

Q. Do you pay him by the day, I guess?

A. Basically, yes.

Q. Or by the job?

A. Right.

Q. Okay. And at any of those times, was the -- was Tracy Beatty drinking?

A. Well, let me put it this way. At one point, he did have some alcohol smell on his breath, but --

Q. So out of the four or five times he worked for you, the one time you did smell alcohol?

A. Right. I did.

Q. Did he appear to be intoxicated, or did you just smell it?

A. Right. I just smelled it.

Q. At that time, did you ever notice whether he had alcohol with him or in his truck, or did you simply just smell it?

A. No, I don't believe I ever saw alcohol in the truck during that period of time.

MR. HARRISON: May I have just one moment, Judge?

THE COURT: Yes.

Q. (By Mr. Harrison) Mr. Wilcox, thank you very much.

MR. HARRISON: I'll pass the witness.

THE WITNESS: Okay. Thank you.

CROSS-EXAMINATION

BY MR. PERKINS:

Q. Hi, Mr. Wilcox, how are you?

A. How are you, sir?

Q. I'm hungry. My stomach is about 30 minutes fast today.

A. I hear you.

Q. My name is Robert Perkins. I never had a chance to visit before.

A. That's correct.

Q. I don't expect that we're going to have a chance to visit long this time.

If I understand what you're saying, you kind of informally hired Tracy Beatty to work for you around December 10th?

A. That's correct.

Q. Gave him permission --

A. Right.

Q. -- at the time that you needed him to use your truck?

A. Yes.

Q. '86 Ford F-350, four-door dually maroon in color?

A. That's correct.

Q. Cream-striped?

A. There you go.

Q. He worked for you four or five times, five being the maximum. Did some work at Crestview Addition. Did some work, you think, down at what's called Wildwood?

A. You know, he did -- you know, now that you bring that up, he did go to the Wildwood Addition for me. That was down on Knotty Pine. I've got a mobile home down there, too, that I was getting ready to finance for some people, and he did. He went down there and cleaned the yard up and cleaned the interior of the house out. Sure did. Come to think about it, he did.

Q. All right. And then might have done some -- and I don't know where all these different ones are, and you know a lot more about it than me, because their yours. And then maybe he did some -- what's the name of the place in Troup?

A. It's the City of Troup, and it's my mobile home park down there. It's a small mobile home park. It's a ten-space mobile home park there.

Q. Okay. Your relationship with Mr. Beatty terminated on December the 18th?

A. That's correct.

Q. He was supposed to do work for you that day?

A. Okay. I don't know whether -- about the 18th or 18th or 19th, but, yes, it terminated.

Q. On that day?

A. Yes, sir, it sure did.

Q. He was supposed to do something?

A. Yes, that's --

Q. Didn't do it?

A. And didn't do it. That's correct.

Q. And since you had given him permission to be in your truck for business purposes, when you hadn't heard from him that night, then you went down and filed on him, filed a statement with the police?

A. Well, that's part of the story.

Q. And that was for unauthorized use of your motor vehicle; is that right?

A. That's correct.

Q. And that's certainly understandable. I don't have any other questions of you.

A. Okay.

MR. PERKINS: Thank you.

THE COURT: Mr. Harrison?

REDIRECT EXAMINATION

BY MR. HARRISON:

Q. Well, Mr. Wilcox, what's the rest of the story?

A. The rest of the story?

Q. Yeah. Mr. Perkins asked you about he was supposed to do work for you.

A. Sure.

Q. He didn't, so you had to file on him because he had taken your car?

A. That's correct.

Q. Past the consent that you had given him?

A. That's correct.

Q. You said that's part of the story.

A. That's part of the story. That's correct.

Q. What's the rest of the story?

A. Well, the rest of the story is that on that evening you know -- and I don't know -- you know, the date, specific date. But let me just take the day he had -- he had called me and said that the -- you know, these F-350 Ford trucks have a actual gas tank on them. He said both tanks were getting down. One was dry, and the other one was getting dry, and would I help him get some gas, and I said sure, come on up to Tandem Mobile Homes and then you can follow me around to Sam's. And he did that, and we went to Sam's.

And as we're filling up the tanks and we filled them up, you know, full, you know, we discussed that he would be taking the truck back down to the Crestview Addition and that tomorrow morning he would be getting up, you know, bright and early to work on Lot Number -- let's see that would be Lot Number 7 down there in cleaning up the, you know, backyard.

And at that point, you know, we just had a -- you know, just a conversation there, and that was it. And he left in the truck. And for my purposes, he was going back to the Crestview Addition to park the truck in order to

get ready to work the next day.

Q. And is it fair to say the next day you heard about where your truck was that it was in Dallas?

A. That is correct.

Q. And Tracy Beatty was in Dallas with it?

A. That's what the -- that's what the Dallas police officers had indicated to the Sheriff's Department, which relayed that information to me.

Q. Okay. Were there --

MR. HARRISON: May I have just a moment, Judge?

Q. (By Mr. Harrison) When you were notified that Tracy Beatty and your truck were in Dallas --

A. Yes.

Q. -- that's not ultimately where your truck was recovered, was it?

A. No, definitely not.

Q. Where was your truck actually ultimately recovered?

A. In Malakoff.

Q. And was the defendant in it?

A. Yes.

Q. Okay. Was he intoxicated at the time?

A. I do not know that. I will say this. When I picked the truck up, there was beer in the truck. That's

all I know.

Q. Mr. Wilcox, thank you.

MR. HARRISON: I'll pass the witness.

THE WITNESS: Not a problem.

MR. PERKINS: I don't have any questions of you. Thank you, sir.

THE COURT: Counsel, do you want Mr. Wilcox subject to re-call?

MR. HARRISON: Yes, sir.

THE COURT: Mr. Wilcox, you're going to be, like, subject to re-call, meaning that in the event the State or Defense needs to re-call you as a witness, they'll get in touch with you and let you know. So you'll still be under the Rule of Witnesses, meaning do not discuss your testimony with any other person.

THE WITNESS: Okay.

THE COURT: And I'm sure the District Attorney's Office has a number for you. If not, be sure they know where to reach you.

THE WITNESS: Okay. Thank you very much, Your Honor.

THE COURT: Thank you very much, Mr. Wilcox.

(The witness leaves the courtroom.)

THE COURT: Who will you have next, Mr. Harrison?

MR. HARRISON: Judge, we're going to call Renee Loomis.

THE COURT: Who?

MR. HARRISON: Renee Loomis.

THE COURT: Renee Loomis.

MR. PERKINS: Judge, we probably need to approach just real quick on Ms. Loomis.

(At the bench, on the record.)

MR. PERKINS: I'm thinking, in an abundance of caution, the Court should consider appointing her attorney before she starts testifying. I believe if she testifies truthfully, she's going to implicate herself on credit card abuse and debit card abuse and possibly being a party to some other matters.

She should probably -- they're shaking their head no, and I don't care. She's not mine to watch after. I think I do have an ethical duty to tell the Court that I think that if she testifies truthfully, that she's going to need an attorney.

THE COURT: Is she going to say to your knowledge -- based on your understanding of what her testimony will be, is she going to testify to anything that would implicate her, make her a party during the commission to any offense or either as the primary actor as a party?

MR. PERKINS: Judge, one other thing that I

would like to bring up, in Mr. Bingham's opening statement, he referred to her as a drug addict, so I'm just telling the Court what I know from reading the discovery and listening to the --

THE COURT: Are you going to ask her about the use of drugs?

MR. BINGHAM: Yeah. She's already debriefed with us numerous times. But the thing is, I can't prosecute her for that. I don't have the drugs. It's pretty clear in the case law to prosecute someone for narcotics, I actually have to have the narcotics, which I don't have.

Additionally -- so I can't prosecute her for that. She has no charges pending here or anywhere else.

Additionally, as far as based on her testimony, any statement she makes about -- the use of cards are not a crime because this defendant told -- based on what this defendant told her, she was not using the cards illegally. Her belief was that they were being used with his permission. So I don't see how she would have any criminal exposure.

If the Court wants to appoint her an attorney and break for lunch, whatever, that's fine with me, but I don't see how she would have any criminal exposure.

THE COURT: Of course, my concern would be -- I'm taking in what you're saying. I couldn't remember from

your opening statement -- that if she's going to testify -- didn't this witness go and make a purchase on the stolen credit card?

MR. BINGHAM: This witness went to Pulse machines with the defendant and put on an ATM card, based on this defendant telling him -- telling her that she could do that.

THE COURT: Was that, like, Carolyn Click's credit card?

MR. BINGHAM: Right. It's the one that came in the mail after she was deceased.

THE COURT: Well, her testimony, obviously, from what you just said, is going to be that the defendant told her that he had the permission to have the card.

MR. BINGHAM: Right. And she always thought what she was doing was with the permission of the defendant.

THE COURT: Okay. I see -- well, I am going to go ahead and recess and get an attorney.

MR. BINGHAM: That's fine.

THE COURT: The only reason I'm going to is because -- I mean, basically, the fact is that she's going to be testifying about using a stolen credit card, saying that, you know, "He told me it was okay."

But on the side of -- I understand your explanation, but on the side of caution --

MR. BINGHAM: I don't have any problem.

THE COURT: Let me see if we can find one of the contract attorneys to visit with her.

MR. PERKINS: And if I had known they were going to call her, I would have brought it to the Court's attention before now. Obviously, I don't have any control over the --

THE COURT: Well, would you just keep her up in your office?

MR. BINGHAM: And then also --

THE COURT: Her attorney may want some type of letter from you in terms of her testifying about drug use.

MR. BINGHAM: The other thing -- that's fine.

The other thing is, I know Mr. Perkins is very -- it's statements like "the Cowboys beat the Redskins, I'm hungry, too." It's those side-bar comments -- and I know Mr. Perkins is not doing it for those reasons. Those are the side-bar comments we don't want to object to that are not proper, and we've not engaged in that. But it's consistent with the Defense.

MR. PERKINS: I'll try --

THE COURT: Try not to do that. I understand you're -- that you don't mean anything but try not to do that, too.

(End of bench conference.)

THE COURT: All right. Ladies and Gentlemen of the Jury, we're going to go ahead and recess early for our noon break that has become necessary. We'll go ahead and recess. It's a quarter till 12:00 time. We'll be in recess until a quarter till 1:00. We'll just take our noon recess now.

All rise for the jury.

(The jury leaves the courtroom.)

(Open court, defendant present, no jury.)

THE COURT: We'll be in recess then. If you will keep the witness, Mr. Conine (sic), in your office -- Mr. Bingham, if you will keep the witness in your office. I'm going to see if I can reach -- I'll reach Mr. Conine, Mr. Davidson, or Mr. Roberson.

MR. PERKINS: Judge, Mr. Davidson is representing the defendant on the contempt matter.

THE COURT: I'll recess -- oh, in his defense, Mr. Perkins, just not too long ago, he was sitting out in the courtroom.

(Lunch recess.)

(Proceedings continued in Volume 40.)

STATE OF TEXAS *

COUNTY OF SMITH *

We, STEVE R. AWBREY, CSR, Official Court Reporter, and KIM CHRISTOPHER, CSR, RPR, Deputy Official Court Reporter, for the 241st Judicial District Court in Smith County, Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all of the proceedings in the foregoing styled and numbered cause, all of which occurred in open court or in chambers and were reported by us.

We further certify that this transcription of the record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

Witness our hand this the 19 day of May, 2005.

KIM CHRISTOPHER, CSR, RPR
Texas CSR Number 4219
Expiration date: 12-31-06
Deputy Official Reporter
241st Judicial District Court
Smith County, Texas
100 North Broadway, Room 304
Tyler, Texas 75702
Telephone: (903) 535-0575

STEVE R. AWBREY, CSR
Texas CSR Number 3940
Expiration date: 12-31-05
Deputy Official Reporter
241st Judicial District Court
Smith County, Texas
100 North Broadway, Room 221
Tyler, Texas 75702
Telephone: (903) 535-0603